# Exhibit F

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

BRENT E. HILLIARD, an          )

individual,                    )

             Plaintiff, )

vs.                            ) Case No. 1:18-cv-00550-CWD

TWIN FALLS COUNTY              )

SHERIFF'S OFFICE, a            )

Public Entity, TWIN FALLS      )

COUNTY, a Public               )

Corporation,                   )

           Defendants.)

_____)

VIDEOTAPED DEPOSITION OF SHERIFF TOM CARTER

MARCH 12, 2020

REPORTED BY:

GRETCHEN SISK, CSR NO. 1125, RPR

NOTARY PUBLIC

Page 2

```
 1          THE VIDEOTAPED DEPOSITION OF SHERIFF TOM
 2   CARTER was taken on behalf of the Plaintiff at the
 3   offices of Hepworth Law Offices, 161 5th Avenue
 4   South, Twin Falls, Idaho, commencing at 9:05 a.m. On
 5   March 12, 2020, before Gretchen Sisk, Certified
 6   Shorthand Reporter and Notary Public within and for
 7   the State of Idaho, in the above-entitled matter.
 8                    APPEARANCES:
 9    For the Plaintiff:
10       HEPWORTH LAW OFFICES
11       BY:  MR. JEFFREY J. HEPWORTH
12            MR. J. GRADY HEPWORTH
13       2229 W. State Street
14       Boise, Idaho 83702
15       jhepworth@idalawyer.com
16       ghepworth@idalawyer.com
17    For the Defendant:
18       IDAHO EMPLOYMENT LAWYERS, PLLC
19       BY:  MS. PAMELA S. HOWLAND
20       1116 S. Vista Avenue, #474
21       Boise, Idaho 83705
22       phowland@idemploymentlawyers.com
23
24    ALSO PRESENT:  Brent Hilliard
25               Al Herrin, Videographer
```

Page 3

```
 1              I N D E X
 2   TESTIMONY OF SHERIFF TOM CARTER:         PAGE
 3   Examination by Mr. Jeffrey Hepworth...............6
 4
 5            E X H I B I T S
 6   Exhibit 36 - Letter dated 10/10/96...............42
 7
 8   Exhibit 37 - Training Record.....................42
 9   Exhibit 38 - Twin Falls County Employee Status
10              Report 11/21/01 ....................42
11   Exhibit 39 - Twin Falls County Sheriff's Office
12              Warning/Reprimand Note 1/11/06......42
13   Exhibit 40 - Twin Falls County Sheriff's Office
14              Law Enforcement Services Document...42
15   Exhibit 41 - Report of Psychological Evaluation..42
16   Exhibit 42 - Twin Falls County Employee Status
17              Report 7/17/07......................42
18   Exhibit 43 - St. Luke's Lab Report 11/15/07......42
19   Exhibit 44 - Twin Falls County Sheriff's Office
20              Notice of Suspension 11/28/08.......42
21   Exhibit 45 - Twin Falls County Sheriff's Office
22              Notice of Removal of Administrative
23              Suspension 1/12/09 .................42
24   Exhibit 46 - Twin Falls County Employee Status
25              Report 2/12/09......................42
```

Page 4

```
 1          E X H I B I T S (Continued)
 2   Exhibit 47 - Twin Falls County Sheriff's Office
 3              Employee Performance Evaluation
 4              6/1/09..............................42
 5   Exhibit 48 - Twin Falls County Employee Status
 6              Report 12/20/10.....................42
 7   Exhibit 49 - Statement 6/23/11...................42
 8   Exhibit 50 - Statement 6/24/11...................42
 9   Exhibit 51 - Twin Falls County Human Resources
10              Department letter 12/14/11..........42
11   Exhibit 52 - Twin Falls County Employee Status
12              Report 7/31/13......................42
13   Exhibit 53 - Twin Falls County Employee Status
14              Report 8/28/13......................42
15   Exhibit 54 - Twin Falls County Employee Status
16              Report 8/28/14......................42
17   Exhibit 55 - Drug Test Report 2/2015.............42
18   Exhibit 56 - Twin Falls County Employee Status
19              Report 8/26/15......................42
20   Exhibit 57 - Drug Test Report 5/2016.............42
21   Exhibit 58 - Twin Falls County Employee Status
22              Report 9/1/16.......................42
23   Exhibit 59 - St. Luke's Medical Record 6/7/17....94
24
25
```

08:54:15-09:06:07                                                Page 5

```
 1                 PROCEEDINGS
 2
 3       VIDEOGRAPHER: We're on the record.  This is
 4   the beginning of video deposition of Sheriff Tom
 5   Carter.  Today's date is March 12th, 2020.  The time
 6   is 9:05 a.m.  This is the matter of Hilliard versus
 7   Twin Falls County Sheriff's Office, et al, in the
 8   United States District Court for the District of
 9   Idaho, Case Number 1:18-cv-00550-CWD.  The deposition
10   is being taken on behalf of the Plaintiff.  We're at
11   the Hepworth Law Offices in Twin Falls, Idaho.
12       The deposition is being reported and
13   videotaped by M&M Court Reporting, which is out of
14   Boise, Idaho.  The court reporter is Gretchen Sisk.
15   I'm Al Herrin, the videographer, H-E-R-R-I-N.  The
16   counsel will introduce themselves.
17       MR. JEFFREY HEPWORTH: My name is Jeff
18   Hepworth.  I represent Brent Hilliard.  And my
19   client, Brent Hilliard, is at the end of the table.
20       MR. J. GRADY HEPWORTH: And Grady Hepworth,
21   on behalf of Brent Hilliard.
22       MS. HOWLAND: Pam Howland, here on behalf of
23   the Defendant.
24       VIDEOGRAPHER: Please swear in the witness.
25
```

1              SHERIFF TOM CARTER,
2  first duly sworn to tell the truth relating to said
3  cause, testified as follows:

5         MR. JEFFREY HEPWORTH:  Let the record
6  reflect that this is the deposition of Sheriff Tom
7  Carter, taken pursuant to the notice of the Idaho --
8  excuse me -- the Federal Rules of Civil Procedure.

10              EXAMINATION
11 BY MR. JEFFREY HEPWORTH:
12    Q.  Sheriff Carter, you've had your deposition
13 taken how many times?
14     A.  This will be three, I believe.
15    Q.  Okay.  And I did one of those depositions --
16     A.  Yes.
17    Q.  -- a couple of years ago.  So I know you
18 know the process.  Let me, kind of, go through the
19 ground rules again just to make sure the process goes
20 a little more smoothly.
21        Obviously, I'm going to ask you questions.
22 I'll start asking about your background, to some
23 extent, and then talk about your involvement in Brent
24 Hilliard's suspension and ultimate termination in
25 2017.  If there's a question that I ask that doesn't

1  make sense, just tell me.  Sometimes I ask bad
2  questions and they're not understandable and I'll
3  rephrase it.  It's important that we communicate,
4  okay?
5      A.  Yes, sir.
6     Q.  I notice from reviewing your deposition that
7  I took last time, you have a tendency to start to
8  answer before I'm finished asking my question.  So
9  you just have to be patient.  Let me finish my
10 question before you start to answer so that the
11 transcript is clear, okay?
12     A.  Yes, sir.
13    Q.  And thirdly, it's important to answer
14 audibly, with a yes or a no, rather than a nod or a
15 shake of the head, or an uh-huh or uh-uh, even though
16 we have a video recording and we can see if you nod
17 or shake your head.  So it's still better if we have
18 a written transcript that's clear, okay?
19     A.  Yes, sir.
20    Q.  Thank you.  Let me just, kind of, go into
21 your background, like I said.  You grew up in Filer,
22 correct?
23     A.  Yes.
24    Q.  And went to Filer High School?
25     A.  Yes, sir.

1     Q.  Did you graduate from Filer High School?
2      A.  I did.
3     Q.  What year?
4      A.  1969.
5     Q.  Okay.  And then if I remember right, you
6  worked for a period of time, and then went into the
7  Marine Corps; is that correct?
8      A.  That is correct.
9     Q.  When you went into the Marine Corps, what
10 year was that?
11     A.  January 26th, 1970.
12    Q.  Okay.  And what type of work did you do in
13 the Marine Corps?
14     A.  It was referred to at the time as a grunt.
15 It was a rifleman.
16    Q.  Okay.
17     A.  The -- I think 0311's, I think's what...
18    Q.  Did you receive any law enforcement training
19 in the military?
20     A.  I did not.  Well, the last six months I was
21 in the law -- in the Marine Corps, they had this --
22 the government had a program called, Project
23 Transition.  It was -- it was about guys like me, who
24 had no intentions of making a career out of the
25 Marine Corps, and there was different, I guess,

1  schools you could attend.  And what they was trying
2  to do was transition you back into civilian life.  I
3  went to a police academy that was sponsored by San
4  Diego.
5     Q.  And you did that while you were in the
6  Marines?
7      A.  That was prior to getting out of the
8  Marines, yes.
9     Q.  All right.
10     A.  But --
11    Q.  And the idea was to allow you a transition
12 back to civilian life?
13     A.  That is correct.
14    Q.  Okay.  And at the -- you made the comment
15 that you had no intention of going into law
16 enforcement at the time you took that training?
17     A.  No, I made the statement that I had no
18 intention of making a career out of the Marine Corps.
19    Q.  Oh, okay.  I misunderstood.  So did you have
20 an interest in going into law enforcement at the end
21 of your military career?
22     A.  I did not.
23    Q.  Okay.
24     A.  I -- I was kind of fed up with
25 regimentation, so to speak, and I -- it was a good

09:10:03-09:11:19                                    Page 10

1  school and I -- I'd done all right in it, but I
2  really hadn't planned on using it.
3      Q. Okay. What did you do after the Marine
4  Corps?
5      A. I was an ironworker.
6      Q. How -- for how long?
7      A. Probably until 1979.
8      Q. Where at?
9      A. San Francisco area and Twin -- Idaho.
10     Q. Okay.
11     A. I was a -- I had what they called a permit
12  to get out of the union shop.
13     Q. Okay. When did you -- what did you do after
14  1979?
15     A. I went to work for the City of Twin Falls.
16     Q. Okay. My memory from your prior deposition
17  is that you did a stint working in Colorado for a
18  family business?
19     A. That is correct.
20     Q. When was that?
21     A. '81 and '82, or '82 and '83.
22     Q. Okay. And then you had a stint farming?
23     A. Shortly. My -- my father farmed over in
24  Filer, and he was getting up in years and needed
25  help, and so I helped him.

09:11:20-09:12:27                                    Page 11

1      Q. What years were those?
2      A. Good Lord. That would have been -- that
3  would have been probably '90, '91.
4      Q. And you did a little bit of a -- the
5  construction work that you did was -- was that part
6  of the ironworker?
7      A. That is correct.
8      Q. And you did some construction work in
9  Idaho --
10     A. Yes.
11     Q. -- I assume it wasn't ironwork, though?
12     A. It was.
13     Q. It was?
14     A. Yes.
15     Q. Where at?
16     A. I was either built or was involved in most
17  of the -- those big over-the-ground potato cellars
18  you see across the state.
19     Q. Okay. All right. When did you decide that
20  law enforcement was your career?
21     A. Probably at some point when it was snowing
22  like crazy and the wind was blowing a hundred mile an
23  hour and I was up on some iron some where, freezing.
24     Q. Okay. Do you remember what year that was?
25     A. It would have been -- well, it would have

09:12:28-09:13:32                                    Page 12

1  been in '78 or '79 because I went to work -- I tested
2  for the City of Twin Falls and was hired as a
3  dispatcher.
4      Q. Okay. And then how long were you at the
5  City of Twin Falls?
6      A. Six years total.
7      Q. Okay. And you worked in dispatch. What
8  other areas?
9      A. Patrol.
10     Q. Mostly patrol?
11     A. I was in dispatch for, I think it was
12  October of '79 and I went to POST in April of 1981.
13     Q. Okay.
14     A. So whatever that means.
15     Q. So you went through the POST program in
16  Idaho?
17     A. That is correct. And I was in the first --
18  first one they had in Boise. POST was originally in
19  Pocatello. They moved it to Boise, Session Number
20  51, I think's the one I was in, from Pocatello to
21  Boise.
22     Q. Had you received any other training from
23  POST since that initial training in 1981?
24     A. Yes. Yes, sir. I think I got, I don't
25  know, 3,000 hours probably. I -- and don't hold me

09:13:36-09:14:57                                    Page 13

1  to that. I -- a lot. It seems like a lot.
2      Q. Over the last --
3      A. Thirty years.
4      Q. Thirty years? Okay.
5          And eventually you went to work with the
6  Twin Falls County, after the City, correct?
7      A. That is correct. 1992, went to work --
8      Q. What caused you to switch from Twin Falls
9  City to Twin Falls County?
10     A. I got out of it for a year or two. And when
11  I went back in, there's a friend of mine, a guy by
12  the name of Bob Wright. I talked to him. He's the
13  jail commander, I believe, at the time, or jail
14  sergeant -- jail something. And he said, hey, why
15  don't you go to work for the Sheriff's Office? And I
16  needed a job, and that sounded like a plan, so I -- I
17  don't remember if I even tested for it or if I was
18  just hired. But I went to work for -- Jim Munn was
19  the sheriff then.
20     Q. So why did you get out of it for a year or
21  two between City and County?
22     A. I was tired of it.
23     Q. What did you do for that one or two years?
24     A. That's during the time that I helped my
25  father.

Hilliard v.
Twin Falls County Sheriff's Office

Sheriff Tom Carter
March 12, 2020

---

09:14:57-09:16:12                                    Page 14

1    Q. Okay. So didn't like farming?
2    A. I never did like farming.
3    Q. Okay. And went back into law enforcement
4  and worked at Twin Falls County?
5    A. That is correct.
6    Q. Okay. Are there more career opportunities,
7  generally, at Twin Falls County than the City? Is
8  there a reason why you chose to go with the County?
9    A. There -- no, I wouldn't say there is. You
10  know, the opportunities at the City is you go to work
11  and you stay there long enough and climb the ladder
12  far enough, you end up chief of police. The County,
13  you go to work there in the jail and you stay long
14  enough and you might end up sheriff at some point.
15    Q. Okay. So my understanding is, did you
16  initially work at the jail at Twin Falls County?
17    A. That is correct. I was in the jail for
18  about a year and half.
19    Q. And then you went into patrol?
20    A. That is correct.
21    Q. And how long did you work patrol?
22    A. I worked patrol until December 6th of 2007.
23    Q. What happened on December 6th, 2007?
24    A. 2006.
25    Q. 2006.

---

09:16:13-09:17:04                                    Page 15

1    A. Yes.
2    Q. What happened on December 6th, 2006?
3    A. I was terminated.
4    Q. By Sheriff Tousley?
5    A. That is correct.
6    Q. And my understanding is there were some
7  allegations of dishonesty on your time card?
8    A. That is correct, there was some allegations
9  of that.
10    Q. And he tried to get you decertified,
11  correct?
12    A. That is correct.
13    Q. And you were successful in resisting that
14  effort?
15    A. That is correct, sir.
16    Q. And if I remember right, that's kind of what
17  motivated you to run for sheriff against Sheriff
18  Tousley?
19    A. What he had done to me was -- the only job I
20  could get was his, so I run for sheriff.
21    Q. Well, and I was going to ask you about that.
22  In order -- do you remember what the -- when you get
23  terminated, the Sheriff has to notify POST that
24  there's been a termination, correct? That's legally
25  required?

---

09:17:04-09:18:09                                    Page 16

1    A. Yes. And it was then, too. It's still...
2    Q. And they have to inform POST of the reasons
3  for the termination?
4    A. Yes.
5    Q. It's certainly true now?
6    A. It's certainly true now. And I'm assuming,
7  sir, that it was true then, but I'm -- I don't know
8  if that was something that was mandated or if that
9  was something they just did.
10    Q. Okay. When -- when -- and you agree that
11  there were allegations of dishonesty and that was the
12  basis for the attempted decertification?
13    A. Yes.
14    Q. If there are allegations of dishonesty and
15  you're being investigated for decertification, is
16  there any way you can get a law enforcement job?
17        MS. HOWLAND: Object to the form.
18
19  BY MR. JEFFREY HEPWORTH:
20    Q. In your opinion, your experience.
21    A. If you'd ask that again, please.
22    Q. Did you try to get another law enforcement
23  job while you were being investigated for
24  decertification?
25    A. I did. And I guess the answer to the

---

09:18:11-09:19:21                                    Page 17

1  question is, yes, depending on where you want to go.
2    Q. Okay. Did you find a law enforcement job
3  during that period of time and before you were
4  elected sheriff?
5    A. I did not. I think the only application I
6  put in was in Kimberly.
7    Q. And why did you only put in one application?
8    A. Because Kimberly was the only other agency
9  that appealed to me enough to go to.
10    Q. Would it be fair to say that it wouldn't
11  have been possible for you to get a job at Twin Falls
12  County Sheriff's Office while you were being
13  investigated?
14    A. That's correct.
15    Q. And did you apply to Twin Falls City?
16    A. No, sir.
17    Q. Why not?
18    A. It would have been a futile effort. And I'd
19  worked at the City and I really didn't have any
20  interest in going back to the City.
21    Q. And the only job that you did apply for was
22  Kimberly, and they wouldn't hire you?
23    A. No. And I -- I understand that, you know.
24  I -- I was in the midst of a decertification process.
25  So, really, there really wouldn't be too many

---

Hilliard v.
Twin Falls County Sheriff's Office

Sheriff Tom Carter
March 12, 2020

---

09:19:27-09:20:32                                      Page 18

1   agencies that would hire a person that was in that
2   position.
3       Q. Okay.
4       A. And I understand that.
5       Q. And the reason why I'm asking you this is
6   there have been questions asked of Mr. Hilliard about
7   his efforts to get a job. Would you agree that it
8   would be almost impossible for him to get a job in
9   law enforcement given how his employment ended at
10  Twin Falls County Sheriff's Office?
11          MS. HOWLAND: Object to the form.
12
13  BY MR. JEFFREY HEPWORTH:
14      Q. Go ahead.
15      A. Okay. It would definitely be challenging.
16  However, you know, I would never say never, you know.
17      Q. It would be -- it would be difficult?
18      A. It would be difficult, yes, but it wouldn't
19  be insurmountable.
20      Q. And -- and you -- you would have filled out
21  the paperwork notifying POST of his termination,
22  correct?
23      A. That is incorrect, no.
24      Q. Who did that?
25      A. Chief Deputy --

---

09:20:33-09:21:52                                      Page 19

1       Q. Do you know -- do you know if -- and I'm
2   familiar with the process. There's a box you check
3   as to whether there should be reason to believe that
4   he's violated ethics or laws or something that would
5   trigger a decertification investigation, correct?
6       A. I can't answer that because I -- I haven't
7   seen that form for a very long time. That --
8   that's -- it makes sense, but I don't think it's
9   exactly like you're explaining there. The --
10  there -- I think the box is in lieu of resignation.
11  In lieu of resignation, termination, I think, is how
12  the boxes work. And now, you don't request anything.
13  You check a box and then POST determines what, if
14  anything, they want to do about.
15      Q. Were you contacted by POST to explore the
16  reasoning for Captain Hilliard's termination?
17      A. No. That would have been Chief Newman.
18      Q. Okay. So based on the answers you've given,
19  it sounds like that's a process that Chief Newman
20  handles and you don't -- you're not involved in that
21  process?
22      A. That is correct.
23      Q. Okay.
24      A. Ninety-nine percent of personnel issues are
25  handled through the Chief Deputy.

---

09:21:54-09:23:30                                      Page 20

1       Q. Okay. So you were cleared in the POST
2   investigation and you were not decertified, correct?
3       A. That is correct.
4       Q. And you ran for -- promptly ran for sheriff
5   against Sheriff Tousley?
6       A. No, sir. I was running for sheriff during
7   that process.
8       Q. Okay. All right. So what -- and that was
9   2006?
10      A. 2007 and '8.
11      Q. When were you elected?
12      A. I was elected November of 2008. I took
13  office January of 2009.
14      Q. After you were elected sheriff, was there a
15  bit of a shake up in the command structure at Twin
16  Falls County Sheriff's Office? Obviously, we got a
17  new sheriff.
18      A. We also got -- we got a new sheriff and we
19  got a new chief deputy. We got a new lieutenant.
20      Q. Was there -- were there any new captains?
21      A. You know, I -- I -- Captain Hughes was a
22  captain. And I believe -- and to be honest with you,
23  I don't know, and I probably should, if Captain
24  Newman -- or if Don was a captain then or if I made
25  him a captain. I -- I don't remember.

---

09:23:32-09:24:47                                      Page 21

1       Q. Just having a hard time remembering?
2       A. Yes.
3       Q. Okay. That's fine.
4          Why don't we switch gears a little bit and
5   go into Captain Hilliard's career. And I think if we
6   go through these records, dates are going to become a
7   little more obvious and apparent. They're
8   documented. Okay?
9          Did you know Captain Hilliard in 1996, when
10  he first applied to be an officer at Twin Falls
11  County Sheriff?
12      A. I knew Brent when he worked in Buhl, which
13  was prior to that.
14      Q. Okay.
15      A. We were both patrolmen. Any deputy is
16  familiar with all patrolmen in Buhl, Filer. And I
17  think, at the time, Kimberly and Hansen had their own
18  agency, so...
19      Q. How long have you known Brent? Over 20
20  years, obviously.
21      A. Oh, yeah. Let's go with '95.
22      Q. Okay. So --
23      A. That's a round number.
24      Q. -- about 25 years?
25      A. Yeah.

---

09:24:48-09:25:41                                                    Page 22

1    Q. How well have you known him?
2    A. How well have I known him?
3    Q. Yeah.
4    A. Brent was always considered a hell of a good
5    friend of mine.
6    Q. Okay.
7    A. So if you're asking, Brent and I socialized
8    some throughout the years. He's -- he tried to teach
9    me how to play golf. Not a lot of luck. We played
10   golf a few times. Brent and I had a friendship other
11   than the office.
12   Q. Okay. And what was your opinion of him
13   professionally?
14   A. I had no problems with Brent professionally.
15   Q. Okay. Is that how you felt, you had no
16   problems?
17       MS. HOWLAND: Object to the form.
18
19   BY MR. JEFFREY HEPWORTH:
20   Q. I'm curious. Did you respect him?
21   A. Yes, sir.
22   Q. Did you think he was a good law enforcement
23   officer?
24       MS. HOWLAND: Object to the form.
25

09:25:41-09:27:02                                                    Page 23

1    BY MR. JEFFREY HEPWORTH:
2    Q. What was your opinion of his professional
3    abilities?
4    A. Brent done a good job in Buhl, that I know
5    of. I certainly never had any reason to think that
6    he didn't. And I believe when Brent went to work for
7    the Sheriff's Office, he came on as a school resource
8    officer.
9    Q. Was that an important area of law
10   enforcement to you?
11   A. Yes, sir. I -- yes, that would be -- any
12   time you're protecting children, it's important, you
13   know. And school resource, I think it was -- that
14   was a brand new position in the County in the
15   Sheriff's Office, and that would have been '96.
16   Q. Okay. Back when you were sheriff and Brent
17   was still at Twin Falls County Sheriff's Office,
18   correct? Do you remember what his rank was when you
19   became sheriff?
20   A. Yes. He was a lieutenant.
21   Q. All right. So --
22   A. He -- he became a lieutenant for -- under
23   me.
24   Q. So you promoted him to lieutenant?
25   A. That is correct.

09:27:04-09:28:07                                                    Page 24

1    Q. So what was he when you started, do you
2    remember?
3    A. He was -- Tousley had some really funky rank
4    structures. I believe Brent was a staff sergeant and
5    then was -- became -- I don't remember what we called
6    it. Like -- Sheriff Tousley had some pretty funky
7    stuff, and I don't remember what it was officially
8    called. We called it a senior toilet seat, is what
9    we called it, but...
10   Q. Let's go back to you. So when you started
11   at Twin Falls County, you started in the jail and you
12   were a jail deputy?
13   A. Yes, sir.
14   Q. And then you went to patrol and you were a
15   patrol deputy?
16   A. Yes, sir.
17   Q. How high -- what was your highest rank at
18   Twin Falls County?
19   A. Sergeant.
20   Q. Okay. So you -- you made it to sergeant
21   before you were terminated?
22   A. I was a sergeant when I was terminated.
23   Q. Okay. And at the time, were there
24   sergeants, and then the next rank above that would be
25   a staff sergeant, and then was there also an

09:28:10-09:29:11                                                    Page 25

1    administrative rank?
2    A. Yes, there was a sergeant -- in fact, I
3    believe Brent was a staff sergeant.
4    Q. Okay.
5    A. At some point. Yeah, I know he's a staff
6    sergeant.
7    Q. So --
8    A. He -- that was during the time I wasn't
9    there.
10   Q. Okay. So --
11   A. And I don't remember if he was a staff
12   sergeant prior to my leaving or not.
13   Q. So you jumped a number of ranks. You went
14   from the first level sergeant to sheriff, correct?
15   A. That is correct.
16   Q. And you skipped about -- well, you sipped
17   staff sergeant, you skipped lieutenant, you skipped
18   captain, you skipped chief deputy, and you made it to
19   sheriff, all in one move?
20   A. In one fell swoop, yes.
21   Q. As the result of an election, correct?
22   A. As a result of being the elected official.
23   Q. And how many times have you been re-elected?
24   A. I've been there 11 years as sheriff, so I'm
25   on my last year of my third term.

09:29:14-09:30:06                              Page 26

1    Q. You must be over 70?
2    A. No.
3    Q. How old are you?
4    A. I'll be 70 in June.
5    Q. Seventy in June. And you were up for
6  re-election?
7    A. That is correct.
8    Q. How important is your job to you?
9    A. I like my job.
10   Q. Is -- is it important?
11   A. Yes, sir.
12   Q. Is -- is it because of the money? Is that
13 part of it?
14   A. No. Well, clearly it's a -- it's a good
15 job. But no, if you're in it for the money, you'd be
16 a chief of police at the City, you know, or you'd be
17 an attorney or...
18   Q. Okay. So what is it about law
19 enforcement -- you have a good retirement at Twin
20 Falls County, right? They have a good benefit
21 program?
22   A. They do now.
23   Q. Okay.
24   A. Twin Falls, since I've been in office, we
25 managed the State retirement, which is PERSI, which

09:30:10-09:31:15                              Page 27

1  I'm sure you guys are familiar. You might even be on
2  it. I don't know how that works.
3    Q. No, we're private sector.
4    A. Okay. We have managed to get PERSI since
5  I've been in office. And that's -- that's a big
6  deal. Maybe it don't sound like it to you guys --
7    Q. I totally agree. PERSI's a huge deal.
8    A. And Twin Falls County was the only county in
9  the state -- in fact, I think the only law
10 enforcement agency in the state that was not on
11 PERSI. Twin Falls County and Gooding County. And
12 Gooding County was on it and chose to get off.
13   Q. When did Twin Falls County go onto PERSI?
14   A. I'm guessing it must be -- this would be the
15 fifth year, I think.
16   Q. And that's a big deal, right?
17   A. That's a very big deal. I -- yes.
18   Q. Is that part of the reason that you're
19 running for re-election, to increase your PERSI
20 benefits?
21   A. No.
22   Q. Will they be affected?
23   A. Yeah, but I don't -- I don't have any idea
24 what that amount would be or not be. I don't know.
25 As an elected official, you are vested in five

09:31:18-09:32:11                              Page 28

1  months. If you're not an elected official, you're
2  vested in five years, I believe, if I'm -- that's how
3  that works. Clearly, every -- every year you're
4  there and your money goes up, then I assume your --
5  your pension would also go up, so...
6    Q. So your -- you have announced your run for
7  re-election?
8    A. Yes, sir.
9    Q. And the primary is in, what, April?
10   A. May --
11   Q. May?
12   A. -- 19th, I believe.
13   Q. Do you have any competitors --
14   A. I do. I have --
15   Q. -- on the republican ticket?
16   A. Yes.
17   Q. Okay.
18   A. I have one that I know of, which -- I don't
19 know if you care who, but --
20   Q. Yeah. Who is it?
21   A. It's a guy named Jeremy Maritt, who is out
22 of Elko County. Lives in Filer.
23   Q. Is he employed in the local area?
24   A. He is not. In fact, he's -- I think he
25 is -- he took an early retirement out of Elko. And

09:32:17-09:33:18                              Page 29

1  you may very well be familiar with, is a guy named
2  Pankey. Ever here of a guy named Steve Pankey?
3    Q. I know the name.
4    A. That's because he ran against Otter. I
5  think he run for Governor and he run for Lieutenant
6  Governor and he run for Lincoln County Commissioner.
7  And then he had some issues, and now I think he's
8  wanting to become sheriff, so...
9    Q. Okay.
10   A. And -- but that I don't know. I don't know
11 if he submitted his paperwork. And I have not heard
12 of anybody on the -- either as an independent or a
13 democrat.
14   Q. In Twin Falls County, would that even
15 matter? I don't think it does, does it?
16   A. I don't think so. There again, I never say
17 never.
18   Q. No, I understand, but we both know Twin
19 Falls County.
20   A. It's kind of republican, you know?
21   Q. Yeah, it is.
22   A. Sheriff Tousley was an independent --
23   Q. Right.
24   A. -- for 16 years and -- whatever that means.
25   Q. Okay. Let me -- I'm just going to go

09:33:27-09:34:35                                      Page 30

1  through Brent's tenure at Twin Falls County Sheriff's
2  Office with some documents.
3        Were you involved at all when he was hired
4  in 1996?
5     A. No.
6     Q. I'm assuming that you've met with your
7  counsel, Ms. Howland, in preparation for your
8  deposition today?
9     A. Yes.
10    Q. And you've reviewed some documents, I
11 assume?
12    A. Yes.
13    Q. Could you share with me what documents
14 you've reviewed?
15    A. Captain's job description.
16    Q. What else?
17    A. Geez, I forgot. The Fit for Duty work -- or
18 policy. I read through some of the other meetings
19 you've had.
20    Q. Deposition transcripts?
21    A. Depositions, yes.
22    Q. Whose deposition transcripts did you read?
23    A. Captains and Perry Barnhill.
24    Q. How about Brown?
25    A. And -- no, I never got to that one.

09:34:37-09:36:10                                      Page 31

1     Q. Didn't get to Daron Brown?
2     A. No. I read Brent's.
3     Q. Okay. And there's a letter that Chief
4  Newman sent to Dr. Tye that's dated July 31st. Have
5  you reviewed that letter?
6     A. I have not.
7     Q. In this litigation, there's been mention of
8  a polygraph that Brent took before he was employed at
9  Twin Falls County. Are -- were you aware of that?
10    A. I have become aware of that since this issue
11 started.
12    Q. Okay.
13    A. I was not prior to that.
14    Q. Have you gone back to look at that report or
15 any information related to what Captain Hilliard
16 reported back then, in 1996?
17    A. Yes.
18    Q. What was the reason for looking at that?
19    A. Because I came across it as I was going
20 through the -- yeah, I came across it.
21    Q. Okay. So I'm -- the way I think -- what my
22 understanding of how his polygraph examination and
23 the investigation, pre-employment, is that Captain
24 Hilliard -- and wasn't a captain at the time, he was
25 just applying for a job -- related that he had used

09:36:15-09:36:46                                      Page 32

1  drugs as a teenager. Is that why you looked at it?
2     A. No.
3     Q. Do you think that's relevant?
4     A. No.
5     Q. Okay.
6     A. I --
7     Q. I'm just curious. You're a guy from the
8  '60s. Have you used drugs?
9        MS. HOWLAND: Object to the form.
10       THE WITNESS: Okay.
11
12 BY MR. JEFFREY HEPWORTH:
13    Q. You can answer.
14    A. Have I ever? Yup, I've smoked dope, if
15 that's what you're asking.
16    Q. Have you used any other drugs?
17    A. No.
18       MS. HOWLAND: Object to the form.
19       THE WITNESS: Sorry.
20
21 BY MR. JEFFREY HEPWORTH:
22    Q. Go ahead.
23    A. No.
24    Q. No? Are you sure?
25    A. Nothing --

09:36:47-09:37:41                                      Page 33

1        MS. HOWLAND: Object to the form.
2
3  BY MR. JEFFREY HEPWORTH:
4     Q. So let me -- you keep looking to your
5  counsel, and she can make objections to the form of
6  my question, but you're still going to have to answer
7  my questions.
8        MR. JEFFREY HEPWORTH: And I'm just going to
9  mention, is there anything wrong with the form of my
10 question?
11       MS. HOWLAND: I'm going to go to where we
12 went in the last deposition, which is asking him
13 information that's beyond the scope of any of this is
14 completely improper. I'm not instructing him not to
15 answer; but if he opts not to, so be it.
16       MR. JEFFREY HEPWORTH: Counsel, this is a
17 discovery deposition and you don't get to decide
18 what's relevant, as we both now know. And I'm
19 entitled to do a deposition without you interfering
20 with my deposition, and there's nothing wrong with my
21 questions. They're not leading. They open-ended.
22 They're certainly not compound. So I'm wondering why
23 you're objecting to the form of my questions?
24       MS. HOWLAND: And I just told you exactly
25 why. Because that question is completely improper

09:37:44-09:38:33                                          Page 34

1  and has absolutely nothing to do with that. This is
2  someone who's just told you he's an elected official
3  running for election, and why you would ask that
4  makes me wonder what your motives are here.
5      MR. JEFFREY HEPWORTH: Okay. Are you done?
6      MS. HOWLAND: I'm done.
7
8  BY MR. JEFFREY HEPWORTH:
9      Q. Okay. So I think it's fair to ask, because
10  it's been asked of Captain Hilliard that he used drugs as a
11  inserted into his employment that he used drugs as a
12  teenager. And so I think I'm -- it's -- it's fair
13  for me to ask you about your use of drugs because
14  you're the sheriff and you're going to continue
15  running for sheriff, and you're in law enforcement,
16  and you apparently believe that your use of drugs as
17  a teenager does not disqualify you in any way, does
18  it?
19      MS. HOWLAND: Same objections.
20
21  BY MR. JEFFREY HEPWORTH:
22      Q. You can answer that question.
23      A. It does not.
24      Q. Okay. And I gather that you're very
25  uncomfortable with my questions asking about your

09:38:38-09:39:30                                          Page 35

1  teenage drug use; is that fair to say?
2      A. What's fair to say is I'm 70 years old and I
3  have a hard time remembering what I done, you know,
4  last week.
5      Q. It's a memory issue then?
6      A. Well, I'm not saying that. I'm saying that
7  in my life, for me to say that I've done anything, I
8  don't know if I have or haven't, you know.
9      Q. Okay. If you don't know, then that's a fair
10  answer.
11      A. Okay. Let's use that word then.
12      Q. Okay. But we have a record of Mr.
13  Hilliard's admissions about the types of drugs he
14  used because that was asked of him in a polygraph
15  examination, correct?
16      A. That is correct.
17      Q. And he passed the polygraph; is that your
18  understanding?
19      A. That's my understanding.
20      Q. And he was employed?
21      A. Yes.
22      Q. And one of the things --
23      A. He was employed --
24      Q. -- he said at the time was that he no longer
25  used hard drugs or illegal drugs or any drugs,

09:39:34-09:40:33                                          Page 36

1  correct?
2      A. And I have no reason to disbelieve that.
3      Q. And you and I both know that he drank
4  alcohol, right?
5      A. We know that.
6      Q. And you do, too, don't you?
7      A. I do.
8      Q. And just because you use alcohol does not
9  disqualify you from doing your job, does it?
10      A. It does not. I don't use a lot -- I -- do
11  you want my use of alcohol? That's really easy.
12      Q. Okay. Sure.
13      A. Three days a week, about three days a week,
14  I go to The Cove with -- actually, with a friend of
15  yours, and I drink two glasses of beer.
16      Q. Okay. Who's my friend?
17      A. Kelly Withers.
18      Q. Oh, very good friend. Yes.
19      A. So that's about the -- I have a fridge in my
20  garage that's got Pacifico in it that I may indulge
21  once in a while.
22      Q. Okay.
23      A. So that's it for my alcohol use.
24      Q. And you don't drink on the job?
25      A. No, no.

09:40:33-09:41:16                                          Page 37

1      Q. But you do drink off the job?
2      A. I have two glasses of beer about three times
3  a week --
4      Q. Okay.
5      A. -- so I guess that -- and I never -- in
6  fact, one time I went in there and forgot I still had
7  my ankle holster on, so I didn't even drink my two
8  glasses that time. I just went home.
9      Q. So have you been impaired in the last five
10  years from drinking alcohol, do you think?
11      A. There again, I can't answer that, I --
12      Q. Just can't remember?
13      A. I just don't know.
14      Q. Okay.
15      A. I don't know.
16      Q. But a lot of the officers drink alcohol,
17  don't they?
18      MS. HOWLAND: Object to the form.
19      THE WITNESS: I don't know the answer to
20  that. They don't drink with me. So for me to say
21  they do or they don't, you know, I don't know the
22  answer to that.
23
24  BY MR. JEFFREY HEPWORTH:
25      Q. Well, you mentioned that you read the

09:41:18-09:42:06                                                    Page 38

1  captains' depositions, and Doug Hughes drinks
2  alcohol.
3      A.  Doug drinks, so...
4      Q.  You knew that?
5      A.  I knew that.
6      Q.  And --
7      A.  And I don't remember if Tim does or not.
8  I -- if he does, it's not very much.
9      Q.  But that does not disqualify an officer from
10 working at Twin Falls County Sheriff's Office, does
11 it?
12         MS. HOWLAND:  Object to the form.
13         THE WITNESS:  What would disqualify --
14 disqualify a person from working at the Sheriff's
15 Office is a DUI.
16
17 BY MR. JEFFREY HEPWORTH:
18     Q.  Okay.  Well, and that's not the only thing.
19     A.  Okay.  That -- DUI --
20     Q.  It -- it -- it --
21     A.  There again, I can touch on that if you
22 want.
23     Q.  We will talk about it.
24     A.  Okay.
25     Q.  Trust me.  We're going to, kind of, go

09:42:08-09:43:10                                                    Page 39

1  through this chronologically, okay?
2          How about impairment?  If somebody shows up
3  to work impaired, then --
4      A.  That's an issue.
5      Q.  -- that's a serious issue, isn't it?
6      A.  That's an issue.
7      Q.  Well, is it a serious issue?
8      A.  Yes, sir.
9      Q.  And you have policies -- let me ask my
10 question.
11         You have policies designed to find out if
12 people are impaired on the job, correct?
13     A.  I think our policy says if somebody thinks
14 an employee is impaired, they have the ability to
15 check.
16     Q.  Are you the policymaker for Twin Falls
17 County Sheriff's Office?
18     A.  Do I write the policies?  No, I do not.  Do
19 I approve the policies?  I do.  Our policies --
20     Q.  So you approve and you enforce, correct?
21     A.  That is a fair statement, yes.
22     Q.  And Don Newman is also a person who's
23 involved both in making policy and enforcing policy,
24 correct?
25     A.  That is correct.  Don would be -- Don would

09:43:13-09:44:17                                                    Page 40

1  be more involved in policy violations than what I
2  would.
3      Q.  Policymaking?  Does he -- is he as involved
4  as you in adopting policy?
5      A.  Our policy is Lexipole, which assume you
6  know what that is.
7      Q.  And what I'm trying to find -- yeah, I do.
8  I'm very familiar with it.
9      A.  Yeah.
10     Q.  What I'm trying to find out is who are the
11 policymakers for the Twin Falls County Sheriff's
12 Office, and I think you agreed that you're a
13 policymaker.  And my question was, is Don Newman one
14 of the people involved in adopting policies?
15     A.  Yes.  And captains are also -- I don't -- I
16 don't arbitrarily make rules because I'm smart.
17     Q.  Okay.
18     A.  But I do take good advice from smart people.
19 That would be my chief deputy and my captains.
20     Q.  Okay.
21     A.  So if there -- if there's a valid reason for
22 me not to adopt anything, I listen to that.  And
23 trust me, they may be right.
24     Q.  Are all officers employed at Twin Falls
25 County Sheriff's Office required to know their

09:44:21-09:45:23                                                    Page 41

1  policies?
2      A.  Yes.
3      Q.  And they're required to follow the policies,
4  correct?
5      A.  Yes.
6      Q.  And it's -- comes to the, you know, the
7  different ranks for enforcing policies, right?
8  Ranks?  I mean, you would expect a sergeant to
9  enforce the policies on the people -- his
10 subordinates, people below him?
11     A.  That's correct.
12     Q.  And captains should be making sure the
13 people below him follow policy?
14     A.  It would go right on down the line, yes.
15     Q.  And everybody is required to know what the
16 policies are?
17     A.  Yes.  There -- there are an awfully lot of
18 policies, so -- me included -- if -- if you're asking
19 if I'd memorized our policy book, the answer is no.
20 If you're -- if you're asking if there's an issue, do
21 I know how to get ahold of the policy and read it?
22 The answer is yes.
23     Q.  Okay.  Appreciate that.
24         MR. JEFFREY HEPWORTH:  Why don't we just
25 mark some exhibits and maybe we can go through it.

09:45:25-10:02:43                                                   Page 42

1      MS. HOWLAND: Are we getting close to a good
2   point for a break?
3      MR. JEFFREY HEPWORTH: Sure, yeah.
4      MS. HOWLAND: Thanks.
5      MR. JEFFREY HEPWORTH: Yeah, why don't we
6   mark a bunch of exhibits and we'll try to go through
7   them as fast as we can.  Go ahead and take a break.
8      VIDEOGRAPHER: We're off the record at 9:46.
9
10     (Whereupon a brief recess was taken from
11     9:45 a.m. to 10:02 a.m.)
12
13     (Exhibits 36-58, marked for identification.)
14
15     VIDEOGRAPHER: We're back on the record at
16   10:02.
17
18   BY MR. JEFFREY HEPWORTH:
19     Q.  Okay.  Let's -- I'm going to try to do this
20   quickly.  I -- I've taken a bunch of records from
21   Captain Hilliard's personnel file to just, kind of,
22   go through his career, and I'll try to do it quickly.
23     I'm handing you what's been marked as
24   Exhibit 36, and I'll represent to you that that's the
25   background investigation on Brent Hilliard when he

10:02:46-10:03:50                                                  Page 43

1   was being -- applying for the job.  Have you seen
2   that document?
3     A.  No.  This -- this is when he was applying in
4   '96.
5     Q.  Right.
6     A.  Yes.
7     Q.  So you haven't seen that document?  And
8   it -- it -- there is discussion about his drug use
9   and alcohol use.  Were you aware of that?
10    A.  Yes.
11    Q.  And would you agree that whatever drug and
12  alcohol use he -- he engaged in, either in 1996 or
13  before, would not be relevant to the decision to
14  terminate him?
15    A.  No, I wouldn't necessarily agree with that.
16  You know, if -- it would depend on what -- what drug
17  use there was, whether or not -- you know, this
18  here --
19     MS. HOWLAND: Is this a new -- sorry.  Is
20  this a new exhibit that you just marked and put --
21     MR. JEFFREY HEPWORTH: Yeah.
22     MS. HOWLAND: Okay.  Do I have a copy?
23     MR. JEFFREY HEPWORTH: Yeah.  I gave you a
24  package.  It's on the top.
25     MS. HOWLAND: Thanks.

10:03:51-10:04:49                                                  Page 44

1
2   BY MR. JEFFREY HEPWORTH:
3     Q.  So let me just make sure I understand your
4   answer.  You haven't reviewed that document?
5     A.  This one, no, I have not.
6     Q.  This is the first time you've ever seen it;
7   is that accurate?
8     A.  I don't know if that's accurate or not.
9   I -- I haven't -- I have not read this document.
10    Q.  If that -- go ahead.  Sorry.  I didn't mean
11  to cut you off.  You haven't read it?
12    A.  No.  I will.
13    Q.  Let's not take our time.  The question I
14  have -- because it's a lengthy document and it's an
15  investigation, pre-employment -- did you rely on that
16  document in 2017, in any way, to suspend Captain
17  Newman from work --
18     MR. J. GRADY HEPWORTH: Captain Hilliard.
19
20  BY MR. JEFFREY HEPWORTH:
21    Q.  Captain Hilliard from work?
22     Thank you.
23     If you don't think you've ever seen that
24  document, wouldn't you agree you didn't rely on that
25  document, as far as the decision-making process, in

10:04:49-10:06:26                                                  Page 45

1   2017?
2     A.  Captain Hilliard was put on administrative
3   leave due to an issue at work.  As far as suspension,
4   he wasn't suspended.  He was put on administrative
5   leave due to an issue.  So as far as, you know, what
6   happened in 1996, I -- what I can tell you is that in
7   2020, this would have been an issue, you know, the
8   drug use.  At the time, it wasn't.  And I don't know
9   why that is.
10    Q.  Okay.  I'm not sure I understand your
11  answer.  My question to you is a little bit different
12  than what you were answering.  So try to listen to my
13  question and be responsive to my question.  My
14  question was specific to you.
15     Did you review Exhibit 36 or rely on Exhibit
16  36, which is the pre-employment evaluation of Captain
17  Hilliard in 1996, did you rely on that document, or
18  even know about it, when you made decisions in June
19  or July or August or September of 2017?
20    A.  I did not.  That would have all been handled
21  by the Chief Deputy.
22    Q.  Okay.  And that's all I was getting at.
23     Exhibit 37, it's -- I will represent to you
24  it looks like his -- Captain Hilliard's training
25  courses over his career?

10:06:34-10:07:32                                    Page 46

1     A. I -- I have seen these before.
2     Q. That's a record that Twin Falls County
3  keeps?
4     A. Yes.
5     Q. And does that look like the type of record
6  that Twin Falls County keeps of an officer's
7  training?
8     A. This would be a POST training, is what this
9  would be showing.  POST school.
10    Q. And I got that record from Twin Falls
11 County.  So Twin Falls County keeps that record?
12    A. That is correct.
13    Q. And POST -- does Twin Falls County
14 get that record from POST or is it --
15    A. Yes, our training coordinator would get this
16 record.
17    Q. Okay.  Let me hand you Exhibit 38, and I'm
18 just going to go through these in chronological
19 order.  Do you recognize Exhibit 38?
20    A. I know what it is, yes.
21    Q. What is it?
22    A. It's a status sheet.
23    Q. Okay.  And what does it reflect?
24    A. It reflects, I think, money.  Pay scale.
25    Q. Okay.  And that -- that Exhibit 38 is dated

10:07:38-10:09:01                                    Page 47

1  what?
2     A. 11/21/01.
3     Q. And --
4     A. Is that --
5     Q. And so this is when Brent was being promoted
6  to patrol corporal, correct?  The bottom line,
7  justification comments.  Let me say -- tell me if I
8  read this correctly.
9        Brent is being promoted to patrol corporal
10 based on his performance, on recommendation by his
11 supervisor.  Brent has passed all his tests for this
12 promotion.  And then: This is to fill on -- an open
13 corporal slot.  Correct?
14    A. That's what it says, yes.
15    Q. So Brent was promoted on November 21st,
16 2001, from senior patrol deputy to patrol corporal,
17 right?
18    A. According to this status sheet, that is
19 correct.  It's signed by -- signed by Wayne Tousley.
20    Q. And this is when Sheriff Tousley --
21    A. Yes.
22    Q. -- was the sheriff?
23       And then Exhibit 39, let me hand you Exhibit
24 39.  Do you recognize Exhibit 39?
25    A. I know what it is.

10:09:02-10:10:14                                    Page 48

1     Q. This is a warning or a reprimand notice,
2  correct?
3     A. Warning/reprimand notice, yes, that's what
4  it says at the top of the page.
5     Q. And again, this is Sheriff Tousley.  And the
6  supervisor, do you know whose signature that is?
7     A. Supervisor, yes, that's Lieutenant Don
8  Newman, I think, if I recognize his signature.
9     Q. And so in -- I don't see the date.  Oh, this
10 is in November of 2005, correct?
11    A. Dated January 11th of '06, I believe, isn't
12 it?
13    Q. Okay.  I see it.  Yeah Brent Hilliard signed
14 it on January 11th, 2006, regarding an incident on
15 November 17th, 2005.  Do you agree?  And I'm not
16 going to -- I'll ask Sergeant Newman about it, but
17 this is --
18    A. Chief Newman.
19    Q. Chief Newman.
20    A. Yes.
21    Q. I'll ask Chief Newman about this document
22 since he was the supervisor.
23       Let me show you Exhibit Number 40.  Do you
24 want to take a look at Exhibit 40?
25    A. Is this 40?

10:10:16-10:11:54                                    Page 49

1     Q. Yeah.  And that -- what is Exhibit 40?
2     A. That's the evaluation sheet.
3     Q. And do you know who did -- can you tell who
4  did the evaluation?
5     A. Don -- looks like Don Newman's writing.
6     Q. All right.  What's the date of that
7  evaluation?
8     A. April to April, 2006.  Annual.
9     Q. Did he get a good evaluation?
10    A. 4.2.  Yes.
11    Q. All right.  Let me show you Exhibit 41.
12 Have you ever seen that document before?
13    A. I have not.
14    Q. And that was in -- I represent to you we got
15 that from Twin Falls County Sheriff's Office.  It
16 looks to be a Fit for Duty evaluation done on
17 captain -- or, excuse me, Officer Hilliard?
18    A. Subject, Fit for Duty, June 11, 2007 and
19 June 20th, 2007.
20    Q. Again, this was done before you were the
21 sheriff, correct?
22    A. That is correct.
23    Q. Okay.  Let me just go to the next one.
24 Exhibit 42.  Is that a status sheet again?
25    A. Yes.

10:11:54-10:13:38                                        Page 50

1    Q. And what was happening on -- on that date?
2    A. A date of 10/21/96. Job title, chief
3  specialist investigator. He was -- he went -- I'm
4  assuming that he went from a patrol staff sergeant to
5  a chief specialist investigator.
6    Q. Okay. And what date was that?
7    A. 10/21/96 is what it says here.
8    Q. And the sheriff was -- is Sheriff Tousley at
9  the time, correct?
10    A. That is correct.
11    Q. And we've got one out of order, and I
12  apologize for that. But here's exhibit -- I'm trying
13  to do this in chronological order -- Exhibit 44. And
14  the date of that is November 28th, 2008 correct?
15    A. That's what it says, yes.
16    Q. And Brent Hilliard was notified of a notice
17  of suspension in that, correct?
18    A. That's what it says.
19    Q. And in the middle of the page it -- it
20  indicates the reason for the suspension, correct?
21    A. Yes. Twin Falls County Sheriff's Substance
22  Abuse Policy. That's what it says.
23    Q. Okay. Were you aware that -- are you
24  familiar -- do you want to take a look at that? I
25  don't know if you can tell from that -- if you can

10:13:40-10:14:56                                        Page 51

1  tell what that was regarding, but were you generally
2  familiar with an investigation that was done on an
3  Officer Gambrell from the Twin Falls Police
4  Department?
5    A. Yes, I have a general knowledge of that.
6    Q. Okay. And you were elected sheriff shortly
7  after that, I believe, in, like, 2009?
8    A. This was November 28th of '08.
9    Q. Right. And were you aware at any time in
10  your --
11    A. I was --
12    Q. Go ahead.
13    A. I would have just been elected.
14    Q. Okay. Were you aware when, you came on as
15  the sheriff, that Brent had been suspended for a
16  substance abuse investigation?
17    A. I was aware that Brent had been suspended.
18  I -- I -- that's what I remember about him.
19    Q. Okay. And with regard to the disciplinary
20  actions or the suspensions that occurred in -- in
21  2017 regarding Captain Hilliard, did -- did this
22  suspension that occurred in November, 2008, enter
23  into the decision-making process in any way?
24    A. It did not. Not with me.
25    Q. Okay. And why is that?

10:14:57-10:16:05                                        Page 52

1    A. It didn't -- this was before I even took
2  office. I took office in January.
3    Q. Okay. And here's the next -- this is
4  Exhibit 45, and I think it relates to that
5  suspension. And that is a document that you signed,
6  correct?
7    A. January 12th, 2009. That would have been
8  when I took --
9    Q. Okay. Tell me what that document --
10    A. It says: Notice of Removal from Suspension
11  Status.
12    Q. Okay. And what happened? What does that
13  letter corroborate or document?
14    A. What that letter corroborates is that he was
15  no longer on suspension when I took office.
16    Q. Okay. And did you remove him from
17  suspension?
18    A. I did.
19    Q. And -- and --
20    A. Let me read this. It should say.
21    Q. Go ahead and read it out loud, if you would.
22    A. You are notified that Twin Falls County and
23  our Twin Falls County Sheriff's Office have removed
24  you from suspension and you are to return to work
25  January 12, 2009. Since you have not been charged

10:16:09-10:17:09                                        Page 53

1  with criminal wrongdoing in this investigation, you
2  are to return to work effective immediately. The
3  allegations of a policy violation have been forwarded
4  to Ada County Sheriff's Office for investigation.
5    Q. Do you recall that there was an IA
6  investigation into Officer Hilliard?
7    A. I do.
8    Q. And what was the result of that IA
9  investigation?
10    A. That, I don't -- I don't recall.
11    Q. Okay.
12    A. That, I don't know. And that -- that would
13  have been -- in fact, I don't know. I can't answer
14  that.
15    Q. So here's -- the next, Exhibit 46, and
16  that's -- looks like it's dated February of 2009,
17  correct?
18    A. February 12, 2009.
19    Q. And that's another status sheet, right?
20    A. That is correct.
21    Q. And that involves Captain Hilliard, correct,
22  or Officer Hilliard at the time?
23    A. That is correct.
24    Q. Okay. What was the change in status on
25  that -- on February 12th, 2009?

---

10:17:12-10:18:25                                        Page 54

1      A. Job title, chief specialist, to job title,
2  lieutenant investigations.
3      Q. Was that a promotion?
4      A. Yes, it would have been more money.
5      Q. Okay. And going from a chief specialist to
6  a lieutenant, is that considered a promotion?
7      A. Yes.
8      Q. Okay. And you -- you authorized that
9  promotion, correct?
10     A. That is correct. The chief deputy at the
11 time was Sam Walker --
12     Q. Okay.
13     A. -- would have done this, and I, elected
14 official -- I sign all of these because -- as an
15 elected official.
16     Q. Okay. So I'm a little curious. It sounds,
17 from your answers, that the Chief Deputy is making
18 the decisions of who to promote without your
19 involvement. Is that accurate?
20     A. It would be more accurate -- personnel is
21 the deal of the Chief Deputy. If I don't have a
22 problem with it, that will happen. If there is a
23 particular reason why I would have a problem, then I
24 certainly have the authority or -- to voice my
25 opinion.

---

10:18:25-10:19:25                                        Page 55

1      Q. Okay. Well, is that something that Chief
2  Deputy Newman would have asked you about before he
3  gave the promotion or after he gave the promotion?
4      A. This?
5      Q. Right.
6      A. No, that wasn't Chief Deputy Newman. That
7  was Chief Deputy Sam Walker.
8      Q. Chief Deputy Sam Walker was -- is
9  that a promotion that Chief Deputy Sam Walker -- Sam
10 Walker's a female, correct?
11     A. That is correct. Gerlyn.
12     Q. Gerlyn -- was it a decision that Gerlyn had
13 made, to promote Captain Hilliard without your input
14 and permission, and then she gets it afterwards?
15     A. She would have -- she would have made that
16 decision with my blessing.
17     Q. And -- that doesn't quite answer my
18 question. Does she have the authority to promote
19 people without your authority?
20     A. Yes. However, I would have to sign as the
21 elected official.
22     Q. Did -- have you ever had a situation where
23 your chief deputy promoted somebody and then you
24 didn't sign off on it?
25     A. Not that I recall.

---

10:19:28-10:20:50                                        Page 56

1      Q. It -- it just seems logical that they would
2  ask you before they promoted somebody. Am I just
3  wrong about that?
4      MS. HOWLAND: Object to the form.
5      THE WITNESS: If -- I am not involved in
6  every promotion or every status sheet other than
7  where it says, elected official. A promotion such as
8  this, I would have known about.
9
10 BY MR. JEFFREY HEPWORTH:
11     Q. Okay. At what point do you get involved
12 before the promotion is made? What rank?
13     A. The -- the only promotion that -- my
14 captains and my chief deputy are appointed. That's
15 up to me.
16     Q. Okay.
17     A. I don't get the input -- well, there again,
18 I never say never. But other than that, I am
19 probably at least aware of any status sheet that
20 comes across my desk -- clearly, I am aware of it
21 because I have to sign it. I don't necessarily --
22 unless there is some reason, I don't get involved in
23 it.
24     Q. I think I understand your question -- or
25 your answer now. So below captain, you let the Chief

---

10:20:57-10:21:55                                        Page 57

1  Deputy and the captains and the lieutenants make
2  promotion decision?
3      A. That -- that's correct. That's done -- yes.
4      Q. You have a lot of employees?
5      A. I have about 130 employees.
6      Q. Okay. Has that increased in the last few
7  years?
8      A. As the County has grown, it hasn't increased
9  as much as I would like, but --
10     Q. Yeah, I understand that.
11     A. But that involves search and rescue. That
12 involves a lot of things.
13     Q. Okay. So the -- the promotions that you are
14 responsible for would be appointing your chief
15 deputy. That would be solely your decision?
16     A. That's correct.
17     Q. And then how about captains? Is that a
18 decision that you want to make rather than the Chief
19 Deputy?
20     A. That is a decision that I make. I may have
21 input from the Chief Deputy.
22     Q. And then below that, you let the Chief
23 Deputy run, for the most part --
24     A. That is correct.
25     Q. -- but you still have to approve?

---

M & M Court Reporting Service
(208)345-9611(ph)  (800)234-9611  (208)-345-8800(fax)

Page 58
10:21:59-10:22:58

1 A. Ultimately, I approve.
2 Q. Okay. Gotcha.
3 Do you do job evaluations?
4 A. No.
5 Q. Performance evaluations?
6 A. No. I -- no.
7 Q. All of that is done below you?
8 A. Yes.
9 Q. Do you review those? Like, the captains, as
10 an example, or the Chief Deputy, do you do a job
11 evaluation of the Chief Deputy?
12 A. I can. I don't always. If I an issue with
13 the job of the Chief Deputy, I address the issue.
14 Evaluations is done throughout the agency.
15 Q. Okay. Is -- is Chief Deputy Newman
16 currently responsible, ultimately, for job
17 evaluations and making sure they're done?
18 A. Yes. Ultimately, that is personnel issue
19 and that would be -- he -- he doesn't do all the
20 evaluations.
21 Q. Right.
22 A. Yeah.
23 Q. The supervisors do?
24 A. The supervisors do the evaluations.
25 Q. But Chief Deputy Newman would do the

Page 59
10:23:01-10:24:12

1 evaluations of the captains, correct?
2 A. Yes.
3 Q. And -- and you're not involved in that
4 process?
5 A. I am not.
6 Q. Okay. So that will make this one easy.
7 Here's Exhibit 47. I -- I believe this is a job
8 evaluation that Captain Newman did on Patrol Sergeant
9 Hilliard on June 1st, 2009, but check that and make
10 sure I'm right.
11 A. June --
12 Q. Do you see that date --
13 A. Yeah, I see the date.
14 Q. And then it's signed on the back?
15 A. It's signed 8/17 of '09 by Brent.
16 Q. Okay. So it -- it was -- the job -- the
17 supervisor -- Brent's supervisor was Don Newman at
18 the time, correct?
19 A. Patrol sergeant. It says here that his
20 supervisor was Matt Eden.
21 Q. Okay. And then Don Newman also signed it?
22 A. Yeah. Matt Eden would have been a staff
23 sergeant, apparently. And Don was a captain at the
24 time when he signed it.
25 Q. Okay. So Exhibit 48, this is another job

Page 60
10:24:17-10:25:24

1 status change, correct?
2 A. It is.
3 Q. And what's the date of that?
4 A. 12/20 of '10.
5 Q. And then captain -- or Officer Hilliard went
6 from what to what?
7 A. Lieutenant Hilliard went from lieutenant to
8 captain.
9 Q. And that would have been --
10 A. According to this.
11 Q. -- a decision you made, correct?
12 A. Yes.
13 Q. And that would have been solely your
14 decision and not -- you would have had some input
15 from Chief Deputy Newman, or the Chief Deputy, at the
16 time?
17 A. Yes.
18 Q. Who was the Chief Deputy at that time?
19 A. I -- well, it would have been Gerlyn because
20 I think -- I don't know the answer to that.
21 Q. So you, at that time, thought it was wise to
22 promote Lieutenant Hilliard to captain, correct?
23 A. That is correct.
24 Q. And he -- that -- he became a member of the
25 command staff in -- in 2010 or two thousand -- early

Page 61
10:25:28-10:26:37

1 2011?
2 A. It says 12/20 of '10.
3 Q. Okay. Why did you select Captain Hilliard
4 to be captain?
5 A. I don't remember what my thought process was
6 other than he was clearly doing a -- a good job as a
7 lieutenant, so...
8 Q. Would you agree that he was doing an
9 outstanding job?
10 A. I don't know that I could answer that. I
11 know that he was promoted to captain, so he must have
12 been doing a good job as a lieutenant. He was -- I
13 think at the time, he was chief -- chief of
14 detectives, I believe.
15 Q. Okay. Did you think he was the best
16 candidate for the job of captain?
17 A. I did.
18 Q. Okay.
19 A. That's why I -- that's why I would have made
20 that change.
21 Q. And there were officers at Twin Falls County
22 Sheriff's Office that had been there longer than
23 Captain Hilliard, correct?
24 A. I don't know the answer to that. Probably.
25 Yeah, there's -- I think our senior guy's been there

10:26:41-10:27:33                                          Page 62

1    since '80s.
2        Q. Daron Brown?  Lieutenant Brown had been
3    there before Captain Hilliard, correct?
4        A. That is correct.  And I believe Art
5    Rebellozo was there before Daron Brown, so...
6        Q. And how about Lieutenant Barnhill?  Had he
7    been there before Captain Hilliard?
8        A. Boy, you're getting into personnel -- I'm --
9    I'm saying yes, I think -- yes.
10       Q. Are --
11       A. Well --
12       Q. Do -- you read Lieutenant Brown -- you
13   didn't read Lieutenant's Brown deposition?
14       A. I did not.
15       Q. Were you aware that he was resentful of the
16   fact that it was Captain Hilliard that got the
17   captain's job and not him?
18           MS. HOWLAND: Object to the form.
19
20   BY MR. JEFFREY HEPWORTH:
21       Q. Were you aware of that, generally?
22       A. No.  And I don't believe if -- you know,
23   like I say, the --
24       Q. You don't believe it?
25       A. -- the captain -- nobody ever expressed

10:27:35-10:28:42                                          Page 63

1    anything to me about that.  If that was said to
2    somebody, it wasn't me and it never came to me.
3        Q. You -- you were unaware of it?
4        A. I would say yes, I --
5        Q. Okay.
6        A. -- you know, I don't know --
7        Q. Would that surprise you that if somebody
8    thought that they were more deserving and had been
9    there longer, and got -- someone got promoted above
10   them, would that tend to cause some animosity?
11       A. No, but --
12           MS. HOWLAND: Object to the form.
13
14   BY MR. JEFFREY HEPWORTH:
15       Q. You can still answer it.
16       A. That is -- I would say that falls more into
17   human nature.
18       Q. And explain that.
19       A. I think anybody senior to somebody else
20   probably would resent that person going above them.
21       Q. Okay.
22       A. Now, you know, so for -- for Daron or
23   anybody else, if there was any issues, it never came
24   to me.  That -- that is an appointed position, so it
25   would do them no good to come to me.

10:28:49-10:30:08                                          Page 64

1        Q. I'm going to give you a couple of statements
2    that I think go together.  Three documents, actually.
3    Let me just, as a background, were you aware that
4    Captain Hilliard, Brent Hilliard, has had back
5    problems?
6        A. Yes.
7        Q. Were you aware that he had had surgeries?
8        A. Yes.
9        Q. How many surgeries or -- are you aware of?
10       A. Either two or three.  I was thinking about
11   that and I don't know if Brent's had three surgeries
12   or two surgeries, but I do know Brent has had back
13   surgeries.
14       Q. How about knee problems?  Were you aware
15   that he had knee surgeries?
16       A. Yes.  I say yes, but I -- I'm -- I can say
17   absolutely, back surgeries.  And I -- I believe
18   you're right about knee surgery, but I don't recall
19   if he's -- if his knee hurt or if he had surgery,
20   but...
21       Q. Okay.  So -- and he had West Nile virus.
22   Were you aware of that?
23       A. I did know that, yes.
24       Q. And he was off work for quite an amount of
25   time with West Nile virus?

10:30:11-10:31:24                                          Page 65

1        A. The West Nile stuff was prior to me, I
2    think.
3        Q. Okay.  And we've already -- I've already
4    shown you that he was suspended for a substance abuse
5    suspicion, correct?  And you were aware of that?
6        A. I was.
7        Q. And you're the one that brought him back
8    onto duty after you were elected?
9        A. I did, but I think I'd done that after Ada
10   County's -- Ada County's report, I think, had already
11   come in.
12       Q. Okay.  So -- and what -- and the result of
13   the Ada County report cleared him?
14       A. Unfounded, I think is how they say that.
15       Q. Did that clear him?
16       A. It did as far as I was concerned.
17       Q. Okay.  So here's some records that were in
18   his personnel file, Exhibits 51, 49, 50.  And it --
19   it looks like there's more concerns about the time he
20   got a back surgery.  I think the FMLA portion is
21   attached to that last document.
22       A. This would have been the second back
23   surgery?
24       Q. I can't remember if it's the second or the
25   third.

10:31:26-10:32:22 — Page 66

1    A. FMLA -- that's the FMLA document.
2    Q. And the date on those documents, 2011?
3    A. December 14, 2011.
4    Q. Do you remember that? Do you have a memory
5  of that?
6    A. Of this?
7    Q. Yeah, and the next two documents --
8    A. I have a memory of the back surgery.
9    Q. And the other two documents are -- are
10  witness statements, I believe, regarding observations
11  of Captain Hilliard, correct?
12       MS. HOWLAND: Foundation.
13       THE WITNESS: Let me read.
14
15  BY MR. JEFFREY HEPWORTH:
16    Q. Yeah, go ahead. Why don't you just read
17  them out loud.
18    A. Earlier --
19    Q. Which exhibit are you reading from?
20    A. I'm reading 49.
21    Q. Okay. Why don't we just talk about -- go
22  ahead and read it. Read the first paragraph --
23    A. It's pretty lengthy.
24    Q. Yeah, just read the first paragraph, then
25  we'll see if we need to go further.

10:32:25-10:33:32 — Page 67

1    A. Earlier this week, I had the opportunity to
2  be in the office during normal business hours. While
3  there, I made contact with Captain Hilliard for no
4  other reason than to make small talk. Hilliard
5  appeared to be extremely tired and nearly lethargic.
6  I noticed this and mentioned he looked like he'd been
7  dragged through a knothole backwards. Hilliard
8  commented that his father, or perhaps father-in-law,
9  had recently been taking much of his time and efforts
10  aside from work, which had caused him to lose sleep.
11  As he made small talk, Hilliard's movements were
12  noted to be slow, his reply to my comments slow in
13  return, and he yawned frequently. I also thought his
14  physical coloring was an ashen gray and not his
15  normal appearance. Chris Bratt. That was June of
16  '11.
17    Q. Okay. So do you have any idea why someone
18  would be making a record of that that would be kept
19  by Twin Falls County in the personnel file?
20       MS. HOWLAND: Objection. Foundation.
21  Objection to form.
22
23  BY MR. JEFFREY HEPWORTH:
24    Q. And I don't know if it's out of the
25  personnel file, but it's a record that I received

10:33:34-10:34:49 — Page 68

1  from Twin Falls County.
2    A. I can only surmise that he thought this was
3  important enough to memorialize it.
4    Q. That it would have to do with job
5  performance?
6    A. I can't answer that. I can't answer that.
7    Q. Okay.
8    A. I wasn't there. I don't know.
9    Q. You don't have any memory of that?
10    A. No.
11    Q. Okay. And then if you look at the -- the
12  FMLA sheet, does it -- it looks like that was related
13  to a back surgery. I think it's on the last page of
14  the FMLA.
15    A. January 16th of '12.
16    Q. Okay. And the second page maybe talks
17  about --
18    A. 12/21/11. Yes. Probable duration of
19  condition: Unknown. Dates: Treated the patient for
20  condition, ongoing, 2010 to present. Will the
21  patient need to have treatment visits? Yes.
22       Did you want me to read this?
23    Q. Just the paragraph -- Paragraph 4, at the
24  very bottom of the page, it talks about lumbar
25  fusion. Surgical -- pain required surgical

10:34:53-10:35:43 — Page 69

1  intervention, lumbar fusion.
2       Do you see that in handwriting?
3    A. Yes. It's final, something, you know.
4    Q. Okay. So --
5    A. I recognize surgical intervention, lumbar
6  fusion, and that's -- that's just because I can read
7  that. I don't know what that is.
8    Q. Have you had any surgery?
9    A. In 2015, I had tendon reassignment surgery
10  on my thumb.
11    Q. No back surgeries?
12    A. No, sir.
13    Q. No neck surgeries?
14    A. No, sir.
15    Q. All right. Are you -- have you been -- have
16  you observed others that have had back surgery, low
17  back surgery, besides Captain Newman?
18       MR. J. GRADY HEPWORTH: Captain Hilliard.
19       THE WITNESS: Captain Hilliard.
20
21  BY MR. JEFFREY HEPWORTH:
22    Q. Captain Hilliard. Excuse me.
23       Sorry, Brent.
24    A. I don't know the answer to that, if I --
25  there again, I don't know if I've known people

| | |
|---|---|
| **10:35:46-10:36:47** Page 70 | **10:37:35-10:38:37** Page 72 |

**Page 70**

1  forever that's had back surgery.
2    Q.  Okay.
3    A.  I've known a lot of people for a long time,
4  so...
5    Q.  All right.  So during that time, was Captain
6  Hilliard able to do his job?
7    A.  I don't know the answer to that.  That was
8  December in 2011, so I certainly can't sit here
9  and --
10   Q.  Well, you were the sheriff then?
11   A.  Yeah, but that doesn't mean I remember what
12 happened in December of 2011.
13   Q.  Okay --
14   A.  If Brent -- if this says he was on FMLA,
15 then he clearly wasn't -- wasn't or couldn't do his
16 job.
17   Q.  Let me go back in time a little bit, then.
18 Let's go back to 2011, if -- if you can remember.
19 Were you having weekly meetings with the captains
20 back then?
21   A.  I've had weekly meetings with the senior
22 staff since probably the first Tuesday in January of
23 2009.
24   Q.  Okay.  Almost your entire career, then?
25   A.  My entire sheriff's career.

**Page 72**

1  with my captains.  I'm saying that I have close
2  proximity, so I see them a lot.  They do their
3  captain stuff, but that -- I do my sheriff stuff,
4  so...
5    Q.  You all have separate offices?
6    A.  That is correct.  I'm on one end and Chief
7  Newman's on the other end.
8    Q.  And captains in between?
9    A.  Captains -- training coordinator are in
10 between, and captain in between, and then down the
11 hallway another captain and another captain, so...
12   Q.  But you at least have weekly meetings with
13 your captains and your chief deputy?
14   A.  As a rule, yes, but not -- that doesn't mean
15 that certain things -- people are gone if there's
16 something going on, the -- the -- the meeting isn't
17 canceled.  It does get canceled, but it's usually my
18 secretary...
19   Q.  So -- and those -- as long as you've been
20 sheriff, you've had those meetings, to the extent
21 that you could have those meetings -- it was the goal
22 to have a meeting every Tuesday?
23   A.  That is correct.
24   Q.  Just didn't happen every Tuesday because
25 there's exceptions?

| | |
|---|---|
| **10:36:49-10:37:33** Page 71 | **10:38:38-10:39:26** Page 73 |

**Page 71**

1    Q.  Okay.
2    A.  As sheriff.
3    Q.  That is a standard operating procedure of
4  Sheriff Tom Carter, is to have a Tuesday meeting with
5  command staff?
6    A.  That is correct.  8:30, and --
7    Q.  As long as --
8    A.  -- don't be late.
9    Q.  Where does that meeting take place?
10   A.  At my office.
11   Q.  And how long does that meeting last?
12   A.  That would depend entirely on what needs
13 discussed.
14   Q.  Okay.  Might last an hour?
15   A.  Might last 30 minutes; it might last two
16 hours.  Just depends on what needs discussed at the
17 time.
18   Q.  How much interaction do you have with your
19 captains?
20   A.  Daily.
21   Q.  Do you see him every day?
22   A.  We share an office space, so...
23   Q.  So you have a lot of interaction with your
24 captains?
25   A.  I wouldn't say I have a lot of interaction

**Page 73**

1    A.  That's correct.
2    Q.  But that was the general rule?
3    A.  That was the general rule.
4    Q.  And the issues -- office issues are
5  discussed at that meeting for purposes of running the
6  Sheriff's Department?
7    A.  That is correct.
8    Q.  Okay.  And in addition to the captains, were
9  there lower level officers that attended those
10 meetings?
11   A.  At one point, there was lieutenants that
12 attended the meetings.
13   Q.  Has that changed?
14   A.  It has now, yes.  It's a captains' meeting.
15 My secretary attends these meetings.
16   Q.  Does she keep notes?
17   A.  Yes.
18   Q.  I assume it's a she.  It's --
19   A.  Kenya.
20   Q.  -- I can't think of her name right now.
21   A.  Kenya.
22   Q.  Kenya?
23   A.  Yes.
24   Q.  How long has Kenya been your secretary?
25   A.  I think she's been my secretary for, geez,

**10:39:30-10:40:23**                                     Page 74

1   seven or eight years.
2       Q.  Okay.  So since at least 2013, then, seven
3   years ago?
4       A.  That's a guess.
5       Q.  Okay.
6       A.  Let's not nail her age down here in any way,
7   shape or form.  Kenya's been my secretary for -- she
8   replaced Stephanie Hass, who went to St. Luke's.
9       Q.  But my question was, did Kenya keep notes of
10  those meetings?
11      A.  She keeps minutes.
12      Q.  And are those minutes reviewed?
13      A.  I hope so.
14      Q.  Have you reviewed any minutes regarding
15  conversations or occurrences that happened or were
16  related to Captain Hilliard?
17      A.  No.
18      Q.  Okay.
19      A.  No.
20      Q.  You --
21      A.  The minutes -- the minutes are -- any
22  conversations that would have pertained to Captain
23  Hilliard would have been a personnel issue, and that
24  is after the meetings.
25      Q.  What do you mean by that?

**10:40:24-10:41:50**                                     Page 75

1       A.  I mean by that, Kenya wouldn't take notes on
2   what's going on with Captain Hilliard.
3       Q.  Okay.  All right.  Let's just -- what's the
4   last exhibit you have?  What's the date of that?  No,
5   I think it's the one or your right.
6       A.  That one (indicating)?
7       Q.  Yeah.  What's the date on that?
8       A.  December 14, 2011.
9       Q.  Okay.  Here's the next marked, Exhibit 52.
10  I think this is a change of status report again.  And
11  I've highlighted so it's easy to find.  Job title
12  change, correct?
13      A.  Law enforcement captain, administrative
14  services professional development captain.  Yes.
15      Q.  What was the reason for that job change?
16      A.  It -- it is and was my goal that any of the
17  captains can do what the other captain does.  Which
18  is easy when you got two captains.  But if the third
19  captain is Captain Hughes, who is in the jail -- and
20  I guarantee the other two captains can't do what he
21  does, you know.  So I -- I changed up patrol captain
22  and civil captain.
23      Q.  Okay.  So this promotion, or this job title
24  change, Captain Hilliard went from patrol or
25  investigations?

**10:41:51-10:42:49**                                     Page 76

1       A.  He was captain over uniform division.
2       Q.  Okay.
3       A.  Which is both.
4       Q.  Okay.  So this changed him to --
5       A.  Law -- admin services professional
6   development captain, which is civil.
7       Q.  Okay.
8       A.  That person is my budget director, in charge
9   of everything from sex offenders to anything not
10  patrol or anything not uniform division.
11      Q.  Okay.  So would that change his job duties
12  somewhat?  I mean, if he's on patrol, on occasion
13  he's going out on patrol?
14      A.  Yes.
15      Q.  Would a patrol captain go out on patrol on
16  occasion?
17      A.  You know, my current patrol captain goes out
18  on patrol.
19      Q.  How often?
20      A.  More often than any of the rest of them ever
21  have.
22      Q.  Is that just his choice or something you've
23  required?
24      A.  That's the way -- no, that's not something I
25  require.  That's the way he --

**10:42:50-10:44:06**                                     Page 77

1       Q.  He likes to do it?
2       A.  That's his thing.  And I sure as hell ain't
3   going to get -- discourage how he wants to run his
4   division.
5       Q.  You're not a micromanager?
6       A.  No, sir.  I'm a long ways from
7   micromanaging.
8       Q.  Okay.  So was there an expectation of
9   Captain Hilliard, when he was the patrol captain, as
10  to how often he would go out on patrol?
11      A.  The only expectation of the captains was
12  that they respond when needed.  As far as -- I have
13  never told a captain, you need to go out and patrol
14  with your guys.  And I don't know if Chief Newman
15  does or not, if he tells them that.  No, I have never
16  dictated to my captains that they spend any amount of
17  time in a patrol car.
18      Q.  Okay.  So the civil captain is more of an
19  administrative job and less car time?
20      A.  The administrative captain is all -- well,
21  all -- like I said, there again, the administrative
22  captain can -- need to go out and he's qualified to
23  go out and he's certainly got the authority to go
24  out, but it doesn't happen very often unless there is
25  a reason.

1    Q. Okay. Exhibit 53 is a document dated August
2  28, 2013. It looks like a pay increase?
3    A. Yes.
4    Q. Merit.
5    A. Went from 30.69 to 31.61.
6    Q. What is a merit increase?
7    A. A merit increase is when the County
8  Commissioners say, okay, everybody gets three
9  percent. And you can call it a merit or you can call
10  it a whatever you want to call it.
11    Q. Okay. Exhibit --
12    A. This would be -- this would have been a
13  merit raise.
14    Q. Okay.
15    A. But everybody on the agency -- they didn't
16  get the same amount because the amounts would vary
17  depending on how much money you make; but everybody
18  would have got a three percent raise.
19    Q. Okay.
20    A. In this case, it was a buck something.
21    Q. So -- and I'm trying to understand that
22  answer. Did some of the captains get a bigger raise
23  than others, or some officers get a bigger raise than
24  others?
25    A. I don't know. I can't answer that because I

1  would have to go through the payroll.
2    Q. Okay. Would that have -- would that be an
3  answer that would be more easily answered by Chief
4  Deputy Newman?
5    A. He would probably have the same issue I
6  would.
7    Q. Okay. All right. Exhibit 54 is August
8  28th, 2014. Looks like another merit. It says,
9  merit increase. That's the box, right?
10    A. I don't see where it says merit, but that
11  would have been 31.61 to 32.50.
12    Q. It's highlighted in blue, in about the
13  middle of the page.
14    A. And then my assumption is that that would
15  have been three percent from the last one of these
16  just looked at.
17    Q. But the box marked says, merit increase,
18  correct?
19    A. Merit increase, right in the middle.
20    Q. And that's Captain Hilliard's merit
21  increase?
22    A. That's Captain Hilliard's merit increase.
23  That's the amount of money that he was given for a
24  raise during that time period.
25    Q. Okay.

1    A. There again, everybody would have had that
2  same thing checked right there, so...
3    Q. Do you know if you had any concerns about
4  Captain Hilliard's job performance at that time?
5    A. I do not know the answer to that.
6    Q. You just don't know?
7    A. I just don't know.
8    Q. Can't remember?
9    A. Can't remember. I don't know.
10    Q. Okay. Exhibit 55, this is a different
11  document. See if you recognize that.
12    A. Drug test report. Drug test report.
13    Q. Have you ever seen a drug test report?
14    A. No.
15    Q. Can you see a date on that?
16    A. I don't have one.
17    Q. Let me see it.
18    A. 2/24/15.
19    Q. And is that a random test? It says --
20    A. That would be a random test, I assume, drug
21  test --
22    Q. So Twin Falls County Sheriff's Office has a
23  drug-free employment policy, correct?
24    A. Yes.
25    Q. And part of their policy allows for drug

1  testing?
2    A. Random drug testing.
3    Q. Well, you have a number of different types
4  of drug testing programs, right? If -- if an officer
5  is involved in an accident, they -- it's mandatory
6  drug testing?
7    A. If an officer is involved in an accident,
8  serious -- let's just use accident, car wrecks. They
9  are obligated to go to Occupational Health and pee in
10  a bottle.
11    Q. Right. So it's a urine test?
12    A. It's a urine test, yes.
13    Q. And the purpose that is what, as far as you
14  know?
15    A. As far as I know, the purpose of that is for
16  the -- it -- it prevents somebody from coming back at
17  some point and saying that guy was on drugs.
18    Q. Okay.
19    A. So that -- that is my best answer to what
20  the reason for that is.
21    Q. And you have random drug testing, too.
22  What's the purpose of random drug testing?
23    A. Drug-free workplaces, random -- I think we
24  get it through -- in fact, there again, that doesn't
25  go to me. That goes to, probably, Captain Hughes and

Hilliard v.
Twin Falls County Sheriff's Office

Sheriff Tom Carter
March 12, 2020

---

10:48:17-10:49:03                                Page 82

1   Chief Deputy Newman.  And it's an envelope that you
2   open and it has a name in it.
3       Q.  But my question to you:  As one of the main
4   policymakers and enforcers, it's ultimately all your
5   responsibility, the way your office is run, right?
6           MS. HOWLAND:  Objection.  Misstates.
7           THE WITNESS:  That's right.
8
9   BY MR. JEFFREY HEPWORTH:
10      Q.  The buck stops with you with all the
11  decisions, don't they?
12      A.  At the end of the day.
13      Q.  Yeah.  So you have a drug testing procedure
14  at your workplace?
15      A.  At the County.
16      Q.  At Twin Falls County, correct?
17      A.  Yes.
18      Q.  Twin Falls County Sheriff's Office?
19      A.  And Twin Falls County.
20      Q.  Right.
21      A.  The whole county is drug-free workplace, no
22  matter if it's the Sheriff's Office or -- or Parks
23  and Rec would get random drug checks.
24      Q.  And the purpose of random testing is what,
25  is -- in your understanding?

---

10:49:05-10:50:02                                Page 83

1       A.  I would say my -- the purpose of it would
2   be -- is just what it would imply.  It's random.
3   So -- when you come to work today, you got to go --
4   you got to go pee in a bottle.
5       Q.  And no notice.  They don't find out until
6   they get to work, right?
7       A.  They don't find out until whichever division
8   head says, hey, you got to go pee in a bottle.
9       Q.  Do you know who runs that program?
10      A.  I do not.
11      Q.  Is it somebody at Twin Falls County?
12      A.  It would be, yes.  In fact, I would -- if I
13  had to guess, and this is strictly a guess, I would
14  say HR.
15      Q.  Okay.  So are you -- are you generally --
16  have you ever had to do a random test?
17      A.  No, oddly enough.  Well, I did -- prior to
18  being sheriff, I've done it, yes.  In my career, yes,
19  I've done random drug tests.
20      Q.  But as the sheriff, you've been the sheriff
21  for --
22      A.  Almost 12 years.
23      Q.  Never been random tested?
24      A.  I don't think elected officials are in that
25  pool.

---

10:50:03-10:51:12                                Page 84

1       Q.  You think you get exempted?
2       A.  I don't know the answer to that.  Or maybe
3   I'm just the luckiest guy in town.  You never know.
4   I've just never been randomly drug tested.
5       Q.  Were you aware -- I would have to look at my
6   notes, but my memory is that Captain Hilliard had
7   been drug tested maybe eight or nine times, maybe
8   more, maybe less?
9       A.  It's random.  I don't know the answer to
10  that.  My assumption on how that works is probably it
11  spits a name out of a computer.  I -- so if you're --
12  if -- if the implication is he got drug tested more
13  than anybody else, I would say no.
14      Q.  Okay.
15      A.  You know, there very well may be people
16  there that -- that's had it one time, and seven if
17  he's done it seven times.  That's not the point.
18  It's random.
19      Q.  When -- when the decisions were made with
20  regard to suspending Captain Newman in -- sorry.
21          When the decisions were made in June, July,
22  August, September in 2017, regarding Captain
23  Hilliard's suspension for work, did you take into
24  consideration that he had been random drug tested
25  multiple times?

---

10:51:14-10:52:22                                Page 85

1       A.  No.
2       Q.  Didn't even know that?
3       A.  I didn't even know that.
4       Q.  Okay.  Is that something that would be
5   relevant to the actions that were taken in July --
6       A.  No.
7       Q.  -- and August --
8       A.  It would not.  The actions that were taken
9   then had nothing to do with random drug, it had to do
10  with job -- I guess, how well you're doing the job.
11  It had nothing to do with random drug use.
12      Q.  Okay.  So let's talk about the reasonable
13  suspicion drug policy.  The Twin Falls County can
14  have a -- drug test performed on an employee that
15  they suspect is impaired on duty, correct?
16      A.  That is correct.  But the only one that
17  comes to mind with me wasn't drugs, it was alcohol.
18  There was a detective who was tested for alcohol.
19      Q.  So I'm just talking about the policy.
20      A.  Okay.
21      Q.  So if you want to talk about someone other
22  than Captain Hilliard --
23      A.  Well --
24      Q.  -- go ahead, but I'm not going to talk
25  about --

---

10:52:24-10:53:03                                    Page 86

1      A. I don't know where you're going with that.
2          MS. HOWLAND: Ask for the policy.
3          THE WITNESS: Could I see the policy?
4
5   BY MR. JEFFREY HEPWORTH:
6      Q. Well, I'm just asking you your knowledge of
7   the policy --
8      A. You know what I know is that if I need a
9   policy, I have my secretary get a policy and I read
10  it.  If you're asking me if I can quote what that
11  policy is, the answer is no.
12     Q. My question is --
13     A. If we had the policy, let's read it.
14     Q. I get to do the deposition.
15     A. I'm sorry, sir.
16     Q. And I'm sorry --
17     A. That's all right.
18     Q. And you didn't review your -- your drug
19  policy before your deposition, it didn't sound like?
20  You didn't know that was an issue?
21         MS. HOWLAND: Object to the form.
22         THE WITNESS: Would you re-state the
23  question, where we started with this?
24
25  BY MR. JEFFREY HEPWORTH:

10:53:03-10:53:45                                    Page 87

1      Q. Well, I'm going to ask a question.  I just
2   ask that you answer my question --
3      A. Okay.
4      Q. -- you're kind of trying to avoid my
5   questions --
6      A. Well, by now I forgot your question, so
7   start over.
8      Q. Well, I know.  So I'm going to -- I'm going
9   to lay a little foundation here.
10         So number one, did you know that this
11  deposition might involve drug testing policy?
12     A. Yes.
13     Q. Did you review your policy in preparation
14  for your deposition?
15     A. Yes.
16     Q. So you've reviewed your policy in
17  preparation for the deposition.  And I assume you
18  have knowledge of your policy, at least to some
19  extent?
20     A. Some extent, yes.
21     Q. And so I'm going to ask questions --
22     A. Okay.
23     Q. -- about your knowledge and your
24  interpretation of your policy, okay?
25     A. Okay.

10:53:47-10:54:55                                    Page 88

1      Q. I'm not going to quibble over words with
2   you.
3      A. Okay.
4      Q. I think that that's maybe the Court's job.
5          But you know that Twin Falls County has
6   reasonable suspicion drug testing, correct?
7      A. Correct.
8      Q. And you knew, as an elected official, that
9   you had the authority to ask an employee to be drug
10  tested on reasonable suspicion, correct?
11     A. I do have that authority.
12     Q. Okay.  And so the purpose of that in your
13  mind is what?
14     A. The purpose of drug testing?
15     Q. Yeah, reasonable suspicion drug testing.
16     A. If a supervisor -- my -- there again,
17  without -- we can read the policy and we'd probably
18  know exactly what it said.  It's my understanding if
19  a supervisor has reason to believe that there is an
20  issue, they have the authority to -- to test.
21     Q. Would you agree that impairment on the job
22  is a safety concern?
23     A. Impairment on the job is a safety concern,
24  yes.
25     Q. And that's the purpose -- that's one of the

10:54:57-10:56:01                                    Page 89

1   purposes of having --
2      A. Yes.
3      Q. -- a reasonable suspicion drug testing,
4   correct?
5      A. Yes.
6      Q. You don't want your police officers driving
7   around in Twin Falls County police cars or their own
8   cars while they're impaired; true?
9      A. That is correct.  And -- that is correct.
10     Q. You -- it's the Twin Falls County Sheriff's
11  job to make sure no one's driving a car impaired?
12     A. Everybody in the county.
13     Q. Twin Falls County --
14     A. Especially -- especially the members of the
15  agency.  You know, the impairment of people driving,
16  it's called DUI, and we deal with it all the time and
17  it's not good.
18     Q. Right.  And you wouldn't accuse somebody of
19  being impaired without doing proper testing, would
20  you?
21         MS. HOWLAND: Object to the form.
22         THE WITNESS: I would -- yes, that -- let
23  me -- ask that again, if you would.
24
25  BY MR. JEFFREY HEPWORTH:

10:56:01-10:56:44                                    Page 90

1    Q. Well, let me just back up.
2       You were a patrolman at one time?
3    A. I was a patrolman.
4    Q. And I assume you made DUI stops?
5    A. I did.
6    Q. And you were familiar -- probably even still
7 remember, even though it was a long time ago -- the
8 general procedure for a DUI stop?
9    A. Yes, I could -- yes.
10   Q. In order make a stop --
11   A. Your're right.
12   Q. -- you had to have, what is it, probably
13 cause or reasonable suspicion --
14   A. Driving -- you had to have -- driving
15 pattern, generally, is the way that started life.
16   Q. You had to observe something that led you to
17 believe that there's a safety issue regarding the
18 driver?
19   A. That is correct.
20   Q. Okay. And then you make the stop, right?
21   A. That is correct.
22   Q. And then you do an investigation. You talk
23 to the driver, ask him --
24   A. Yes.
25   Q. -- some questions, typically?

10:56:44-10:57:37                                    Page 91

1    A. Yes.
2    Q. Observe his demeanor, behavior, physical
3 appearance, right?
4    A. Smell.
5    Q. Smell? Right. And if you think there's
6 enough evidence, then you ask them to do field
7 sobriety tests?
8    A. You do a field sobriety test.
9    Q. What types of tests were you trained to do,
10 field sobriety test?
11   A. That was before the gaze nystagmus, which
12 tells you how long ago it was I done a DUI. It was
13 heel-to-toe --
14   Q. Say their ABCs?
15   A. Say their ABC's --
16   Q. Count backwards?
17   A. Forwards and backwards. Go down six steps
18 and back seven steps.
19   Q. And that is just standard operating
20 procedure from a law enforcement professional?
21   A. That would be the -- yes, that would be the
22 way they do DUI assessments, yes.
23   Q. And then based on that assessment, if you
24 thought there was reasonable cause to test, you would
25 do a scientific test, a breath test, typically,

10:57:41-10:58:42                                    Page 92

1 correct?
2    A. If you had reason to believe they were under
3 the influence, that's when you would take them to
4 jail and they would blow on an intox -- intoxilyzer.
5    Q. And I don't know what they did back when you
6 were a patrolman; but more recently, if you think
7 it's alcohol, you have them blow, right? A breath
8 test, typically?
9    A. Yes, yes.
10   Q. And if you think it's drugs, you usually do
11 a blood or a urine test; isn't that true?
12   A. Yes. If it's drugs, you would get a DRE.
13   Q. What's a DRE?
14   A. Drug recognition expert if it's drugs. I
15 would never, and most cops would never, make that
16 assumption without a DRE involved.
17   Q. And then the DRE would make the call as to
18 whether further testing was necessary?
19   A. That would be -- yes. That would be my
20 understanding.
21   Q. Okay. Now, on your drug free workplace
22 policy, is it your understanding that no disciplinary
23 actions can be taken against an employee until
24 there's a confirmatory blood or urine test?
25       MS. HOWLAND: Object to the form. Object to

10:58:10-10:59:32                                    Page 93

1 the fact he's requested to see the policy.
2       THE WITNESS: They would remain being paid.
3 If there was an issue, they would be on
4 administrative leave and they would get paid.
5
6 BY MR. JEFFREY HEPWORTH:
7    Q. Okay. When you say, "get paid," are you
8 saying they take sick leave or they get a regular
9 paycheck?
10   A. They get a paycheck.
11   Q. Okay. They don't have to take sick leave,
12 do they?
13   A. Not at that point.
14   Q. Okay. And it's only after they test
15 positive on the confirmatory test that disciplinary
16 action can be taken, correct? And if you don't know,
17 you can just say it.
18   A. Yeah, I'm --
19   Q. Okay.
20   A. -- I'm not comfortable answering that
21 because I don't know. But I am uncomfortable because
22 I need to go to the bathroom.
23   Q. Let's take a break and you can use the
24 bathroom.
25   A. You're a good man.

10:59:34-11:15:44                                      Page 94

1        VIDEOGRAPHER: We're off the record at
2    10:59.
3
4        (Whereupon a brief recess was taken from
5        10:59 a.m. to 11:15 a.m.)
6
7        (Exhibit 59 marked for identification.)
8
9        VIDEOGRAPHER: We're back on the record at
10   11:15.
11
12   BY MR. JEFFREY HEPWORTH:
13       Q. Okay. We've taken a little bit of a break.
14   You've had an opportunity to talk to your attorney --
15   or to -- yeah, to your attorney. Are there any
16   answers that you've given that you feel like you need
17   to change at this point?
18       A. No.
19       Q. You're comfortable with what we've
20   discussed?
21       A. So far, so good.
22       Q. Okay. Just one last question on this drug
23   testing Exhibit 55. Captain Hilliard tested negative
24   on the random drug test on Exhibit 55, and I think
25   that was in 2015, correct?

11:15:49-11:16:52                                      Page 95

1        A. I -- now, there again, if there's a
2    prescription for whatever you're looking at there, it
3    would come back -- that's my understanding.
4        Q. Explain that.
5        A. Drug test shows negative, negative,
6    negative. Now, for instance, I don't know if a
7    person had a prescription for extended marijuana
8    medal -- whatever. If you had a prescription for
9    that and you were randomly tested, it would show that
10   you had a prescription and it would probably come
11   back negative, that you have --
12       Q. That's your -- that's your understanding of
13   how --
14       A. That's my understanding.
15       Q. Okay. And my understanding is a little bit
16   different. And so there is somebody at Twin Falls
17   County that would know how to -- the testing's done,
18   what's tested for, correct?
19       A. I'm guessing Chief Newman would probably
20   know more about that -- could answer that better for
21   you than I can.
22       Q. Okay. Perfect. I'll ask Chief Deputy
23   Newman.
24           Exhibit 56 is just another status change
25   sheet dated August 26th, 2015, regarding Captain

11:16:57-11:18:15                                      Page 96

1    Hilliard and a merit increase; is that accurate?
2        A. Yes, sir. I'm guessing that that figure is
3    three percent bigger than that figure (indicating),
4    so...
5        Q. Okay. So he got a pay increase. Is it --
6    and that was 2015, or starting in -- for the 2016
7    year?
8        A. Year, '16. So it was 2.99 percent.
9        Q. So what pay period would he get the increase
10   for? The increase would be effective --
11       A. October. It happens in October.
12       Q. So that pay increase would have become
13   effective in October, 2016?
14       A. Yes.
15       Q. Okay. So let's go to --
16       A. Here's a date. 9/13 of '15, which is the
17   pay date before October.
18       Q. Okay. So it was effective from September,
19   '15 to September, '16?
20       A. I think it shows on your check.
21       Q. Right.
22       A. The pay date before.
23       Q. And Exhibit 57 is another random drug test,
24   and the date is May 9th, 2016, correct?
25       A. That's what it appears to be, yes, sir.

11:18:17-11:19:49                                      Page 97

1        Q. And that was, again, a random test?
2        A. Well, does it say? I don't know where it
3    says random, but it would be a random test.
4        Q. So in 2015 and 2016, both years, Captain
5    Hilliard was randomly tested, correct?
6        A. Apparently.
7        Q. Okay. And both results were negative, no --
8    no detection of drugs?
9        A. What day -- what day was -- yes, negative is
10   what they have for what they was testing him for.
11       Q. Okay. Now Exhibit 58, there's a number of
12   things going on there, I believe. On the top it says
13   September 1st, 2016, right?
14       A. Yes.
15       Q. And then it's -- it -- in the middle, it's a
16   merit increase, correct?
17       A. That's what it says, yes, sir.
18       Q. And that -- that pay increase would have
19   gone into effect September 25th, 2016, it says, on
20   the -- on that box in the middle?
21       A. Effective date of change -- yes, September
22   25th. There again, prior to October.
23       Q. So that had to have been the pay level that
24   Captain Hilliard was earning at the time of his
25   suspension and also at the time of his termination,

11:19:52-11:20:50                                    Page 98

1   correct?
2      A.   When he was put on administrative leave, he
3   was paid 34.51 per hour.
4      Q.   Okay.  And at the time, his job title was
5   captain of patrol?
6      A.   Yes.
7      Q.   And I didn't see a sheet that showed a job
8   change.  Is -- is that a job change, captain of
9   administrative services to captain to -- of patrol,
10  is that a job change?
11     A.   It is a job change but it pays the same,
12  so...
13     Q.   Do -- do you know why there was a job change
14  from administrative services to patrol when it came
15  to, I believe it's Captain Miller --
16     A.   Miller.
17     Q.   -- and captain -- Captain Hilliard?  Was
18  that your decision?
19     A.   That is my decision.
20     Q.   What was the reason for that?
21     A.   Captain Miller is probably better at the --
22  that position.  My goal is that captains learn each
23  other's stuff.
24     Q.   Okay.  So you felt that Captain Miller
25  wasn't doing patrol as well as he could have done

11:20:53-11:21:44                                    Page 99

1   administrative services?
2      A.   I'm saying Captain Miller was better at
3   administrative services.
4      Q.   Had he been in administrative services
5   previously?
6      A.   Yes.
7      Q.   So he --
8      A.   He started -- he started in administrative
9   services.
10     Q.   So you were flip-flopping Captain Hilliard
11  and Captain Miller?
12     A.   That is correct.  I flip-flopped them and
13  then I changed them back.
14     Q.   Okay.  How would you compare their
15  abilities?
16     A.   I couldn't -- that's hard to say, you know.
17  That's hard to say.  I know Captain Miller was
18  probably better at administrative services than
19  Captain Hilliard; but then, you know, that's just my
20  opinion.
21     Q.   Okay.  How about at patrol, who was better
22  at patrol?
23     A.   You know, I hate to rate people or rank
24  people.  Their -- they both -- if they do their job,
25  then that's what I ask.

11:21:46-11:22:47                                   Page 100

1      Q.   Okay.
2      A.   So to say that he's better than him, you
3   know, I -- I don't worry about who's better.  I worry
4   about who's not doing it.
5      Q.   So when that change was made, was that a
6   change initiated by you or captain -- or by Chief
7   Deputy Newman?
8      A.   That probably would have been me.  And I
9   don't remember when that was, so...
10     Q.   Did you do the performance evaluations for
11  Captain Miller and Captain Hilliard?
12     A.   No.
13     Q.   And those -- the job evaluations were done
14  by Chief Deputy Newman for both of those officers?
15     A.   That is correct.
16     Q.   Okay.  And Chief Deputy Newman does those
17  job evaluations and makes comments and rankings,
18  right?  Points?
19     A.   There again, whatever it shows on -- there's
20  one (indicating).
21     Q.   Okay.  So -- yeah.  And the -- I think the
22  form's a little different now, isn't it?
23     A.   It is different.
24     Q.   What is that exhibit you're referring to?
25     A.   47.

11:22:47-11:23:41                                   Page 101

1      Q.   What's the date, do you know?
2      A.   The date?
3      Q.   On the back?
4      A.   7/21.
5      Q.   What year?
6      A.   2009.
7      Q.   So let me -- let's go to Exhibit 59.  And I
8   don't know if you've seen this exhibit or not.  I'll
9   represent to you that that's the work release
10  document signed by Brent Hilliard's doctor, released
11  to light duty.
12     A.   Which doctor?
13     Q.   Dazley.
14          MS. HOWLAND:  This is -- what's the number
15  on that, Jeff?  I'm trying to see which one it is.
16          MR. JEFFREY HEPWORTH:  I don't think it's
17  ever been marked as an exhibit, alone, before, so
18  obviously it's marked --
19          MS. HOWLAND:  Oh, 59?  Is that what that
20  says?
21          MR. JEFFREY HEPWORTH:  Right.
22
23  BY MR. JEFFREY HEPWORTH:
24     Q.   Have you ever seen that document before?
25     A.   I have not.

11:23:42-11:24:57          Page 102

1      Q. I'll represent to you it says June 7th.
2 There's a date on it, I believe, near the bottom?
3      A. There's a date of 3/12 -- no, that must be
4 your date. Scanned 7/28/17.
5      Q. Let me see it. So right next to Brent
6 Hilliard -- at the bottom, there's a patient named
7 Brent Hilliard. And to the right of that it says,
8 date, and there's June 7th, 2017. Do you see that?
9      A. That is what that says, yes.
10      Q. Okay. And I'll represent to you that
11 Captain Hilliard returned to light duty work, and it
12 was with restrictions, on June 7th, 2017. Do you
13 have any reason to dispute that?
14      A. That -- you'd have to talk to the Chief
15 about that.
16      Q. That document would seem to --
17      A. That document would indicate that, yes.
18      Q. Okay. So I'm going to hand you -- this is
19 an exhibit from a prior deposition -- Exhibit 35.
20 It's a job evaluation that was done of Captain
21 Hilliard by Chief Deputy Newman. The due date was
22 May 31st, 2017. Have you ever seen that document?
23      A. No.
24      Q. Your signature's -- your electronic
25 signature's on the back?

11:24:59-11:25:48          Page 103

1      A. Yeah.
2      Q. Do you see the signature page?
3      A. Signature, yes. Approval and signature.
4      Q. Your signature's --
5      A. Before it -- before this can be finalized, it
6 needs my signature.
7      Q. So you've seen it?
8      A. Yes.
9      Q. And you would have seen it at the time that
10 you electronically signed it, correct?
11      A. Yes.
12      Q. And have you seen it in preparation for your
13 deposition today?
14      A. No.
15      Q. Okay. I'm not going to go through -- you
16 weren't involved in that evaluation?
17      A. I was not.
18      Q. Don Newman did the evaluation; you approved
19 it. Correct?
20      A. Yes.
21      Q. And that would -- do you -- do you think you
22 read it before you approved it?
23      A. I -- I can't say I read it before I approved
24 it, but I can't say I didn't read it before I
25 approved it. If -- I probably did.

11:25:51-11:26:42          Page 104

1      Q. So do you have a habit and practice of
2 reviewing your captains' performance evaluations?
3      A. Generally. If there's an issue, I would,
4 yes.
5      Q. Okay. Well, was there an issue with Captain
6 Hilliard?
7      A. Clearly, there was an issue at the end of
8 his employment, yes.
9      Q. No, I'm talking about in -- in -- on May
10 31st, 2017, were you aware of any issues with Captain
11 Hilliard's job performance?
12      A. I don't know the answer to that. Nothing --
13 no.
14      Q. As far as you sit here, you can't remember
15 any concerns about Captain Hilliard's job
16 performance?
17        MS. HOWLAND: Object to the form.
18        THE WITNESS: On that date, I can't -- I
19 can't answer that, sir. I don't know. If I said no,
20 then you'd say something and -- so there was nothing
21 that I can come up with at this time that I had an
22 issue with.
23
24 BY MR. JEFFREY HEPWORTH:
25      Q. Well, let me ask you this: If you -- if you

11:26:44-11:27:53          Page 105

1 believe that Captain Hilliard was coming to work
2 impaired prior to May 31st, 2017, would that be an
3 issue that would concern you?
4      A. It would.
5      Q. And if -- if the job evaluation came to you
6 somewhere around May 31st and there wasn't any
7 mention of being impaired on the job, and you knew
8 that there were allegations that he was impaired on
9 the job, would that be something that would cause you
10 to reflect that on his job evaluation?
11        MS. HOWLAND: Object to the form.
12        THE WITNESS: The job evaluation would have
13 been done by the Chief.
14
15 BY MR. JEFFREY HEPWORTH:
16      Q. And I'm not asking that. I understand --
17 you've told me that a number of times and I totally
18 understand. I'm asking about you. I'm asking if you
19 knew and what you did?
20      A. I approved this. If you're asking me if
21 there was an issue, would I know it? Probably. And
22 if there was an issue and I knew it, I would probably
23 go talk to the Chief, if -- if that helps what we're
24 answering.
25      Q. My question is, would that somehow be

11:27:55-11:28:39                                        Page 106

1    reflected on his job evaluation?
2         MS. HOWLAND: Object to the form.
3         THE WITNESS: I never read this job. I
4    would assume if there was an issue, it would. That's
5    what I know about that.
6
7    BY MR. JEFFREY HEPWORTH:
8         Q. What is the purpose of a job evaluation?
9         A. It's to check how the employee's doing on
10   the job.
11        Q. And you do it frequently, don't you?
12        A. Once a year, twice a year.
13        Q. And when I say, "Twin Falls County Sheriff's
14   Office," or -- when I say, "you," I'm referring to
15   Twin Falls County --
16        A. To the Sheriff's Office.
17        Q. Right.
18        A. Yeah. I think we're doing them once a year
19   now.
20        Q. And the job evaluations are a tool that you
21   use to assess people's performance, correct?
22        A. That is correct.
23        Q. And you use that tool to determine whether
24   they should get promotions or job suspensions or
25   warnings or pay raises, right?

11:28:41-11:30:47                                        Page 107

1         A. With evaluations.
2         Q. That's the purpose of that document?
3         A. That's the purpose of that document.
4         Q. Okay. So there was no indication on Exhibit
5    35, the job evaluation of Captain Hilliard in May of
6    2017, of -- of any substance abuse problems that
7    you're aware of?
8         A. I'd have to read it, so...
9         Q. You can read it if you want. Take your
10   time.
11        A. If you're asking that I was aware
12   of...(reading document).
13        Okay. What I am looking at here is the
14   comments, is what I'm --
15        Q. Yeah, go ahead. Yeah, that's great.
16        A. (Reading document.)
17        Q. How would you characterize that job
18   evaluation?
19        A. Solid.
20        Q. A very good review, isn't it?
21        A. I see nothing negative about it. You know,
22   there's --
23        Q. Was there a lot of positive?
24        A. Score three. A valuable contributor, is
25   what it says. There is one here that is a four,

11:30:50-11:31:53                                        Page 108

1    which is a significant accomplishment, which --
2    Captain Hilliard has the ability to see conflicts for
3    what they are.
4         Q. Okay.
5         A. Captain Hilliard takes the safety and
6    welfare seriously. You know, this -- this particular
7    evaluation is -- a valuable contributor. A three, a
8    four, it's -- it's -- it is what it is.
9         Q. It's a very good evaluation, isn't it?
10        A. It's certainly a good evaluation as I see
11   it.
12        Q. And that's the last evaluation that was done
13   of Captain Hilliard, and it's dated May 31st, 2017,
14   correct?
15        A. That would be, I assume, correct. I --
16        Q. And at the time, he was off duty?
17        A. From that date?
18        Q. Yes.
19        A. Yeah.
20        Q. We just -- I gave you the doctor's release.
21   He came back to work June 7th. I'll represent that
22   that's a fact, okay?
23        A. Okay.
24        Q. So here's an exhibit that's been marked
25   previously. It was both Exhibit 30 and Exhibit 8.

11:31:56-11:33:09                                        Page 109

1    It's a letter that was written by Chief Deputy Newman
2    to Dr. Tye, okay? And I'm sure you've seen that
3    letter, right?
4         A. (Reading document.)
5         Q. Did you review that letter prior to your
6    deposition?
7         A. Did I read this today? No.
8         Q. Prior to your deposition. So you're not
9    familiar with that letter?
10        A. I have seen this letter, but I -- unless I
11   read it as we sit here --
12        Q. Okay. Well, we might have to. So it -- you
13   agree the date on the letter -- it's exhibit -- both
14   Exhibit 30 and Exhibit 8 --
15        A. 7/31.
16        Q. -- July 31st, 2017. And the letter is, on
17   Page 3, it's: Sincerely, Don Newman.
18        It's a letter Don Newman wrote, right?
19   Chief Deputy?
20        A. Yes.
21        Q. And then, it's addressed to Treasure Valley
22   Psychological Services, Dear Dr. Tye. Correct?
23        A. Yes, yes.
24        Q. Okay. Then go to the second paragraph. It
25   says: On June 6th, we were conducting our regularly

11:33:14-11:34:10                                      Page 110

1  scheduled staff meeting when the Sheriff asked
2  everyone to leave, excluding the captains and myself.
3  Captain Hilliard was not present for the meeting.
4  According to Sheriff Carter, it was brought to his
5  attention there was an issue with Captain Hilliard
6  being at work and appearing to be under the influence
7  of something.  I was out of the office on June 7th --
8  meaning "I" being captain -- Chief Deputy Newman.  So
9  Newman was out of the office on June 7th due to a
10 prior engagement in Blaine County.  I met with
11 Captain Hilliard on the 8th.
12        Correct?  Did I read that correctly?
13     A.  That's what it says.
14     Q.  So this is the day before Captain Hilliard
15 came back to work.  It's a regularly scheduled
16 meeting on June 6th, right?
17        MS. HOWLAND:  Object to the form.
18 Foundation.
19
20 BY MR. JEFFREY HEPWORTH:
21     Q.  That's what the letter says?
22        MS. HOWLAND:  Foundation.
23        THE WITNESS:  I don't know what day that
24 was.
25

11:34:10-11:34:45                                      Page 111

1  BY MR. JEFFREY HEPWORTH:
2     Q.  Do you remember a meeting, a regularly
3  scheduled captain's meeting?  It's a Tuesday, June
4  6th.
5     A.  That would have been a staff meeting.
6     Q.  Okay.  And do you remember, at that time,
7  telling everyone to leave except the captains and
8  yourself --
9     A.  Yes.
10    Q.  -- do you remember that?
11    A.  Yes.
12    Q.  That occurred, correct?
13    A.  That occurred.
14    Q.  And Don Newman didn't make a mistake when he
15 said that happened on June 6th, did he?
16       MS. HOWLAND:  Foundation.
17       THE WITNESS:  I don't know the answer to
18 that --
19
20 BY MR. JEFFREY HEPWORTH:
21    Q.  Well, it's a Tuesday --
22    A.  It's a Tuesday.  So if it was a captain's --
23    Q.  Yeah.
24    A.  -- a staff meeting and a Tuesday morning,
25 that makes sense.

11:34:46-11:35:52                                      Page 112

1     Q.  Well, I'm going to suggest to you that with
2  regard to this litigation, that's a very significant
3  date, okay?
4     A.  Okay.
5     Q.  So I want to make sure that you don't
6  disagree that this happened.  Captain -- or Chief
7  Deputy Newman has written this down.  And he says
8  that according to Sheriff Carter, it was brought to
9  his attention there was an issue with Captain
10 Hilliard being at work and appearing to be under the
11 influence of something.  So do you remember what it
12 is that you brought up?  What -- when did this issue
13 come up?
14    A.  Brent was --
15       MS. HOWLAND:  Object to form.
16
17 BY MR. JEFFREY HEPWORTH:
18    Q.  Go ahead.
19    A.  There were employees who seen that Brent was
20 struggling.
21    Q.  Who?
22    A.  Captains -- who talked about it?
23 Captains --
24    Q.  No.  Who?  Who brought it to your attention?
25    A.  That, I don't remember.

11:35:52-11:36:32                                      Page 113

1     Q.  You -- you -- you brought this issue up --
2     A.  Yes.
3     Q.  -- at this meeting --
4     A.  Yes.
5     Q.  -- on Tuesday, June 6th?
6     A.  I would say that --
7        MS. HOWLAND:  Objection.  Foundation.
8  Misstates.
9
10 BY MR. JEFFREY HEPWORTH:
11    Q.  The letter suggestS that you brought the
12 issue up.  Do you disagree with that?
13    A.  That's what the letter says.
14    Q.  Do you disagree with that?
15    A.  No.
16    Q.  Okay.  So you --
17    A.  But I don't remember it, so we're going off
18 of this.
19    Q.  Okay.
20    A.  And if you're asking me who would have said
21 that, I don't remember.  It would have been somebody
22 who had seen and had a -- that was worried about
23 Brent.  Now the -- the timing here, I don't know what
24 to tell you on that.
25    Q.  So we've already talked about being impaired

11:36:39-11:37:51                                          Page 114

1  on duty.  That's a very serious issue?
2      A.  That's a bad thing.
3      Q.  Okay.  And somebody has accused Brent, and
4  brought it to your attention, of being impaired on
5  duty, correct?
6      A.  That is correct.
7      Q.  And what did you do about that?
8      A.  I would have talked to the Chief.  I -- I
9  would have talked to the Chief about that.  That
10 conversation was held by -- you know, it -- it was
11 lots of people that had had that opinion, you know.
12 Captains, lieutenants, the patrol clerk, the patrol
13 secretary.  There --
14     Q.  Okay.  Let's --
15     A.  -- there was lots of people that observed an
16 issue.
17     Q.  You're -- you're talking about allegations
18 that were made after he came back to work?
19     A.  While he was there, yes.  I don't know of --
20     Q.  So that's why this is pretty important,
21 okay?  This is before he got back to work.  I'm not
22 talking about observations that were made on July
23 10th, because I -- this letter addresses the
24 allegations that were made on July 10th.  And I've
25 taken the depositions of Barnhill and Brown, who made

11:37:57-11:38:48                                          Page 115

1  allegations of Brent being at home and saying that he
2  had had alcohol and couldn't respond to a scene.  Do
3  you -- do you remember that?
4      A.  Yes, I -- I also know of that, yes.
5      Q.  And that has nothing to do with on-duty,
6  does it?
7          MS. HOWLAND:  Object to the form.
8          THE WITNESS:  That has to do with not being
9  able to respond to a call out.
10
11 BY MR. JEFFREY HEPWORTH:
12     Q.  Do you make a distinction between off work
13 and on work?
14         You know Brent Hilliard drinks beer?
15     A.  Yes.
16     Q.  And you know he doesn't do it on the job,
17 does he?
18     A.  I've never seen him, you know --
19     Q.  But you know he drinks off the job?
20     A.  Yes.
21     Q.  And so do you?
22     A.  Yes.  Occasionally, I do.
23     Q.  And so did Doug Hughes, and so do a lot of
24 other officers, correct?
25         MS. HOWLAND:  Objection.  Foundation.

11:38:51-11:39:54                                          Page 116

1          THE WITNESS:  That is correct.
2
3  BY MR. JEFFREY HEPWORTH:
4      Q.  So accusing someone of being on-duty
5  impaired is a totally different thing; wouldn't you
6  agree?
7          MS. HOWLAND:  Object to the form.
8          THE WITNESS:  On-duty impaired is not
9  alcohol-related.
10
11 BY MR. JEFFREY HEPWORTH:
12     Q.  Well, I don't -- all I know is that it says
13 impaired.  "Under the influence of something" is the
14 wording.  Do you see where it says --
15     A.  Yes.
16     Q.  So did -- do you contend that chief
17 deputy -- excuse me.
18         Do you contend that there is a witness that
19 Captain Hilliard was under the influence of something
20 prior to June 6th, 2017?
21     A.  I can't answer that.  I don't know the
22 answer to that.
23     Q.  And the standard policy would be if -- if an
24 officer observes another employee under the
25 influence, it's their responsibility to report that

11:39:56-11:40:46                                          Page 117

1  and investigate further; wouldn't you agree?
2      A.  Yes.
3      Q.  And under the drug testing policy, the only
4  way to prove it is to do a drug test?
5          MS. HOWLAND:  Object to the form.
6  Misstates.
7
8  BY MR. JEFFREY HEPWORTH:
9      Q.  Do you know of any other way to test?
10     A.  No, I do not.
11     Q.  If -- if an officer thought that Captain
12 Hilliard was under the influence of something, would
13 it be recommended that they at least do field
14 sobriety tests?
15         MS. HOWLAND:  Object to the form.
16
17 BY MR. JEFFREY HEPWORTH:
18     Q.  If captain -- if Captain Hilliard was on
19 duty?
20     A.  If somebody seen something, they would
21 report that up and it would make it to me.  And at
22 some point, I would say do something about it.
23     Q.  Okay.  So apparently, on June 6th, you're
24 sharing that with the other captains, that somebody
25 had reported to you.  And you don't remember who it

11:40:49-11:41:54                                             Page 118

1   was, correct?
2       A. Yeah.
3       Q. And you don't know anymore than just,
4   vaguely, that somebody told you something; is that --
5   is that fair?
6       A. There -- there was lots of people causing
7   issues. One person saying something is what it is.
8   If there is an accumulation of people saying
9   something, at some point you need to check it out.
10  And that's what that Fit for Duty thing is. At some
11  point you -- you say, okay, we need to check this
12  out. One way of checking this out is Fit for Duty.
13      Q. Okay. And another way is doing a drug test?
14      A. Yes, that would be another way of doing it.
15      Q. And we'll get into the Fit for Duty; but
16  another way of checking it out would be field
17  sobriety tests, right?
18          MS. HOWLAND: Object to the form.
19  Foundation.
20          THE WITNESS: You would need a drug
21  recognition expert to do a field sobriety on anything
22  other than alcohol.
23
24  BY MR. JEFFREY HEPWORTH:
25      Q. Okay. So under the influence of something?

11:41:58-11:43:04                                            Page 119

1       A. Yes.
2       Q. And at the time, you didn't know it was
3   drugs or alcohol?
4       A. At the time, I would have clearly known that
5   it wasn't alcohol.
6       Q. Okay. Why is that?
7       A. Because Brent never came to work drinking.
8       Q. Okay.
9       A. After -- you never smelled alcohol on Brent.
10  Brent -- the only issues that anyone ever seen was
11  lethargy. You couldn't -- so what would happen is I
12  would say something, and then Chief Newman would do
13  whatever I told him to do. This thing had to do with
14  a Fit for Duty.
15      Q. Well, and that's -- I understand your
16  answer, but my questions are a little bit different.
17  I'm talking about the time frame. So we've
18  established that it wasn't alcohol. You're not aware
19  of anybody saying that he -- that he had alcohol, the
20  smell of alcohol, or was consuming alcohol on the
21  job?
22      A. No.
23      Q. There has been testimony -- I'll represent
24  to you that Daron Brown and Barnhill said that they
25  called Brent at home, I think in November of 2016 and

11:43:09-11:44:27                                            Page 120

1   maybe after that, and said -- and Brent told them
2   he'd been drinking. You're aware of that?
3       A. Yes.
4       Q. Okay. You wouldn't fire him for that, would
5   you?
6           MS. HOWLAND: Object to the form.
7           THE WITNESS: Not unless it became a -- an
8   issue a lot -- for that, no.
9
10  BY MR. JEFFREY HEPWORTH:
11      Q. Had it?
12      A. No.
13      Q. As --
14      A. Okay. Memory. There was an issue that
15  involved a shooting. I'm assuming either a sergeant
16  or a lieutenant had called Brent and said they --
17  somebody was involved in a shooting tonight. And
18  then that -- in fact, he apologized to me for that.
19  That one should have been handled by the captain.
20  What should have happened, in my opinion -- and I'm
21  sheriff -- that captain, I would expect him to -- to
22  get to that scene and check on his people; check on
23  what's going on and take -- take over. He didn't.
24      Q. When did that happen?
25      A. I don't know.

11:44:27-11:45:17                                            Page 121

1       Q. Did that show up on his job evaluation?
2       A. I don't have any idea.
3       Q. Did --
4       A. I'm telling you what I just thought of, that
5   we was talking about.
6       Q. Did that show up on his job evaluation?
7       A. I don't know the answer to that.
8       Q. Should it have shown up on his job
9   evaluation?
10      A. Probably.
11      Q. Should he have received a suspension or a
12  warning?
13          MS. HOWLAND: Object to the form.
14          THE WITNESS: What he received on that, I
15  think, was verbal. Him and I talked about that.
16
17  BY MR. JEFFREY HEPWORTH:
18      Q. Okay. Was that your job to talk to Brent
19  about it or was that Newman's job?
20      A. I talked to Brent about it.
21      Q. Has there ever been a time where you thought
22  Captain Hilliard had a drinking problem?
23      A. No.
24      Q. Had --
25          MR. J. GRADY HEPWORTH: Was that a no?

11:45:18-11:46:29                                        Page 122

1        THE WITNESS: That's a no.
2
3    BY MR. JEFFREY HEPWORTH:
4        Q. So have you ever had the opinion that
5    Captain Hilliard's drinking somehow interfered with
6    doing his job?
7        A. No.
8        Q. Okay. So with regard to Captain Hilliard's
9    suspension and termination, did it have -- well,
10   let's just talk about the suspension.
11       So he was suspended later in July. Do you
12   remember that?
13       A. Okay.
14       Q. And he went to a Fit for Duty?
15       A. Yes.
16       Q. And the Fit for Duty report, itself, talks
17   about substance abuse. Was that -- was that your
18   understanding?
19       A. That was my understanding.
20       Q. Okay. Is it -- was it Twin Falls County's
21   position that Captain Hilliard had abused substances?
22       A. That's why the Fit for Duty was done.
23       Q. Okay. And the substances we're talking
24   about are what?
25       A. Medications, I think, is what we're talking

11:46:31-11:47:21                                        Page 123

1    about.
2        Q. All right. So you're not contending that it
3    was illegal substances?
4        A. No. I'm talking -- I'm contending it was
5    abuse of substances.
6        Q. Okay. So you knew when he came back on
7    light duty that he was taking medications, right?
8        MS. HOWLAND: Object to the form.
9    Foundation. Misstates.
10
11   BY MR. JEFFREY HEPWORTH:
12       Q. Did you know that he was --
13       A. I would have known that he would be taking
14   medication.
15       Q. And he had done that previously? He had had
16   back surgeries, been on pain meds, come back to work
17   on light duty, right? Were you aware of that?
18       A. Yes.
19       Q. And I believe this was his fourth back
20   surgery, by the way.
21       A. I thought it was his third, to my knowledge,
22   so...
23       Q. Were you aware, previously, of ever having
24   any problems with Brent Hilliard, after back
25   surgeries, having difficulties at work performing his

11:47:24-11:48:46                                        Page 124

1    job?
2        A. Yes.
3        Q. Okay.
4        A. Brent would have the appearance of issues at
5    work. So the answer to that would be yes.
6        Q. When is the first time you recall he had
7    appearance of issues at work?
8        A. Probably after the first or second -- any
9    issues would work themselves out.
10       Q. What do you mean by that?
11       A. I mean by that, you would get the same
12   conversation every time. Sooner or later, you have
13   got to do something.
14       Q. I'm not following you.
15       A. You're not following me. Brent would come
16   to work appearing to be under the influence of
17   something. You would have people talk about that.
18   The captains would talk about it. The sheriff talked
19   about it. Let's see. At some point --
20       Q. How far back are we going? First --
21       A. I can only -- you know, I can -- let's go
22   back two. The one before this one.
23       Q. Okay.
24       A. Okay. As far as I was concerned, Brent
25   always was given the benefit of the doubt. Then

11:48:53-11:49:59                                        Page 125

1    after this back surgery, there were issues -- I say,
2    "issues." I heard issues; I witnessed issues. This
3    isn't -- this is at work.
4        Q. Pardon?
5        A. This is at work that I'm talking about.
6        Q. Well, I assumed the prior issues were at
7    work, right?
8        A. Yes.
9        Q. He took off work following his back
10   surgeries?
11       A. Yes.
12       Q. And then he would come back, light duty?
13       A. Yes.
14       Q. And he'd be on light duty because he was
15   taking some pain medications, right?
16       A. Right.
17       MS. HOWLAND: Foundation.
18
19   BY MR. JEFFREY HEPWORTH:
20       Q. Or he'd have restrictions on lifting,
21   bending, you know, physical limitations?
22       A. Light duty to a captain is decision-making.
23   I didn't ever worry about Brent's ability to lift or
24   jump or run or any of that. The captain has to make
25   decisions. That's what scared me about Brent. I --

**11:50:03-11:51:14**      Page 126

1  there was the decision-making -- when you have the
2  appearance of being on something, whatever we
3  determined that was, and you are impaired by it, I
4  don't want you making a life-and-death decision
5  that's going to affect somebody else.
6     Q. So did you believe that whether Brent was
7  impaired or not could be measured scientifically?
8     A. Fit for Duty. That's why we went to
9  Dr. Tye.
10    Q. So --
11    A. My --
12    Q. So when you hired Dr. Tye, or when Twin
13 Falls County hired Dr. Tye, the purpose of that was
14 to measure his cognitive abilities? Is that what
15 you're telling me?
16    A. Psychologicals. I don't know what -- I
17 don't know what Dr. Tye and all that involves, but
18 psychological is what I know. And then if you got
19 one of his tasks, that goes into testing and this and
20 that, so -- I don't even presume to understand
21 what Dr. Tye does.
22    Q. Well, I'm going to talk to Don Newman later
23 this afternoon. What I want to find out is your
24 observations and your opinions and what motivated you
25 to do what you did.

**11:51:16-11:52:14**      Page 127

1     A. If you want to know what my motivation was,
2  was to get Brent help.
3     Q. And --
4     A. My motivation was Brent would come to work
5  and he was clearly having issues. Like I say, the
6  lowest person on our totem pole could see that. You
7  don't have to be a drug recognition expert to
8  understand when somebody's got some odd behavior
9  going.
10    Q. Okay.
11    A. What --
12    Q. Go ahead. Go ahead and answer. I didn't
13 mean to cut you off.
14    A. All right. What I wanted to happen was the
15 Fit for Duty and Brent to get -- pass the Fit for
16 Duty and come back to work.
17    Q. You --
18    A. That -- that was my goal.
19    Q. So the goal was to get Brent back to work?
20    A. To get Brent better was the goal.
21    Q. And your concerns about being better were
22 what? I assume his back is one issue?
23    A. That was one issue.
24    Q. But that wasn't something --
25    A. That's not --

**11:52:15-11:53:23**      Page 128

1     Q. That wasn't what was driving your
2  decision-making?
3     A. My decision-making had to do with Brent's
4  well-being. And Brent's well-being and my
5  decision-making had to do with the agency's
6  well-being. It goes right back to making a decision
7  that could be life-altering. That was my decision.
8  Twofold. I wanted Brent back to work, fit for duty.
9  Two, I wanted Brent back healthy because he's a
10 friend.
11    Q. Were you concerned about him?
12    A. You said, was I concerned about him?
13    Q. Yeah.
14    A. Of course I'm concerned about him.
15    Q. Because he's a friend?
16    A. And he's a captain of my agency.
17    Q. Did you know that he wanted to come back to
18 work?
19    A. Of course I did.
20    Q. I mean, did you -- did he talk to you about
21 wanting to get back to work after his surgery?
22    A. No. During -- during that time frame, that
23 would have been handled by the Chief. Brent and I
24 never interacted during that time frame other than
25 professionally. What Brent needed to do was pass

**11:53:28-11:54:33**      Page 129

1  that Fit for Duty test, get better, and quit coming
2  to work under the influence. Impaired.
3     Q. Okay. So that's really important, what you
4  just said. You're -- you're claiming that Brent came
5  to work impaired, right?
6     A. Yes.
7     Q. And you're claiming that he did before he
8  came back to work after his surgery in May and after
9  he came back to work after his surgery in May; is
10 that -- is that accurate?
11    A. Yes.
12    Q. And so would it be fair to say that you had
13 a -- because it was both before and after, you'd been
14 through this before, you were at a very high level of
15 concern? And that is why you told people on June
16 6th, hey --
17    A. We need to do something.
18    Q. Right. So you'd made up your mind already
19 that Brent had a drug abuse problem?
20       MS. HOWLAND: Object to the form.
21
22 BY MR. JEFFREY HEPWORTH:
23    Q. Is that correct?
24    A. No. I had made up my mind that Brent was
25 having issues.

11:54:34-11:55:31                                Page 130

1      Q.  You had made up your mind that he was
2   impaired in his decision-making?
3      A.  I seen that with my own eyes.
4      Q.  On June 6th, you had the opinion that Brent
5   was impaired in his decision-making; is that correct?
6   And then he came back to work June 7th, right?
7          MS. HOWLAND:  Object to the form.
8   Foundation.
9
10  BY MR. JEFFREY HEPWORTH:
11     Q.  Let me back up.  Is it accurate that before
12  Brent came back to work on June 7th -- actually, on
13  June 6th, you told people that there was a problem
14  with Brent being under the influence on the job?
15         MS. HOWLAND:  Object to the form.
16
17  BY MR. JEFFREY HEPWORTH:
18     Q.  And that refers to observations that
19  happened before June 6th, right?
20     A.  It would be on June 6th or between June 6th
21  and -- what date did this all go down?  When was the
22  Fit for Duty?
23     Q.  Fit for Duty was July --
24     A.  July.
25     Q.  -- 27th.  So -- so he came back to work June

11:55:35-11:56:22                                Page 131

1   7th.
2          MS. HOWLAND:  Object to the form.
3   Foundation.
4
5   BY MR. JEFFREY HEPWORTH:
6      Q.  I've already laid a foundation.  He came
7   back to work June 7th --
8          MS. HOWLAND:  Object to the form.
9   Foundation.
10
11  BY MR. JEFFREY HEPWORTH:
12     Q.  -- you had the meeting on June 6th, and you
13  told everybody that Brent -- you -- was the purpose
14  of that to say, hey, keep a look out?  Is that why
15  you brought it to their attention?  I -- I --
16     A.  It was already to their attention.
17     Q.  Okay.  But you brought it up?
18     A.  I brought it up that time, yes.
19     Q.  And I watch a lot of police -- they call it
20  a BOLO, right?  Be on the look out?
21     A.  Be on the look out for it, yeah.
22     Q.  So you put a BOLO out on Brent appearing to
23  be under the influence on the job; is that fair?
24     A.  We discussed it.
25     Q.  Okay.  So he came to work June 7th and he

11:56:25-11:57:04                                Page 132

1   was working part-time, correct?
2      A.  I don't remember that.  I don't know what
3   his schedule was.
4      Q.  I'll represent to you that he came back June
5   7th and worked part-time.  Do you have any reason to
6   dispute that?
7          MS. HOWLAND:  Foundation.  Form.
8
9   BY MR. JEFFREY HEPWORTH:
10     Q.  Do you have any reason to dispute that?
11     A.  I do not.
12     Q.  And he got suspended July 10th.  Do you
13  remember that?
14     A.  I remember him getting suspended, yes --
15     Q.  So he worked --
16     A.  -- or him going on administrative leave.
17     Q.  Just assume, for purposes of my question,
18  that he worked from June 7th to July 10th, part-time.
19  Can you assume that?
20     A.  I would have to see the time sheets.
21     Q.  Just assume it.  I'm asking you to assume
22  it.  Can you do that?
23         THE WITNESS:  Can I just assume that?
24  You're my attorney.
25         MS. HOWLAND:  I'm going to object to the

11:57:05-11:57:46                                Page 133

1   form.  You don't have to assume that.
2
3   BY MR. JEFFREY HEPWORTH:
4      Q.  I'm asking you to.  Are you -- if you don't
5   want to --
6      A.  I'm not going to assume that.
7      Q.  Okay.
8      A.  If we had a stack of time sheets --
9      Q.  Well, let's talk about you, personally,
10  witnessing things, okay?  You said you, personally,
11  witnessed situations where you felt Brent was under
12  the influence; is that correct?
13     A.  That's correct.
14     Q.  And was that after June 6th?
15     A.  That was before and after.
16     Q.  Let's just talk about after June 6th, okay?
17  Tell me the first time --
18     A.  I can't.
19     Q.  Tell me the first time you, personally,
20  witnessed Brent Hilliard at work when you thought he
21  was under the influence?
22     A.  I can't give you a date because I don't know
23  the date.
24     Q.  But you, personally, witnessed -- you're
25  saying --

Hilliard v.
Twin Falls County Sheriff's Office

Sheriff Tom Carter
March 12, 2020

---

11:57:47-11:58:35      Page 134

1    A. I, personally, witnessed what I -- appeared
2 to me, Brent having issues.
3    Q. Did you document it?
4    A. No.
5    Q. Did you ask him to perform field sobriety
6 tests?
7    A. I did not. I asked him if he was all right.
8    Q. Did you ask him to undergo a reasonable
9 suspicion drug test?
10    A. I did not.
11    Q. Why did you not ask him to do a reasonable
12 suspicion drug test?
13    A. Because I give him the benefit of the doubt.
14    Q. Did you feel that you had reasonable
15 suspicion?
16    A. I felt I had reasonable cause to be alarmed,
17 or be concerned.
18    Q. And my question is, using the words of your
19 policy, "reasonable suspicion," did you feel that you
20 had a reasonable suspicion that Brent Hilliard was at
21 work, under the influence, that impaired him sometime
22 after June 7th, 2017?
23      MS. HOWLAND: Object to the form.
24      THE WITNESS: Yes.
25

---

11:58:35-11:59:23      Page 135

1 BY MR. JEFFREY HEPWORTH:
2    Q. And did you ask him to do a drug test?
3    A. I did not.
4    Q. Would you agree that you made an intentional
5 decision not to request a drug test?
6    A. I made an intentional decision to give him
7 the benefit of the doubt.
8    Q. And that doesn't answer my question.
9    A. Well, sir, it does answer your question.
10    Q. Please answer my question. Did you --
11    A. Let's try it again.
12    Q. Did you choose not to give a drug test when
13 you believed that you had a reasonable suspicion that
14 Brent Hilliard was under the influence and impaired
15 after June 7th, 2017?
16    A. Yes.
17    Q. So you made a -- you made a -- you thought
18 you had a reasonable suspicion of impairment?
19    A. I had reasonable suspicion. I did not
20 pursue it.
21    Q. And you knew you had the authority to order
22 a drug test?
23    A. Of course I did.
24    Q. And you chose not to?
25    A. At that time, I chose not to.

---

11:59:25-12:00:29      Page 136

1    Q. Did you ever choose to drug test him?
2    A. The conversation we had about drug testing
3 was the same day that he went on administrative
4 leave.
5    Q. Tell me about that.
6    A. That conversation in my office, at my
7 conference table, Chief Newman had said that there's
8 issues and he needed to go home. Chief Newman talked
9 about going to Occupational Health and doing a drug
10 test, which he didn't want to do.
11    Q. What do you mean by that?
12    A. I -- what do you mean, what do I mean?
13    Q. This is a conversation between you and
14 Newman?
15    A. And Brent.
16    Q. Okay. So --
17    A. We were all three in the room.
18    Q. Okay. So this is a conversation in your
19 office?
20    A. In my office.
21    Q. On -- I assume this is July 10th, when he
22 was sent home?
23    A. Probably.
24    Q. If you want to look at --
25    A. I don't have to look at it. I don't know

---

12:00:31-12:01:42      Page 137

1 what date it is.
2    Q. Well, it -- okay. There was a meeting in
3 your office and it was just you, Newman and Captain
4 Hilliard?
5    A. At that point, it was.
6    Q. What time of day was this?
7    A. Morning. I don't know what time it was.
8    Q. Okay. Tell me everything that you remember
9 being discussed.
10    A. What I remember about that being discussed
11 is Don talked about being on meds. Brent said he was
12 on Tramadol, I think. Something. Don said
13 something -- you need to go home until you're off all
14 your medications, I think, is how that went.
15    Q. Okay.
16    A. The conversation -- Brent said he wasn't --
17 the conversation progressed to: I'll give you a
18 choice, Brent. Either -- you can either go to
19 Occupational Health with us now and we'll do a drug
20 test or you can go -- go home. That's the way that
21 conversation went, as I recall.
22    Q. So --
23    A. And -- and he said, I'll go home. And he
24 did.
25    Q. And so you told -- or captain -- Chief

---

12:01:45-12:02:39                                        Page 138

1  Deputy Newman told Captain Hilliard, you need to go
2  home until you're off all your medications?
3      A. That's how I recall that conversation.
4      Q. Was that an order?
5      A. No, it was not.
6      Q. So chief -- or excuse me --
7      A. Had --
8      Q. -- Captain Hilliard had the option of
9  staying at work?
10     A. He had the option of going to Occupational
11 Health and getting a --
12     Q. Did he have the option of staying at work?
13     A. Not unless he went to the -- either go get
14 drug tested or go home, is how that conversation
15 went.
16     Q. And the statement was made, until you're off
17 all your medications?
18     A. I don't know --
19     Q. Well, that's what you said.
20     A. Well, I don't care what I said. I can't sit
21 here and we're talking and tell you, that's how that
22 conversation went. That's how I remember that
23 conversation.
24     Q. And I -- I wrote down what you said --
25     A. Good.

12:02:39-12:03:28                                        Page 139

1      Q. -- and you said, you need to go home until
2  you're off all your medications. Do you -- does that
3  --
4      A. All the pain --
5      Q. Just a second.
6      A. Okay.
7      Q. Is that what was said: You need to go home
8  until you're off all your medications?
9      A. I don't know. That's not -- I can't tell
10 you what was said verbatim.
11     Q. Well, you said that earlier. Do you --
12     A. I don't care what I said earlier. I was
13 paraphrasing.
14     Q. Okay. So let me just tell you -- I mean, if
15 you need a break -- I don't know if you're hot. You
16 seem angry.
17     A. No, I'm not angry. I love this.
18     Q. But it is really important what you say.
19     A. Okay.
20     Q. We're going to hold you to it. That's why
21 we have a court reporter, that's why we have a
22 camera, because what happened is important. Do you
23 understand he almost committed suicide? Do you
24 understand that?
25         MS. HOWLAND: Object to the form.

12:03:29-12:04:18                                        Page 140

1
2  BY MR. JEFFREY HEPWORTH:
3      Q. Do you understand that?
4      A. I understand that he said he was going to
5  commit suicide. I don't know that.
6      Q. And he lost his career, didn't he?
7      A. I understand that.
8      Q. And that's a huge deal to him. Do you
9  understand why it might be a huge deal to him?
10     A. Of course I do.
11     Q. Okay. Do you have some empathy for him?
12     A. I got all kinds of empathy for him.
13     Q. So you deny that he was told that if he got
14 off his pain medications, he could come back to work?
15     A. I can't tell you that that verbiage was
16 used. You don't --
17     Q. You already said it.
18     A. You're going to have to --
19     Q. Are you going to take it back? Because you
20 said it.
21     A. Newman was in the same meeting I was at.
22     Q. I'll ask him.
23     A. See if he remembers.
24     Q. Was it your understanding if he got off his
25 pain medications, he could come back to work?

12:04:21-12:05:27                                        Page 141

1      A. I was my understanding when he became fit
2  for duty, he could come back to work.
3      Q. That didn't answer my question.
4      A. That did answer your question.
5      Q. Please answer my question. Yes or no, was
6  it your understanding that Brent Hilliard could come
7  back to work after he was off his pain medications?
8      A. I don't know the answer to that.
9      Q. Would that have satisfied you?
10     A. Yes.
11     Q. Your concern was his prescription
12 medications, correct?
13     A. My concern was his actions. I don't know if
14 it was Tramadol or -- I don't know what it was. I
15 know that he was off his game. That's what I know.
16     Q. As of July 10th, or the date of this meeting
17 that you're talking about, did you assume that it was
18 his prescription medications that were causing what
19 you believed were -- was an impairment?
20     A. That was my assumption.
21     Q. Okay. At that time, did you have any
22 concern that Brent Hilliard was a substance abuser?
23     A. No, I didn't say that.
24     Q. Okay. At some later date did you have a
25 concern that Brent Hilliard was a substance abuser?

| 12:05:31-12:06:34 | Page 142 |
| --- | --- |

1  A. I am not qualified to decide if somebody is
2  a substance abuser. I see what I see. I see that
3  Brent was having issues at work. That's what I see.
4  Now if that means that he was abusing prescription
5  drugs or not, my goal was that he come back to work
6  and do his job as capable as what I knew he could do
7  it.
8  Q. Did you trust Brent at that point?
9  A. Did I trust him?
10  Q. Yeah.
11  A. Well, hell, yeah. I've always trusted
12  Brent.
13  Q. Has he ever lied to you, to your knowledge?
14  A. Not to my knowledge.
15  Q. Okay. So --
16  A. That -- I don't know. That's -- I've known
17  him many years. So maybe about his handicap.
18  Q. About his golf handicap?
19  A. Yeah.
20  Q. Well, that's a statistic, right?
21  So as of July 10th, or the meeting that I'll
22  represent to you is the day he got suspended, was
23  July 10th. At that time, you did not believe he was
24  a substance abuser?
25  A. I'm not --

| 12:06:35-12:07:31 | Page 143 |
| --- | --- |

1  MS. HOWLAND: Object to the form.
2  THE WITNESS: -- going to say that.
3
4  BY MR. JEFFREY HEPWORTH:
5  Q. You didn't --
6  A. I am not going to say that. I am going to
7  say that he had issues. Now if that's because he was
8  abusing drugs, I'm not qualified to say that. I'm
9  not -- all I know is what I saw. Now if that was --
10  and if -- if he took a Fit for Duty and it come back
11  that he was not a substance abuser or he was a
12  substance abuser, that's what I would live with.
13  Q. So was the purpose of the testing to find
14  out if he was a substance abuser?
15  A. The purpose of the testing was to find out
16  if he was fit for duty.
17  Q. Well, the -- I'll represent that the Fit for
18  Duty test said it's an evaluation for substance
19  abuse. Do you understand that that's kind of
20  important? If you're accusing somebody of being a
21  substance abuser versus accusing somebody of taking
22  prescription medication as prescribed, they're two
23  totally different things --
24  MS. HOWLAND: Object to the form.
25  Foundation. Can we take a break?

| 12:07:34-12:08:52 | Page 144 |
| --- | --- |

1  MR. JEFFREY HEPWORTH: No.
2  THE WITNESS: I got to pee.
3  MS. HOWLAND: Well, we're taking a break.
4  Finish your question; we're taking a break.
5  THE WITNESS: How close are we?
6
7  BY MR. JEFFREY HEPWORTH:
8  Q. Before we leave, answer my question.
9  A. Ask it again.
10  MR. JEFFREY HEPWORTH: Could you read it
11  back?
12
13  (Whereupon the court reporter read back the
14  requested testimony.)
15
16
17  BY MR. JEFFREY HEPWORTH:
18  Q. Let me clarify the question.
19  So did you have any reason to believe that
20  Brent wasn't taking his prescription medications
21  consistent with his doctor's orders?
22  MS. HOWLAND: Foundation.
23  THE WITNESS: What I had -- see if this
24  answers it for you. Whether he was or he wasn't, it
25  was what it was doing to him that concerned me. For

| 12:08:55-12:19:14 | Page 145 |
| --- | --- |

1  all I know, whatever he -- whatever he was taking
2  could have affected anybody that way. I don't know
3  if you have to abuse it for it to interfere with your
4  work. So I can't -- there again, I am not qualified
5  to say if he was abusing drugs. I can't and I won't.
6
7  BY MR. JEFFREY HEPWORTH:
8  Q. And so if he was told that when he got off
9  his prescription pain medications, he could come back
10  to work, would that have satisfied your concern?
11  A. If he would have went home and got normal --
12  let's call it normal. Let's call it lucid. We can
13  call it anything you want to call it. What my
14  concern was that Brent came back to work as Brent.
15  That was my goal.
16  Q. Okay.
17  MS. HOWLAND: Okay. We're taking out break.
18  VIDEOGRAPHER: Off the record, 12:10.
19
20  (Whereupon a brief recess was taken from
21  12:09 p.m. to 12:19 p.m.)
22
23  VIDEOGRAPHER: We're back on the record at
24  12:19.
25

| 12:19:14-12:20:15 | Page 146 |
| --- | --- |

1   BY MR. JEFFREY HEPWORTH:
2      Q.  You have Exhibit 30 and 8 front of you, that
3   July 31st letter from Newman --
4         VIDEOGRAPHER: Excuse me.  Can you mike
5   yourself?
6         MR. JEFFREY HEPWORTH: Oh, sorry.
7
8   BY MR. JEFFREY HEPWORTH:
9      Q.  Do you have the July 31st letter in front of
10  you?
11     A.  Yes.
12     Q.  Okay.  Go to Page 2.  So see at the top it
13  says: On July 10th?  And I recognize that this is
14  Newman wrote the letter, right --
15     A.  Yes.
16     Q.  -- so it's not your letter.  But I'll --
17  I'll represent to you that that second page talks
18  about what happened on July 10th, okay?
19     A.  Okay.
20     Q.  And then the second to last paragraph on
21  that page, it says:  Sheriff Carter contacted me and
22  indicated that there had been some issues with
23  Captain Hilliard while I was gone.  We met in the
24  Sheriff's office.
25        And the very last sentence of that paragraph

| 12:20:17-12:21:32 | Page 147 |
| --- | --- |

1   says:  I informed Captain Hilliard he needed to go
2   home until he was at a point he could come to work
3   without taking medication that could cause
4   impairment.
5         Is that what captain -- or Chief Deputy
6   Newman wrote?  Yes?
7      A.  That's what's on this document.
8      Q.  And that's consistent with your memory,
9   right?
10     A.  That is consistent.
11     Q.  And so you remember that meeting?
12     A.  I do, on July 10th.
13     Q.  Okay.  What -- what were your observations
14  of Captain Hilliard at the time you met with him in
15  your office with Chief Deputy Newman?
16     A.  That morning?
17     Q.  Well, it -- I think it says around noon,
18  but -- okay.
19     A.  I don't know if I had --
20     Q.  I don't know that it says what time it was.
21     A.  I believe it was in the morning.
22     Q.  It doesn't show a time.
23        MR. J. GRADY HEPWORTH: Arrived just prior
24  to noon.
25        MR. JEFFREY HEPWORTH: Oh, okay.

| 12:21:33-12:22:23 | Page 148 |
| --- | --- |

1
2   BY MR. JEFFREY HEPWORTH:
3      Q.  So Captain Hilliard arrived just prior to
4   noon.  Do you see that, where it says that?
5      A.  Yes.
6      Q.  Do you have any reason to dispute that?
7      A.  I do not.  If I was going to put a time to
8   it, I would have said it was late morning, so...
9      Q.  Okay.  In any event, the timing isn't
10  terribly important.  My question, really, is, is you
11  met in your office with both Chief Deputy Newman and
12  Captain Hilliard?
13     A.  That is correct.
14     Q.  And that's when he was suspended and sent
15  home?
16     A.  That's when he was put on administrative
17  leave.
18     Q.  And -- and that's when he was told that
19  people in the Sheriff's office believed that he was
20  impaired by his medication, correct?
21     A.  During that conversation we had?
22     Q.  Well, it's -- second to last paragraph -- or
23  sentence says:  I informed Captain Hilliard he needed
24  to go home until he was at a point he could come to
25  work without taking medication that could cause

| 12:22:26-12:23:21 | Page 149 |
| --- | --- |

1   impairment?
2      A.  Okay.
3      Q.  Would you agree that that was the concern?
4      A.  Yes.
5      Q.  You were concerned about his mental
6   impairment?
7      A.  Yes, he -- we was concerned about his
8   impairment at work.
9      Q.  Right.  And based on what other people had
10  reported, right?
11     A.  Yes.
12     Q.  And what I'm asking you about is you met
13  with Captain Hilliard prior to noon, in your office,
14  in this meeting, right?  What were your observations
15  of his impairment at that time, or lack of
16  impairment?
17     A.  I had no observation of that.  Brent sit at
18  the end of the table, we discussed it, he -- I have
19  no -- I have no reason to believe that he, at that
20  time, was impaired, no.
21     Q.  Okay.  So the next sentence on that, at the
22  bottom of the page, it says:  During our discussion,
23  Captain Hilliard was lucid and did not appear to be
24  impaired.
25        Do you have any reason to disagree with that

12:23:23-12:24:36                                          Page 150

1    observation of Chief --
2        A. I agree --
3        Q. -- Deputy Newman?
4        A. I agree with that observation.
5        Q. Okay. So at the time, he wasn't impaired,
6    in your opinion?
7        A. Not during that conversation, no.
8        Q. So -- and he wasn't back at work, ever,
9    after that, was he?
10       A. No, he was not.
11       Q. So tell me every instance that you remember
12   between June 7th, 2017 and that meeting on July 10th,
13   2017, where you, personally, observed Deputy
14   Newman appearing -- excuse me. Gosh. Strike that.
15   I keep switching names.
16           What I want to get from you is each
17   occasion, as best you remember, between June 7th,
18   2017 and July 10th, 2017, where you, personally,
19   observed Captain Hilliard when you would characterize
20   him as being impaired or under the influence?
21       A. I cannot give you dates because I don't know
22   dates.
23       Q. Okay. That's fine.
24       A. I can give you observations.
25       Q. What -- tell me what you remember. How many

12:24:39-12:25:59                                          Page 151

1    times do you remember having that feeling?
2        A. More than once.
3        Q. Okay. Tell me the first time you remember.
4        A. And it was the same -- I can't give you a
5    date. I --
6        Q. I didn't ask for a date --
7        A. Okay --
8        Q. -- just the observation.
9        A. The observation -- the observation, Brent
10   was in his office, facing the door. I walked by his
11   office. Brent was sitting there gazing, I guess
12   you'd say, at the -- at his screen. I said -- I
13   spoke to him and I got no response.
14       Q. Did you go into his office?
15       A. Not at that time. I went on, done wherever
16   I was doing, wherever I was going. And when I came
17   back, I stopped again and spoke to him and I still
18   got zero response. So I walked into his office. I
19   said, Brent, are you all right? Brent? And then he
20   said, yeah, yeah, I'm all right. In my opinion, he
21   was sitting there with a-thousand-yard-stare, clearly
22   impaired.
23       Q. Was that prior to July 10th?
24       A. That was prior to July 10th.
25       Q. And in your opinion, he was clearly

12:26:01-12:27:00                                          Page 152

1    impaired?
2        A. In my opinion, he was clearly acting odd. I
3    guess you'd -- impaired. We'll call it whatever you
4    want to call it, but he wasn't acting like himself.
5        Q. Did you consider having him drug tested?
6        A. I did not.
7        Q. Why not?
8        A. Give him the benefit of the doubt. I did
9    not.
10       Q. Okay. Did you try to engage him in
11   conversation to see if he was impaired or just
12   staring off --
13       A. I did.
14       Q. So describe his speech.
15       A. His speech was not good. It was slurred.
16       Q. Okay. Anything else?
17       A. I can't -- and I -- I damn sure can't tell
18   you what that conversation consisted of other than
19   small talk.
20       Q. Any other observations that led you to
21   believe that he was impaired?
22       A. Brent would have a tendency to chewing his
23   lip when he was having issues, whether he was mad or
24   whatever he was doing. If you noticed Brent chewing
25   on his lip, then chances are there was an issue. And

12:27:04-12:28:26                                          Page 153

1    that was my observation. That's me being a
2    therapist.
3        Q. Did you have any observation around that
4    time that he wasn't performing his job properly?
5        A. If he was impaired in the workplace, he
6    wasn't doing his job properly. If there is any
7    instant that you want me to refer to, I can't think
8    of any.
9        Q. You can't think of any way in which the
10   ability to execute his tasks was affected?
11       A. I don't know what his tasks were at that
12   point.
13       Q. Okay. Any -- what was the next time?
14       A. It would have been the same scenario.
15       Q. Do you remember how close in time to the
16   first one?
17       A. No, I don't.
18       Q. Okay. Tell me what happened.
19       A. It would be the same scenario.
20       Q. Just tell me what happened.
21       A. Brent would -- he would sit and gaze, for a
22   better term or better description, at his computer.
23   Deep in thought, I don't know. But he would -- you
24   could walk in, you could speak, and you would get no
25   response until you got his attention. Brent, you all

**12:28:31-12:29:33**                                      Page 154

1  right?
2     Q. Okay. Anything else?
3     A. That was my observations.
4     Q. So you've -- you've related two. Were there
5  any others?
6     A. Brent showed up -- okay. We're getting into
7  a time period here, you're going to have to tell me
8  how far back you want.
9     Q. I just wanted that June 7th to July 10th.
10  That's the only thing we're worried about.
11     A. That's what we're worried about. Okay.
12  We're good.
13     Q. So that's -- you've related everything in
14  that time period?
15     A. That's what, as I recall, that's what, I
16  personally...
17     Q. Did you make notes of those observations?
18     A. Did not.
19     Q. Why not?
20     A. Did not. Chose not to. Didn't --
21     Q. All right.
22     A. Did not.
23     Q. Did you tell anyone else?
24     A. Told Newman. Told the captains.
25     Q. When?

**12:29:35-12:30:55**                                      Page 155

1     A. In that time frame.
2     Q. Okay. Why did you tell the captains?
3     A. Because that was the conversation: Did you
4  guys see if Brent's all right? That type thing.
5     Q. So another statement you made that I want to
6  clarify, were you aware during the July 10th/June 7th
7  time period, June 7th/July 10th, that Brent was on
8  light duty, part-time? Did you know that?
9     A. Yes, I would have known that, but I -- the
10  dates doesn't make sense to me. I -- I would have
11  thought -- I don't --
12     Q. Well, the -- I'm just going --
13     A. You're going by that --
14     Q. I'm going by Don Newman's letter --
15     A. I don't know.
16     Q. So would -- would Captain Hilliard be making
17  life-and-death decisions during that period of time
18  when he's light duty, working part-time?
19     A. Yes, he could.
20     Q. Tell me the types of --
21     A. Very well could.
22     Q. Tell me -- explain that.
23     A. That's what I say -- whether or not Brent
24  can run and jump is not a concern of mine. The
25  ability to make rational decisions is what concerns

**12:30:58-12:31:46**                                      Page 156

1  me.
2     Q. So there was a period of time when Brent was
3  totally off work, right, for the --
4     A. Yes.
5     Q. -- before -- after surgery and for about a
6  month?
7     A. Yes.
8     Q. So did anyone fill in for him while he was
9  totally off work?
10     A. It would have been -- I would say the Chief
11  or Captain Miller, they might have divvied up that --
12     Q. So --
13     A. -- Lieutenant Barnhill.
14     Q. So when he was totally off work, you weren't
15  relying on Brent Hilliard to make life-and-death
16  decisions?
17     A. No. Zero.
18     Q. Wouldn't you agree that you could have given
19  him a period of time to accommodate him and not make
20  him make life-and-death decisions when he returned to
21  work light duty, part-time?
22         MS. HOWLAND: Object to the form.
23
24  BY MR. JEFFREY HEPWORTH:
25     Q. Would that have been a reasonable

**12:31:47-12:32:43**                                      Page 157

1  accommodation?
2         MS. HOWLAND: Object to the form. Calls for
3  a legal conclusion.
4         THE WITNESS: No, it would not.
5
6  BY MR. JEFFREY HEPWORTH:
7     Q. Why not?
8     A. Because Brent, if he's there, he's the
9  captain. Now if you're saying -- if you're wanting
10  me to agree with you that he could be there and he
11  didn't have to make any decisions, then he may as
12  well stay home.
13     Q. Well --
14     A. His job -- his job as a captain with the
15  Sheriff's office is to make decisions.
16     Q. What kind of decisions was he making?
17     A. Whatever. It didn't matter if it was -- it
18  wouldn't matter what decision if it was a proper
19  decision. Now whether or not a schedule, or
20  something, doesn't concern me. But if somebody
21  called and said, hey, one of the guys got shot at
22  tonight, that's an important decision. Somebody --
23  it's -- you know --
24     Q. But --
25     A. -- you can't divvy it up and you can't say,

12:32:47-12:33:47                                         Page 158

1 well, you can make this decision but somebody else
2 can make the rest of them.
3    Q. Are you aware of any decision that Brent
4 Hilliard made between June 7th and July 10th that
5 were improper?
6    A. I have no idea. I couldn't tell you that.
7 I wouldn't -- I wouldn't know that if -- one way or
8 another.
9    Q. You don't know if he made any mistakes?
10    A. I can't tell you. I --
11    Q. Do you know anybody -- do you know if he was
12 ever put in a position where he had to make a
13 life-and-death decision during that time period?
14    A. Do not.
15    Q. But you agree when he was totally off work,
16 there was somebody to fill in for him?
17    A. Yes.
18    Q. And I just want to make sure I understand.
19 It sounds like it wasn't you that arranged the Fit
20 for Duty evaluation?
21    A. That would have been handled by the Chief.
22    Q. Was it your decision to do a Fit for Duty?
23    A. My decision was that the Chief needed to do
24 something. I agreed with his assessment to do a Fit
25 for Duty.

12:33:48-12:34:42                                         Page 159

1    Q. Okay. So did you and Don Newman talk about
2 that before Dr. Tye was hired to do the Fit for Duty?
3    A. The conversation was the Chief said, I'm
4 going to have him do a Fit for Duty. And I said, you
5 know.
6    Q. And did you know --
7    A. And --
8    Q. -- did the Chief tell you what they were
9 going to test Captain Hilliard for when the --
10    A. No.
11    Q. -- Fit for Duty was done?
12    A. No.
13    Q. No idea?
14    A. Fit for Duty.
15    Q. Not -- not something that you handle?
16    A. Not something that I would have been
17 involved in.
18    Q. Are you aware that other employees at Twin
19 Falls County Sheriff's Office have had -- been
20 required to have Fit for Duty evaluations? Is that
21 something that's somewhat --
22    A. The only other Fit for Duty that I can think
23 of was actually Brent, and that was prior to my
24 taking office. I don't recall, since I've been in
25 office, doing -- anyone doing a Fit for Duty but

12:34:44-12:35:45                                         Page 160

1 Brent.
2    Q. And again, that was Chief Deputy Newman's
3 responsibility that you delegated to him; is that
4 correct?
5    A. Yes.
6    Q. And it would have been chief duty -- Chief
7 Deputy Newman's responsibility to find a person with
8 the qualifications to do the Fit for Duty?
9    A. Yes. Dr. Tye.
10    Q. And it sounds like you weren't sure what
11 Brent was going to be tested for; is that accurate?
12       MS. HOWLAND: Object to the form.
13       THE WITNESS: It sounds like what?
14
15 BY MR. JEFFREY HEPWORTH:
16    Q. You didn't know for certain what type of
17 testing or condition that Brent Hilliard was going to
18 be tested for?
19    A. I had no idea how a Fit for Duty is even
20 handled, by a psychiatrist, psychologist, whatever it
21 does. I -- I don't know the -- how they do Fit for
22 Duties. I've never had one; I've never been involved
23 in one.
24    Q. Did -- did Don Newman ever tell you that he
25 was going to test Captain Hilliard for substance

12:35:48-12:36:51                                         Page 161

1 abuse?
2       MS. HOWLAND: Object to the form.
3       THE WITNESS: I'm -- Don and I never had
4 that conversation.
5
6 BY MR. JEFFREY HEPWORTH:
7    Q. Okay.
8    A. Once it became Don's -- my part of that,
9 when Don took it -- we got Don involved, we got human
10 resource involved, and we got the attorney upstairs,
11 Mary -- I can't remember her name now. She's a
12 district judge now.
13    Q. Was she involved in the decision-making --
14    A. She was involved in all the meetings.
15    Q. When you say, "all the meetings," what
16 meetings do you recall?
17    A. Any time we discussed Fit for Duty, anything
18 we discussed -- there was probably three meetings
19 that they were involved in.
20    Q. "They" being the prosecutor, the --
21    A. No. "They" being the HR and --
22    Q. Rosemary Emory?
23    A. Rosemary. Rosemary.
24    Q. So the people involved in the meeting were
25 Rosemary Emory, yourself, Chief Deputy Newman; anyone

12:36:55-12:37:45                                          Page 162

1  else?
2      A. Elaine.
3      Q. Molignoni?  Molignoni?
4      A. Very good.
5      Q. Whatever --
6      A. Now spell it.
7      Q. I know how to spell it.
8         So how many meetings do you think the four
9  of you had?
10     A. Four.
11     Q. Is this before or after Dr. Tye did his
12  evaluation?
13     A. During.  Same time frame.
14     Q. So were you aware that Dr. Tye is not a
15  substance abuse evaluator?
16        MS. HOWLAND: Object to the form.
17
18  BY MR. JEFFREY HEPWORTH:
19     Q. Has anybody told you that?
20        MS. HOWLAND: Misstates.
21        THE WITNESS: No.  And I -- am I aware of
22  it?  No, I am not aware of it.
23
24  BY MR. JEFFREY HEPWORTH:
25     Q. Do --

12:37:47-12:38:49                                          Page 163

1      A. I don't know even --
2      Q. Were you aware that chief -- excuse me --
3  Captain Hilliard actually had a substance abuse
4  evaluation by a substance abuse evaluator?  Did you
5  know that?
6      A. I did not.  It's --
7      Q. Didn't know that?
8         MS. HOWLAND: Foundation.
9         THE WITNESS: I -- I can't tell you any of
10  these answers right now because I know Brent had a --
11  a doctor, a PA, whatever -- whatever they were -- a
12  counselor.  I don't know.
13
14  BY MR. JEFFREY HEPWORTH:
15     Q. Okay.  So --
16     A. I know that the Fit for Duty was handled by
17  Dr. Tye.  That, I know.  And I know that he does all
18  of our psyches for as long as I've been doing psyches
19  there and we've never had an issue, so that would --
20  my assumption is that's why the Chief went to him.
21     Q. So were you aware that Captain Hilliard
22  spoke to Dr. Tye on two different occasions?
23     A. I can't say that, no.  I'm -- I wasn't in
24  that loop.
25     Q. Were you --

12:38:50-12:39:48                                          Page 164

1      A. I know he -- he went to Dr. Tye and had an
2  assessment -- I guess we'll call it an assessment.
3  The assessment came back unfit for duty.  That, I
4  seen.  And I know that -- and I don't know when, how
5  long; I know that he went back and he talked to
6  Dr. Tye again.
7      Q. Did you know that there were recommendations
8  made by Dr. Tye for Brent to seek treatment and a
9  substance abuse evaluation?
10     A. Yes.
11     Q. You knew that?
12     A. I seen that paperwork.
13     Q. Did you know that Brent did what he was
14  asked --
15     A. No.
16     Q. Didn't know that?
17     A. No, I don't know the answer to that.
18     Q. Okay.  So did you know that after having a
19  substance abuse evaluation and receiving treatment
20  for his depression -- did you know he had depression?
21     A. I did not.
22     Q. Okay.
23     A. No.
24     Q. So no idea at the time?
25     A. No.  Depression came out of left field

12:39:50-12:40:43                                          Page 165

1  there.  I...
2      Q. So did you know that his treating counselor
3  and the substance abuse people cleared him, and his
4  medications manager cleared him to return to work?
5  Were you aware of that?
6         MS. HOWLAND: Foundation.
7
8  BY MR. JEFFREY HEPWORTH:
9      Q. Were you aware of that?
10     A. No.
11     Q. Okay.  Is it something that Chief Deputy
12  Newman might have told you and you had forgotten --
13     A. Quite --
14     Q. -- or you were totally out of the loop?
15     A. Quite possibly.
16     Q. Okay.  You just don't remember?
17     A. I just don't remember that.
18     Q. And there came a time when the decision had
19  to be made whether Captain Hilliard could return to
20  work in September.  Do you remember that?
21     A. No.
22     Q. Did you know it was the same day that he
23  almost committed suicide and got his DUI?
24        MS. HOWLAND: Object to the form.
25

12:40:43-12:41:37                                    Page 166

1   BY MR. JEFFREY HEPWORTH:
2      Q. Did you know that?
3      A. What I know is that he got a DUI.  Now
4   whether or not there is a suicide involved in this, I
5   have no idea.
6      Q. Okay.  Okay.  So --
7      A. But I do know that there was calls to
8   SIRCOMM; that there was -- turned out to be Brent
9   running people off the road and they had lot of calls
10  on it.
11     Q. Okay.
12     A. And I know where he stopped and I know what
13  happened after he stopped.
14     Q. So you have a very clear memory of that?
15     A. Well, and I wasn't even involved in that
16  other than a phone call.
17     Q. But I'm just curious, did you know that that
18  happened right after he -- he was told that he had
19  not been released and found fit for duty?
20     A. No, no, I didn't.
21     Q. Didn't know there was a relationship --
22     A. No.
23     Q. -- that he was informed that he had not been
24  released for duty by Dr. Tye, and then that same day
25  he got a DUI --

12:41:40-12:42:15                                    Page 167

1      A. If I --
2         MS. HOWLAND: Foundation.  Misstates, and to
3   the form.
4         THE WITNESS: I wasn't involved in that
5   conversation.
6
7   BY MR. JEFFREY HEPWORTH:
8      Q. Pardon?
9      A. I wasn't involved in that conversation.  I'm
10  not doubting anything you're saying.
11     Q. Well, the reason I asked, I thought you
12  might remember, you talked about what a good friend
13  you were.
14     A. Yes.
15     Q. And when -- you knew that Brent wanted to
16  come back to work, didn't you?
17     A. Yes.
18     Q. And that was really important to him?
19     A. It was.
20     Q. And when he was told he couldn't come back
21  to work, do you think that was something that
22  disappointed him?
23         MS. HOWLAND: Object to the form.
24  Misstates.
25

12:42:16-12:43:15                                    Page 168

1   BY MR. JEFFREY HEPWORTH:
2      Q. Just --
3      A. I can't look in Brent's head, if he's
4   disappointed or not.  I -- it would me.  I can't tell
5   you what Brent's thought process was.  I can tell you
6   that what he needed to come back to work was for
7   Dr. Tye to stay fit for duty.  That's what Brent
8   needed so he could come back to work.
9      Q. Do you remember having a phone conversation
10  with Brent where, right before that time, you told
11  him he couldn't come back to work --
12     A. Yes.
13     Q. -- unless Dr. Tye issued a fit for duty
14  order?
15     A. Yes.
16     Q. Okay.  And the report of Dr. Tye didn't say
17  he was unfit for duty, did it?
18     A. I don't know.  I didn't -- I don't know what
19  it said.  It just -- it didn't say fit for duty.
20     Q. Were you aware that he left it in the
21  discretion of the Twin Falls County Sheriff's Office
22  as to whether chief -- whether Captain Hilliard could
23  come back to work?
24         MS. HOWLAND: Foundation and form.
25         THE WITNESS: You're going to have to talk

12:43:16-12:44:13                                    Page 169

1   to the Chief about that.  That would have been -- all
2   the conversations between Dr. Tye and the Twin Falls
3   Sheriff's Office was with Chief Newman.  I was not in
4   that loop.
5
6   BY MR. JEFFREY HEPWORTH:
7      Q. Okay.  So as you sit here today, you do know
8   he had a substance abuse evaluation?
9      A. I know he had a Fit for Duty.  Now, there
10  again, I don't know what Fit for Duty's consist of.
11  I have no idea.  I do know that he had a Fit for
12  Duty; and if that involved abuse, if that involved --
13  whatever that involved, that it is what it is.
14     Q. So just make sure I'm tracking here, I get
15  the impression from your answers that he left it in
16  the decision for Captain Hilliard to not come back to
17  work after seeing Dr. Tye the second time was made by Don
18  Newman?
19         MS. HOWLAND: Object to the form.
20  Foundation.
21
22  BY MR. JEFFREY HEPWORTH:
23     Q. Is that true?
24     A. It would have came past me.  The decision
25  would have been made by Don.  What Don would have

12:44:16-12:45:50                                                     Page 170

1   said -- in fact, I...
2      Q. What did Don tell you?
3      A. Don told me that it came back not fit for
4   duty. That it didn't change, I think is what Don
5   told me. And it needed to.
6      Q. Did you look at Dr. Tye's reports?
7      A. I don't remember. I don't remember.
8      Q. All right. Do you think that would be
9   important for you to look at Dr. Tye's --
10     A. I don't remember if I looked -- in fact,
11  I've got one right here, I think --
12     Q. I can give you the reports, if you want.
13  I --
14     A. Give me whatever you want. I looked at
15  one...
16     Q. So here's --
17     A. Let's do the second one.
18     Q. Here's Exhibit 8.
19     A. Which one is that?
20     Q. That's the first one. Well, maybe the
21  second one is attached. I don't know.
22     A. This is the first one.
23     Q. Right.
24     A. And this lists -- is the second one on here?
25     Q. I don't know if it is or not. Just a

12:45:51-12:49:25                                                     Page 171

1   second. Sorry.
2      MR. JEFFREY HEPWORTH: Off record for right
3   now.
4
5      (Whereupon an off-the-record discussion was
6      held from 12:46 p.m. to 12:46 p.m.)
7
8   BY MR. JEFFREY HEPWORTH:
9      Q. So here's Exhibit 28, which is the last
10  one --
11     A. Are we back on the record?
12     Q. Yeah.
13     A. Do you want this back?
14     Q. Well, you can have it, too. Why don't we...
15     THE WITNESS: Have you read this? Hey, have
16  you read this?
17     MS. HOWLAND: Yeah, I have it in front of
18  me, if it's -- yeah, I have it in front of me.
19
20  BY MR. JEFFREY HEPWORTH:
21     Q. So I don't see anything in Exhibit 28 that
22  says he's unfit for duty. Do you?
23     A. I don't see anything in Exhibit 28 that says
24  he is fit for duty.
25     Q. Right.

12:49:26-12:50:15                                                     Page 172

1      A. But --
2      Q. It doesn't say one way or another, does it?
3      A. Now this one here, it clearly said, unfit
4   for duty (indicating).
5      Q. Right. So Exhibit 8 --
6      A. Is that this?
7      Q. Exhibit 8. This is the first report.
8      A. Yeah.
9      Q. And then, last page of the exhibit is the
10  report, at least, Exhibit 8, had some
11  recommendations, right?
12     A. Right.
13     Q. Were you aware of that at the time?
14     A. Yes.
15     Q. Do you know if -- do you know if Brent
16  followed the recommendations?
17     A. I do not.
18     Q. Don't know if he did or he didn't?
19     A. Do not.
20     Q. Okay. And the second report of Dr. Tye
21  didn't say he's unfit for duty, does it?
22     A. No. I don't see anywhere on here that says
23  he is unfit for duty.
24     Q. Did -- did Chief Deputy Newman tell you that
25  he had talked to Dr. Tye a number of times?

12:50:18-12:51:14                                                     Page 173

1      MS. HOWLAND: Object to the form.
2      THE WITNESS: Chief Deputy told me that it
3   wasn't -- this is after the second one because I
4   specifically asked if he is fit for duty and I --
5   there again, I think the Chief called Dr. Tye. And
6   that's what I can tell you about that.
7
8   BY MR. JEFFREY HEPWORTH:
9      Q. Okay. So --
10     A. I don't know -- I can't tell you what
11  Dr. Tye and Chief Deputy Newman talked about. I
12  don't -- I don't know.
13     Q. If Dr. Tye had put fit for duty for light
14  duty, part-time, then would you have let him go back
15  to work part duty -- light duty, part-time?
16     A. Fit for duty. If he'd have specified fit
17  for duty.
18     Q. Yeah?
19     A. Absolutely.
20     Q. But I'm talking about restricted. I mean,
21  he came off his surgery and was part-time, light
22  duty, right?
23     A. Yes.
24     Q. And then if Dr. Tye had said in his report,
25  or told someone, that -- that Brent, Captain Hilliard

12:51:18-12:52:12                                    Page 174

1  could go back to work light duty, part-time, would
2  you have allowed him to do it?
3        MS. HOWLAND: Object to the form.
4  Foundation.
5        THE WITNESS: After the unfit, if it would
6  have come back fit, yes.
7
8  BY MR. JEFFREY HEPWORTH:
9     Q. Well, see -- and --
10    A. You're --
11    Q. Is that fit?  If he said he can come back --
12 he's fit for duty part-time, light duty.  If he'd
13 actually put that in writing, would you have allowed
14 him to do it?
15       MS. HOWLAND: Object to the form.
16       THE WITNESS: I can't answer that.  I would
17 have to -- I -- I would -- I don't know.  What I
18 wanted -- what I wanted this to say is the same thing
19 that said (indicating).  That said unfit.  And after
20 that time to this time, he goes up for another
21 exam -- I guess you'd call it an exam, whatever the
22 hell you'd call it -- and he'd say, okay, he's fit
23 for duty.
24
25 BY MR. JEFFREY HEPWORTH:

12:52:13-12:52:56                                    Page 175

1     Q. So were you relying on Dr. Tye to tell you
2  whether he could return to work?
3     A. Yes.
4     Q. And you put all your faith in his expertise?
5     A. He's -- of course I did.
6     Q. Would -- would you agree that if you're
7  going to give that kind of decision-making power to a
8  consultant, that it would be important to fully
9  inform that consultant?
10       MS. HOWLAND: Object to the form.
11       THE WITNESS: I would agree to that, yes.
12
13 BY MR. JEFFREY HEPWORTH:
14    Q. And when you make decisions, you want to be
15 fully informed, don't you?
16    A. I do.
17    Q. And if you want Dr. Tye to make that
18 decision, he was entitled to have all the relevant
19 information, wasn't he?
20    A. I don't know --
21       MS. HOWLAND: Object to form.
22       THE WITNESS: -- what information he had.
23 Do you -- I don't know what you're saying he didn't
24 have.
25

12:52:56-12:53:42                                    Page 176

1  BY MR. JEFFREY HEPWORTH:
2     Q. Well, wouldn't you agree he should have been
3  provided the most recent performance evaluation?
4        MS. HOWLAND: Foundation.
5
6  BY MR. JEFFREY HEPWORTH:
7     Q. Would you agree with that?
8     A. I -- I won't agree or disagree with that.
9  That's -- I don't know.  You mean the most -- the
10 eval?
11    Q. Yeah.  His performance evaluation.
12       MS. HOWLAND: Same objection.
13
14 BY MR. JEFFREY HEPWORTH:
15    Q. That's something that's important for him to
16 consider about Brent's abilities, right?
17       MS. HOWLAND: Foundation.
18       THE WITNESS: Brent's abilities -- nobody's
19 saying that he didn't get good evals.  Brent's
20 abilities wasn't what was on his eval.  His abilities
21 had to do with whether or not he could make a sound
22 decision at work.
23
24 BY MR. JEFFREY HEPWORTH:
25    Q. Would -- would you expect the expert that

12:53:47-12:54:45                                    Page 177

1  you're relying on, Dr. Tye, to test that, whether his
2  cognitive abilities were impaired?
3     A. I can't -- I can't answer that.  I don't
4  know what he tests or don't test.
5     Q. Well, no, but I'm asking you -- if you're
6  going to have Dr. Tye make the decision whether he
7  can go back to work, your concern was Brent's
8  cognitive abilities, right?
9     A. My concern was that Dr. Tye said he was fit
10 to go back to work.  Now whatever method's they would
11 use to get there, I don't know.
12    Q. But your --
13    A. The first trip -- the first trip up there,
14 it came back and it said unfit for duty.
15    Q. Okay.
16    A. After --
17    Q. I'm not disagreeing with it.  That's what it
18 said.
19    A. The -- the second trip up there came back,
20 says nowhere on here, fit for duty.  That's what I
21 needed to see.
22    Q. And you've said that and I understand that.
23 So I'd appreciate it if you would answer my
24 question --
25    A. Well, sir, I'm trying.

12:54:47-12:55:32                                    Page 178

1      Q. And I think we're in agreement here, I just
2    don't -- I don't know why we're fighting.
3          Your concern, and I think you said it a
4    number out of times, was you were concerned about
5    Brent's ability to make life-and-death decisions?
6      A. Yes. My concern was that Brent made good
7    decisions.
8      Q. And you wanted Dr. Tye to test whether Brent
9    was mentally capable of making good decisions,
10   correct?
11     A. If that's what the Fit for Duty consists of,
12   that is correct.
13     Q. Well --
14     A. That --
15     Q. -- in order to address your concern --
16     A. Yes.
17     Q. -- that's what it would need to do?
18         MS. HOWLAND: Foundation.
19         THE WITNESS: Yes. That's what it would
20   need to do.
21
22   BY MR. JEFFREY HEPWORTH:
23     Q. Okay.
24     A. That assessment from Dr. Tye would need to
25   say fit for duty.

12:55:33-12:56:45                                    Page 179

1      Q. And would -- would you agree that when he
2    was being tested by Dr. Tye, you had no basis to say
3    that Brent had a substance abuse problem?
4      A. I never talked to Dr. Tye. I have never met
5    Dr. Tye.
6      Q. Just please answer my question. I asked
7    you, wouldn't you agree that you had no basis to
8    accuse Brent of having a substance abuse problem?
9      A. No.
10     Q. No, what?
11     A. I had -- I would not have called what
12   Brent's issue was a substance abuse problem.
13     Q. Thank you.
14     A. What I...
15     Q. Go ahead.
16     A. I am not qualified to know if Brent had a
17   substance abuse problem. Where my knowledge comes
18   and goes is, I'm smart enough to know when somebody
19   is having issues. Now let's call that substance
20   abuse; let's call that medication at work. That's
21   what I needed to stop. So, you know, I can't sit
22   here and tell you Brent had a substance abuse problem
23   because who the hell am I?
24     Q. And I appreciate what you're saying. You
25   don't have the expertise to make a scientific

12:56:51-12:57:44                                    Page 180

1    decision like that?
2      A. Yes.
3      Q. You're concerned about Brent's
4    decision-making abilities?
5      A. Yes.
6      Q. And you wanted to consult an expert who
7    could measure his ability to make good decisions,
8    correct?
9      A. Yes.
10     Q. And that expert was Dr. Tye?
11     A. That's who we went to, yes.
12     Q. And you assumed that he would measure that,
13   his cognitive abilities?
14         MS. HOWLAND: Foundation.
15         THE WITNESS: I would have to know the
16   sequence of what that testing is to answer that.
17
18   BY MR. JEFFREY HEPWORTH:
19     Q. Okay. I don't...
20         MR. J. GRADY HEPWORTH: Could you pass
21   Exhibit 8 back to us?
22         THE WITNESS: Is that it? This one?
23         MR. JEFFREY HEPWORTH: No, it's the
24   folder --
25         MR. J. GRADY HEPWORTH: The earlier one.

12:57:45-12:58:33                                    Page 181

1          THE WITNESS: This one?
2          MR. JEFFREY HEPWORTH: Yeah.
3
4    BY MR. JEFFREY HEPWORTH:
5      Q. On the bottom of Page 5 of Dr. Tye's report,
6    it -- it has notes. It says: Light duty. Do you
7    see that?
8          MS. HOWLAND: Which exhibit are we looking
9    at?
10         MR. JEFFREY HEPWORTH: Exhibit 8 -- Dr.
11   Tye's first report.
12
13   BY MR. JEFFREY HEPWORTH:
14     Q. Did you know that that note was there? Just
15   read -- why don't you just read it out loud?
16     A. Number four, work duties?
17     Q. No. It says, light duty.
18     A. Oh. Light duty may be resumed at the
19   discretion of supervised -- supervision based on
20   Captain Hilliard's progress in regaining/maintaining
21   healthy goals.
22     Q. So were you aware of that --
23     A. This is the first one, isn't it?
24     Q. Yeah, that's the first one.
25     A. Yeah.

| 12:58:34-12:59:44 | Page 182 |
| --- | --- |

1    Q. So what was your understanding of that?
2    A. So my understanding on this was --
3    Q. I'm just asking that specific note. What
4  was your -- what was your interpretation on that note
5  about light duty?
6    A. I don't know the answer to that. I can't
7  give you a -- I don't know. I damn sure don't know
8  what that means. I think this is the same one that
9  says unfit for duty.
10    Q. And again --
11    A. It doesn't -- it doesn't say -- it says
12  unfit for duty except for light duty or for evening
13  work or for anything else. What I needed back from
14  Dr. Tye was that unfit for duty to change to fit for
15  duty.
16    Q. Even though Dr. Tye had made a note on his
17  report that he could be released to light duty, that
18  wasn't sufficient to release him to light duty?
19    A. I can't answer to what Dr. Tye said, sir.
20    Q. Well, I'm asking you to look at the --
21    A. I did look at it.
22    Q. Yeah --
23    A. And I don't know -- I sure as heck can't
24  tell you what that means or don't mean. But what I
25  do know about a page ahead of that, it says, in bold

| 12:59:47-13:00:32 | Page 183 |
| --- | --- |

1  letters, he is unfit for duty.
2    Q. I understand. You keep saying that.
3    A. It's --
4    Q. And that's not what I'm asking you and I
5  think you know I'm not asking you about --
6    A. I think what you're asking me is to draw a
7  conclusion on something I'm not smart enough to
8  draw --
9    Q. No, just -- please -- please just answer my
10  question. I'm not here to argue.
11    A. I would be glad to answer your question.
12    Q. So it says: Light duty may be resumed at
13  the discretion of supervision.
14      So who do you think that was referring to,
15  "supervision"?
16    MS. HOWLAND: Foundation.
17    THE WITNESS: I don't know the answer. This
18  is -- this is a question you got to talk to the
19  Chief about.
20
21  BY MR. JEFFREY HEPWORTH:
22    Q. Okay. So that's what I was asking. You
23  weren't the supervisor; Chief Deputy Newman was --
24    A. I would not have been the supervisor that
25  they're talking about.

| 13:00:33-13:01:36 | Page 184 |
| --- | --- |

1    Q. Okay.
2    A. So this is something that you're going to
3  have to bring up with Don.
4    Q. Okay. I think that's all. I appreciate
5  your time.
6    A. Well, this was certainly a pleasant
7  experience.
8    MS. HOWLAND: So, Jeff, I would like to put
9  something on the record, if I could. I don't --
10  maybe it's possible we could stipulate. But I would
11  like to move for a protective order under Federal
12  Rule of Civil Procedure 26(c) on the basis that good
13  cause exists to keep the information within this
14  transcript confidential. And I would move to seal
15  this transcript on the basis that compelling reasons
16  exist to seal it. It could be used to create serious
17  harm to the competitive standing of the Sheriff or
18  could be used in a spiteful way against him. And for
19  that reason, would either ask that it be stipulated
20  or move to seal it.
21    MR. JEFFREY HEPWORTH: You know, I'm not
22  sure what you're asking for. I -- if you want me to
23  promise that I'm not going to give it to his
24  political opponents, I'm happy to -- I won't release
25  it to anybody, I can tell you that. If you want an

| 13:01:38-13:02:10 | Page 185 |
| --- | --- |

1  order, you're going to have to move the Court. You
2  can't move me. I'm happy to agree that we're not
3  going to give a copy of the video or the transcript
4  to any of his political opponents, and I think that's
5  what you're asking for.
6    MS. HOWLAND: Well, I'm asking to make a
7  record that I want to seek a protective order and for
8  the deposition to be sealed, and I think I've done
9  that. So if I need to move for it, I will --
10    MR. JEFFREY HEPWORTH: You --
11    MS. HOWLAND: -- and we can get court
12  guidance on it.
13    MR. JEFFREY HEPWORTH: Do what you need to
14  do.
15    MS. HOWLAND: Okay.
16    VIDEOGRAPHER: There is the end of video
17  deposition Sheriff Tom Carter. We're off the record
18  at 1:02.
19
20      (Deposition concluded at 1:02 p.m.)
21      (Signature requested.)
22
23
24
25

Hilliard v.
Twin Falls County Sheriff's Office

Sheriff Tom Carter
March 12, 2020

Page 186

CERTIFICATE OF WITNESS

1
2       I, SHERIFF TOM CARTER, being first duly
3   sworn, depose and say:
4       That I am the witness named in the foregoing
5   deposition, consisting of pages 1 through 185; that I
6   have read said deposition and know the contents
7   thereof; that the questions contained therein were
8   propounded to me; and that the answers contained
9   therein are true and correct, except for any changes
10  that I may have listed on the Change Sheet attached
11  hereto:
12      DATED this _____ day of _____, 2020.
13
14  _____
15  SHERIFF TOM CARTER
16
17      SUBSCRIBED AND SWORN to before me this ____ day
18  of _____, 2020.
19
20  _____
21  NAME OF NOTARY PUBLIC
22
23  NOTARY PUBLIC FOR _____
24  RESIDING AT _____
25  MY COMMISSION EXPIRES _____

Page 187

ERRATA SHEET FOR SHERIFF TOM CARTER

1
2
3   Page____ Line ____ Reason for Change _____
    Reads_____
4   Should Read_____
5   Page____ Line ____ Reason for Change _____
    Reads_____
6   Should Read_____
7
8   Page____ Line ____ Reason for Change _____
    Reads_____
9   Should Read_____
10  Page____ Line ____ Reason for Change _____
    Reads_____
11  Should Read_____
12
13  Page____ Line ____ Reason for Change _____
    Reads_____
14  Should Read_____
15  Page____ Line ____ Reason for Change _____
    Reads_____
16  Should Read_____
17
18  Page____ Line ____ Reason for Change _____
    Reads_____
19  Should Read_____
20  Page____ Line ____ Reason for Change _____
    Reads_____
21  Should Read_____
22
23  Page____ Line ____ Reason for Change _____
    Reads_____
24  Should Read_____
25  You may use another sheet if you need more room.

Page 188

REPORTER'S CERTIFICATE

1
2       I, GRETCHEN SISK, CSR No. 1125, Certified
3   Shorthand Reporter, certify:
4       That the foregoing proceedings were taken
5   before me at the time and place therein set forth, at
6   which time the witness was put under oath by me;
7       That the testimony and all objections made
8   were recorded stenographically by me and transcribed
9   by me or under my direction;
10      That the foregoing is a true and correct
11  record of all testimony given, to the best of my
12  ability;
13      I further certify that I am not a relative
14  or employee of any attorney or party, nor am I
15  financially interested in the action.
16      IN WITNESS WHEREOF, I set my hand and seal
17  this 24th day of March, 2020.
18
19  _____
20
21  GRETCHEN SISK, CSR
22  Notary Public
23  P.O. Box 2636
24  Boise, Idaho  83701-2636
25  My commission expires January 24, 2026

## A

**ABCs (1)**
91:14
**ABC's (1)**
91:15
**abilities (11)**
23:3;99:15;126:14;176:16,
18,20,20;177:2,8;180:4,13
**ability (7)**
39:14;108:2;125:23;153:10;
155:25;178:5;180:7
**able (2)**
70:6;115:9
**above (3)**
24:24;63:9,20
**absolutely (3)**
34:1;64:17;173:19
**Abuse (24)**
50:22;51:16;65:4;107:6;
122:17;123:5;129:19;143:19;
145:3;161:1;162:15;163:3,4;
164:9,19;165:3;169:8,12;
179:3,8,12,17,20,22
**abused (1)**
122:21
**abuser (8)**
141:22,25;142:2,24;143:11,
12,14,21
**abusing (3)**
142:4;143:8;145:5
**academy (1)**
9:3
**accident (3)**
81:5,7,8
**accommodate (1)**
156:19
**accommodation (1)**
157:1
**accomplishment (1)**
108:1
**According (4)**
47:18;60:10;110:4;112:8
**accumulation (1)**
118:8
**accurate (8)**
44:7,8;54:19,20;96:1;129:10;
130:11;160:11
**accuse (2)**
89:18;179:8
**accused (1)**
114:3
**accusing (3)**
116:4;143:20,21
**across (4)**
11:18;31:19,20;56:20
**acting (2)**
152:2,4
**action (1)**
93:16
**actions (5)**
51:20;85:5,8;92:23;141:13

**actually (6)**
36:14;64:2;130:12;159:23;
163:3;174:13
**Ada (4)**
53:4;65:9,10,13
**addition (1)**
73:8
**address (2)**
58:13;178:15
**addressed (1)**
109:21
**addresses (1)**
114:23
**admin (1)**
76:5
**administrative (19)**
25:1;45:2,4;75:13;77:19,20,
21;93:4;98:2,9,14;99:1,3,4,8,
18;132:16;136:3;148:16
**admissions (1)**
35:13
**adopt (1)**
40:22
**adopting (2)**
40:4,14
**advice (1)**
40:18
**affect (1)**
126:5
**affected (3)**
27:22;145:2;153:10
**afternoon (1)**
126:23
**afterwards (1)**
55:14
**again (28)**
16:21;29:16;37:11;38:21;
48:5;49:20,24;56:17;69:25;
75:10;77:21;80:1;81:24;88:16;
89:23;95:1;97:1,22;100:19;
135:11;144:9;145:4;151:17;
160:2;164:6;169:10;173:5;
182:10
**against (5)**
15:17;20:5;29:4;92:23;
184:18
**age (1)**
74:6
**agencies (1)**
18:1
**agency (7)**
17:8;21:18;27:10;58:14;
78:15;89:15;128:16
**agency's (1)**
128:5
**ago (3)**
74:3;90:7;91:12
**agree (27)**
16:10;18:7;27:7;43:11,15;
44:24;48:15;61:8;88:21;
109:13;116:6;117:1;135:4;
149:3;150:2,4;156:18;157:10;
158:15;175:6,11;176:2,7,8;

179:1,7;185:2
**agreed (2)**
40:12;158:24
**agreement (1)**
178:1
**ahead (9)**
18:14;32:22;42:7;44:10;
51:12;52:21;66:16,22;85:24;
107:15;112:18;127:12,12;
179:15;182:25
**ahold (1)**
41:21
**ain't (1)**
77:2
**al (2)**
5:7,15
**alarmed (1)**
134:16
**alcohol (21)**
36:4,8,11,23;37:10,16;38:2;
43:9,12;85:17,18;92:7;115:2;
118:22;119:3,5,9,18,19,20,20
**alcohol-related (1)**
116:9
**allegations (9)**
15:7,8;16:11,14;53:3;105:8;
114:17,24;115:1
**allow (1)**
9:11
**allowed (2)**
174:2,13
**allows (1)**
80:25
**almost (5)**
18:8;70:24;83:22;139:23;
165:23
**alone (1)**
101:17
**always (4)**
22:4;58:12;124:25;142:11
**amount (5)**
27:24;64:24;77:16;78:16;
79:23
**amounts (1)**
78:16
**angry (2)**
139:16,17
**animosity (1)**
63:10
**ankle (1)**
37:7
**announced (1)**
28:6
**Annual (1)**
49:8
**answered (1)**
79:3
**anymore (1)**
118:3
**apologize (1)**
50:12
**apologized (1)**
120:18

**apparent (1)**
21:7
**apparently (4)**
34:16;59:23;97:6;117:23
**appealed (1)**
17:9
**appear (1)**
149:23
**appearance (5)**
67:15;91:3;124:4,7;126:2
**appeared (2)**
67:5;134:1
**appearing (5)**
110:6;112:10;124:16;
131:22;150:14
**appears (1)**
96:25
**application (2)**
17:5,7
**applied (1)**
21:10
**apply (2)**
17:15,21
**applying (3)**
31:25;43:1,3
**appointed (2)**
56:14;63:24
**appointing (1)**
57:14
**Appreciate (4)**
41:23;177:23;179:24;184:4
**Approval (1)**
103:3
**approve (4)**
39:19,20;57:25;58:1
**approved (5)**
103:18,22,23,25;105:20
**April (4)**
12:12;28:9;49:8,8
**arbitrarily (1)**
40:16
**area (3)**
10:9;23:9;28:23
**areas (1)**
12:8
**argue (1)**
183:10
**around (4)**
89:7;105:6;147:17;153:3
**arranged (1)**
158:19
**Arrived (2)**
147:23;148:3
**Art (1)**
62:4
**ashen (1)**
67:14
**aside (1)**
67:10
**assess (1)**
106:21
**assessment (6)**
91:23;158:24;164:2,2,3;

178:24

**assessments (1)**
91:22

**assume (20)**
11:11;28:4;30:11;40:5;
73:18;80:20;87:17;90:4;106:4;
108:15;127:22;132:17,19,21,
21,23;133:1,6;136:21;141:17

**assumed (2)**
125:6;180:12

**assuming (4)**
16:6;30:6;50:4;120:15

**assumption (5)**
79:14;84:10;92:16;141:20;
163:20

**a-thousand-yard-stare (1)**
151:21

**attached (3)**
65:21;170:21;186:10

**attempted (1)**
16:12

**attend (1)**
9:1

**attended (2)**
73:9,12

**attends (1)**
73:15

**attention (7)**
110:5;112:9,24;114:4;
131:15,16;153:25

**attorney (4)**
26:17;94:14,15;132:24;
161:10

**audibly (1)**
7:14

**August (6)**
45:19;78:1;79:7;84:22;85:7;
95:25

**authority (8)**
54:24;55:18,19;77:23;88:9,
11,20;135:21

**authorized (1)**
54:8

**avoid (1)**
87:4

**aware (38)**
31:9,10;43:9;50:23;51:9,14,
17;56:19,20;62:15,21;64:3,7,9,
14,22;65:5;84:5;104:10;107:7,
11;119:18;120:2;123:17,23;
155:6;158:3;159:18;162:14,21,
22;163:2,21;165:5,9;168:20;
172:13;181:22

**awfully (1)**
41:17

## B

**back (103)**
9:2,12;13:11;14:3;17:20;
23:16;24:10;31:14,16;42:15;
59:14;64:4,12,17;65:7,20,22;
66:8;68:13;69:11,16,17;70:1,

17,18,20;81:16;90:1;91:18;
92:5;94:9;95:3,11;99:13;101:3;
102:25;108:21;110:15;114:18,
21;123:6,16,16,19,24;124:20,
22;125:1,9,12;127:16,19,22;
128:6,8,9,17,21;129:8,9;130:6,
11,12,25;131:7;132:4;140:14,
19,25;141:2,7;142:5;143:10;
144:11,13;145:9,14,23;150:8;
151:17;154:8;164:3,5;167:16,
20;168:6,8,11,23;169:16;
170:3;171:11,13;173:14;174:1,
6,11;177:7,10,14,19;180:21;
182:13

**background (3)**
7:21;42:25;64:3

**backwards (3)**
67:7;91:16,17

**bad (2)**
7:1;114:2

**Barnhill (5)**
30:23;62:6;114:25;119:24;
156:13

**based (5)**
19:18;47:10;91:23;149:9;
181:19

**basis (5)**
16:12;179:2,7;184:12,15

**bathroom (2)**
93:22,24

**became (7)**
23:19,22;24:5;60:24;120:7;
141:1;161:8

**become (4)**
21:6;29:8;31:10;96:12

**beer (3)**
36:15;37:2;115:14

**beginning (1)**
5:4

**behalf (3)**
5:10,21,22

**behavior (2)**
91:2;127:8

**below (5)**
41:10,13;56:25;57:22;58:7

**bending (1)**
125:21

**benefit (5)**
26:20;124:25;134:13;135:7;
152:8

**benefits (1)**
27:20

**besides (1)**
69:17

**best (3)**
61:15;81:19;150:17

**better (13)**
7:17;95:20;98:21;99:2,18,21;
100:2,3;127:20,21;129:1;
153:22,22

**beyond (1)**
33:13

**big (4)**

11:17;27:5,16,17

**bigger (3)**
78:22,23;96:3

**bit (8)**
11:4;20:15;21:4;45:11;
70:17;94:13;95:15;119:16

**Blaine (1)**
110:10

**blessing (1)**
55:16

**blood (2)**
92:11,24

**blow (2)**
92:4,7

**blowing (1)**
11:22

**blue (1)**
79:12

**Bob (1)**
13:12

**Boise (4)**
5:14;12:18,19,21

**bold (1)**
182:25

**BOLO (2)**
131:20,22

**book (1)**
41:19

**both (14)**
21:15;29:18;33:18;36:3;
39:23;76:3;97:4,7;99:24;
100:14;108:25;109:13;129:13;
148:11

**bottle (3)**
81:10;83:4,8

**bottom (6)**
47:6;68:24;102:2,6;149:22;
181:5

**box (2)**
19:2,10,13;79:9,17;97:20

**boxes (1)**
19:12

**Boy (1)**
62:8

**brand (1)**
23:14

**Bratt (1)**
67:15

**break (9)**
42:2,7;93:23;94:13;139:15;
143:25;144:3,4;145:17

**breath (2)**
91:25;92:7

**Brent (122)**
5:18,19,21;21:12,19;22:4,7,
10,14;23:4,6,16;24:4;25:3;
31:8;42:25;47:5,9,11,15;48:13;
50:16;51:15,17;59:15;64:4,12;
69:23;70:14;101:10;102:5,7;
112:14,19;113:23;114:3;115:1,
14;119:7,9,10,25;120:1,16;
121:18,20;123:24;124:4,15,24;
125:25;126:6;127:2,4,15,19,20;

128:8,9,23,25;129:4,19,24;
130:4,12,14;131:13,22;133:11,
20;134:2,20;135:14;136:15;
137:11,16,18;141:6,22,25;
142:3,8,12;144:20;145:14,14;
149:17;151:9,11,19,19;152:22,
24;153:21,25;154:6;155:7,23;
156:2,15;157:8;158:3;159:23;
160:1,11,17;163:10;164:8,13;
166:8;167:15;168:7,10;172:15;
173:25;178:6,8;179:3,8,16,22

**Brent's (17)**
30:1;31:2;59:17;64:11;
125:23;128:3,4;155:4;168:3,5;
176:16,18,19;177:7;178:5;
179:12;180:3

**brief (3)**
42:10;94:4;145:20

**bring (1)**
184:3

**brought (11)**
65:7;110:4;112:8,12,24;
113:1,11;114:4;131:15,17,18

**Brown (9)**
30:24;31:1;62:2,2,5,12,13;
114:25;119:24

**buck (2)**
78:20;82:10

**budget (1)**
76:8

**Buhl (3)**
21:12,16;23:4

**built (1)**
11:16

**bunch (2)**
42:6,20

**business (2)**
10:18;67:2

## C

**call (18)**
78:9,9,10;92:17;115:9;
131:19;145:12,12,13,13;152:3,
4;164:2;166:16;174:21,22;
179:19,20

**called (12)**
8:22;10:11;24:5,8,8,9;89:16;
119:25;120:16;157:21;173:5;
179:11

**Calls (2)**
157:2;166:7,9

**came (32)**
23:7;31:19,20;51:14;63:2,23;
98:14;105:5;108:21;110:15;
114:18;119:7;123:6;129:4,8,9;
130:6,12,25;131:6,25;132:4;
145:14;151:16;164:3,25;
165:18;169:24;170:3;173:21;
177:14,19

**camera (1)**
139:22

**can (57)**

7:16;16:16;32:13;33:5;
34:22;38:21;41:25;42:7;45:6;
49:3;50:25,25;58:12;63:15;
64:16;68:2;69:6;70:18;75:17;
77:22;78:9,9;80:15;85:13;
86:10;88:17;92:23;93:16,17,
23;95:21;103:5;104:21;107:9;
124:21,21;132:19,22,23;
137:18,20;143:25;145:12;
146:4;150:24;155:24;158:1,2;
159:22;168:5;170:12;171:14;
173:6;174:11;177:7;184:25;
185:11

**canceled (2)**
72:17,17

**candidate (1)**
61:16

**capable (2)**
142:6;178:9

**Captain (157)**
19:16;20:21,22,23,24,25;
21:5,9;25:18;31:15,23,24;
34:10;42:21;44:16,18,21;45:2,
16,24;49:17;51:21;53:21;
55:13;56:25;59:8,23;60:5,8,22;
61:3,4,11,16,23;62:3,7,16,25;
64:4;66:11;67:3;69:17,18,19,
22;70:5;72:3,10,11,11;74:16,
22;75:2,13,14,17,19,19,21,22,
24;76:1,6,15,17;77:9,9,13,18,
20,22;79:20,22;80:4;81:25;
84:6,20,22;85:22;94:23;95:25;
97:4,24;98:5,8,9,15,17,17,21,
24;99:2,10,11,17,19;100:6,11,
11;102:11,20;104:5,10,15;
105:1;107:5;108:2,5,13;110:3,
5,8,11,14;112:6,9;116:19;
117:11,18,18;120:19,21;
121:22;122:5,8,21;125:22,24;
128:16;137:3,25;138:1,8;
146:23;147:1,5,14;148:3,12,23;
149:13,23;150:19;155:16;
156:11;157:9,14;159:9;160:25;
163:3,21;165:19;168:22;
169:16;173:25;181:20

**captains (34)**
20:20;30:23;40:15,19;41:12;
56:14;57:1,17;58:9;59:1;70:19;
71:19,24;72:1,8,9,13;73:8;
75:17,18,20;77:11,16;78:22;
98:22;110:2;111:7;112:22,23;
114:12;117:24;124:18;154:24;
155:2

**captains' (3)**
38:1;73:14;104:2

**Captain's (4)**
30:15;62:17;111:3,22

**car (4)**
77:17,19;81:8;89:11

**card (1)**
15:7

**care (3)**
28:19;138:20;139:12

**career (12)**
8:24;9:18,21;11:20;14:6;
21:5;42:22;45:25;70:24,25;
83:18;140:6

**cars (2)**
89:7,8

**Carter (8)**
5:5;71:4;110:4;112:8;
146:21;185:17;186:2,15

**Case (2)**
5:9;78:20

**cause (8)**
63:10;90:13;91:24;105:9;
134:16;147:3;148:25;184:13

**caused (2)**
13:8;67:10

**causing (2)**
118:6;141:18

**cellars (1)**
11:17

**certain (2)**
72:15;160:16

**certainly (9)**
16:5,6;23:5;33:22;54:24;
70:8;77:23;108:10;184:6

**CERTIFICATE (1)**
186:1

**challenging (1)**
18:15

**chances (1)**
152:25

**change (21)**
53:24;60:1;61:20;75:10,12,
15,24;76:11;94:17;95:24;
97:21;98:8,8,10,11,13;100:5,6;
170:4;182:14;186:10

**changed (4)**
73:13;75:21;76:4;99:13

**changes (1)**
186:9

**characterize (2)**
107:17;150:19

**charge (1)**
76:8

**charged (1)**
52:25

**check (10)**
19:2,13;39:15;59:9;96:20;
106:9;118:9,11;120:22,22

**checked (1)**
80:2

**checking (2)**
118:12,16

**checks (1)**
82:23

**chewing (2)**
152:22,24

**chief (96)**
14:12;18:25;19:17,19,25;
20:19;25:18;26:16;31:3;40:19;
45:21;48:18,19,21;50:2,5;54:1,
5,10,17,21;55:1,6,7,8,9,23;
56:14,25;57:14,18,21,22;58:10,

11,13,15,25;60:15,15,18;61:13,
13;72:6,13;77:14;79:3;82:1;
95:19,22;100:6,14,16;102:14,
21;105:13,23;109:1,19;110:8;
112:6;114:8,9;116:16;119:12;
128:23;136:7,8;137:25;138:6;
147:5,15;148:11;150:1,13;
156:10;158:21,23;159:3,8;
160:2,6,6;161:25;163:2,20;
165:11;168:22;169:1,3;172:24;
173:2,5,11;183:19,23

**children (1)**
23:12

**choice (2)**
76:22;137:18

**choose (2)**
135:12;136:1

**chose (5)**
14:8;27:12;135:24,25;154:20

**Chris (1)**
67:15

**chronological (2)**
46:18;50:13

**chronologically (1)**
39:1

**City (12)**
10:15;12:2,5;13:6,9,21;14:7,
10;17:15,19,20;26:16

**civil (4)**
75:22;76:6;77:18;184:12

**civilian (2)**
9:2,12

**claiming (2)**
129:4,7

**clarify (2)**
144:18;155:6

**clear (4)**
7:11,18;65:15;166:14

**cleared (4)**
20:1;65:13;165:3,4

**clearly (12)**
26:14;28:3;56:20;61:6;
70:15;104:7;119:4;127:5;
151:21,25;152:2;172:3

**clerk (1)**
114:12

**client (1)**
5:19

**climb (1)**
14:11

**close (4)**
42:1;72:1;144:5;153:15

**cognitive (4)**
126:14;177:2,8;180:13

**Colorado (1)**
10:17

**coloring (1)**
67:14

**comfortable (2)**
93:20;94:19

**coming (2)**
81:16;105:1;129:1

**command (3)**

20:15;60:25;71:5

**commander (1)**
13:13

**comment (1)**
9:14

**commented (1)**
67:8

**comments (4)**
47:7;67:12;100:17;107:14

**COMMISSION (1)**
186:25

**Commissioner (1)**
29:6

**Commissioners (1)**
78:8

**commit (1)**
140:5

**committed (2)**
139:23;165:23

**communicate (1)**
7:3

**compare (1)**
99:14

**compelling (1)**
184:15

**competitive (1)**
184:17

**competitors (1)**
28:13

**completely (2)**
33:14,25

**compound (1)**
33:22

**computer (2)**
84:11;153:22

**concern (18)**
88:22,23;105:3;129:15;
141:11,13,22,25;145:10,14;
149:3;155:24;157:20;177:7,9;
178:3,6,15

**concerned (11)**
65:16;124:24;128:11,12,14;
134:17;144:25;149:5,7;178:4;
180:3

**concerns (5)**
65:19;80:3;104:15;127:21;
155:25

**concluded (1)**
185:20

**conclusion (2)**
157:3;183:7

**condition (3)**
68:19,20;160:17

**conducting (1)**
109:25

**conference (1)**
136:7

**confidential (1)**
184:14

**confirmatory (2)**
92:24;93:15

**conflicts (1)**
108:2

**consider (2)**
152:5;176:16
**consideration (1)**
84:24
**considered (2)**
22:4;54:6
**consist (1)**
169:10
**consisted (1)**
152:18
**consistent (3)**
144:21;147:8,10
**consisting (1)**
186:5
**consists (1)**
178:11
**construction (2)**
11:5,8
**consult (1)**
180:6
**consultant (2)**
175:8,9
**consuming (1)**
119:20
**contact (1)**
67:3
**contacted (2)**
19:15;146:21
**contained (2)**
186:7,8
**contend (2)**
116:16,18
**contending (2)**
123:2,4
**contents (1)**
186:6
**continue (1)**
34:14
**contributor (2)**
107:24;108:7
**conversation (23)**
114:10;124:12;136:2,6,13,
18;137:16,17,21;138:3,14,22,
23;148:21;150:7;152:11,18;
155:3;159:3;161:4;167:5,9;
168:9
**conversations (3)**
74:15,22;169:2
**coordinator (2)**
46:15;72:9
**cops (1)**
92:15
**copy (2)**
43:22;185:3
**corporal (4)**
47:6,9,13,16
**Corps (7)**
8:7,9,13,21,25;9:18;10:4
**correctly (2)**
47:8;110:12
**corroborate (1)**
52:13
**corroborates (1)**

52:14
**counsel (4)**
5:16;30:7;33:5,16
**counselor (2)**
163:12;165:2
**Count (1)**
91:16
**County (70)**
5:7;13:6,9,21;14:4,7,8,12,16;
17:12;18:10;20:16;21:11;
23:14,17;24:11,18;26:20;27:8,
8,11,11,12,13;28:22;29:6,14,
19;30:1;31:9;38:10;39:17;
40:11,25;46:2,6,11,11,13;
49:15;50:21;52:22,23;53:4;
57:8;61:21;65:13;67:19;68:1;
78:7;80:22;82:15,16,18,19,21;
83:11;85:13;88:5;89:7;10,12,
13;95:17;106:13,15;110:10;
126:13;159:19;168:21
**County's (3)**
65:10,10;122:20
**couple (1)**
64:1
**course (5)**
128:14,19;135:23;140:10;
175:5
**courses (1)**
45:25
**Court (7)**
5:8,13,14;139:21;144:13;
185:1,11
**Court's (1)**
88:4
**Cove (1)**
36:14
**crazy (1)**
11:22
**create (1)**
184:16
**criminal (1)**
53:1
**curious (4)**
22:20;32:7;54:16;166:17
**current (1)**
76:17
**currently (1)**
58:16
**cut (2)**
44:11;127:13

## D

**Daily (1)**
71:20
**damn (2)**
152:17;182:7
**Daron (5)**
31:1;62:2,5;63:22;119:24
**date (38)**
5:5;48:9;49:6;50:1,2,6,14;
59:12,13;60:3;66:2;75:4,7;
80:15;96:16,17,22,24;97:21;

101:1,2;102:2,3,4,8,21;104:18;
108:17;109:13;112:3;130:21;
133:22,23;137:1;141:16,24;
151:5,6
**dated (8)**
31:4;46:25;48:11;53:16;
78:1;95:25;108:13;186:12
**dates (5)**
21:6;68:19;150:21,22;155:10
**day (13)**
71:21;82:12;97:9,9;110:14,
23;136:3;137:6;142:22;165:22;
166:24;186:12,17
**days (2)**
36:13,13
**Dazley (1)**
101:13
**deal (8)**
27:6,7,16,17;54:21;89:16;
140:8,9
**Dear (1)**
109:22
**December (7)**
14:22,23;15:2;66:3;70:8,12;
75:8
**decertification (5)**
16:12,15,24;17:24;19:5
**decertified (2)**
15:10;20:2
**decide (3)**
11:19;33:17;142:1
**decision (31)**
43:13;55:12,16;57:2,15,18,
20;60:11,14;98:18,19;126:4;
128:6,7;135:5,6;157:18,19,22;
158:1,3,13,22,23;165:18;
169:15,24;175:18;176:22;
177:6;180:1
**decision-making (12)**
44:25;51:23;125:22;126:1;
128:2,3,5;130:2,5;161:13;
175:7;180:4
**decisions (18)**
45:18;54:18;82:11;84:19,21;
125:25;155:17,25;156:16,20;
157:11,15,16;175:14;178:5,7,9;
180:7
**Deep (1)**
153:23
**Defendant (1)**
5:23
**definitely (1)**
18:15
**delegated (1)**
160:3
**demeanor (1)**
91:2
**democrat (1)**
29:13
**deny (1)**
140:13
**Department (2)**
51:4;73:6

**depend (2)**
43:16;71:12
**depending (2)**
17:1;78:17
**depends (1)**
71:16
**depose (1)**
186:3
**deposition (27)**
5:4,9,12;7:6;10:16;30:8,20,
22;33:12,17,19,20;62:13;86:14,
19;87:11,14,17;102:19;103:13;
109:6,8;185:8,17,20;186:5,6
**Depositions (3)**
30:21;38:1;114:25
**depression (3)**
164:20,20,25
**Deputy (60)**
18:25;19:25;20:19;21:15;
24:12,15;25:18;40:19;45:21;
47:16;54:10,17,21;55:2,6,7,8,9,
23;56:14;57:1,15,19,21,23;
58:10,11,13,15,25;60:15,15,18;
72:13;79:4;82:1;95:22;100:7,
14,16;102:21;109:1,19;110:8;
112:7;116:17;138:1;147:5,15;
148:11;150:3,13;160:2,7;
161:25;165:11;172:24;173:2,
11;183:23
**describe (1)**
152:14
**description (2)**
30:15;153:22
**deserving (1)**
63:8
**designed (1)**
39:11
**desk (1)**
56:20
**detection (1)**
97:8
**detective (1)**
85:18
**detectives (1)**
61:14
**determine (1)**
106:23
**determined (1)**
126:3
**determines (1)**
19:13
**development (2)**
75:14;76:6
**dictated (1)**
77:16
**Diego (1)**
9:4
**different (12)**
8:25;41:7;45:11;80:10;81:3;
95:16;100:22,23;116:5;119:16;
143:23;163:22
**difficult (2)**
18:17,18

**difficulties (1)**
123:25
**director (1)**
76:8
**disagree (5)**
112:6;113:12,14;149:25;
176:8
**disagreeing (1)**
177:17
**disappointed (2)**
167:22;168:4
**disbelieve (1)**
36:2
**disciplinary (3)**
51:19;92:22;93:15
**discourage (1)**
77:3
**discovery (1)**
33:17
**discretion (3)**
168:21;181:19;183:13
**discussed (10)**
71:13,16;73:5;94:20;131:24;
137:9,10;149:18;161:17,18
**discussion (3)**
43:8;149:22;171:5
**dishonesty (3)**
15:7;16:11,14
**dispatch (2)**
12:7,11
**dispatcher (1)**
12:3
**dispute (4)**
102:13;132:6,10;148:6
**disqualify (5)**
34:17;36:9;38:9,13,14
**distinction (1)**
115:12
**District (3)**
5:8,8;161:12
**division (4)**
76:1,10;77:4;83:7
**divvied (1)**
156:11
**divvy (1)**
157:25
**doctor (3)**
101:10,12;163:11
**doctor's (2)**
108:20;144:21
**document (30)**
43:2,7;44:4,9,14,16,24,25;
45:17;48:21;49:12;52:5,9,13;
65:21;66:1;78:1;80:11;101:10,
24;102:16,17,22;107:2,3,12,16;
109:4;134:3;147:7
**documented (1)**
21:8
**documents (7)**
30:2,10,13;64:2;66:2,7,9
**Don (31)**
20:24;39:22,25,25;40:13;
48:7;49:5,5;59:17,21,23;

103:18;109:17,18;111:14;
126:22;137:11,12;155:14;
159:1;160:24;161:3,9,9;
169:17,25,25;170:2,3,4;184:3
**done (31)**
10:1;15:19;23:4;34:5,6;35:3,
7;49:16,20;51:2;54:13;57:3;
58:7,14,17;65:9;83:18,19;
84:17;91:12;95:17;98:25;
100:13;102:20;105:13;108:12;
122:22;123:15;151:15;159:11;
185:8
**Don's (1)**
161:8
**door (1)**
151:10
**dope (1)**
32:14
**doubt (4)**
124:25;134:13;135:7;152:8
**doubting (1)**
167:10
**Doug (3)**
38:1,3;115:23
**down (7)**
41:14;72:10;74:6;91:17;
112:7;130:21;138:24
**Dr (47)**
31:4;109:2,22;126:9,12,13,
17,21;159:2;160:9;162:11,14;
163:17,22;164:1,6,8;166:24;
168:7,13,16;169:2,17;170:6,9;
172:20,25;173:5,11,13,24;
175:1,17;177:1,6,9;178:8,24;
179:2,4,5;180:10;181:5,10;
182:14,16,19
**dragged (1)**
67:7
**drank (1)**
36:3
**draw (2)**
183:6,8
**DRE (4)**
92:12,13,16,17
**drink (6)**
36:15,24;37:1,7,16,20
**drinking (5)**
37:10;119:7;120:2;121:22;
122:5
**drinks (4)**
38:1,3;115:14,19
**driver (2)**
90:18,23
**driving (6)**
89:6,11,15;90:14,14;128:1
**drug (75)**
35:1;43:8,11,16;45:8;80:12,
12,13,20,25;81:2,4,6,21,22;
82:13,23;83:19;84:4,7,12,24;
85:9,11,13,14;86:18;87:11;
88:6,9,14,15;89:3;92:14,21;
94:22,24;95:5;96:23;117:3,4;
118:13,20;127:7;129:19;134:9,

12;135:2,5,12,22;136:1,2,9;
137:19;138:14;152:5
**drug-free (3)**
80:23;81:23;82:21
**drugs (20)**
32:1,8,16;34:11,13,16;35:13,
25,25,25;81:17;85:17;92:10,12,
14;97:8;119:3;142:5;143:8;
145:5
**due (4)**
45:3,5;102:21;110:9
**DUI (10)**
38:15,19;89:16;90:4,8;91:12,
22;165:23;166:3,25
**duly (1)**
186:2
**duration (1)**
68:18
**during (17)**
13:24;17:3;20:6;25:8;67:2;
70:5;79:24;128:22,22,24;
148:21;149:22;150:7;155:6,17;
158:13;162:13
**duties (2)**
76:11;160:22;181:16
**Duty (96)**
30:17;49:16,18;65:8;85:15;
101:11;102:11;108:16;114:1,5;
117:19;118:10,12,15;119:14;
122:14,16,22;123:7,17;125:12,
14,22;126:8;127:15,16;128:8;
129:1;130:22,23;141:2;143:10,
16,18;155:8,18;156:21;158:20,
22,25;159:2,4,11,14,20,22,25;
160:6,8,19;161:17;163:16;
164:3;166:19,24;168:7,13,17,
19;169:9,12;170:4;171:22,24;
172:4,21,23;173:4,13,14,15,15,
16,17,22;174:1,1,12,12,23;
177:14,20;178:11,25;181:6,17,
18;182:5,9,12,14,15,17,18;
183:1,12
**Duty's (1)**
169:10

---

**E**

**Earlier (5)**
66:18;67:1;139:11,12;180:25
**early (2)**
28:25;60:25
**earning (1)**
97:24
**easily (1)**
79:3
**easy (4)**
36:11;59:6;75:11,18
**Eden (2)**
59:20,22
**effect (1)**
97:19
**effective (5)**
53:2;96:10,13,18;97:21

**effort (2)**
15:14;17:18
**efforts (2)**
18:7;67:9
**eight (2)**
74:1;84:7
**either (9)**
11:16;29:12;43:12;64:10;
120:15;137:18,18;138:13;
184:19
**Elaine (1)**
162:2
**elected (17)**
17:4;20:11,12,14;25:22;
27:25;28:1;34:2;51:6,13;54:13,
15;55:21;56:7;65:8;83:24;88:8
**election (2)**
25:21;34:3
**electronic (1)**
102:24
**electronically (1)**
103:10
**Elko (2)**
28:22,25
**else (11)**
30:16;63:19,23;84:13;126:5;
152:16;154:2,23;158:1;162:1;
182:13
**Emory (2)**
161:22,25
**empathy (2)**
140:11,12
**employed (5)**
28:23;31:8;35:20,23;40:24
**employee (5)**
39:14;85:14;88:9;92:23;
116:24
**employees (4)**
57:4,5;112:19;159:18
**employee's (1)**
106:9
**employment (4)**
18:9;34:11;80:23;104:8
**end (10)**
5:19;9:20;14:12,14;72:6,7;
82:12;104:7;149:18;185:16
**ended (1)**
18:9
**enforce (2)**
39:20;41:9
**enforcement (16)**
8:18;9:16,20;11:20;14:3;
16:16,22;17:2;18:9;22:22;
23:10;26:19;27:10;34:15;
75:13;91:20
**enforcers (1)**
82:4
**enforcing (2)**
39:23;41:7
**engage (1)**
152:10
**engaged (1)**
43:12

**engagement (1)**
110:10
**enough (9)**
14:11,12,14;17:9;68:3;83:17;
91:6;179:18;183:7
**enter (1)**
51:22
**entire (2)**
70:24,25
**entirely (1)**
71:12
**entitled (2)**
33:19;175:18
**envelope (1)**
82:1
**Especially (2)**
89:14,14
**established (1)**
119:18
**et (1)**
5:7
**ethics (1)**
19:4
**eval (2)**
176:10,20
**evals (1)**
176:19
**evaluation (34)**
45:16;49:2,4,7,9,16;58:11;
59:8;102:20;103:16,18;105:5,
10,12;106:1,8;107:5,18;108:7,
9,10,12;121:1,6,9;143:18;
158:20;162:12;163:4;164:9,19;
169:8;176:3,11
**evaluations (14)**
58:3,5,14,17,20,24;59:1;
100:10,13,17;104:2;106:20;
107:1;159:20
**evaluator (2)**
162:15;163:4
**even (16)**
7:15;13:17;27:1;29:14;37:7;
45:18;52:1;85:2,3;90:6,7;
126:20;160:19;163:1;166:15;
182:16
**evening (1)**
182:12
**event (1)**
148:9
**eventually (1)**
13:5
**everybody (7)**
41:15;78:8,15,17;80:1;89:12;
131:13
**everyone (2)**
110:2;111:7
**evidence (1)**
91:6
**exactly (3)**
19:9;33:24;88:18
**exam (2)**
174:21,21
**examination (2)**

31:22;35:15
**example (1)**
58:10
**except (3)**
111:7;182:12;186:9
**exceptions (1)**
72:25
**excluding (1)**
110:2
**excuse (7)**
49:17;69:22;116:17;138:6;
146:4;150:14;163:2
**execute (1)**
153:10
**exempted (1)**
84:1
**Exhibit (60)**
42:24;43:20;45:15,15,23;
46:17,19,25;47:23,23,24;48:23,
24;49:1,11,24;50:12,13;52:4;
53:15;59:7,25;66:19;75:4,9;
78:1,11;79:7;80:10;94:7,23,24;
95:24;96:23;97:11;100:24;
101:7,8,17;102:19;107:4;
108:24,25,25;109:13,14,14;
146:2;170:18;171:9,21,23;
172:5,7,9,10;180:21;181:8,10
**exhibits (4)**
41:25;42:6,13;65:18
**exist (1)**
184:16
**exists (1)**
184:13
**expect (3)**
41:8;120:21;176:25
**expectation (2)**
77:8,11
**experience (2)**
16:20;184:7
**expert (6)**
92:14;118:21;127:7;176:25;
180:6,10
**expertise (2)**
175:4;179:25
**EXPIRES (1)**
186:25
**explain (3)**
63:18;95:4;155:22
**explaining (1)**
19:9
**explore (1)**
19:15
**expressed (1)**
62:25
**extended (1)**
95:7
**extent (3)**
72:20;87:19,20
**extremely (1)**
67:5
**eyes (1)**
130:3

**F**

**facing (1)**
151:10
**fact (13)**
25:2;27:9;28:24;37:6;53:13;
62:16;81:24;83:12;93:1;
108:22;120:18;170:1,10
**fair (10)**
17:10;34:9,12;35:1,2,9;
39:21;118:5;129:12;131:23
**faith (1)**
175:4
**Falls (64)**
5:7,11;10:15;12:2,5;13:6,8,9;
14:4,7,16;17:11,15;18:10;
20:16;21:10;23:17;24:11,18;
26:20,24;27:8,11,13;29:14,19;
30:1;31:9;38:10;39:16;40:11,
24;46:2,6,10,11,13;49:15;
50:21;51:3;52:22,23;61:21;
63:16;67:19;68:1;80:22;82:16,
18,19;83:11;85:13;88:5;89:7,
10,13;95:16;106:13,15;122:20;
126:13;159:19;168:21;169:2
**familiar (9)**
19:2;21:16;27:1;29:1;40:8;
50:24;51:2;90:6;109:9
**family (1)**
10:18
**far (13)**
14:12;44:25;45:3,5;65:16;
77:12;81:13,15;94:21;104:14;
124:20,24;154:8
**farmed (1)**
10:23
**farming (3)**
10:22;14:1,2
**fast (1)**
42:7
**father (3)**
10:23;13:25;67:8
**father-in-law (1)**
67:8
**February (3)**
53:16,18,25
**fed (1)**
9:24
**Federal (1)**
184:11
**feel (3)**
94:16;134:14,19
**feeling (1)**
151:1
**fell (1)**
25:20
**felt (4)**
22:15;98:24;133:11;134:16
**female (1)**
55:10
**few (2)**
22:10;57:6

**field (8)**
91:6,8,10;117:13;118:16,21;
134:5;164:25
**fifth (1)**
27:15
**fighting (1)**
178:2
**figure (2)**
96:2,3
**file (4)**
42:21;65:18;67:19,25
**Filer (6)**
7:21,24;8:1;10:24;21:16;
28:22
**fill (3)**
47:12;156:8;158:16
**filled (1)**
18:20
**final (1)**
69:3
**finalized (1)**
103:5
**find (11)**
17:2;39:11;40:7,10;75:11;
83:5,7;126:23;143:13,15;160:7
**fine (2)**
21:3;150:23
**finish (2)**
7:9;144:4
**finished (1)**
7:8
**fire (1)**
120:4
**first (24)**
12:17,18;21:10;25:14;44:6;
66:22,24;70:22;124:6,8,20;
133:17,19;151:3;153:16;
170:20,22;172:7;177:13,13;
181:11,23,24;186:2
**Fit (58)**
30:17;49:16,18;118:10,12,
15;119:14;122:14,16,22;126:8;
127:15,15;128:8;129:1;130:22,
23;141:1;143:10,16,17;158:19,
22,24;159:2,4,11,14,20,22,25;
160:8,19,21;161:17;163:16;
166:19;168:7,13,19;169:9,10,
11;170:3;171:24;173:4,13,16,
16;174:6,11,12,22;177:9,20;
178:11,25;182:14
**five (3)**
27:25;28:2;37:9
**flip-flopped (1)**
99:12
**flip-flopping (1)**
99:10
**FMLA (6)**
65:20;66:1,1;68:12,14;70:14
**folder (1)**
180:24
**follow (2)**
41:3,13
**followed (1)**

172:16
**following (3)**
124:14,15;125:9
**foregoing (1)**
186:4
**forever (1)**
70:1
**forgot (3)**
30:17;37:6;87:6
**forgotten (1)**
165:12
**form (60)**
16:17;18:11;19:7;22:17,24;
32:9,18;33:1,5,9,23;37:18;
38:12;56:4;62:18;63:12;67:21;
74:7;86:21;89:21;92:25;
104:17;105:11;106:2;110:17;
112:15;115:7;116:7;117:5,15;
118:18;120:6;121:13;123:8;
129:20;130:7,15;131:2,8;
132:7;133:1;134:23;139:25;
143:1,24;156:22;157:2;160:12;
161:2;162:16;165:24;167:3,23;
168:24;169:19;173:1;174:3,15;
175:10,21
**form's (1)**
100:22
**forwarded (1)**
53:3
**Forwards (1)**
91:17
**found (1)**
166:19
**Foundation (29)**
66:12;67:20;87:9;110:18,22;
111:16;113:7;115:25;118:19;
123:9;125:17;130:8;131:3,6,9;
132:7;143:25;144:22;163:8;
165:6;167:2;168:24;169:20;
174:4;176:4,17;178:18;180:14;
183:16
**four (5)**
107:25;108:8;162:8,10;
181:16
**fourth (1)**
123:19
**frame (5)**
119:17;128:22,24;155:1;
162:13
**Francisco (1)**
10:9
**free (1)**
92:21
**freezing (1)**
11:23
**frequently (2)**
67:13;106:11
**fridge (1)**
36:19
**friend (8)**
13:11;22:5;36:14,16,18;
128:10,15;167:12
**friendship (1)**

22:10
**front (4)**
146:2,9;171:17,18
**fully (2)**
175:8,15
**funky (2)**
24:3,6
**further (3)**
66:25;92:18;117:1
**fusion (3)**
68:25;69:1,6
**futile (1)**
17:18

**G**

**Gambrell (1)**
51:3
**game (1)**
141:15
**garage (1)**
36:20
**gather (1)**
34:24
**gave (4)**
43:23;55:3,3;108:20
**gaze (2)**
91:11;153:21
**gazing (1)**
151:11
**gears (1)**
21:4
**Geez (2)**
30:17;73:25
**general (4)**
51:5;73:2,3;90:8
**generally (6)**
14:7;51:1;62:21;83:15;
90:15;104:3
**Gerlyn (4)**
55:11,12,12;60:19
**gets (2)**
55:14;78:8
**given (6)**
18:9;19:18;79:23;94:16;
124:25;156:18
**glad (1)**
183:11
**glasses (3)**
36:15;37:2,8
**goal (8)**
72:21;75:16;98:22;127:18,
19,20;142:5;145:15
**goals (1)**
181:21
**goes (7)**
28:4;76:17;81:25;126:19;
128:6;174:20;179:18
**golf (3)**
22:9,10;142:18
**good (31)**
9:25;11:2;22:4,22;23:4;
26:14,19,20;36:18;40:18;42:1;

49:9;61:6,12;63:25;89:17;
93:25;94:21;107:20;108:9,10;
138:25;152:15;154:12;162:4;
167:12;176:19;178:6,9;180:7;
184:12
**Gooding (1)**
27:11,12
**Gosh (1)**
150:14
**Gotcha (1)**
58:2
**government (1)**
8:22
**Governor (2)**
29:5,6
**graduate (1)**
8:1
**Grady (8)**
5:20,20;44:18;69:18;121:25;
147:23;180:20,25
**gray (1)**
67:14
**great (1)**
107:15
**Gretchen (1)**
5:14
**grew (1)**
7:21
**grown (1)**
57:8
**grunt (1)**
8:14
**guarantee (1)**
75:20
**guess (11)**
8:25;16:25;37:5;74:4;83:13,
13;85:10;151:11;152:3;164:2;
174:21
**guessing (3)**
27:14;95:19;96:2
**guidance (1)**
185:12
**guy (7)**
13:11;28:21;29:1,2;32:7;
81:17;84:3
**guys (6)**
8:23;27:1,6;77:14;155:4;
157:21
**guy's (1)**
61:25

**H**

**habit (1)**
104:1
**half (1)**
14:18
**hallway (1)**
72:11
**hand (3)**
46:17;47:23;102:18
**handicap (2)**
142:17,18

**handing (1)**
42:23
**handle (1)**
159:15
**handled (7)**
19:25;45:20;120:19;128:23;
158:21;160:20;163:16
**handles (1)**
19:20
**handwriting (1)**
69:2
**Hansen (1)**
21:17
**happen (6)**
54:22;72:24;77:24;119:11;
120:24;127:14
**happened (16)**
14:23;15:2;45:6;52:12;
70:12;74:15;111:15;112:6;
120:20;130:19;139:22;146:18;
153:18,20;166:13,18
**happening (1)**
50:1
**happens (1)**
96:11
**happy (2)**
184:24;185:2
**hard (5)**
21:1;35:3,25;99:16,17
**harm (1)**
184:17
**Hass (1)**
74:8
**hate (1)**
99:23
**head (4)**
7:15,17;83:8;168:3
**Health (4)**
81:9;136:9;137:19;138:11
**healthy (2)**
128:9;181:21
**heard (2)**
29:11;125:2
**heck (1)**
182:23
**heel-to-toe (1)**
91:13
**held (2)**
114:10;171:6
**hell (5)**
22:4;77:2;142:11;174:22;
179:23
**help (2)**
10:25;127:2
**helped (2)**
10:25;13:24
**helps (1)**
105:23
**Hepworth (122)**
5:11,17,18,20,20;16:19;
18:13;22:19;23:1;32:12,21;
33:3,8,16;34:5,8,21;37:24;
38:17;41:24;42:3,5,18;43:21,

23;44:2,18,20;56:10;62:20;
63:14;66:15;67:23;69:18,21;
82:9;86:5,25;89:25;93:6;94:12;
101:16,21,23;104:24;105:15;
106:7;110:20;111:1,20;112:17;
113:10;115:11;116:3,11;117:8,
17;118:24;120:10;121:17,25;
122:3;123:11;125:19;129:22;
130:10,17;131:5,11;132:9;
133:3;135:1;140:2;143:4;
144:1,7,10,17;145:7;146:1,6,8;
147:23,25;148:2;156:24;157:6;
160:15;161:6;162:18,24;
163:14;165:8;166:1;167:7;
168:1;169:6,22;171:2,8,20;
173:8;174:8,25;175:13;176:1,
6,14,24;178:22;180:18,20,23,
25;181:2,4,10,13;183:21;
184:21;185:10,13

**here's (11)**
50:12;52:3;53:15;59:7;
65:17;75:9;96:16;108:24;
170:16,18;171:9

**hereto (1)**
186:11

**Herrin (1)**
5:15

**H-E-R-R-I-N (1)**
5:15

**hey (6)**
13:14;83:8;129:16;131:14;
157:21;171:15

**High (4)**
7:24;8:1;24:17;129:14

**highest (1)**
24:17

**highlighted (2)**
75:11;79:12

**Hilliard (108)**
5:6,18,19,21;18:6;21:9;
31:15,24;34:10;42:25;44:18,
21;45:2,17;48:13;49:17;50:16;
51:21;53:6,21,22;55:13;59:9;
60:5,7,22;61:3,23;62:3,7,16;
64:4,4;66:11;67:3,4,7;69:18,19,
22;70:6;74:16,23;75:2,24;77:9;
84:6;85:22;94:23;96:1;97:5,24;
98:17;99:10,19;100:11;102:6,
7,11,21;104:6;105:1;107:5;
108:2,5,13;110:3,5,11,14;
112:10;115:14;116:19;117:12,
18;121:22;122:21;123:24;
133:20;134:20;135:14;137:4;
138:1,8;141:6,22,25;146:23;
147:1,14;148:3,12,23;149:13,
23;150:19;155:16;156:15;
158:4;159:9;160:17,25;163:3,
21;165:19;168:22;169:16;
173:25

**Hilliard's (16)**
19:16;21:5;35:13;42:21;
45:24;67:11;79:20,22;80:4;
84:23;101:10;104:11,15;122:5,

8;181:20

**himself (1)**
152:4

**hire (2)**
17:22;18:1

**hired (6)**
12:2;13:18;30:3;126:12,13;
159:2

**hold (2)**
12:25;139:20

**holster (1)**
37:7

**home (17)**
37:8;115:1;119:25;136:8,22;
137:13,20,23;138:2,14;139:1,7;
145:11;147:2;148:15,24;
157:12

**honest (1)**
20:22

**hope (1)**
74:13

**hot (1)**
139:15

**hour (3)**
11:23;71:14;98:3

**hours (3)**
12:25;67:2;71:16

**Howland (95)**
5:22,22;16:17;18:11;22:17,
24;30:7;32:9,18;33:1,11,24;
34:6,19;37:18;38:12;42:1,4;
43:19,22,25;56:4;62:18;63:12;
66:12;67:20;82:6;86:2,21;
89:21;92:25;101:14,19;104:17;
105:11;106:2;110:17,22;
111:16;112:15;113:7;115:7,25;
116:7;117:5,15;118:18;120:6;
121:13;123:8;125:17;129:20;
130:7,15;131:2,8;132:7,25;
134:23;139:25;143:1,24;144:3,
22;145:17;156:22;157:2;
160:12;161:2;162:16,20;163:8;
165:6,24;167:2,23;168:24;
169:19;171:17;173:1;174:3,15;
175:10,21;176:4,12,17;178:18;
180:14;181:8;183:16;184:8;
185:6,11,15

**HR (2)**
83:14;161:21

**huge (3)**
27:7;140:8,9

**Hughes (5)**
20:21;38:1;75:19;81:25;
115:23

**human (2)**
63:17;161:9

**hundred (1)**
11:22

**hurt (1)**
64:19

**I**

**IA (2)**
53:5,8

**Idaho (6)**
5:9,11,14;10:9;11:9;12:16

**idea (10)**
9:11;27:23;67:17;121:2;
158:6;159:13;160:19;164:24;
166:5;169:11

**identification (2)**
42:13;94:7

**illegal (2)**
35:25;123:3

**immediately (1)**
53:2

**impaired (36)**
37:9;39:3,12,14;85:15;89:8,
11,19;105:2,7,8;113:25;114:4;
116:5,8,13;126:3,7;129:2,5;
130:2,5;134:21;135:14;148:20;
149:20,24;150:5,20;151:22;
152:1,3,11,21;153:5;177:2

**impairment (12)**
39:2;88:21,23;89:15;135:18;
141:19;147:4;149:1,6,8,15,16

**implication (1)**
84:12

**imply (1)**
83:2

**important (18)**
7:3,13;23:9,12;26:8,10;68:3;
114:20;129:3;139:18,22;
143:20;148:10;157:22;167:18;
170:9;175:8;176:15

**impossible (1)**
18:8

**impression (1)**
169:15

**improper (3)**
33:14,25;158:5

**incident (1)**
48:14

**included (1)**
41:18

**incorrect (1)**
18:23

**increase (16)**
27:19;78:2,6,7;79:9,17,19,21,
22;96:1,5,9,10,12;97:16,18

**increased (2)**
57:6,8

**independent (2)**
29:12,22

**indicate (1)**
102:17

**indicated (1)**
146:22

**indicates (1)**
50:20

**indicating (5)**
75:6;96:3;100:20;172:4;
174:19

**indication (1)**
107:4

**indulge (1)**
36:20

**influence (17)**
92:3;110:6;112:11;116:13,
19,25;117:12;118:25;124:16;
129:2;130:14;131:23;133:12,
21;134:21;135:14;150:20

**inform (2)**
16:2;175:9

**information (5)**
31:15;33:13;175:19,22;
184:13

**informed (4)**
147:1;148:23;166:23;175:15

**initial (1)**
12:23

**initially (1)**
14:16

**initiated (1)**
100:6

**input (4)**
55:13;56:17;57:21;60:14

**inserted (1)**
34:11

**instance (2)**
95:6;150:11

**instant (1)**
153:7

**instructing (1)**
33:14

**insurmountable (1)**
18:19

**intention (2)**
9:15,18

**intentional (2)**
135:4,6

**intentions (1)**
8:24

**interacted (1)**
128:24

**interaction (3)**
71:18,23,25

**interest (2)**
9:20;17:20

**interfere (1)**
145:3

**interfered (1)**
122:5

**interfering (1)**
33:19

**interpretation (2)**
87:24;182:4

**intervention (2)**
69:1,5

**into (21)**
7:20;8:6,9;9:2,15,20;14:3,19;
21:5;34:11;51:23;53:6;62:8;
63:16;84:23;97:19;118:15;
126:19;151:14,18;154:6

**intox (1)**
92:4

**intoxilyzer (1)**
92:4

**introduce (1)**
5:16
**investigate (1)**
117:1
**investigated (3)**
16:15,23;17:13
**investigation (12)**
19:5;20:2;31:23;42:25;
44:15;51:2,16;53:1,4,6,9;90:22
**investigations (2)**
54:2;75:25
**investigator (2)**
50:3,5
**involve (1)**
87:11
**involved (32)**
11:16;19:20;30:3;39:23;
40:1,3,14;56:5,11,22;59:3;81:5,
7;92:16;103:16;120:15,17;
159:17;160:22;161:9,10,13,14,
19,24;166:4,15;167:4,9;169:12,
12,13
**involvement (1)**
54:19
**involves (4)**
53:21;57:11,12;126:17
**iron (1)**
11:23
**ironwork (1)**
11:11
**ironworker (2)**
10:5;11:6
**issue (41)**
31:10;35:5;39:4,5,6,7;41:20;
45:3,5,7;58:12,13,18;74:23;
79:5;86:20;88:20;90:17;93:3;
104:3,5,7,22;105:3,21,22;
106:4;110:5;112:9,12;113:1,
12;114:1,16;120:8,14;127:22,
23;152:25;163:19;179:12
**issued (1)**
168:13
**issues (25)**
19:24;29:7;63:23;73:4,4;
104:10;118:7;119:10;124:4,7,
9;125:1,2,2,2,6;127:5;129:25;
134:2;136:8;142:3;143:7;
146:22;152:23;179:19

**J**

**jail (10)**
13:13,13,14;14:13,16,17;
24:11,12;75:19;92:4
**January (9)**
8:11;20:13;48:11,14;52:2,7,
25;68:15;70:22
**Jeff (3)**
5:17;101:15;184:8
**JEFFREY (112)**
5:17;16:19;18:13;22:19;
23:1;32:12,21;33:3,8,16;34:5,8,
21;37:24;38:17;41:24;42:3,5,

18;43:21,23;44:2,20;56:10;
62:20;63:14;66:15;67:23;
69:21;82:9;86:5,25;89:25;93:6;
94:12;101:16,21,23;104:24;
105:15;106:7;110:20;111:1,20;
112:17;113:10;115:11;116:3,
11;117:8,17;118:24;120:10;
121:17;122:3;123:11;125:19;
129:22;130:10,17;131:5,11;
132:9;133:3;135:1;140:2;
143:4;144:1,7,10,17;145:7;
146:1,6,8;147:25;148:2;
156:24;157:6;160:15;161:6;
162:18,24;163:14;165:8;166:1;
167:7;168:1;169:6,22;171:2,8,
20;173:8;174:8,25;175:13;
176:1,6,14,24;178:22;180:18,
23;181:2,4,10,13;183:21;
184:21;185:10,13
**Jeremy (1)**
28:21
**Jim (1)**
13:18
**job (93)**
13:16;15:19;16:16,23;17:2,
11,21;18:7,8;23:4;26:8,9,15;
30:15;31:25;36:9,24;37:1;
39:12;43:1;50:2;54:1,1;58:3,
10,13,16;59:7,16,25;61:6,9,12,
16;62:17;68:4;70:6,16;75:11,
15,23;76:11;77:19;80:4;85:10,
10;88:4,21,23;89:11;98:4,7,8,
10,11,13;99:24;100:13,17;
102:20;104:11,15;105:5,7,9,10,
12;106:1,3,8,10,20,24;107:5,
17;115:16,19;119:21;121:1,6,8,
18,19;122:6;124:1;130:14,20;
131:23;142:6;153:4,6;157:14,
14
**judge (1)**
161:12
**July (28)**
31:4;45:19;84:21;85:5;
109:16;114:22,24;122:11;
130:23,24;132:12,18;136:21;
141:16;142:21,23;146:3,9,13,
18;147:12;150:12,18;151:23,
24;154:9;155:6;158:4
**jump (2)**
125:24;155:24
**jumped (1)**
25:13
**June (44)**
26:4,5;45:18;49:18,19;59:9,
11;67:15;84:21;102:1,8,12;
108:21;109:25;110:7,9,16;
111:3,15;113:5;116:20;117:23;
129:15;130:4,6,12,13,19,20,25;
131:7,12,25;132:4,18;133:14,
16;134:22;135:15;150:12,17;
154:9;155:7;158:4
**justification (1)**
47:7

**K**

**keep (7)**
33:4;73:16;74:9;131:14;
150:15;183:2;184:13
**keeps (4)**
46:3,6,11;74:11
**Kelly (1)**
36:17
**Kenya (6)**
73:19,21,22,24;74:9;75:1
**Kenya's (1)**
74:7
**kept (1)**
67:18
**Kimberly (4)**
17:6,8,22;21:17
**kind (10)**
7:20;9:24;15:16;29:20;
38:25;42:21;87:4;143:19;
157:16;175:7
**kinds (1)**
140:12
**knee (4)**
64:14,15,18,19
**knew (12)**
21:12;38:4,5;88:8;105:7,19,
22;123:6;135:21;142:6;164:11;
167:15
**knothole (1)**
67:7
**knowledge (8)**
51:5;86:6;87:18,23;123:21;
142:13,14;179:17
**known (10)**
21:19;22:1,2;56:8;69:25;
70:3;119:4;123:13;142:16;
155:9

**L**

**lack (1)**
149:15
**ladder (1)**
14:11
**laid (1)**
131:6
**last (23)**
7:7,8:20;13:2;25:25;33:12;
35:4;37:9;57:6;65:21;68:13;
71:11,14,15;75:4;79:15;
94:22;108:12;146:20,25;
148:22;171:9;172:9
**late (2)**
71:8;148:8
**later (4)**
122:11;124:12;126:22;
141:24
**Law (19)**
5:11;8:18,21;9:15,20;11:20;
14:3;16:16,22;17:2;18:9;22:22;
23:9;26:18;27:9;34:15;75:13;

76:5;91:20
**laws (1)**
19:4
**lay (1)**
87:9
**leading (1)**
33:21
**learn (1)**
98:22
**least (6)**
56:19;72:12;74:2;87:18;
117:13;172:10
**leave (12)**
45:3,5;93:4,8,11;98:2;110:2;
111:7;132:16;136:4;144:8;
148:17
**leaving (1)**
25:12
**led (2)**
90:16;152:20
**left (2)**
164:25;168:20
**legal (1)**
157:3
**legally (1)**
15:24
**lengthy (2)**
44:14;66:23
**less (2)**
77:19;84:8
**lethargic (1)**
67:5
**lethargy (1)**
119:11
**letter (21)**
31:3,5;52:13,14;109:1,3,5,9,
10,13,16,18;110:21;113:11,13;
114:23;146:3,9,14,16;155:14
**letters (1)**
183:1
**level (4)**
25:14;73:9;97:23;129:14
**Lexipole (1)**
40:5
**lied (1)**
142:13
**lieu (2)**
19:10,11
**lieutenant (19)**
20:19;23:20,22,24;25:17;
29:5;48:7;54:2,6;60:7,7,22;
61:7,12;62:2,6,12;120:16;
156:13
**lieutenants (3)**
57:1;73:11;114:12
**Lieutenant's (1)**
62:13
**life (4)**
9:2,12;35:7;90:15
**life-altering (1)**
128:7
**life-and-death (6)**
126:4;155:17;156:15,20;

158:13;178:5

**lift (1)**
125:23
**lifting (1)**
125:20
**light (23)**
101:11;102:11;123:7,17;
125:12,14,22;155:8,18;156:21;
173:13,15,21;174:1,12;181:6,
17,18;182:5,12,17,18;183:12
**likes (1)**
77:1
**limitations (1)**
125:21
**Lincoln (1)**
29:6
**line (2)**
41:14;47:6
**lip (2)**
152:23,25
**listed (1)**
186:10
**listen (2)**
40:22;45:12
**lists (1)**
170:24
**litigation (2)**
31:7;112:2
**little (11)**
11:4;21:4,7;45:11;54:16;
70:17;87:9;94:13;95:15;
100:22;119:16
**live (1)**
143:12
**Lives (1)**
28:22
**local (1)**
28:23
**logical (1)**
56:1
**long (17)**
10:6;12:4;14:11,13,21;19:7;
21:19;70:3;71:7,11;72:19;
73:24;77:6;90:7;91:12;163:18;
164:5
**longer (4)**
35:24;52:15;61:22;63:9
**look (16)**
31:14;46:5;48:24;50:24;
68:11;84:5;131:14,20,21;
136:24,25;168:3;170:6,9;
182:20,21
**looked (5)**
32:1;67:6;79:16;170:10,14
**looking (5)**
31:18;33:4;95:2;107:13;
181:8
**looks (8)**
45:24;49:5,16;53:16;65:19;
68:12;78:2;79:8
**loop (3)**
163:24;165:14;169:4
**Lord (1)**

11:2
**lose (1)**
67:10
**lost (1)**
140:6
**lot (17)**
13:1,1;22:9;36:10;37:16;
41:17;57:4,12;70:3;71:23,25;
72:2;107:23;115:23;120:8;
131:19;166:9
**lots (3)**
114:11,15;118:6
**loud (3)**
52:21;66:17;181:15
**love (1)**
139:17
**low (1)**
69:16
**lower (1)**
73:9
**lowest (1)**
127:6
**lucid (2)**
145:12;149:23
**luck (1)**
22:9
**luckiest (1)**
84:3
**Luke's (1)**
74:8
**lumbar (3)**
68:24;69:1,5

## M

**M&M (1)**
5:13
**mad (1)**
152:23
**main (1)**
82:3
**makes (4)**
19:8;34:4;100:17;111:25
**making (12)**
8:24;9:18;39:23;41:12;
54:17;58:17;67:18;126:4;
128:6;155:16;157:16;178:9
**man (1)**
93:25
**managed (2)**
26:25;27:4
**manager (1)**
165:4
**mandated (1)**
16:8
**mandatory (1)**
81:5
**many (6)**
17:25;25:23;64:9;142:17;
150:25;162:8
**March (1)**
5:5
**marijuana (1)**

95:7
**Marine (7)**
8:7,9,13,21,25;9:18;10:3
**Marines (2)**
9:6,8
**Maritt (1)**
28:21
**mark (2)**
41:25;42:6
**marked (9)**
42:13,23;43:20;75:9;79:17;
94:7;101:17,18;108:24
**Mary (1)**
161:11
**Matt (2)**
59:20,22
**matter (5)**
5:6;29:15;82:22;157:17,18
**May (20)**
28:10,11;29:1;36:20;40:23;
57:20;84:15;96:24;102:22;
104:9;105:2,6;107:5;108:13;
129:8,9;157:11;181:18;183:12;
186:10
**Maybe (12)**
27:6;41:25;68:16;84:2,7,7,8;
88:4;120:1;142:17;170:20;
184:10
**mean (18)**
41:8;44:10;70:11;72:14;
74:25;75:1;76:12;124:10,11;
127:13;128:20;136:11,12,12;
139:14;173:20;176:9;182:24
**meaning (1)**
110:8
**means (5)**
12:14;29:24;142:4;182:8,24
**measure (3)**
126:14;180:7,12
**measured (1)**
126:7
**medal (1)**
95:8
**medication (6)**
123:14;143:22;147:3;148:20,
25;179:20
**Medications (16)**
122:25;123:7;125:15;
137:14;138:2,17;139:2,8;
140:14,25;141:7,12,18;144:20;
145:9;165:4
**meds (2)**
123:16;137:11
**meeting (24)**
71:4,9,11;72:16,22;73:5,14;
110:1,3,16;111:2,3,5,24;113:3;
131:12;137:2;140:21;141:16;
142:21;147:11;149:14;150:12;
161:24
**meetings (16)**
30:18;70:19,21;72:12,20,21;
73:10,12,15;74:10,24;161:14,
15,16,18;162:8

**member (1)**
60:24
**members (1)**
89:14
**memorialize (1)**
68:3
**memorized (1)**
41:19
**memory (9)**
10:16;35:5;66:4,8;68:9;84:6;
120:14;147:8;166:14
**mental (1)**
149:5
**mentally (1)**
178:9
**mention (3)**
31:7;33:9;105:7
**mentioned (2)**
37:25;67:6
**Merit (14)**
78:4,6,7,9,13;79:8,9,10,17,
19,20,22;96:1;97:16
**met (7)**
30:6;110:10;146:23;147:14;
148:11;149:12;179:4
**method's (1)**
177:10
**micromanager (1)**
77:5
**micromanaging (1)**
77:7
**middle (5)**
50:19;79:13,19;97:15,20
**midst (1)**
17:24
**might (11)**
14:14;27:1;71:14,15,15;
87:11;109:12;140:9;156:11;
165:12;167:12
**mike (1)**
146:4
**mile (1)**
11:22
**military (2)**
8:19;9:21
**Miller (9)**
98:15,16,21,24;99:2,11,17;
100:11;156:11
**mind (9)**
85:17;88:13;129:18,24;130:1
**mine (3)**
13:11;22:5;155:24
**minutes (6)**
71:15;74:11,12,14,21,21
**Misstates (7)**
82:6;113:8;117:6;123:9;
162:20;167:2,24
**mistake (1)**
111:14
**mistakes (1)**
158:9
**misunderstood (1)**
9:19

**Molignoni (2)**
162:3,3
**money (7)**
26:12,15;28:4;46:24;54:4;
78:17;79:23
**month (1)**
156:6
**months (2)**
8:20;28:1
**more (16)**
14:6;21:7;40:1;54:4,20;63:8,
16;65:19;76:20;77:18;79:3;
84:8,12;92:6;95:20;151:2
**morning (7)**
111:24;137:7;147:16,21;
148:8
**most (5)**
11:16;57:23;92:15;176:3,9
**Mostly (1)**
12:10
**motivated (2)**
15:17;126:24
**motivation (2)**
127:1,4
**motives (1)**
34:4
**move (7)**
25:19;184:11,14,20;185:1,2,
9
**moved (1)**
12:19
**movements (1)**
67:11
**much (5)**
38:8;57:9;67:9;71:18;78:17
**multiple (1)**
84:25
**Munn (1)**
13:18
**must (4)**
26:1;27:14;61:11;102:3
**myself (1)**
110:2

**N**

**nail (1)**
74:6
**name (8)**
5:17;13:12;29:3;73:20;82:2;
84:11;161:11;186:21
**named (5)**
28:21;29:1,2;102:6;186:4
**names (1)**
150:15
**nature (1)**
63:17
**near (1)**
102:2
**nearly (1)**
67:5
**necessarily (2)**
43:15;56:21

**necessary (1)**
92:18
**neck (1)**
69:13
**need (21)**
66:25;68:21;77:13,22;86:8;
93:22;94:16;118:9,11,20;
129:17;137:13;138:1;139:1,7,
15;178:17,20,24;185:9,13
**needed (14)**
10:24;13:16;77:12;128:25;
136:8;147:1;148:23;158:23;
168:6,8;170:5;177:21;179:21;
182:13
**needs (3)**
71:12,16;103:6
**negative (8)**
94:23;95:5,5,6,11;97:7,9;
107:21
**new (8)**
20:17,18,19,19,20;23:14;
43:19,20
**Newman (64)**
19:17,19;20:24;31:4;39:22;
40:13;44:17;48:8,16,18,19,21;
55:2,6;58:15,25;59:8,17,21;
60:15;69:17;77:14;79:4;82:1;
84:20;95:19,23;100:7,14,16;
102:21;103:18;109:1,17,18;
110:8,9;111:14;112:7;119:12;
126:22;136:7,8,14;137:3;
138:1;140:21;146:3,14;147:6,
15;148:11;150:3,14;154:24;
159:1;160:24;161:25;165:12;
169:3,18;172:24;173:11;
183:23
**Newman's (6)**
49:5;72:7;121:19;155:14;
160:2,7
**next (9)**
24:24;49:23;52:3;53:15;
66:7;75:9;102:5;149:21;153:13
**Nile (3)**
64:21,25;65:1
**nine (1)**
84:7
**Ninety-nine (1)**
19:24
**nobody (1)**
62:25
**nobody's (1)**
176:18
**nod (2)**
7:14,16
**noon (4)**
147:17,24;148:4;149:13
**normal (4)**
67:2,15;145:11,12
**NOTARY (2)**
186:21,23
**note (4)**
181:14;182:3,4,16
**noted (1)**

67:12
**notes (6)**
73:16;74:9;75:1;84:6;
154:17;181:6
**notice (6)**
7:6;48:1,3;50:16;52:10;83:5
**noticed (2)**
67:6;152:24
**notified (2)**
50:16;52:22
**notify (1)**
15:23
**notifying (1)**
18:21
**November (8)**
20:12;47:15;48:10,15;50:14;
51:8,22;119:25
**nowhere (1)**
177:20
**Number (13)**
5:9;12:19;21:23;25:13;
48:23;81:3;87:10;97:11;
101:14;105:17;172:25;178:4;
181:16
**nystagmus (1)**
91:11

**O**

**Object (52)**
16:17;18:11;22:17,24;32:9,
18;33:1;37:18;38:12;56:4;
62:18;63:12;86:21;89:21;
92:25,25;104:17;105:11;106:2;
110:17;112:15;115:7;116:7;
117:5,15;118:18;120:6;121:13;
123:8;129:20;130:7,15;131:2,
8;132:25;134:23;139:25;143:1,
24;156:22;157:2;160:12;161:2;
162:16;165:24;167:23;169:19;
173:1;174:3,15;175:10,21
**objecting (1)**
33:23
**Objection (6)**
67:20,21;82:6;113:7;115:25;
176:12
**objections (2)**
33:5;34:19
**obligated (1)**
81:9
**observation (8)**
149:17;150:1,4;151:8,9,9;
153:1,3
**observations (10)**
66:10;114:22;126:24;
130:18;147:13;149:14;150:24;
152:20;154:3,17
**observe (2)**
90:16;91:2
**observed (4)**
69:16;114:15;150:13,19
**observes (1)**
116:24

obvious (1)
21:7
**Obviously (3)**
20:16;21:20;101:18
**occasion (3)**
76:12,16;150:17
**Occasionally (1)**
115:22
**occasions (1)**
163:22
**Occupational (4)**
81:9;136:9;137:19;138:10
**occurred (4)**
51:20,22;111:12,13
**occurrences (1)**
74:15
**October (6)**
12:12;96:11,11,13,17;97:22
**odd (2)**
127:8;152:2
**oddly (1)**
83:17
**off (33)**
27:12;37:1;42:8;44:11;
55:24;64:24;94:1;108:16;
113:17;115:12;119;125:9;
127:13;137:13;138:2,16;139:2,
8;140:14,24;141:7,15;145:8,
18;152:12;156:3,9,14;158:15;
166:9;171:2;173:21;185:17
**offenders (1)**
76:9
**Office (56)**
5:7;13:15;17:12;18:10;
20:13,16;22:11;23:7,15,17;
26:24;27:5;30:2;38:10,15;
39:17;40:12,25;49:15;52:2,2,
15,23;53:4;61:22;67:2;71:10,
22;73:4;80:22;82:5,18,22;
106:14,16;110:7,9;136:6,19,20;
137:3;146:24;147:15;148:11,
19;149:13;151:10,11,14,18;
157:15;159:19,24,25;168:21;
169:3
**officer (13)**
21:10;22:23;23:8;38:9;
49:17;51:3;53:6,22;60:5;81:4,
7;116:24;117:11
**officers (8)**
37:16;40:24;61:21;73:9;
78:23;89:6;100:14;115:24
**officer's (1)**
46:6
**Offices (2)**
5:11;72:5
**official (9)**
25:22;27:25;28:1;34:2;
54:14,15;55:21;56:7;88:8
**officially (1)**
24:7
**officials (1)**
83:24
**off-the-record (1)**

171:5
**ofreading (1)**
107:12
**often (4)**
76:19,20;77:10,24
**old (2)**
26:3;35:2
**once (5)**
36:21;106:12,18;151:2;161:8
**on-duty (3)**
115:5;116:4,8
**one (63)**
12:18,20;13:23;17:7;25:19,
20;28:18;30:25;35:22;37:6;
40:13;44:5;49:23;50:11;59:6;
65:7;72:6;73:11;75:5,6;79:15;
80:16;82:3;84:16;85:16;87:10;
88:25;90:2;94:22;100:20;
101:15;107:25;118:7,12;
120:19;124:22,22;126:19;
127:22,23;153:16;157:21;
158:7;160:22,23;170:11,15,17,
19,20,21,22,24;171:10;172:2,3;
173:3;180:22,25;181:1,23,24;
182:8
**one's (1)**
89:11
**ongoing (1)**
68:20
**only (18)**
15:19;17:5,7,8,21;27:8,9;
38:18;56:13;68:2;77:11;85:16;
93:14;117:3;119:10;124:21;
154:10;159:22
**onto (2)**
27:13;65:8
**open (2)**
47:12;82:2
**open-ended (1)**
33:21
**operating (2)**
71:3;91:19
**opinion (13)**
16:20;22:12;23:2;54:25;
99:20;114:11;120:20;122:4;
130:4;150:6;151:20,25;152:2
**opinions (1)**
126:24
**opponents (2)**
184:24;185:4
**opportunities (2)**
14:6,10
**opportunity (2)**
67:1;94:14
**option (3)**
138:8,10,12
**opts (1)**
33:15
**order (12)**
15:22;46:19;50:11,13;90:10;
135:21;138:4;168:14;178:15;
184:11;185:1,7
**orders (1)**

144:21
**originally (1)**
12:18
**others (4)**
69:16;78:23,24;154:5
**other's (1)**
98:23
**Otter (1)**
29:4
**out (48)**
5:13;8:24;9:7,18;10:12;
13:10,20;18:20;28:21,25;
39:11;40:10;50:11;52:21;
66:17;67:24;76:13,15,17;
77:10,13,22,23,24;83:5,7;
84:11;110:7,9;115:9;118:9,12,
12,16;124:9;126:23;131:14,20,
21,22;143:14,15;145:17;
164:25;165:14;166:8;178:4;
181:15
**outstanding (1)**
61:9
**over (9)**
10:23;13:2;21:19;26:1;
45:25;76:1;87:7;88:1;120:23
**over-the-ground (1)**
11:17
**own (3)**
21:17;89:7;130:3

**P**

**PA (1)**
163:11
**Pacifico (1)**
36:20
**package (1)**
43:24
**page (15)**
48:4;50:19;68:13,16,24;
79:13;103:2;109:17;146:12,17,
21;149:22;172:9;181:5;182:25
**pages (1)**
186:5
**paid (4)**
93:2,4,7;98:3
**pain (8)**
68:25;123:16;125:15;139:4;
140:14,25;141:7;145:9
**Pam (1)**
5:22
**Pankey (2)**
29:2,2
**paperwork (3)**
18:21;29:11;164:12
**paragraph (8)**
66:22,24;68:23,23;109:24;
146:20,25;148:22
**paraphrasing (1)**
139:13
**Pardon (2)**
125:4;167:8
**Parks (1)**

82:22
**part (7)**
11:5;26:13;27:18;57:23;
80:25;161:8;173:15
**particular (2)**
54:23;108:6
**part-time (11)**
132:1,5,18;155:8,18;156:21;
173:14,15,21;174:1,12
**pass (3)**
127:15;128:25;180:20
**passed (2)**
35:17;47:11
**past (1)**
169:24
**patient (4)**
7:9;68:19,21;102:6
**Patrol (35)**
12:9,10;14:19,21,22;24:14,
15;47:6,9,16,16;50:4;59:8,19;
75:21,24;76:10,12,13,15,15,17,
18;77:9,10,13,17;98:5,9,14,25;
99:21,22;114:12,12
**patrolman (3)**
90:2,3;92:6
**patrolmen (2)**
21:15,16
**pattern (1)**
90:15
**Pay (10)**
46:24;78:2;96:5,9,12,17,22;
97:18,23;106:25
**paycheck (2)**
93:9,10
**payroll (1)**
79:1
**pays (1)**
98:11
**pee (4)**
81:9;83:4,8;144:2
**pension (1)**
28:5
**people (27)**
39:12;40:14,18;41:9,10,13;
55:19;69:25;70:3;72:15;84:15;
89:15;99:23,24;114:11,15;
118:6,8;120:22;124:17;129:15;
130:13;148:19;149:9;161:24;
165:3;166:9
**people's (1)**
106:21
**per (1)**
98:3
**percent (6)**
19:24;78:9,18;79:15;96:3,8
**Perfect (1)**
95:22
**perform (1)**
134:5
**performance (11)**
47:10;58:5;68:5;80:4;
100:10;104:2,11,16;106:21;
176:3,11

**performed (1)**
85:14
**performing (2)**
123:25;153:4
**perhaps (1)**
67:8
**period (11)**
8:6;17:3;79:24;96:9;154:7,
14;155:7,17;156:2,19;158:13
**permission (1)**
55:14
**permit (1)**
10:11
**Perry (1)**
30:23
**PERSI (5)**
26:25;27:4,11,13,19
**PERSI's (1)**
27:7
**person (9)**
18:1;38:14;39:22;63:20;
76:8;95:7;118:7;127:6;160:7
**personally (8)**
133:9,10,19,24;134:1;
150:13,18;154:16
**personnel (7)**
19:24;42:21;54:20;58:18;
62:8;65:18;67:19,25;74:23
**pertained (1)**
74:22
**phone (2)**
166:16;168:9
**physical (3)**
67:14;91:2;125:21
**place (1)**
71:9
**Plaintiff (1)**
5:10
**plan (1)**
13:16
**planned (1)**
10:2
**play (1)**
22:9
**played (1)**
22:9
**pleasant (1)**
184:6
**Please (7)**
5:24;16:21;135:10;141:5;
179:6;183:9,9
**pm (5)**
145:21,21;171:6,6;185:20
**Pocatello (2)**
12:19,20
**point (19)**
11:21;14:14;25:5;42:2;
56:11;73:11;81:17;84:17;
93:13;94:1;117:22;118:9,11;
124:19;137:5;142:8;147:2;
148:24;153:12
**Points (1)**
100:18

**pole (1)**
127:6
**police (7)**
9:3;14:12;26:16;51:3;89:6,7;
131:19
**policies (12)**
39:9,11,18,19,19;40:14;41:1,
3,7,9,16,18
**policy (35)**
30:18;39:13,23,23;40:1,4,5;
41:13,19,21;50:22;53:3;80:23,
25;85:13,19;86:2,3,7,9,9,11,13,
19;87:11,13,16,18,24;88:17;
92:22;93:1;116:23;117:3;
134:19
**policymaker (2)**
39:16;40:13
**policymakers (2)**
40:11;82:4
**Policymaking (1)**
40:3
**political (2)**
184:24;185:4
**polygraph (4)**
31:8,22;35:14,17
**pool (1)**
83:25
**portion (1)**
65:20
**position (6)**
18:2;23:14;63:24;98:22;
122:21;158:12
**positive (2)**
93:15;107:23
**possible (2)**
17:11;184:10
**possibly (1)**
165:15
**POST (14)**
12:12,15,18,23;15:23;16:2;
18:21;19:13,15;20:1;46:8,9,13,
14
**potato (1)**
11:17
**power (1)**
175:7
**practice (1)**
104:1
**pre-employment (3)**
31:23;44:15;45:16
**preparation (4)**
30:7;87:13,17;103:12
**prescribed (1)**
143:22
**prescription (10)**
95:2,7,8,10;141:11,18;142:4;
143:22;144:20;145:9
**present (2)**
68:20;110:3
**presume (1)**
126:20
**pretty (3)**
24:6;66:23;114:20

**prevents (1)**
81:16
**previously (4)**
99:5;108:25;123:15,23
**primary (1)**
28:9
**prior (21)**
9:7;10:16;21:13;25:12;
31:13;65:1;83:17;97:22;
102:19;105:2;109:5,8;110:10;
116:20;125:6;147:23;148:3;
149:13;151:23,24;159:23
**private (1)**
27:3
**Probable (1)**
68:18
**Probably (27)**
10:7;11:3,21;12:25;20:23;
56:19;61:24;63:20;70:22;79:5;
81:25;84:10;88:17;90:6,12;
95:10,19;98:21;99:18;100:8;
103:25;105:21,22;121:10;
124:8;136:23;161:18
**problem (10)**
54:22,23;121:22;129:19;
130:13;179:3,8,12,17,22
**problems (6)**
22:14,16;64:5,14;107:6;
123:24
**procedure (5)**
71:3;82:13;90:8;91:20;
184:12
**PROCEEDINGS (1)**
5:1
**process (10)**
17:24;19:2,19,21;20:7;44:25;
51:23;59:4;61:5;168:5
**professional (4)**
23:2;75:14;76:5;91:20
**professionally (3)**
22:13,14;128:25
**program (4)**
8:22;12:15;26:21;83:9
**programs (1)**
81:4
**progress (1)**
181:20
**progressed (1)**
137:17
**Project (1)**
8:22
**promise (1)**
184:23
**promote (4)**
54:18;55:13,18;60:22
**promoted (8)**
23:24;47:5,9,15;55:23;56:2;
61:11;63:9
**promotion (13)**
47:12;54:3,6,9;55:3,3,9;56:6,
7,12,13;57:2;75:23
**promotions (2)**
57:13;106:24

**promptly (1)**
20:4
**proper (2)**
89:19;157:18
**properly (2)**
153:4,6
**propounded (1)**
186:8
**prosecutor (1)**
161:20
**protecting (1)**
23:12
**protective (2)**
184:11;185:7
**prove (1)**
117:4
**provided (1)**
176:3
**proximity (1)**
72:2
**psyches (2)**
163:18,18
**psychiatrist (1)**
160:20
**Psychological (2)**
109:22;126:18
**Psychologicals (1)**
126:16
**psychologist (1)**
160:20
**PUBLIC (2)**
186:21,23
**purpose (15)**
81:13,15,22;82:24;83:1;
88:12,14,25;106:8;107:2,3;
126:13;131:13;143:13,15
**purposes (3)**
73:5;89:1;132:17
**pursue (1)**
135:20
**put (14)**
17:6,7;43:20;45:2,4;98:2;
131:22;148:7,16;158:12;
173:13;174:13;175:4;184:8

## Q

**qualifications (1)**
160:8
**qualified (5)**
77:22;142:1;143:8;145:4;
179:16
**quibble (1)**
88:1
**quickly (2)**
42:20,22
**quit (1)**
129:1
**quite (4)**
55:17;64:24;165:13,15
**quote (1)**
86:10

## R

**raise (5)**
78:13,18,22,23;79:24
**raises (1)**
106:25
**ran (3)**
20:4,4;29:4
**random (22)**
80:19,20;81:2,21,22,23;
82:23,24;83:2,16,19,23;84:9,
18,24;85:9,11;94:24;96:23;
97:1,3,3
**randomly (3)**
84:4;95:9;97:5
**rank (7)**
23:18;24:3,17,24;25:1;56:12;
99:23
**rankings (1)**
100:17
**ranks (3)**
25:13;41:7,8
**rate (1)**
99:23
**rather (2)**
7:14;57:18
**rational (1)**
155:25
**read (38)**
30:18,22;31:2;37:25;41:21;
44:9,11;47:8;52:20,21;62:12,
13;66:13,16,22,22,24;68:22;
69:6;86:9,13;88:17;103:22,23,
24;106:3;107:8,9;109:7,11;
110:12;144:10,13;171:15,16;
181:15,15;186:6
**reading (4)**
66:19,20;107:16;109:4
**really (10)**
10:2;17:19,25,25;24:3;36:11;
129:3;139:18;148:10;167:18
**reason (27)**
14:8;18:5;19:3;23:5;27:18;
31:18;36:2;40:21;50:20;54:23;
56:22;67:4;75:15;77:25;81:20;
88:19;92:2;98:20;102:13;
132:5,10;144:19;148:6;149:19,
25;167:11;184:19
**reasonable (17)**
85:12;88:6,10,15;89:3;90:13;
91:24;134:8,11,14,16,19,20;
135:13,18,19;156:25
**reasoning (1)**
19:16
**reasons (2)**
16:2;184:15
**reassignment (1)**
69:9
**Rebellozo (1)**
62:5
**Rec (1)**
82:23

**recall (10)**
53:5,10;55:25;64:18;124:6;
137:21;138:3;154:15;159:24;
161:16
**receive (1)**
8:18
**received (4)**
12:22;67:25;121:11,14
**receiving (1)**
164:19
**recent (1)**
176:3
**recently (2)**
67:9;92:6
**recess (3)**
42:10;94:4;145:20
**recognition (3)**
92:14;118:21;127:7
**recognize (6)**
46:19;47:24;48:8;69:5;
80:11;146:13
**recommendation (1)**
47:10
**recommendations (3)**
164:7;172:11,16
**recommended (1)**
117:13
**record (21)**
5:3;35:12;42:8,15;46:2,5,10,
11,14,16;67:18,25;94:1,9;
145:18,23;171:2,11;184:9;
185:7,17
**recording (1)**
7:16
**records (3)**
21:6;42:20;65:17
**re-elected (1)**
25:23
**re-election (3)**
26:6;27:19;28:7
**refer (1)**
153:7
**referred (1)**
8:14
**referring (3)**
100:24;106:14;183:14
**refers (1)**
130:18
**reflect (2)**
46:23;105:10
**reflected (1)**
106:1
**reflects (1)**
46:24
**regaining/maintaining (1)**
181:20
**regard (4)**
51:19;84:20;112:2;122:8
**regarding (8)**
48:14;51:1,21;66:10;74:14;
84:22;90:17;95:25
**regimentation (1)**
9:25

**regular (1)**
93:8
**regularly (3)**
109:25;110:15;111:2
**related (6)**
31:15,25;68:12;74:16;154:4,
13
**relates (1)**
52:4
**relationship (1)**
166:21
**release (4)**
101:9;108:20;182:18;184:24
**released (4)**
101:10;166:19,24;182:17
**relevant (5)**
32:3;33:18;43:13;85:5;
175:18
**rely (4)**
44:15,24;45:15,17
**relying (3)**
156:15;175:1;177:1
**remain (1)**
93:2
**remember (56)**
8:5;11:24;13:17;15:16,22;
20:25;23:18;24:2,5,7;25:11;
37:12;38:7;51:18;61:5;65:24;
66:4;70:11,18;80:8,9;90:7;
100:9;104:14;111:2,6,10;
112:11,25;113:17,21;115:3;
117:25;122:12;132:2,13,14;
137:8,10;138:22;147:11;
150:11,17,25;151:1,3;153:15;
161:11;165:16,17,20;167:12;
168:9;170:7,7,10
**remembering (2)**
21:1;35:3
**remembers (1)**
140:23
**Removal (1)**
52:10
**remove (1)**
52:16
**removed (1)**
52:23
**rephrase (1)**
7:3
**replaced (1)**
74:8
**reply (1)**
67:12
**report (18)**
31:14;65:10,13;75:10;80:12,
12,13;116:25;117:21;122:16;
168:16;172:7,10,20;173:24;
181:5,11;182:17
**reported (4)**
5:12;31:16;117:25;149:10
**reporter (3)**
5:14;139:21;144:13
**Reporting (1)**
5:13

**reports (2)**
170:6,12
**represent (13)**
5:18;42:24;45:23;49:14;
101:9;102:1,10;108:21;119:23;
132:4;142:22;143:17;146:17
**reprimand (1)**
48:1
**republican (2)**
28:15;29:20
**request (2)**
19:12;135:5
**requested (3)**
93:1;144:14;185:21
**require (1)**
76:25
**required (7)**
15:25;40:25;41:3,15;68:25;
76:23;159:20
**rescue (1)**
57:11
**resent (1)**
63:20
**resentful (1)**
62:15
**RESIDING (1)**
186:24
**resignation (2)**
19:10,11
**resisting (1)**
15:13
**resource (3)**
23:7,13;161:10
**respect (1)**
22:20
**respond (3)**
77:12;115:2,9
**response (3)**
151:13,18;153:25
**responsibility (4)**
82:5;116:25;160:3,7
**responsible (2)**
57:14;58:16
**responsive (1)**
45:13
**rest (2)**
76:20;158:2
**re-state (1)**
86:22
**restricted (1)**
173:20
**restrictions (2)**
102:12;125:20
**result (4)**
25:21,22;53:8;65:12
**results (1)**
97:7
**resumed (2)**
181:18;183:12
**retirement (3)**
26:19,25;28:25
**return (6)**
52:24;53:2;67:13;165:4,19;

175:2
**returned (2)**
102:11;156:20
**review (6)**
45:15;58:9;86:18;87:13;
107:20;109:5
**reviewed (7)**
30:10,14;31:5;44:4;74:12,14;
87:16
**reviewing (2)**
7:6;104:2
**rifleman (1)**
8:15
**right (98)**
8:5;9:9;10:1;11:19;15:16;
20:8;23:21;26:20;27:16;29:23;
36:4;40:23;41:7,14;43:5;47:17;
49:6,11;51:9;53:19;55:5;58:21;
59:10;64:18;69:15;70:5;73:20;
75:3,5;79:7,9,19;80:2;81:4,11;
82:5,7,20;83:6;86:17;89:18;
90:11,20;91:3,5;92:7;96:21;
97:13;100:18;101:21;102:5,7;
106:17,25;109:3,18;110:16;
118:17;123:2,7,17;125:7,15,16;
127:14;128:6;129:5,18;130:6,
19;131:20;134:7;142:20;
146:14;147:9;149:9,10,14;
151:19,20;154:1,21;155:4;
156:3;163:10;166:18;168:10;
170:8,11,23;171:2,25;172:5,11,
12;173:22;176:16;177:8
**road (1)**
166:9
**room (1)**
136:17
**Rosemary (4)**
161:22,23,23,25
**round (1)**
21:23
**rule (4)**
72:14;73:2,3;184:12
**rules (1)**
40:16
**run (11)**
15:17,20;28:6;29:5,5,6;
57:23;77:3;82:5;125:24;155:24
**running (6)**
20:6;27:19;34:3,15;73:5;
166:9
**runs (1)**
83:9

---

**S**

**safety (4)**
88:22,23;90:17;108:5
**Sam (5)**
54:11;55:7,8,9,9
**Same (17)**
34:19;78:16;79:5;80:2;
98:11;124:11;136:3;140:21;
151:4;153:14,19;162:13;

165:22;166:24;174:18;176:12;
   182:8
**San (2)**
   9:3;10:9
**satisfied (2)**
   141:9;145:10
**saw (1)**
   143:9
**saying (18)**
   35:6,6;62:9;72:1;81:17;93:8;
   99:2;115:1;118:7,8;119:19;
   133:25;157:9;167:10;175:23;
   176:19;179:24;183:2
**scale (1)**
   46:24
**Scanned (1)**
   102:4
**scared (1)**
   125:25
**scenario (2)**
   153:14,19
**scene (2)**
   115:2;120:22
**schedule (2)**
   132:3;157:19
**scheduled (3)**
   110:1,15;111:3
**School (6)**
   7:24;8:1;10:1;23:7,13;46:9
**schools (1)**
   9:1
**scientific (2)**
   91:25;179:25
**scientifically (1)**
   126:7
**scope (1)**
   33:13
**Score (1)**
   107:24
**screen (1)**
   151:12
**seal (3)**
   184:14,16,20
**sealed (1)**
   185:8
**search (1)**
   57:11
**seat (1)**
   24:8
**second (17)**
   65:22,24;68:16;109:24;
   124:8;139:5;146:17,20;148:22;
   169:17;170:17,21,24;171:1;
   172:20;173:3;177:19
**secretary (7)**
   72:18;73:15,24,25;74:7;86:9;
   114:13
**sector (1)**
   27:3
**seeing (1)**
   169:17
**seek (2)**
   164:8;185:7

**seem (2)**
   102:16;139:16
**seems (2)**
   13:1;56:1
**select (1)**
   61:3
**senior (5)**
   24:8;47:16;61:25;63:19;
   70:21
**sense (4)**
   7:1;19:8;111:25;155:10
**sent (3)**
   31:4;136:22;148:14
**sentence (3)**
   146:25;148:23;149:21
**separate (1)**
   72:5
**September (8)**
   45:19;84:22;96:18,19;97:13,
   19,21;165:20
**sequence (1)**
   180:16
**sergeant (19)**
   13:14;24:4,19,20,22,25;25:2,
   3,6,12,14,17;41:8;48:16;50:4;
   59:8,19,23;120:15
**sergeants (1)**
   24:24
**serious (5)**
   39:5,7;81:8;114:1;184:16
**seriously (1)**
   108:6
**services (10)**
   75:14;76:5;98:9,14;99:1,3,4,
   9,18;109:22
**Session (1)**
   12:19
**seven (5)**
   74:1,2;84:16,17;91:18
**Seventy (1)**
   26:5
**sex (1)**
   76:9
**shake (3)**
   7:15,17;20:15
**shape (1)**
   74:7
**share (2)**
   30:13;71:22
**sharing (1)**
   117:24
**sheet (11)**
   46:22;47:18;49:2,24;53:19;
   56:6,19;68:12;95:25;98:7;
   186:10
**sheets (2)**
   132:20;133:8
**Sheriff (52)**
   5:4;13:19;14:14;15:4,17,17,
   20,23;17:4;20:4,5,6,14,17,18;
   21:11;23:16,19;24:6;25:14,19,
   24;29:8,22;34:14,15;47:20,22;
   48:5;49:21;50:8,8;51:6,15;

70:10;71:2,4;72:3,20;83:18,20,
   20;110:1,4;112:8;120:21;
   124:18;146:21;184:17;185:17;
   186:2,15
**Sheriff's (33)**
   5:7;13:15;17:12;18:10;
   20:16;23:7,15,17;30:1;38:10,
   14;39:17;40:11,25;49:15;
   50:21;52:23;53:4;61:22;70:25;
   73:6;80:22;82:18,22;89:10;
   106:13,16;146:24;148:19;
   157:15;159:19;168:21;169:3
**shooting (2)**
   120:15,17
**shop (1)**
   10:12
**Shortly (2)**
   10:23;51:6
**shot (1)**
   157:21
**show (6)**
   48:23;49:11;95:9;121:1,6;
   147:22
**showed (2)**
   98:7;154:6
**showing (1)**
   46:9
**shown (2)**
   65:4;121:8
**shows (4)**
   39:2;95:5;96:20;100:19
**sick (2)**
   93:8,11
**sign (4)**
   54:14;55:20,24;56:21
**signature (7)**
   48:6,8;103:2,3,3,6;185:21
**signature's (3)**
   102:24,25;103:4
**signed (10)**
   47:19,19;48:13;52:5;59:14,
   15,21,24;101:10;103:10
**significant (2)**
   108:1;112:2
**Sincerely (1)**
   109:17
**sipped (1)**
   25:16
**SIRCOMM (1)**
   166:8
**Sisk (1)**
   5:14
**sit (8)**
   70:8;104:14;109:11;138:20;
   149:17;153:21;169:7;179:21
**sitting (2)**
   151:11,21
**situation (1)**
   55:22
**situations (1)**
   133:11
**six (3)**
   8:20;12:6;91:17

**skipped (4)**
   25:16,17,17,18
**sleep (1)**
   67:10
**slot (1)**
   47:13
**slow (2)**
   67:12,12
**slurred (1)**
   152:15
**small (3)**
   67:4,11;152:19
**smart (2)**
   40:16,18;179:18;183:7
**Smell (3)**
   91:4,5;119:20
**smelled (1)**
   119:9
**smoked (1)**
   32:14
**snowing (1)**
   11:21
**sobriety (7)**
   91:7,8,10;117:14;118:17,21;
   134:5
**socialized (1)**
   22:7
**solely (2)**
   57:15;60:13
**Solid (1)**
   107:19
**somebody (26)**
   39:2,13;55:23;56:2;63:2,7,
   19;81:16;83:11;89:18;95:16;
   113:21;114:3;117:20,24;118:4;
   120:17;126:5;142:1;143:20,21;
   157:20,22;158:1,16;179:18
**somebody's (1)**
   127:8
**somehow (2)**
   105:25;122:5
**someone (6)**
   34:2;63:9;67:17;85:21;
   116:4;173:25
**sometime (1)**
   134:21
**Sometimes (1)**
   7:1
**somewhat (2)**
   76:12;159:21
**somewhere (1)**
   105:6
**Sooner (1)**
   124:12
**Sorry (9)**
   32:19;43:19;44:10;69:23;
   84:20;86:15,16;146:6;171:1
**sound (3)**
   27:6;86:19;176:21
**sounded (1)**
   13:16
**sounds (5)**
   19:19;54:16;158:19;160:10,

13

space (1)
71:22

speak (2)
9:25;153:24

specialist (4)
50:3,5;54:1,5

specific (2)
45:14;182:3

specifically (1)
173:4

specified (1)
173:16

speech (2)
152:14,15

spell (2)
162:6,7

spend (1)
77:16

spiteful (1)
184:18

spits (1)
84:11

spoke (3)
151:13,17;163:22

sponsored (1)
9:3

St (1)
74:8

stack (1)
133:8

staff (14)
24:4,25;25:3,5,11,17;50:4;
59:22;60:25;70:22;71:5;110:1;
111:5,24

standard (3)
71:3;91:19;116:23

standing (1)
184:17

staring (1)
152:12

start (3)
7:7,10;87:7

started (8)
24:1,10,11;31:11;86:23;
90:15;99:8,8

starting (1)
96:6

state (4)
11:18;26:25;27:9,10

statement (4)
9:17;39:21;138:16;155:5

statements (2)
64:1;66:10

States (1)
5:8

statistic (1)
142:20

status (11)
46:22;47:18;49:24;52:11;
53:19,24;56:6,19;60:1;75:10;
95:24

stay (4)

14:11,13;157:12;168:7

staying (2)
138:9,12

Stephanie (1)
74:8

steps (2)
91:17,18

Steve (1)
29:2

still (9)
7:17;16:1;23:17;33:6;37:6;
57:25;63:15;90:6;151:17

stint (2)
10:17,22

stipulate (1)
184:10

stipulated (1)
184:19

stop (4)
90:8,10,20;179:21

stopped (3)
151:17;166:12,13

stops (2)
82:10;90:4

strictly (1)
83:13

Strike (1)
150:14

structure (1)
20:15

structures (1)
24:4

struggling (1)
112:20

stuff (5)
24:7;65:1;72:3,3;98:23

Subject (1)
49:18

submitted (1)
29:11

subordinates (1)
41:10

SUBSCRIBED (1)
186:17

Substance (28)
50:21;51:16;65:4;107:6;
122:17;141:22,25;142:2,24;
143:11,12,14,18,21;160:25;
162:15;163:3,4;164:9,19;
165:3;169:8;179:3,8,12,17,19,
22

substances (4)
122:21,23;123:3,5

successful (1)
15:13

sufficient (1)
182:18

suggest (1)
112:1

suggestS (1)
113:11

suicide (4)
139:23;140:5;165:23;166:4

supervised (1)
181:19

supervision (3)
181:19;183:13,15

supervisor (11)
47:11;48:6,7,22;59:17,17,20;
88:16,19;183:23,24

supervisors (2)
58:23,24

sure (20)
27:1;32:24;36:12;41:12;
42:3;44:3;45:10;58:17;59:10;
77:2;89:11;109:2;112:5;
152:17;158:18;160:10;169:14;
182:7,23;184:22

surgeries (12)
64:7,9,11,12,13,15,17;69:11,
13;123:16,25;125:10

surgery (18)
64:18,19;65:20,23;66:8;
68:13;69:8,9,16,17;70:1;
123:20;125:1;128:21;129:8,9;
156:5;173:21

surgical (3)
68:25,25;69:5

surmise (1)
68:2

surprise (1)
63:7

suspect (1)
85:15

suspend (1)
44:16

suspended (9)
45:4;51:15,17;65:4;122:11;
132:12,14;142:22;148:14

suspending (1)
84:20

suspension (14)
45:3;50:17,20;51:22;52:5,10,
15,17,24;84:23;97:25;121:11;
122:9,10

suspensions (2)
51:20;106:24

suspicion (15)
65:5;85:13;88:6,10,15;89:3;
90:13;134:9,12,15,19,20;
135:13,18,19

swear (1)
5:24

switch (2)
13:8;21:4

switching (1)
150:15

swoop (1)
25:20

sworn (2)
186:3,17

T

table (3)
5:19;136:7;149:18

talk (23)
38:23;66:21;67:4,11;85:12,
21,24;90:22;94:14;102:14;
105:23;121:18;122:10;124:17,
18;126:22;128:20;133:9,16;
152:19;159:1;168:25;183:18

talked (15)
13:12;112:22;113:25;114:8,
9;121:15,20;124:18;136:8;
137:11;164:5;167:12;172:25;
173:11;179:4

talking (14)
85:19;104:9;114:17,22;
119:17;121:5;122:23,25;123:4;
125:5;138:21;141:17;173:20;
183:25

talks (4)
68:16,24;122:16;146:17

tasks (3)
126:19;153:10,11

teach (1)
22:8

teenage (1)
35:1

teenager (3)
32:1;34:12,17

telling (3)
111:7;121:4;126:15

tells (2)
77:15;91:12

tend (1)
63:10

tendency (2)
7:7;152:22

tendon (1)
69:9

tenure (1)
30:1

term (2)
25:25;153:22

terminate (1)
43:14

terminated (4)
15:3,23;24:21,22

termination (7)
15:24;16:3;18:21;19:11,16;
97:25;122:9

terribly (1)
148:10

test (45)
80:12,13,19,20,21;81:11,
12;83:16;85:14;88:20;91:8,10,
24,25,25;92:8,11,24;93:14,15;
94:24;95:5;96:23;97:1,3;117:4,
9;118:13;129:1,1;134:9,12;
135:2,5,12,22;136:1,10;137:20;
143:18;159:9;160:25;177:1,4;
178:8

tested (18)
12:1;13:17;83:23;84:4,7,12,
24;85:18;88:10;94:23;95:9,18;
97:5;138:14;152:5;160:11,18;
179:2

**testimony (2)**
119:23;144:14
**testing (24)**
81:1,2,4,6,21,22;82:13,24;
87:11;88:6,14,15;89:3,19;
92:18;94:23;97:10;117:3;
126:19;136:2;143:13,15;
160:17;180:16
**testing's (1)**
95:17
**tests (8)**
47:11;83:19;91:7,9;117:14;
118:17;134:6;177:4
**Thanks (2)**
42:4;43:25
**therapist (1)**
153:2
**therein (1)**
186:7,9
**thereof (1)**
186:7
**thinking (1)**
64:10
**think's (2)**
8:17;12:20
**third (4)**
25:25;65:25;75:18;123:21
**thirdly (1)**
7:13
**Thirty (2)**
13:3,4
**though (4)**
7:15;11:11;90:7;182:16
**thought (16)**
60:21;61:5;63:8;67:13;68:2;
91:24;117:11;121:4,21;123:21;
133:20;135:17;153:23;155:11;
167:11;168:5
**thousand (1)**
60:25
**three (14)**
36:13,13;37:2;64:2,10,11;
78:8,18;79:15;96:3;107:24;
108:7;136:17;161:18
**throughout (2)**
22:8;58:14
**thumb (1)**
69:10
**ticket (1)**
28:15
**Tim (1)**
38:7
**times (10)**
22:10;25:23;37:2;84:7,17,25;
105:17;151:1;172:25;178:4
**timing (2)**
113:23;148:9
**tired (2)**
13:22;67:5
**title (6)**
50:2;54:1,1;75:11,23;98:4
**today (5)**
30:8;83:3;103:13;109:7;

169:7
**Today's (1)**
5:5
**together (1)**
64:2
**toilet (1)**
24:8
**told (26)**
33:24;34:2;77:13;105:17;
118:4;119:13;120:1;129:15;
130:13;131:13;137:25;138:1;
140:13;145:8;148:18;154:24,
24;162:19;165:12;166:18;
167:20;168:10;170:3,5;173:2,
25
**Tom (5)**
5:4;71:4;185:17;186:2,15
**tonight (2)**
120:17;157:22
**took (12)**
7:7;9:16;20:12;28:25;31:8;
52:1,2,8,15;125:9;143:10;
161:9
**tool (2)**
106:20,23
**top (4)**
43:24;48:4;97:12;146:12
**total (1)**
12:6
**totally (9)**
27:7;105:17;116:5;143:23;
156:3,9,14;158:15;165:14
**totem (1)**
127:6
**touch (1)**
38:21
**Tousley (10)**
15:4,18;20:5;24:3,6;29:22;
47:19,20;48:5;50:8
**town (1)**
84:3
**tracking (1)**
169:14
**trained (1)**
91:9
**training (9)**
8:18;9:16;12:22,23;45:24;
46:7,8,15;72:9
**Tramadol (2)**
137:12;141:14
**transcript (5)**
7:11,18;184:14,15;185:3
**transcripts (2)**
30:20,22
**Transition (3)**
8:23;9:2,11
**Treasure (1)**
109:21
**Treated (1)**
68:19
**treating (1)**
165:2
**treatment (3)**

68:21;164:8,19
**tried (2)**
15:10;22:8
**trigger (1)**
19:5
**trip (3)**
177:13,13,19
**true (7)**
16:5,6,7;89:8;92:11;169:23;
186:9
**Trust (3)**
38:25;40:23;142:8,9
**trusted (1)**
142:11
**try (7)**
16:22;42:6,19,22;45:12;
135:11;152:10
**trying (8)**
9:1;40:7,10;50:12;78:21;
87:4;101:15;177:25
**Tuesday (9)**
70:22;71:4;72:22,24;111:3,
21,22,24;113:5
**turned (1)**
166:8
**twice (1)**
106:12
**Twin (64)**
5:7,11;10:9,15;12:2,5;13:6,8,
9;14:4,7,16;17:11,15;18:10;
20:15;21:10;23:17;24:11,18;
26:19,24;27:8,11,13;29:14,18;
30:1;31:9;38:10;39:16;40:11,
24;46:2,6,10,11,13;49:15;
50:21;51:3;52:22,23;61:21;
67:19;68:1;80:22;82:16,18,19;
83:11;85:13;88:5;89:7,10,13;
95:16;106:13,15;122:20;
126:12;159:18;168:21;169:2
**two (19)**
13:10,11,23;36:15;37:2,7;
60:25;64:10,12;66:7,9;71:15;
75:18,20;124:22;128:9;143:22;
154:4;163:22
**Twofold (1)**
128:8
**Tye (43)**
31:4;109:2,22;126:9,12,13,
17,21;159:2;160:9;162:11,14;
163:17,22;164:1,6,8;166:24;
168:7,13,16;169:2,17;172:20,
25;173:5,11,13,24;175:1,17;
177:1,6,9;178:8,24;179:2,4,5;
180:10;182:14,16,19
**Tye's (4)**
170:6,9;181:5,11
**type (4)**
8:12;46:5;155:4;160:16
**types (4)**
35:13;81:3;91:9;155:20
**typically (3)**
90:25;91:25;92:8

**U**

**uh-uh (1)**
7:15
**Ultimately (4)**
58:1,16,18;82:4
**unaware (1)**
63:3
**uncomfortable (2)**
34:25;93:21
**under (20)**
23:22;92:2;110:6;112:10;
116:13,19,24;117:3,12;118:25;
124:16;129:2;130:14;131:23;
133:11,21;134:21;135:14;
150:20;184:11
**undergo (1)**
134:8
**understandable (1)**
7:2
**unfit (13)**
164:3;168:17;171:22;172:3,
21,23;174:5,19;177:14;182:9,
12,14;183:1
**Unfounded (1)**
65:14
**uniform (2)**
76:1,10
**union (1)**
10:12
**United (1)**
5:8
**Unknown (1)**
68:19
**unless (6)**
56:22;77:24;109:10;120:7;
138:13;168:13
**up (36)**
7:21;9:24;10:24;11:23;
14:12,14;20:15;26:5;28:4,5;
39:2;56:15;75:21;90:1;104:21;
112:12,13;113:1,12;117:21;
121:1,6,8;129:18,24;130:1,11;
131:17,18;154:6;156:11;
157:25;174:20;177:13,19;
184:3
**upstairs (1)**
161:10
**urine (4)**
81:11,12;92:11,24
**use (19)**
34:13,16;35:1,11;36:8,10,11,
23;43:8,9,12,17;45:8;81:8;
85:11;93:23;106:21,23;177:11
**used (9)**
31:25;32:8,16;34:11;35:14,
25;140:16;184:16,18
**using (2)**
10:2;134:18
**usually (2)**
72:17;92:10

## V

**vaguely (1)**
118:4
**valid (1)**
40:21
**Valley (1)**
109:21
**valuable (2)**
107:24;108:7
**vary (1)**
78:16
**verbal (1)**
121:15
**verbatim (1)**
139:10
**verbiage (1)**
140:15
**versus (2)**
5:6;143:21
**vested (2)**
27:25;28:2
**video (4)**
5:4;7:16;185:3,16
**VIDEOGRAPHER (11)**
5:3,15,24;42:8,15;94:1,9;
145:18,23;146:4;185:16
**videotaped (1)**
5:13
**violated (1)**
19:4
**violation (1)**
53:3
**violations (1)**
40:1
**virus (2)**
64:21,25
**visits (1)**
68:21
**voice (1)**
54:24

## W

**walk (1)**
153:24
**walked (2)**
151:10,18
**Walker (4)**
54:11;55:7,8,9
**Walker's (1)**
55:10
**wants (1)**
77:3
**warning (2)**
48:1;121:12
**Warning/reprimand (1)**
48:3
**warnings (1)**
106:25
**watch (1)**
131:19

**way (24)**
16:16;31:21;34:17;44:16;
51:23;74:6;76:24,25;82:5;
90:15;91:22;117:4,9;118:12,
13,14,16;123:20;137:20;145:2;
153:9;158:7;172:2;184:18
**Wayne (1)**
47:19
**ways (1)**
77:6
**week (5)**
35:4;36:13,13;37:3;67:1
**weekly (3)**
70:19,21;72:12
**welfare (1)**
108:6
**well-being (3)**
128:4,4,6
**weren't (4)**
103:16;156:14;160:10;
183:23
**West (3)**
64:21,25;65:1
**what's (16)**
33:18;35:2;42:23;49:6;60:3;
75:2,3,4,7;81:22;92:13;95:18;
101:1,14;120:23;147:7
**Whereupon (5)**
42:10;94:4;144:13;145:20;
171:5
**wherever (2)**
151:15,16
**whichever (1)**
83:7
**whole (1)**
82:21
**who's (5)**
34:2;36:16;39:22;100:3,4
**Whose (2)**
30:22;48:6
**wind (1)**
11:22
**wise (1)**
60:21
**Withers (1)**
36:17
**within (1)**
184:13
**without (9)**
33:19;54:18;55:13,19;88:17;
89:19;92:16;147:3;148:25
**witness (54)**
5:24;32:10,19;37:19;38:13;
56:5;66:10,13;69:19;82:7;86:3,
22;89:22;93:2;104:18;105:12;
106:3;110:23;111:17;115:8;
116:1,8,18;118:20;120:7;
121:14;122:1;132:23;134:24;
143:2;144:2,5,23;157:4;
160:13;161:3;162:21;163:9;
167:4;168:25;171:15;173:2;
174:5,16;175:11,22;176:18;
178:19;180:15,22;181:1;

183:17;186:1,4
**witnessed (5)**
125:2;133:11,20,24;134:1
**witnessing (1)**
133:10
**wonder (1)**
34:4
**wondering (1)**
33:22
**word (1)**
35:11
**wording (1)**
116:14
**words (2)**
88:1;134:18
**work (104)**
8:12;10:15;11:5,8;12:1;13:5,
7,15,18;14:10,13,16,21;19:12;
23:6;30:17;39:3;44:17,21;45:3;
52:24;53:2;64:24;67:10;83:3,6;
84:23;101:9;102:11;105:1;
108:21;110:6,15;112:10;
114:18,21;115:12,13;119:7;
123:16,25;124:5,7,9,16;125:3,
5,7,9;127:4,16,19;128:8,18,21;
129:2,5,8,9;130:6,12,25;131:7,
25;133:20;134:21;138:9,12;
140:14,25;141:2,7;142:3,5;
145:4,10,14;147:2;148:25;
149:8;150:8;156:3,9,14,21;
158:15;165:4,20;167:16,21;
168:6,8,11,23;169:16;173:15;
174:1;175:2;176:22;177:7,10;
179:20;181:16;182:13
**worked (9)**
8:6;12:7;14:4,22;17:19;
21:12;132:5,15,18
**working (5)**
10:17;38:10,14;132:1;155:18
**workplace (4)**
82:14,21;92:21;153:5
**workplaces (1)**
81:23
**works (3)**
27:2;28:3;84:10
**worried (3)**
113:22;154:10,11
**worry (3)**
100:3,3;125:23
**wrecks (1)**
81:8
**Wright (1)**
13:12
**write (1)**
39:18
**writing (2)**
49:5;174:13
**written (3)**
7:18;109:1;112:7
**wrong (3)**
33:9,20;56:3
**wrongdoing (1)**
53:1

**wrote (4)**
109:18;138:24;146:14;147:6

## Y

**yawned (1)**
67:13
**year (15)**
8:3,10;11:24;13:10,20;14:18;
25:25;27:15;28:3;96:7,8;101:5;
106:12,12,18
**years (20)**
10:24;11:1;12:6;13:3,4,23;
21:20,24;22:8;25:24;28:2;
29:24;35:2;37:10;57:7;74:1,3;
83:22;97:4;142:17
**Your're (1)**
90:11
**Yup (1)**
32:14

## Z

**zero (2)**
151:18;156:17

## 0

**0311's (1)**
8:17
**06 (1)**
48:11
**08 (1)**
51:8
**09 (1)**
59:15

## 1

**1 (1)**
186:5
**1:02 (2)**
185:18,20
**1:18-cv-00550-CWD (1)**
5:9
**10 (2)**
60:4;61:2
**10/21/96 (2)**
50:2,7
**10:02 (2)**
42:11,16
**10:59 (2)**
94:2,5
**10th (18)**
114:23,24;132:12,18;136:21;
141:16;142:21,23;146:13,18;
147:12;150:12,18;151:23,24;
154:9;155:7;158:4
**10th/June (1)**
155:6
**11 (3)**
25:24;49:18;67:16
**11/21/01 (1)**

47:2
**11:15 (2)**
  94:5,10
**11th (2)**
  48:11,14
**12 (4)**
  52:25;53:18;68:15;83:22
**12/20 (2)**
  60:4;61:2
**12/21/11 (1)**
  68:18
**12:09 (1)**
  145:21
**12:10 (1)**
  145:18
**12:19 (2)**
  145:21,24
**12:46 (2)**
  171:6,6
**12th (3)**
  5:5;52:7;53:25
**130 (1)**
  57:5
**14 (2)**
  66:3;75:8
**15 (2)**
  96:16,19
**16 (3)**
  29:24;96:8,19
**16th (1)**
  68:15
**17th (1)**
  48:15
**185 (1)**
  186:5
**1969 (1)**
  8:4
**1970 (1)**
  8:11
**1979 (2)**
  10:7,14
**1981 (2)**
  12:12,23
**1992 (1)**
  13:7
**1996 (6)**
  21:9;30:4;31:16;43:12;45:6,
  17
**19th (1)**
  28:12
**1st (2)**
  59:9;97:13

**2001 (1)**
  47:16
**2005 (2)**
  48:10,15
**2006 (6)**
  14:24,25;15:2;20:9;48:14;
  49:8
**2007 (5)**
  14:22,23;20:10;49:18,19
**2008 (3)**
  20:12;50:14;51:22
**2009 (10)**
  20:13;51:7;52:7,25;53:16,18,
  25;59:9;70:23;101:6
**2010 (2)**
  60:25;68:20
**2011 (7)**
  61:1;66:2,3;70:8,12,18;75:8
**2013 (2)**
  74:2;78:2
**2014 (1)**
  79:8
**2015 (5)**
  69:9;94:25;95:25;96:6;97:4
**2016 (7)**
  96:6,13,24;97:4,13,19;
  119:25
**2017 (20)**
  44:16;45:1,19;51:21;84:22;
  102:8,12,22;104:10;105:2;
  107:6;108:13;109:16;116:20;
  134:22;135:15;150:12,13,18,18
**2020 (4)**
  5:5;45:7;186:12,18
**20th (1)**
  49:19
**21st (1)**
  47:15
**25 (1)**
  21:24
**25th (2)**
  97:19,22
**26c (1)**
  184:12
**26th (2)**
  8:11;95:25
**27th (1)**
  130:25
**28 (4)**
  78:2;171:9,21,23
**28th (3)**
  50:14;51:8;79:8

**30.69 (1)**
  78:5
**31.61 (2)**
  78:5;79:11
**31st (9)**
  31:4;102:22;104:10;105:2,6;
  108:13;109:16;146:3,9
**32.50 (1)**
  79:11
**34.51 (1)**
  98:3
**35 (2)**
  102:19;107:5
**36 (3)**
  42:24;45:15,16
**36-58 (1)**
  42:13
**37 (1)**
  45:23
**38 (3)**
  46:17,19,25
**39 (3)**
  47:23,24,24

### 4

**4 (1)**
  68:23
**4.2 (1)**
  49:10
**40 (4)**
  48:23,24,25;49:1
**41 (1)**
  49:11
**42 (1)**
  49:24
**44 (1)**
  50:13
**45 (1)**
  52:4
**46 (1)**
  53:15
**47 (2)**
  59:7;100:25
**48 (1)**
  59:25
**49 (2)**
  65:18;66:20

### 5

**5 (1)**
  181:5
**50 (1)**
  65:18
**51 (2)**
  12:20;65:18
**52 (1)**
  75:9
**53 (1)**
  78:1
**54 (1)**
  79:7

**55 (3)**
  80:10;94:23,24
**56 (1)**
  95:24
**57 (1)**
  96:23
**58 (1)**
  97:11
**59 (3)**
  94:7;101:7,19

### 6

**60s (1)**
  32:8
**6th (18)**
  14:22,23;15:2;109:25;
  110:16;111:4,15;113:5;116:20;
  117:23;129:16;130:4,13,19,20;
  131:12;133:14,16

### 7

**7/21 (1)**
  101:4
**7/28/17 (1)**
  102:4
**7/31 (1)**
  109:15
**70 (3)**
  26:1,4;35:2
**78 (1)**
  12:1
**79 (2)**
  12:1,12
**7th (20)**
  102:1,8,12;108:21;110:7,9;
  130:6,12;131:1,7,25;132:5,18;
  134:22;135:15;150:12,17;
  154:9;155:6;158:4
**7th/July (1)**
  155:7

### 8

**8 (10)**
  20:10;108:25;109:14;146:2;
  170:18;172:5,7,10;180:21;
  181:10
**8/17 (1)**
  59:15
**8:30 (1)**
  71:6
**80s (1)**
  62:1
**81 (1)**
  10:21
**82 (2)**
  10:21,21
**83 (1)**
  10:21
**8th (1)**
  110:11

### 2

**2 (1)**
  146:12
**2.99 (1)**
  96:8
**2/24/15 (1)**
  80:18
**20 (1)**
  21:19

### 3

**3 (1)**
  109:17
**3,000 (1)**
  12:25
**3/12 (1)**
  102:3
**30 (4)**
  71:15;108:25;109:14;146:2

**9**

**9/13 (1)**
  96:16
**9:05 (1)**
  5:6
**9:45 (1)**
  42:11
**9:46 (1)**
  42:8
**90 (1)**
  11:3
**91 (1)**
  11:3
**95 (1)**
  21:21
**96 (2)**
  23:15;43:4
**9th (1)**
  96:24

Exhibit G

# Remote Videotaped Deposition of
# Mark Gritton, LCPC

Date: June 03, 2020

Case: Hilliard vs. Twin Falls County Sheriff's Office

Case No: 1:18-cv-00550-CWD

*Reporter: Rebecca Martin, CSR, RPR*



ASSOCIATED REPORTING & VIDEO

*Next-Level Litigation Support*

The Owyhee
1109 Main Street, Suite 220
Boise, Idaho 83702

Phone: (208) 343-4004
Facsimile: (208) 343-4002
production@arvboise.com
arvboise.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO


BRENT E. HILLIARD, an individual,   )
                                    )
                  Plaintiff,        )
                                    )  Case No. 1:18-cv-00550-CWD
vs.                                 )
                                    )
TWIN FALLS COUNTY SHERIFF'S         )
OFFICE, and TWIN FALLS COUNTY,      )
                                    )
                  Defendants.       )
_____ )




REMOTE VIDEOTAPED DEPOSITION OF MARK GRITTON, LCPC

June 3, 2020

Boise, Idaho




Reported by: Rebecca Martin, CSR #1108, RPR

Page 2

```
 1        REMOTE VIDEOTAPED DEPOSITION OF MARK GRITTON, LCPC
 2
 3             BE IT REMEMBERED that the remote deposition of
 4   MARK GRITTON, LCPC was taken and recorded via Zoom
 5   videoconference Defendants before Associated Reporting
 6   & Video, Rebecca Martin, Court Reporter and Notary Public
 7   in and for the County of Ada, State of Idaho, on Wednesday,
 8   the 3rd day of June, 2020, commencing at the hour of
 9   9:00 a.m. Mountain Standard Time in the above-entitled matter.
10
11
12   APPEARANCES (Remotely):
13
     For the Defendants:
14        IDAHO EMPLOYMENT LAWYERS, PLLC
          By: PAMELA S. HOWLAND, Esq.
15            JENNIFER WALRATH, Esq.
          1112 W. Main Street, Ste. 105
16        Boise, Idaho 83702
          Telephone:  (208) 484-8921
17        Facsimile:  (208) 534-7445
          phowland@idemploymentlawyers.com
18
     For the Plaintiff:
19        HEPWORTH LAW OFFICE
          By: JEFFREY J. HEPWORTH, Esq.
20            GRADY J. HEPWORTH, Esq.
          2229 W. State Street
21        Post Office Box 2815
          Boise, Idaho  83701
22        Telephone:  (208) 333-0702
          jhepworth@idalawyer.com
23
     Also Present:  Ryan Kinney
24                  Courtney Diehl
25
```

Page 3

```
 1                      I N D E X
 2              E X A M I N A T I O N
 3
     MARK GRITTON, LCPC                              PAGE
 4
 5   By:  MS. HOWLAND..............................4
 6        MR. HEPWORTH............................135
 7
 8                  E X H I B I T S
 9
     NO.                                            PAGE
10
     1.   Subpoena Duces Tecum and to Testify......17
11        by Remote and Audiovisual Means at a
          Deposition in a Civil Action
12        (9 pages)
13   2.   Twin Falls County Class Specification....38
          Sheriff's Deputy - Captain (3 pages)
14
15   3.   Records from Crosspointe Family..........52
          Services (24 pages)
16   4.   Medical records from St. Luke's..........82
          (3 pages)
17
18   5.   Plaintiff's Expert Witness Disclosure...106
          (10 pages)
19
20
21
22
23
24
25
```

Page 4

```
 1             P R O C E E D I N G S
 2
 3             MARK GRITTON, LCPC,
 4   a witness having been first duly sworn to tell the
 5   truth, the whole truth and nothing but the truth,
 6   was examined and testified as follows:
 7             EXAMINATION
 8   BY MS. HOWLAND:
 9        Q.   Good morning, Mr. Gritton.
10        A.   Good morning.
11        Q.   My name is Pam Howland.  We have not yet
12   had a chance to meet, but I appreciate your
13   attendance here today.
14        A.   Okay.
15        Q.   Would you please state your name for the
16   record, spelling your last name?
17        A.   Yes.  It's Mark.  The last is Gritton,
18   G-r-i-t-t-o-n.
19        Q.   Okay.  And where are you at right now?
20        A.   I'm in my office at Crosspointe Family
21   Services in Twin Falls, Idaho.
22        Q.   Will you give us the address for
23   Crosspointe?
24        A.   Yes.  It's 1363 Fillmore Street.
25        Q.   How long have you worked for
```

Page 5

```
 1   Crosspointe?
 2        A.   Since July of 2010.  I own Crosspointe.
 3        Q.   Okay.  Thanks for that clarification.
 4             Where did you work at before that?
 5        A.   I worked for the State of Idaho for
 6   Vocational Rehabilitation.
 7        Q.   Where was that at?
 8        A.   It was -- my last assignment was in Twin
 9   Falls, Idaho, as a regional manager.
10        Q.   What years did you work for Voc Rehab?
11        A.   I think from -- if memory serves me
12   right, from 2000 to 2010.
13        Q.   What did you do before you went to work
14   for Voc Rehab?
15        A.   Well, I worked for Voc Rehab for about
16   ten years, but prior to that I worked as a store
17   manager for Walmart, and I also worked as a drug
18   and alcohol counselor in Idaho Falls.
19        Q.   What years were you a drug and alcohol
20   counselor in Idaho Falls?
21        A.   I don't know.  I'd have to bring up my
22   résumé.  It's been too many years.  Hang on a
23   second here.  Let me find that.
24        Q.   We would love a copy of that, if that
25   hasn't been produced.  That would be helpful for
```

Mark Gritton, LCPC                                                June 03, 2020

Page 6

1  us.
2      A.  I have produced it to -- well, I've
3  given it to the other side.  They've requested it.
4  But I can definitely forward you a copy if you
5  would like.
6      Q.  Yes, please.
7      A.  I'll make a list here of what it is you
8  need so that as we get done I can do that.  So a
9  copy of my résumé.
10         Okay.  So let me find it.  Technology is
11  wonderful if it cooperates with you.  Okay.  So I
12  have it up in front of me now.  Let's see here.  So
13  ask me your question again now, please.
14     Q.  When did you work as a drug and alcohol
15  counselor in Idaho Falls?
16     A.  So in 2003 -- 2002 and 2003.  And that
17  was at CLUB.
18         And then after that I worked at Pacific
19  Rim Consulting from 2005 to 2006.
20     Q.  I might have misunderstood you.  When
21  you said you worked as a drug and alcohol counselor
22  in 2002 and 2003, did you say it was at a club?  I
23  didn't understand what you said there.
24     A.  Yeah.  The name of the organization was
25  called CLUB.  C-period-L-period-U-period-B-period.

Page 7

1      Q.  Got it.  What did that stand for?
2      A.  I honestly don't know.
3      Q.  Okay.  And what was Pacific Rim
4  Consulting?
5      A.  They -- I was an alcohol treatment
6  counselor there as well, a chemical dependency
7  counselor.
8      Q.  When was the Walmart job?
9      A.  Let's see here.  Walmart was -- I've got
10  to find a different résumé because that's going to
11  go back even farther.  Let me see here.  It doesn't
12  look like I'm going to be able to grab that off my
13  computer here right now.  I'm not able to connect
14  to my public drive.
15         Let's see here.  I left Walmart to go
16  to work for the State of Idaho, and I started with the
17  State of Idaho in 2000, so I would have worked for
18  Walmart from -- well, I was there for a year or
19  two, I believe, if memory serves me right.  So
20  probably from, like, '98 through 2000.
21     Q.  And so were you working for the state
22  for Vocational Rehabilitation while you were
23  working the other jobs as an alcohol treatment
24  counselor at the same time?
25     A.  Yes.

Page 8

1      Q.  Okay.  Were you working for the state
2  full time?
3      A.  Yes, I was.
4      Q.  When you worked for CLUB, how many hours
5  would you work there per week?
6      A.  I was part time, so I was probably
7  between 20 to 25 hours a week.
8      Q.  And how about at Pacific Rim Consulting,
9  how many hours would you work there?
10     A.  I believe it was probably between 18 and
11  22, 23 a week.
12     Q.  Where was Pacific Rim Consulting at?
13     A.  They're located in Pocatello, Idaho.
14     Q.  Have you ever been deposed before?
15     A.  Yes.
16     Q.  Tell me about that.  What were you
17  deposed for?
18     A.  I've been in a deposition for an action
19  against the State of Idaho.
20     Q.  Any other times or just the one?
21     A.  I was trying to think if there was
22  another one or two there.  Somewhere down the road,
23  I was thinking there was another one, but I don't
24  remember.  It's been too long.
25     Q.  When was the deposition?

Page 9

1      A.  The deposition was in 2011, as I recall,
2  for the State of Idaho.
3      Q.  Do you remember the name of the case
4  that you were deposed in?
5      A.  It was, I believe, Gritton versus State
6  of Idaho.
7      Q.  Oh, it was your case against the state?
8      A.  Yes, ma'am.
9      Q.  Okay.  What was your case against the
10  state about?
11     A.  Well, I don't want to -- I was let go
12  incorrectly or what I deemed to be incorrectly.
13     Q.  Why did they tell you you were let go?
14     A.  I would have to go back and look at the
15  records, to be honest with you, because it was
16  pretty convoluted, but I was terminated, and I
17  believe I was terminated incorrectly, so we took
18  action against the state, and the state settled
19  with me and the case was -- part of the settlement
20  was that I was not to discuss the details or
21  anything like that of the case.
22     Q.  Who was your attorney?
23     A.  David Gadd.
24     Q.  What were your claims against the state?
25     A.  Just wrongful termination under the

Mark Gritton, LCPC                                          June 03, 2020

1   Whistleblower Act.
2       Q.   What court were you in?
3       A.   We never went to court, but it was done
4   here in Idaho.
5       Q.   Were you in state court or federal
6   court?
7       A.   I honestly don't remember how it was
8   filed.  I can't tell you.  I don't know.
9       Q.   Did your termination involve performance
10  issues?
11      A.   No.  My termination revolved around
12  disclosure of financial impropriety by the
13  administrator of the agency.
14      Q.   Who was that?
15      A.   The administrator at that time was
16  Michael Graham.
17      Q.   Will you spell that last name for us,
18  please?
19      A.   Yeah, Graham, like graham cracker,
20  G-r-a-h-a-m.  At least that's how I remember it.
21      Q.   Okay.  Well, since it sounds like it's
22  been a while since you've given a deposition, I'll
23  just go over the ground rules real quick.
24      A.   Okay.
25      Q.   So the goal here is for the court

1   reporter to take everything down that you say and
2   that I ask word for word.  As a result of that,
3   it's important that you give audible responses that
4   she can take down.  So nods or shakes or things
5   like "uh-huh" or "hmm-mm" don't go down well.  Does
6   that make sense?
7       A.   Yes.  Understood.
8       Q.   It's my job to ask you good questions
9   that you understand.  So if you don't understand my
10  question, I would ask that you alert me to that,
11  and I will rephrase it until we get a question that
12  you can understand.  Does that sound fair?
13      A.   Fair enough.
14      Q.   Okay.  If you answer my question, I'm
15  going to assume that you understood it.  Do you
16  understand that?
17      A.   Yes, I do.
18      Q.   If you need a break at anytime, let me
19  know.  I'm not sure how long we'll be here.  It's
20  likely that we'll need a break or two.  But we can
21  make that happen.  My goal is certainly not to make
22  you uncomfortable in any way.  So if you need a
23  break, just let me know.  I'm sure I'll just ask
24  that you answer any pending question and then we
25  can go from there.  Does that make sense?

1       A.   Yes, it does.
2       Q.   Okay.  My last comment really relates to
3   some recent developments here.  So normally, I
4   guess pre-COVID-19, we would be in the same room
5   together and I would be asking you questions.  We'd
6   all be together.  But we're trying not to do that
7   so we don't expose people any more than we need to,
8   which means that we're doing this remotely today.
9           And as a result of that, I would ask
10  that you not look at a phone or a computer or any
11  instant messaging or any other device when you're
12  asked a question.
13          Can I have that representation under
14  oath from you?
15      A.   Yes.
16      Q.   Okay.  Are you taking any medications or
17  do you have any medical issues that would prevent
18  you from answering my questions today fully and
19  truthfully?
20      A.   No.
21      MR. HEPWORTH:  Pam, who is the gentleman
22  sitting between you and Jennifer?  We haven't
23  identified who is in the deposition, and I don't
24  recognize him.  My apologies.
25      MS. HOWLAND:  Oh, sure.  Fair enough.  Yes.

1   So this is Ryan Kinney.  He's a law student.  He's
2   an extern with us this summer.
3           Yep.  And then I've got Jennifer Walrath
4   here --
5       MR. HEPWORTH:  Yeah, I know Jennifer.  I
6   just didn't know who Ryan was.
7       MS. HOWLAND:  And then we have down at the
8   end -- you can't see her -- I have a runner who is
9   working with us this summer who wants to go to law
10  school, and her name is Courtney Diehl.  So she's
11  just observing as well.
12      MR. HEPWORTH:  Okay.  Sounds good.
13      MS. HOWLAND:  Okay.
14      Q.   (BY MS. HOWLAND) So, Mr. Gritton, have
15  you ever testified as an expert before in a
16  lawsuit?
17      A.   No.
18      Q.   Okay.  Have you ever been a
19  non-testifying consultant before?
20      A.   Yes.
21      Q.   Okay.  Tell me about that.
22      A.   In the course of our agency, we do a lot
23  of work for Child Protection Services.  So we
24  frequently go to court, and I go to court with my
25  counselors here at Crosspointe and act as an

Mark Gritton, LCPC                                          June 03, 2020

Page 14

1  advisor with them because I'm also the clinical
2  supervisor here at Crosspointe.
3         So oftentimes we review documents.  We
4  review case matter during the court and present it.
5  I'm able to have access to the counselor as well as
6  the other counsel that's representing the action
7  that we're there for.
8      Q.  Do you get compensated for that work?
9      A.  It depends, because normally when we're
10  working for the department, we do that pro bono
11  because of the -- oftentimes it's to do with child
12  custody and things like that, and oftentimes the
13  families involved don't have the financial
14  resources to do that.  Or if it's Medicaid, as some
15  of them are, we're able to bill Medicaid our hourly
16  rate.
17     Q.  Have you ever been a non-testifying
18  expert on any other cases other than in the work
19  you do for CPS?
20     A.  No.
21     Q.  Are you being paid for your testimony in
22  this lawsuit?
23     A.  I've been paid by the -- Mr. Hepworth's
24  firm, as he's been aware of my fees.  And I also
25  understand that you and your office have been made

Page 15

1  aware of my fee and agreed to pay those fees, which
2  is $500 an hour.
3      Q.  That's correct.  I do plan to pay you
4  for your time today.  That's right.
5      A.  Okay.
6      Q.  How much has Mr. Hepworth's firm paid
7  you to date?
8      A.  He has given me a $1,000 retainer.
9      Q.  And have you used that retainer up?
10     A.  Have I what?
11     Q.  Have you used the retainer?
12        Sorry.  Did you hear that?
13     A.  We used some of it, yes.
14     Q.  Okay.  Is there some left or has it all
15  been used?
16     A.  No, there's some left.
17     Q.  Okay.  How did you prepare for your
18  deposition today?
19     A.  I have reviewed the documents that I
20  have created as the counselor to Brent Hilliard and
21  gone through those so I have that familiarity, and
22  refreshing myself so that I can talk to those
23  notes.
24     Q.  Have you talked to anyone in preparation
25  for your testimony?

Page 16

1      A.  I just talked with my personal corporate
2  attorney, David Gadd.
3      Q.  How do you spell Mr. Gadd's last name?
4      A.  G-a-d-d.
5      Q.  Okay.  Have you talked to anyone else in
6  preparation for your testimony today?
7      A.  Not in preparation for my testimony.  I
8  have talked with the other side's counsel.
9      Q.  When did you do that?
10     A.  I don't remember the exact date.
11        Jeff, you might be able to address -- I
12  don't have it in front of me, but I think it was
13  sometime in May, if I'm not mistaken.
14     MR. HEPWORTH:  I don't remember the day
15  either.
16     Q.  (BY MS. HOWLAND) Was that by phone or in
17  person?
18     A.  It was in person.
19     Q.  How long did you meet for?
20     A.  One hour.
21     Q.  I'm sorry.  I didn't hear that.
22     A.  Oh, one hour.
23     Q.  Okay.  Thank you.
24        Have you talked to anyone other than
25  Mr. Hepworth and your corporate attorney?

Page 17

1      A.  I have not.
2      Q.  Have you looked at any documents other
3  than the Crosspointe medical records?
4      A.  No, other than the documents that have
5  been sent to me as I've gotten summonsed and had
6  subpoenas served.  I reviewed those, obviously.
7     MS. HOWLAND:  Fair enough.  I guess while
8  we're talking about that, let's look at the
9  subpoena in this case.  And I'll mark that on my
10  end as Exhibit 1.  Jennifer is going to help pull
11  that up on the screen there.
12        (Deposition Exhibit No. 1 was marked.)
13     Q.  (BY MS. HOWLAND) Is this the document
14  you were talking about that you've reviewed?
15     A.  Yes, it looks like it.  I think that's
16  an accurate representation.
17     Q.  Okay.  If you would turn to the second
18  page.
19     A.  Okay.
20     Q.  It asks that you bring to the deposition
21  the following documents:  Electronically stored
22  information or objects, and that includes
23  documents, e-mails, or files supporting Brent
24  Hilliard's claims in this action.
25        Did you bring anything related to that

Mark Gritton, LCPC                                          June 03, 2020

Page 18

1  that you have not already produced in this case?
2      A.  I have not.
3      Q.  It asks that you bring all documents,
4  e-mails, or files relating to your sessions with or
5  diagnosis or treatment of Brent Hilliard during the
6  year 2017, including but not limited to:  Diagnosis
7  or treatment of drug addiction, depression, or
8  substance-induced depressive order.
9          Did you bring anything today that you
10 have not already produced?
11     A.  No.
12     Q.  Is there anything that exists that you
13 didn't bring or that you haven't produced?
14     A.  Not to my knowledge, no.  Everybody
15 should have an exact copy of what I have.
16     Q.  Okay.  And same question for number 3:
17 Did you bring any notes and reports pertaining to
18 your sessions with or your diagnosis or treatment
19 of Mr. Hilliard during the year 2017, including but
20 not limited to:  Diagnosis or treatment of drug
21 addiction, depression, or substance-induced
22 depressive disorder?
23         Did you bring anything in that category?
24     A.  Nothing that you don't already have.
25     Q.  Okay.  And communications with or

Page 19

1  concerning Mr. Hilliard that relate in any way to
2  your diagnosis or treatment of him in the year
3  2017, including but not limited to:  Diagnosis and
4  treatment of drug addiction, depression, or
5  substance-induced depressive disorder?
6          Did you bring anything that you haven't
7  already produced?
8      A.  No.
9      Q.  Does anything exist in any of these
10 categories that you haven't already produced?
11     A.  Not that I'm aware of.  You have an
12 exact copy of everything I have.
13     Q.  Okay.  Thanks for that.
14         Let's talk a little bit about your
15 educational background.
16     A.  Okay.
17     Q.  Can you walk me through that?  Tell me
18 how you got your educational experience that
19 qualifies you to do the work you do at Crosspointe.
20     A.  Okay.  Let me bring up something here
21 that I can look at to keep me on track and stay
22 focused.
23         Okay.  My education:  I received a
24 bachelor's of science from Weber State University
25 in August of 1993.  As part of my educational

Page 20

1  pursuits there, I was introduced into the world of
2  social work and completed a majority of social work
3  classes, although that was not my major.
4          After -- moving from that:  In 1998 I
5  pursued a master's of education, occupational
6  training management, from Idaho State University.
7          And from there I then moved into the
8  master's of education in community and
9  rehabilitation counseling.
10     Q.  Can I stop you?  Sorry.  I didn't hear
11 one of the things you said there.  You said in 1998
12 you pursued a master's of education in what?
13     A.  In occupational training management.
14     Q.  Okay.  Sorry about that interruption.
15 Occupational training management.  Okay.
16         And then you said you pursued something
17 else?
18     A.  And then my second master's degree, I
19 completed in August of 2007, which was a master's
20 of education in community and rehabilitation
21 counseling through the University of Idaho.
22         My coursework for the master's of
23 education included a lot of work surrounding the
24 substance abuse area.  That's an area that I had
25 specialized in over the years, and I've completed

Page 21

1  all that.
2          Additionally, as I've gone onward --
3  when you get a copy of my leader résumé -- I
4  complete a lot of continuing education credits
5  every year.  I'm required by my licensure to do 20.
6          I'm also a QSUDP, which is a qualified
7  substance use disorders professional.  I attained
8  that in 5 of 2013.
9          My regular licensure that I have is
10 LCPC, and my license number is LCPC-4894.
11         And I obtained my clinical endorsement
12 and received that licensure in June of 2012, and I
13 maintain that currently.
14     Q.  Let me stop you there, if I could, so I
15 can kind of catch up with you.  That was a lot of
16 info.
17     A.  Okay.
18     Q.  Okay.  So in 1998, did you obtain a
19 master's of education in occupational training
20 management?
21     A.  That's correct.
22     Q.  Okay.  And then you went on to get a
23 second master's in 2007, correct?
24     A.  Correct.
25     Q.  Where was the first master's at?

Mark Gritton, LCPC                                                June 03, 2020

Page 22

1    A.  Idaho State University in Pocatello.
2        Q.  Okay.  And is it common for counselors
3   to have an education master's?
4        A.  No.  There's -- my understanding is
5   there's a variety of master's, whether it's a
6   educational one -- my understanding is a lot of the
7   master's students that do the educational piece
8   also continue on and get a doctoral degree, and
9   that's, I think, why they maintained the
10  educational piece of that.
11       Q.  When you got the master's of education
12  in occupational training management, what did you
13  want to do with it?  What was your career
14  objective?
15       A.  Management, which is, you know,
16  obviously -- I obtained that in the vocational
17  rehabilitation world, moving up from a
18  rehabilitation counselor, one, where you start at
19  the bottom, and working my way up until I left
20  being a counselor, became the -- a regional
21  assistant manager, and then a regional manager over
22  an office that covers one of the regions in the
23  state.
24       Q.  Okay.  So did you work on this, then,
25  while you were working for the state in Voc Rehab,

Page 23

1   is what I'm hearing you say?
2        A.  Yes.
3        Q.  Yeah.  Okay.  I'm following.  Okay.
4            Then what made you decide to get your
5   master's of education in rehab counseling and what?
6   Was it communications?
7        A.  It's community and rehabilitation
8   counseling.
9        Q.  Okay.  What made you get that master's?
10  What was your objective?
11       A.  Well, for one, it was paid for by the
12  state.  That was one of our benefits.  We were able
13  to take classes at a reduced rate.  But being in
14  the world of counseling, whether in vocational or
15  community, I just believed it was necessary to have
16  the proper degree and training.  So that was part
17  of -- part of my educational goals in the agency
18  was to attain that degree.
19       Q.  Because at that time you'd already
20  worked as a drug and alcohol counselor for both
21  CLUB and Pacific Rim, right?
22       A.  That is correct.  That is correct.  In
23  the world of vocational rehabilitation, we see a
24  lot of drug and alcohol folks.  Think of people
25  coming out of prison, people who have battled that

Page 24

1   disease and have relapsed and, you know, it affects
2   their ability to maintain employment and those
3   kinds of things.
4        Q.  Okay.  And I believe you said you
5   consider substance abuse as your area of
6   specialization; is that right?
7        A.  That's one of my areas of
8   specialization.  That is correct.
9        Q.  What are your other areas?
10       A.  Mental health.  I consider and work with
11  a lot of folks that have anxiety.  I do a lot of
12  counseling with people in relationships, whether
13  they're married or, you know, just considering a
14  relationship or whatever.  And we do a lot of
15  family work here working with the children of
16  families that have trauma.  And then just the drug
17  and alcohol piece; that is, taking and treating
18  those folks.
19       Q.  Okay.  And then I believe you said you
20  obtained a QSADP -- is that correct -- in 2013?
21       A.  Yes.  It's QSUDP.
22       Q.  Oh.  QSUDP.  Sorry about that.  Okay.
23  Tell me what that means.
24       A.  It's qualified substance use -- sorry --
25  qualified substance use disorders professional.

Page 25

1        Q.  How did you obtain that?  And what would
2   you call that?  That's an endorsement or a -- what
3   would you call that?
4        A.  I think you would call it more like an
5   endorsement.  And I obtained that through
6   application and having a history of enough work
7   hours, that is, in that field.  And then I made
8   application through the state.
9        Q.  So no additional class work to obtain
10  that?
11       A.  No.  You just have to basically have a
12  history of performing those types of services, the
13  counseling and treatments and so forth,
14  assessments.
15       Q.  What do you have to do to retain that
16  endorsement?
17       A.  In Idaho you no longer have to do
18  anything because it's part of your continuing
19  education.  Idaho passed a law that made anybody
20  that has a LPC or LCPC licensure, they now consider
21  them a qualified substance use disorders
22  professional, so I've not had to do anything but
23  just maintain my clinical counselor license.
24       Q.  And then I believe you said you got your
25  LCPC license in 2012; is that correct?

Page 26

1    A.  Yes.  June of 2012.
2    Q.  Okay.  How did you obtain that?
3    A.  I had to have five years --
4  approximately five years.  I'd have to look.  I
5  don't remember exactly, but some experience in a
6  clinical setting.  And then I had to take a written
7  test through the State of Idaho to obtain that.
8    Q.  How do you retain that license?
9    A.  I have to complete 20 credits of
10 continuing education on a yearly basis.
11   Q.  Who oversees that license?
12   A.  The Idaho Bureau of Occupational
13 Licenses periodically monitors your continuing
14 education credits.
15   Q.  Have you ever had a complaint brought
16 against you before the Idaho Bureau of Occupational
17 Licenses?
18   A.  I've had two.
19   Q.  Okay.  Tell us about those.
20   A.  The first one was a situation with --
21 (audio cutting out) -- a patient in our office,
22 client indicated to be a sexual -- I don't know
23 what to call it, but basically he was prohibited
24 from being in and around establishments that
25 predominantly deal and provide services to

Page 27

1  children, and we are one of those establishments.
2  And as well we work with a lot of children from CPS
3  that are involved in those kinds of situations.
4        This gentleman had gone to prison and
5  paroled out to Michigan, I believe, and showed up
6  here at our office and became belligerent.  And
7  when I realized who it was, I asked him to leave,
8  and he became enraged, and he was forced to leave,
9  and he filed a complaint against my licensure.  The
10 complaint was resolved in my favor.
11   Q.  What year was that?
12   A.  I think it was -- the year the complaint
13 was filed or the year the complaint was addressed?
14   Q.  Well, both would be great.
15   A.  Okay.  Let me pull out that file here.
16       So the complaint was filed on
17 December 24th, 2018.  And let's see here if I can
18 find the other paper.
19       Sorry.  It's taking a minute --
20   Q.  That's okay.
21   A.  -- I've got papers everywhere here.
22       So it was resolved on January 23rd, I
23 think.  Let me make sure here.  No, that's not the
24 right date.  I don't seem to have that letter back
25 from the state.  I provided a copy to my attorney

Page 28

1  for my file there just to keep it up.  But it was
2  resolved and, again -- oh, here it is.  It was
3  completed on June 7th of 2019, and then the
4  board -- the Idaho Bureau of Occupational Licensing
5  board concluded the evidence did not reveal a
6  violation of the board's laws and rules governing
7  the practice of counseling, so the board,
8  therefore, has closed the file in this matter.
9    Q.  And what was the patient's name?
10       MR. HEPWORTH:  I'm going to object.  That's
11 totally inappropriate.
12       THE WITNESS:  I don't know that I can
13 release that to you, as far as the patient's name.
14 That would be a violation of confidentiality of
15 that patient.
16   Q.  (BY MS. HOWLAND)  Okay.  Well, can we get
17 a copy of the letter and then you can redact out
18 the name if you want, but can we get a copy of the
19 letter you were just referencing?
20   A.  The letter saying it's been resolved?
21   Q.  Correct.
22   A.  Yes, I can provide that to you.  It
23 doesn't provide any patient information on that.
24   Q.  Okay.  That sounds good.
25   A.  Okay.  So I need to add that to my list.

Page 29

1        Okay.  So the second charge or complaint
2  that was filed was filed -- I received notice on
3  April 3rd, 2019, and I received a letter on May 28,
4  2020, advising -- and I'll quote it again that:
5  The investigation and the board's review concluded
6  the evidence did not reveal a violation of the
7  board's laws and rules regarding the practice of
8  counseling.  The board has therefore closed the
9  file in this matter.
10   Q.  What was that one about?
11   A.  That one was about a school counselor.
12 I had a patient, and the patient saw the school
13 counselor, and a school counselor released
14 confidential information about the patient's mental
15 health to other students and faculty in the school,
16 and it went around the school, and the student
17 experienced bullying.  The parents were flustrated,
18 and I informed them that as a counselor there
19 there's a governing board and that they could file
20 a complaint.
21       As we researched that, I contacted the
22 school and talked to the administrator of the
23 school and asked them -- after I checked the IBOL
24 website and discovered that the school counselor
25 has -- had lost her license due to ethical

Mark Gritton, LCPC                                          June 03, 2020

Page 30

1  violations and complaints -- and asked the school
2  administrator who her governing body was because I
3  was not familiar with that.
4       And during that conversation, I
5  disclosed to him that the reason I was calling was
6  because when we looked at the IBOL website, her
7  license was suspended, so we were inquiring as to
8  who we would go to to make a complaint.
9       And the counselor became enraged when
10 she found out about this and filed a complaint and
11 said I was unethical because I had informed her
12 supervisor, the principal of the school, that her
13 IBOL license, her counseling license had been
14 revoked.  And that was a matter of public record.
15      Q.  Okay.  Can we get a copy of that letter
16 too --
17      A.  You certainly may.
18      Q.  -- that says your claim's dismissed?
19      A.  I will get you a copy of that.
20      Q.  And have you held your license
21 continuously, then, from 2012 to now?
22      A.  From when?
23      Q.  From June 2012 to now.
24      A.  My LCPC?
25      Q.  Correct.

Page 31

1       A.  Prior to that, in October of 2008, I had
2  my -- I was issued my licensed professional
3  counselor license from the state, and subsequently
4  took the C test or the clinical test and got my
5  clinical endorsement for the LCPC.
6       Q.  Okay.  So just to make sure I
7  understand:  You got your licensed professional
8  counselor in October 2008 and then you got the
9  clinical endorsement in 2012; is that right?
10      A.  That's correct.  And I've continued to
11 maintain the clinical endorsement license.
12      Q.  Okay.  And so have you had a license
13 continuously from 2008 to present?
14      A.  Yes, I have.
15      Q.  Okay.  All right.  I think I interrupted
16 you as you were going through your educational
17 experience and qualifications.  Was there anything
18 after that -- after you got the 2012 endorsement
19 that you wanted to add or was that everything?
20      A.  The other -- the other license that I
21 have is I'm -- excuse me.  I have an Idaho clinical
22 counselor supervisor license through the Idaho
23 Bureau of Occupational Licenses.  So I'm a licensed
24 clinical supervisor for providing supervisions to
25 other counselors within the State of Idaho.  I

Page 32

1  received that in January of 2017 and am current as
2  well.
3       I currently have two supervisees that I
4  see.
5       Q.  Who are you supervisees?
6       A.  One of them is a counselor that works
7  for me.  Her name is Melissa Uhl, U-h-l.
8       And the other one is -- gosh, sorry.  My
9  mind went blank.  Jordan Kezele, K-e-z-e-l-e.  He's
10 my other supervisee.
11      Q.  Okay.  Let's talk a little bit about
12 your practice at Crosspointe.
13      A.  Okay.
14      Q.  Did you say you started that in 2010?
15      A.  That's correct.
16      Q.  Okay.  What areas do you primarily focus
17 on at Crosspointe?
18      A.  So that's a pretty broad question.  Are
19 you asking me as a counselor at Crosspointe or as
20 services we provide to the community as Crosspointe
21 Family Services, the business?
22      Q.  Well, explain that a little bit more to
23 me, if you would.  What's the difference between
24 services and counseling?
25      A.  Okay.  So I'll start with Crosspointe

Page 33

1  and work my way down to myself.  So Crosspointe
2  Family Services is a mental health agency, a
3  for-profit mental health agency in Twin Falls,
4  Idaho.  We provide services to the general
5  community.  The services we provide are counseling,
6  individual and family, and we provide group
7  counseling.  We have specialized groups that we
8  provide treatments for.  The treatment that we
9  address involves mental health, substance abuse.
10      The services we provide -- besides the
11 ones I've identified, we provide services outside
12 and to the community for people who receive
13 Medicaid funding.  Those services include
14 community-based rehabilitation services, case
15 management, peer support, and family support.
16      I currently have 26 employees.  Six of
17 those employees are administrative staff.  The
18 balance are providers.  They're licensed or in some
19 form or fashion have certifications to provide
20 services to our clientele.
21      Q.  Okay.  Let me stop you there and make
22 sure I'm following.  So 26 employees, right?
23      A.  Correct.
24      Q.  And you said how many are providers?
25      A.  20.

Mark Gritton, LCPC                                          June 03, 2020

---

Page 34

1    Q.  20 of the 26?
2    A.  That's correct.
3    Q.  Okay.  How much of your practice is
4  spent treating mental health clients?
5    A.  A hundred percent.
6    Q.  And how much of your practice is spent
7  in the substance abuse arena?
8    A.  Probably 40 percent.
9    Q.  Of the substance abuse patients that you
10  see, how much of the substance abuse treatment
11  relates to alcohol abuse?
12    A.  Well, we don't specify specific types of
13  chemicals like meth or opiates or alcohol because
14  we view all those as mood-altering substances.  So
15  I don't know that I can break that down by how many
16  are alcohol and how many are, you know, opiates or
17  painkillers or methamphetamine or cocaine or
18  heroine or anything like that.  That's not a
19  demographic that we typically monitor for any kind
20  of a report.  I've not had anybody ask me about
21  that.
22    Q.  Fair enough.  So 40 percent -- if I'm
23  understanding you, 40 percent of your practice is
24  substance abuse that could be of any type of
25  substance abuse?

---

Page 35

1    A.  That is correct.
2    Q.  Okay.  Has that breakdown of your
3  practice been consistent since 2010 or does that
4  fluctuate over time?
5    A.  It ebbs and flows.  And the two numbers
6  I gave you, 100 and 40, those numbers, I would say
7  without any -- without fail, the majority of people
8  who come through the door that have substance abuse
9  issues also suffer from some type of mental health
10  issue.  We find oftentimes that a lot of those
11  people self-medicate as a way to manage their --
12  their mental health disorders.  So there's -- it's
13  called co-occurring, obviously, and that's --
14  that's why those two numbers may look
15  disproportionate, you know.  A hundred percent
16  mental health but 40 percent substance use or
17  abuse.  So did I answer that to your satisfaction?
18    Q.  Well, sort of.  I guess what I'm trying
19  to figure out is if, you know, early on, for
20  example, you did a lot more substance abuse work
21  and then it tapered off more towards -- that's
22  what -- I'm just using that as an example, but
23  maybe it's always been that percentage.
24    A.  I would say as an average it stays about
25  40 percent.  Sometimes a little higher.  Sometimes

---

Page 36

1  a little lower.  But as an average, I would say 40
2  percent is where it's at most of the time.
3    Q.  Okay.  That sounds good.  Have you ever
4  done a fitness for duty examination or evaluation?
5    A.  Not an official one.  In the context of
6  what we do for substance use and mental health, we
7  do those reports because we do a lot of work for
8  employers in the area for substance use
9  evaluations.  We do GAIN assessments.  We do the
10  clinical interview and the mental health interview.
11  And that is the extent of my assessments.  We've
12  not provided a strict return to health type --
13  return to work type evaluation as I've seen some
14  places do.  I don't know if that answers your
15  question.
16    Q.  Sort of.  So you don't -- you haven't
17  received any training in how to conduct a fitness
18  for-duty evaluation?
19    A.  Not fit for duty in that sense.  Like,
20  in this case, Mr. Hilliard is a police officer.
21  I'm able to assess and provide a opinion about his
22  mental health and his substance use and his ability
23  to perform the duties of his job.
24          But the other side of that coin is, you
25  know, how do you -- you know, I'm not familiar with

---

Page 37

1  the official return to duty thing that a county or
2  an entity would say, "Hey, you need to fill this
3  out," or, you know, "You need to do this type of
4  evaluation."
5          I could do a mental health evaluation
6  and assessment, and I could do a substance use
7  evaluation and assessment and then look at the
8  person's job requirements, the things that they're
9  required to do, and, you know, draw an opinion
10  about that based on their mental health stability
11  and their substance use.
12    Q.  So what would you consider, then, an
13  official fitness for duty as opposed to what you
14  do?  What's the difference in your mind?
15    A.  Well, I guess it's the title of the
16  assessment.  And like I say, I've seen a few of
17  those, and sometimes they go into other areas that
18  I don't know that I'm necessarily qualified to go
19  into.  I need to stay in my own lane, and I do.
20    Q.  What have you seen that's on a fitness
21  for duty that's an area you're not qualified to
22  give an opinion about?
23    A.  They sometimes ask about physical
24  attributes, things of that nature.  So there's a
25  specific example of what you're asking for.

---

Mark Gritton, LCPC                                                    June 03, 2020

Page 38

1     Q.   Have you ever gone to a CLE on
2  conducting a fitness for duty for return to work
3  purposes?
4     A.   No, I have not.
5     Q.   Okay.  So you don't have any training in
6  that area for official fitness for duty
7  evaluations?
8     A.   I do not.
9        MS. HOWLAND:  I'm going to pull up -- and
10 Jennifer, this is the job description, 299.
11 Hilliard-299.
12       Jennifer is going to pull this up.  I'm
13 going to mark it as Exhibit 2.
14       (Deposition Exhibit No. 2 was marked.)
15    Q.   (BY MS. HOWLAND) I'll give you a moment
16 to look at that.  Tell me when you've had a chance
17 to look at it, if you would.
18    A.   Okay.  How much of the document do you
19 want me to review, because I'm only able to see,
20 like, the -- there you go.  If you can move it down
21 a little bit.
22    Q.   It's three pages long too, so just tell
23 Jennifer when you're ready for her to scroll down
24 and she'll help you out there.  Take as much time
25 as you need.

Page 39

1     A.   Okay.  Will you scroll down some more?
2  That's good.  You can scroll down, please, to the
3  next page.  Okay.  Scroll down, please, to the
4  bottom of the page.  Next page, please.  Okay.
5  Down to the bottom of the page.
6        Okay.  I've completed review of the
7  document.
8     Q.   Have you ever seen this before?
9     A.   That particular document, I believe I
10 have.
11    Q.   Okay.  When did you see it?
12    A.   I believe I received it as part of some
13 documentation.  Let me look here.  What does the
14 top of the document look like again?  Give me a
15 moment.  I've got to look through the documentation
16 here.  See if I have a copy of it.  I'm pretty sure
17 that looks very familiar to me.  I just don't know
18 where I've seen it at here.  Sorry.  This is a big
19 stack.  I've got several stacks here and I've just
20 got to make sure.
21    Q.   Take your time.
22    A.   I can't find a copy of it, but for some
23 reason, it looks familiar to me.  I know I've seen
24 it.  I just don't know where.  I don't have it in
25 my stack here for some reason, if I've had it.

Page 40

1     Q.   Okay.  I'll represent that when you
2  produced documents, this was not in them.
3     A.   Give me one more second here and I'll do
4  one more run-through of the pile I have here to
5  make sure just in case I missed something.  Okay.
6  I'm going to say that I do not have a copy of it
7  that I can find in my possession.
8     Q.   Do you know if you asked Brent Hilliard
9  to provide one to you?
10    A.   I did not.  And as I recall, I don't
11 believe he provided me one or it would be in my
12 copy of my documentation here that I have, because
13 I --
14    Q.   What -- oh, sorry.  Go ahead.
15    A.   At least, my staff was instructed to
16 print out everything, but I don't have the luxury
17 right at the moment to be able to access the EMR.
18 I would have to have one of the other girls
19 double-check to see if there was a copy of it.  But
20 I do -- for whatever, in my mind, I believe I've
21 seen this before.
22    Q.   Do you know when you saw it?
23    A.   I don't.
24    Q.   Would it be typical for you to ask a
25 patient that you are treating to bring in a job

Page 41

1  description?
2     A.   Usually speaking, yes, because we want
3  to know what the expectations are and what they
4  need to do.  Yes, we would ask for something like
5  that.
6     Q.   But you don't recall if you did that
7  here?
8     A.   Not in the moment.  Like I say, it's
9  possible, for whatever reason, that they didn't get
10 a copy in this stack that I have, but I would have
11 to go back to our EMR and check, because when we
12 receive a document into our office, it's scanned
13 into that patient's file.
14    Q.   I would ask that if you find you have
15 that document, that you alert Mr. Hepworth and I
16 immediately, because that's significant to our
17 case.
18    A.   Okay.  I will check on that when we're
19 done today and have somebody -- I'll personally go
20 back and visually check it.
21    Q.   Do you have any expertise in treating
22 law enforcement officers?
23    A.   I can't say I've had any specific
24 training in that particular area.  So I do have
25 training and experience in treating people with

Mark Gritton, LCPC                                                    June 03, 2020

Page 42

1  disabilities, specifically injuries to their body,
2  as well as my expertise with the mental health
3  aspects of people.  My work as a rehabilitation
4  counselor, we focused a lot on disability.  We
5  assessed people.  If it's something that we're not
6  able to assess, we have a side person we'll refer
7  to people who are more adept in that particular
8  area.
9      Q.  But you don't hold yourself out as an
10  expert for counseling law enforcement officers?
11     A.  Not specifically, no.
12     Q.  Are you familiar with Shelley Wray?
13     A.  I am.
14     Q.  Okay.  What was her role at Crosspointe?
15     A.  Shelley Wray was employed at Crosspointe
16  as a psychiatric nurse practitioner.  Her job was
17  to assist patients by providing psychiatric
18  medication management.
19     Q.  Tell me what that means in lay terms.
20  What does it mean to provide psychiatric medication
21  management?
22     A.  If somebody has depression or anxiety,
23  they would meet with Shelley.  She would complete a
24  psychological/mental health assessment.  And based
25  on her training, she would then prescribe

Page 43

1  medications to address the symptomatology of the
2  person's mental health diagnosis.
3      Q.  Are you able to prescribe medication?
4      A.  I am not.
5      Q.  Were you in communication with Shelley
6  Wray about her meetings with Brent Hilliard?
7      A.  Generally speaking, when somebody comes
8  in and we make a referral for medication
9  management, I briefly give the person -- in this
10  case Shelley -- a heads-up that I've referred
11  someone to her, and then that person fills out
12  paperwork, new application paperwork to receive
13  services from her, and they meet with her.  She
14  does her own independent assessment and evaluation
15  and prescribes.
16      Even though we are housed -- were housed
17  in the same building, that is, Shelley saw patients
18  for medication management.  I see patients for
19  counseling and therapy services.  We generally do
20  not cross that boundary of talking about those
21  patients unless there's some type of a crisis or
22  something of that nature that requires immediate
23  care.
24      For instance, I sometimes have people
25  come in who -- when Shelley was working here --

Page 44

1  were very depressed, suicidal in the moment.  We
2  would have them meet with her as a crisis patient.
3  I may join the session for the first five or ten
4  minutes and give her some background, as I've
5  worked and gotten to know the client, and then turn
6  the client's care over to her for the medication
7  management.
8      Q.  Would you get a copy of her records so
9  you could see what she was prescribing?
10     A.  No.  Normally what we would do -- we try
11  not to mangle or intermingle those types of
12  records.  Normally what we would get is a notice of
13  what kind of medication or the name of the
14  medication and the dosage.  We generally encourage
15  the clients to be responsible to obtain that
16  information and report it to us.
17      We do, as a matter of practice, when
18  someone comes in if they're already receiving
19  medication from another provider or whomever, we
20  have them sign a release of information and we get
21  the last note or we ask them for a medication list
22  so that we have a list of their medications so that
23  we can monitor them as we go forward for adverse
24  effects or effectiveness of the medications.
25  Sometimes they start them on new meds and it

Page 45

1  doesn't go well, they have reactions and they tell
2  us.  And we send them back to see their primary
3  care provider or their prescriber.
4      Q.  So if I understand you right, you didn't
5  get a copy of Shelley Wray's records that pertain
6  to Brent Hilliard while you were treating him,
7  correct?
8      A.  While I was treating him.  I have since
9  have a copy here today that I've gone through.
10     Q.  And you didn't talk to Shelley Wray
11  about how she was treating Brent?
12     A.  No.  I -- that's out of my lane of
13  practice because I -- that's just not something I
14  can do.
15     Q.  Wouldn't it be significant to your
16  diagnosis, if there was a substance abuse issue, if
17  she was prescribing opioids?
18     A.  It would.  But to my knowledge, she
19  wouldn't be prescribing an opioid for a mental
20  health disorder.  Opioids, it's my understanding,
21  falls in the pain medication category.  She might
22  prescribe a benzo or something of that nature for
23  anxiety disorder or something, but I don't believe
24  she would prescribe an opiate.
25     Q.  Would it be significant if she was

Mark Gritton, LCPC                                                    June 03, 2020

Page 46

1  prescribing a benzo for a patient with a substance
2  abuse problem?
3      A.  That could be, absolutely.
4      Q.  But you wouldn't have access to that?
5      A.  I would have access to it, but I would
6  have to go through the proper channels, even in our
7  agency, to get it.
8      Q.  When did you review Shelley Wray's
9  records?
10      A.  When I became aware of this --
11  approximately, I'll say within the last 30 days
12  because I don't know the exact date, because as we
13  started to amass records and send them out, my
14  policy at Crosspointe is any records -- before any
15  records leave, I like to look through them and make
16  sure and see what's going out so that I have
17  awareness of it as the clinical supervisor.
18      Q.  That was the first time you'd seen those
19  records?
20      A.  That is correct.
21      Q.  Does Shelley Wray still work for you?
22      A.  She does not.
23      Q.  Where does she work now?
24      A.  I do not know.
25      Q.  Did she leave on favorable terms?

Page 47

1      A.  No.
2      Q.  Okay.  Tell us about the terms of her
3  departure.
4      A.  She lost her license to practice and
5  self-terminated.
6      Q.  How did she lose her license to
7  practice?
8      A.  She was under the auspices of the PRN
9  program of Idaho that assists medical practitioners
10  that have issues with substance use, and for
11  whatever reason, she did not comply with those
12  terms, and the state board pulled her licensure and
13  gave us notice, and she self-terminated.
14      Q.  Which part of the terms did she not
15  comply with?
16      A.  Well, she has to have a license to
17  practice, and she lost her license to practice,
18  which would be her psychiatric nurse practitioner
19  license.
20      Q.  Was there an event that related to that
21  or just a failure to fill out paperwork?
22      A.  I don't know all the details.  I do
23  have -- I know that she was on the program.  I
24  believe she failed to take a UA when required and
25  then had something concerning a dental procedure

Page 48

1  where she was given medication and she saw a
2  patient.  I think that's accurate.  I may be --
3  that may not be 100 percent accurate, but I believe
4  that's close.
5      Q.  How about Justine Sweet?  Do you know
6  Justine Sweet?
7      A.  I do.  She used to work for me as a
8  counselor.
9      Q.  And did she see Brent Hilliard?
10      A.  She did.  She saw Brent and completed a
11  GAIN assessment, which stands for Global Assessment
12  [sic] of Individual Needs.  It's done for people
13  who request or who are in need of a substance use
14  evaluation.  It's one that the State of Idaho
15  recognizes and is universal in Idaho.
16      Q.  Are you qualified to give GAIN
17  assessments?
18      A.  Yes, I am.
19      Q.  Why did she give it in this case?
20      A.  Because she was also qualified, and that
21  was how it was assigned at the time.
22      Q.  Did you have conversations with her
23  about the GAIN assessment she gave to Brent
24  Hilliard?
25      A.  No, I did not.

Page 49

1      Q.  Have you seen her GAIN assessment?
2      A.  I have.
3      Q.  When did you see that for the first
4  time?
5      A.  I saw that when I was treating Brent.
6      Q.  What was the significance of that to
7  you?
8      A.  The significance was is he completed the
9  assessment and -- I can pull a copy of it up real
10  quick.  I just saw that here a second ago in my
11  records.
12          Justine indicated, as I recall, that he
13  did not require any substance use treatment at this
14  time.  That's correct.  He did not meet criteria
15  for any -- she put on here, "Based on the ASAM
16  criteria, there's no further recommendation for
17  treatment," which means he did not have a substance
18  use disorder that was identified during the course
19  of that assessment.
20      Q.  How long have you worked with Justine
21  Sweet?
22      A.  Justine was my employee, I think, for
23  approximately three years.  I'd have to look to
24  give you an exact 100 percent accurate answer to
25  that.  I don't have her file in front of me, her

Associated Reporting & Video                              46 to 49
(208) 343-4004

Mark Gritton, LCPC                                                        June 03, 2020

Page 50

1  personnel file.
2      She has since left us and she's, I
3  believe, in another private practice in the area.
4      Q.  What were the circumstances of her
5  departure?
6      A.  She was just ready for a change of
7  scenery, you know.  Usually speaking, most of my
8  counselors work for me between three to four years
9  and then they move on.  It's just the nature of the
10 beast.
11     Q.  How much time did you spend reviewing
12 Justine Sweet's GAIN assessment?
13     A.  I don't recall the exact time, but when
14 I received it, I went through it because, you know,
15 when I get a copy of an evaluation, I always take
16 the time to sit down and review it.
17     Q.  Did you have any questions or concerns
18 about it?
19     A.  I did not.  I'm very familiar with the
20 GAIN and extremely adept at identifying issues.
21     And Justine has worked in the drug and
22 alcohol treatment world, as I recall, for some
23 time.  The GAIN is administered on the computer;
24 that is, a counselor sits at a computer, has an
25 interactive interview with the patient, asks

Page 51

1  questions regarding their use and all those similar
2  things, and -- it's pretty straightforward.
3      Q.  Are you aware of Mr. Hilliard's DUI that
4  he received in early September of 2017?
5      A.  That one was in the newspaper probably.
6  If it was, I was aware of that, yes.
7      Q.  Did you ever meet with him after he got
8  his DUI?
9      A.  I've not met with Brent since we
10 completed our treatment here.
11     Q.  When was that?
12     A.  Let me look at my last note to give you
13 an idea here.  I did a -- that's not going to
14 matter.  I believe the last time I -- that's
15 Justine's.  Move on to mine.  I believe the last
16 time I saw Brent was on 8-22 of '17, according to
17 my treatment notes.
18     Q.  Have you ever talked with him about his
19 DUI?
20     A.  Nope.  I've had no contact with him
21 since then other than to provide a letter that I --
22 that's dated August 24th that should have been in
23 the paperwork, the documents that were submitted to
24 you and to Mr. Hepworth.
25     MS. HOWLAND:  I'm looking at the GAIN

Page 52

1  assessment, and I'm looking at Hilliard -- it's
2  marked Hilliard-15.  And Jennifer is going to bring
3  that up for you here.  And I'm going to mark a
4  packet that I have here that is labeled Hilliard-7
5  through Hilliard-30.  I'm going to mark that as
6  Exhibit 3.
7      (Deposition Exhibit No. 3 was marked.)
8      THE WITNESS:  Okay.  So this is the note
9  that we're going to talk about here?
10     Q.  (BY MS. HOWLAND) Not yet.  She's still
11 getting there.  We're looking for Hilliard-15,
12 which is the GAIN assessment.  The last page --
13     A.  Okay.  I have a copy here in front of me
14 as well.
15     Q.  Yep.  It's the last page.
16     A.  Okay.
17     Q.  And Justine Sweet gives a series of
18 summary recommendations on page --
19     A.  Okay.
20     Q.  On pages 4 and 5 of her report.
21     A.  Okay.
22     Q.  And, for example, it says:  Dimension 4.
23 There are no issues related to readiness to change
24 as Brent has followed through with all
25 requirements.  Any issues related to depression are

Page 53

1  being addressed through Crosspointe Family
2  Services.  Relapse potential is low due to Brent
3  has minimal use potential.
4      Based on the fact that he got a DUI the
5  week after --
6      A.  You cut out, so I didn't hear what
7  you --
8      Q.  I'll repeat it here.
9      So do you see those different summary
10 recommendations that are labeled Dimension 1
11 through 6?
12     A.  I do.
13     Q.  Okay.  So based on the fact that he got
14 a DUI a week after she issued that report, do you
15 have any concerns about the validity of those
16 recommendations?
17     A.  No.  And the reason for that is is -- my
18 experience with the GAIN is this:  The GAIN is an
19 interactive assessment tool that is administered by
20 the counselor with the patient present.  The
21 counselor interacts, asks questions, and goes
22 through the assessment.  It's very structured.  The
23 questions are read to the patient, and the patient
24 answers the questions.  And based on that, that is
25 how we draw the designation, diagnosis, treatment

Mark Gritton, LCPC                                              June 03, 2020

Page 54

1  recommendations, and so forth that comes from the
2  GAIN assessment.
3      Q.  I still don't understand how that
4  answers my question.  I'm going to ask it one more
5  time.
6      A.  Okay.  Please re-ask the question.
7      Q.  Okay.  So based on her summary
8  recommendations --
9      A.  Correct.
10      Q.  -- which include comments like:  There
11  is no risk for withdrawal from alcohol or other
12  drugs, any issues related to depression are being
13  addressed, there are no issues related to
14  readiness, relapse potential is low, do you have
15  any concerns about the validity of the GAIN
16  assessment?
17      A.  I don't know that I can talk to the
18  validity of the GAIN assessment in general.  The
19  validity of this, I can give you my impression of
20  this particular assessment by Justine of Brent.
21  The last time I saw Brent was prior to this date,
22  as I recall.  She saw him and assessed him on 8-23
23  of '17.  That's the screening date.  I saw Brent
24  last on 8-22.  The last time I saw Brent, he was
25  doing well.  I wrote him a letter indicating that.

Page 55

1      He completed a GAIN assessment, and
2  Justine as a professional rendered this decision.
3  I don't know that I can explain one way or another
4  or interpret her decision because she was the one
5  that was there.  You would need to probably talk
6  with her to get her impression of that.
7      Q.  Which I will.
8      A.  Okay.
9      Q.  That's fine.  Did you rely on the GAIN
10  results, the GAIN assessment?
11      A.  No.  This was after the fact.  And as I
12  recall -- I'm trying to remember in my mind.
13  Something is coming to me -- Brent, as he ended
14  this therapy work with me, was concerned about
15  getting back to work.  And I believe somewhere in
16  the depths of my mind I recall a conversation just
17  briefly that he said that he had to set up an
18  assessment so that he could do what he needed to do
19  to get released back to work, and I think that's
20  why he did a GAIN at the end as opposed to doing a
21  GAIN at the beginning of his treatment.
22      Q.  Did you recommend that he get a GAIN?
23      A.  Let me look back here.  I think that was
24  his -- I think that was his decision to do that
25  because I believe that was required.  At least in

Page 56

1  the back of my mind, I'm thinking he communicated
2  that, that he needed to do that as part of what he
3  had to complete in order to get released back to
4  work.  His concern was to get back to work, so he
5  was doing what he needed to do to accomplish that.
6      Q.  So you don't think you recommended it?
7      A.  Not off the top of my head.  I would
8  have to go back again and re-read everything,
9  but -- let me look here.  There's not that many
10  notes.  Okay.  I don't see anything in my written
11  notes that I can point to say that I did.  So, no,
12  I believe that was something that he was trying to
13  accomplish as part of what he needed to do in order
14  to get put back to work with the sheriff's
15  department.
16      Q.  Do you think a GAIN assessment is a
17  reliable indicator of whether someone suffers a
18  substance abuse problem or not?
19      A.  Yes, I believe it to be a reliable
20  indicator.  Plus, you know, in addition to that,
21  the State of Idaho recognizes it as such.  It's
22  used by the Department of Corrections.  It's used
23  by the courts.  So I believe it to be reliable.
24      Q.  And I believe what you were indicating
25  earlier is that if a patient doesn't give accurate

Page 57

1  information in regard to the questions asked, that
2  can impact the reliability of the GAIN; is that
3  correct?
4      MR. HEPWORTH:  Objection; that misstates his
5  testimony.  Go ahead and answer.
6      THE WITNESS:  So please repeat the question.
7      Q.  (BY MS. HOWLAND)  Sure.  Would you agree
8  that if a patient does not give accurate
9  information in response to the questions they're
10  asked, that can skew the reliability of the GAIN
11  results?
12      A.  I can't give you a yes/no answer, but I
13  will say that, based on my experience, if a person
14  comes in to see me for a GAIN, there's generally a
15  reason for it.  The questions in the GAIN are
16  designed to elicit a lot of information from
17  multiple angles.  And if somebody came in and lied
18  through their teeth; that is, they said, "No, I
19  don't have a drug or alcohol problem; I don't know
20  why I'm here," the GAIN is going to have validity
21  indicators built into it, and those indicators
22  would pop up, and that would also show in the
23  report that there's concern with validity.
24      Q.  How many GAIN assessments have you
25  given?

Mark Gritton, LCPC                                              June 03, 2020

Page 58

1    A.   Oh, I've probably done 5- or 600 at
2  least.
3    Q.   Have you ever had someone who did not
4  give honest answers in response to your questions?
5    A.   My opinion is yes, I've had a few people
6  that have not answered all the questions honestly.
7  And as we go through the GAIN, oftentimes the GAIN
8  catches that in the sense that we ask some
9  questions at the beginning that we may review again
10 that pop up as part of the queue later on because
11 something didn't jive, if you will.  I was trying
12 to think of an example of that, and I can't off the
13 top of my head.
14       Again, if somebody sat down and said,
15 "Okay.  I have no problems.  I don't know why I'm
16 here, and I've never had problems with drugs or
17 alcohol.  I've never drank in the last ten years,"
18 that would skew the GAIN instrument.  But I've not
19 had anybody ever do that to that extreme,
20 personally, in my testing.
21    Q.   So if I'm understanding you right,
22 you've never had someone give dishonest answers
23 that skewed the conclusion of the GAIN assessment?
24    A.   Well, I didn't say that.  So let me
25 clarify.  If somebody comes in and gives all the

Page 59

1  wrong answers, will the GAIN be skewed?  Yes.
2        Have I had anybody come in and give all
3  wrong answers?  No.
4        Have I had somebody come in and give
5  some wrong answers?  Yes.
6        Does it skew the GAIN?  My experience
7  tells me the GAIN still catches what it needs to
8  and identifies a problem.
9    Q.   Have you ever had a case where the GAIN
10 didn't catch what it needed to and where you ended
11 up with a false conclusion?
12    A.   Not that I'm aware of, no.
13    Q.   Let's talk a little bit about your
14 treatment of Brent Hilliard.
15    A.   Okay.
16    Q.   And we can pull up some of these medical
17 records that we've got.  I think the earliest one
18 that I've got is July 18th, 2017, which is
19 Hilliard-29 at the bottom.
20       MR. HEPWORTH:  No, it's July 12th.  You have
21 the right page.  It's just July 12th.  It is marked
22 Hilliard-29.
23       MS. HOWLAND:  Oh, I see what you're saying.
24 Yeah.  Session date is July 12th.  Sorry about
25 that.  Jennifer is going to scroll through as you

Page 60

1  need her to unless you have it in front of you.
2        THE WITNESS:  What is the correct date we're
3  going to talk about?  July 12th?
4    Q.   (BY MS. HOWLAND)  Yeah.  The log notes
5  are July 18th, but the session date is July 12th.
6    A.   Okay.  So the log note is the -- I don't
7  know what that date represents, but the date of the
8  session.  The session date 7-12.  Fire away.
9    Q.   Was that your first session with Brent
10 Hilliard?
11    A.   Yes, it was.
12    Q.   Okay.  And how did he come to be your
13 patient?
14    A.   He -- I don't remember if this was an
15 EAP or otherwise.  He called up.  I assume he
16 called up -- it was an EAP session, so that's
17 Employee Assistance Program through his insurance
18 through the county -- and made an appointment to
19 come meet with me.
20    Q.   What was your diagnosis?
21    A.   At that time I gave him a F code 11.94
22 substance-induced depressive disorder.
23    Q.   What is an "F code"?
24    A.   F code is from the DSM-5.  It is the
25 code that is used to identify diagnostic disorders.

Page 61

1    Q.   What methodology did you use to come up
2  with that diagnosis?
3    A.   A clinical impression based on my
4  interaction with Brent in that session.
5    Q.   How long did you meet with him for?
6    A.   45 minutes.
7    Q.   Did you review any medical records
8  before you made that diagnosis?
9    A.   No.  I had no medical records to review
10 at that time from anybody.  This was our initial
11 session.
12    Q.   Did you ever obtain Mr. Hilliard's
13 medical records from other health care providers?
14    A.   I would have to look back at his file.
15 I don't have that in front of me at the moment.
16       Normally speaking, when someone comes in
17 for an EAP, the EAP requirements -- and I was
18 looking.  I don't know that I put down here which
19 EAP it was.  ComPsych.  So ComPsych -- most of the
20 EAP companies require -- don't require that we
21 complete a lot of assessments.  They do not pay for
22 assessments.  They do not pay for any of those
23 things.  They simply -- an employee can call and
24 say:  Hey, I'm having a bad day or I'm depressed or
25 I'm having a problem with my kids or my wife or my

Mark Gritton, LCPC                                                June 03, 2020

Page 62

1  job or whatever.
2       EAP says:  Here are some sessions.  Here
3  are the counselors in the area.  You're welcome to
4  go see one of those.  Who would you like to see?
5  And then they send an authorization to that
6  counselor and an appointment is made.
7       So did I answer your question?
8       Q.  Would it be a normal part of your
9  practice to request medical records from other
10  health care providers?
11      A.  Yes.  And he may have provided written
12  authorization to do that.  If that's the case, we
13  would have got those records.  And normally
14  speaking, when they come in for their first
15  session, we have them sign those records -- those
16  record requests, releases of information, and it
17  may take days, weeks, or months to get those,
18  depending on where they're coming from and whether
19  or not that other agency or doctor or whoever is
20  good at getting those records to us.
21      Q.  Okay.  Well, we've been going about an
22  hour-and-a-half.  What I would propose is we take a
23  break.  And during that break, we'll give you time,
24  I'd like you to look through the file and see if
25  you had his medical records from other providers.

Page 63

1       A.  Okay.
2       Q.  Does that sound okay?
3       A.  You lost me.  You cut out.  I didn't
4  hear what you said.  You cut out.
5       Q.  Okay.  Fair enough.  I said that we've
6  been going about an hour-and-a-half, and it seems
7  like a good time to take a break, and that I would
8  ask you during the break to look at his file and
9  see if you had his medical records, and if so, when
10  you received them.
11      A.  Okay.  I can do that.
12      Q.  Okay.  So how much time do you think you
13  need to review that file?  If we meet in 15
14  minutes, does that give you enough time?
15      A.  Yeah.  So we'll meet at what, ten 'til
16  or five 'til?
17      Q.  Let's say ten 'til.
18      A.  Ten 'til.  And the time is now -- 10:30.
19  Okay.
20      Q.  I've got 10:30.  Yep.  So we'll meet at
21  10:50.
22      A.  Okay.  Perfect.
23      MS. HOWLAND:  Thank you.
24      (A recess was taken from 10:31 a.m. to 10:50 a.m.)
25      THE WITNESS:  I'm faxing this to both of

Page 64

1  you.  He did sign a release, a medical release of
2  his records from -- it looks like it's Dr. Josh
3  Waters.  It was faxed to Dr. Waters' office, but
4  we've got nothing back from him, so I have no
5  medical records in his file.
6       So I'll hand these off to my girls and
7  be right back.
8       Okay.  I'm back.  One of my gals is
9  going to e-mail that to you here in the next couple
10  minutes.
11      Q.  (BY MS. HOWLAND) Great.  Okay.  Thank
12  you for that.
13      A.  In addition to that are those two
14  documents you wanted about my licensure complaints.
15      Q.  Sounds good.  Okay.
16      So Mr. Gritton, they didn't get all of
17  that on the record, so I was just going to
18  summarize a little in that you said you were going
19  to e-mail us a copy of Hilliard's intake.  There
20  was a medical release to Dr. Waters, but that you
21  didn't get anything back.  Correct?
22      A.  That is correct.
23      Q.  Did you ever follow up with Dr. Waters?
24      A.  No.  My staff may have, but I don't know
25  without taking the time to go and ask somebody.

Page 65

1       Q.  Did you direct --
2       A.  That's been long enough that the staff
3  that filled out that form and did the faxing is no
4  longer with us.
5       Q.  Did you direct your staff to follow up
6  with Dr. Waters?
7       A.  Generally, after 30 to 45 days, we do do
8  a follow-up if we haven't received the records, so
9  that's why I say I would have to go and see if that
10  was done because I don't have that knowledge right
11  at the moment.
12      Q.  Okay.  So at the time we took the break,
13  we had just gotten done talking about the GAIN
14  assessment, and we were moving on to the medical
15  records.  I just had one more question, a couple
16  maybe, about the GAIN assessment.
17      A.  Okay.
18      Q.  So is the GAIN assessment designed to
19  flag abuse problems related to a patient taking
20  prescription drugs prescribed by a doctor?
21      A.  Yes.
22      Q.  And in the actual assessment, are
23  patients advised to disclose their prescription
24  drug use that they are taking as prescribed?
25      A.  Yes.  They -- that's a question that's

Page 66

1  in there, because it asks you about medications and
2  drugs that are both prescribed by a physician and
3  also those that are not.
4      Q.  Okay.  So --
5      A.  It differentiates the two.
6      Q.  Okay.  Let's talk about this session on
7  July 12th, 2017.  You've indicated you're going to
8  send an intake form.  Tell us what that is and how
9  that works in regard to your practice.
10     A.  Well, say that again so I understand the
11 question.
12     Q.  Okay.  So you just indicated that you're
13 going to send us an intake form --
14     A.  Correct.
15     Q.  -- okay?
16     A.  So the forms that I'm sending you are
17 the forms that Mr. Hilliard filled out, including
18 some mental health screeners and the releases of
19 information that he signed to Dr. Waters.
20     Q.  Okay.
21     A.  And everybody that comes into
22 Crosspointe fills out these paperwork.  And I just
23 thought, for whatever reason, I don't think that
24 made it into the copies that I sent you, so I'm
25 making sure you have literally copies of every

Page 67

1  particular document of any sort that's in his file.
2      Q.  I appreciate that.
3      MS. HOWLAND:  So is that what you've pulled
4  up, Jennifer?  The intake form?
5      MS. WALRATH:  No, it's just the session
6  notes.
7      MS. HOWLAND:  Oh, Scroll down, then.
8      Q.  (BY MS. HOWLAND) Okay.  So Jennifer has
9  just pulled up the session notes from the
10 July 12th, 2017, session.
11     A.  Okay.
12     Q.  And towards the top, if you would go
13 back, it says, Diagnosis Code:  F11.94,
14 substance-induced depressive disorder.
15     Do you see that?
16     A.  I do.
17     Q.  Was that your diagnosis on your first
18 meeting with Mr. Hilliard?
19     A.  Yes, it was.
20     Q.  Okay.  And tell us in lay terms what a
21 substance-induced depressive disorder is.
22     A.  Okay.  I'll be specific to Brent's
23 particular case.  So when I met with Brent the
24 first time, as you notice down in the lower portion
25 of that note under Problem, I described that he

Page 68

1  describes depression.  He sits around and cries for
2  no reason that he can identify.  No energy and
3  lacks motivation.  He reports having back surgery
4  several months ago and is trying to titrate off
5  Oxycontin.  The symptoms started about six weeks
6  ago when he started to end the use of Oxycontin.
7      One of the side effects/symptoms of
8  Oxycontin is:  When you use it for treatment of
9  pain, as in Mr. Hilliard's case, Oxycontin has this
10 particularity, I'll call it, that as you start to
11 stop use of it, it causes depression-like symptoms,
12 including the ones that I've described that Brent
13 presented with.  The tearfulness, the crying.
14     And I've treated multiple patients over
15 the years that have for whatever reason stopped
16 using Oxycontin, and that is the pattern of
17 symptoms that they displayed as a group when I look
18 at all of them together.  So the diagnosis
19 substance-induced depressive disorder is why I gave
20 that to him, the substance being the Oxycontin that
21 he's trying to titrate off.
22     Q.  What was your understanding of how long
23 he'd been taking Oxycontin at that time?
24     A.  So my recollection was is he indicated
25 that he had had back surgery -- and he's had

Page 69

1  multiples, as I recall him telling me that -- and
2  as he's recovered from the surgeries, he had used
3  prior -- opiates in the past, and he's been able to
4  do so; that is, recover, remove himself, stop
5  taking, reduce and stop taking his pain medication
6  successfully.
7      And this particular time, he was not
8  able to do that, hence he shows up in my office
9  depressed, sad, crying, and, you know, is just kind
10 of shutting down.
11     Q.  And so what type of information did you
12 gather about his history of Oxycontin use?
13     A.  He just described his past surgeries and
14 the fact that he's been able to use pain
15 medications in the past and has been able to get
16 off them successfully.  For whatever reason, he
17 said he was unable to navigate this one.  And I
18 don't know that he told me that he'd taken Oxy in
19 the past, just opiates, as I recall was his
20 description.
21     Q.  What opioids had he taken in the past
22 other than Oxy?
23     A.  I believe he mentioned hydrocodone.
24     Q.  When did he start taking the Oxy -- how
25 long had he been taking it leading up to his

Page 70

1  session with you on July 12th?
2      A.  He told me that he had been taking them
3  up to, approximately, six weeks ago, from the date
4  of my note when he started to reduce the amount
5  that he was taking so that he could get off of them
6  and return to work.  He had the realization and
7  understood that he could not work while he was
8  taking Oxy.
9          And obviously in the condition he was
10  in, he wouldn't have been able to, you know, return
11  to work and do anything if he's mopey and crying
12  and all those kinds of things.
13      Q.  So was it your understanding that in the
14  six weeks leading up to July 12th, he had been
15  taking Oxycontin?
16      A.  Yes.  That's my belief, yes.
17      Q.  And do you know how -- what dose he'd
18  been taking and how often he was taking it?
19      A.  No, I didn't make a note of that.
20      Q.  And do you have a note or an
21  understanding of the first date that he was
22  prescribed Oxycontin and took it that led to his
23  concerns in this appointment?
24      A.  It's my understanding that he began
25  taking them after his surgery; that is, his

Page 71

1  medical -- or his back doctor prescribed them and
2  he, you know, has taken them during his recovery
3  period.
4      Q.  And is it your understanding he tried to
5  stop six weeks before his appointment and started
6  having withdrawal symptoms?
7      A.  Yes.
8      Q.  What did he say about that?
9      A.  He indicated that he had attempted to --
10  as I wrote in my note -- titrate off; that is,
11  stairstep down.  And in doing so, experienced the
12  symptoms that led him to come see me:  His
13  demeanor, his sadness, his lack of motivation, and,
14  you know, just the general tearfulness.
15      Q.  Do you have an opinion as to whether he
16  would have appeared impaired at work if he was
17  taking Oxycontin in the six weeks leading up to his
18  appointment with you?
19      A.  I believe, yes, he would have been --
20  someone could have looked at him and said something
21  is not right.
22          The man came into my office crying like
23  a baby, you know, literally just sobbing.  You
24  know, anybody that was in a sheriff's office that
25  saw someone in a uniform doing that would be

Page 72

1  concerned and, you know, would inquire as to what
2  was going on.
3      Q.  You have a notation here that says:
4  Awareness of addiction.  Trying to wean self off
5  pain meds.
6      A.  Correct.
7      Q.  Was "addiction" your word or Hilliard's
8  word?
9      A.  Probably my word.  And the reason I say
10  that is is oftentimes, generally speaking, when
11  someone comes in that's in the process of weaning
12  themselves off of pain meds, we talk about the
13  addictiveness of the pain med, how it affects the
14  brain to the point that a person can become
15  consumed with taking it.  We talk about tolerance;
16  that is, over time your brain requires more and
17  more, so it's hard to get off of it.  And we talk
18  about:  What are the side effects and what can you
19  expect for symptomatology as you start to titrate
20  off or stop using an opiate, because people that go
21  that may experience depression.  We call those
22  withdrawal symptoms.  The sadness, the crying, the
23  lack of energy, those kinds of things.
24      Q.  Did Mr. Hilliard agree that he was
25  addicted to Oxycontin?

Page 73

1      A.  I don't know that he agreed to that.  He
2  was -- because we didn't talk about him necessarily
3  being an addict to it because he was prescribed it.
4  He was desirous to go back to work and realized
5  that he now needed to now start getting off them so
6  he could be back to work and be able to perform and
7  do what he needed to do as a police officer.
8      Q.  So you agreed that it was a good thing
9  he was off work at that time; is that correct?
10      A.  I believe so, yes.  Because if he was
11  taking Oxycontin, he would be impaired.
12      Q.  Did you know what other prescription
13  drugs he was taking at that time?
14      A.  I believe that's the only one he
15  disclosed to me.  Let me look here.
16          He told me in the next note, on 7-19,
17  that he reports seeing Dr. Shell on 7-18, which is
18  after my initial visit with him, and he was started
19  on Prozac and was given a prescription for Xanax
20  for his anxiety.
21          And that, again, is the note dated --
22  session date 7-19 of '17.
23      Q.  Okay.  And we'll move there in just a
24  minute here.
25          So it sounds like you're saying you knew

Mark Gritton, LCPC                                                    June 03, 2020

Page 74

1 at about that same time frame he was taking Prozac
2 and Xanax; is that right?
3     A.   The week after my initial visit, yes --
4     Q.   Okay.
5     A.   -- he disclosed that to me.
6     Q.   Okay.  Did he disclose use of tramadol?
7     A.   He did not.
8     Q.   Would that be significant to you for
9 purposes of diagnosis and treatment?
10     A.   Tramadol is a synthetic opiate, so yes,
11 it would be -- it would be something that would be
12 beneficial to know about because when we're dealing
13 with someone who is titrating off of medication, I
14 believe that would be important to know because we
15 would need to know as much as we can about what
16 medications that are -- you know, the addictive
17 ones, the opiates, because that was what he
18 communicated to me that he needed to do in order to
19 go back to work was to get off opiates.
20     Q.   Your other notation here indicates you
21 discussed options for stopping pain med use.
22         What were the options you discussed with
23 him?
24     A.   If someone has severe withdrawal
25 symptoms, in order to address concerns that I have

Page 75

1 as a professional with liability, I always make
2 people aware that if they have severe symptoms;
3 that is, they become suicidal due to severe
4 depression or whatever in that realm, that they
5 seek out help to go to an emergency room, see their
6 doctor.  We cover those kinds of basis for safety's
7 sake.
8     Q.   Did he have severe symptoms at that
9 meeting on July 12th?
10     A.   No, he did not indicate to me that he
11 was suicidal or had any suicidal thoughts or
12 ideation.
13     Q.   Let's look at some of your other notes,
14 treatment notes.  You talked about your July 19th
15 session.  Let's pull up Hilliard-27, if we could,
16 and we'll look at that.  So this was the following
17 week; is that right?
18     A.   That is correct.  One week from my
19 initial visit.  Seven days exactly.
20     Q.   And tell Jennifer if you need her to
21 scroll.  Let's go down towards the bottom of the
22 page a little bit.  Yeah.  That should do it.
23     A.   Okay.
24     Q.   It indicates:  He was anxious and
25 suspicious.

Page 76

1         What was your reaction to that?  Would
2 that be expected for a patient like Mr. Hilliard?
3     A.   Repeat the question, please.
4     Q.   Your note indicates:  He was anxious and
5 suspicious.
6         And I said:  Would that be unusual or
7 significant to you?  Why did you put that down on
8 the history?
9     A.   I'm reviewing the note, so give me a
10 second.
11     Q.   Okay.
12     A.   So where do you see the "anxious and
13 suspicious" about?  Are you implying that?
14     Q.   No.  It says Mental Status, Affect:
15 Anxious and guarded.  And then Mood:  Anxious and
16 suspicious.
17     A.   Okay.
18     Q.   What significance was that to you that
19 he was anxious and suspicious?
20     A.   So Mr. Hilliard has communicated to me
21 that he feels -- or at that time felt that people
22 in his office were out to get him.
23         And I think I -- down there in the
24 second paragraph under Problem -- stated during the
25 session doesn't trust anybody except his wife.

Page 77

1 People are out to get me.
2         And the information that I recall that
3 he communicated to me that he had another officer
4 in the department that he thought he was pretty
5 good friends with, and that officer apparently
6 violated his trust in some form or fashion.  And
7 the theme of "people are out to get me," I think
8 pertains, in the context of this as he's
9 communicated to me, were the people in his office
10 because he felt like that perhaps there was some
11 sort of plan or something going on.
12         As I go through my notes, I think I
13 elaborate more on that as we get down the road.
14     Q.   Is paranoia a symptom of opioid
15 addiction?
16     A.   Not necessarily of addiction.  I would
17 describe it more as a symptom of withdrawal,
18 because as I indicated here I reviewed and
19 reconciled the medications list.
20         Again, he reported seeing Dr. Shell on
21 7-18 and started Prozac.  Given a prescription for
22 Xanax and later stated he doesn't like taking meds,
23 so he didn't fill it.  And he said he's continuing
24 to take a half a tablet of Oxy and that his plan
25 was to stop it.  So as he's coming to the end of

Mark Gritton, LCPC                                                          June 03, 2020

Page 78

1  taking Oxy 100 percent, I would say that that
2  symptomatology, the anxiousness, the
3  suspiciousness, could be a symptom of that.
4        But again, with the situation, as he's
5  describing it, that people are out to get him at
6  work, then, you know, there is some validity to his
7  concern as far as being anxious and suspicious.
8     Q.  And in this document, again, you
9  diagnosed him with substance-induced depressive
10  disorder, correct?
11     A.  That's correct.
12     Q.  You continued to maintain that his Oxy
13  use caused depression; is that right?
14     A.  That is my belief.  Based on my
15  experience, yes, that's my opinion.
16     Q.  At the top of that page you indicate:
17  Current medications documented.
18        Did you document any medications other
19  than the Prozac, the Xanax, and his oxycodone use
20  at a half a tablet for two days?
21     A.  No.  That's what was reported to me by
22  him, so that's what I put down.
23     Q.  Your notes indicate:  He stated he feels
24  his Oxy is not contributing to his depression.
25        Did you disagree with that?

Page 79

1     A.  To some extent, and this is why:
2  Because he felt like he was managing the
3  symptomatology, but yet with my experience in
4  seeing people coming down from Oxy, to me this
5  is -- this is very -- I'll use the word "classic";
6  that is, the depressive symptoms and, again, the
7  weeping, the crying, the sadness, and so forth.
8        And he thought that as close as he was
9  to the end or stopping his medication, that he
10  should be done with that, so he was not accepting
11  the idea that his body is going to need some time
12  to fully get rid of that so he's not under the full
13  influence or have that influence of the Oxy in his
14  body, in his brain.
15     Q.  Your notes indicate that:  He stated he
16  has voices in his head that talk to him.
17        Is that consistent with opioid
18  withdrawal?
19     A.  It can be a symptom, yes.
20     Q.  Did you --
21     A.  Because, you notice there I said:  He
22  stated he has voices in his head that talk to him.
23        He did not elaborate as to what the
24  voices tell him.  So when someone tells me they
25  hear voices, I always probe and ask:  So, you know,

Page 80

1  what do the voices tell you?  When did you hear
2  them?
3        He just didn't want to talk about it
4  because -- he chose not to.  I don't know what his
5  reasoning was.
6     Q.  Were you worried about the voices in his
7  head?
8     A.  No, not at that time because --
9  oftentimes my experience tells me when people hear
10  voices in their head, they are typically things
11  telling people to do things like "You need to go
12  jump off the bridge," or "You're a bad person, so
13  you should hurt yourself," or things like that.
14        Or, conversely, I think of schizophrenic
15  people who hear voices that tell them that they're
16  Jesus Christ.  They take off their clothes.  They
17  give all their possessions away, and they run away
18  naked until the cops catch them.
19        Brent was not in that frame of mind.
20  Had he have been or if I had identified something
21  that was concerning, I would have noted it further.
22     Q.  When I asked if you were worried about
23  the voices in his head, you said:  Not at that
24  time.
25        Did there ever come a time where you

Page 81

1  were worried about voices in his head?
2     A.  He did not report in any further
3  sessions that he heard voices.
4     Q.  Were you ever worried about it, then?
5     A.  No.  I believe Brent and I connected as
6  therapist and patient.  I believe he had a level of
7  trust with me.  He was talking to me about things
8  that, you know, most people wouldn't normally talk
9  about unless they trusted you.  For instance, being
10  able to talk about the pain meds, the people that
11  he works with, his relationship, you know, with his
12  wife and how he trusts her and he doesn't trust
13  other people, those kinds of things.  I believe him
14  to be fairly honest.  I've not had any reason to
15  doubt his honesty or his desire to get help.
16     Q.  Your note indicates that as of July 19th
17  he had an extreme risk of withdrawal issues and
18  that his wife was aware of the situation.
19        Why was it an "extreme risk of
20  withdrawal issues"?  What did you mean by that?
21     A.  Well, because he's coming to the end of
22  taking his opiates.  So when a person stops a
23  hundred percent, the brain sometimes rebels against
24  that because the brain likes the opiates, and that
25  puts people at risk.

Mark Gritton, LCPC                                          June 03, 2020

Page 82

1      So that week after for sure is an
2  extreme time because people can go back to it
3  because it becomes unbearable.
4      Q.  I'm going to show you a document labeled
5  Hilliard-616.
6      A.  Okay.
7      MS. HOWLAND:  This is one of Dr. Waters'
8  notes dating back to March of 2017.  This is
9  labeled Exhibit 4.
10     (Deposition Exhibit No. 4 was marked.)
11     Q.  (BY MS. HOWLAND) I'll let you tell
12 Jennifer when you need her to stop as she's
13 scrolling through there so you can get a good look
14 at it.
15     A.  Okay.  I don't see it yet.
16     MR. HEPWORTH:  What page?
17     MS. HOWLAND:  This is Hilliard-616.
18     THE WITNESS:  What is the date at the top of
19 this form?
20     Q.  (BY MS. HOWLAND) It's March 20th, 2017.
21     A.  Okay.  I see it there.  Encounter date:
22 3-20-17.
23     Okay.  Continue on.
24     Q.  So fair to say you've never seen medical
25 records from Dr. Waters?

Page 83

1      A.  I did not find any in my files when I
2  looked during our break.
3      Q.  Okay.
4      A.  So you can scroll down, please.  Scroll
5  some more.  Okay.  Let me look here for a moment.
6      Valtrex.  Soma.  He was taking Soma,
7  Prevacid, oxycodone.  Okay.
8      Scroll down some more, please.  Continue
9  scrolling.  Okay.  Scroll some more, if there's
10 more to see.  Keep going.
11     Q.  I think that's it.
12     A.  Okay.
13     Q.  Yep.  So did you see in there where in
14 March of 2017 he had prescriptions for oxycodone?
15     A.  Correct.  I see it there.  It says
16 discontinued.
17     Q.  Okay.
18     A.  So he didn't get any refills.  So he was
19 not taking it, from what I can see.
20     Q.  It looks like it's ordered down at the
21 bottom there.  Do you see that?
22     Ordered oxycodone.  Start March 20th.
23 End March 29th.
24     A.  Correct.  But when I read that -- when I
25 see "discontinued," and it says, "dispense and

Page 84

1  refills," I guess I would have to look at a
2  pharmacy report to see if he actually got those.
3      Q.  Do you know why it would be reordered if
4  he wasn't going to take it?
5      A.  I don't know.  That's a question you'd
6  have to ask the prescriber.
7      Q.  Okay.  Would that matter, for purposes
8  of your analysis in July of 2017, that he was
9  taking oxycodone in March of 2017?
10     A.  I don't think so.  And the reason why is
11 is because it's still an opiate.  If he reported to
12 me that he was taking Oxys as opposed to -- in this
13 case Oxy -- well, this is Oxy, so it's still the
14 same thing if he's still taking it, so I don't see
15 a difference.  It would still be what it is.
16     Q.  Would it matter for purposes of a
17 tolerance level or withdrawal symptoms?
18     A.  Yes.  In that respect, yes.  But if he's
19 stair-stepping off of this, we would still be where
20 we're at in my notes.  I don't think what he was
21 taking three months before is going to necessarily
22 affect the moment; that is, he's trying to titrate
23 down, stop, reduce the daily intake of it so he
24 gets off of it.  So I don't know what you're trying
25 to ask me there, I guess.

Page 85

1      Q.  Well, I'm just trying to -- you had
2  indicated that you knew he was taking oxycodone
3  after his recent surgery, and I'm just trying to
4  understand if it's important if he was taking
5  oxycodone for months before that and at what point
6  it becomes a further indication of addiction.
7      A.  I understand, I guess, what you're
8  trying to ask me, and I don't know that I can go
9  back that far because I don't know the
10 circumstances of why he was being prescribed that.
11     It says -- when I look at that, it says:
12 Take one to two tablets by mouth every six hours as
13 needed for pain.  Oral.
14     So that tells me, at least as I
15 interpret that, that maybe he had some dental
16 surgery or something.  I don't know.  That's why
17 I'm saying:  I can't address this because I don't
18 know how long -- if he just took it for, like, 40
19 tablets until it was gone and he didn't get any
20 more, so he used it up in March and then didn't
21 take any more until later on.  I don't know.  It's
22 out of context for me.  I can't -- I can't address
23 that.
24     Q.  Let's talk about some of your other
25 medical records, your treatment notes for

Page 86

1  Mr. Hilliard.
2      A.  Okay.
3      Q.  Let's look at your July 25th, 2017,
4  note, which is at Hilliard-25.
5      A.  I have that in front of me as well as on
6  the screen.
7      Q.  Okay.  Do you see where you've got a
8  diagnosis code of F11.94, substance-induced
9  depressive disorder?
10      A.  Correct.  The same one that's been on
11  all my other notes so far.
12      Q.  Okay.  So the same diagnosis continued
13  on your appointment with him on July 25th, 2017?
14      A.  Correct.
15      Q.  Okay.  And when you look at the second
16  page, it talks about progress towards treatment
17  goals, and it says:  He's engaging in catastrophic
18  thinking and paranoia.
19          Tell us what that means and what you're
20  referencing there.
21      A.  Well, catastrophic thinking is assuming
22  the worst is going to happen to him.  So in the
23  context of this note, if you go back to the
24  problem, he talks about his family's history of
25  depression.  Says it runs in his family.  His wife

Page 87

1  is concerned and doesn't seem to understand.
2  Expects him just to get better.  He's isolating at
3  home.  He tried to return to work unsuccessfully.
4  Feels like he needs to do something but does not
5  want to go anywhere.
6          So catastrophic is:  My wife is going to
7  divorce me; they're going to fire me at my job; I'm
8  not going to be able to support my family; and the
9  sky is falling.  The paranoia is that extreme fear
10  about things happening.
11      Q.  So at that point, a week later, fair to
12  say he was still taking Oxycontin or had he
13  stopped?
14      A.  On 7-25?
15      Q.  Yes.
16      A.  According to the note I made here, he
17  says he's been off Oxy for three days as of
18  7-25-17.
19      Q.  Did you believe that he'd been off for
20  three days?
21      A.  I did.  During that time, he stated that
22  he saw Shelley Wray and she told him to stop taking
23  the Prozac.  And you'd have to pick it up from
24  there with her as far as what she may have
25  prescribed to him and how it affected his -- how it

Page 88

1  affected him.
2      Q.  Was he having withdrawal symptoms at
3  that appointment?
4      A.  I would say that he was still having
5  some because when you look at the depression, he
6  still is somewhat depressed in this in the sense of
7  the catastrophic feelings.  He's trying to deal
8  with the family issues.  I put in there:  Process
9  feelings, related family history, queried questions
10  he struggles with.
11          So I did some cognitive reframing and
12  challenging to address cognitive distortions,
13  helped him identify some goals, some specific
14  changes he wants to make in his life in his current
15  situation, give him some focus, something positive
16  to move towards.
17      Q.  You indicate that:  He does not like
18  medication, yet wants to get better.  His wife does
19  not understand him.  His family pretends nothing is
20  wrong.
21          When you say "his family pretends
22  nothing is wrong," was there something wrong at
23  that point?
24      A.  They're able to see his sadness, the
25  weepiness.  They've been with him through this

Page 89

1  process, and he is having -- you know, he is
2  concerned.  He's stressed.  So, yeah, they're able
3  to see that change.  So that's what they're trying
4  not to, you know, say:  Hey, there's a big pink
5  elephant in the room but nobody wants to talk about
6  it.
7      Q.  And you indicate --
8      A.  That's not uncommon for people that have
9  mental health issues.
10      Q.  Okay.  You indicated at that appointment
11  you thought his progress was minimal.
12      A.  As we ended the session, based on the
13  interaction of the day, yes, because he was focused
14  on the catastrophic thinking mostly, and instead of
15  using some of the tools to get himself back to a
16  good spot, he was just, you know, going down the
17  road to doom and gloom.
18      Q.  Based on his minimal progress, did you
19  think he should be back in the workplace at that
20  point?
21      A.  At that point, no.
22      Q.  Let's look at your treatment note from
23  August 1st, which is at Hilliard-23.
24      A.  Okay.
25      Q.  At that point you continued to diagnose

Mark Gritton, LCPC                                                    June 03, 2020

Page 90

1  him with substance-induced depressive disorder,
2  correct?
3      A.   Correct.
4      Q.   Did you believe at that point he had
5  discontinued use of Oxycontin?
6      A.   Yes.
7      Q.   Did you --
8      A.   I --
9      Q.   Whoops.  Sorry.  Didn't mean to
10 interrupt you.  Go ahead.
11     A.   I had no reason not to, so yeah, I
12 believe he'd stopped them.
13     Q.   How would you describe his condition at
14 that appointment?
15     A.   Let's see here.  I give him:
16 Appropriate affect, felt content, focused.  His
17 mood was appropriate.  No suicidal stuff.  He was
18 oriented.
19          I thought he was actually in probably a
20 pretty upbeat mood.  His wife did attend that
21 session.  He talked a lot.  Provided
22 psychoeducation to her as far as what do people
23 look like who have depression.  So we talked about
24 the depression itself.  We talked about the
25 symptomatology of people who are discontinuing

Page 91

1  opiates, especially Oxycontin.
2      Q.   What did his wife say about his
3  Oxycontin use at that appointment?
4      A.   As I recall, I think she was kind of --
5  the words I would use is she was learning about it
6  as opposed to having an opinion because I don't
7  think she had that awareness.
8      Q.   Was his addiction to Oxycontin
9  discussed?
10     A.   No, not in the form of addiction, per
11 se, because he had stopped it, but we were talking
12 more about the aftereffects, the symptomatology
13 that goes as your body starts to slough off the
14 rest of that drug and your brain is struggling
15 with, "Hey, where is this stuff at because I want
16 it," and how that affects the brain, because -- and
17 I'm not a neuroscientist, however, rudimentary --
18 from a rudimentary -- rudiment, basic position,
19 oftentimes opiates cause people to feel euphoria,
20 that is:  I feel really good when I take my
21 opiates, but when I stop taking them, I become
22 depressed.  I'm sad.  I'm grumpy.  All those kinds
23 of things because I'm not taking them anymore, so I
24 don't feel good.
25          So the brain needs time to slough off or

Page 92

1  process the opiates and get it out of your system.
2  Then your brain has to pick up the production of
3  the other feel-good things like oxytocin,
4  serotonin, and those kinds of
5  neurotransmitting-type drugs so that you start to
6  feel normal again.  That's why he started to see
7  Shelley to address that depression piece.
8      Q.   Okay.
9      A.   Okay.
10     Q.   Let's talk about your session on
11 August 9th, 2017 --
12     A.   Okay.
13     Q.   -- which is at Hilliard-21.
14          On that date you continued to diagnose
15 him with substance-induced depressive disorder?
16     A.   Correct.
17     Q.   At that point was it your understanding
18 he had stopped taking Oxycontin?
19     A.   Yes.  And he reports he started
20 Cymbalta, which I'm going to make an assumption
21 here that Shelley prescribed to him.
22     Q.   What is Cymbalta?
23     A.   Cymbalta is a psychiatric medication
24 that treats depression.
25     Q.   Do you believe the depression at that

Page 93

1  point was caused by the Oxycontin?
2      A.   I will say yes because he -- you know,
3  we're talking a period here of five weeks, so he's
4  still kind of in the throws of getting off the Oxy
5  and getting it out of his system, adjusting to life
6  without Oxy, which means he's still dealing with
7  residual pain and those types of things.
8          And I think in a prior note I talked
9  about the fact he's using exercise and those kinds
10 of things.  We've talked in a prior session -- I do
11 this with pain patients -- about alternatives to
12 taking opiates.  So that's all I'll say about that
13 for now.
14     Q.   He continued to be paranoid at that
15 time; is that right?
16     A.   I don't know that he was paranoid.  I
17 just put that he is still, you know, a little
18 bit -- I find he's anxious.  The sheriff wants to
19 meet with him.  His wife has a lump in her neck and
20 she's going in for a biopsy later this week.  He's
21 fearful.  He voiced apprehension about the
22 sheriff's meeting, and he feels that others are out
23 to get him.  He fears demotion at the sheriff's
24 office.  He was very vocal about that.
25          My sense by this time is I believe he

Page 94

1  feels that he's not going to get his job back, and
2  I don't know what some of the outside or other
3  influences were as far as what was occurring at
4  work. Nothing that he shared with me, because as
5  far as I know he didn't go into work during this
6  time.
7        And, again, I challenged, reframed
8  cognitive distortions, reviewed CBT tools, keeping
9  head in a positive manner, and we left it off
10  there.
11        Q.  Where it says "He feels others are out
12  to get him," is that paranoia?
13        A.  I would say in this context, because he
14  shared with me some of the experiences he's had
15  with the sheriff's department, and he's -- as I
16  recalled, he's been there a long time, and I think
17  there's been -- as I recall, he explained to me
18  that people come and go and sometimes there's a lot
19  of political stuff and just the office things that
20  happened, so he believed that, again, that others
21  were out to get him. I don't know if that was
22  paranoia. He explained that the -- one of his
23  friends there, who was another deputy or was an
24  officer there, did something and he didn't really
25  want to talk too much about that because it

Page 95

1  happened and he was upset about it. And that, I
2  believe, is the basis for his "people are out to
3  get me," because, you know, friends are friends and
4  all that kind of stuff with other friends and
5  everybody has got their own agenda, those kinds of
6  things.
7        Q.  In the Plaintiff's Expert Witness
8  Disclosures, it states that at the time you saw
9  Mr. Hilliard, you thought he was being paranoid,
10  but now you agree that his concerns were valid.
11        Is that an opinion you're going to give?
12        A.  So refer me back to where that statement
13  was made.
14        Q.  In the Plaintiff's Expert Witness
15  Disclosures in this case.
16        MR. HEPWORTH: He hasn't been provided that,
17  so you might show it to him.
18        Q.  (BY MS. HOWLAND) Well, let me ask the
19  question: I mean, is it your opinion that
20  Mr. Hilliard's concerns about the Twin Falls County
21  Sheriff's Office were valid?
22        A.  To some degree, yes, because there's
23  been a theme through there, and when I look in my
24  mind and say, "What is paranoia versus anxiety,"
25  you know, they are similar but different. Can we

Page 96

1  describe this as paranoia in some aspects?
2  Perhaps, but there is a lot of anxiety as well.
3        So, you know, that's -- yeah. I can get
4  out my book here and parse those two out real
5  quick, if you'd like, and I can give you a more
6  definite answer.
7        Q.  Well, what I want to know is why you
8  think his concerns were valid.
9        A.  Because of the experiences, the examples
10  he shared with me about some of his contacts with
11  the people he thought were his friends in the
12  sheriff's department.
13        And I did not take detailed-enough notes
14  to recall the specific person who did the specific
15  thing to him and why that violated his trust and
16  confidence with that person, and -- other than to
17  say it was somebody who he works with and he
18  trusted them with some information, and that
19  information apparently got back to someone that
20  caused him some kind of problem at work.
21        Q.  But if I understand your testimony
22  earlier, his paranoia was caused by his opioid
23  withdrawal, correct?
24        A.  At that time it was early on enough,
25  yes, because I was -- you know, you need to see

Page 97

1  someone over a little bit of time to see what stays
2  constant and what goes away.
3        Q.  And you thought that in July 2017,
4  Hilliard should have been out of the workplace,
5  correct?
6        A.  Correct. He should not have been at
7  work.
8        Q.  Okay. So how do you know his concerns
9  were valid? Did you ever talk to anybody at the
10  Twin Falls County Sheriff's Office?
11        A.  I cannot without a release from
12  Mr. Hilliard, so I did not.
13        Q.  So what are you basing your confirmation
14  that his concerns were valid on?
15        A.  His --
16        MR. HEPWORTH: I'm going to object to the
17  question -- just a second. You started talking
18  about our expert disclosure, and I think it's only
19  fair -- I've expressed what his opinions, I think,
20  will be at trial, and he has not seen what I wrote
21  based on the conversation I had with him, and now
22  you're looping back and asking him about questions
23  that he knew at the time in August of 2017. We
24  know a lot more about what happened now, today,
25  than what he knew or what even Brent knew in 2017.

Page 98

1    So if you're going to ask questions
2  about what he's going to testify to at trial, you
3  probably need to establish what the facts are as we
4  know them today.  I think it's kind of -- the
5  questioning is a little bit unfair.
6    MS. HOWLAND:  Okay.  Well, that's fine.
7    **Q.  (BY MS. HOWLAND) Let's keep going**
8  **through your medical records, and then when we're**
9  **done and we have everything out there, we'll go**
10 **back through the expert disclosure.  Because do you**
11 **understand, Mr. Gritton, that this is my time to**
12 **get everything you're going to testify about at**
13 **trial out on the table and to ask questions about**
14 **it?**
15   A.  I understand that, yes.
16   **Q.  Okay.  That's all I'm trying to do here.**
17   MR. HEPWORTH:  You were referring to the
18 document that I wrote, and you specifically asked
19 him about it, so if you want to ask him about it,
20 show it to him.  That's all I'm saying.
21   MS. HOWLAND:  I think I just said I'm going
22 to, but I'm going to ask some other questions
23 first.
24   THE WITNESS:  Okay.  Because I do not have
25 access to that document, so I think it's rather

Page 99

1  unfair for you to ask questions about it.  I agree
2  that without that, I don't know.  Because when I
3  talked with Mr. Hepworth and he took his
4  impressions and put that into written form, I have
5  not seen that, so I can't -- does that make sense?
6  I'm happy to answer the notes, but like he said, if
7  you're going to talk about what he wrote in a
8  statement to you, then I need to see that, I think.
9    **Q.  (BY MS. HOWLAND) Yes.  I think I just**
10 **said I was going to show it to you, but I'm going**
11 **to ask some other questions first.**
12   A.  Okay.  So let's move on.  Thank you.
13   **Q.  Yeah.  So, I guess before we do, that**
14 **makes me curious.  What do you think are the**
15 **opinions you're going to give in this case?  What**
16 **did you tell Mr. Hepworth that you want to testify**
17 **about here?**
18   A.  Well, I indicated that I would testify
19 to my notes.  And my opinions about Mr. Hilliard,
20 as I progress through this, I believe he got to the
21 point that he was well enough to return to work;
22 that is, he was mentally stable.  And someone can
23 be taking medications and be mentally stable as
24 long as they're prescribed and managed by a
25 prescriber that's qualified to do that.  And I

Page 100

1  released him from my care after we completed what
2  we needed to.  I wrote a letter to that effect.
3    Now, my understanding is is he was
4  terminated from employment.  I don't know all the
5  ins and outs of that, but up to that point in my
6  care, I believed him good to go.  That's my
7  opinion.  I believe he could have returned to work.
8  And after reviewing that document you put up about
9  his job duties and so forth, after I was through
10 helping him, I believe he could have returned to
11 work.
12   **Q.  So you didn't think he was suicidal,**
13 **then?**
14   A.  No.  Where does it say I thought he was
15 suicidal?
16   **Q.  Well, I'm just asking the question.**
17 **That's what he says.  He says he was suicidal, and**
18 **the opinion that I'm going to show you says Twin**
19 **Falls County Sheriff's Office caused him severe**
20 **emotional distress.**
21   A.  Okay.  So I would have questions, then,
22 that I would want to ask because I can only address
23 what I've put here.
24   So, for instance, let's assume that for
25 whatever reason the Twin Falls County Sheriff said,

Page 101

1  Hey, we don't need your services anymore because
2  you -- because I see that he got his DUI -- he got
3  a DUI and, you know, we can't have that in our
4  department.  You're fired.
5    If that's the case, was he given the
6  opportunity to have the opportunity to go do
7  treatment, if that's what was required?  And I get
8  it that maybe he decided to become suicidal after
9  they told him, "Hey, you're no longer working for
10 us."
11   But yet when I think about that,
12 Mr. Hilliard has been a police officer for a long
13 time.  I have a brother that's a police officer.
14 He doesn't -- they have a different set of friends,
15 and most of those friends, their social world
16 revolves around their law enforcement friends.  So
17 he would have been, I guess in a sense, ostracized,
18 is what my opinion would be and with every- -- you
19 lose that, he's lost his identity and everything, I
20 could see the opportunity for him to say, "Well,
21 there's no more future for me.  Goodbye, cold cruel
22 world."  That's extreme, but sometimes people go
23 there.
24   **Q.  Did he tell you that when you treated**
25 **him?**

Mark Gritton, LCPC                                                    June 03, 2020

1      A.   Did he tell me what?
2      Q.   That he was suicidal.  Goodbye, cruel
3  world?
4      A.   No.  There was no hint of suicidality.
5  What I'm saying is something -- from the time I got
6  with him and was done with him to the time he
7  decided to become suicidal, something must have
8  happened.  I don't have the knowledge of what that
9  was other than he was fired from the sheriff's
10  department.  Would that make somebody suicidal?
11  Well, in this case, I can see that happening
12  because of his position as a law enforcement
13  officer.  Again, their social structure is
14  generally built around the friends, the people they
15  work with.
16          And the other thing, I guess, is looking
17  now putting that together with what's in his notes
18  about people he doesn't trust, you know, we could
19  make some assumptions in that case.
20      Q.   So are you giving an opinion he was
21  suicidal based on things that happened after you
22  stopped treating him?
23      A.   That's a possibility.  I don't know.
24      Q.   I'm asking you if that's your opinion.
25      A.   I didn't see him after that, so I can't

1  say, "Oh, he was suicidal," because I didn't see
2  him.
3      Q.   Right.  That's my point.
4      A.   I had no more contact with him after, it
5  looks like, 9-6 of '17.
6      Q.   Right.  So you can't give an opinion as
7  to his mental state after you stopped treating him.
8      A.   That's correct.
9      Q.   Okay.
10      A.   But I could postulate, based in
11  generalities, somebody that's lost that social
12  structure and support that they've had for umpteen
13  years, however long he's worked there, I think
14  depending on the person, that could lead them to
15  that point, yes.
16      Q.   Have you reviewed the policies at the
17  Twin Falls County Sheriff's Office?
18      A.   I have not.
19      Q.   Have you reviewed any facts related to
20  his termination?
21      A.   I have not reviewed any facts.  I have
22  seen a document, I think, from the -- that was
23  shared with me by Mr. Hepworth.
24      Q.   Have you talked to Mr. Hilliard about
25  his termination?

1      A.   I have not.
2      Q.   Have you talked to anyone at Twin Falls
3  County about his termination?
4      A.   No.  But from a traumatic point of view,
5  trauma, what constitutes psychiatric trauma?  So if
6  we look at this from a general perspective of
7  psychiatric trauma, is Mr. Hilliard's firing from
8  his job, with whatever events happened, traumatic
9  to him to the point he could become suicidal?
10  That's a possibility, in my opinion.
11      Q.   Do you plan on giving that opinion at
12  the trial in this case?
13      A.   If asked, yes.
14      Q.   And is that appropriate in your
15  profession to give an opinion about psychiatric
16  trauma based on the fact that the opinion you're
17  giving involves a patient you ceased treating,
18  based on the fact that opinion involves
19  circumstances that you have absolutely no facts
20  about?
21      A.   In a general sense, I would be willing
22  to explain that in that sense, yes, because
23  trauma -- what constitutes trauma in a general
24  sense?  So from a psychiatric perspective, mental
25  health perspective, what is trauma?  Trauma can be

1  a divorce.  Trauma can be a life -- a major life
2  change, a job, losing your job.  It can be, you
3  know, somebody close to you being -- losing their
4  life, passing away.  Your dog gets run over on the
5  street.  So, anyway.
6      Q.   I'm just trying to make sure I
7  understand this.  I'm kind of confused.  So is it
8  your opinion that Brent Hilliard was suicidal after
9  you ceased treating him?
10      A.   I can't say that he was suicidal after I
11  treated him.  I did not see him.  No, it is not my
12  opinion that he was suicidal after I stopped
13  treating him.
14      Q.   Okay.  That's what I needed to know.
15      A.   Okay.
16      Q.   Is it your opinion he was fit for duty
17  after you stopped treating him?
18      A.   Yes.  And I wrote a letter to Tom
19  Carter, the Twin Falls County Sheriff, and outlined
20  in that letter Brent's progress and addressed his
21  ability to return to work as a deputy for the
22  office-initiated treatment.  He's maintained 100
23  percent attendance to his sessions.  He's referred
24  to Shelley Wray for psychotropic medication
25  evaluation and ongoing medication management.

Mark Gritton, LCPC                                            June 03, 2020

---

Page 106

1   As I documented in my notes, he stopped
2   taking Oxycontin, the opiates. His mood
3   stabilized. He's reported re-engagement in some
4   activities of life. And I believe he was in a
5   position that he could return to work.
6   **Q. Was he fit for duty on September 6,**
7   **2017?**
8   A. September 6th. Yes. And I wrote that
9   letter August 24th. I met with him one time after
10  that. At that time I referred him for EMDR to
11  address some PTSD issues he identified. And that's
12  when he saw Justine Sweet to go back and do EMDR
13  with him. That was going to be the plan.
14  **Q. Is an officer fit for duty if he gets a**
15  **DUI?**
16  A. I would say not.
17  **Q. Is an officer fit for duty if he's**
18  **suicidal?**
19  A. No.
20  MS. HOWLAND: Let's go through your expert
21  opinions here. I'm going to hand you what I am
22  going to mark as Exhibit 5.
23  (Deposition Exhibit No. 5 was marked.)
24  **Q. (BY MS. HOWLAND) Jennifer is going to**
25  **pull that up and show it to you so you can see the**

---

Page 107

1   opinions that the plaintiff's counsel has said you
2   are going to make in this case.
3   A. Okay. Can we interrupt here for a
4   minute? I need to interrupt for a second.
5   **Q. Sure.**
6   A. Do you anticipate us going past 1:00?
7   **Q. It's ten 'til 12:00. No, I don't think**
8   **so.**
9   A. Okay. Because if so, I need to have my
10  staff call and cancel appointments. I had cleared
11  my calendar through noon, but I needed to make
12  sure. So if I need to cancel appointments, I need
13  to give the folks a little bit of time and a little
14  bit of notice.
15  **Q. I know I'll be done by then.**
16  A. Okay. So you can scroll down, if you
17  would. Where are we at? Okay. Here we go.
18  Please scroll down. Scroll again. Okay. I'm
19  ready to answer questions.
20  **Q. Okay. So is there anything in this**
21  **write-up that you disagree with? Is there anything**
22  **that says you're going to give an opinion about**
23  **that you're not going to give an opinion about?**
24  A. Okay. One thing that I probably would
25  take and change or not be able to -- scroll back up

---

Page 108

1   one page, please. Let me go back down through
2   there.
3   So on section 4 there -- one, two,
4   three, four, five, six, seven -- the seventh and
5   eighth line there, it says: Regarding his opinion,
6   should return to light-duty work.
7   I did not specify what kind or what --
8   light or heavy or anything like that. It should
9   just be return to work.
10  **Q. Was it your opinion he should return to**
11  **work without any restrictions?**
12  A. I did not see any reason for him to have
13  any restrictions at the time, so he could return to
14  work, yes.
15  **Q. But you didn't have his medical records**
16  **at that time?**
17  A. I did not.
18  **Q. Would your opinion change if he**
19  **continued to take prescription painkillers?**
20  A. It would change, yes.
21  **Q. Would your opinion change if he took**
22  **other drugs that could impair his ability to work?**
23  MR. HEPWORTH: I'm going to object. I think
24  that's outside his expertise, but go ahead if you
25  can answer it.

---

Page 109

1   THE WITNESS: Well, I was going to say: I
2   don't know that I can -- I don't know what -- I
3   don't know that I can address that because I don't
4   know what those other drugs were that could impair
5   him. If it's opiates, I believe he would be
6   impaired.
7   **Q. (BY MS. HOWLAND) Tell me what you mean**
8   **by "Mr. Gritton is knowledgeable regarding**
9   **Hilliard's mental health as well as the severe**
10  **emotional distress caused by Defendant's conduct."**
11  **Tell me about that. What's the severe**
12  **emotional distress caused by Defendant's conduct?**
13  A. So as I discussed with you earlier, when
14  someone has a traumatic event, they can do -- they
15  can do things like become suicidal. And based on
16  what's happened here, Mr. Hilliard deciding to go
17  out and drink, drive, take his life was totally out
18  of character for him. He's a police officer. He's
19  been doing this. So reasonably, logically, the
20  fact that he got fired, I believe, contributed to
21  his desire to take his life.
22  **Q. Would that be your testimony even if the**
23  **termination was in accordance with policy?**
24  A. Yes, because he's still -- he
25  experienced the trauma and logically reacted -- or

---

**Page 110**

1  could react to it the way he did.
2       Now, whether or not he was fired for
3  cause or for justifiable reasons, I can't address
4  that piece, but I could and can address:  What
5  could a person do who has experienced that, from a
6  psychological perspective?  Could they go on a
7  bender and drink?  Could they take drugs?  Could
8  they, you know, take your own life?  Commit
9  self-harm?  Absolutely.  I think that would be well
10  within the expectations of somebody who experiences
11  something and they don't have the ability or it
12  overwhelms them to the point they can't cope with
13  it from a psychological perspective.
14       **Q.   Is it your testimony anytime someone**
15  **gets terminated it's a traumatic event?**
16       A.   Not necessarily.  And an example of that
17  would be an employee.  I can use a personal
18  example.  I had an employee who was showing up to
19  work smelling of alcohol.  This employee works with
20  patients and drives a vehicle.  We addressed it
21  with the employee.  We gave him a chance to go and
22  get treatment.  We offered to pay for the
23  treatment.  They turned it down.  They were
24  terminated because we gave them the opportunity to
25  address it and they chose not to.  They chose to go

**Page 111**

1  ahead and drink and do what they wanted to do.
2       So is that a traumatic event?  Did that
3  person go commit suicide?  No.  They're working at
4  another agency, sadly.
5       **Q.   Have you terminated other people before?**
6       A.   Yes, I have.
7       **Q.   And is it your testimony that unless you**
8  **give someone a chance to remedy the problem,**
9  **termination is a traumatic event that could cause**
10  **severe emotional distress?**
11       A.   Not necessarily.  I would disagree with
12  that.  If somebody has the opportunity -- because I
13  value employees.  I value the investment and the
14  time I've spent helping an employee be successful.
15  I want to give them a chance to save that if
16  they're willing to.  If they choose not to, that's
17  their choice.  I respect choice.  Choice and
18  consequences.
19       **Q.   And did the Twin Falls County Sheriff's**
20  **Office value Mr. Hilliard's employment?**
21       A.   I can -- I can't say that I've seen any
22  evidence that says they do or they don't other than
23  the fact that he's remained employed there
24  successfully, as he reported to me.  I've seen no
25  documentation that says he's done any subminimal

**Page 112**

1  job or had any kind of write-ups or anything that
2  would cause him to lose his job.  So that's all I
3  have to say about that.
4       **Q.   Now, he was employed there more than 20**
5  **years, right?**
6       A.   That's my understanding.  Quite a long
7  time.  Most of his career.
8       **Q.   Well, let's see here.  What is your rate**
9  **that you're being compensated at in this case?**
10       A.   $500 per hour.
11       **Q.   Okay.  Turning to the second page of**
12  **your testimony, it indicates:  Mr. Gritton is**
13  **expected to testify consistent with his records**
14  **that Mr. Hilliard was very motivated to return to**
15  **work and followed the directions he had been given**
16  **by the Twin Falls County Sheriff's Office to get**
17  **off pain medication, pursue counseling, obtain a**
18  **substance abuse evaluation, and doctor releases.**
19       **Do you see that?**
20       A.   I see that.
21       **Q.   Okay.  Now, how do you know that**
22  **Mr. Hilliard was off of his pain medications at the**
23  **time you stopped treating him?**
24       A.   By his self-report.
25       **Q.   Would your opinion change if his medical**

**Page 113**

1  records indicate otherwise?
2       A.   They may.
3       **Q.   And do you see the sentence that I asked**
4  **you about earlier where it says:  Mr. Gritton**
5  **thought at the time Mr. Hilliard was being**
6  **paranoid, but now agrees Hilliard's concerns were**
7  **valid?**
8       A.   You addressed this a little bit ago, but
9  I'll revisit it.
10       So paranoia is -- in this case, to me,
11  is interjectible or interchangeable with anxiety.
12  And paranoia is a fear that something is going to
13  happen and you're absolutely convinced of it, but
14  yet there's -- you know, there's not a whole lot of
15  tangible stuff that you can grab hold of.  As we
16  progress through this, like I said, it became a
17  theme, and as he shared stories about what's
18  happened and his fears, to me, it's -- it started
19  to gain validity; that is, I believe some of his
20  concerns were valid based on my understanding of
21  what he shared with me as we've gone through this
22  process.
23       **Q.   I'm still trying to understand that,**
24  **because you understand he was terminated after he**
25  **got a DUI, correct?**

Mark Gritton, LCPC                                    June 03, 2020

Page 114

1    A.  Correct.
2        Q.  So what were the concerns that were
3    valid?
4        A.  So he voiced -- and I believe I've
5    documented that in there a couple times -- that he
6    felt that others were out to get him; that there
7    was some sort of effort to undermine his employment
8    position.  I believe I documented somewhere in
9    there that he said that he felt like he was going
10   to be terminated from his employment.  And I don't
11   know when he got word that he was terminated.  Was
12   that before or after he got his DUI and attempted
13   self-harm?
14       Q.  He was terminated for getting a DUI.  So
15   what is your opinion that supports the
16   conclusion -- what facts are you relying on that
17   others were out to get him?
18       A.  Just the information that he shared with
19   me personally in session.
20       Q.  And what facts did you rely on in
21   concluding others were out to undermine his
22   position?
23       A.  Again, he indicated to me that one of
24   the other deputies there, one of the other police
25   officers, he had shared information with and they

Page 115

1    disclosed it to someone higher up the food chain,
2    and it caused him to have some problems.
3        Q.  Do you know who Dr. Tye is?
4        A.  I do not.  I've never met Dr. Tye, nor
5    heard of him.
6        Q.  He is the doctor that performed the
7    fitness for duty on Mr. Hilliard.  Have you ever
8    seen the fitness for duty evaluation?
9        A.  Yes, I have.
10       Q.  Okay.  Did Mr. Hilliard ever tell you
11   that Dr. Tye wanted to speak with you?
12       A.  No.
13       Q.  Did you know that Mr. Hilliard refused
14   to allow Dr. Tye to speak with you?
15       A.  No, I did not.
16       Q.  Do you know why he would not allow
17   Dr. Tye to speak with you?
18       A.  No.
19       Q.  You're not a psychiatrist, correct?
20       A.  That is correct.
21       Q.  Okay.  What you do is different than
22   what a psychiatrist would do?
23       A.  In some aspects, yes.
24       Q.  Would you treat someone for substance
25   abuse different than a psychiatrist would?

Page 116

1    A.  Repeat the question, please.
2        Q.  Would a psychiatrist treat someone for
3    substance abuse in a different way than you would?
4        A.  I guess that depends.  And I'm going to
5    qualify that answer because I don't know if the
6    psychiatrist has had experience or training in
7    assessment of substance abuse or treating substance
8    abuse.  My understanding of psychiatrists are they
9    do psychological assessments, evaluations.  They
10   see patients for psychotherapy and prescribe
11   medications.
12       Q.  Are there psychiatrists in Twin Falls?
13       A.  There might be one or two or three.
14   There's not many.  We have a hard time keeping
15   psychiatrists in Twin Falls.
16       Q.  How about psychologists?  You're not a
17   psychologist, correct?
18       A.  I'm not a psychologist.
19       Q.  Are there psychologists in Twin Falls?
20       A.  Correct.  There are.
21       Q.  How many, do you think?
22       A.  Probably six or eight.  That's just a
23   guess.  Obviously I don't take a population count
24   on them, but, you know, give or take.
25       Q.  Let's take a look at your doctor's note

Page 117

1    from a session on August 22nd, 2017.  This is at
2    Hilliard-17.
3        A.  Okay.  I have it here in front of me.
4        Q.  Okay.  The diagnosis on August 22nd was
5    different than the prior diagnosis of
6    substance-induced depressive disorder; is that
7    right?
8        A.  That's right.
9        Q.  Okay.  Why did the diagnosis change?
10       A.  After -- let's see.  How do I want to
11   state this?  So Brent had completed, by his
12   reports, removing himself off of the opiates, and
13   once that's done, he's considered to be in
14   remission.  So I then updated the diagnostics to
15   reflect his depression and his anxiety.
16       Q.  At that time did you think Mr. Hilliard
17   was suicidal?
18       A.  No.
19       Q.  We've talked about the expert witness
20   report and the expert witness disclosure.  Is there
21   anything else --
22       A.  Can you go back to that report?  I
23   thought there was one other thing I wanted to
24   address.
25       Q.  Yep.  Let's go back to that.  That's

Mark Gritton, LCPC                                    June 03, 2020

---

**Page 118**

1  Exhibit 5.
2      A.  So let me -- so I'm going to ask that
3  we -- maybe we change this -- so this page that
4  we're looking at says:  Expected to testify
5  consistent with records.  Hilliard is very
6  motivated to return to work.  That's accurate.
7      Followed the directions he'd been given
8  because he communicated to me that he needed to do
9  the things that are identified there.
10     And he did communicate -- through my
11 notes -- that he did not trust -- was figuring he
12 was going to lose his job.
13     And the next piece is true.  I didn't
14 see any reason why he couldn't return to work.  I
15 wrote a letter to that effect.
16     We addressed the paranoia, I think.  I
17 don't know if Twin Falls County's conduct was
18 unreasonable.  I have no way to ascertain that,
19 however, I think that's what you guys get to duke
20 it out in court over.
21     So Captain Hilliard became suicidal as
22 reported to Crosspointe as reflected in
23 Crosspointe's medical records.
24     Where did -- where did that -- where is
25 that at?

---

**Page 119**

1      Because I've got to ask that of you,
2  Jeff, because we talked about that.  I don't know
3  that --
4      MR. HEPWORTH:  I had Brent sign a release so
5  that you could review the other Crosspointe
6  records, and in the Crosspointe records -- and I
7  think it was -- I don't know if it was Shelley Wray
8  or what other provider at Crosspointe talked about
9  his suicidal --
10     THE WITNESS:  That may have been Shelley's
11 records.
12     MR. HEPWORTH:  I've asked you to review
13 those.  I thought you had reviewed those.
14     THE WITNESS:  Well, I looked through them,
15 but I hesitate to get into them because -- or at
16 least to testify to this point or -- because
17 they're not my records.  They're Shelley's.  And I
18 think in hindsight that that would probably be a
19 better thing to have her attest to that than
20 myself.  But if they're in the records, then
21 they're in the records, but I can't -- you know, I
22 can't vouch for the -- for her records.  That's
23 outside of my scope.  That's unethical.
24     MR. HEPWORTH:  Well, you would agree -- I'm
25 just reporting our conversation.  Our conversation

---

**Page 120**

1  was that you would review those records and you
2  told me -- and you asked me to get a release from
3  Captain Hilliard so that you could.
4      THE WITNESS:  Right.
5      MR. HEPWORTH:  He did sign a release so that
6  you could.
7      THE WITNESS:  Right.  I don't think we had a
8  follow-up conversation after I got the records,
9  though.
10     MR. HEPWORTH:  Yeah.  What I assumed that
11 you would do -- because an expert witness can rely
12 on other people's records, and so I'd asked you to
13 look at Shelley's records and -- I expect her to
14 testify with her records.  I expect you
15 to testify consistent with your records.  And
16 that's --
17     THE WITNESS:  Okay.  Well, I haven't taken
18 the -- I need to rephrase that:  I would need to go
19 back through these, then, and do some highlighting
20 and gain a deeper understanding, then I could
21 testify to some of that, I'm sure, but --
22     MR. HEPWORTH:  You haven't looked at the
23 records?
24     THE WITNESS:  Not in depth and actually gone
25 through and marked them up.

---

**Page 121**

1      MR. HEPWORTH:  Yeah.
2      THE WITNESS:  So that clarifies that.
3  Sorry.
4      MR. HEPWORTH:  That's all right.  We'll ask
5  you to do that before you testify.
6      THE WITNESS:  Okay.  I can do that.
7  Absolutely.
8      MS. HOWLAND:  Well, I'm going --
9      THE WITNESS:  I didn't think I can --
10     MS. HOWLAND:  I'm going to put an objection
11 on the record.  I mean, the witness disclosure has
12 come and gone.  He said he can't give that opinion,
13 it's not ethical, and he hasn't reviewed them.  So
14 I'm going to object to any type of change in his
15 testimony after today based on what he has or
16 hasn't reviewed.
17     MR. HEPWORTH:  Our expert disclosure, I
18 think is accurate, so --
19     THE WITNESS:  Okay.
20     MR. HEPWORTH:  -- you've been advised of --
21 and I think I've clarified it, so that's all I'm
22 going to do.
23     Q.  (BY MS. HOWLAND) Was there anything
24 else, Mr. Gritton, that you wanted to talk about in
25 regard to this disclosure?

---

Mark Gritton, LCPC                                          June 03, 2020

Page 122

1    A.  I don't think so.  I think it's fairly
2  accurate as reported, per our conversation.
3    Q.  With the caveats that we've just
4  discussed?
5    A.  That's correct.
6    Q.  Okay.  Let's talk about your treatment
7  notes from September 6th, 2017.
8    A.  Okay.
9    Q.  And that's at Hilliard-9.
10   A.  Okay.
11   Q.  Was this your last appointment with him?
12   A.  Yes, this was my last appointment with
13 him because the next record is from Justine Sweet.
14 So this was my last visit with Brent.
15   Q.  And on that visit, you noted that there
16 was no risk of self-harm or suicide, correct?
17   A.  That is correct.
18   Q.  You indicate in the notes:  The
19 psychiatrist the sheriff's department uses in Boise
20 is taking his time in getting his report to the
21 sheriff.  We discussed processes and things that
22 happen at their own speed.
23       What did you talk about in regard to
24 that discussion?
25   A.  I discussed with Brent that sometimes

Page 123

1  when they do psychological evaluations, and if it's
2  coming from the psychiatrist, my assumption is it's
3  some kind of evaluation in this case or return to
4  work, and Brent was not happy with the process
5  because, again, he's wanting to get back to work.
6  He's motivated.  He's excited to think he's going
7  to get back to work, so he was just voicing that.
8       Part of what I try to do sometimes is
9  when people have expectations like that that, you
10 know, things happen in their own time and space.
11 You have to give it time to do the -- you know, to
12 run the process, because after the psychologist or
13 psychiatrist meets with the patient, they have to
14 create their paperwork, their encounter, their
15 assessment, and all that stuff, then they have to
16 write the report, then they have to get it out to
17 everybody.  That takes time.  It's not like:  Okay.
18 I see you today and I'll have your report at 5:00
19 tonight.
20   Q.  On the next page it indicates that:
21 Brent remains abstinent from all drugs except his
22 prescribed ones.
23       Which prescribed drugs was he taking at
24 that time?
25   A.  That would be the -- continuing the

Page 124

1  drugs that Shelley was giving him.  The Cymbalta,
2  was my understanding.
3    Q.  Did he continue to take the drugs
4  prescribed by Dr. Waters?
5    A.  He didn't indicate as such.
6    Q.  Do you know what drugs those were at the
7  time?
8    A.  I do not because I did not get any
9  records and he did not tell me that he was seeing
10 Dr. Waters or receiving any medications from
11 Dr. Waters.
12   Q.  Did Mr. Hilliard discuss alcohol
13 consumption?  Like, did you talk about that as part
14 of your treatment and analysis of him?
15   A.  No, he did not disclose to me that he
16 was drinking alcohol.
17   Q.  Does the fact that he got a DUI indicate
18 otherwise?
19   A.  Well, I don't know what -- what getting
20 a DUI indicates except that he consumed too much
21 and decided to get behind the wheel of a car, and
22 that's a bad choice and the consequence was a DUI.
23   Q.  And termination, right?
24   A.  And termination, if that's what they
25 terminated him for.

Page 125

1    Q.  But you don't have any information about
2  that, correct?
3    A.  I do not.
4    Q.  So when you were having your sessions,
5  did you ever ask him how much alcohol he consumed?
6    A.  No.  He did not report drinking,
7  therefore I would not have gone there.  And
8  initially when we talked at his first session, part
9  of my initial assessment is we typically go over:
10 What substances are you using?  Meaning, are you
11 taking any prescription meds?  Illicit meds?
12 Alcohol?  Any mood-altering chemicals?  And alcohol
13 definitely falls into that category.
14   Q.  Mr. Gritton, I think I'm about done
15 here.  If you would just give me a minute to look
16 at my notes --
17   A.  Okay.
18   Q.  -- I will try to get this wrapped up.  I
19 just need one minute here.
20   A.  That will be fine.
21   Q.  What was your understanding of why
22 Mr. Hilliard was removed from the workplace in
23 mid-July 2017?
24   A.  When he came to me, he indicated that he
25 was recovering from his back surgery and presented

Mark Gritton, LCPC                                                   June 03, 2020

Page 126

1  with a symptomatology of -- consistent with opiate
2  withdrawal, specifically Oxycontin, and that's
3  why -- you know, with the symptoms he had that's
4  why he was presenting.
5      Q.  Did he tell you in one of your sessions
6  that he had tried to return to work but was
7  unsuccessful?
8      A.  I noted that in one of my case notes,
9  yes.
10     Q.  And what did that mean?  What did he
11 tell you about that?
12     A.  He just said he attempted to go back to
13 work and did not -- he wasn't able to due to pain
14 and stuff with sitting.  Specifically, I remember
15 him saying for him to sit was hard.
16     Q.  Did he tell you that his employer had a
17 discussion with him about reports of impairment in
18 the workplace?
19     A.  He did not.
20     Q.  Does that impact your opinion?
21     A.  It may impact my opinion because I don't
22 know the details.
23     Q.  How would it impact your opinion?
24     A.  Well, look, for instance, if he was --
25 if he appeared impaired, I would want to have a

Page 127

1  discussion with him to say, "Okay.  If they saw you
2  and you appeared impaired, are you taking any
3  medications that you're not telling me about," for
4  instance.  Because when somebody says "impaired,"
5  I'm making an assumption here that they may not
6  talk clearly.  They may not walk clearly.  Or if
7  someone was trying to talk to them, their thought
8  and reasoning is not congruent.  Things like that,
9  you know.  Because if you talk to somebody you
10 understand, and you've worked with them, I would
11 think you know how they should communicate and
12 stuff.  If they observe something, you know, what
13 did they observe?  What did they see?  And I guess
14 in my world, I would say, okay.  So if I have
15 somebody doing that and I don't have evidence, I
16 would say maybe we need to have a drug test or
17 something.
18     Q.  Do you ever drug test your patients?
19     A.  Patients?  It depends.  Some of our drug
20 and alcohol patients are drug tested outside of
21 Crosspointe because we don't drug test in clinic,
22 but we can make referrals to the places that do
23 that if we need to.
24        Oftentimes a lot of them come with --
25 for instance, from probation or parole or through

Page 128

1  the courts.  They're mandated to drug test
2  randomly, whatever that turns out to be for them.
3  So we're able to believe and verify.
4      Q.  Did you ever consider drug testing
5  Mr. Hilliard in order to determine if he had
6  stopped taking Oxycontin?
7      A.  I did not.  As he presented -- again,
8  his symptoms were such that they were consistent
9  with somebody who was decreasing and getting off of
10 medication as opposed to showing up and being all
11 impaired.  It's apparent to me if someone is taking
12 Oxys or opiates.  They would have small, dilated
13 pupils.  They wouldn't be sitting there crying like
14 he was.  Things like that.  So I had no reason to
15 suspect or be suspicious of him using something.
16     Q.  Would it be significant to you if
17 Mr. Hilliard was prescribed Norco on various
18 occasions between 2010 and 2016?
19     MR. HEPWORTH:  Objection; lack of
20 foundation.  If he doesn't know why he's being
21 prescribed and he's not a licensed physician of
22 medications, that goes beyond his expertise.  Go
23 ahead if you can answer.
24     THE WITNESS:  I don't know that I can answer
25 because would it be -- I don't know, because did he

Page 129

1  take them for a month due to a toothache or was it
2  a continual use; that is, a pattern of use over
3  time?  I don't know.  I have no way to judge that,
4  if it would be impactful or make a difference.
5      Q.  (BY MS. HOWLAND) Well, you hold yourself
6  out to be a substance abuse expert; is that right?
7      A.  I am a substance abuse expert.  That is
8  correct.
9      Q.  Okay.  So if Mr. Hilliard admitted --
10 and I'll represent to you that he did in questions
11 we asked -- that he was prescribed Norco in
12 October 2010, December 2013, March 2014,
13 October 2014, May, June, and July 2015,
14 February 2016, and December 2016, would that be
15 significant to you?
16     A.  Perhaps.  Was he -- were these one-time
17 things related to medical procedures?  Was he --
18 there's a lot of -- a lot of what-ifs in there.  So
19 let me back up and put this out there:  Typically
20 speaking, if people are addicted to opiates,
21 they're not addicted to opiates on a random basis.
22 Well, let's see, I can go and get some for this
23 month and I'll use them.  And then it might be a
24 few months later I'll get some more and I'll use
25 those.

Mark Gritton, LCPC                                                    June 03, 2020

Page 130

1       To me, that doesn't fall into the
2   pattern of addictive abuse.  But, again, I don't
3   know what the context was.  Was he under medical
4   care for a surgery or procedure, dental or
5   something?  Because he had to have a prescriber, I
6   assume, unless he was getting them, you know, off
7   the street corner or something.  I don't know.
8   That's presumptuous, I guess.  I don't know.
9       Q.   So how important is it to you, when
10  you're diagnosing the extent to which someone is
11  abused to opioids, that they had a history of past
12  opioid use?
13      A.   It may or may not be significant.  I do
14  know that Mr. Hilliard had told me that he's had
15  other back surgeries.  Do those -- does use of
16  those other medications correspond with that?  If
17  so, that would be appropriate.  I guess I'm -- I
18  want to make sure before I render an opinion.  And
19  as an assessor, if I were assessing that, and I had
20  all that information in context, then I could look
21  at it and say:  This is what I think.  This is my
22  professional opinion based on that.
23      But just to randomly say:  Okay.  Here's
24  some dates and he got Oxycontin or hydrocodone or
25  whatever it was.  That -- I don't know that that's

Page 131

1   something I want to stick my neck out for until I
2   have it all in context.
3       Q.   What if Mr. Hilliard admitted that he
4   was prescribed Percocet in September, October, and
5   November 2011 and again in March 2014, on top of
6   the Norco that we just discussed?  Would that be
7   significant to you?
8       MR. HEPWORTH:  Just a second.  Just a
9   second.  Let me make my objection.  Again, he just
10  answered those questions.  He's not a licensed
11  physician that can prescribe medications.  He
12  doesn't have any knowledge about what was going on
13  back in that time.  He just told you that.  And
14  he's already told you he's not going to offer
15  opinions when he doesn't have all the information.
16  So it's improper.
17      Q.   (BY MS. HOWLAND) Go ahead, Mr. Gritton.
18  He's got his objection out there.
19      A.   I was just going to pretty much give you
20  the same -- the same answer I just gave you.  It
21  depends and -- in context.  I don't have anything
22  in context that I can use; that is -- so what I
23  would consider significant is a pattern of use and
24  abuse in the past one to two years because that's
25  the most recent.  I'm going to look at that.

Page 132

1       When we do the GAIN assessment, we talk
2   about use in the past 90 days and the past 12
3   months.  So that is the time frame, if you will,
4   that we use to make those assessments with that
5   instrument.  And that, again, is what's accepted by
6   the state, our correction systems, and so forth.
7   So that would be the -- that would be the ideal
8   context.
9       Q.   Okay.
10      A.   If I was talking to somebody and they
11  had, you know, fell into that context, that time
12  frame, would I go back?  Yeah.  I would say:  Okay.
13  So when did you first start using?
14      And that's a question in the GAIN.  When
15  did you first start using?  When did you last use
16  alcohol?  When did you last use this, that, or the
17  other?  And we get that historical perspective.
18  But what really -- the meat of it is going to be in
19  the last 12 months with the GAIN assessment.  And
20  based on what Justine did and the results, that's
21  where we're at.
22      Q.   Okay.  Well, how about the fact that
23  Mr. Hilliard admitted he was taking Valium in
24  June 2017?  That's within the time period you just
25  outlined, right?

Page 133

1       A.   Right.
2       Q.   So did he disclose that to you?
3       A.   He did not.
4       Q.   Is that significant?
5       A.   It may be because I would want to know
6   why he was taking it, who is prescribing it, those
7   kinds of things, because that all plays a part in
8   this.  Because if he's medically managed by a
9   doctor who is saying:  Okay.  You've got to take
10  this -- and hopefully that doctor has awareness
11  with the other medications.  And again, I'm not a
12  doctor, but this is just my perspective as a
13  substance use disorder professional expert.  We
14  would want -- we would want all that information.
15  That information would be considered in an
16  assessment if it's known about.  And it may or may
17  not have an impact on it based on the -- as we
18  gather all the information and we complete the
19  assessment and make recommendations.
20      Q.   We talked a little bit about tramadol
21  earlier, but Mr. Hilliard admitted he was using
22  tramadol in June 2017.  Did he disclose that to
23  you?
24      A.   No.
25      Q.   Would that be significant to you?

Associated Reporting & Video                    130 to 133
(208) 343-4004

Mark Gritton, LCPC                                                June 03, 2020

Page 134

1      A.  It may be.  Again, in context because
2  we -- we would need to know how much he's using,
3  when he's using it, why he's using it.  And again,
4  back to the same thing:  When, where, why, what,
5  and I don't have all that context, so I can't say,
6  "Hey, that's going to make a huge difference one
7  way or another," because I don't know.
8      Q.  Without that information, can you give a
9  reliable opinion on the extent of his substance
10  abuse problem?
11      A.  Not without all the information.
12      Q.  What is alprazolam?  Did I say it right?
13  Do you know what that is?
14      A.  That's a mouthful.
15      Q.  It is.
16      A.  It is a medication that they can
17  prescribe for anxiety.
18      Q.  Okay.  I don't have any other questions.
19  I appreciate your time today, Mr. Gritton.
20      A.  Thank you.
21      MS. HOWLAND:  I can get together with
22  Mr. Hilliard afterwards to figure out how to get
23  you payment for this too.  I'll make sure that
24  works.
25      THE WITNESS:  Okay.

Page 135

1      THE REPORTER:  Mr. Hepworth, do you have any
2  questions?
3      MR. HEPWORTH:  Probably just one.
4           EXAMINATION
5  BY MR. HEPWORTH:
6      Q.  When Mr. Hilliard first consulted with
7  you, Mr. Gritton, what was your understanding of
8  why he was consulting with you?
9      A.  Because he wanted to return to work at
10  the Twin Falls County Sheriff's Office and he was
11  experiencing issues with stopping the medications
12  he knew he had to stop in order to do so.
13      Q.  Did he -- was there a -- did he -- did
14  you consider him -- his therapist for stopping
15  medications or did you refer him to someone to help
16  with that?
17      A.  We did not make a referral out for any
18  kind of treatment to help him medically detox,
19  which I believe is what you're -- it's the next
20  step.  If we can't do it outpatient, he then would
21  be inpatient to do a detox because of the severity
22  of the withdrawal symptoms and things like that.
23           So there was no referral made.  We
24  decided to work outpatient and address his issues,
25  and then we referred him to Shelley to address

Page 136

1  psychiatric meds to make sure everything was good
2  and to help him with the depression and get him
3  back on his feet so he could go back to work.
4      Q.  Maybe that's a better way.  It was my
5  impression, from looking at your record, that he
6  was there to you seeking for help with his
7  depression.
8      MS. HOWLAND:  Object to the form.
9      Q.  (BY MR. HEPWORTH) Go ahead and answer.
10      A.  Okay.  So he came in, and as I described
11  in my first note -- let me go back to it so that I
12  can refer to it -- which was dated 7-12, I
13  diagnosed him with a substance abuse depressive
14  disorder.  His presentation was that of depression.
15  Again, as we went through this, he cries, sits
16  around, no energy, lacks motivation, gave me the
17  back history of having a surgery, being put on
18  these opiates to manage the pain.  He's ready to
19  move ahead and here we go.
20           So depression, yes.  And, you know, the
21  reason for him wanting to reduce that, that put him
22  in the depressive state was he's -- wants to go
23  back to work.
24      Q.  So going back to that record -- you have
25  the July 12th record?

Page 137

1      A.  I do.
2      Q.  So when you described the problem, you
3  wrote:  Brent describes depression.  He sits around
4  and cries for no reason he can identify.  He has no
5  energy and lacks motivation.  He reports having
6  back surgery several months ago and is trying to
7  titrate off Oxycontin.
8           So I just want to make sure my
9  understanding of what you understood he was -- was
10  he coming there for the depression or was he coming
11  there to have you help him get off the medication?
12      MS. HOWLAND:  I'm going to object to the
13  leading form.
14      THE WITNESS:  So my opinion is:  He came in
15  because of the symptoms he was experiencing
16  titrating off of the medications.
17      Q.  (BY MR. HEPWORTH) Okay.
18      A.  Not understanding what he was
19  experiencing as we talked, I diagnosed him the way
20  I did and treated him the way I did.
21      Q.  Was it your opinion at that time that
22  his going off the medications had some relationship
23  to his depressive symptoms?
24      A.  Yes, I believe they had a direct
25  relationship to that --

Mark Gritton, LCPC                                    June 03, 2020

1     Q.   Okay.
2     A.   -- because most people who are depressed
3  can't tell you why they're depressed.  They just
4  are depressed.  And, again, his symptomatology,
5  that crying, people that are depressed don't
6  necessarily sit around and cry a lot.  People
7  coming off Oxytocin sit around and cry and just
8  shut down.  It is the most amazing thing to see.
9  It's one of the insidious side effects of Oxy.
10     Q.   Just one other thing:  In -- when I
11  disclosed what I believed we were going to ask you
12  about, were you aware prior to today that I'd asked
13  you to review the other records from Crosspointe?
14     A.   That is correct.  You did ask me to do
15  that, and I just didn't go into it enough to say,
16  okay, let's go in there and testify to some of
17  these pieces.
18     Q.   Okay.
19     A.   I can own that.  That's fine.
20     Q.   Okay.
21     A.   I didn't realize I would be testifying a
22  whole lot to what Shelley put in hers.
23     Q.   Were you aware that Brent almost
24  committed suicide?
25     MS. HOWLAND:  Object to the form; assumes

1  facts.
2     Q.   (BY MR. HEPWORTH) As of today, were you
3  aware of that?
4     A.   I've been made aware of it.
5     Q.   You hadn't looked at Shelley's records?
6     A.   Not in depth enough to say that I can
7  say:  Here's where it happened and stuff.
8     Q.   Will you look --
9     A.   I will do that.  I will have those
10  reviewed thoroughly.
11     Q.   Okay.
12     A.   I'll look it up, like I said.
13     MR. HEPWORTH:  Thank you.  That's all I
14  have.
15     MS. HOWLAND:  Nothing further from me.
16
17  (The videoconference deposition concluded at 12:35 p.m.)
18               * * *
19        (Signature was requested.)
20
21
22
23
24
25

1                VERIFICATION
2
   STATE OF _____ )
3                          ) ss.
   COUNTY OF _____   )
4
5     I, MARK GRITTON, LCPC, being first duly sworn on my
6  oath, depose and say:
7     That I am the witness named in the foregoing
8  deposition taken the 3rd day of June, 2020, consisting
9  of pages numbered 1 to 139, inclusive; that I have read
10  the said deposition and know the contents thereof; that
11  the questions contained therein were propounded to me;
12  that the answers to said questions were given by me, and
13  that the answers as contained therein (or as corrected
14  by me therein) are true and correct.
15
16
      Corrections Made:  Yes_____ No_____
17
18
   _____
19        MARK GRITTON, LCPC
20
   Subscribed and sworn to before me this _____
21
   day of _____, 2020, at _____, Idaho.
22
23
   _____
24             Notary Public for Idaho
             Residing at_____, Idaho
25             My Commission Expires: _____.

1                REPORTER'S CERTIFICATE
2
   STATE OF IDAHO )
3                 ) ss.
   COUNTY OF ADA  )
4
5     I, REBECCA MARTIN, Certified Shorthand Reporter and
6  Notary Public in and for the State of Idaho, do hereby
7  certify:
8     That prior to being examined, the witness named in
9  the foregoing deposition was duly sworn remotely by me to
10  testify to the truth, the whole truth and nothing but
11  the truth;
12     That said deposition was taken down by me in
13  shorthand at the time and place therein named and
14  thereafter reduced to typewriting under my direction,
15  and that the foregoing transcript contains a full, true
16  and verbatim record of said deposition.
17     I further certify that I have no interest in the
18  event of the action.
19     WITNESS my hand and seal this 10th day of June,
20  2020.
21
22                          _____
   ┌─────────────────────┐  REBECCA MARTIN
   │   REBECCA MARTIN     │  CSR, RPR and Notary
23 │NOTARY PUBLIC - STATE OF IDAHO│  Public in and for the
   │COMMISSION NUMBER 47068│  State of Idaho.
   │MY COMMISSION EXPIRES 8-27-2024│
24 └─────────────────────┘
25 My Commission Expires: 08-27-2024

Mark Gritton, LCPC                                                          June 03, 2020

**Exhibits**

**Exhibit 1** 17:10, 12

**Exhibit 2** 38:13, 14

**Exhibit 3** 52:6,7

**Exhibit 4** 82:9,10

**Exhibit 5** 106:22, 23 118:1

**$**

**$1,000** 15:8

**$500** 15:2 112:10

**1**

**1** 17:10,12 53:10

**100** 35:6 48:3 49:24 78:1 105:22

**10:30** 63:18,20

**10:31** 63:24

**10:50** 63:21,24

**11.94** 60:21

**12** 132:2,19

**12:00** 107:7

**12:35** 139:17

**12th** 59:20,21,24 60:3,5 66:7 67:10 70:1,14 75:9 136:25

**1363** 4:24

**15** 63:13

**17** 51:16 54:23 73:22 103:5

**18** 8:10

**18th** 59:18 60:5

**1993** 19:25

**1998** 20:4,11 21:18

**19th** 75:14 81:16

**1:00** 107:6

**1st** 89:23

**2**

**2** 38:13,14

**20** 8:7 21:5 26:9 33:25 34:1 112:4

**2000** 5:12 7:17,20

**2002** 6:16,22

**2003** 6:16,22

**2005** 6:19

**2006** 6:19

**2007** 20:19 21:23

**2008** 31:1,8,13

**2010** 5:2,12 32:14 35:3 128:18 129:12

**2011** 9:1 131:5

**2012** 21:12 25:25 26:1 30:21,23 31:9,18

**2013** 21:8 24:20 129:12

**2014** 129:12,13 131:5

**2015** 129:13

**2016** 128:18 129:14

**2017** 18:6,19 19:3 32:1 51:4 59:18 66:7 67:10 82:8, 20 83:14 84:8,9 86:3,13 92:11 97:3,23,25 106:7 117:1 122:7 125:23 132:24 133:22

**2018** 27:17

**2019** 28:3 29:3

**2020** 29:4

**20th** 82:20 83:22

**22** 8:11

**22nd** 117:1,4

**23** 8:11

**23rd** 27:22

**24th** 27:17 51:22 106:9

**25** 8:7

**25th** 86:3,13

**26** 33:16,22 34:1

**28** 29:3

**299** 38:10

**29th** 83:23

**3**

**3** 18:16 52:6,7

**3-20-17** 82:22

**30** 46:11 65:7

**3rd** 29:3

**4**

**4** 52:20,22 82:9,10 108:3

**40** 34:8,22,23 35:6,16,25 36:1 85:18

**45** 61:6 65:7

**5**

**5** 21:8 52:20 106:22,23 118:1

**5-** 58:1

**5:00** 123:18

**6**

**6** 53:11 106:6

**600** 58:1

**6th** 106:8 122:7

**7**

**7-12** 60:8 136:12

**7-18** 73:17 77:21

**7-19** 73:16,22

**7-25** 87:14

**7-25-17** 87:18

**7th** 28:3

**8**

**8-22** 51:16 54:24

**8-23** 54:22

**9**

**9-6** 103:5

**90** 132:2

**98** 7:20

**9th** 92:11

**A**

**a.m.** 63:24

**ability** 24:2 36:22 105:21 108:22 110:11

**absolutely** 46:3 104:19 110:9 113:13 121:7

**abstinent** 123:21

**abuse** 20:24 24:5 33:9 34:7,9,10,11, 24,25 35:8,17,20 45:16 46:2 56:18 65:19 112:18 115:25 116:3,7,8 129:6,7 130:2 131:24 134:10 136:13

**abused** 130:11

**accepted** 132:5

**accepting** 79:10

**access** 14:5 40:17 46:4,5 98:25

**accomplish** 56:5,13

**accordance** 109:23

**accurate** 17:16 48:2,3 49:24 56:25 57:8 118:6 121:18 122:2

**act** 10:1 13:25

**action** 8:18 9:18 14:6 17:24

**activities** 106:4

**actual** 65:22

**add** 28:25 31:19

**addict** 73:3

**addicted** 72:25 129:20,21

**addiction** 18:7, 21 19:4 72:4,7 77:15,16 85:6 91:8,10

**addictive** 74:16 130:2

**addictiveness** 72:13

**addition** 56:20 64:13

**additional** 25:9

**Additionally** 21:2

**address** 4:22 16:11 33:9 43:1 74:25 85:17,22 88:12 92:7 100:22 106:11 109:3 110:3,4,25 117:24 135:24,25

**addressed** 27:13 53:1 54:13 105:20 110:20 113:8 118:16

**adept** 42:7 50:20

adjusting 93:5

administered 50:23 53:19

administrative 33:17

administrator 10:13,15 29:22 30:2

admitted 129:9 131:3 132:23 133:21

adverse 44:23

advised 65:23 121:20

advising 29:4

advisor 14:1

affect 76:14 84:22 90:16

affected 87:25 88:1

affects 24:1 72:13 91:16

aftereffects 91:12

agency 10:13 13:22 23:17 33:2, 3 46:7 62:19 111:4

agenda 95:5

agree 57:7 72:24 95:10 99:1 119:24

agreed 15:1 73:1, 8

agrees 113:6

ahead 40:14 57:5 90:10 108:24 111:1 128:23 131:17 136:9,19

alcohol 5:18,19 6:14,21 7:5,23 23:20,24 24:17 34:11,13,16 50:22 54:11 57:19 58:17 110:19 124:12,16 125:5,12 127:20

132:16

alert 11:10 41:15

alprazolam 134:12

alternatives 93:11

amass 46:13

amazing 138:8

amount 70:4

analysis 84:8 124:14

angles 57:17

answering 12:18

answers 36:14 53:24 54:4 58:4, 22 59:1,3,5

anticipate 107:6

anxiety 24:11 42:22 45:23 73:20 95:24 96:2 113:11 117:15 134:17

anxious 75:24 76:4,12,15,19 78:7 93:18

anxiousness 78:2

anymore 91:23 101:1

anytime 11:18 110:14

apologies 12:24

apparent 128:11

apparently 77:5 96:19

appeared 71:16 126:25 127:2

application 25:6, 8 43:12

appointment 60:18 62:6 70:23 71:5,18 86:13 88:3 89:10 90:14 91:3 122:11,12

appointments 107:10,12

apprehension 93:21

approximately 26:4 46:11 49:23 70:3

April 29:3

area 20:24 24:5 36:8 37:21 38:6 41:24 42:8 50:3 62:3

areas 24:7,9 32:16 37:17

arena 34:7

ASAM 49:15

ascertain 118:18

asks 17:20 18:3 50:25 53:21 66:1

aspects 42:3 96:1 115:23

assess 36:21 42:6

assessed 42:5 54:22

assessing 130:19

assessment 37:6,7,16 42:24 43:14 48:11,23 49:1,9,19 50:12 52:1,12 53:19,22 54:2,16,18,20 55:1,10,18 56:16 58:23 65:14,16, 18,22 116:7 123:15 125:9 132:1,19 133:16, 19

assessments 25:14 36:9,11 48:17 57:24 61:21,22 116:9 132:4

assessor 130:19

assigned 48:21

assignment 5:8

assist 42:17

Assistance 60:17

assistant 22:21

assists 47:9

assume 11:15 60:15 100:24 130:6

assumed 120:10

assumes 138:25

assuming 86:21

assumption 92:20 123:2 127:5

assumptions 102:19

attain 23:18

attained 21:7

attempted 71:9 114:12 126:12

attend 90:20

attendance 4:13 105:23

attest 119:19

attorney 9:22 16:2,25 27:25

attributes 37:24

audible 11:3

audio 26:21

August 19:25 20:19 51:22 89:23 92:11 97:23 106:9 117:1,4

auspices 47:8

authorization 62:5,12

average 35:24 36:1

aware 14:24 15:1 19:11 46:10 51:3, 6 59:12 75:2 81:18 138:12,23

139:3,4

awareness 46:17 72:4 91:7 133:10

B

baby 71:23

bachelor's 19:24

back 7:11 9:14 27:24 41:11,20 45:2 55:15,19,23 56:1,3,4,8,14 61:14 64:4,7,8,21 67:13 68:3,25 71:1 73:4,6 74:19 82:2,8 85:9 86:23 89:15,19 94:1 95:12 96:19 97:22 98:10 106:12 107:25 108:1 117:22,25 120:19 123:5,7 125:25 126:12 129:19 130:15 131:13 132:12 134:1 136:3,11,17,23,24 137:6

background 19:15 44:4

bad 61:24 80:12 124:22

balance 33:18

based 37:10 42:24 49:15 53:4, 13,24 54:7 57:13 61:3 78:14 89:12, 18 97:21 102:21 103:10 104:16,18 109:15 113:20 121:15 130:22 132:20 133:17

basic 91:18

basically 25:11 26:23

basing 97:13

basis 26:10 75:6 95:2 129:21

battled 23:25

**beast** 50:10

**began** 70:24

**beginning** 55:21 58:9

**belief** 70:16 78:14

**believed** 23:15 94:20 100:6 138:11

**belligerent** 27:6

**bender** 110:7

**beneficial** 74:12

**benefits** 23:12

**benzo** 45:22 46:1

**big** 39:18 89:4

**bill** 14:15

**biopsy** 93:20

**bit** 19:14 32:11,22 38:21 59:13 75:22 93:18 97:1 98:5 107:13,14 113:8 133:20

**blank** 32:9

**board** 28:4,5,7 29:8,19 47:12

**board's** 28:6 29:5,7

**body** 30:2 42:1 79:11,14 91:13

**Boise** 122:19

**bono** 14:10

**book** 96:4

**bottom** 22:19 39:4,5 59:19 75:21 83:21

**boundary** 43:20

**brain** 72:14,16 79:14 81:23,24 91:14,16,25 92:2

**break** 11:18,20, 23 34:15 62:23 63:7,8 65:12 83:2

**breakdown** 35:2

**Brent** 15:20 17:23 18:5 40:8 43:6 45:6,11 48:9,10, 23 49:5 51:9,16 52:24 53:2 54:20, 21,23,24 55:13 59:14 60:9 61:4 67:23 68:12 80:19 81:5 97:25 105:8 117:11 119:4 122:14,25 123:4, 21 137:3 138:23

**Brent's** 67:22 105:20

**bridge** 80:12

**briefly** 43:9 55:17

**bring** 5:21 17:20, 25 18:3,9,13,17, 23 19:6,20 40:25 52:2

**broad** 32:18

**brother** 101:13

**brought** 26:15

**building** 43:17

**built** 57:21 102:14

**bullying** 29:17

**Bureau** 26:12,16 28:4 31:23

**business** 32:21

---

**C**

**C-PERIOD-L-PERIOD-U-PERIOD-B-PERIOD** 6:25

**calendar** 107:11

**call** 25:2,3,4 26:23 61:23 68:10 72:21 107:10

**called** 6:25 35:13 60:15,16

**calling** 30:5

**cancel** 107:10,12

**Captain** 118:21 120:3

**car** 124:21

**care** 43:23 44:6 45:3 61:13 62:10 100:1,6 130:4

**career** 22:13 112:7

**Carter** 105:19

**case** 9:3,7,9,19, 21 14:4 17:9 18:1 33:14 36:20 40:5 41:17 43:10 48:19 59:9 62:12 67:23 68:9 84:13 95:15 99:15 101:5 102:11,19 104:12 107:2 112:9 113:10 123:3 126:8

**cases** 14:18

**catastrophic** 86:17,21 87:6 88:7 89:14

**catch** 21:15 59:10 80:18

**catches** 58:8 59:7

**categories** 19:10

**category** 18:23 45:21 125:13

**caused** 78:13 93:1 96:20,22 100:19 109:10,12 115:2

**caveats** 122:3

**CBT** 94:8

**ceased** 104:17 105:9

**certifications** 33:19

**chain** 115:1

**challenged** 94:7

**challenging** 88:12

**chance** 4:12 38:16 110:21 111:8,15

**change** 50:6 52:23 89:3 105:2 107:25 108:18,20, 21 112:25 117:9 118:3 121:14

**channels** 46:6

**character** 109:18

**charge** 29:1

**check** 41:11,18, 20

**checked** 29:23

**chemical** 7:6

**chemicals** 34:13 125:12

**child** 13:23 14:11

**children** 24:15 27:1,2

**choice** 111:17 124:22

**choose** 111:16

**chose** 80:4 110:25

**Christ** 80:16

**circumstances** 50:4 85:10 104:19

**claim's** 30:18

**claims** 9:24 17:24

**clarification** 5:3

**clarified** 121:21

**clarifies** 121:2

**clarify** 58:25

**class** 25:9

**classes** 20:3 23:13

**classic** 79:5

**CLE** 38:1

**cleared** 107:10

**client** 26:22 44:5

**client's** 44:6

**clientele** 33:20

**clients** 34:4 44:15

**clinic** 127:21

**clinical** 14:1 21:11 25:23 26:6 31:4,5,9,11,21,24 36:10 46:17 61:3

**close** 48:4 79:8 105:3

**closed** 28:8 29:8

**clothes** 80:16

**club** 6:17,22,25 8:4 23:21

**co-occurring** 35:13

**cocaine** 34:17

**code** 60:21,23,24, 25 67:13 86:8

**cognitive** 88:11, 12 94:8

**coin** 36:24

**cold** 101:21

**comment** 12:2

**comments** 54:10

**commit** 110:8 111:3

**committed** 138:24

**common** 22:2

**communicate** 118:10 127:11

**communicated** 56:1 74:18 76:20 77:3,9 118:8

**communication** 43:5

**communications** 18:25 23:6

**community** 20:8, 20 23:7,15 32:20 33:5,12

community-based 33:14

companies 61:20

compensated 14:8 112:9

complaint 26:15 27:9,10,12,13,16 29:1,20 30:8,10

complaints 30:1 64:14

complete 21:4 26:9 42:23 56:3 61:21 133:18

completed 20:2, 19,25 28:3 39:6 48:10 49:8 51:10 55:1 100:1 117:11

comply 47:11,15

Compsych 61:19

computer 7:13 12:10 50:23,24

concern 56:4 57:23 78:7

concerned 55:14 72:1 87:1 89:2

concerns 50:17 53:15 54:15 70:23 74:25 95:10,20 96:8 97:8,14 113:6,20 114:2

concluded 28:5 29:5 139:17

concluding 114:21

conclusion 58:23 59:11 114:16

condition 70:9 90:13

conduct 36:17 109:10,12 118:17

conducting 38:2

confidence 96:16

confidential 29:14

confidentiality 28:14

confirmation 97:13

confused 105:7

congruent 127:8

connect 7:13

connected 81:5

consequence 124:22

consequences 111:18

considered 117:13 133:15

consistent 35:3 79:17 112:13 118:5 120:14,15 126:1 128:8

constant 97:2

constitutes 104:5,23

consultant 13:19

consulted 135:6

consulting 6:19 7:4 8:8,12 135:8

consumed 72:15 124:20 125:5

consumption 124:13

contact 51:20 103:4

contacted 29:21

contacts 96:10

content 90:16

context 36:5 77:8 85:22 86:23 94:13 130:3,20 131:2, 21,22 132:8,11 134:1,5

continual 129:2

continue 22:8 82:23 83:8 124:3

continued 31:10 78:12 86:12 89:25 92:14 93:14 108:19

continuing 21:4 25:18 26:10,13 77:23 123:25

continuously 30:21 31:13

contributed 109:20

contributing 78:24

conversation 30:4 55:16 97:21 119:25 120:8 122:2

conversations 48:22

conversely 80:14

convinced 113:13

convoluted 9:16

cooperates 6:11

cope 110:12

copies 66:24,25

cops 80:18

copy 5:24 6:4,9 18:15 19:12 21:3 27:25 28:17,18 30:15,19 39:16,22 40:6,12,19 41:10 44:8 45:5,9 49:9 50:15 52:13 64:19

corner 130:7

corporate 16:1, 25

correct 15:3 21:21,23,24 23:22 24:8,20 25:25 28:21 30:25 31:10 32:15 33:23 34:2 35:1 45:7 46:20

49:14 54:9 57:3 60:2 64:21,22 66:14 72:6 73:9 75:18 78:10,11 83:15,24 86:10,14 90:2,3 92:16 96:23 97:5,6 103:8 113:25 114:1 115:19,20 116:17,20 122:5, 16,17 125:2 129:8 138:14

correction 132:6

Corrections 56:22

correspond 130:16

counsel 14:6 16:8 107:1

counseling 20:9, 21 23:5,8,14 24:12 25:13 28:7 29:8 30:13 32:24 33:5,7 42:10 43:19 112:17

counselor 5:18, 20 6:15,21 7:6,7, 24 14:5 15:20 22:18,20 23:20 25:23 29:11,13, 18,24 30:9 31:3,8, 22 32:6,19 42:4 48:8 50:24 53:20, 21 62:6

counselors 13:25 22:2 31:25 50:8 62:3

count 116:23

county 37:1 60:18 95:20 97:10 100:19,25 103:17 104:3 105:19 111:19 112:16 135:10

County's 118:17

couple 64:9 65:15 114:5

coursework 20:22

court 10:2,3,5,6, 25 13:24 14:4 118:20

Courtney 13:10

courts 56:23 128:1

cover 75:6

covers 22:22

CPS 14:19 27:2

cracker 10:19

create 123:14

created 15:20

credits 21:4 26:9, 14

cries 68:1 136:15 137:4

crisis 43:21 44:2

criteria 49:14,16

cross 43:20

Crosspointe 4:20,23 5:1,2 13:25 14:2 17:3 19:19 32:12,17, 19,20,25 33:1 42:14,15 46:14 53:1 66:22 118:22 119:5,6,8 127:21 138:13

Crosspointe's 118:23

cruel 101:21 102:2

cry 138:6,7

crying 68:13 69:9 70:11 71:22 72:22 79:7 128:13 138:5

curious 99:14

current 32:1 78:17 88:14

custody 14:12

cut 53:6 63:3,4

cutting 26:21

**Mark Gritton, LCPC**                                                    June 03, 2020

**Cymbalta** 92:20, 22,23 124:1

**D**

**daily** 84:23

**date** 15:7 16:10 27:24 46:12 54:21,23 59:24 60:2,5,7,8 70:3,21 73:22 82:18,21 92:14

**dated** 51:22 73:21 136:12

**dates** 130:24

**dating** 82:8

**David** 9:23 16:2

**day** 16:14 61:24 89:13

**days** 46:11 62:17 65:7 75:19 78:20 87:17,20 132:2

**deal** 26:25 88:7

**dealing** 74:12 93:6

**December** 27:17 129:12,14

**decide** 23:4

**decided** 101:8 102:7 124:21 135:24

**deciding** 109:16

**decision** 55:2,4, 24

**decreasing** 128:9

**deemed** 9:12

**deeper** 120:20

**Defendant's** 109:10,12

**definite** 96:6

**degree** 20:18 22:8 23:16,18 95:22

**demeanor** 71:13

**demographic** 34:19

**demotion** 93:23

**dental** 47:25 85:15 130:4

**department** 14:10 56:15,22 77:4 94:15 96:12 101:4 102:10 122:19

**departure** 47:3 50:5

**dependency** 7:6

**depending** 62:18 103:14

**depends** 14:9 116:4 127:19 131:21

**deposed** 8:14,17 9:4

**deposition** 8:18, 25 9:1 10:22 12:23 15:18 17:12,20 38:14 52:7 82:10 106:23 139:17

**depressed** 44:1 61:24 69:9 88:6 91:22 138:2,3,4,5

**depression** 18:7, 21 19:4 42:22 52:25 54:12 68:1 72:21 75:4 78:13, 24 86:25 88:5 90:23,24 92:7,24, 25 117:15 136:2, 7,14,20 137:3,10

**depression-like** 68:11

**depressive** 18:8, 22 19:5 60:22 67:14,21 68:19 78:9 79:6 86:9 90:1 92:15 117:6 136:13,22 137:23

**depth** 120:24

139:6

**depths** 55:16

**deputies** 114:24

**deputy** 94:23 105:21

**describe** 77:17 90:13 96:1

**describes** 68:1 137:3

**describing** 78:5

**description** 38:10 41:1 69:20

**designation** 53:25

**designed** 57:16 65:18

**desire** 81:15 109:21

**desirous** 73:4

**detailed-enough** 96:13

**details** 9:20 47:22 126:22

**determine** 128:5

**detox** 135:18,21

**developments** 12:3

**device** 12:11

**diagnose** 89:25 92:14

**diagnosed** 78:9 136:13 137:19

**diagnosing** 130:10

**diagnosis** 18:5, 6,18,20 19:2,3 43:2 45:16 53:25 60:20 61:2,8 67:13,17 68:18 74:9 86:8,12 117:4,5,9

**diagnostic** 60:25

**diagnostics**

117:14

**Diehl** 13:10

**difference** 32:23 37:14 84:15 129:4 134:6

**differentiates** 66:5

**dilated** 128:12

**Dimension** 52:22 53:10

**direct** 65:1,5 137:24

**directions** 112:15 118:7

**disabilities** 42:1

**disability** 42:4

**disagree** 78:25 107:21 111:11

**disclose** 65:23 74:6 124:15 133:2,22

**disclosed** 30:5 73:15 74:5 115:1 138:11

**disclosure** 10:12 97:18 98:10 117:20 121:11,17, 25

**Disclosures** 95:8,15

**discontinued** 83:16,25 90:5

**discontinuing** 90:25

**discovered** 29:24

**discuss** 9:20 124:12

**discussed** 74:21,22 91:9 109:13 122:4,21, 25 131:6

**discussion** 122:24 126:17 127:1

**disease** 24:1

**dishonest** 58:22

**dismissed** 30:18

**disorder** 18:22 19:5 45:20,23 49:18 60:22 67:14,21 68:19 78:10 86:9 90:1 92:15 117:6 133:13 136:14

**disorders** 21:7 24:25 25:21 35:12 60:25

**dispense** 83:25

**displayed** 68:17

**disproportionat e** 35:15

**distortions** 88:12 94:8

**distress** 100:20 109:10,12 111:10

**divorce** 87:7 105:1

**doctor** 62:19 65:20 71:1 75:6 112:18 115:6 133:9,10,12

**doctor's** 116:25

**doctoral** 22:8

**document** 17:13 38:18 39:7,9,14 41:12,15 67:1 78:8,18 82:4 98:18,25 100:8 103:22

**documentation** 39:13,15 40:12 111:25

**documented** 78:17 106:1 114:5,8

**documents** 14:3 15:19 17:2,4,21, 23 18:3 40:2 51:23 64:14

**dog** 105:4

**doom** 89:17

**door** 35:8

**dosage** 44:14

**dose** 70:17

**double-check** 40:19

**doubt** 81:15

**drank** 58:17

**draw** 37:9 53:25

**drink** 109:17 110:7 111:1

**drinking** 124:16 125:6

**drive** 7:14 109:17

**drives** 110:20

**drug** 5:17,19 6:14,21 18:7,20 19:4 23:20,24 24:16 50:21 57:19 65:24 91:14 127:16,18,19,20, 21 128:1,4

**drugs** 54:12 58:16 65:20 66:2 73:13 92:5 108:22 109:4 110:7 123:21,23 124:1, 3,6

**DSM-5** 60:24

**due** 29:25 53:2 75:3 126:13 129:1

**DUI** 51:3,8,19 53:4,14 101:2,3 106:15 113:25 114:12,14 124:17, 20,22

**duke** 118:19

**duly** 4:4

**duties** 36:23 100:9

**duty** 36:4,19 37:1, 13,21 38:2,6 105:16 106:6,14,

17 115:7,8

---

**E**

**e-mail** 64:9,19

**e-mails** 17:23 18:4

**EAP** 60:15,16 61:17,19,20 62:2

**earlier** 56:25 96:22 109:13 113:4 133:21

**earliest** 59:17

**early** 35:19 51:4 96:24

**ebbs** 35:5

**education** 19:23 20:5,8,12,20,23 21:4,19 22:3,11 23:5 25:19 26:10, 14

**educational** 19:15,18,25 22:6, 7,10 23:17 31:16

**effect** 100:2 118:15

**effectiveness** 44:24

**effects** 44:24 72:18 138:9

**effects/ symptoms** 68:7

**effort** 114:7

**eighth** 108:5

**elaborate** 77:13 79:23

**Electronically** 17:21

**elephant** 89:5

**elicit** 57:16

**EMDR** 106:10,12

**emergency** 75:5

**emotional**

100:20 109:10,12 111:10

**employed** 42:15 111:23 112:4

**employee** 49:22 60:17 61:23 110:17,18,19,21 111:14

**employees** 33:16,17,22 111:13

**employer** 126:16

**employers** 36:8

**employment** 24:2 100:4 111:20 114:7,10

**EMR** 40:17 41:11

**encounter** 82:21 123:14

**encourage** 44:14

**end** 13:8 17:10 55:20 68:6 77:25 79:9 81:21 83:23

**ended** 55:13 59:10 89:12

**endorsement** 21:11 25:2,5,16 31:5,9,11,18

**energy** 68:2 72:23 136:16 137:5

**enforcement** 41:22 42:10 101:16 102:12

**engaging** 86:17

**enraged** 27:8 30:9

**entity** 37:2

**establish** 98:3

**establishments** 26:24 27:1

**ethical** 29:25 121:13

**euphoria** 91:19

**evaluation** 36:4, 13,18 37:4,5,7 43:14 48:14 50:15 105:25 112:18 115:8 123:3

**evaluations** 36:9 38:7 116:9 123:1

**event** 47:20 109:14 110:15 111:2,9

**events** 104:8

**every-** 101:18

**evidence** 28:5 29:6 111:22 127:15

**exact** 16:10 18:15 19:12 46:12 49:24 50:13

**examination** 4:7 36:4 135:4

**examined** 4:6

**examples** 96:9

**excited** 123:6

**excuse** 31:21

**exercise** 93:9

**Exhibit** 17:10,12 38:13,14 52:6,7 82:9,10 106:22,23 118:1

**exist** 19:9

**exists** 18:12

**expect** 72:19 120:13,14

**expectations** 41:3 110:10 123:9

**expected** 76:2 112:13 118:4

**Expects** 87:2

**experience** 19:18 26:5 31:17 41:25 53:18 57:13 59:6 72:21 78:15 79:3 80:9 116:6

**experienced**

29:17 71:11 109:25 110:5

**experiences** 94:14 96:9 110:10

**experiencing** 135:11 137:15,19

**expert** 13:15 14:18 42:10 95:7, 14 97:18 98:10 106:20 117:19,20 120:11 121:17 129:6,7 133:13

**expertise** 41:21 42:2 108:24 128:22

**explain** 32:22 55:3 104:22

**explained** 94:17, 22

**expose** 12:7

**expressed** 97:19

**extent** 36:11 79:1 130:10 134:9

**extern** 13:2

**extreme** 58:19 81:17,19 82:2 87:9 101:22

**extremely** 50:20

---

**F**

**F11.94** 67:13 86:8

**fact** 53:4,13 55:11 69:14 93:9 104:16,18 109:20 111:23 124:17 132:22

**facts** 98:3 103:19, 21 104:19 114:16, 20 139:1

**faculty** 29:15

**fail** 35:7

**failed** 47:24

**failure** 47:21

**fair** 11:12,13 12:25 17:7 34:22 63:5 82:24 87:11 97:19

**fairly** 81:14 122:1

**fall** 130:1

**falling** 87:9

**falls** 4:21 5:9,18, 20 6:15 33:3 45:21 95:20 97:10 100:19,25 103:17 104:2 105:19 111:19 112:16 116:12,15,19 118:17 125:13 135:10

**false** 59:11

**familiar** 30:3 36:25 39:17,23 42:12 50:19

**familiarity** 15:21

**families** 14:13 24:16

**family** 4:20 24:15 32:21 33:2,6,15 53:1 86:25 87:8 88:8,9,19,21

**family's** 86:24

**farther** 7:11

**fashion** 33:19 77:6

**favor** 27:10

**favorable** 46:25

**faxed** 64:3

**faxing** 63:25 65:3

**fear** 87:9 113:12

**fearful** 93:21

**fears** 93:23 113:18

**February** 129:14

**federal** 10:5

**fee** 15:1

**feel** 91:19,20,24

92:6

**feel-good** 92:3

**feelings** 88:7,9

**feels** 76:21 78:23 87:4 93:22 94:1, 11

**fees** 14:24 15:1

**feet** 136:3

**fell** 132:11

**felt** 76:21 77:10 79:2 90:16 114:6, 9

**field** 25:7

**figure** 35:19 134:22

**figuring** 118:11

**file** 27:15 28:1,8 29:9,19 41:13 49:25 50:1 61:14 62:24 63:8,13 64:5 67:1

**filed** 10:8 27:9,13, 16 29:2 30:10

**files** 17:23 18:4 83:1

**fill** 37:2 47:21 77:23

**filled** 65:3 66:17

**Fillmore** 4:24

**fills** 43:11 66:22

**financial** 10:12 14:13

**find** 5:23 6:10 7:10 27:18 35:10 39:22 40:7 41:14 83:1 93:18

**fine** 55:9 98:6 125:20 138:19

**fire** 60:8 87:7

**fired** 101:4 102:9 109:20 110:2

**firing** 104:7

**firm** 14:24 15:6

**fit** 36:19 105:16 106:6,14,17

**fitness** 36:4,17 37:13,20 38:2,6 115:7,8

**flag** 65:19

**flows** 35:5

**fluctuate** 35:4

**flustrated** 29:17

**focus** 32:16 88:15

**focused** 19:22 42:4 89:13 90:16

**folks** 23:24 24:11, 18 107:13

**follow** 64:23 65:5

**follow-up** 65:8 120:8

**food** 115:1

**for-duty** 36:18

**for-profit** 33:3

**forced** 27:8

**form** 33:19 65:3 66:8,13 67:4 77:6 82:19 91:10 99:4 136:8 137:13 138:25

**forms** 66:16,17

**forward** 6:4 44:23

**found** 30:10

**foundation** 128:20

**frame** 74:1 80:19 132:3,12

**frequently** 13:24

**friends** 77:5 94:23 95:3,4 96:11 101:14,15, 16 102:14

**front** 6:12 16:12 49:25 52:13 60:1

61:15 86:5 117:3

**full** 8:2 79:12

**fully** 12:18 79:12

**funding** 33:13

**future** 101:21

---

**G**

**G-A-D-D** 16:4

**G-R-A-H-A-M** 10:20

**G-R-I-T-T-O-N** 4:18

**Gadd** 9:23 16:2

**Gadd's** 16:3

**gain** 36:9 48:11, 16,23 49:1 50:12, 20,23 51:25 52:12 53:18 54:2,15,18 55:1,9,10,20,21, 22 56:16 57:2,10, 14,15,20,24 58:7, 18,23 59:1,6,7,9 65:13,16,18 113:19 120:20 132:1,14,19

**gals** 64:8

**gather** 69:12 133:18

**gave** 35:6 47:13 48:23 60:21 68:19 110:21,24 131:20 136:16

**general** 33:4 54:18 71:14 104:6,21,23

**generalities** 103:11

**generally** 43:7, 19 44:14 57:14 65:7 72:10 102:14

**gentleman** 12:21 27:4

**get all** 64:16

**girls** 40:18 64:6

**give** 4:22 11:3 37:22 38:15 39:14 40:3 43:9 44:4 48:16,19 49:24 51:12 54:19 56:25 57:8,12 58:4,22 59:2,4 62:23 63:14 76:9 80:17 88:15 90:15 95:11 96:5 99:15 103:6 104:15 107:13,22, 23 111:8,15 116:24 121:12 123:11 125:15 131:19 134:8

**giving** 102:20 104:11,17 124:1

**Global** 48:11

**gloom** 89:17

**goal** 10:25 11:21

**goals** 23:17 86:17 88:13

**good** 4:9,10 11:8 13:12 28:24 36:3 39:2 62:20 63:7 64:15 73:8 77:5 82:13 89:16 91:20,24 100:6 136:1

**Goodbye** 101:21 102:2

**gosh** 32:8

**governing** 28:6 29:19 30:2

**grab** 7:12 113:15

**graham** 10:16,19

**great** 27:14 64:11

**Gritton** 4:3,9,17 9:5 13:14 64:16 98:11 109:8 112:12 113:4 121:24 125:14 131:17 134:19 135:7

**ground** 10:23

**group** 33:6 68:17

**groups** 33:7

**grumpy** 91:22

**guarded** 76:15

**guess** 12:4 17:7
35:18 37:15 84:1,
25 85:7 99:13
101:17 102:16
116:4,23 127:13
130:8,17

**guys** 118:19

---

**H**

**half** 77:24 78:20

**hand** 64:6 106:21

**Hang** 5:22

**happen** 11:21
86:22 113:13
122:22 123:10

**happened** 94:20
95:1 97:24 102:8,
21 104:8 109:16
113:18 139:7

**happening** 87:10
102:11

**happy** 99:6 123:4

**hard** 72:17
116:14 126:15

**head** 56:7 58:13
79:16,22 80:7,10,
23 81:1 94:9

**heads-up** 43:10

**health** 24:10
29:15 33:2,3,9
34:4 35:9,12,16
36:6,10,12,22
37:5,10 42:2,24
43:2 45:20 61:13
62:10 66:18 89:9
104:25 109:9

**hear** 15:12 16:21
20:10 53:6 63:4
79:25 80:1,9,15

**heard** 81:3 115:5

**hearing** 23:1

**heavy** 108:8

**held** 30:20

**helped** 88:13

**helpful** 5:25

**helping** 100:10
111:14

**Hepworth** 12:21
13:5,12 16:14,25
28:10 41:15 51:24
57:4 59:20 82:16
95:16 97:16 98:17
99:3,16 103:23
108:23 119:4,12,
24 120:5,10,22
121:1,4,17,20
128:19 131:8
135:1,3,5 136:9
137:17 139:2,13

**Hepworth's**
14:23 15:6

**heroine** 34:18

**hesitate** 119:15

**Hey** 37:2 61:24
89:4 91:15 101:1,
9 134:6

**higher** 35:25
115:1

**highlighting**
120:19

**Hilliard** 15:20
18:5,19 19:1
36:20 40:8 43:6
45:6 48:9,24 52:1
59:14 60:10 66:17
67:18 72:24 76:2,
20 86:1 95:9 97:4,
12 99:19 101:12
103:24 105:8
109:16 112:14,22
113:5 115:7,10,13
117:16 118:5,21
120:3 124:12
125:22 128:5,17
129:3 130:14
131:3 132:23
133:21 134:22
135:6

**Hilliard's** 17:24
51:3 61:12 64:19

68:9 72:7 95:20
104:7 109:9
111:20 113:6

**Hilliard-15** 52:2,
11

**Hilliard-17** 117:2

**Hilliard-21** 92:13

**Hilliard-23** 89:23

**Hilliard-25** 86:4

**Hilliard-27** 75:15

**Hilliard-29** 59:19,
22

**Hilliard-299**
38:11

**Hilliard-30** 52:5

**Hilliard-616**
82:5,17

**Hilliard-7** 52:4

**Hilliard-9** 122:9

**hindsight** 119:18

**hint** 102:4

**historical** 132:17

**history** 25:6,12
69:12 76:8 86:24
88:9 130:11
136:17

**hmm-mm** 11:5

**hold** 42:9 113:15
129:5

**home** 87:3

**honest** 9:15 58:4
81:14

**honestly** 7:2 10:7
58:6

**honesty** 81:15

**hour** 15:2 16:20,
22 112:10

**hour-and-a-half**
62:22 63:6

**hourly** 14:15

**hours** 8:4,7,9
25:7 85:12

**housed** 43:16

**Howland** 4:8,11
12:25 13:7,13,14
16:16 17:7,13
28:16 38:9,15
51:25 52:10 57:7
59:23 60:4 63:23
64:11 67:3,7,8
82:7,11,17,20
95:18 98:6,7,21
99:9 106:20,24
109:7 121:8,10,23
129:5 131:17
134:21 136:8
137:12 138:25
139:15

**huge** 134:6

**hundred** 34:5
35:15 81:23

**hurt** 80:13

**hydrocodone**
69:23 130:24

---

**I**

**IBOL** 29:23 30:6,
13

**Idaho** 4:21 5:5,9,
18,20 6:15 7:16,
17 8:13,19 9:2,6
10:4 20:6,21 22:1
25:17,19 26:7,12,
16 28:4 31:21,22,
25 33:4 47:9
48:14,15 56:21

**idea** 51:13 79:11

**ideal** 132:7

**ideation** 75:12

**identified** 12:23
33:11 49:18 80:20
106:11 118:9

**identifies** 59:8

**identify** 60:25
68:2 88:13 137:4

**identifying** 50:20

**identity** 101:19

**Illicit** 125:11

**immediately**
41:16

**impact** 57:2
126:20,21,23
133:17

**impactful** 129:4

**impair** 108:22
109:4

**impaired** 71:16
73:11 109:6
126:25 127:2,4
128:11

**impairment**
126:17

**implying** 76:13

**important** 11:3
74:14 85:4 130:9

**impression**
54:19 55:6 61:3
136:5

**impressions**
99:4

**improper** 131:16

**impropriety**
10:12

**inappropriate**
28:11

**include** 33:13
54:10

**included** 20:23

**includes** 17:22

**including** 18:6,
19 19:3 66:17
68:12

**incorrectly** 9:12,
17

**independent**
43:14

**indicating** 54:25
56:24

**indication** 85:6

**indicator** 56:17,
20

**indicators** 57:21

**individual** 33:6 48:12

**influence** 79:13

**influences** 94:3

**info** 21:16

**information** 17:22 28:23 29:14 44:16,20 57:1,9, 16 62:16 66:19 69:11 77:2 96:18, 19 114:18,25 125:1 130:20 131:15 133:14,15, 18 134:8,11

**informed** 29:18 30:11

**initial** 61:10 73:18 74:3 75:19 125:9

**initially** 125:8

**injuries** 42:1

**inpatient** 135:21

**inquire** 72:1

**inquiring** 30:7

**ins** 100:5

**insidious** 138:9

**instance** 43:24 81:9 100:24 126:24 127:4,25

**instant** 12:11

**instructed** 40:15

**instrument** 58:18 132:5

**insurance** 60:17

**intake** 64:19 66:8,13 67:4 84:23

**interaction** 61:4 89:13

**interactive** 50:25 53:19

**interacts** 53:21

**interchangeable** 113:11

**interjectible** 113:11

**intermingle** 44:11

**interpret** 55:4 85:15

**interrupt** 90:10 107:3,4

**interrupted** 31:15

**interruption** 20:14

**interview** 36:10 50:25

**introduced** 20:1

**investigation** 29:5

**investment** 111:13

**involve** 10:9

**involved** 14:13 27:3

**involves** 33:9 104:17,18

**isolating** 87:2

**issue** 35:10 45:16

**issued** 31:2 53:14

**issues** 10:10 12:17 35:9 47:10 50:20 52:23,25 54:12,13 81:17,20 88:8 89:9 106:11 135:11,24

— **J** —

**January** 27:22 32:1

**Jeff** 16:11 119:2

**Jennifer** 12:22 13:3,5 17:10 38:10,12,23 52:2

59:25 67:4,8 75:20 82:12 106:24

**Jesus** 80:16

**jive** 58:11

**job** 7:8 11:8 36:23 37:8 38:10 40:25 42:16 62:1 87:7 94:1 100:9 104:8 105:2 112:1,2 118:12

**jobs** 7:23

**join** 44:3

**Jordan** 32:9

**Josh** 64:2

**judge** 129:3

**July** 5:2 59:18,20, 21,24 60:3,5 66:7 67:10 70:1,14 75:9,14 81:16 84:8 86:3,13 97:3 129:13 136:25

**jump** 80:12

**June** 21:12 26:1 28:3 30:23 129:13 132:24 133:22

**justifiable** 110:3

**Justine** 48:5,6 49:12,20,22 50:12,21 52:17 54:20 55:2 106:12 122:13 132:20

**Justine's** 51:15

— **K** —

**K-E-Z-E-L-E** 32:9

**keeping** 94:8 116:14

**Kezele** 32:9

**kids** 61:25

**kind** 21:15 34:19 44:13 69:9 91:4 93:4 95:4 96:20 98:4 105:7 108:7

112:1 123:3 135:18

**kinds** 24:3 27:3 70:12 72:23 75:6 81:13 91:22 92:4 93:9 95:5 133:7

**Kinney** 13:1

**knew** 73:25 85:2 97:23,25 135:12

**knowledge** 18:14 45:18 65:10 102:8 131:12

**knowledgeable** 109:8

— **L** —

**labeled** 52:4 53:10 82:4,9

**lack** 71:13 72:23 128:19

**lacks** 68:3 136:16 137:5

**lane** 37:19 45:12

**law** 13:1,9 25:19 41:22 42:10 101:16 102:12

**laws** 28:6 29:7

**lawsuit** 13:16 14:22

**lay** 42:19 67:20

**LCPC** 4:3 21:10 25:20,25 30:24 31:5

**LCPC-4894** 21:10

**lead** 103:14

**leader** 21:3

**leading** 69:25 70:14 71:17 137:13

**learning** 91:5

**leave** 27:7,8 46:15,25

**led** 70:22 71:12

**left** 7:15 15:14,16 22:19 50:2 94:9

**letter** 27:24 28:17,19,20 29:3 30:15 51:21 54:25 100:2 105:18,20 106:9 118:15

**level** 81:6 84:17

**liability** 75:1

**license** 21:10 25:23,25 26:8,11 29:25 30:7,13,20 31:3,11,12,20,22 47:4,6,16,17,19

**licensed** 31:2,7, 23 33:18 128:21 131:10

**Licenses** 26:13, 17 31:23

**Licensing** 28:4

**licensure** 21:5,9, 12 25:20 27:9 47:12 64:14

**lied** 57:17

**life** 88:14 93:5 105:1,4 106:4 109:17,21 110:8

**light** 108:8

**light-duty** 108:6

**likes** 81:24

**limited** 18:6,20 19:3

**list** 6:7 28:25 44:21,22 77:19

**literally** 66:25 71:23

**located** 8:13

**log** 60:4,6

**logically** 109:19, 25

**long** 4:25 8:24 11:19 16:19 38:22 49:20 61:5 65:2

Mark Gritton, LCPC                                                        June 03, 2020

68:22 69:25 85:18
94:16 99:24
101:12 103:13
112:6

**longer**  25:17 65:4
101:9

**looked**  17:2 30:6
71:20 83:2 119:14
120:22 139:5

**looping**  97:22

**lose**  47:6 101:19
112:2 118:12

**losing**  105:2,3

**lost**  29:25 47:4,17
63:3 101:19
103:11

**lot**  13:22 20:23
21:4,15 22:6
23:24 24:11,14
27:2 35:10,20
36:7 42:4 57:16
61:21 90:21 94:18
96:2 97:24 113:14
127:24 129:18
138:6,22

**love**  5:24

**low**  53:2 54:14

**lower**  36:1 67:24

**LPC**  25:20

**lump**  93:19

**luxury**  40:16

_____

**M**

**made**  14:25 23:4,
9 25:7,19 60:18
61:8 62:6 66:24
87:16 95:13
135:23 139:4

**maintain**  21:13
24:2 25:23 31:11
78:12

**maintained**  22:9
105:22

**major**  20:3 105:1

**majority**  20:2
35:7

**make**  6:7 11:6,21,
25 27:23 30:8
31:6 33:21 39:20
40:5 43:8 46:15
70:19 75:1 88:14
92:20 99:5
102:10,19 105:6
107:2,11 127:22
129:4 130:18
131:9 132:4
133:19 134:6,23
135:17 136:1
137:8

**makes**  99:14

**making**  66:25
127:5

**man**  71:22

**manage**  35:11
136:18

**managed**  99:24
133:8

**management**
20:6,13,15 21:20
22:12,15 33:15
42:18,21 43:9,18
44:7 105:25

**manager**  5:9,17
22:21

**managing**  79:2

**mandated**  128:1

**mangle**  44:11

**manner**  94:9

**March**  82:8,20
83:14,22,23 84:9
85:20 129:12
131:5

**mark**  4:3,17 17:9
38:13 52:3,5
106:22

**marked**  17:12
38:14 52:2,7
59:21 82:10
106:23 120:25

**married**  24:13

**master's**  20:5,8,
12,18,19,22
21:19,23,25 22:3,
5,7,11 23:5,9

**matter**  14:4 28:8
29:9 30:14 44:17
51:14 84:7,16

**Meaning**  125:10

**means**  12:8
24:23 42:19 49:17
86:19 93:6

**meat**  132:18

**med**  72:13 74:21

**Medicaid**  14:14,
15 33:13

**medical**  12:17
17:3 47:9 59:16
61:7,9,13 62:9,25
63:9 64:1,5,20
65:14 71:1 82:24
85:25 98:8 108:15
112:25 118:23
129:17 130:3

**medically**  133:8
135:18

**medication**
42:18,20 43:3,8,
18 44:6,13,14,19,
21 45:21 48:1
69:5 74:13 79:9
88:18 92:23
105:24,25 112:17
128:10 134:16
137:11

**medications**
12:16 43:1 44:22,
24 66:1 69:15
74:16 77:19
78:17,18 99:23
112:22 116:11
124:10 127:3
128:22 130:16
131:11 133:11
135:11,15 137:16,
22

**meds**  44:25 72:5,
12 77:22 81:10
125:11 136:1

**meet**  4:12 16:19

42:23 43:13 44:2
49:14 51:7 60:19
61:5 63:13,15,20
93:19

**meeting**  67:18
75:9 93:22

**meetings**  43:6

**meets**  123:13

**Melissa**  32:7

**memory**  5:11
7:19

**mental**  24:10
29:14 33:2,3,9
34:4 35:9,12,16
36:6,10,22 37:5,
10 42:2 43:2
45:19 66:18 76:14
89:9 103:7 104:24
109:9

**mentally**  99:22,
23

**mentioned**  69:23

**messaging**
12:11

**met**  51:9 67:23
106:9 115:4

**meth**  34:13

**methamphetami
ne**  34:17

**methodology**
61:1

**Michael**  10:16

**Michigan**  27:5

**mid-july**  125:23

**mind**  32:9 37:14
40:20 55:12,16
56:1 80:19 95:24

**mine**  51:15

**minimal**  53:3
89:11,18

**minute**  27:19
73:24 107:4
125:15,19

**minutes**  44:4

61:6 63:14 64:10

**missed**  40:5

**misstates**  57:4

**mistaken**  16:13

**misunderstood**
6:20

**moment**  38:15
39:15 40:17 41:8
44:1 61:15 65:11
83:5 84:22

**monitor**  34:19
44:23

**monitors**  26:13

**month**  129:1,23

**months**  62:17
68:4 84:21 85:5
129:24 132:3,19
137:6

**mood**  76:15
90:17,20 106:2

**mood-altering**
34:14 125:12

**mopey**  70:11

**morning**  4:9,10

**motivated**
112:14 118:20
123:6

**motivation**  68:3
71:13 136:16
137:5

**mouth**  85:12

**mouthful**  134:14

**move**  38:20 50:9
51:15 73:23 88:16
99:12 136:19

**moved**  20:7

**moving**  20:4
22:17 65:14

**multiple**  57:17
68:14

**multiples**  69:1

**N**

**naked** 80:18

**nature** 37:24
43:22 45:22 50:9

**navigate** 69:17

**necessarily**
37:18 73:2 77:16
84:21 110:16
111:11 138:6

**neck** 93:19 131:1

**needed** 55:18
56:2,5,13 59:10
73:5,7 74:18
85:13 100:2
105:14 107:11
118:8

**neuroscientist**
91:17

**neurotransmitti
ng-type** 92:5

**newspaper** 51:5

**nods** 11:4

**non-testifying**
13:19 14:17

**noon** 107:11

**Norco** 128:17
129:11 131:6

**normal** 62:8 92:6

**notation** 72:3
74:20

**note** 44:21 51:12
52:8 60:6 67:25
70:4,19,20 71:10
73:16,21 76:4,9
81:16 86:4,23
87:16 89:22 93:8
116:25 136:11

**noted** 80:21
122:15 126:8

**notes** 15:23
18:17 51:17
56:10,11 60:4
67:6,9 75:13,14
77:12 78:23 79:15

82:8 84:20 85:25
86:11 96:13 99:6,
19 102:17 106:1
118:11 122:7,18
125:16 126:8

**notice** 29:2 44:12
47:13 67:24 79:21
107:14

**November** 131:5

**number** 18:16
21:10

**numbers** 35:5,6,
14

**nurse** 42:16
47:18

**O**

**oath** 12:14

**object** 28:10
97:16 108:23
121:14 136:8
137:12 138:25

**objection** 57:4
121:10 128:19
131:9,18

**objective** 22:14
23:10

**objects** 17:22

**observe** 127:12,
13

**observing** 13:11

**obtain** 21:18
25:1,9 26:2,7
44:15 61:12
112:17

**obtained** 21:11
22:16 24:20 25:5

**occasions**
128:18

**occupational**
20:5,13,15 21:19
22:12 26:12,16
28:4 31:23

**occurring** 94:3

**October** 31:1,8
129:12,13 131:4

**offer** 131:14

**offered** 110:22

**office** 4:20 14:25
22:22 26:21 27:6
41:12 64:3 69:8
71:22,24 76:22
77:9 93:24 94:19
95:21 97:10
100:19 103:17
111:20 112:16
135:10

**office-initiated**
105:22

**officer** 36:20 73:7
77:3,5 94:24
101:12,13 102:13
106:14,17 109:18

**officers** 41:22
42:10 114:25

**official** 36:5 37:1,
13 38:6

**oftentimes** 14:3,
11,12 35:10 58:7
72:10 80:9 91:19
127:24

**one-time** 129:16

**ongoing** 105:25

**onward** 21:2

**opiate** 45:24
72:20 74:10 84:11
126:1

**opiates** 34:13,16
69:3,19 74:17,19
81:22,24 91:1,19,
21 92:1 93:12
106:2 109:5
117:12 128:12
129:20,21 136:18

**opinion** 36:21
37:9,22 58:5
71:15 78:15 91:6
95:11,19 100:7,18
101:18 102:20,24
103:6 104:10,11,
15,16,18 105:8,
12,16 107:22,23

108:5,10,18,21
112:25 114:15
121:12 126:20,21,
23 130:18,22
134:9 137:14,21

**opinions** 97:19
99:15,19 106:21
107:1 131:15

**opioid** 45:19
77:14 79:17 96:22
130:12

**opioids** 45:17,20
69:21 130:11

**opportunity**
101:6,20 110:24
111:12

**opposed** 37:13
55:20 84:12 91:6
128:10

**options** 74:21,22

**Oral** 85:13

**order** 18:8 56:3,
13 74:18,25 128:5
135:12

**ordered** 83:20,22

**organization**
6:24

**oriented** 90:18

**ostracized**
101:17

**outlined** 105:19
132:25

**outpatient**
135:20,24

**outs** 100:5

**oversees** 26:11

**overwhelms**
110:12

**Oxy** 69:18,22,24
70:8 77:24 78:1,
12,24 79:4,13
84:13 87:17 93:4,
6 138:9

**oxycodone**
78:19 83:7,14,22

84:9 85:2,5

**Oxycontin** 68:5,
6,8,9,16,20,23
69:12 70:15,22
71:17 72:25 73:11
87:12 90:5 91:1,3,
8 92:18 93:1
106:2 126:2 128:6
130:24 137:7

**Oxys** 84:12
128:12

**oxytocin** 92:3
138:7

**P**

**p.m.** 139:17

**Pacific** 6:18 7:3
8:8,12 23:21

**packet** 52:4

**pages** 38:22
52:20

**paid** 14:21,23
15:6 23:11

**pain** 45:21 68:9
69:5,14 72:5,12,
13 74:21 81:10
85:13 93:7,11
112:17,22 126:13
136:18

**painkillers** 34:17
108:19

**Pam** 4:11 12:21

**paper** 27:18

**papers** 27:21

**paperwork** 43:12
47:21 51:23 66:22
123:14

**paragraph** 76:24

**paranoia** 77:14
86:18 87:9 94:12,
22 95:24 96:1,22
113:10,12 118:16

**paranoid** 93:14,
16 95:9 113:6

Mark Gritton, LCPC                                                                    June 03, 2020

parents 29:17

parole 127:25

paroled 27:5

parse 96:4

part 8:6 9:19 19:25 23:16,17 25:18 39:12 47:14 56:2,13 58:10 62:8 123:8 124:13 125:8 133:7

particularity 68:10

passed 25:19

passing 105:4

past 69:3,13,15, 19,21 107:6 130:11 131:24 132:2

patient 26:21 28:15,23 29:12 40:25 44:2 46:1 48:2 50:25 53:20, 23 56:25 57:8 60:13 65:19 76:2 81:6 104:17 123:13

patient's 28:9,13 29:14 41:13

patients 34:9 42:17 43:17,18,21 65:23 68:14 93:11 110:20 116:10 127:18,19,20

pattern 68:16 129:2 130:2 131:23

pay 15:1,3 61:21, 22 110:22

payment 134:23

peer 33:15

pending 11:24

people 12:7 23:24,25 24:12 33:12 35:7,11 41:25 42:3,5,7 43:24 48:12 58:5

72:20 75:2 76:21 77:1,7,9 78:5 79:4 80:9,11,15 81:8, 10,13,25 82:2 89:8 90:22,25 91:19 94:18 95:2 96:11 101:22 102:14,18 111:5 123:9 129:20 138:2,5,6

people's 120:12

percent 34:5,8, 22,23 35:15,16,25 36:2 48:3 49:24 78:1 81:23 105:23

percentage 35:23

Percocet 131:4

Perfect 63:22

perform 36:23 73:6

performance 10:9

performed 115:6

performing 25:12

period 71:3 93:3 132:24

periodically 26:13

person 16:17,18 42:6 43:9,11 57:13 72:14 80:12 81:22 96:14,16 103:14 110:5 111:3

person's 37:8 43:2

personal 16:1 110:17

personally 41:19 58:20 114:19

personnel 50:1

perspective 104:6,24,25 110:6,13 132:17

133:12

pertain 45:5

pertaining 18:17

pertains 77:8

pharmacy 84:2

phone 12:10 16:16

physical 37:23

physician 66:2 131:11

pick 87:23 92:2

piece 22:7,10 24:17 92:7 110:4 118:13

pieces 138:17

pile 40:4

pink 89:4

places 36:14 127:22

plaintiff's 95:7, 14 107:1

plan 15:3 77:11, 24 104:11 106:13

plays 133:7

Pocatello 8:13 22:1

point 56:11 72:14 85:5 87:11 88:23 89:20,21,25 90:4 92:17 93:1 99:21 100:5 103:3,15 104:4,9 110:12 119:16

police 36:20 73:7 101:12,13 109:18 114:24

policies 103:16

policy 46:14 109:23

political 94:19

pop 57:22 58:10

population 116:23

portion 67:24

position 91:18 102:12 106:5 114:8,22

positive 88:15 94:9

possession 40:7

possessions 80:17

possibility 102:23 104:10

postulate 103:10

potential 53:2,3 54:14

practice 28:7 29:7 32:12 34:3,6, 23 35:3 44:17 45:13 47:4,7,17 50:3 62:9 66:9

practitioner 42:16 47:18

practitioners 47:9

pre-covid-19 12:4

predominantly 26:25

preparation 15:24 16:6,7

prepare 15:17

prescribe 42:25 43:3 45:22,24 116:10 131:11 134:17

prescribed 65:20,24 66:2 70:22 71:1 73:3 85:10 87:25 92:21 99:24 123:22,23 124:4 128:17,21 129:11 131:4

prescriber 45:3 84:6 99:25 128:21 130:5

prescribes 43:15

prescribing 44:9 45:17,19 46:1 133:6

prescription 65:20,23 73:12,19 77:21 108:19 125:11

prescriptions 83:14

present 14:4 31:13 53:20

presentation 136:14

presented 68:13 125:25 128:7

presenting 126:4

presumptuous 130:8

pretends 88:19, 21

pretty 9:16 32:18 39:16 51:2 77:4 90:20 131:19

Prevacid 83:7

prevent 12:17

primarily 32:16

primary 45:2

principal 30:12

print 40:16

prior 5:16 31:1 54:21 69:3 93:8, 10 117:5 138:12

prison 23:25 27:4

private 50:3

PRN 47:8

pro 14:10

probation 127:25

probe 79:25

problem 46:2 56:18 57:19 59:8 61:25 67:25 76:24 86:24 96:20 111:8 134:10 137:2

**problems** 58:15, 16 65:19 115:2

**procedure** 47:25 130:4

**procedures** 129:17

**process** 72:11 88:8 89:1 92:1 113:22 123:4,12

**processes** 122:21

**produced** 5:25 6:2 18:1,10,13 19:7,10 40:2

**production** 92:2

**profession** 104:15

**professional** 21:7 24:25 25:22 31:2,7 55:2 75:1 130:22 133:13

**program** 47:9,23 60:17

**progress** 86:16 89:11,18 99:20 105:20 113:16

**prohibited** 26:23

**proper** 23:16 46:6

**propose** 62:22

**Protection** 13:23

**provide** 26:25 28:22,23 32:20 33:4,5,6,8,10,11, 19 36:21 40:9 42:20 51:21

**provided** 27:25 36:12 40:11 62:11 90:21 95:16

**provider** 44:19 45:3 119:8

**providers** 33:18, 24 61:13 62:10,25

**providing** 31:24 42:17

**Prozac** 73:19 74:1 77:21 78:19 87:23

**psychiatric** 42:16,17,20 47:18 92:23 104:5,7,15, 24 136:1

**psychiatrist** 115:19,22,25 116:2,6 122:19 123:2,13

**psychiatrists** 116:8,12,15

**psychoeducatio n** 90:22

**psychological** 110:6,13 116:9 123:1

**psychological/ mental** 42:24

**psychologist** 116:17,18 123:12

**psychologists** 116:16,19

**psychotherapy** 116:10

**psychotropic** 105:24

**PTSD** 106:11

**public** 7:14 30:14

**pull** 17:10 27:15 38:9,12 49:9 59:16 75:15 106:25

**pulled** 47:12 67:3,9

**pupils** 128:13

**purposes** 38:3 74:9 84:7,16

**pursue** 112:17

**pursued** 20:5,12, 16

**pursuits** 20:1

**put** 49:15 56:14 61:18 76:7 78:22

88:8 93:17 99:4 100:8,23 121:10 129:19 136:17,21 138:22

**puts** 81:25

**putting** 102:17

---

## Q

**QSADP** 24:20

**QSUDP** 21:6 24:21,22

**qualifications** 31:17

**qualified** 21:6 24:24,25 25:21 37:18,21 48:16,20 99:25

**qualifies** 19:19

**qualify** 116:5

**queried** 88:9

**question** 6:13 11:10,11,14,24 12:12 18:16 32:18 36:15 54:4,6 57:6 62:7 65:15,25 66:11 76:3 84:5 95:19 97:17 100:16 116:1 132:14

**questioning** 98:5

**questions** 11:8 12:5,18 50:17 51:1 53:21,23,24 57:1,9,15 58:4,6,9 88:9 97:22 98:1, 13,22 99:1,11 100:21 107:19 129:10 131:10 134:18 135:2

**queue** 58:10

**quick** 10:23 49:10 96:5

**quote** 29:4

---

## R

**random** 129:21

**randomly** 128:2 130:23

**rate** 14:16 23:13 112:8

**re-ask** 54:6

**re-engagement** 106:3

**re-read** 56:8

**react** 110:1

**reacted** 109:25

**reaction** 76:1

**reactions** 45:1

**read** 53:23 83:24

**readiness** 52:23 54:14

**ready** 38:23 50:6 107:19 136:18

**real** 10:23 49:9 96:4

**realization** 70:6

**realize** 138:21

**realized** 27:7 73:4

**realm** 75:4

**reason** 30:5 39:23,25 41:9 47:11 53:17 57:15 66:23 68:2,15 69:16 72:9 81:14 84:10 90:11 100:25 108:12 118:14 128:14 136:21 137:4

**reasoning** 80:5 127:8

**reasons** 110:3

**rebels** 81:23

**recall** 9:1 40:10 41:6 49:12 50:13, 22 54:22 55:12,16

69:1,19 77:2 91:4 94:17 96:14

**recalled** 94:16

**receive** 33:12 41:12 43:12

**received** 19:23 21:12 29:2,3 32:1 36:17 39:12 50:14 51:4 63:10 65:8

**receiving** 44:18 124:10

**recent** 12:3 85:3 131:25

**recess** 63:24

**recognize** 12:24

**recognizes** 48:15 56:21

**recollection** 68:24

**recommend** 55:22

**recommendatio n** 49:16

**recommendatio ns** 52:18 53:10,16 54:1,8 133:19

**recommended** 56:6

**reconciled** 77:19

**record** 4:16 30:14 62:16 64:17 121:11 122:13 136:5,24,25

**records** 9:15 17:3 44:8,12 45:5 46:9,13,14,15,19 49:11 59:17 61:7, 9,13 62:9,13,15, 20,25 63:9 64:2,5 65:8,15 82:25 85:25 98:8 108:15 112:13 113:1 118:5,23 119:6, 11,17,20,21,22 120:1,8,12,13,14, 15,23 124:9 138:13 139:5

recover 69:4

recovered 69:2

recovering 125:25

recovery 71:2

redact 28:17

reduce 69:5 70:4 84:23 136:21

reduced 23:13

refer 42:6 95:12 135:15 136:12

referencing 28:19 86:20

referral 43:8 135:17,23

referrals 127:22

referred 43:10 105:23 106:10 135:25

referring 98:17

refills 83:18 84:1

reflect 117:15

reflected 118:22

reframed 94:7

reframing 88:11

refreshing 15:22

refused 115:13

regard 57:1 66:9 121:25 122:23

regional 5:9 22:20,21

regions 22:22

regular 21:9

rehab 5:10,14,15 22:25 23:5

rehabilitation 5:6 7:22 20:9,20 22:17,18 23:7,23 33:14 42:3

relapse 53:2 54:14

relapsed 24:1

relate 19:1

related 17:25 47:20 52:23,25 54:12,13 65:19 88:9 103:19 129:17

relates 12:2 34:11

relating 18:4

relationship 24:14 81:11 137:22,25

relationships 24:12

release 28:13 44:20 64:1,20 97:11 119:4 120:2,5

released 29:13 55:19 56:3 100:1

releases 62:16 66:18 112:18

reliability 57:2, 10

reliable 56:17,19, 23 134:9

rely 55:9 114:20 120:11

relying 114:16

remained 111:23

remains 123:21

remedy 111:8

remember 8:24 9:3 10:7,20 16:10, 14 26:5 55:12 60:14 126:14

remission 117:14

remotely 12:8

remove 69:4

removed 125:22

removing 117:12

render 130:18

rendered 55:2

reordered 84:3

repeat 53:8 57:6 76:3 116:1

rephrase 11:11 120:18

report 34:20 44:16 52:20 53:14 57:23 81:2 84:2 117:20,22 122:20 123:16,18 125:6

reported 77:20 78:21 84:11 106:3 111:24 118:22 122:2

reporter 11:1 135:1

reporting 119:25

reports 18:17 36:7 68:3 73:17 92:19 117:12 126:17 137:5

represent 40:1 129:10

representation 12:13 17:16

representing 14:6

represents 60:7

request 48:13 62:9

requested 6:3 139:19

requests 62:16

require 49:13 61:20

required 21:5 37:9 47:24 55:25 101:7

requirements 37:8 52:25 61:17

requires 43:22 72:16

researched 29:21

residual 93:7

resolved 27:10, 22 28:2,20

resources 14:14

respect 84:18 111:17

response 57:9 58:4

responses 11:3

responsible 44:15

rest 91:14

restrictions 108:11,13

result 11:2 12:9

results 55:10 57:11 132:20

retain 25:15 26:8

retainer 15:8,9, 11

return 36:12,13 37:1 38:2 70:6,10 87:3 99:21 105:21 106:5 108:6,9,10, 13 112:14 118:6, 14 123:3 126:6 135:9

returned 100:7, 10

reveal 28:5 29:6

review 14:3,4 29:5 38:19 39:6 46:8 50:16 58:9 61:7,9 63:13 119:5,12 120:1 138:13

reviewed 15:19 17:6,14 77:18 94:8 103:16,19,21 119:13 121:13,16 139:10

reviewing 50:11 76:9 100:8

revisit 113:9

revoked 30:14

revolved 10:11

revolves 101:16

rid 79:12

Rim 6:19 7:3 8:8, 12 23:21

risk 54:11 81:17, 19,25 122:16

road 8:22 77:13 89:17

role 42:14

room 12:4 75:5 89:5

rudiment 91:18

rudimentary 91:17,18

rules 10:23 28:6 29:7

run 80:17 105:4 123:12

run-through 40:4

runner 13:8

runs 86:25

Ryan 13:1,6

résumé 5:22 6:9 7:10 21:3

**S**

sad 69:9 91:22

sadly 111:4

sadness 71:13 72:22 79:7 88:24

safety's 75:6

sake 75:7

sat 58:14

satisfaction 35:17

save 111:15

scanned 41:12

scenery 50:7

schizophrenic
80:14

school 13:10
29:11,12,13,15,
16,22,23,24 30:1,
12

science 19:24

scope 119:23

screen 17:11
86:6

screeners 66:18

screening 54:23

scroll 38:23 39:1,
2,3 59:25 67:7
75:21 83:4,8,9
107:16,18,25

scrolling 82:13
83:9

section 108:3

seek 75:5

seeking 136:6

self-harm 110:9
114:13 122:16

self-medicate
35:11

self-report
112:24

self-terminated
47:5,13

send 45:2 46:13
62:5 66:8,13

sending 66:16

sense 11:6,25
36:19 58:8 88:6
93:25 99:5 101:17
104:21,22,24

sentence 113:3

September 51:4
106:6,8 122:7
131:4

series 52:17

serotonin 92:4

served 17:6

serves 5:11 7:19

services 4:21
13:23 25:12 26:25
32:20,21,24 33:2,
4,5,10,11,13,14,
20 43:13,19 53:2
101:1

session 44:3
59:24 60:5,8,9,16
61:4,11 62:15
66:6 67:5,9,10
70:1 73:22 75:15
76:25 89:12 90:21
92:10 93:10
114:19 117:1
125:8

sessions 18:4,18
62:2 81:3 105:23
125:4 126:5

set 55:17 101:14

setting 26:6

settled 9:18

settlement 9:19

seventh 108:4

severe 74:24
75:2,3,8 100:19
109:9,11 111:10

severity 135:21

sexual 26:22

shakes 11:4

shared 94:4,14
96:10 103:23
113:17,21 114:18,
25

she'll 38:24

Shell 73:17 77:20

Shelley 42:12,15,
23 43:5,10,17,25
45:5,10 46:8,21
87:22 92:7,21
105:24 119:7
124:1 135:25
138:22

Shelley's 119:10,
17 120:13 139:5

sheriff 93:18
100:25 105:19
122:21

sheriff's 56:14
71:24 93:22,23
94:15 95:21 96:12
97:10 100:19
102:9 103:17
111:19 112:16
122:19 135:10

show 57:22 82:4
95:17 98:20 99:10
100:18 106:25

showed 27:5

showing 110:18
128:10

shows 69:8

shut 138:8

shutting 69:10

sic 48:12

side 6:3 36:24
42:6 68:7 72:18
138:9

side's 16:8

sign 44:20 62:15
64:1 119:4 120:5

signature 139:19

signed 66:19

significance
49:6,8 76:18

significant 41:16
45:15,25 74:8
76:7 128:16
129:15 130:13
131:7,23 133:4,25

similar 51:1
95:25

simply 61:23

sit 50:16 126:15
138:6,7

sits 50:24 68:1
136:15 137:3

sitting 12:22
126:14 128:13

situation 26:20
78:4 81:18 88:15

situations 27:3

skew 57:10 58:18
59:6

skewed 58:23
59:1

sky 87:9

slough 91:13,25

small 128:12

smelling 110:19

sobbing 71:23

social 20:2
101:15 102:13
103:11

Soma 83:6

sort 35:18 36:16
67:1 77:11 114:7

sound 11:12 63:2

sounds 10:21
13:12 28:24 36:3
64:15 73:25

space 123:10

speak 115:11,14,
17

speaking 41:2
43:7 50:7 61:16
62:14 72:10
129:20

specialization
24:6,8

specialized
20:25 33:7

specific 34:12
37:25 41:23 67:22
88:13 96:14

specifically
42:1,11 98:18
126:2,14

speed 122:22

spell 10:17 16:3

spelling 4:16

spend 50:11

spent 34:4,6
111:14

spot 89:16

stability 37:10

stabilized 106:3

stable 99:22,23

stack 39:19,25
41:10

stacks 39:19

staff 33:17 40:15
64:24 65:2,5
107:10

stair-stepping
84:19

stairstep 71:11

stand 7:1

stands 48:11

start 22:18 32:25
44:25 68:10 69:24
72:19 73:5 83:22
92:5 132:13,15

started 7:16
32:14 46:13 68:5,
6 70:4 71:5 73:18
77:21 92:6,19
97:17 113:18

starts 91:13

state 4:15 5:5
7:16,17,21 8:1,19
9:2,5,7,10,18,24
10:5 19:24 20:6
22:1,23,25 23:12
25:8 26:7 27:25
31:3,25 47:12
48:14 56:21 103:7
117:11 132:6
136:22

stated 76:24
77:22 78:23
79:15,22 87:21

statement 95:12
99:8

Mark Gritton, LCPC                                          June 03, 2020

**states** 95:8

**Status** 76:14

**stay** 19:21 37:19

**stays** 35:24 97:1

**step** 135:20

**stick** 131:1

**stop** 20:10 21:14
33:21 68:11 69:4,
5 71:5 72:20
77:25 82:12 84:23
87:22 91:21
135:12

**stopped** 68:15
87:13 90:12 91:11
92:18 102:22
103:7 105:12,17
106:1 112:23
128:6

**stopping** 74:21
79:9 135:11,14

**stops** 81:22

**store** 5:16

**stored** 17:21

**stories** 113:17

**straightforward**
51:2

**street** 4:24 105:5
130:7

**stressed** 89:2

**strict** 36:12

**structure** 102:13
103:12

**structured** 53:22

**struggles** 88:10

**struggling** 91:14

**student** 13:1
29:16

**students** 22:7
29:15

**stuff** 90:17 91:15
94:19 95:4 113:15
123:15 126:14
127:12 139:7

**subminimal**
111:25

**submitted** 51:23

**subpoena** 17:9

**subpoenas** 17:6

**subsequently**
31:3

**substance** 20:24
21:7 24:5,24,25
25:21 33:9 34:7,9,
10,24,25 35:8,16,
20 36:6,8,22 37:6,
11 45:16 46:1
47:10 48:13
49:13,17 56:18
68:20 112:18
115:24 116:3,7
129:6,7 133:13
134:9 136:13

**substance-
induced** 18:8,21
19:5 60:22 67:14,
21 68:19 78:9
86:8 90:1 92:15
117:6

**substances**
34:14 125:10

**successful**
111:14

**successfully**
69:6,16 111:24

**suffer** 35:9

**suffers** 56:17

**suicidal** 44:1
75:3,11 90:17
100:12,15,17
101:8 102:2,7,10,
21 103:1 104:9
105:8,10,12
106:18 109:15
117:17 118:21
119:9

**suicidality** 102:4

**suicide** 111:3
122:16 138:24

**summarize**
64:18

**summary** 52:18
53:9 54:7

**summer** 13:2,9

**summonsed**
17:5

**supervisee**
32:10

**supervisees**
32:3,5

**supervisions**
31:24

**supervisor** 14:2
30:12 31:22,24
46:17

**support** 33:15
87:8 103:12

**supporting**
17:23

**supports** 114:15

**surgeries** 69:2,
13 130:15

**surgery** 68:3,25
70:25 85:3,16
125:25 130:4
136:17 137:6

**surrounding**
20:23

**suspect** 128:15

**suspended** 30:7

**suspicious**
75:25 76:5,13,16,
19 78:7 128:15

**suspiciousness**
78:3

**Sweet** 48:5,6
49:21 52:17
106:12 122:13

**Sweet's** 50:12

**sworn** 4:4

**symptom** 77:14,
17 78:3 79:19

**symptomatolog
y** 43:1 72:19 78:2
79:3 90:25 91:12

126:1 138:4

**symptoms** 68:5,
11,17 71:6,12
72:22 74:25 75:2,
8 79:6 84:17 88:2
126:3 128:8
135:22 137:15,23

**synthetic** 74:10

**system** 92:1 93:5

**systems** 132:6

---

**T**

**table** 98:13

**tablet** 77:24
78:20

**tablets** 85:12,19

**takes** 123:17

**taking** 12:16
24:17 27:19 64:25
65:19,24 68:23
69:5,24,25 70:2,5,
8,15,18,25 71:17
72:15 73:11,13
74:1 77:22 78:1
81:22 83:6,19
84:9,12,14,21
85:2,4 87:12,22
91:21,23 92:18
93:12 99:23 106:2
122:20 123:23
125:11 127:2
128:6,11 132:23
133:6

**talk** 15:22 19:14
32:11 45:10 52:9
54:17 55:5 59:13
60:3 66:6 72:12,
15,17 73:2 79:16,
22 80:3 81:8,10
85:24 89:5 92:10
94:25 97:9 99:7
121:24 122:6,23
124:13 127:6,7,9
132:1

**talked** 15:24
16:1,5,8,24 29:22
51:18 75:14
90:21,23,24 93:8,

10 99:3 103:24
104:2 117:19
119:2,8 125:8
133:20 137:19

**talking** 17:8,14
43:20 65:13 81:7
91:11 93:3 97:17
132:10

**talks** 86:16,24

**tangible** 113:15

**tapered** 35:21

**tearfulness**
68:13 71:14

**Technology** 6:10

**teeth** 57:18

**telling** 69:1 80:11
127:3

**tells** 59:7 79:24
80:9 85:14

**ten** 5:16 44:3
58:17 63:15,17,18
107:7

**terminated** 9:16,
17 100:4 110:15,
24 111:5 113:24
114:10,11,14
124:25

**termination** 9:25
10:9,11 103:20,25
104:3 109:23
111:9 124:23,24

**terms** 42:19
46:25 47:2,12,14
67:20

**test** 26:7 31:4
127:16,18,21
128:1

**tested** 127:20

**testified** 4:6
13:15

**testify** 98:2,12
99:16,18 112:13
118:4 119:16
120:14,15,21
121:5 138:16

testifying 138:21

testimony 14:21
15:25 16:6,7 57:5
96:21 109:22
110:14 111:7
112:12 121:15

testing 58:20
128:4

theme 77:7 95:23
113:17

therapist 81:6
135:14

therapy 43:19
55:14

thing 37:1 73:8
84:14 96:15
102:16 107:24
117:23 119:19
134:4 138:8,10

things 11:4 14:12
20:11 24:3 37:8,
24 51:2 61:23
70:12 72:23
80:10,11,13 81:7,
13 87:10 91:23
92:3 93:7,10
94:19 95:6 102:21
109:15 118:9
122:21 123:10
127:8 128:14
129:17 133:7
135:22

thinking 8:23
56:1 86:18,21
89:14

thought 66:23
77:4 79:8 89:11
90:19 95:9 96:11
97:3 100:14 113:5
117:23 119:13
127:7

thoughts 75:11

throws 93:4

til 63:15,16,17,18
107:7

time 7:24 8:2,6
10:15 15:4 23:19
35:4 36:2 38:24
39:21 46:18 48:21

49:4,14 50:11,13,
16,23 51:14,16
54:5,21,24 60:21
61:10 62:23 63:7,
12,14,18 64:25
65:12 67:24 68:23
69:7 72:16 73:9,
13 74:1 76:21
79:11 80:8,24,25
82:2 87:21 91:25
93:15,25 94:6,16
95:8 96:24 97:1,
23 98:11 101:13
102:5,6 106:9,10
107:13 108:13,16
111:14 112:7,23
113:5 116:14
117:16 122:20
123:10,11,17,24
124:7 129:3
131:13 132:3,11,
24 134:19 137:21

times 8:20 114:5

title 37:15

titrate 68:4,21
71:10 72:19 84:22
137:7

titrating 74:13
137:16

today 4:13 12:8,
18 15:4,18 16:6
18:9 41:19 45:9
97:24 98:4 121:15
123:18 134:19
138:12 139:2

told 69:18 70:2
73:16 87:22 101:9
120:2 130:14
131:13,14

tolerance 72:15
84:17

Tom 105:18

tonight 123:19

tool 53:19

tools 89:15 94:8

toothache 129:1

top 39:14 56:7
58:13 67:12 78:16
82:18 131:5

totally 28:11
109:17

track 19:21

training 20:6,13,
15 21:19 22:12
23:16 36:17 38:5
41:24,25 42:25
116:6

tramadol 74:6,10
133:20,22

trauma 24:16
104:5,7,16,23,25
105:1 109:25

traumatic 104:4,
8 109:14 110:15
111:2,9

treat 115:24
116:2

treated 68:14
101:24 105:11
137:20

treating 24:17
34:4 40:25 41:21,
25 45:6,8,11 49:5
102:22 103:7
104:17 105:9,13,
17 112:23 116:7

treatment 7:5,23
18:5,7,18,20 19:2,
4 33:8 34:10
49:13,17 50:22
51:10,17 53:25
55:21 59:14 68:8
74:9 75:14 85:25
86:16 89:22 101:7
105:22 110:22,23
122:6 124:14
135:18

treatments 25:13
33:8

treats 92:24

trial 97:20 98:2,13
104:12

true 118:13

trust 76:25 77:6
81:7,12 96:15
102:18 118:11

trusted 81:9
96:18

trusts 81:12

truth 4:5

truthfully 12:19

turn 17:17 44:5

turned 110:23

Turning 112:11

turns 128:2

Twin 4:21 5:8
33:3 95:20 97:10
100:18,25 103:17
104:2 105:19
111:19 112:16
116:12,15,19
118:17 135:10

Tye 115:3,4,11,
14,17

type 34:24 35:9
36:12,13 37:3
43:21 69:11
121:14

types 25:12 34:12
44:11 93:7

typical 40:24

typically 34:19
80:10 125:9
129:19

---

**U**

U-H-L 32:7

UA 47:24

uh-huh 11:5

Uhl 32:7

umpteen 103:12

unable 69:17

unbearable 82:3

uncomfortable
11:22

uncommon 89:8

undermine
114:7,21

trusted 81:9
96:18

understand 6:23
11:9,12,16 14:25
31:7 45:4 54:3
66:10 85:4,7 87:1
88:19 96:21
98:11,15 105:7
113:23,24 127:10

understanding
22:4,6 34:23
45:20 58:21 68:22
70:13,21,24 71:4
92:17 100:3 112:6
113:20 116:8
120:20 124:2
125:21 135:7
137:9,18

understood
11:7,15 70:7
137:9

unethical 30:11
119:23

unfair 98:5 99:1

uniform 71:25

universal 48:15

University 19:24
20:6,21 22:1

unreasonable
118:18

unsuccessful
126:7

unsuccessfully
87:3

unusual 76:6

upbeat 90:20

updated 117:14

upset 95:1

---

**V**

valid 95:10,21
96:8 97:9,14
113:7,20 114:3

validity 53:15
54:15,18,19
57:20,23 78:6
113:19

**Valium** 132:23

**Valtrex** 83:6

**variety** 22:5

**vehicle** 110:20

**verify** 128:3

**versus** 9:5 95:24

**videoconference** 139:17

**view** 34:14 104:4

**violated** 77:6 96:15

**violation** 28:6,14 29:6

**violations** 30:1

**visit** 73:18 74:3 75:19 122:14,15

**visually** 41:20

**Voc** 5:10,14,15 22:25

**vocal** 93:24

**vocational** 5:6 7:22 22:16 23:14, 23

**voiced** 93:21 114:4

**voices** 79:16,22, 24,25 80:1,6,10, 15,23 81:1,3

**voicing** 123:7

**vouch** 119:22

---

**W**

**walk** 19:17 127:6

**Walmart** 5:17 7:8,9,15,18

**Walrath** 13:3 67:5

**wanted** 31:19 64:14 111:1 115:11 117:23 121:24 135:9

**wanting** 123:5 136:21

**Waters** 64:3,20, 23 65:6 66:19 82:25 124:4,10,11

**Waters'** 64:3 82:7

**wean** 72:4

**weaning** 72:11

**Weber** 19:24

**website** 29:24 30:6

**week** 8:5,7,11 53:5,14 74:3 75:17,18 82:1 87:11 93:20

**weeks** 62:17 68:5 70:3,14 71:5,17 93:3

**weepiness** 88:25

**weeping** 79:7

**what-ifs** 129:18

**wheel** 124:21

**Whistleblower** 10:1

**whomever** 44:19

**Whoops** 90:9

**wife** 61:25 76:25 81:12,18 86:25 87:6 88:18 90:20 91:2 93:19

**withdrawal** 54:11 71:6 72:22 74:24 77:17 79:18 81:17,20 84:17 88:2 96:23 126:2 135:22

**wonderful** 6:11

**word** 11:2 72:7,8, 9 79:5 114:11

**words** 91:5

**work** 5:4,10,13 6:14 7:16 8:5,9 13:23 14:8,18 19:19 20:2,23

22:24 24:10,15 25:6,9 27:2 33:1 35:20 36:7,13 38:2 42:3 46:21, 23 48:7 50:8 55:14,15,19 56:4, 14 70:6,7,11 71:16 73:4,6,9 74:19 78:6 87:3 94:4,5 96:20 97:7 99:21 100:7,11 102:15 105:21 106:5 108:6,9,11, 14,22 110:19 112:15 118:6,14 123:4,5,7 126:6, 13 135:9,24 136:3,23

**worked** 4:25 5:5, 15,16,17 6:18,21 7:17 8:4 23:20 44:5 49:20 50:21 103:13 127:10

**working** 7:21,23 8:1 13:9 14:10 22:19,25 24:15 43:25 101:9 111:3

**workplace** 89:19 97:4 125:22 126:18

**works** 32:6 66:9 81:11 96:17 110:19 134:24

**world** 20:1 22:17 23:14,23 50:22 101:15,22 102:3 127:14

**worried** 80:6,22 81:1,4

**worst** 86:22

**wrapped** 125:18

**Wray** 42:12,15 43:6 45:10 46:21 87:22 105:24 119:7

**Wray's** 45:5 46:8

**write** 123:16

**write-up** 107:21

**write-ups** 112:1

**written** 26:6 56:10 62:11 99:4

**wrong** 59:1,3,5 88:20,22

**wrongful** 9:25

**wrote** 54:25 71:10 97:20 98:18 99:7 100:2 105:18 106:8 118:15 137:3

---

**X**

**Xanax** 73:19 74:2 77:22 78:19

---

**Y**

**year** 7:18 18:6,19 19:2 21:5 27:11, 12,13

**yearly** 26:10

**years** 5:10,16,19, 22 20:25 26:3,4 49:23 50:8 58:17 68:15 103:13 112:5 131:24

**yes/no** 57:12

Exhibit H

# Remote Videotaped Deposition of
# Shelley Wray, PNP

Date: June 03, 2020

Case: Hilliard vs. Twin Falls County Sheriff's Office

Case No: 1:18-cv-00550-CWD

*Reporter: Rebecca Martin, CSR, RPR*



## ASSOCIATED REPORTING & VIDEO

*Next-Level Litigation Support*

The Owyhee
1109 Main Street, Suite 220
Boise, Idaho 83702

Phone: (208) 343-4004
Facsimile: (208) 343-4002
production@arvboise.com
arvboise.com

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO


BRENT E. HILLIARD, an individual,   )
                                    )
                Plaintiff,          )
                                    )   Case No. 1:18-cv-00550-CWD
vs.                                 )
                                    )
TWIN FALLS COUNTY SHERIFF'S         )
OFFICE, and TWIN FALLS COUNTY,      )
                                    )
                Defendants.         )
_____)




REMOTE VIDEOTAPED DEPOSITION OF SHELLEY WRAY, PNP

June 3, 2020

Boise, Idaho




Reported by: Rebecca Martin, CSR #1108, RPR

Shelley Wray, PNP                                                                    June 03, 2020

---

Page 2

1          REMOTE VIDEOTAPED DEPOSITION OF SHELLEY WRAY, PNP
2
3          BE IT REMEMBERED that the remote deposition of
4    SHELLEY WRAY, PNP, was taken and recorded via Zoom
5    videoconference Defendants before Associated Reporting
6    & Video, Rebecca Martin, Court Reporter and Notary Public
7    in and for the County of Ada, State of Idaho, on Wednesday,
8    the 3rd day of June, 2020, commencing at the hour of
9    2:00 p.m. Mountain Standard Time in the above-entitled matter.
10
11
12   APPEARANCES (Remotely):
13
     For the Defendants:
14         IDAHO EMPLOYMENT LAWYERS, PLLC
           By: PAMELA S. HOWLAND, Esq.
15             JENNIFER WALRATH, Esq.
           1112 W. Main Street, Ste. 105
16         Boise, Idaho 83702
           Telephone: (208) 484-8921
17         Facsimile: (208) 534-7445
           phowland@idemploymentlawyers.com
18
     For the Plaintiff:
19   HEPWORTH LAW OFFICE
           By: JEFFREY J. HEPWORTH, Esq.
20             GRADY J. HEPWORTH, Esq.
           2229 W. State Street
21         Post Office Box 2815
           Boise, Idaho 83701
22         Telephone: (208) 333-0702
           jhepworth@idalawyer.com
23
     Also Present:  Ryan Kinney
24               Courtney Diehl
25

---

Page 3

1                      I N D E X
2                 E X A M I N A T I O N
3
     SHELLEY WRAY, PNP                          PAGE
4
5    By: MS. HOWLAND..................................4
6
7                    E X H I B I T S
8
     NO.                                        PAGE
9
10   1.   07/24/2017 Crosspointe records..........21
          (4 pages)
11   2.   St. Luke's medical records (15 pages)....26
12   3.   07/18/2017 Crosspointe records..........32
          (5 pages)
13
14   4.   08/16/2017 Crosspointe records..........36
          (4 pages)
15   5.   08/21/2017 letter written by Shelley.....56
          Wray, PMHNP-C (1 page)
16
17   6.   09/13/2017 Crosspointe records..........43
          (4 pages)
18   7.   Plaintiff's Expert Witness Disclosure....50
          (10 pages)
19
20   8.   11/06/2017 Crosspointe records..........56
          (3 pages)
21   9.   10/11/2017 Crosspointe records..........55
          (4 pages)
22
23
24
25

---

Page 4

1          P R O C E E D I N G S
2
3              SHELLEY WRAY, PNP,
4    a witness having been first duly sworn to tell the
5    truth, the whole truth and nothing but the truth,
6    was examined and testified as follows:
7              EXAMINATION
8    BY MS. HOWLAND:
9          Q.  Good afternoon, Ms. Wray.
10         A.  Good afternoon.
11         Q.  My name is Pam Howland, and I represent
12   the defendant in this case, Twin Falls County.
13             Will you please state your name for the
14   record, spelling your last name?
15         A.  Shelley Wray, W-r-a-y.
16         Q.  Where are you currently calling from?
17         A.  Star, Idaho.  Home.
18         Q.  How long have you lived in Star?
19         A.  About eight months.
20         Q.  Did you live in Twin Falls before that?
21         A.  We moved to Boise a year ago in
22   April from Twin Falls.
23         Q.  Are you currently employed?
24         A.  Yes.
25         Q.  Where do you work?

---

Page 5

1          A.  BRC Mental Health Services.
2          Q.  Where is that located?
3          A.  Boise.
4          Q.  What is your job at BRC Mental Health
5    Services?
6          A.  I currently do a variety of roles as --
7    I do case management.  I do nursing and
8    community-based rehabilitation for people with
9    severe chronic mental illness.
10         Q.  When did you begin work there?
11         A.  April of 2019.
12         Q.  Before that, did you work for
13   Crosspointe?
14         A.  Yeah.  I worked for Crosspointe from
15   January 2016 to January 2018.
16         Q.  Did you work anywhere between
17   Crosspointe and BRC Mental Health Services?
18         A.  Yes.  I worked for Lacie Asher at Total
19   Life Clinic between those times.
20         Q.  What did you do at Total Life Clinic?
21         A.  Nursing, charting, kind of a variety of
22   things there as well since it's a small clinic.
23         Q.  Was that in Boise or Twin or where is
24   that at?
25         A.  No, that's in Burley.

---

Shelley Wray, PNP                                                    June 03, 2020

Page 6

1    Q.   Okay.  Before you worked at Crosspointe,
2  where did you work?
3    A.   I worked at Desert Sage Health Center in
4  Mountain Home/Glenns Ferry.  They had clinics in
5  both places.
6    Q.   How long did you work there?
7    A.   About 20 months probably.
8    Q.   What was your job title there?
9    A.   I was a psychiatric nurse practitioner.
10   Q.   How about before that?
11   A.   I was a registered nurse at St. Luke's
12 in Twin Falls, Idaho.
13   Q.   Do you know the dates that you worked as
14 an RN at St. Luke's?
15   A.   2005 to 2015.
16   Q.   Why did you leave St. Luke's?
17   A.   And I worked -- I worked at Canyon View,
18 which is the psychiatric hospital.
19   Q.   Why did you leave St. Luke's?
20   A.   I got my master's degree.
21   Q.   How about before St. Luke's, where did
22 you work?
23   A.   I didn't.  I was a mom.
24   Q.   Okay.  Have you ever been deposed
25 before?

Page 7

1    A.   No.
2    Q.   I'll go over a few of the ground rules
3  for you, then, to give you some guidance.
4        So the purpose of this deposition is for
5  the court reporter to take everything down that you
6  say and that I say and that Mr. Hepworth says word
7  for word.  So as a result of that, it's really
8  important that we don't speak over each other and
9  that we give audible answers that she can take
10 down.
11       And it sounds easy, but in practice it's
12 a little harder because we have some things in our
13 regular language like nodding or shaking your head
14 or saying "uh-huh" or "huh-uh."  So if I hear you
15 doing that, I'll do my best to let you know so we
16 can try to clean that up, and I'll try to avoid
17 those things too.
18   A.   Okay.
19   Q.   My job is to ask you clear questions
20 that you can understand.  And if you don't
21 understand my question, I would ask that you tell
22 me that, and I'll do my best to rephrase it or ask
23 it a different way so you understand the question
24 I'm asking.  Does that make sense?
25   A.   Yes.

Page 8

1    Q.   Okay.  And if you answer my question,
2  I'm going to assume that you understood it.  Is
3  that fair?
4    A.   Yes.
5    Q.   If at any time you need a break, let me
6  know.  I'm guessing we'll probably take, you know,
7  maybe one break in this deposition, but if you need
8  any other break, just let me know and we'll make
9  sure that happens.
10       This deposition is being taken by
11 videoconference, which is a little different than
12 how we normally do it.  But because of the whole
13 COVID-19 thing, we're trying to do more of these
14 remotely so people aren't exposed and can social
15 distance and all that good stuff.  But I would ask
16 that if you -- that you refrain from looking at a
17 cell phone or sending or receiving text messages or
18 using any type of instant messaging program in
19 order to guide you on answering questions.  Does
20 that make sense?
21   A.   Yes.
22   Q.   Okay.  So I have your representation
23 under oath that the answers to your question will
24 be yours and yours alone, correct?
25   A.   Correct.

Page 9

1    Q.   Are you taking any medications or do you
2  have any medical issues that would prevent you from
3  answering my questions fully and truthfully today?
4    A.   No.
5    Q.   Have you ever been involved in a lawsuit
6  before?
7    A.   No.
8    Q.   Tell me a little bit about how you
9  prepared for your deposition today.  Did you do
10 anything to get ready?
11   A.   The -- it was pretty short notice, so I
12 read over chart notes from Brent and I's visit to
13 refresh my memory since it's been three years.
14   Q.   Did you look at any records other than
15 your chart notes with Mr. Hilliard?
16   A.   No.
17   Q.   Did you talk to anyone to get ready for
18 your deposition?
19   A.   No.
20   Q.   You were telling us a little bit about
21 your work history.  Could you walk us through your
22 educational history as well?
23   A.   I graduated from the College of Southern
24 Idaho in 2005 with my associate degree in nursing.
25 And 2009 I graduated from ISU with my bachelor's

Shelley Wray, PNP                                                    June 03, 2020

1  degree in nursing.  And then 2014 I graduated from
2  Montana State University with my master's in
3  nursing.
4       Q.  You cut out there a little bit.  Did you
5  say your master's in nursing from Montana State?
6       A.  Yes.  Yes.
7       Q.  Did you do your master's remotely?
8       A.  It was, I would say, 80 percent remote,
9  and there were times that we did have to travel to
10 Bozeman as well.
11      Q.  Any education after you got your
12 master's from Montana State?
13      A.  No.
14      Q.  What licenses do you hold?
15      A.  I'm sorry, you cut out.
16      Q.  What licenses do you hold?
17      A.  Currently I do not hold any nursing
18 licenses.  I have gone down a different path.
19      Q.  What is the different path?
20      A.  Just more hands-on work with clients.
21      Q.  Are you required to hold a license to
22 treat patients?
23      A.  Yeah, you are if you are treating
24 patients, yes.
25      Q.  Did you have a license in 2017?

1       A.  Yes.
2       Q.  Did you lose your license?
3       A.  In 2017?
4       Q.  At any time, did you lose your license?
5       A.  Yes, I did.
6       Q.  Okay.  Tell us about that.
7       A.  I was on the program for recovering
8  nurses program from 2013 until 2018.  I went to the
9  dentist and -- in fall of 2000-- -- October of 2017
10 and had a root canal that left a lot of pain.  Went
11 and saw a second -- got a second opinion, received
12 a pain medication, and the Board considered that a
13 relapse --
14      THE REPORTER:  I'm sorry, you cut out.
15      THE WITNESS:  -- so they sent me to
16 treatment for 30 days.
17          The Board considered that a relapse, and
18 so I was sent to treatment for -- inpatient
19 treatment for 30 days.
20          When I was three weeks into the
21 treatment program, they told me the program wasn't
22 approved.  And so when I got out of treatment, they
23 sent it to the Board of Nursing, who pulled my
24 license for two years, said I was noncompliant.
25      Q.  (BY MS. HOWLAND) What led to your entry

1  into the program for recovering nurses in 2013?
2           I think we're having a connection
3  problem.  Let's see if we can get it fixed.  Can
4  you hear us okay?
5       A.  Yeah.  I can hear you.
6       Q.  Okay.  Did you hear my last question
7  about what led to your entry into the program for
8  recovering nurses in 2013?
9       A.  I had had three surgeries within three
10 months in 2011 and became dependent on opiates and
11 chose to turn myself in to the Board.
12      Q.  In 2017 when you were deemed to have a
13 relapse, were you taking opiates again?
14      A.  Yeah.  I had taken opiates for the tooth
15 pain.
16      Q.  And did you say you completed a
17 treatment program after that?
18      A.  Yes.  But the Board told me three weeks
19 into the program that it was not an approved
20 program.
21      Q.  Where was your program at?
22      A.  It was in Utah at Renaissance Ranch.
23      Q.  Was your license revoked, then, from
24 2017 to 2019?
25      A.  No.  It was 2018 is when they revoked it

1  because it had to go in front of the Board.
2       Q.  Was it revoked from 2018 through 2020?
3       A.  Yes.
4       Q.  Do you plan to reapply for your license?
5       A.  Yes.
6       Q.  When will you be able --
7       A.  I'm working on that right now.
8       Q.  So you have not treated any patients
9  from 2018 through 2020; is that correct?
10      A.  Correct.
11      Q.  We talked about your educational
12 background.  We talked about the nursing license.
13 Any other certifications you hold or specialty
14 degrees?
15      A.  No.
16      Q.  Do you plan to treat patients again?
17      A.  Down the road, yes.
18      Q.  Do you consider yourself to have a
19 specialty?
20      A.  I'm sorry, you kind of cut out.  A
21 specialty?
22      Q.  Yes.  An area that you --
23      A.  Yes.
24      Q.  -- specialize in?
25      A.  Yes.

**Shelley Wray, PNP**                                        **June 03, 2020**

1    Q.   Okay.  Tell us --
2    A.   Mental health.
3    Q.   Okay.  Do you consider substance abuse
4  part of your specialty area?
5    A.   I would consider it equal grounds with
6  mental illness.  It does occur a lot with mental
7  illness.
8    Q.   Do you consider yourself to have a
9  specialty in treating patients with substance
10  abuse?
11    A.   No.
12    Q.   Are you familiar with Mark Gritton?
13    A.   Yes.
14    Q.   You worked with him at Crosspointe?
15    A.   Yes.
16    Q.   Was he your supervisor?
17    A.   Yes.
18    Q.   How about Justine Sweet, did you work
19  with her?
20    A.   I did --
21    Q.   Sorry.
22    A.   I did know of her, but I never really
23  had a lot of conversation with her.
24    Q.   Let's talk a little bit about your
25  treatment of Brent Hilliard while you worked at

1  Crosspointe.  Do you recall when you first met him?
2    A.   Yes.
3    Q.   When was that?
4    A.   July 2017.  July 18th to be exact.
5    Q.   When was the last time that you treated
6  him?
7    A.   November 6th, 2017.
8    Q.   Had you ever met him before you treated
9  him at Crosspointe?
10    A.   No.
11    Q.   Have you seen or talked to him since
12  November 6th, 2017?
13    A.   No.
14    Q.   We deposed Mr. Gritton earlier today.
15  What was your role in regard to the treatment of
16  Brent Hilliard as opposed to Mr. Gritton's?
17    A.   I prescribed psychiatric medications.
18    Q.   Have you reviewed Mr. Gritton's medical
19  records or treatment notes related to Brent
20  Hilliard?
21    A.   I've reviewed my medical notes.
22    Q.   But not his?
23    A.   Mark's?
24    Q.   Correct.
25    A.   No, I have not reviewed Mark's.

1    Q.   While you were treating Brent Hilliard,
2  did you and Mark Gritton ever talk about Brent
3  Hilliard and the treatment?
4    A.   Yes.
5    Q.   What would you discuss?
6    A.   I cannot remember specifics.  This has
7  been three years ago.  But just the concern for his
8  mental health through everything he was going
9  through.
10    Q.   Would it be common when you were the
11  nurse practitioner over prescriptions to have
12  contact with the counselor who was otherwise
13  providing treatment?
14       In other words, I'm trying to get at:
15  Did you kind of tag team it or did you do your work
16  in isolation?
17    A.   I would not say it was in isolation.
18    Q.   How often did you and Mark Gritton talk
19  about Brent Hilliard?
20    A.   I can't remember specifics, but if
21  Brent, you know, had an appointment with Mark and
22  Mark was concerned about something, he would always
23  come and talk with me during the day whenever I had
24  a break that we could talk.
25    Q.   Would you talk about the prescriptions

1  Mr. Hilliard was taking?
2    A.   Yes.
3    Q.   Earlier when I asked you about the
4  reason you would have discussions with Mr. Gritton,
5  you said it was because of concerns of what
6  Mr. Hilliard was going through.  So what is your
7  recollection of what Mr. Hilliard --
8    A.   Correct.
9    Q.   -- was going through?
10    A.   Mr. Hilliard had a major back surgery
11  and was experiencing severe depression.  And along
12  with depression comes anxiety.  And all -- I mean,
13  if having a major back surgery wasn't enough, then
14  he had to worry about losing his job that he had
15  had for 20-something years.
16    Q.   Was it your understanding that
17  Mr. Gritton had diagnosed him with depression
18  caused by his opioid use?
19    A.   Was it my understanding?
20    Q.   Yeah.  Did you have an understanding of
21  the root of Mr. Hilliard's depression?
22    A.   Mr. Hilliard, I wouldn't say, was
23  dependent on opiates.  He had just had back
24  surgery.  There's going to be maintenance doses of
25  those medications.  That's a serious surgery.

Shelley Wray, PNP                                                    June 03, 2020

1    Q.  So you didn't think he was an opioid
2  addict?
3    A.  No, I did not.
4    Q.  Let's look a little bit at some of
5  Mr. Gritton's records.  You indicated you had some
6  conversations with him.  Let's see if you discussed
7  some of the things that he documented in his
8  records.
9        We're going to pull up a document that's
10  Hilliard-29.  And Jennifer is going to pull that
11  up, and she'll scroll down as you direct her to so
12  you have a chance to look at that.
13    A.  Okay.  I see.
14    Q.  Okay.  Do you see where Mr. Gritton has
15  diagnosed Mr. Hilliard with substance-induced
16  depressive disorder?
17    A.  Yes, I do.
18    Q.  Did you discuss that with Mr. Gritton?
19    A.  I don't recall if I did or not.
20    Q.  And then do you see where it says,
21  Problem:  Current stressors and life events,
22  therapist observations, other information.
23        And it says:  Brent describes
24  depression, he sits around and cries for no reason
25  he can identify.  He has no energy and lacks

1  motivation.  He reports having back surgery and is
2  trying to titrate off Oxycontin and his symptoms
3  started about six weeks ago when he started to end
4  use of Oxycontin.
5        Do you see that?
6    A.  I don't see that.  I'm, like, stuck on
7  a --
8    Q.  Can you scroll down a little?
9        Do you see it now where it says
10  "Problem"?
11    A.  Yes.
12    Q.  Were you aware that Mr. Hilliard was
13  having problems stopping his use of Oxycontin?
14        MR. HEPWORTH:  Objection; misstates the
15  record.  Go ahead and answer if you can.
16        THE WITNESS:  Will you reask the question?
17  I'm sorry.
18        MS. HOWLAND:  Sure.  Will you read that
19  back, please?
20          (The record was read.)
21        MR. HEPWORTH:  Same objection.
22        THE WITNESS:  Mr. Hilliard wasn't seeing me
23  for Oxycontin.
24        MS. HOWLAND:  My question was a little
25  different.  I'm going to have the court reporter

1  ask that one more time, and I'd ask you to answer
2  my question.
3          (The record was read.)
4    THE WITNESS:  No.
5    Q.  (BY MS. HOWLAND) And I'll represent to
6  you that this morning in Mr. Gritton's deposition,
7  he testified that Mr. Hilliard was experiencing
8  symptoms caused by withdrawal from Oxycontin.  Is
9  that information you were privy to at the time you
10  treated Mr. Hilliard?
11    A.  No.
12    Q.  What was your understanding of
13  Mr. Hilliard's history of opioid use?
14        MR. HEPWORTH:  I'm going to object.  She
15  just testified she wasn't seeing him for opioid
16  use.  So I'm not quite sure where we're headed with
17  this.
18    Q.  (BY MS. HOWLAND) You were the
19  prescription manager, weren't you?
20    A.  Not of his opioids.
21    Q.  What were you the prescription manager
22  of?
23    A.  Only psychiatric medications, nothing --
24  he had a primary care physician that he saw for,
25  say, blood pressure medicine or basic things that

1  you see a primary care provider for.  I did not
2  have anything to do with his oxycodone or anything
3  that wasn't psychiatric.
4    Q.  Is it your testimony that his use of
5  opioids was not relevant to the work you were
6  doing?
7    A.  I would say there was relevancy.
8    Q.  How so?
9    A.  Because if a patient comes to you on an
10  opiate or any other kind of controlled medication,
11  it -- it could interact with other meds.  You have
12  to know what a patient is taking when you are
13  prescribing medications to them.
14        MS. HOWLAND:  I'm going to pull up some of
15  your medical records here.  So let's pull up
16  Hilliard -- give me one second here.  Let's look at
17  Hilliard-46.  And I'm going to label that
18  Exhibit 1.
19          (Deposition Exhibit No. 1 was marked.)
20    Q.  (BY MS. HOWLAND) Jennifer can scroll
21  through.  Just tell her if you need her to scroll
22  up or down.
23    A.  Okay.
24    Q.  Tell her when you're ready.  I think
25  she's waiting for you to indicate.

Shelley Wray, PNP                                                           June 03, 2020

Page 22

1    A.  Okay.  What are we waiting for?  I have
2  a copy of this in front of me, so I can see it.
3    Q.  Okay.  All right.  So you've got the
4  July 24th, 2017, treatment notes?
5    A.  Yes.
6    Q.  On the second page, under Current
7  Medications, you list oxycodone, correct?
8    A.  Yes.  We list whatever medications they
9  are on, whether from me, his primary care provider,
10  we have a list of all their medications.
11    Q.  So on some level, the medications he's
12  taking were significant, correct, even the
13  nonpsychiatric ones?
14    A.  I -- can you -- I don't understand what
15  you're asking.
16    Q.  Well, you've listed current medications
17  on the second page of that note, correct?
18    A.  Yes.
19    Q.  And you've listed medications in
20  addition to his psychiatric medications, right?
21    A.  Yes.
22    Q.  Okay.  And you've listed oxycodone on
23  there?
24    A.  Yes.
25    Q.  Okay.  So on some level, not just the

Page 23

1  psychiatric medications were important to your
2  treatment?
3    A.  Yes.
4    Q.  If you go back to the first page, it
5  discusses under Subjective, it says:  Brent
6  presents to the clinic reporting he's been having a
7  reaction to the Prozac medication, including
8  increased anxiety, decreased appetite, disrupted
9  sleep, nausea, sweating, and states, "I feel like
10  I'm coming out of my skin."
11    Do you see that?
12    A.  Yes.
13    Q.  How did you know that that was a Prozac
14  reaction instead of Oxycontin withdrawal?
15    A.  Because of the -- my handbook that I
16  refer to, Stahl's Psychopharmacology.
17    Q.  Did you discuss that with Mr. Gritton?
18    A.  I don't recall.
19    Q.  Did Mr. Hilliard tell you he was
20  experiencing withdrawal symptoms and he wanted to
21  stop use of his pain medication?
22    A.  He did not ever mention withdrawal --
23  withdrawals or wanting to stop his pain medication.
24  Like I said, he was only two months post-surgery.
25    Q.  Did Dr. Gritton tell you that in

Page 24

1  July 2017 Hilliard had told him he was completely
2  tapering off of his Oxycontin medication?
3    A.  I don't recall.
4    Q.  Under the list of current medications,
5  you list several things.  Would it have been
6  important for you that Mr. Hilliard disclose all of
7  the medications he was taking to you that were
8  prescribed by his other health care providers?
9    A.  Yes.
10    Q.  Did you have any of the medical records
11  from any of his other health care providers?
12    A.  I don't recall.
13    Q.  Do you have your file in front of you
14  right now?
15    A.  Yes, just a print of medical
16  appointments with me.
17    Q.  How did you get those?
18    A.  From Crosspointe.
19    Q.  When you treat patients and do a
20  psychiatric prescription review and management,
21  would you normally ask for medical records from
22  their health care provider?
23    A.  Nowadays, yes, definitely.  It is a --
24  an important, you know, piece to have in his file.
25    Q.  When did that start?

Page 25

1    A.  What do you mean?
2    Q.  Well, you said nowadays that's an
3  important thing for you to have that in his file.
4  Was that an important thing for you to have in
5  2017?
6    A.  I don't feel -- if a patient came to me
7  and was diabetic and had all these heart, you know,
8  blood pressure medications, yeah, it would be very
9  important that you get collateral information.  He
10  came to me from his primary care provider on
11  Prevacid, which is for heartburn.  So that
12  really -- I really wouldn't think I would need his
13  records from his primary care provider.  It wasn't
14  an urgent request.
15    Q.  So you're saying it wasn't important for
16  you to have his medical records from his health
17  care provider?
18    A.  No, that's not what I'm saying.
19    The nurse/receptionist, she is the one
20  that took care of all the records requests.  So
21  I -- this has been, like I said, three years ago, I
22  saw over 300 patients.  I can't remember every
23  exact detail relating to Brent.
24    Q.  Do you know if you ever saw any record
25  from Dr. Waters?

Shelley Wray, PNP                                    June 03, 2020

Page 26

1    A.  I don't.  I don't recall.  I can't
2  remember.
3      MS. HOWLAND:  Let's pull up Hilliard-1628.
4  I'm going to label this Exhibit 2.
5      (Deposition Exhibit No. 2 was marked.)
6    Q.  (BY MS. HOWLAND) This is Dr. Waters'
7  medical record for a visit he had with Mr. Hilliard
8  on July 13th, 2017.  And the prescription list on
9  the second page is what I'm particularly interested
10  in.  And I see a lot of medications listed there
11  that don't show up on your medication list.  Is
12  that accurate?
13    A.  Yes.
14    Q.  Okay.  If you had had these records,
15  would you have updated your medication list to
16  include those?
17    A.  Yes.
18    Q.  If you knew that Mr. Hilliard was trying
19  to stop taking opioids and that he was having
20  withdrawal symptoms, would that have impacted your
21  treatment of him?
22    A.  No.
23    Q.  As you look at the top of your page, the
24  second page from your meeting with him on
25  July 24th, 2017 -- you're going to need to pop that

Page 27

1  up, Jennifer -- it's Hilliard-47.  It indicates
2  that he displayed typical adverse side effects to
3  the Prozac, but he's also displaying symptoms of
4  serotonin syndrome.  Tell us what that means.
5    A.  Serotonin syndrome is something that
6  happens when your body, for whatever reason,
7  metabolizes the drug not as effectively, so you
8  have way too much serotonin in your blood that can
9  cause increased temperature, increased blood
10  pressure, anxiety, and -- I mean, it's serious.  It
11  can lead to death.
12      And, you know, some people can take a
13  little dose of a medication, like Prozac for
14  instance, and it can make them very sick.  Other
15  people, they don't have any problem with it.  It's
16  just the certain enzymes that the body has to
17  metabolize certain drugs.
18    Q.  How did you know that the serotonin
19  syndrome was caused by the Prozac and not by the
20  oxycodone?
21    A.  All I could do is know that we had just
22  started him on Prozac, and then all of a sudden
23  he's having exact adverse side effects to Prozac
24  that are listed in Stahl's psychopharmacology book,
25  which is what every psychiatrist refers to is that

Page 28

1  book.  It's like the Bible for psychotherapy.
2    Q.  If you turn --
3    A.  Psychopharmacology.
4    Q.  If you turn to the previous page, under
5  your medical write-up, it says:  His boss called
6  him in last Thursday and told him that they want
7  him to see a psychiatrist, Dr. Tye, in Boise for a
8  psychiatric evaluation before he returns to work.
9      Do you see that?
10    A.  Yes.
11    Q.  Did you have an understanding as to why
12  Mr. Hilliard was not in the workplace?
13    A.  My understanding was because of his back
14  surgery, he had to take oxycodone, and his job did
15  not like that he was taking that medication.  But
16  besides that, he had depression because he just had
17  a major surgery.  That -- when you are unable to
18  get up and do the things that you normally do or
19  used to do can cause significant, you know,
20  depression.  And then I'm sure him feeling like he
21  wasn't wanted at work only added to that depression
22  and anxiety.
23    Q.  And the oxycodone use could have caused
24  the depression as well, correct?
25    MR. HEPWORTH:  I'm going to object.  I think

Page 29

1  it calls for a medical opinion that I don't think
2  she's said that she has.  But go ahead and answer
3  if you can.
4      THE WITNESS:  There is a diagnosis in the
5  DSM-5 for depression, but it's caused by many
6  things.  I don't think I can say his depression was
7  caused by oxycodone use.  There's way more factors
8  that go into play here.
9    Q.  (BY MS. HOWLAND) Would you agree with
10  Mr. Gritton if that's what his conclusion was?
11    A.  No.
12    Q.  So would you --
13    A.  Mark can have his own diagnosis, and you
14  see this a lot in our field.  One psychiatrist
15  might label somebody bipolar, and another
16  psychiatrist says, no, they're schizophrenic.  It
17  happens all the time.  So just because one
18  counselor or therapist says one thing, another
19  person can diagnose them differently.  It's not
20  black and white when it comes to mental illness.
21    Q.  You're not a --
22    A.  It's not -- okay.  It's not:  Okay, you
23  have a blood glucose of 250 every morning you wake
24  up, you're prediabetic.  It's black and white with
25  those types of things, but not in the psychiatric

Shelley Wray, PNP                                                    June 03, 2020

**Page 30**

1  world.

2      Q.  You're not a psychiatrist though, right?

3      A.  Correct.

4      Q.  Did he tell you that he had been put on

5  leave from work because of reports of impairment?

6      A.  I don't have that in my notes, so I can

7  not recall that.  And I am pretty good about -- or

8  I was pretty good about documenting thoroughly with

9  what they were -- with what the patient was telling

10  me.

11      Q.  Would you agree that if he was taking

12  oxycodone or Oxycontin in the workplace, that he

13  would have been impaired?

14      A.  I can't say that for sure.

15      Q.  What factors --

16      A.  Everybody has a different tolerance to

17  medications.

18      Q.  So you would disagree with Mr. Gritton

19  if that's what he testified to earlier, that

20  Mr. Hilliard would have been impaired if he was

21  taking Oxycontin?

22      A.  I can't -- I can't agree with that, no.

23      Q.  What facts would you need to know in

24  order to give an opinion on that?

25      MR. HEPWORTH:  Again, I'm going to object

**Page 31**

1  for the record.  That calls for expert opinion.

2  Excuse me.  Just -- sorry, Shelley.

3      THE WITNESS:  That's okay.

4      MR. HEPWORTH:  I object.  I think it calls

5  for testimony about expertise I don't think this

6  client has talking about the effects of Oxycontin.

7  She prescribed psychiatric medications, not pain

8  medications, and I think even Mr. Gritton agreed

9  that he didn't have any expertise in the effects of

10  those pain medications.

11      Go ahead and answer if you can.

12      THE WITNESS:  What was the question again

13  exactly?

14      Q.  (BY MS. HOWLAND)  Well, let me ask this:

15  Do you agree with Mr. Hepworth that you do not have

16  the expertise to give opinion on Mr. Hilliard's

17  impairment caused by his Oxycontin?

18      A.  I do not have the expertise, but I have

19  a lot of years experience.

20      Q.  So do you have an opinion on that?

21      A.  No.

22      Q.  Do you have personal experience with

23  taking Oxycontin and working?

24      A.  No.

25      MS. HOWLAND:  Let's look at your treatment

**Page 32**

1  note from July 18th, 2017.  That's Hilliard-50.

2  I'm going to label this Exhibit 3.

3      (Deposition Exhibit No. 3 was marked.)

4      THE WITNESS:  Okay.

5      Q.  (BY MS. HOWLAND)  Okay.  Do you remember

6  this visit with Mr. Hilliard?

7      A.  I remember visiting with him, yes.  I

8  don't remember everything about that visit.  That

9  was three years ago.

10      Q.  If you turn to the second page, under

11  Current Medications it indicates that Mr. Hilliard

12  was taking oxycodone during that time; is that

13  right?

14      A.  Yes.

15      Q.  And under psychiatric history, was

16  Mr. Hilliard suicidal at that time?

17      A.  He was definitely having passive

18  suicidal thoughts.  That doesn't mean he's going

19  to, you know, go out and kill himself.  But he --

20  you can have the thoughts.  That's a part of

21  depression.

22      Q.  What medication did you prescribe in

23  order to address his mental health issues?

24      A.  Well, we first started with Prozac, and

25  that did not go over very well with him, he had an

**Page 33**

1  adverse reaction.  So then we tried Cymbalta, and

2  Cymbalta is a great antidepressant because it also

3  addresses pain issues with people.  So you can kind

4  of get, you know, people that have pain, Cymbalta

5  is a great antidepressant because that's kind of a

6  side effect, it helps with pain.  So we started him

7  on the Cymbalta which he tolerated well and --

8      THE REPORTER:  I'm sorry.  I've lost you.

9  You froze on me there.

10      MS. HOWLAND:  Let's go off the record.

11      (A discussion was held off the record.)

12      MS. HOWLAND:  We lost you for a second.  I'm

13  sorry.  I don't think -- I think we cut out right

14  as you were starting to give your answer to that

15  question.  Could you repeat that?  Maybe let me

16  have the court reporter read back as much as she

17  got, and then if you would pick it up from there.

18      THE WITNESS:  Okay.

19      MS. HOWLAND:  Sorry about that.

20      (The record was read.)

21      THE WITNESS:  Titrated that medication up to

22  a therapeutic dose.  I also started him on Klonopin

23  for his anxiety.  He couldn't sleep.  He was

24  anxious, worrying, racing thoughts about his job,

25  was having issues at home as well because of him

Shelley Wray, PNP                                          June 03, 2020

Page 34

1  not being able to go back to work.
2       So he did -- he did pretty good on the
3  Klonopin. It still didn't really help him sleep,
4  so we later added Ambien, which helped -- helped
5  him fall asleep better. He would still wake up in
6  the middle of the night, though, with racing
7  thoughts and worries and, you know, "What am I
8  going to do?"
9       Q. (BY MS. HOWLAND) Do you have expertise
10  in drug interactions? So if he was taking
11  Cymbalta, Klonopin, and Ambien, would the oxycodone
12  interact with that?
13      A. That's the great thing about when you
14  prescribe a medication, the interactions do come
15  up, and the pharmacist is your second check system
16  with dispensing the medications.
17      Q. Do you have an opinion as to whether the
18  Oxycontin would have interacted with the Cymbalta?
19      A. No.
20      Q. No opinion?
21      A. No opinion.
22      Q. The medical record we looked at earlier
23  from Dr. Waters indicated that Mr. Hilliard was
24  prescribed Lexapro.
25       So when you put him on Prozac, were you

Page 35

1  taking him off of Lexapro and converting him to
2  something else?
3      A. Yes.
4      Q. Okay.
5      A. Yeah. You never want to be taking two
6  antidepressants at the same time. That increases
7  your risk for serotonin syndrome.
8      Q. Did he tell you he was taking tramadol?
9      A. No.
10      Q. Would that be significant to you?
11      A. Yes.
12      Q. In what way?
13      A. Just because it's a -- a narcotic.
14      Q. Do you have expertise in how tramadol
15  and oxycodone interact?
16      A. No.
17      Q. How about how tramadol and Cymbalta
18  react?
19      A. Not off the top of my head. But if a
20  medication is prescribed, it's always checked with,
21  you know, possible interactions.
22      Q. If he filled his prescriptions in
23  different places, how would the interactions be
24  checked?
25      A. Well, they would be checked with what --

Page 36

1  whatever information I have on my file and whatever
2  information the pharmacy has on their file.
3       MS. HOWLAND: Let's take a look at your
4  treatment notes from August 16th, 2017. That's
5  Hilliard-42. I'm going to mark that Exhibit 4.
6       (Deposition Exhibit No. 4 was marked.)
7       THE WITNESS: Okay.
8       Q. (BY MS. HOWLAND) Do you recall anything
9  about that visit? Does anything stand out in your
10  mind?
11      A. Nothing stands out.
12      Q. It indicates under --
13      A. Just that he --
14      Q. Sorry.
15      A. Just that he didn't -- or he received
16  the letter to not go back to work.
17      Q. And are you looking at the statement
18  that says, "Brent presents to the clinic today
19  reporting that he went to a psychologist in Boise
20  who diagnosed him with major depression and sent a
21  letter to Brent's boss stating that he was not fit
22  to go back to work at this time." Is that your
23  reference?
24      A. Yes. Yes.
25      Q. Did you ever see a copy of that letter?

Page 37

1      A. No.
2      Q. Did you ever attempt to contact the
3  psychologist?
4      A. I don't recall.
5       Can I ask for a break?
6      Q. Sure. Yeah. Yep.
7      A. I'm sorry. I had foot surgery last week
8  and I --
9      Q. Yeah. That's okay. It's 3:07. How
10  much time do you need?
11      A. 3:07. Oh, just like 10 minutes.
12      Q. Okay. Sounds good. We'll be back at
13  about 3:20.
14      A. Okay. Thank you.
15       MS. HOWLAND: You're welcome.
16      (A recess was taken from 3:07 p.m. to 3:17 p.m.)
17       MS. HOWLAND: Okay. When we left, we were
18  talking about your note -- your doctor's -- I guess
19  your medical note from August 16th, 2017. And
20  maybe I could have the court reporter read back the
21  last question and answer.
22       (The record was read.)
23      Q. (BY MS. HOWLAND) Was it significant to
24  you that he had determined that Mr. Hilliard was
25  not fit to go back to work?

Shelley Wray, PNP                                                June 03, 2020

---

Page 38

1      A.   I would say yes.
2      Q.   If you turn the page, there is the
3   current medication list.  And it indicates
4   oxycodone on that list.  Do you see that?
5      A.   Yes.
6      Q.   Do you know when you met with
7   Mr. Hilliard on August 16th, 2017, how much
8   oxycodone he was taking?
9      A.   I don't recall.
10      Q.   And when it says "medication list
11   reviewed and reconciled with the patient," tell us
12   how you did that.
13      A.   That means we review what medications
14   he's telling us that he's taking and update our
15   documents.
16      Q.   Let's talk about the letter that you
17   wrote for Mr. Hilliard on August 21st, 2017.
18      A.   Okay.  I don't have a copy of that.
19      Q.   Okay.  We will pull it up here for you.
20      A.   Okay.
21      Q.   So tell me why you wrote this letter.
22   How did that come about?
23      A.   I assume Brent requested me to write a
24   letter, and -- which is what I did.  Brent had been
25   doing much better on our visit on August 16th as

---

Page 39

1   far as decreased anxiety, decreased depression,
2   felt a lot better once we had changed him over to
3   the Cymbalta.  I saw no reason why he couldn't
4   return to work.
5      Q.   Did you have any reservations about
6   writing that in light of the fact -- in light of
7   the fact that Mr. Hilliard had told you that a
8   psychologist had just determined he was not fit to
9   go back to work?
10      A.   No.
11      Q.   Why not?
12      A.   Because like I said earlier, different
13   providers can give different diagnoses and see
14   things differently.  Just because a psychologist in
15   Boise diagnosed him with something and said he
16   wasn't fit to go back to work, that is his opinion.
17      Q.   Your letter --
18      A.   He saw this patient for, I don't know,
19   an hour.  I've been seeing the patient in my office
20   and working with another counselor.  I believe I
21   knew the patient a little better than he did.
22      Q.   How much time total had you spent with
23   Mr. Hilliard at the time you wrote that letter?
24      A.   Oh, generally my initial psychiatric
25   evaluations are an hour-and-a-half to two hours.

---

Page 40

1   And every follow-up, 45 minutes.  So I'm not sure
2   how many exact -- I'd have to go through and count,
3   you know, but it's much more time with Brent than
4   the psychologist has spent with him.
5      Q.   How do you know that?  How do you know
6   how much time the psychologist spent?
7      A.   I'm assuming normal psychological
8   evaluations are an hour.
9      Q.   But you didn't talk to Dr. Tye in this
10   case to confirm that?
11      A.   No.
12      Q.   You didn't call him to ask why he
13   reached a different conclusion?
14      A.   No.  That wouldn't have changed my
15   treatment of Brent's depression.
16      Q.   Is it possible it would have changed
17   your conclusion that he was fit to go back to work?
18      A.   No.  I don't feel -- like I said, I
19   don't go off of what somebody else -- just because
20   somebody has a different opinion than me doesn't
21   mean I'm going to change my opinion.
22      Q.   Even if that opinion is coming from a
23   psychiatrist?
24      MR. HEPWORTH:  Objection.
25      THE WITNESS:  Correct.

---

Page 41

1      MR. HEPWORTH:  He's not a psychiatrist.
2      Q.   (BY MS. HOWLAND) Even if that opinion is
3   coming from a psychologist?
4      A.   Correct.
5      Q.   So your letter indicates that you
6   believe he has stabilized on his current medication
7   regimen and that he was stable enough to return to
8   current duties and responsibilities at work.  He
9   has responded well to his current medication, and
10   he feels that he's ready to resume his job.
11      Is that what you wrote?
12      A.   Yes.
13      Q.   What was your understanding of his job
14   duties?
15      A.   I don't recall specifics.  I know he was
16   not working in the field.  I recall him just being
17   in the office.  I don't know -- like I said, I
18   can't recall with accuracy that that's what was
19   happening.
20      Q.   Did you review his job description?
21      A.   No.
22      Q.   Fair to say you really didn't have any
23   idea of his job duties, then?
24      A.   Correct.
25      Q.   At the time you wrote the letter on

---

Shelley Wray, PNP                                                    June 03, 2020

1  August 21st, 2017, it was your understanding that
2  he was still taking oxycodone; is that right?
3      A.  Correct.
4      Q.  How did you know that his oxycodone
5  usage would not impact his ability to perform his
6  job?
7      A.  I -- that is not my specialty.  That is
8  not what I was treating him for.  So I would not
9  comment on that.
10      Q.  You indicated, though, that he was able
11  to return to current duties and responsibilities.
12  Were you worried about the fact that if he was
13  taking oxycodone he might not be able to do his
14  duties?
15      MR. HEPWORTH:  Objection; asked and
16  answered.
17      Q.  (BY MS. HOWLAND) You can still answer.
18  He put his objection on the record, we're waiting
19  for you to answer it.  And we can have the court
20  reporter read it back if you want.
21      A.  No.
22      Q.  So you weren't worried?
23      A.  I'm sorry, that faded out.
24      Q.  You weren't concerned about his
25  oxycodone use?

1      A.  No.
2      Q.  Did you know how much oxycodone he was
3  taking during the day?
4      A.  No.  That's not what I was seeing Brent
5  for.
6      Q.  Have you ever done a fitness for duty
7  evaluation or did you consider yourself to have
8  performed one when you wrote this letter?
9      A.  No.
10      Q.  So you don't hold yourself out as a
11  health care provider who is able to perform a
12  fitness for duty?
13      A.  No, I don't say that.  I didn't give him
14  a fitness for duty evaluation.  I gave him an
15  evaluation on how he was responding to his current
16  medications with me, his depression, his anxiety
17  with me, not his oxycodone prescription.
18      MS. HOWLAND:  Let's look at your
19  September 13th, 2017, treatment notes.  And this is
20  Exhibit 6 because we're missing one that we didn't
21  have.  Because Exhibit 5 was your letter, so this
22  is Exhibit 6.
23      (Deposition Exhibit No. 6 was marked.)
24      THE WITNESS:  Okay.
25      Q.  (BY MS. HOWLAND) Does anything stand out

1  about that visit?
2      A.  Okay.  You cut out when you said "does
3  anything."
4      Q.  Does anything stand out in your mind
5  about that visit?
6      A.  Well, yeah.  He tried to commit suicide.
7  He had a really close call with suicide.
8      Q.  How do you know that?
9      A.  Because he told me.
10      Q.  Was it significant to you that he got a
11  DUI on September 6, 2017?
12      MR. HEPWORTH:  Objection; I'm not sure --
13  significant to what?  I don't know what your
14  question is.  I object to the form of the question;
15  it's vague.
16      Q.  (BY MS. HOWLAND) When you met with him
17  on September 13th, 2017, did you know he had gotten
18  a DUI on September 6, 2017?
19      A.  Yes.  He told me, and I documented that.
20      Q.  Okay.  And was that important
21  information for you?
22      MR. HEPWORTH:  Objection; form of the
23  question is vague.
24      Q.  (BY MS. HOWLAND) You can answer.
25      A.  Yes.

1      Q.  In what way?  Why was that important?
2      A.  For many reasons.  For his nearly
3  committing suicide because of his drinking, his
4  mental state, that's what was the most important.
5      Q.  When you met with him on September 13th,
6  2017, did you still think he would have been
7  capable of performing his job?  In other words, had
8  your opinion changed from your letter on
9  August 21st, 2017?
10      A.  His mental state had changed.  If you
11  will read the note from one month earlier, he was
12  doing better.  He was improving on the medication
13  for his depression and anxiety.
14      Q.  Would he still have been stable enough
15  to return to his current duties and
16  responsibilities at work when you met with him on
17  September 13th, 2017?
18      A.  I can't say yes or no.
19      Q.  Why not?
20      A.  Because a lot of the issues that I felt
21  were of concern for Brent was the poor treatment he
22  was receiving from his work.  It weighed on him.
23  It caused him a lot of mental crises, and, you
24  know, that was the core of this whole thing.
25      Q.  What treatment are you referencing?

Shelley Wray, PNP                                                                June 03, 2020

Page 46

1    A.  His treatment with me, his depression,
2  his anxiety, his treatment with Mark.
3    Q.  You just said that the core of this
4  involved his treatment from work.  But he wasn't
5  working.
6    A.  No, I mean --
7    Q.  So I'm trying to understand what
8  treatment you're referring to.
9    A.  His poor treatment.
10   Q.  And what poor treatment, is my question?
11   A.  Them not letting him come back to work.
12 You know, a part of a person's identity is their
13 job.  And when he's having that ripped from him,
14 that significantly impacts his mental state.
15   Q.  Is it your opinion he should have been
16 allowed to return to work even if he was impaired
17 from taking oxycodone?
18   A.  No.
19   Q.  So if there was a conclusion that he was
20 not allowed to return to work and he wasn't fit for
21 duty, then what is the poor treatment that you're
22 relying on?
23   MR. HEPWORTH:  Are you assuming that he was
24 impaired by Oxycontin?  I'm not sure if I
25 understand the question.  I object to the form of

Page 47

1  the question; it's vague.
2    MS. HOWLAND:  Well, we've heard Ms. Wray
3  say, and we've seen her records that establish, he
4  was telling her during this time period he was
5  taking oxycodone.  And we heard this morning from
6  Mr. Gritton that he had an addiction problem and
7  was having withdrawal symptoms.
8    MR. HEPWORTH:  You can ask her questions,
9  I'm just objecting.
10   MS. HOWLAND:  Yeah.  I understand.  And I'm
11 trying to give her background.  She's referred to
12 problems --
13   MR. HEPWORTH:  Well, if you want her to
14 assume things, tell her what you want her to
15 assume.
16   MS. HOWLAND:  Are you going to let me finish
17 the deposition or not?
18   MR. HEPWORTH:  Facts are disputed in this
19 case.
20   MS. HOWLAND:  The sooner you let me ask
21 questions, the sooner we get out of here, Jeff.
22   MR. HEPWORTH:  Well, I'm going to have to
23 object if you ask questions that are objectionable.
24   Q.  (BY MS. HOWLAND) So I've heard you say,
25 Ms. Wray, that you think the poor treatment that

Page 48

1  apparently you tie to causing a problem with
2  Mr. Hilliard was the fact that his employer would
3  not let him return to work; is that right?
4    A.  Yes.
5    Q.  But you don't know how much oxycodone he
6  was taking?
7    A.  I was not seeing him for oxycodone.
8    Q.  Right.  So you don't know how much
9  oxycodone he was taking?
10   A.  Correct.
11   Q.  And you didn't know his job duties?
12   A.  Correct.
13   Q.  So you have a note on September 13 that
14 says:  Brent presents to the clinic today reporting
15 that the psychiatrist from Boise would not release
16 him back to work and so he lost his job.
17   Do you know the circumstances related to
18 Mr. Hilliard's termination from the Twin Falls
19 County Sheriff's Office?
20   A.  No.  That is none of my business.  I'm
21 not an investigator.  I am a provider trying to
22 help Mr. Hilliard become functional in his life
23 again, despite having a huge weight of his work
24 held over his shoulders.
25   Q.  Was he relieved to be terminated?

Page 49

1    A.  No.
2    Q.  Well, your note under the subjective
3  part says:  There is a part of him that is relieved
4  stating, "That place is killing me."
5    A.  That's what he said.
6    Q.  So he was --
7    A.  But I don't -- absolutely do not feel
8  like that.  People say things to try to make
9  themselves feel better all the time.  He had
10 20-something years invested.  He had a pension.  It
11 was his life, his insurance, that was who he was.
12 And then for it to be just ripped from him, that --
13 by him saying "That place is killing me," he was
14 right.  But he still wanted his job.
15   Q.  But you don't know the circumstances of
16 his termination?
17   A.  No, I don't.  I know how he presents to
18 me as a client and the rapport I have developed
19 with him.
20   Q.  Do you plan to testify at the trial in
21 this matter?
22   A.  I've not been asked to testify.
23   Q.  Do you have --
24   MR. HEPWORTH:  She probably will.
25 (Inaudible.)

Shelley Wray, PNP                                                June 03, 2020

Page 50

1    THE REPORTER:  I'm sorry, what was the last
2  thing you said?
3    MR. HEPWORTH:  I said -- this is
4  Mr. Hepworth, I -- she will be asked to testify at
5  trial.  I haven't talked to her about it.
6    THE WITNESS:  So if I need to testify, yes,
7  I will testify.
8    Q.  (BY MS. HOWLAND) And do you know the
9  scope of the opinions you plan to offer at that
10  time?
11    A.  I don't understand what you're saying.
12    Q.  What opinions do you plan to testify to?
13    MR. HEPWORTH:  Objection; calls for
14  speculation.  It depends on what she's asked, and
15  I'm the one that asks the questions, so I can tell
16  you I'm going to ask her about her records.
17    MS. HOWLAND:  I'm going to hand you a
18  document that I'm going to label Exhibit 7,
19  Ms. Wray.
20    (Deposition Exhibit No. 7 was marked.)
21    Q.  (BY MS. HOWLAND) I guess I'm not going
22  to hand it to you, but Jennifer is going to pull it
23  up, and we're going to look at page 7.  There's a
24  paragraph that talks about you, and it says:  You
25  may be called as a nonretained medical expert

Page 51

1  regarding her treatment and professional opinions
2  of Mr. Hilliard regarding his mental health and
3  fitness for duty with the Twin Falls County
4  Sheriff's Office.  Ms. Wray is expected to testify
5  she managed his medications as he was reducing and
6  attempting to stop using pain medication while on
7  duty at the Twin Falls County Sheriff's Office.
8    What is the opinion you plan to give
9  regarding Mr. Hilliard reducing and attempting to
10  stop using pain medication?  Or is that wrong?
11    A.  I was not treating Mr. Hilliard for pain
12  medication.
13    Q.  So was this incorrect?
14    A.  Well, this is the first time I've seen
15  this, so --
16    Q.  Is it incorrect?
17    A.  Yes.
18    Q.  Okay.  So you're not going to say you
19  managed his medications as he was reducing and
20  attempting to stop using pain medication?
21    A.  Correct.
22    Q.  And are you going to say you determined
23  he was fit for duty in August 2017?
24    A.  I back up what my letter stated
25  regarding how he was improving on his medications.

Page 52

1  My notes back that up.  He was doing better.
2    Q.  Are you giving an opinion he was fit for
3  duty?
4    A.  What does fit for duty mean to you or to
5  everyone?
6    Q.  You've told us that you're a medical --
7  your experience and your education in the medical
8  practice, and this is a disclosure about your
9  opinion.  So I'm asking you what fit for duty
10  means.  I thought you told me earlier you didn't
11  have fit for duty expertise, but maybe I'm wrong.
12    A.  Okay.  Then why are you asking me what
13  fit for duty is?
14    Q.  Because it says on this document that
15  Mr. Hepworth has disclosed, for purposes of the
16  trial, that you're going to give an opinion saying
17  you determined he was fit for duty.  And this is my
18  opportunity to ask questions about that opinion.
19  So if that's not your opinion, I'm entitled to know
20  that today.
21    MR. HEPWORTH:  I mean, you're asking her
22  about what I wrote.
23    MS. HOWLAND:  Right.  I'm asking her if it's
24  wrong.
25    MR. HEPWORTH:  When I referenced fit for

Page 53

1  duty, I was referencing the letter that she wrote
2  saying he could return to work, just to clarify.
3    And as a point of further clarification,
4  the reality is Mr. Hilliard or Captain Hilliard was
5  reducing and going off his oxycodone at the time.
6  He was seeing Mark Gritton for that.  Mark Gritton
7  referred him to Shelley for his psychiatric pain --
8  excuse me, his psychiatric medications.  And so
9  we'll ask her about what she did.  If there's any
10  confusion, I hope that clears it up.
11    MS. HOWLAND:  It doesn't.
12    Q.  (BY MS. HOWLAND) I just want to clarify
13  that you're not giving an opinion that he was fit
14  for duty?
15    A.  I can't answer that.  I --
16    MR. HEPWORTH:  That's fine.
17    Q.  (BY MS. HOWLAND) Have you ever testified
18  in a trial before, Ms. Wray?
19    A.  No.
20    Q.  Now that you have additional information
21  in the form of hindsight available, is there any
22  information you wish you would have known when you
23  wrote the letter on August 21st, 2017?  Is there
24  any info you wish you had but you didn't at the
25  time you wrote that letter?

**Page 54**

1     A.   No.
2          Q.   Give me just a second, Ms. Wray, to look
3     at my notes.  I think I'm about done here.
4          If you would pull up your notes from
5     November 6th, 2017.
6     A.   Okay.
7          Q.   I'm looking at Hilliard -- it's tough to
8     read.  I'm thinking it's maybe 2004.  It indicates
9     on that document that you saw Mr. Hilliard on
10    November 6th, 2017, and he was talking about
11    increased anxiety over his court hearing next week
12    for his sentencing for his DUI.  Do you see that?
13    A.   Yes.
14         Q.   Did Mr. Hilliard talk to you about
15    whether or not he had a substance abuse problem
16    related to drinking?
17    A.   No.
18         Q.   Did you have discussions about that?
19    A.   I don't recall.
20         Q.   There's a sentence that says:  He will
21    be sober this weekend for two months.
22         What did you take that to mean?
23    A.   From his drinking from his DUI, I
24    assume.  I don't recall exactly.
25         Q.   It indicates on the second page:  Not

**Page 55**

1     taking oxycodone.  Do you see that?
2     A.   Yes.
3          Q.   And that's the first place I've seen it
4     show up where it says "not taking."  Do you recall
5     a discussion with him about him no longer taking
6     oxycodone?
7     A.   No, I do not recall.
8          Q.   Was that the last time you saw him in
9     November 2017?
10    A.   Yes.
11         MS. HOWLAND:  Let's look at your notes from
12    October 2017, which is Hilliard-31.  And I do have
13    this one, so I'm going to label it Exhibit 9 so we
14    can go back and add that last one.
15         (Deposition Exhibit No. 9 was marked.)
16         THE WITNESS:  Okay.
17         Q.   (BY MS. HOWLAND) It indicates:  He
18    reports increased sedation with the Seroquel
19    medication and has been sleeping until noon.  What
20    was that medication for?
21    A.   Seroquel is a mood stabilizer that helps
22    with depression, and it does have a sedative
23    effect, and so it's prescribed at night to help
24    people that have problems with sleep.
25         Q.   At that point under Current Medication,

**Page 56**

1     it indicates he's still taking oxycodone; is that
2     right?
3     A.   That's what it says, yes.
4          Q.   And was it your understanding that up
5     through October 11th, 2017, he had been taking
6     oxycodone continuously?
7     A.   Yes.  How much he had been taking, I
8     don't know.  That was not my reason for seeing him.
9     I don't discuss all his medications that he's
10    prescribed by other providers.  I focus on the
11    medications that I am prescribing him.
12         MS. HOWLAND:  I don't think I have any other
13    questions.  Thank you for your time today.
14         MR. HEPWORTH:  I don't have any questions.
15         (Deposition Exhibit Nos. 5 and 8 were marked.)
16
17    (The videoconference deposition concluded at 3:53 p.m.)
18                   * * *
19         (Signature was requested.)
20
21
22
23
24
25

**Page 57**

1                   VERIFICATION
2
      STATE OF _____ )
3                              ) ss.
      COUNTY OF _____   )
4
5          I, SHELLEY WRAY, PNP, being first duly sworn on my
      oath, depose and say:
6          That I am the witness named in the foregoing
7     deposition taken the 3rd day of June, 2020, consisting
8     of pages numbered 1 to 56, inclusive; that I have read
9     the said deposition and know the contents thereof; that
10    the questions contained therein were propounded to me;
11    that the answers to said questions were given by me, and
12    that the answers as contained therein (or as corrected
13    by me therein) are true and correct.
14
15
16
          Corrections Made:  Yes_____ No_____
17
18
19         _____
          SHELLEY WRAY, PNP
20
      Subscribed and sworn to before me this _____
21
      day of _____, 2020, at _____, Idaho.
22
23
24         _____
          Notary Public for Idaho
          Residing at_____, Idaho
25        My Commission Expires: _____.

**Page 58**

```
 1                    REPORTER'S CERTIFICATE
 2
    STATE OF IDAHO  )
 3                  )  ss.
    COUNTY OF ADA   )
 4
 5      I, REBECCA MARTIN, Certified Shorthand Reporter and
 6  Notary Public in and for the State of Idaho, do hereby
 7  certify:
 8       That prior to being examined, the witness named in
 9  the foregoing deposition was duly sworn remotely by me to
10  testify to the truth, the whole truth and nothing but
11  the truth;
12       That said deposition was taken down by me in
13  shorthand at the time and place therein named and
14  thereafter reduced to typewriting under my direction,
15  and that the foregoing transcript contains a full, true
16  and verbatim record of said deposition.
17       I further certify that I have no interest in the
18  event of the action.
19       WITNESS my hand and seal this 10th day of June,
20  2020.
21
22                               REBECCA MARTIN
23                               CSR, RPR and Notary
                                 Public in and for the
                                 State of Idaho.
24
25  My Commission Expires: 08-27-2024
```

REBECCA MARTIN
NOTARY PUBLIC - STATE OF IDAHO
COMMISSION NUMBER 47068
MY COMMISSION EXPIRES 8-27-2024

**Exhibits**

**Exhibit 1** 21:18, 19

**Exhibit 2** 26:4,5

**Exhibit 3** 32:2,3

**Exhibit 4** 36:5,6

**Exhibit 5** 43:21

**Exhibit 6** 43:20, 22,23

**Exhibit 7** 50:18, 20

**Exhibit 8** 56:15

**Exhibit 9** 55:13, 15

---

**1**

**1** 21:18,19

**10** 37:11

**11th** 56:5

**13** 48:13

**13th** 26:8 43:19 44:17 45:5,17

**16th** 36:4 37:19 38:7,25

**18th** 15:4 32:1

---

**2**

**2** 26:4,5

**20** 6:7

**20-something** 17:15 49:10

**2000-** 11:9

**2004** 54:8

**2005** 6:15 9:24

**2009** 9:25

**2011** 12:10

**2013** 11:8 12:1,8

**2014** 10:1

**2015** 6:15

**2016** 5:15

**2017** 10:25 11:3,9 12:12,24 15:4,7, 12 22:4 24:1 25:5 26:8,25 32:1 36:4 37:19 38:7,17 42:1 43:19 44:11, 17,18 45:6,9,17 51:23 53:23 54:5, 10 55:9,12 56:5

**2018** 5:15 11:8 12:25 13:2,9

**2019** 5:11 12:24

**2020** 13:2,9

**21st** 38:17 42:1 45:9 53:23

**24th** 22:4 26:25

**250** 29:23

---

**3**

**3** 32:2,3

**30** 11:16,19

**300** 25:22

**3:07** 37:9,11,16

**3:17** 37:16

**3:20** 37:13

**3:53** 56:17

---

**4**

**4** 36:5,6

**45** 40:1

---

**5**

**5** 43:21 56:15

---

**6**

**6** 43:20,22,23 44:11,18

**6th** 15:7,12 54:5, 10

---

**7**

**7** 50:18,20,23

---

**8**

**8** 56:15

**80** 10:8

---

**9**

**9** 55:13,15

---

**A**

**ability** 42:5

**absolutely** 49:7

**abuse** 14:3,10 54:15

**accuracy** 41:18

**accurate** 26:12

**add** 55:14

**added** 28:21 34:4

**addict** 18:2

**addiction** 47:6

**addition** 22:20

**additional** 53:20

**address** 32:23

**addresses** 33:3

**adverse** 27:2,23 33:1

**afternoon** 4:9,10

**agree** 29:9 30:11, 22 31:15

**agreed** 31:8

**ahead** 19:15 29:2 31:11

**allowed** 46:16,20

**Ambien** 34:4,11

**answering** 8:19 9:3

**answers** 7:9 8:23

**antidepressant** 33:2,5

**antidepressants** 35:6

**anxiety** 17:12 23:8 27:10 28:22 33:23 39:1 43:16 45:13 46:2 54:11

**anxious** 33:24

**apparently** 48:1

**appetite** 23:8

**appointment** 16:21

**appointments** 24:16

**approved** 11:22 12:19

**April** 4:22 5:11

**area** 13:22 14:4

**Asher** 5:18

**asks** 50:15

**asleep** 34:5

**associate** 9:24

**assume** 8:2 38:23 47:14,15 54:24

**assuming** 40:7 46:23

**attempt** 37:2

**attempting** 51:6, 9,20

**audible** 7:9

**August** 36:4 37:19 38:7,17,25 42:1 45:9 51:23 53:23

**avoid** 7:16

**aware** 19:12

---

**B**

**bachelor's** 9:25

**back** 17:10,13,23 19:1,19 23:4 28:13 33:16 34:1 36:16,22 37:12, 20,25 39:9,16 40:17 42:20 46:11 48:16 51:24 52:1 55:14

**background** 13:12 47:11

**basic** 20:25

**begin** 5:10

**Bible** 28:1

**bipolar** 29:15

**bit** 9:8,20 10:4 14:24 18:4

**black** 29:20,24

**blood** 20:25 25:8 27:8,9 29:23

**Board** 11:12,17, 23 12:11,18 13:1

**body** 27:6,16

**Boise** 4:21 5:3,23 28:7 36:19 39:15 48:15

**book** 27:24 28:1

**boss** 28:5 36:21

**Bozeman** 10:10

**BRC** 5:1,4,17

**break** 8:5,7,8 16:24 37:5

**Brent** 9:12 14:25 15:16,19 16:1,2, 19,21 18:23 23:5 25:23 36:18 38:23,24 40:3 43:4 45:21 48:14

**Brent's** 36:21 40:15

**Burley** 5:25

Shelley Wray, PNP                                                    June 03, 2020

business 48:20

**C**

call 40:12 44:7

called 28:5 50:25

calling 4:16

calls 29:1 31:1,4 50:13

canal 11:10

Canyon 6:17

capable 45:7

Captain 53:4

care 20:24 21:1 22:9 24:8,11,22 25:10,13,17,20 43:11

case 4:12 5:7 40:10 47:19

caused 17:18 20:8 27:19 28:23 29:5,7 31:17 45:23

causing 48:1

cell 8:17

Center 6:3

certifications 13:13

chance 18:12

change 40:21

changed 39:2 40:14,16 45:8,10

chart 9:12,15

charting 5:21

check 34:15

checked 35:20, 24,25

chose 12:11

chronic 5:9

circumstances 48:17 49:15

clarification 53:3

clarify 53:2,12

clean 7:16

clear 7:19

clears 53:10

client 31:6 49:18

clients 10:20

clinic 5:19,20,22 23:6 36:18 48:14

clinics 6:4

close 44:7

collateral 25:9

College 9:23

comment 42:9

commit 44:6

committing 45:3

common 16:10

community-based 5:8

completed 12:16

completely 24:1

concern 16:7 45:21

concerned 16:22 42:24

concerns 17:5

concluded 56:17

conclusion 29:10 40:13,17 46:19

confirm 40:10

confusion 53:10

connection 12:2

considered 11:12,17

contact 16:12 37:2

continuously 56:6

controlled 21:10

conversation 14:23

conversations 18:6

converting 35:1

copy 22:2 36:25 38:18

core 45:24 46:3

correct 8:24,25 13:9,10 15:24 17:8 22:7,12,17 28:24 30:3 40:25 41:4,24 42:3 48:10,12 51:21

counselor 16:12 29:18 39:20

count 40:2

County 4:12 48:19 51:3,7

court 7:5 19:25 33:16 37:20 42:19 54:11

COVID-19 8:13

cries 18:24

crises 45:23

Crosspointe 5:13,14,17 6:1 14:14 15:1,9 24:18

current 18:21 22:6,16 24:4 32:11 38:3 41:6,8, 9 42:11 43:15 45:15 55:25

cut 10:4,15 11:14 13:20 33:13 44:2

Cymbalta 33:1,2, 4,7 34:11,18 35:17 39:3

**D**

dates 6:13

day 16:23 43:3

days 11:16,19

death 27:11

decreased 23:8 39:1

deemed 12:12

defendant 4:12

degree 6:20 9:24 10:1

degrees 13:14

dentist 11:9

dependent 12:10 17:23

depends 50:14

deposed 6:24 15:14

deposition 7:4 8:7,10 9:9,18 20:6 21:19 26:5 32:3 36:6 43:23 47:17 50:20 55:15 56:15,17

depression 17:11,12,17,21 18:24 28:16,20, 21,24 29:5,6 32:21 36:20 39:1 40:15 43:16 45:13 46:1 55:22

depressive 18:16

describes 18:23

description 41:20

Desert 6:3

detail 25:23

determined 37:24 39:8 51:22 52:17

developed 49:18

diabetic 25:7

diagnose 29:19

diagnosed 17:17 18:15 36:20 39:15

diagnoses 39:13

diagnosis 29:4, 13

differently 29:19 39:14

direct 18:11

disagree 30:18

disclose 24:6

disclosed 52:15

disclosure 52:8

discuss 16:5 18:18 23:17 56:9

discussed 18:6

discusses 23:5

discussion 33:11 55:5

discussions 17:4 54:18

disorder 18:16

dispensing 34:16

displayed 27:2

displaying 27:3

disputed 47:18

disrupted 23:8

distance 8:15

doctor's 37:18

document 18:9 50:18 52:14 54:9

documented 18:7 44:19

documenting 30:8

documents 38:15

dose 27:13 33:22

doses 17:24

drinking 45:3 54:16,23

drug 27:7 34:10

Shelley Wray, PNP                                                              June 03, 2020

drugs 27:17

DSM-5 29:5

DUI 44:11,18
54:12,23

duly 4:4

duties 41:8,14,23
42:11,14 45:15
48:11

duty 43:6,12,14
46:21 51:3,7,23
52:3,4,9,11,13,17
53:1,14

**E**

earlier 15:14 17:3
30:19 34:22 39:12
45:11 52:10

easy 7:11

education 10:11
52:7

educational 9:22
13:11

effect 33:6 55:23

effectively 27:7

effects 27:2,23
31:6,9

employed 4:23

employer 48:2

end 19:3

energy 18:25

entitled 52:19

entry 11:25 12:7

enzymes 27:16

equal 14:5

establish 47:3

evaluation 28:8
43:7,14,15

evaluations
39:25 40:8

events 18:21

exact 15:4 25:23

27:23 40:2

**EXAMINATION**
4:7

examined 4:6

excuse 31:2 53:8

Exhibit 21:18,19
26:4,5 32:2,3
36:5,6 43:20,21,
22,23 50:18,20
55:13,15 56:15

expected 51:4

experience
31:19,22 52:7

experiencing
17:11 20:7 23:20

expert 31:1 50:25

expertise 31:5,9,
16,18 34:9 35:14
52:11

exposed 8:14

**F**

fact 39:6,7 42:12
48:2

factors 29:7
30:15

facts 30:23 47:18

faded 42:23

fair 8:3 41:22

fall 11:9 34:5

Falls 4:12,20,22
6:12 48:18 51:3,7

familiar 14:12

feel 23:9 25:6
40:18 49:7,9

feeling 28:20

feels 41:10

felt 39:2 45:20

Ferry 6:4

field 29:14 41:16

file 24:13,24 25:3

36:1,2

filled 35:22

fine 53:16

finish 47:16

fit 36:21 37:25
39:8,16 40:17
46:20 51:23 52:2,
4,9,11,13,17,25
53:13

fitness 43:6,12,
14 51:3

fixed 12:3

focus 56:10

follow-up 40:1

foot 37:7

form 44:14,22
46:25 53:21

front 13:1 22:2
24:13

froze 33:9

fully 9:3

functional 48:22

**G**

gave 43:14

generally 39:24

give 7:3,9 21:16
30:24 31:16 33:14
39:13 43:13 47:11
51:8 52:16 54:2

giving 52:2 53:13

glucose 29:23

good 4:9,10 8:15
30:7,8 34:2 37:12

graduated 9:23,
25 10:1

great 33:2,5
34:13

Gritton 14:12
15:14 16:2,18
17:4,17 18:14,18
23:17,25 29:10

30:18 31:8 47:6
53:6

Gritton's 15:16,
18 18:5 20:6

ground 7:2

grounds 14:5

guess 37:18
50:21

guessing 8:6

guidance 7:3

guide 8:19

**H**

hand 50:17,22

handbook 23:15

hands-on 10:20

happening 41:19

harder 7:12

head 7:13 35:19

headed 20:16

health 5:1,4,17
6:3 14:2 16:8
24:8,11,22 25:16
32:23 43:11 51:2

hear 7:14 12:4,5,6

heard 47:2,5,24

hearing 54:11

heart 25:7

heartburn 25:11

held 33:11 48:24

helped 34:4

helps 33:6 55:21

Hepworth 7:6
19:14,21 20:14
28:25 30:25 31:4,
15 40:24 41:1
42:15 44:12,22
46:23 47:8,13,18,
22 49:24 50:3,4,
13 52:15,21,25
53:16 56:14

Hilliard 9:15
14:25 15:16,20
16:1,3,19 17:1,6,
7,10,22 18:15
19:12,22 20:7,10
21:16 23:19 24:1,
6 26:7,18 28:12
30:20 32:6,11,16
34:23 37:24 38:7,
17 39:7,23 48:2,
22 51:2,9,11 53:4
54:7,9,14

Hilliard's 17:21
20:13 31:16 48:18

Hilliard-1628
26:3

Hilliard-29 18:10

Hilliard-31 55:12

Hilliard-42 36:5

Hilliard-46 21:17

Hilliard-47 27:1

Hilliard-50 32:1

hindsight 53:21

history 9:21,22
20:13 32:15

hold 10:14,16,17,
21 13:13 43:10

home 4:17 33:25

Home/glenns
6:4

hope 53:10

hospital 6:18

hour 39:19 40:8

hour-and-a-half
39:25

hours 39:25

Howland 4:8,11
11:25 19:18,24
20:5,18 21:14,20
26:3,6 29:9 31:14,
25 32:5 33:10,12,
19 34:9 36:3,8
37:15,17,23 41:2
42:17 43:18,25
44:16,24 47:2,10,

16,20,24 50:8,17,
21 52:23 53:11,
12,17 55:11,17
56:12

**huge** 48:23

**huh-uh** 7:14

---

**I**

**I's** 9:12

**Idaho** 4:17 6:12
9:24

**idea** 41:23

**identify** 18:25

**identity** 46:12

**illness** 5:9 14:6,7
29:20

**impact** 42:5

**impacted** 26:20

**impacts** 46:14

**impaired** 30:13,
20 46:16,24

**impairment** 30:5
31:17

**important** 7:8
23:1 24:6,24 25:3,
4,9,15 44:20 45:1,
4

**improving** 45:12
51:25

**Inaudible** 49:25

**include** 26:16

**including** 23:7

**incorrect** 51:13,
16

**increased** 23:8
27:9 54:11 55:18

**increases** 35:6

**info** 53:24

**information**
18:22 20:9 25:9
36:1,2 44:21
53:20,22

**initial** 39:24

**inpatient** 11:18

**instance** 27:14

**instant** 8:18

**insurance** 49:11

**interact** 21:11
34:12 35:15

**interacted** 34:18

**interactions**
34:10,14 35:21,23

**interested** 26:9

**invested** 49:10

**investigator**
48:21

**involved** 9:5 46:4

**isolation** 16:16,
17

**issues** 9:2 32:23
33:3,25 45:20

**ISU** 9:25

---

**J**

**January** 5:15

**Jeff** 47:21

**Jennifer** 18:10
21:20 27:1 50:22

**job** 5:4 6:8 7:19
17:14 28:14 33:24
41:10,13,20,23
42:6 45:7 46:13
48:11,16 49:14

**July** 15:4 22:4
24:1 26:8,25 32:1

**Justine** 14:18

---

**K**

**kill** 32:19

**killing** 49:4,13

**kind** 5:21 13:20
16:15 21:10 33:3,
5

**Klonopin** 33:22
34:3,11

**knew** 26:18 39:21

---

**L**

**label** 21:17 26:4
29:15 32:2 50:18
55:13

**Lacie** 5:18

**lacks** 18:25

**language** 7:13

**lawsuit** 9:5

**lead** 27:11

**leave** 6:16,19
30:5

**led** 11:25 12:7

**left** 11:10 37:17

**letter** 36:16,21,25
38:16,21,24
39:17,23 41:5,25
43:8,21 45:8
51:24 53:1,23,25

**letting** 46:11

**level** 22:11,25

**Lexapro** 34:24
35:1

**license** 10:21,25
11:2,4,24 12:23
13:4,12

**licenses** 10:14,
16,18

**life** 5:19,20 18:21
48:22 49:11

**light** 39:6

**list** 22:7,8,10
24:4,5 26:8,11,15
38:3,4,10

**listed** 22:16,19,22
26:10 27:24

**live** 4:20

**lived** 4:18

**located** 5:2

**long** 4:18 6:6

**longer** 55:5

**looked** 34:22

**lose** 11:2,4

**losing** 17:14

**lost** 33:8,12 48:16

**lot** 11:10 14:6,23
26:10 29:14 31:19
39:2 45:20,23

**Luke's** 6:11,14,
16,19,21

---

**M**

**maintenance**
17:24

**major** 17:10,13
28:17 36:20

**make** 7:24 8:8,20
27:14 49:8

**managed** 51:5,
19

**management**
5:7 24:20

**manager** 20:19,
21

**mark** 14:12 16:2,
18,21,22 29:13
36:5 46:2 53:6

**Mark's** 15:23,25

**marked** 21:19
26:5 32:3 36:6
43:23 50:20 55:15
56:15

**master's** 6:20
10:2,5,7,12

**matter** 49:21

**means** 27:4
38:13 52:10

**medical** 9:2
15:18,21 21:15
24:10,15,21 25:16
26:7 28:5 29:1
34:22 37:19 50:25
52:6,7

**medication**
11:12 21:10 23:7,
21,23 24:2 26:11,
15 27:13 28:15
32:22 33:21 34:14
35:20 38:3,10
41:6,9 45:12 51:6,
10,12,20 55:19,
20,25

**medications** 9:1
15:17 17:25 20:23
21:13 22:7,8,10,
11,16,19,20 23:1
24:4,7 25:8 26:10
30:17 31:7,8,10
32:11 34:16 38:13
43:16 51:5,19,25
53:8 56:9,11

**medicine** 20:25

**meds** 21:11

**meeting** 26:24

**memory** 9:13

**mental** 5:1,4,9,17
14:2,6 16:8 29:20
32:23 45:4,10,23
46:14 51:2

**mention** 23:22

**messages** 8:17

**messaging** 8:18

**met** 15:1,8 38:6
44:16 45:5,16

**metabolize**
27:17

**metabolizes**
27:7

**middle** 34:6

**mind** 36:10 44:4

**minutes** 37:11
40:1

**missing** 43:20

**misstates** 19:14

**mom** 6:23

**Montana** 10:2,5,
12

Shelley Wray, PNP                                                    June 03, 2020

**month** 45:11

**months** 4:19 6:7 12:10 23:24 54:21

**mood** 55:21

**morning** 20:6 29:23 47:5

**motivation** 19:1

**Mountain** 6:4

**moved** 4:21

**N**

**narcotic** 35:13

**nausea** 23:9

**night** 34:6 55:23

**nodding** 7:13

**noncompliant** 11:24

**nonpsychiatric** 22:13

**nonretained** 50:25

**noon** 55:19

**normal** 40:7

**Nos** 56:15

**note** 22:17 32:1 37:18,19 45:11 48:13 49:2

**notes** 9:12,15 15:19,21 22:4 30:6 36:4 43:19 52:1 54:3,4 55:11

**notice** 9:11

**November** 15:7, 12 54:5,10 55:9

**nowadays** 24:23 25:2

**nurse** 6:9,11 16:11

**nurse/ receptionist** 25:19

**nurses** 11:8 12:1, 8

**nursing** 5:7,21 9:24 10:1,3,5,17 11:23 13:12

**O**

**oath** 8:23

**object** 20:14 28:25 30:25 31:4 44:14 46:25 47:23

**objecting** 47:9

**objection** 19:14, 21 40:24 42:15,18 44:12,22 50:13

**objectionable** 47:23

**observations** 18:22

**occur** 14:6

**October** 11:9 55:12 56:5

**offer** 50:9

**office** 39:19 41:17 48:19 51:4, 7

**opiate** 21:10

**opiates** 12:10,13, 14 17:23

**opinion** 11:11 29:1 30:24 31:1, 16,20 34:17,20,21 39:16 40:20,21,22 41:2 45:8 46:15 51:8 52:2,9,16,18, 19 53:13

**opinions** 50:9,12 51:1

**opioid** 17:18 18:1 20:13,15

**opioids** 20:20 21:5 26:19

**opportunity** 52:18

**opposed** 15:16

**order** 8:19 30:24 32:23

**oxycodone** 21:2 22:7,22 27:20 28:14,23 29:7 30:12 32:12 34:11 35:15 38:4,8 42:2, 4,13,25 43:2,17 46:17 47:5 48:5,7, 9 53:5 55:1,6 56:1,6

**Oxycontin** 19:2, 4,13,23 20:8 23:14 24:2 30:12, 21 31:6,17,23 34:18 46:24

**P**

**p.m.** 37:16 56:17

**pain** 11:10,12 12:15 23:21,23 31:7,10 33:3,4,6 51:6,10,11,20 53:7

**Pam** 4:11

**paragraph** 50:24

**part** 14:4 32:20 46:12 49:3

**passive** 32:17

**path** 10:18,19

**patient** 21:9,12 25:6 30:9 38:11 39:18,19,21

**patients** 10:22,24 13:8,16 14:9 24:19 25:22

**pension** 49:10

**people** 5:8 8:14 27:12,15 33:3,4 49:8 55:24

**percent** 10:8

**perform** 42:5 43:11

**performed** 43:8

**performing** 45:7

**period** 47:4

**person** 29:19

**person's** 46:12

**personal** 31:22

**pharmacist** 34:15

**pharmacy** 36:2

**phone** 8:17

**physician** 20:24

**pick** 33:17

**piece** 24:24

**place** 49:4,13 55:3

**places** 6:5 35:23

**plan** 13:4,16 49:20 50:9,12 51:8

**play** 29:8

**PNP** 4:3

**point** 53:3 55:25

**poor** 45:21 46:9, 10,21 47:25

**pop** 26:25

**post-surgery** 23:24

**practice** 7:11 52:8

**practitioner** 6:9 16:11

**prediabetic** 29:24

**prepared** 9:9

**prescribe** 32:22 34:14

**prescribed** 15:17 24:8 31:7 34:24 35:20 55:23 56:10

**prescribing** 21:13 56:11

**prescription**

**prescriptions** 16:11,25 35:22

**presents** 23:6 36:18 48:14 49:17

**pressure** 20:25 25:8 27:10

**pretty** 9:11 30:7,8 34:2

**Prevacid** 25:11

**prevent** 9:2

**previous** 28:4

**primary** 20:24 21:1 22:9 25:10, 13

**print** 24:15

**privy** 20:9

**problem** 12:3 18:21 19:10 27:15 47:6 48:1 54:15

**problems** 19:13 47:12 55:24

**professional** 51:1

**program** 8:18 11:7,8,21 12:1,7, 17,19,20,21

**provider** 21:1 22:9 24:22 25:10, 13,17 43:11 48:21

**providers** 24:8, 11 39:13 56:10

**providing** 16:13

**Prozac** 23:7,13 27:3,13,19,22,23 32:24 34:25

**psychiatric** 6:9, 18 15:17 20:23 21:3 22:20 23:1 24:20 28:8 29:25 31:7 32:15 39:24 53:7,8

**psychiatrist** 27:25 28:7 29:14,

**20:19,21 24:20 26:8 43:17**

Shelley Wray, PNP                                                                  June 03, 2020

16 30:2 40:23
41:1 48:15

**psychological**
40:7

**psychologist**
36:19 37:3 39:8,
14 40:4,6 41:3

**psychopharmac ology** 23:16
27:24 28:3

**psychotherapy**
28:1

**pull** 18:9,10
21:14,15 26:3
38:19 50:22 54:4

**pulled** 11:23

**purpose** 7:4

**purposes** 52:15

**put** 30:4 34:25
42:18

---

**Q**

**question** 7:21,23
8:1,23 12:6 19:16,
24 20:2 31:12
33:15 37:21
44:14,23 46:10,25
47:1

**questions** 7:19
8:19 9:3 47:8,21,
23 50:15 52:18
56:13,14

---

**R**

**racing** 33:24 34:6

**Ranch** 12:22

**rapport** 49:18

**reached** 40:13

**react** 35:18

**reaction** 23:7,14
33:1

**read** 9:12 19:18,
20 20:3 33:16,20

37:20,22 42:20
45:11 54:8

**ready** 9:10,17
21:24 41:10

**reality** 53:4

**reapply** 13:4

**reask** 19:16

**reason** 17:4
18:24 27:6 39:3
56:8

**reasons** 45:2

**recall** 15:1 18:19
23:18 24:3,12
26:1 30:7 36:8
37:4 38:9 41:15,
16,18 54:19,24
55:4,7

**received** 11:11
36:15

**receiving** 8:17
45:22

**recess** 37:16

**recollection** 17:7

**reconciled** 38:11

**record** 4:14
19:15,20 20:3
25:24 26:7 31:1
33:10,11,20 34:22
37:22 42:18

**records** 9:14
15:19 18:5,8
21:15 24:10,21
25:13,16,20 26:14
47:3 50:16

**recovering** 11:7
12:1,8

**reducing** 51:5,9,
19 53:5

**refer** 23:16

**reference** 36:23

**referenced** 52:25

**referencing**
45:25 53:1

**referred** 47:11

53:7

**referring** 46:8

**refers** 27:25

**refrain** 8:16

**refresh** 9:13

**regard** 15:15

**regimen** 41:7

**registered** 6:11

**regular** 7:13

**rehabilitation**
5:8

**relapse** 11:13,17
12:13

**related** 15:19
48:17 54:16

**relating** 25:23

**release** 48:15

**relevancy** 21:7

**relevant** 21:5

**relieved** 48:25
49:3

**relying** 46:22

**remember** 16:6,
20 25:22 26:2
32:5,7,8

**remote** 10:8

**remotely** 8:14
10:7

**Renaissance**
12:22

**repeat** 33:15

**rephrase** 7:22

**reporter** 7:5
11:14 19:25 33:8,
16 37:20 42:20
50:1

**reporting** 23:6
36:19 48:14

**reports** 19:1 30:5
55:18

**represent** 4:11

20:5

**representation**
8:22

**request** 25:14

**requested** 38:23
56:19

**requests** 25:20

**required** 10:21

**reservations**
39:5

**responded** 41:9

**responding**
43:15

**responsibilities**
41:8 42:11 45:16

**result** 7:7

**resume** 41:10

**return** 39:4 41:7
42:11 45:15
46:16,20 48:3
53:2

**returns** 28:8

**review** 24:20
38:13 41:20

**reviewed** 15:18,
21,25 38:11

**revoked** 12:23,25
13:2

**ripped** 46:13
49:12

**risk** 35:7

**RN** 6:14

**road** 13:17

**role** 15:15

**roles** 5:6

**root** 11:10 17:21

**rules** 7:2

---

**S**

**Sage** 6:3

**schizophrenic**
29:16

**scope** 50:9

**scroll** 18:11 19:8
21:20,21

**sedation** 55:18

**sedative** 55:22

**sending** 8:17

**sense** 7:24 8:20

**sentence** 54:20

**sentencing**
54:12

**September**
43:19 44:11,17,18
45:5,17 48:13

**Seroquel** 55:18,
21

**serotonin** 27:4,5,
8,18 35:7

**Services** 5:1,5,17

**severe** 5:9 17:11

**shaking** 7:13

**she'll** 18:11

**Shelley** 4:3,15
31:2 53:7

**Sheriff's** 48:19
51:4,7

**short** 9:11

**shoulders** 48:24

**show** 26:11 55:4

**sick** 27:14

**side** 27:2,23 33:6

**signature** 56:19

**significant** 22:12
28:19 35:10 37:23
44:10,13

**significantly**
46:14

**sits** 18:24

**skin** 23:10

Shelley Wray, PNP                                                June 03, 2020

**sleep** 23:9 33:23 34:3 55:24

**sleeping** 55:19

**small** 5:22

**sober** 54:21

**social** 8:14

**sooner** 47:20,21

**sounds** 7:11 37:12

**Southern** 9:23

**speak** 7:8

**specialize** 13:24

**specialty** 13:13, 19,21 14:4,9 42:7

**specifics** 16:6,20 41:15

**speculation** 50:14

**spelling** 4:14

**spent** 39:22 40:4, 6

**St** 6:11,14,16,19, 21

**stabilized** 41:6

**stabilizer** 55:21

**stable** 41:7 45:14

**Stahl's** 23:16 27:24

**stand** 36:9 43:25 44:4

**stands** 36:11

**Star** 4:17,18

**start** 24:25

**started** 19:3 27:22 32:24 33:6, 22

**starting** 33:14

**state** 4:13 10:2,5, 12 45:4,10 46:14

**stated** 51:24

**statement** 36:17

**states** 23:9

**stating** 36:21 49:4

**stop** 23:21,23 26:19 51:6,10,20

**stopping** 19:13

**stressors** 18:21

**stuck** 19:6

**stuff** 8:15

**subjective** 23:5 49:2

**substance** 14:3, 9 54:15

**substance-induced** 18:15

**sudden** 27:22

**suicidal** 32:16,18

**suicide** 44:6,7 45:3

**supervisor** 14:16

**surgeries** 12:9

**surgery** 17:10, 13,24,25 19:1 28:14,17 37:7

**sweating** 23:9

**Sweet** 14:18

**sworn** 4:4

**symptoms** 19:2 20:8 23:20 26:20 27:3 47:7

**syndrome** 27:4, 5,19 35:7

**system** 34:15

**T**

**tag** 16:15

**taking** 9:1 12:13 17:1 21:12 22:12 24:7 26:19 28:15 30:11,21 31:23

32:12 34:10 35:1, 5,8 38:8,14 42:2, 13 43:3 46:17 47:5 48:6,9 55:1, 4,5 56:1,5,7

**talk** 9:17 14:24 16:2,18,23,24,25 38:16 40:9 54:14

**talked** 13:11,12 15:11 50:5

**talking** 31:6 37:18 54:10

**talks** 50:24

**tapering** 24:2

**team** 16:15

**telling** 9:20 30:9 38:14 47:4

**temperature** 27:9

**terminated** 48:25

**termination** 48:18 49:16

**testified** 4:6 20:7, 15 30:19 53:17

**testify** 49:20,22 50:4,6,7,12 51:4

**testimony** 21:4 31:5

**text** 8:17

**therapeutic** 33:22

**therapist** 18:22 29:18

**thing** 8:13 25:3,4 29:18 34:13 45:24 50:2

**things** 5:22 7:12, 17 18:7 20:25 24:5 28:18 29:6, 25 39:14 47:14 49:8

**thinking** 54:8

**thought** 52:10

**thoughts** 32:18,

20 33:24 34:7

**Thursday** 28:6

**tie** 48:1

**time** 8:5 11:4 15:5 20:1,9 29:17 32:12,16 35:6 36:22 37:10 39:22,23 40:3,6 41:25 47:4 49:9 50:10 51:14 53:5, 25 55:8 56:13

**times** 5:19 10:9

**title** 6:8

**titrate** 19:2

**Titrated** 33:21

**today** 9:3,9 15:14 36:18 48:14 52:20 56:13

**told** 11:21 12:18 24:1 28:6 39:7 44:9,19 52:6,10

**tolerance** 30:16

**tolerated** 33:7

**tooth** 12:14

**top** 26:23 35:19

**total** 5:18,20 39:22

**tough** 54:7

**tramadol** 35:8, 14,17

**travel** 10:9

**treat** 10:22 13:16 24:19

**treated** 13:8 15:5, 8 20:10

**treating** 10:23 14:9 16:1 42:8 51:11

**treatment** 11:16, 18,19,21,22 12:17 14:25 15:15,19 16:3,13 22:4 23:2 26:21 31:25 36:4 40:15 43:19

**trial** 49:20 50:5 52:16 53:18

**truth** 4:5

**truthfully** 9:3

**turn** 12:11 28:2,4 32:10 38:2

**Twin** 4:12,20,22 5:23 6:12 48:18 51:3,7

**Tye** 28:7 40:9

**type** 8:18

**types** 29:25

**typical** 27:2

**U**

**uh-huh** 7:14

**unable** 28:17

**understand** 7:20,21,23 22:14 46:7,25 47:10 50:11

**understanding** 17:16,19,20 20:12 28:11,13 41:13 42:1 56:4

**understood** 8:2

**University** 10:2

**update** 38:14

**updated** 26:15

**urgent** 25:14

**usage** 42:5

**Utah** 12:22

**V**

**vague** 44:15,23 47:1

**variety** 5:6,21

**Shelley Wray, PNP**                                            **June 03, 2020**

**videoconferenc e** 8:11 56:17

**View** 6:17

**visit** 9:12 26:7 32:6,8 36:9 38:25 44:1,5

**visiting** 32:7

---

**W**

**W-R-A-Y** 4:15

**waiting** 21:25 22:1 42:18

**wake** 29:23 34:5

**walk** 9:21

**wanted** 23:20 28:21 49:14

**wanting** 23:23

**Waters** 25:25 34:23

**Waters'** 26:6

**week** 37:7 54:11

**weekend** 54:21

**weeks** 11:20 12:18 19:3

**weighed** 45:22

**weight** 48:23

**white** 29:20,24

**withdrawal** 20:8 23:14,20,22 26:20 47:7

**withdrawals** 23:23

**word** 7:6,7

**words** 16:14 45:7

**work** 4:25 5:10, 12,16 6:2,6,22 9:21 10:20 14:18 16:15 21:5 28:8, 21 30:5 34:1 36:16,22 37:25 39:4,9,16 40:17 41:8 45:16,22

46:4,11,16,20 48:3,16,23 53:2

**worked** 5:14,18 6:1,3,13,17 14:14, 25

**working** 13:7 31:23 39:20 41:16 46:5

**workplace** 28:12 30:12

**world** 30:1

**worried** 42:12,22

**worries** 34:7

**worry** 17:14

**worrying** 33:24

**Wray** 4:3,9,15 47:2,25 50:19 51:4 53:18 54:2

**write** 38:23

**write-up** 28:5

**writing** 39:6

**wrong** 51:10 52:11,24

**wrote** 38:17,21 39:23 41:11,25 43:8 52:22 53:1, 23,25

---

**Y**

**year** 4:21

**years** 9:13 11:24 16:7 17:15 25:21 31:19 32:9 49:10

# Exhibit I

**Fabrice Czarnecki, MD**
**6440 Noble Drive**
**McLean, VA 22101**


June 18, 2020


Re: Brent E. Hilliard v. Twin Falls County Sheriff's Office, Twin Falls County


I was asked by Pam Howland, Esq., to provide an opinion on the ability of Mr. Brent E. Hilliard to safely and effectively perform the duties of a Deputy Sheriff – Captain while taking opioid and other sedating medications and on the appropriateness of the fitness-for-duty evaluation ordered by Twin Falls County Sheriff's Office on Mr. Hilliard.

It is my opinion that the fitness-for-duty evaluation ordered by Twin Falls County Sheriff's Office on Mr. Hilliard was appropriate, and that law enforcement officers are not medically qualified to work full and unrestricted duty while taking opioid medications.


### Records

The following is a chronological summary of the pertinent records that were presented to me for review:

4/30/10 – St Luke phone note
7/19/10 – St Luke office visit for right foot pain
6/23/11 – Statement from Chris Bratt
6/23/11 – Statement from Stephanie Haught
6/24/11 – Statement, unsigned ("Newman gave to me" on sticker)
4/16/12 – St. Luke phone note
4/20/12 – St Luke phone note
9/6/13 – St Luke Quick Care office visit for back pain
12/2013 – Twin Falls County Class Specification, Sheriff's Deputy – Captain
12/31/13 – St. Luke phone note. New medication was added: hydrocodone-acetaminophen 10-325 mg.
1/6/14 – St. Luke office visit with Dr. Waters for "right-sided flank/back pain."
3/24/14 – Visit with Dr. Dille for low back pain radiating to both legs. Among the current medications were listed Percocet 10 mg-325 mg ("start on November 22, 2011, end on December 21, 2011 and maintenance drug"), Norco 10 mg-325 mg and "Percocet oral." A lumbar epidural steroid injection was performed.
3/27/14 – Letter from Dr. Dazley
4/17/14 – Work note from Phillip Stevenson, PA-C

HILLIARD002371

4/25/14 – St Luke Quick Care office visit for back pain. Current medications included cyclobenzaprine 10 mg, oxycodone 5 mg and diazepam 5 mg.

5/15/14 – St Luke office visit Phillip Stevenson, PA-C, for follow-up after revision laminectomy L3-5, posterior spinal fusion L3-4 and repair pseudoarthrosis L4-5 on 4/4/14. Current medications included cyclobenzaprine 10 mg, hydrocodone-acetaminophen 10-325 mg and diazepam 5 mg.

6/23/14 – Work note from Dr. Dazley: Return to work without restrictions.

9/15/14 – St Luke visit with Dr. Dazley for follow-up. Current medications included cyclobenzaprine 10 mg and diazepam 5 mg.

10/14/14 – St Luke visit with Dr. Waters for left knee injury. Hydrocodone-acetaminophen 7.5-325 was prescribed.

8/10/15 – St. Luke office visit with Dr. Waters for wellness physical exam. Current medications included varenicline.

7/11/16 – St Luke office visit Phillip Stevenson, PA-C, for low back pain and left leg pain. Current medications included hydrocodone-acetaminophen 7.5-325 mg. The assessment was "episode of acute on chronic low back pain."

9/14/16 – Office visit with Janice Carter, FNP, for left buttock tendonitis.

10/3/16 – St Luke's visit summary (pages 1 and 2 are missing)

10/4/16 – Office visit with Janice Carter, FNP, for left knee pain.

12/1/16 – St Luke's telephone encounter

12/2/16 – St Luke's note

12/7/16 – St Luke's encounter notes. Current medications included cyclobenzaprine 10 mg, hydrocodone-acetaminophen 7.5-325 mg.

1/8/17 – St Luke's emergency department visit for back pain. Dr. Bradbury wrote that Mr. Hilliard has "a history of back pain" and "had several surgeries." The past surgical history mentioned "Back surgery x3 L4-5 [fusion]" and "laminectomy revision L3-4, PSF L3-4, repair pseudoarthrosis L4-5." Mr. Hilliard's alcohol use was described as "10 cans of beer per week." He was prescribed diazepam 5 mg and oxycodone-acetaminophen 5-325 mg.

1/12/17 – Office visit with Janice Carter, FNP, for right hip pain. Medications were oxycodone-acetaminophen 7.5-325 mg and carisoprodol 350 mg.

1/26/17 – Office visit with Janice Carter, FNP, for right hip pain. Medication was oxycodone-acetaminophen 7.5-325 mg.

2/14/17 – St Luke's note. Medication documentation included cyclobenzaprine 10 mg and hydrocodone-acetaminophen 7.5-325 mg, both with a start date in July 2016 and with an end date of 3/15/17.

2/16/17 – Office visit with Janice Carter, FNP, for right hip pain. Medications were oxycodone-acetaminophen 7.5-325 mg and carisoprodol 350 mg.

2/28/17 – St Luke's note. Order for lumbar MRI for lumbar radiculopathy.

3/6/17 – St Luke's note. MRI appointment. The MRI showed severe degenerative disc disease at L2-3 with large disc extrusion that impinges on right L3 nerve root, moderate spinal canal stenosis at L2-3 with moderate bilateral neural foraminal narrowing and posterior mechanical fusion spanning L3-5.

3/15/17 – St Luke encounter notes by Dr. Dazley. Diagnosis was lumbar radiculopathy. Physical therapy and epidural steroid injection were ordered. Medication documentation included oxycodone-acetaminophen 7.5-325 mg, with a start date of 3/6/17 and an end date of 3/20/17.

HILLIARD002372

3/20/17 – St Luke's note. Medication documentation included oxycodone-acetaminophen 7.5-325 mg and carisoprodol 350 mg, both with a start date of 3/20/17 and an end date of 3/29/17.

3/21/17 – St Luke's physical therapy note.

3/24/17 – St Luke's physical therapy note.

3/27/17 – St Luke's epidural steroid injection procedure.

3/29/17 – St Luke's note. Medication documentation included oxycodone-acetaminophen 7.5-325 mg and carisoprodol 350 mg, both with a start date of 3/29/17 and an end date of 4/19/17 and 4/5/17, respectively.

4/5/17 – St Luke's note. Visit for back pain. No relief after epidural steroid injection. Dr Dazley wrote that Mr. Hilliard "continues to have difficulty with his regular activities of daily living." Carisoprodol 350 mg was reordered until 4/19/17.

4/5/17 – St Luke's physical therapy discharge note.

4/18/17 – St Luke's telephone encounter.

4/19/17 – St Luke's note. Oxycodone-acetaminophen 7.5-325 mg was prescribed, with an end date of 5/9/17.

4/26/17 – St Luke's note. Carisoprodol 350 mg was prescribed, with an end date of 5/13/17.

4/28/17 – St Luke pre-op exam by Dr. Waters. Dr. Waters wrote that Mr. Hilliard "has chronic low back pain with recent acute exacerbation and severe right-sided sciatica symptoms."

4/28/17 – FMLA certification from Dr. Dazley for continuous period of time. The probable duration of condition was 6 weeks after the surgery of 5/6/17.

5/4/17 – St Luke's note.

5/9/17 to 5/13/17 – St Luke's inpatient notes. Back surgery on 5/9/17 – the procedure was "Posterior spinal arthrodesis L2-L3, L3-L4, L4-L5; inspection fusion mass; application of segmental instrumentation L2-5; revision laminectomy L2; revision laminectomy L3; bilateral partial medial facetectomy L2-3." MRI of lumbar spine performed on 5/12/17. Dr. Pedersen's anesthesia evaluation on 5/9/17 included "chronic pain" and "chronic opioid use." Discharge medications included long-acting oxycodone 20 mg (until 5/30/17) and immediate-release oxycodone 5 mg (until 5/30/17).

5/18/17 to 5/23/17 – St Luke's inpatient notes – admission for sepsis, lower extremity cellulitis and acute gout of the right foot.

5/24/17 – St Luke post-op visit with Dr. Dazley. Diazepam 5 mg was prescribed, with an end date of 6/10/17.

5/30/17 – St Luke follow-up visit with Dr. Waters. Prescribed medications included long-acting oxycodone 20 mg (until 6/14/17) and immediate-release oxycodone 5 mg (until 6/9/17).

5/31/17 – Annual evaluation of Captain Hilliard

6/6/17 – St Luke telephone encounter.

6/7/17 – St Luke encounter. Tramadol 50 mg was prescribed, with an end date of 6/17/17. The end dates for diazepam, long-acting oxycodone and immediate-release oxycodone were unchanged at 6/10/17, 6/14/17 and 6/9/17, respectively. Note from Dr. Dazley stating "May return to work with restrictions of no bending, lifting or twisting and activity as tolerated."

6/10/17 – St Luke encounter for medication refill. Diazepam 5 mg was prescribed with a new end date of 6/21/17.

6/12/17 – St Luke encounter. Immediate-release oxycodone 5 mg was prescribed with a new end date of 6/22/17.

6/14/17 – St Luke encounter notes by Phillip Stevenson, PA-C. Mr. Hilliard had returned to work and was "only working 3-4 hours a day because of the increased pain in his back." The records

HILLIARD002373

mentioned that Mr. Hilliard was taking immediate-release oxycodone, long-acting oxycodone (with an end date of 6/14/17), tramadol and diazepam – all prescribed with several doses per day as needed.

6/20/17 – St Luke encounter notes by Dr. Waters for depression. Current medications included diazepam and tramadol. Escitalopram 10 mg was prescribed.

6/21/17 – St Luke medication refill. Tramadol 50 mg was prescribed with a new end date of 7/10/17 and diazepam 5 mg was prescribed with a new end date of 7/13/17.

7/7/17 – St Luke telephone encounter: "Patient states called on Wednesday and needs refill of oxy and tramadol."

7/10/17 – St Luke encounter notes by Phillip Stevenson, PA-C. "He continues to use his pain medication regularly and does need refills today." Tramadol 50 mg, immediate-release oxycodone 5 mg and gabapentin 300 mg were prescribed, with end dates of 7/13/17, 8/3/17 and 7/10/18, respectively.

7/12/17 – Crosspointe Family Services psychotherapy note

7/13/17 – St Luke encounter notes by Dr. Waters. Mr. Hilliard was concerned "about withdrawal symptoms from his pain medication." He had "been on oxycodone for several months," his pain improved and "he decided to stop his oxycodone. He was taking 1 tab 4 times a day. He very promptly developed withdrawal symptoms and wonders what to do to get off the oxycodone." Current medications included gabapentin 300 mg, escitalopram 10 mg and immediate-release oxycodone 5 mg. Alprazolam 0.5 mg was started and plans were made to "taper off" oxycodone.

7/18/17 – Crosspointe Family Services progress note. Shelley Wray, PMHNP-C, wrote that Mr. Hilliard's "attention and concentration are impaired."

7/19/17 – Crosspointe Family Services psychotherapy note. Mr. Hilliard reported that he was planning to stop oxycodone three days later.

7/24/17 – Crosspointe Family Services progress note. Shelley Wray, PMHNP-C, wrote that Mr. Hilliard's "current medications" included oxycodone 5 mg and that his "mood is severely anxious and depressed," and that his "attention and concentration are impaired."

7/24/17 – St Luke encounter notes by Dr. Waters. The reason for visit was "Hypertension – Serotonin syndrome?" The blood pressure was 134/80. Dr. Waters wrote, "At this point is no evidence of serotonin syndrome and would be extremely unlikely for him to develop symptoms just to 20 mg of fluoxetine if he was not on another serotonin medication. I think he simply has an intolerance to fluoxetine which is causing significant increased anxiety." Fluoxetine was stopped.

7/25/17 – Crosspointe Family Services psychotherapy note

7/27/17 – Personality Assessment Inventory report by Dr. Roberts

7/27/17 – Fitness for duty evaluation by Dr. Tye. The reason was "Evaluate for possible substance abuse/dependency." Dr. Tye quotes Chief Deputy Newman in his report. Chief Deputy Newman stated that Mr. Hilliard had appeared impaired a at work, according to several co-workers. Dr Tye wrote that he received the "incident narrative" from Chief Deputy Newman on 7/31/17, after Mr. Hilliard's evaluation, which occurred on 7/27/17. Dr. Tye also documented a phone call with Chief Deputy Newman on 8/1/17. The only medications listed in Dr. Tye's report were escitalopram (listed as discontinued), fluoxetine (listed as discontinued) and tramadol. Dr. Tye's impressions included "major depression, moderate – severe, recurrent," anxiety disorder, opioid use disorder and "serious impairment in occupational functioning." Dr. Tye found that Mr. Hilliard was "unfit for duty" and made several treatment recommendations.

7/28/17 – St Luke note.

HILLIARD002374

7/31/17 – St Luke encounter notes by Dr. Waters. The diagnosis was "moderate single current episode of major depressive disorder." Duloxetine was started.

7/31/17 – Letter from Chief Deputy Don Newman to Dr. Tye

8/1/17 – Crosspointe Family Services psychotherapy note

8/7/17 – Statement from Lt. Daron Brown

8/7/17 – Statement from Lt. Barnhill

8/9/17 – Crosspointe Family Services psychotherapy note

8/14/17 – St Luke encounter notes by Phillip Stevenson, PA-C

8/16/17 – Crosspointe Family Services psychotherapy note

8/16/17 – Crosspointe Family Services psychiatric follow up

8/21/17 – Letter from Shelley Wray, PMHNP-C

8/22/17 – Crosspointe Family Services psychotherapy note

8/24/17 – Letter from Mark Gritton, LCPC, NCC, Crosspointe Family Services to Sheriff Tom Carter

8/28/17 – GAIN-I recommendation and referral summary

8/28/17 – St Luke encounter notes by Dr. Waters. Follow-up of "depression with anxiety." "He feels his moods are significantly improved."

9/6/17 – Crosspointe Family Services psychotherapy note

9/7/17 – Letter from Dr. Tye to Chief Deputy Don Newman. Dr. Tye refers to "adolescent substance abuse history" and "adult substance abuse history." Dr Tye added that "Captain Hillard had not disclosed" his adult substance abuse history during his fitness for duty evaluation or during the substance abuse evaluation performed by Justine Sweet, LCSW, according to Dr. Tye.

9/8/17 – St Luke notes for medication refill. Medications included clonazepam 0.5 mg, gabapentin 300 mg and duloxetine 60 mg.

9/11/17 – Crosspointe Family Services psychotherapy note

9/13/17 – Crosspointe Family Services psychiatric follow up

9/25/17 – Crosspointe Family Services psychiatric follow up

10/9/17 – St Luke notes

10/11/17 – Crosspointe Family Services psychiatric follow up

10/13/17 – Statement from Lt. Douglas Sugden

11/6/17 – Crosspointe Family Services psychiatric follow up

11/14/17 – Magic Valley on Mr. Hilliard's DUI

11/22/17 – St Luke's orthopedics visit with Dr. Dazley. Diagnoses were spinal stenosis of lumbar region with radiculopathy and lumbar radiculopathy. Gabapentin 300 mg, twice a day (started on 7/10/17), clonazepam 0.5 mg (started on 8/18/17) and duloxetine 60 mg (started on 7/31/17) were included in the list of medications.

11/22/17 – St Luke's lumbar x-ray

12/15/17 – St Luke's HIDA scan

7/10/19 – Amended complaint, Brent E. Hilliard v. Twin Falls County Sheriff's Office

12/2/19 – Deposition of Brent Hilliard, including exhibits

3/9/20 – Deposition of Dr. Tye

3/12/20 – Deposition of Chief Deputy Don Newman

5/11/20 – Expert Report from Dr. Hoffman

5//18/20 – Expert Report from Susan Langley, CPA, CFE

5/28/20 – Plaintiff's response to defendant's second set of discovery

HILLIARD002375

6/3/20 – Deposition of Mark Gritton, LCPC
6/3/20 – Deposition of Shelley Wray, PNP
Undated – Expert report from Victor McCraw
Undated – Statement, unsigned ("Barnhill" on court reporter's sticker)
Undated – Statement from Shelli Stokesberry
Undated – Unsigned statement starting with "On 07-20-2017, Sheriff Carter and I"
Undated – Statement from Jon Daubner
Undated – Twin Falls County Drug & Alcohol Policy
Undated – Twin Falls County Sheriff's Office Drug- and Alcohol-Free Workplace Policy
Undated – Twin Falls County Sheriff's Office Fitness for Duty Policy

HILLIARD002376

**Discussion**

**Was Mr. Hilliard's fitness-for-duty evaluation request appropriate?**

Law enforcement officers must be able to meet high physical and mental demands in the performance of their jobs. For example, law enforcement officers have to drive under emergent conditions, restrain resisting persons, decide when to use deadly force, exercise judgment and make correct decisions in crisis situations. The essential job functions that Mr. Hilliard had to perform, as a Sheriff's Deputy – Captain, include enforcing state and local laws and ordinances, informing commanding officer immediately of any situation which appears to be out of the ordinary, communicating and coordinating with co-workers, testifying as a credible witness, operating a motor vehicle and carrying and using a firearm. The job of Sheriff's Deputy – Captain also requires having "sufficient […] mental capability to effectively manage subordinate employees and administrative functions." Law enforcement is a safety-sensitive position, which requires a high degree of decision-making, attention and judgment, especially for a supervisor who directs and is responsible for the actions of other officers.

A law enforcement officer having a condition or taking a medication causing sedation or impaired judgment could create serious consequences, including loss of lives. An officer in one of these situations could jeopardize the life of members of the public or their own, directly through misuse of a firearms or a vehicle, or indirectly if making wrong decisions as a supervisor.

Law enforcement agencies have a duty to ensure that their officers can safely and effectively perform their jobs, including by using the fitness-for-duty evaluation process. A law enforcement agency could be liable if it did not address an officer's erratic behavior.

In his letter to Dr. Tye of July 31, 2017, Chief Deputy Newman mentions that Mr. Hilliard was "appearing to be under the influence of something," had reported taking Valium, a sedating medication, and tramadol, an opioid medication, and was treated for depression. According to Chief Deputy Newman, multiple employees of the Twin Falls County Sheriff's Office, including several supervisors, had reported that Mr. Hilliard showed "perceived impairment while at work," was "looking confused […] on a fairly frequent basis" and was exhibited concerning behavior. On July 18, and on July 24, 2017, Shelley Wray, PMHNP-C, wrote that Mr. Hilliard's "attention and concentration are impaired." Any of these issues (depression with impairment, sedating medications, changes in behavior) could serve as the basis of a fitness-for-duty evaluation.

On July 18, and on July 24, 2017, Shelley Wray, PMHNP-C, assessed Mr. Hilliard and found that he had major depressive disorder and generalized anxiety disorder. His mood was described on July 24, 2017 as "severely anxious and depressed." These findings, in addition to the fact that "attention and concentration [were] impaired" on both days, are consistent with Mr. Hilliard not being fit for duty as a law enforcement officer at that time. The ACOEM Guidance for the Medical Evaluation of Law Enforcement Officers, the only national set of fitness-for-duty medical guidelines for law enforcement, require "absence of impairing symptoms in the past 2

7

months" for both depressive disorders and anxiety disorders, in order to return to work without restrictions.

Management (Chief Deputy Newman and Sheriff Carter) had objective evidence, based on consistent reports from other employees, including Lt. Brown, Lt. Barnhill, Brytany Claassen and two patrol sergeant) that Mr. Hilliard had been impaired while at work. Twin Falls County Sheriff's Office's policy on fitness for duty required Chief Deputy Newman and Sheriff Carter to "take prompt and appropriate action" to address coworkers' reports concerning Mr. Hilliard. Chief Deputy Newman and Sheriff Carter clearly had reasons to be concerned about Mr. Hilliard's health and about his ability to perform as a Sheriff's Deputy – Captain.

It is expected and appropriate that management communicate with the fitness-for-duty evaluator to provide the reasons for the evaluation – background information and management's concerns. Chief Deputy Newman provided that information to Dr. Tye by phone and by fax, as Dr. Tye documented in his report. The faxed information was supported by other witnesses.


**Can law enforcement officers safely and effectively perform their essential job functions while taking opioid medications and other sedating medications?**

Opioids are medications primarily used to treat pain. Examples of opioids include morphine, hydrocodone, oxycodone, tramadol and fentanyl.

The American College of Occupational and Environmental Medicine (ACOEM) is the largest American medical society dedicated to occupational medicine. The peer-reviewed 2014 ACOEM Practice Guidelines on opioids and safety-sensitive work state that "[a]cute or chronic opioid use is not recommended for patients who perform safety-sensitive jobs." Safety-sensitive jobs are further defined as including operating motor vehicles, other modes of transportation, forklift driving, overhead crane operation, heavy equipment operation, sharps work (eg, knives, box cutters, needles), work with injury risks (eg, heights) and tasks involving high levels of cognitive function and judgment." That description would cover law enforcement officers and supervisors.

Similar recommendations on opioids and safety-sensitive occupations were issued by the Official Disability Guidelines (evidence-based worker's compensation guidelines adopted by several states), the Federal Motor Carrier Safety Administration 2006 Medical Expert Panel on licit schedule II drug use, the Federal Aviation Administration, the US Coast Guard and the National Fire Protection Association.

The ACOEM Practice Guidelines state that "there are no validated tools to assess whether [employees taking opioids] can perform their job safely." Therefore, it is not possible to determine that a law enforcement officer can safely perform all their essential job functions while taking opioids. Officers or persons occupying a safety-sensitive position who take opioids should be restricted, since there is no recognized method to ensure safe job performance.

8

HILLIARD002378

The manufacturer of Percocet, a combination of oxycodone and acetaminophen, makes the following advice to patients taking this medication:

> "Patients should be advised that PERCOCET tablets may impair mental and/or physical ability required for the performance of potentially hazardous tasks (e.g., driving, operating heavy machinery).
>
> Patients should not combine PERCOCET tablets with alcohol, opioid analgesics, tranquilizers, sedatives, or other CNS depressants unless under the recommendation and guidance of a physician. When co-administered with another CNS depressant, PERCOCET tablets can cause dangerous additive central nervous system or respiratory depression, which can result in serious injury or death."

These warnings apply to the brand Percocet, to the generic combination of oxycodone and acetaminophen and to short-acting oxycodone. Long-acting oxycodone (such as Oxycontin) carries similar warnings. According to the records I reviewed, Mr. Hilliard was prescribed long-acting and short-acting oxycodone and the combination of oxycodone and acetaminophen, as generic or as a brand name.

The manufacturer of Ultram, a brand of tramadol (which was prescribed to Mr. Hilliard), makes the following advice to patient:

> "Patients should be informed that ULTRAM® may cause seizures and/or serotonin syndrome with concomitant use of serotonergic agents (including SSRIs, SNRIs, and triptans) or drugs that significantly reduce the metabolic clearance of tramadol. ULTRAM® may impair mental or physical abilities required for the performance of potentially hazardous tasks such as driving a car or operating machinery.
> • ULTRAM® should not be taken with alcohol containing beverages.
> • ULTRAM® should be used with caution when taking medications such as tranquilizers, hypnotics or other opiate containing analgesics."

Sedating medications taken only off-duty could still impair an officer while at work. Medications have a certain duration of action, which could last for almost a day (or longer) in the case of long-acting oxycodone (such as Oxycontin). On July 13, 2017, Dr. Waters wrote that Mr. Hilliard had been taking oxycodone (presumably short-acting) "1 tab 4 times a day." These multiple doses during the day would likely lead to side effects, including sedation, while on duty.

Pain itself, rather than its treatment, may also disqualify safety-sensitive workers. Severe pain is known to affect cognition. An officer needing to take opioids to control pain while off-duty is likely to have severe, impairing pain when the opioids are not active anymore and the employee is at work.

The records I reviewed show that Mr. Hilliard has been prescribed opioid medications on and off for several years, to include hydrocodone, oxycodone (both long-acting and short-acting forms) and tramadol. He was also prescribed other sedating medication, such as alprazolam, diazepam, clonazepam, carisoprodol and gabapentin. Any of these sedating medications, alone or in combinations, should have led the prescribing healthcare provider to issue restrictions, i.e., essential job functions that Mr. Hilliard should not perform. A combination of opioids with other sedating medications (including other opioids), as Mr. Hilliard was prescribed, may increase the risk of impairment and the risk of serious side effects. The US Food and Drug Administration

HILLIARD002379

warned against the "combined use of opioid medicines with benzodiazepines or other drugs that depress the central nervous system (CNS) has resulted in serious side effects, including slowed or difficult breathing and deaths" (alprazolam, diazepam and clonazepam are benzodiazepine medications that were prescribed to Mr. Hilliard). The combination of these medications creates additive sedating effects.

On June 7, 2017, Dr. Dazley recommended that Mr. Hilliard "may return to work with restrictions of no bending, lifting or twisting and activity as tolerated" while documenting treatment with tramadol, diazepam long-acting oxycodone and immediate-release oxycodone. I think that Mr. Hilliard's physician should have ordered additional restrictions for activities requiring any significant degree of attention or decision-making, based on his safety-sensitive occupation and his multiple sedating medications. These restrictions should have addressed the operation of firearms and motor vehicles, as well as essential job functions that do not require physical skills but need focus, awareness, concentration, judgment and decision-making – such as directing other deputies during critical situations.

Given Mr. Hilliard's occupation as a Sheriff's Deputy – Captain, the following essential job functions, at a minimum, should have likely been restricted, while taking opioids or other sedating medications:
-   Be on-call 24/7
-   Enforce state and local laws and ordinances
-   Oversee and participate in incident command system
-   Inform commanding officer immediately of any situation which appears to be out of the ordinary
-   Communicates and coordinates regularly with appropriate co-workers
-   Testify as a credible witness
-   Operate a motor vehicle
-   Carry and use a firearm
-   Functions that require "sufficient […] mental capability to effectively manage subordinate employees and administrative functions"
-   Be deployed to emergency or crisis situations

According to the Centers for Disease Control and Prevention (CDC), opioids were involved in 46,802 overdose deaths in 2018 (69.5% of all drug overdose deaths). Prescription opioids were involved in 14,975 overdose deaths. In 2016, the CDC published the Guideline for Prescribing Opioids for Chronic Pain (with chronic pain defined a pain lasting longer than three months), to reduce the risk of overdose and improve the effectiveness of pain treatment. The Guideline made the following recommendations, which were generally not followed in Mr. Hilliard's records I reviewed, among others:
-   "Clinicians should evaluate benefits and harms of continued therapy with patients every 3 months or more frequently."
-   "Before starting and periodically during continuation of opioid therapy, clinicians should evaluate risk factors for opioid-related harms. Clinicians should incorporate into the management plan strategies to mitigate risk, including considering offering naloxone when factors that increase risk for opioid overdose, such as history of overdose, history of

10

HILLIARD002380

substance use disorder, higher opioid dosages (=50 MME/day), or concurrent benzodiazepine use, are present."
-   "Clinicians should review the patient's history of controlled substance prescriptions using state prescription drug monitoring program (PDMP) data to determine whether the patient is receiving opioid dosages or dangerous combinations that put him or her at high risk for overdose. Clinicians should review PDMP data when starting opioid therapy for chronic pain and periodically during opioid therapy for chronic pain, ranging from every prescription to every 3 months."
-   "When prescribing opioids for chronic pain, clinicians should use urine drug testing before starting opioid therapy and consider urine drug testing at least annually to assess for prescribed medications as well as other controlled prescription drugs and illicit drugs."
-   "Clinicians should avoid prescribing opioid pain medication and benzodiazepines concurrently whenever possible."

Recommendations are also made for patients who have multiple controlled substance prescriptions written by different clinicians.


**Inconsistencies in the list of medications Dr. Tye's fitness-for-duty evaluation of July 27, 2017**

In his fitness-for-duty evaluation of July 27, 2017, Dr. Tye mentioned a total of three medications in his "medications" section:
-   Lexapro, marked as "discontinued"
-   Prozac, marked as "discontinued"
-   Tramadol, with the comment of "One (1) prescription reported by Captain Hilliard"

Since Dr. Tye was clearly interested in current as well as "discontinued," but probably recent, medications, I was surprised not to see oxycodone in Dr. Tye's report, especially since the reason for the evaluation was "possible substance abuse/dependency." Shelley Wray, PMHNP-C, reported on July 24, 2017 that Mr. Hilliard was taking oxycodone. Dr. Waters wrote the same on July 13, 2017.

Tramadol was apparently prescribed on June 7, 2017, June 21, 2017 and July 10, 2017 (after Mr. Hilliard requested a refill for both tramadol and oxycodone).

If inconsistent information is reported during a fitness-for-duty evaluation, the conclusion and subsequent recommendations could be invalid.

11

HILLIARD002381

**Issues raised by Dr. Hoffman in his expert report**

In his report dated May 11, 2020, Dr. Hoffman stated: "Further, Dr. Tye did not make any possible work accommodation recommendations based on his evaluations and rather declared Captain Hilliard unfit for duty and recommended an evaluation for substance abuse."

To be accurate, Dr. Tye, in his fitness-for-duty evaluation of July 27, 2017, indicated that "work duties" should be "suspended until such time as supervision with the progress reported" and added that "light duties may be resumed at the discretion of supervision."

While a fitness-for-duty evaluation may include recommendations for restrictions and accommodations, this is not always the case, especially, in my experience, with mental health evaluations. The evaluator rarely understands the job and work expectation as well as the employee's supervisors. An accommodation should be the result of an interactive process between the employee and management, with input provided by the employee's healthcare provider and by the fitness-for-duty evaluator, but is not the primary responsibility of the evaluator, who may not have a full grasp of the job demands, legal and administrative issues. Dr. Tye considered light duty as a valid option, once recommended treatment had started, and to be decided by management.

**Issues raised by Victor McCraw in his expert report**

While I agree with Mr. McCraw that a drug test was a valid option to investigate "allegations of drug impairment," if Twin Falls County followed the US Department of Transportation procedures, oxycodone, hydrocodone and tramadol would not have been detected in a drug test performed in 2017. Oxycodone and hydrocodone were added to the US Department of Transportation drug test panel in January 2018. Tramadol has not been added, to this date.

As Mr. McCraw wrote, "any number of medical origins, including fatigue, pain, hearing loss, low blood sugar, head injury, TIA, or stress" could have been the cause of the Mr. Hilliard's behaviors. This is exactly the reason a comprehensive fitness-for-duty was the right option that management chose. The department's drug recognition expert, Sergeant Thom told Sheriff Carter that "he was worried for Capt. Hilliard and that Capt. Hilliard needed to get help." There was no mention that Sergeant Thom recommended drug testing, according to Chief Deputy Newman letter to Dr. Tye dated July 31, 2017.

A drug test provides much more limited information than a fitness-for-duty evaluation. The drug test could be reported negative because of timing issues, lack of detection of certain substances (such as oxycodone with the US Department of Transportation drug test panel in 2017), impairment due to medical or mental health issue, or because the medication causing impairment is legally prescribed. A positive drug test could only show a part of a more global problem and could lead to ignoring concurrent depression or other drugs that were not detected. Finally, the fitness-for-duty evaluator could order drug tests that are more comprehensive or sensitive compared with the ones used routinely by the employer.

12

HILLIARD002382

I hope that the above meets all your needs for this evaluation. If you have any further questions, please do not hesitate to contact me. I would be happy to supplement this report, if additional information or medical records become available.


Very truly yours,


Fabrice Czarnecki, MD, MA, MPH, FAAFP, FIAIME, FACOEM
Chair, Public Safety Medicine Section, American College of Occupational and Environmental Medicine
Vice-Chair, Task Group on Guidance for the Medical Evaluation of Law Enforcement Officers, American College of Occupational and Environmental Medicine
Immediate Past Chair, Police Physicians Section, International Association of Chiefs of Police
Secretary/Treasurer, International Association of Independent Medical Examiners
Certified Medical Review Officer, Medical Review Officer Certification Council

HILLIARD002383

### *FABRICE CZARNECKI, MD, MA, MPH, FACOEM*

---

**PROFESSIONAL EXPERIENCE**

**Transportation Security Administration**; Arlington, VA
Chief Medical Officer                                                     **07/2016 – Present**
Medical Officer (Occupational Medicine)                                   **11/2014 – 06/2016**


**US Secret Service**; Washington, DC                                     **08/2014 – 11/2014**
Medical Officer


**Northwestern Memorial Physicians Group**; Chicago, IL                   **09/2012 – 05/2014**
Medical Director, Public Safety Medicine
- Medical Director, Chicago Fire Department (09/2013 – 01/2014)
- Occupational medicine consultant for Chicago Fire Department (06/2013 – Present)


**University of Maryland St. Joseph Medical Center**; Towson, MD          **03/2005 – 12/2016**
Attending Physician and EMS Base Station Medical Director, Emergency Department


**Franklin Square Hospital Center**; Baltimore, MD                        **01/2002 – 12/2004**
Resident in Family Medicine


**Ambroise-Paré Hospital**; Boulogne, France                             **05/1998 – 10/2001**
Attending Physician, Emergency Department

HILLIARD002384

## *FABRICE CZARNECKI, MD, MA, MPH, FACOEM*                    *PAGE 2*

### EDUCATION AND PROFESSIONAL TRAINING

- **Medical School** – Faculté de Médecine Necker-Enfants Malades, Université René Descartes, Paris, France
- **Master of Public Health –** Faculté de Médecine Lariboisière-Saint Louis, Université Denis Diderot, Paris, France
- **Master of Arts in Biochemistry and Genetics –** Faculté de Médecine Necker-Enfants Malades, Université René Descartes, Paris, France
- **Residency** – Department of Family Practice, Franklin Square Hospital Center, Baltimore, MD
- **Residency –** General Medicine, Assistance Publique-Hôpitaux de Paris, Paris, France

### CERTIFICATIONS

- Board-certified, American Board of Family Medicine
- Board-certified in emergency medicine, American Board of Physician Specialties

- Fellow, American Academy of Family Physicians
- Fellow, American College of Occupational and Environmental Medicine
- Fellow, International Academy of Independent Medical Evaluators

- Medical Review Officer, Medical Review Officer Certification Council
- Registered Medical Examiner, National Registry of Certified Medical Examiners, Federal Motor Carrier Safety Administration
- Certified MedicoLegal Evaluator, International Academy of Independent Medical Evaluators
- Certification in Evaluation of Disability and Impairment Rating, American Academy of Disability Evaluating Physicians
- ACLS Provider (Advanced Cardiac Life Support), American Heart Association
- PALS Provider (Pediatric Advanced Life Support), American Heart Association
- ATLS Provider (Advanced Trauma Life Support), American College of Surgeons
- National Disaster Life Support Instructor, American Medical Association
- National EMS Medical Directors Course, National Association of EMS Physicians

### MEDICAL LICENSES

- State of Florida – Active
- State of Louisiana – Active
- State of Maryland – Active
- State of New Hampshire – Active
- State of Illinois – Inactive
- State of Virginia – Active
- France – Active
- United Kingdom – Inactive

HILLIARD002385

## *FABRICE CZARNECKI, MD, MA, MPH, FACOEM* *PAGE 3*

### NATIONAL COMMITTEES

- Chair, Public Safety Medicine Section, American College of Occupational and Environmental Medicine
- Vice-Chair, Task Group: Guidance for the Medical Evaluation of Law Enforcement Officers, American College of Occupational and Environmental Medicine
- Principal Member, Technical Committee on Emergency Responders Occupational Health, National Fire Protection Association
- Principal Member, Technical Committee on Fire Service Occupational Safety and Health, National Fire Protection Association
- Chair, NFPA 1582 Task Group (2018 edition), Technical Committee on Fire Service Occupational Safety and Health, National Fire Protection Association (2014 - 2017)
- Chairman, Police Physicians Section, International Association of Chiefs of Police (2007 - 2013)
- Officer, International Academy of Independent Medical Evaluators

### PROFESSIONAL AFFILIATIONS

- American Academy of Family Physicians
- American College of Emergency Physicians
- American College of Occupational and Environmental Medicine
- International Academy of Independent Medical Evaluators
- International Association of Chiefs of Police
- International Law Enforcement Educators and Trainers Association
- National Association of EMS Physicians
- National Fire Protection Association
- National Tactical Officers Association
- Special Operations Medical Association

HILLIARD002386

**Fabrice Czarnecki, MD**
**6440 Noble Drive**
**McLean, VA 22101**

1.  My professional fee for document review, literature search, preparation, report writing and phone calls is $500 per hour.

2.  My professional fee for face-to-face meetings, deposition, hearing testimony and local travel is $500 per hour.

3.  There is no charge for routine office expenses (secretarial services, copying, online search fees).

4.  My travel expenses and accommodation are billed at cost.

5.  A minimum of six hours will be billed for each day scheduled away from the office. Travel time beyond these six hours will be billed at $200 per hour.

6.  A minimum of two hours will be billed for telephone testimony.

7.  A retainer of $4,000 (8 hours) is requested before work is started.

HILLIARD002387

**List of cases in which I have testified as an expert in the last four years**

Tonya Gower v. Barry Smith, et al.
Circuit Court of Wicomico County (Maryland)
Case No. 22-C16-001158OT
Deposition on May 10, 2017

HILLIARD002388

**LIST OF PUBLICATIONS AUTHORED IN THE LAST TEN YEARS**

- Guidance for the Medical Evaluation of Law Enforcement Officers, author of Tactical Teams (2019), Bomb Technicians (2016), Initial Evaluation (2015), Medications (2014) and Pregnancy (2010) chapters, American College of Occupational and Environmental Medicine
- NFPA 1582, Standard on Comprehensive Occupational Medical Program for Fire Departments, 2018 Edition, National Fire Protection Association (co-author)
- Samo DG, Czarnecki F. Choosing the Right Occupational Police Physician, Officer Safety Corner. The Police Chief 83 (April 2016).
- Czarnecki F, Medical Screening of Police Applicants. The Police Chief 81 (March 2014).
- Czarnecki F, Samo D, Hyman MH. Causation in Public Safety Personnel. In: Melhorn JM, Talmage JB, Ackerman WE, Hyman MH (eds.) AMA Guides to the Evaluation of Disease and Injury Causation. 2nd ed. Chicago, IL: American Medical Association; 2013.
- NFPA 1582, Standard on Comprehensive Occupational Medical Program for Fire Departments, 2013 Edition, National Fire Protection Association (co-author)
- Czarnecki F, McArdle DQ. A Synopsis of Some Featured Departments Providing Medical Support to Police Field Operations. The Police Chief 79 (December 2012).
- Springer BL, McArdle DQ, Czarnecki F, Eastman AL. Law Enforcement Medicine: Core Concepts from the IACP Police Physicians Section. The Police Chief 79 (December 2012).
- Czarnecki F, Bollard GA, McArdle D, Meade J, Pappas P, Springer BL, Sztajnkrycer MD. Training Keys #667, #668 and #669: Emergency Trauma Care. International Association of Chiefs of Police; 2012.
- Vilke GM, Debard ML, Chan TC, Ho JD, Dawes DM, Hall C, Curtis MD, Costello MW, Mash DC, Coffman SR, McMullen MJ, Metzger JC, Roberts JR, Sztajnkrcer MD, Henderson SO, Adler J, Czarnecki F, Heck J, Bozeman WP. Excited Delirium Syndrome (ExDS): Defining Based on a Review of the Literature. J Emerg Med. 2011 Mar 24.
- Samo DG, Bogucki S, Hales T, Haimes S, Czarnecki F, Louis D. Fire fighter wellness regime. J Occup Environ Med. 2011 Mar;53(3):229.

HILLIARD002389

Exhibit J

**EXPERT REPORT OF**

**DAVID M. COREY, PH.D., ABPP**

**PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 26(a)(2)(B)**

*Brent Hilliard, Plaintiff, v. Twin Falls County Sheriff's Office, a public entity, Twin Falls County, a public corporation, Defendants*

Case No. 1:18-cv-99559-CWD

United States District Court
For the District of Idaho

June 15, 2020

HILLIARD002335

## TABLE OF CONTENTS

Introduction ................................................................................................................3

Summary of Opinions ................................................................................................3

Background and Qualifications ..................................................................................4

Expert Opinion #1: *The Defendants' referral of the Plaintiff for evaluation of his psychological fitness for duty was appropriate and consistent with professional standards of practice in law enforcement.* ................................................................7

Expert Opinion #2: *Chief Deputy Don Newman's provision of collateral information to Dr. Tye on July 31, 2017 (Ex. 30) was appropriate and consistent with the standards of practice in fitness-for-duty evaluations and necessary for a valid fitness determination.* ...............................................................................................12

Expert Opinion #3: *The Defendants' reliance on Dr. Tye's opinions and recommendations was reasonable* ................................................................................14

Expert Opinion #4: *The opinions of the Plaintiff's treating mental healthcare providers that his mental health crisis on September 7, 2017 stemmed from the loss of his job are unsupported by the facts.* ............................................................21

Cases In Which, During the Previous 4 Years, I Have Testified As an Expert At Trial or By Deposition ................................................................................................23

Compensation to Be Paid for My Research and Testimony In This Case .........................23

Publications Authored in the Previous 10 Years ...............................................................23

### *Exhibits*

1.  Documents Reviewed ...........................................................................................28

2.  Curriculum Vitae ..................................................................................................31

HILLIARD002336

## EXPERT REPORT OF DAVID M. COREY, PH.D., ABPP

### Introduction

1.   I am a licensed psychologist and board certified specialist in Forensic Psychology and in Police and Public Safety Psychology. I discuss in this report my findings and opinions, as well as the standards of practice pertaining to occupationally mandated psychological evaluations and, in particular, psychological fitness-for-duty evaluations of law enforcement officers. The information in this report is based upon my personal knowledge and on sources of the type normally relied upon by experts in my field of study. If called upon to testify, I could and would competently testify thereto.

### Summary of Opinions

2.   On the basis of my review of the documents provided me (listed in Exhibit #1), as well as my experience, training and knowledge, I declare the following:

   a.   The Defendants' referral of the Plaintiff for evaluation of his psychological fitness for duty was appropriate and consistent with professional standards of practice in law enforcement.

   b.   Chief Deputy Don Newman's provision of collateral information to Dr. Tye on July 31, 2017 (Ex. 30) was appropriate and consistent with the standards of practice in fitness-for-duty evaluations and necessary for a valid fitness determination.

   c.   The Defendants' reliance on Dr. Tye's opinions and recommendations was reasonable.

HILLIARD002337

d.   The opinions of the Plaintiff's treating mental healthcare providers that his mental health crisis on September 7, 2017 stemmed from the loss of his job are unsupported by the facts.

## Background and Qualifications

3.   I am a licensed psychologist in Oregon, Washington, California, Hawaii, Utah, and Arizona with a full-time practice in Lake Oswego, Oregon.

4.   I earned my Ph.D. in Clinical Psychology in 1988 from Fielding Graduate University with additional doctoral study at Claremont Graduate University. I earned my M.A. in Experimental Psychology in 1977 from San Diego State University and my B.A. with honors (*magna cum laude*) in Psychology and German in 1975 from Loma Linda University.

5.   I am board certified in Forensic Psychology by the American Board of Forensic Psychology (ABFP), and I am board certified in Police and Public Safety Psychology by the American Board of Police & Public Safety Psychology (ABPPSP). Both the ABFP and ABPPSP are specialty boards of the American Board of Professional Psychology, which is the only board-certifying organization recognized by the American Psychological Association Commission on Recognition of Specialties and Proficiencies in Professional Psychology.

6.   I was elected to the rank of Fellow of the American Psychological Association in August 2010 "in recognition of outstanding and unusual contributions to the science and profession of psychology."

7.   I have been practicing psychology for over 40 years. I am contracted as an examining psychologist for the Portland Police Bureau, Oregon State Police, Salt

HILLIARD002338

Lake City Police Department, Honolulu Police Department, Multnomah County Sheriff's Office, Marion County Sheriff's Office, Port of Portland, City of Vancouver, City of Gresham, City of Medford, Clark County Sheriff's Office, Washington County Sheriff's Office, Portland Bureau of Emergency Communications, Washington County Consolidated Communications Agency, Clark Regional Emergency Services Agency, Tucson Police Department, and numerous other public employers throughout the western United States, and I have conducted evaluations on referral for several hundred other police agencies. I have served as an agreed-upon independent medical examiner in multiple fitness-for-duty disputes between labor and management in Alaska, Arizona, California, Hawaii, Idaho, Nevada, Oregon, Utah, and Washington.

8.  For these and other public safety agencies, I have conducted more than 30,000 preemployment psychological evaluations, more than 3,000 fitness-for-duty evaluations, and dozens of consultations and trainings on topics pertaining to the selection, retention, promotion, supervision, and management of police officers and other public safety employees.

9.  I am an active member of the faculties of the American Academy of Forensic Psychology and the American Academy of Police & Public Safety Psychology, and I teach nationally to psychologists on the topic of psychological fitness-for-duty evaluations of law enforcement officers and other public safety personnel.

10. I am the founding president of the American Board of Police & Public Safety Psychology, the certifying body for specialists in this field in the U.S. and Canada; past General Chair of the Police Psychological Services Section, International

HILLIARD002339

Association of Chiefs of Police; and past president of the Society for Police & Criminal Psychology.

11. I chaired the American Psychological Association Committee on Professional Practice & Standards development group responsible for writing the *Professional Practice Guidelines for Occupationally Mandated Psychological Evaluations*. These guidelines were approved as official policy of the American Psychological Association in February 2017. In this capacity and others (e.g., chairing the 2018 fitness-for-duty evaluation guidelines revision committee of the Police Psychological Services Section of the International Association of Chiefs of Police), I have participated in the establishment and revision of national practice guidelines concerning fitness-for-duty evaluations of law enforcement officers.

12. I have published extensively on topics pertaining to preemployment psychological screening and fitness-for-duty evaluations of police and other public safety officers. (See list of publications I have authored in the past 10 years.)

13. I continue to be actively engaged in conducting and publishing empirical research on the prediction of counterproductive work behavior and performance problems in law enforcement officers.

14. I have been retained by Pam Howland, J.D. of Idaho Employment Lawyers, PLLC, to render expert opinions in the fields of Forensic Psychology and Police and Public Safety Psychology.

15. As a result of my training, knowledge, and experience in the fields of Forensic Psychology and Police and Public Safety Psychology, I am familiar with statutory

HILLIARD002340

and regulatory requirements, and professional practice standards and research

literature, with respect to fitness-for-duty evaluations of law enforcement officers.

16.  A true and correct copy of my curriculum vitae is attached to this report as Exhibit

#2

## Expert Opinion #1

**The Defendants' referral of the Plaintiff for evaluation of his psychological fitness for duty**

**was appropriate and consistent with professional standards of practice in law enforcement.**

17.  As summarized by the Plaintiff's psychiatric expert, Micah Hoffman, M.D., in his

expert report dated May 11, 2020, the following facts comprise the partial

background for the Defendants' decision to refer the Plaintiff, former TFCSO

Captain (Cpt.) Brent Hilliard, for a psychological fitness-for-duty evaluation

conducted by Ronald B. Tye, Psy.D. on July 27, 2017:

  a.  "The primary reason stated for the fitness for evaluation [sic] was to 'evaluate for

possible substance abuse/dependency.'" (Bates 02610) [quoting Dr. Tye's report,

Ex. 26, p. 1]

  b.  The evaluation "was prompted on suspicions that Cpt. Hilliard was impaired while

on duty." (Bates 02610)

  c.  "These suspicions stemmed from reports provided to Chief Deputy Don Newman

that Cpt. Brent Hilliard looked groggy, appeared to have impairment of speech,

slow thought process and that Hilliard appeared to be lost or confused while on

duty, all prior to July 10, 2017." (Bates 02610-02611)

  d.  "This was based on suspicions that he was impaired while performing his usual and

customary duties, as that of a captain in the department." (Bates 02611)

HILLIARD002341

18.  The "Guidance for Medical Evaluation of Law Enforcement Officers" ("Guidance")

published by the American College of Occupational and Environmental Medicine

(ACOEM) recommends "a substance use disorder evaluation" for law enforcement

officers "identified as possibly having substance abuse or substance dependence."

(p. 2)

    a.  The ACOEM Guidance stipulates that certified health care providers in addition

       to physicians (e.g., psychologists or social workers) are appropriate

       professionals to "evaluate persons with substance abuse issues and may also

       recommend treatment." (p. 2).

    b.  The ACOEM Guidance states that such assessments appropriately include

       "substance-related psychiatric comorbidity both as precipitants and

       consequences—e.g., depression, anxiety, PTSD, suicidal behavior" (p. 2), as

       Dr. Tye included in his evaluation of the Plaintiff (see Ex. 26).

19.  The "Psychological Fitness-for-Duty Evaluation Guidelines" ("Guidelines")

published by the Police Psychological Services Section of the International

Association of Chiefs of Police (IACP) are widely regarded as reflecting the

standard of practice for conducting psychological fitness-for-duty evaluations of

law enforcement personnel.[1]

    a.  The IACP Guidelines define a psychological fitness-for-duty evaluation (FFDE)

       as "a formal, specialized examination of an incumbent employee that results

       from (1) objective evidence that the employee may be unable to safely or

---

[1] At the time of the Plaintiff's referral for his fitness evaluation, the 2013 edition of the IACP Guidelines were in force. The 2018 revision (ratified in October 2018) was not published until early 2019. All references to the IACP Guidelines in this expert report pertain to the 2013 edition.

HILLIARD002342

effectively  perform a  defined  job  and  (2)  a  reasonable  basis  for  believing

that  the  cause  may  be  attributable  to  a  psychological  condition  or  impairment.

The  central  purpose  of  an  FFDE  is   to  determine  whether  the  employee  is

able  to  safely  and  effectively  perform  his  or  her  essential  job  functions."

(Guideline 3.1)

b.  IACP Guideline 4.1 states, "Referring an employee for an FFDE is indicated

whenever there is an objective and  reasonable basis for believing that the

employee may be unable to safely and/or effectively  perform his or her duties

due to a psychological condition or impairment. An objective basis  is one that

is not merely speculative but derives from direct observation, credible third-

party  report, or other reliable evidence."

1)  At the time that the Plaintiff was referred for evaluation, the Defendants

had an objective and reasonable basis for believing that the Plaintiff may

have had a substance use impairment that could render him unable to

safely or effectively perform the essential functions of his position. (Exs.

26 and 30)

2)  The Defendants are not mental health experts and they reasonably relied

upon Dr. Tye to evaluate the Plaintiff's psychological fitness for duty and

offer his opinions and recommendations.

20.  The "Professional Practice Guidelines for Occupationally Mandated Psychological

Evaluations" ("OMPE Guidelines") published by the American Psychological

Association consist of aspirational practices for psychologists who conduct clinical

HILLIARD002343

assessments of applicants or employees required to submit to a psychological

evaluation as a condition of initial or continuing employment.

   a.   The OMPE Guidelines state, "Police officers and other public safety employees

       that exhibit posthire problems are often required to submit to mandatory

       psychological evaluations of their fitness for duty, as are military and aviation

       personnel." (citations omitted; p. 187)

21.   Had the Defendants required the Plaintiff to submit to a reasonable suspicion drug

      test rather than a psychological fitness-for-duty evaluation, as Plaintiff's expert

      Victor McGraw opines should have occurred, the results of that test would likely

      only have confirmed what the Defendants' already knew from the Plaintiff's own

      disclosures; namely, that his blood serum contained some amount of one or more

      narcotic drugs (e.g., Oxycontin) and/or benzodiazepine (Valium), which he

      reportedly was prescribed by his physician and had already disclosed to the

      Defendants. (See Policy 1012.7.2[b] at Bates 01540.)

   a.   The Defendants' referral of the Plaintiff for a psychological fitness-for-duty

       evaluation was not for the purpose of determining whether he was impaired by

       medication; rather, the purpose was to "evaluate for possible substance

       abuse/dependency." (Ex. 26) As noted in Expert Opinions 18 and 19 above, the use

       of a psychological fitness-for-duty evaluation for such purposes in consistent with

       the professional standard of practice.

   b.   The Defendants were guided by several personnel policies that provided more than

       a single course of action. Policy 600 (Drug and Alcohol Policy) provides for

       mandatory drug screening when there exists "reasonable suspicion to believe that

       an employee is under the influence of drugs and/or alcohol" (600-07, Bates 01694;

HILLIARD002344

see also Policy 1012.7 at Bates 01539). On the other hand, Policy 1032 (Fitness for Duty, Bates 01572), provides for mandatory referral to a physical or psychological fitness-for-duty evaluation "[w]henever circumstances reasonably indicate that an employee is unfit for duty" (Police 1032.4[a], Bates 01573).

1) The Defendants were informed by multiple subordinate employees about concerns that the Plaintiff was impaired from one or more intoxicants both on duty (02138, 02139, 02140, and 02282) and off duty (02138)

2) Indeed, even the Plaintiff's mental health counselor testified that "someone could have looked at [Plaintiff] and said something is not right. The man came iinto my office [on July 18, 2017] crying like a baby, you know, literally just sobbing. You know, anybody that was in a sheriff's office that saw someone in a uniform doing that would be concerned and, you know, would inquire as to what was going on" (per deposition of Mark Gritton, LCPC, June 3, 2020, pages 71-72).

3) Plaintiff's expert Victor McGraw also stated that, in his opinion, "reasonable suspicion did exist that Brent Hilliard may have been impaired while on duty during the timeframe of June to July 2017" (Expert Opinion Report, undated, p. 1).

4) Chief Deputy Don Newman testified that the aggregate information available to him when he placed the Plaintiff on paid administrative leave (preceding the fitness-for-duty evaluation) left him concerned *not* about the Plaintiff's impairment on any particular day, but episodically across multiple occasions (per transcript of Chief Deputy Newman's 3/12/2020 deposition, p. 72, lines 22 to 28).

HILLIARD002345

5) Chief Deputy Newman testified that he was concerned that the absence of a policy specifying the impermissible toxicology level of an opioid in an employee's system would render meaningless any positive findings from a drug screen of the presence of a prescribed narcotic (per transcript of Chief Deputy Newman's 3/12/2020 deposition, pages 82-83).

6) Therefore, Chief Deputy Newman's reliance on the Fitness for Duty policy rather than the Drug and Alcohol policy was appropriate in light of his reasonable concern based on objective evidence.

### Expert Opinion #2

**Chief Deputy Don Newman's provision of collateral information to Dr. Tye on July 31, 2017 (Ex. 30) was appropriate and consistent with the standards of practice in fitness-for-duty evaluations and necessary for a valid fitness determination.**

22. Fitness for Duty Policy 1032.4(c) states, "In order to facilitate the examination of any employee, the Office will provide all appropriate documents and available information to assist in the evaluation and/or treatment."

23. The IACP Guidelines state, "In the course of conducting the FFDE, it is usually necessary for the examiner to receive background and collateral information regarding the employee's past and recent performance, conduct, and functioning." (Guideline 7.4)

   a. The information provided by Chief Deputy Newman to Dr. Tye was directly relevant to the purpose for which the Plaintiff was referred for evaluation, inasmuch as the collateral reports of the Plaintiff's impaired behavior (a)

HILLIARD002346

established the objective basis for the employer's concerns about the Plaintiff's fitness for duty, and (b) were close in time to the referral.

b.  Contrary to Dr. Hoffman's opinion, an employer's transmittal of such information in connection with a psychological fitness-for-duty evaluation is not "unusual" and does not comprise an effort to "participate" in the evaluation. (02612)

24.  The OMPE Guidelines state, "Failure to seek out multiple sources of information may compromise the reliability of OMPE findings, especially in high-stakes evaluations in which there is incentive to distort information deliberately. During workplace safety assessments, gathering and considering information from several collateral sources (e.g., coworker and supervisor interviews, background check of examinee) is considered essential ...." (p. 194)

25.  Chief Deputy Newman's July 31, 2017 letter to Dr. Tye was limited to facts known or reported to him about the Plaintiff's recent and remote on-the-job behavior and contained no opinions about the Plaintiff's fitness for duty or expectations as to how Dr. Tye should weigh the information contained in his letter.

26.  Whatever weight Dr. Tye assigned to the information he received from Chief Deputy Newman was decided by Dr. Tye, not by Chief Deputy Newman.

a.  Dr. Hoffman stated that Dr. Tye's evaluation of the Plaintiff was "based purely on opinions of the referral source, Chief Deputy Don Newman" (02611).

b.  In fact, Dr. Tye's findings and opinions were based also on findings derived from psychological testing and a clinical interview of the Plaintiff. (Ex. 26)

HILLIARD002347

c.  Any change to the opinion Dr. Tye reportedly communicated to the Plaintiff on July 27, 2017 immediately after the evaluation, even if influenced by the information subsequently reported to him by Chief Deputy Newman, does not constitute "pure" reliance on that information.

27.  The information contained in the Plaintiff's annual performance evaluation (Ex. 35) was not essential to the fitness-for-duty evaluation inasmuch as it pertained to performance that preceded the Plaintiff's May 2017 back surgery and his associated use of narcotics and benzodiazepine.

### Expert Opinion #3

**The Defendants' reliance on Dr. Tye's opinions and recommendations was reasonable.**

28.  Dr. Hoffman cited a number of alleged deficits in Dr. Tye's qualifications, methodology and practice in performing his evaluation of the Plaintiff, including (a) his opinions not being based on scientific evidence, (b) his nonconformance with several practices recommended by the OMPE Guidelines, and (c) failing to include "the required elements to address substance misuse/abuse" (02611) in his evaluation of the Plaintiff. I discuss each of these in turn.

a.  Scientific evidence is only one form of evidence used by psychologists in making clinical judgments, as indicated by the official policy of the American Psychological Association: "Evidence-based practice in psychology (EBPP) is the integration of the best available research with clinical expertise in the context of patient characteristics, culture, and preferences.[2] This definition of EBPP closely parallels the definition of evidence-based practice adopted by the Institute of Medicine (2001, p. 147) as adapted from Sackett and colleagues

HILLIARD002348

(2000): 'Evidence-based practice is the integration of best research evidence with clinical expertise and patient values.' The purpose of EBPP is to promote effective psychological practice and enhance public health by applying empirically supported principles of psychological assessment, case formulation, therapeutic relationship, and intervention."

b. The *Professional Practice Guidelines for Occupationally Mandated Psychological Evaluations* (American Psychological Association), which Dr. Hoffman criticized Dr. Tye for not adhering to in his evaluation of the Plaintiff were not published until January 2018 (*American Psychologist,* Vol. 73, No. 2, 186–197 (https://www.apa.org/pubs/journals/features/amp-amp0000170.pdf). Therefore, it is unlikely that Dr. Tye would have been aware of the content of the OMPE professional practice guidelines at the time of his evaluation of the Plaintiff in July 2017. In any event, the guidelines are not mandatory ("Guidelines are not intended to be mandatory or exhaustive and may not be applicable to every professional and clinical situation. They are not intended to take precedence over the professional judgments of psychologists that are based on the scientific and professional knowledge of the field." [p. 187]).

c. Contrary to Dr. Hoffman's assertion that Dr. Tye's alleged failure to include the "required elements" for evaluation of Plaintiff's substance misuse or abuse somehow undermined the validity of his assessment, Dr. Tye followed standards of good clinical practice by referring the Plaintiff to a "Substance Abuse Specialist" for the purpose of obtaining a "professional assessment" and recommendations for treatment, if any (Ex. 26, p. 5).

HILLIARD002349

1) The "Specialty Guidelines for Forensic Psychology" (American Psychological Association, 2013) stipulate that, "When determining one's competence to provide services in a particular matter, forensic practitioners may consider a variety of factors including the relative complexity and specialized nature of the service, relevant training and experience, the preparation and study they are able to devote to the matter, and the opportunity for consultation with a professional of established competence in the sub ject matter in question. Even with regard to subjects in which they are expert, forensic practitioners may choose to consult with colleagues" (Guideline 2.01).

2) The "Psychological Fitness-for-Duty Evaluation [FFDE] Guidelines" published by the International Association of Chiefs of Police, Police Psychological Services Section (2018) state, "The range of methods and data sources used by an FFDE examiner frequently include referral to, and/or consultation with, a specialist if deemed necessary by the examiner" (Guideline 9.1.5).

3) In *Evaluations of Police Suitability and Fitness for Duty* (2020, Oxford University Press), Corey and Zelig advise practitioners who lack the assessment skills or tools to address a clinically relevant topic in a fitness evaluation to "determine if they need to refer the matter to another

HILLIARD002350

professional or if the evaluation can be competently performed by using another specialist as a consultant" (p. 59).[2]

4) Dr. Hoffman wrote, "Dr. Tye diagnosed the applicant [sic] with an opiate related disorder during the context of the evaluation" (02612). This mischaracterizes Dr. Tye's findings. In fact, Dr. Tye listed a number of "Diagnostic Impressions," among which was "Other Opioid, Related Disorder" with the DSM-5 diagnostic code "292.229." Dr. Tye was presumably referring to DSM-5 diagnostic code 292.9, Unspecified Opioid-Related Disorder, which applies to presentations in which there are symptoms characteristic of an opioid-related disorder causing clinically significant impairment but do not meet the full criteria for any specific opioid-related disorder or any of the disorders in the substance-related and addictive disorders diagnostic class. Indeed, the purpose of this diagnostic category is to indicate that more information is needed to arrive at a final and specific diagnosis, which was the purpose of Dr. Tye's referral for assessment by a Substance Abuse Specialist.

   a) Dr. Tye's opinion following his 7/27/2017 evaluation of the Plaintiff led him to conclude that the Plaintiff was unfit for duty at that time. (Ex. 26, p. 5)

---

[2] This is precisely what Dr. Tye did by referring the Plaintiff for a substance abuse assessment, which was conducted by Justine Sweet, LCSQ, QP, who was an employee of the Plaintiff's mental health counselor, Mark Gritton, LCPC, NCC. However, after receiving the records from Crosspointe Family Services—including the substance use assessment conducted by Ms. Sweet, as well as letters submitted by Mr. Gritton and another of his employees, Shelley Wray, PMHNP-C—on August 29, 2017, Dr. Tye identified information in those records that caused him to doubt the reliability and validity of their opinions. Consequently, he sought to consult with Mr. Gritton, the owner and Clinical Director of Crosspointe Family Services, but the Plaintiff "would not allow that" (per Ex. 26, p. 81 at line 9).

HILLIARD002351

b) Dr. Tye reviewed the records from the Plaintiff's healthcare providers and determined that the opinions were based on incomplete or inaccurate disclosures by the Plaintiff and, therefore, were unreliable. Dr. Tye attempted to obtain the Plaintiff's authorization to confer with his counselor, but his request was denied. (Ex. 28)

 i. The OMPE Guidelines state, "In general, psychologists avoid relying on only one source of information and seek to corroborate information whenever possible. Failure to seek out multiple sources of information may compromise the reliability of OMPE findings, especially in high-stakes evaluations in which there is incentive to distort information deliberately. … When integrating data from multiple sources, psychologists strive to give preferential weight to relevant data with the highest known reliability and validity" (Guideline 10, p. 194).

 ii. Corey and Zelig (2020) wrote, "In fitness evaluations, one may encounter occasions in which not all of the records were produced or instances in which collateral informants refused to speak with the evaluator. … The reliability an validity of [a fitness-for-duty] assessment, like all psychological evaluations, depends in large part on the

HILLIARD002352

accuracy and completeness of the underlying information"
(2020, pp. 217-218).

    iii.  Dr. Tye's decision to make no statement concerning the
Plaintiff's fitness for duty in his 9/7/2017 letter to Chief
Deputy Newman, but rather to cite the concerns he had
about the Plaintiff's "openness with the substance abuse
intake counselor" (Ex. 28, p. 1), effectively left his prior
"unfit for duty" opinion in force pending the resolution of
his concerns.

29.   Even if Dr. Hoffman was correct in his assertion that Dr. Tye's qualifications,
methodology and practice in performing his evaluation of the Plaintiff were
deficient, Dr. Hoffman did not show that (or how) any of the alleged deficits were a
proximate cause of any error in Dr. Tye's opinions.

30.   No information contained in Dr. Tye's written reports (Exs. 26 and 28) would have
enabled a lay person to identify deficiencies in Dr. Tye's qualifications,
methodology or practice if, in fact, they did exist. Therefore, the Defendants'
reliance on Dr. Tye's report of July 27, 2017 indicating that the Plaintiff was unfit
for duty, and his letter of September 7, 2017 indicating his ongoing concerns about
the Plaintiff's fitness for duty, was reasonable.

31.   The weight the Defendants' placed on Dr. Tye's opinions relative to the opinions of
the Plaintiff's treating healthcare providers was appropriate and consistent with
regulatory enforcement guidance.

HILLIARD002353

a.  The U.S. Equal Employment Opportunity Commission (EEOC) is the federal regulatory agency responsible for issuing guidance on enforcement of the Americans with Disabilities Act of 1990, issued guidance on how an employer should weigh conflicting medical opinions concerning the impact of an employee's health condition on the ability to safely and effectively perform essential job functions (i.e., fitness for duty): "In evaluating conflicting medical information, the employer may find it helpful to consider: (1) the area of expertise of each medical professional who has provided information; (2) the kind of information each person providing documentation has about the job's essential functions and the work environment in which they are performed; (3) whether a particular opinion is based on speculation or on current, objectively verifiable information about the risks associated with a particular condition; and, (4) whether the medical opinion is contradicted by information known to or observed by the employer (e.g., information about the employee's actual experience in the job in question or in previous similar jobs)."[3]

b.  In her letter of 8/21/2017, Ms. Wray wrote that the Plaintiff had "stabilized on his current medical regimen and I feel he is stable enough to return to current duties and responsibilities at work" (Ex. 31, p. 2). However, Ms. Wray testified that she never reviewed the Plaintiff's job description and "didn't have any idea of his job duties" (per transcript of her 6/3/2020 deposition, p. 41, lines 5-24). Furthermore, she testified that her opinion about the Plaintiff's ability to return

---

[3] "Enforcement Guidance on Disability-Related Inquiries and Medical Examination of Employees Uner the ADA," July 27, 2000 (at Question 12). Available at https://www.eeoc.gov/laws/guidance/enforcement-guidance-disability-related-inquiries-and-medical-examinations-employees

HILLIARD002354

to work was not intended as an opinion about his fitness for duty, but solely an opinion "on how he was responding to his current medications with me, his depression, his anxiety with me, not his oxycodone prescription" (p. 43 , lines 14-17). In addition, Ms. Wray testified that she is not qualified to perform a fitness-for-duty evaluation (p. 43, lines 10-14).

c.   Mr. Gritton testified (per transcript of his 6/3/2020 deposition, pages 40-41) that he is not certain that he received or reviewed the Plaintiff's job description prior to providing his 8/24/2017 written opinion that the Plaintiff "made adequate progress in therapy to resume his employment at this time" (p. 1).

d.   On the basis of Dr. Tye's communications with the Defendants, which followed his review of Ms. Sweet's 8/28/2017 report (Ex. 31, pages 3-7), they had objective reasons for believing that Ms. Sweet's professional opinion concerning the Plaintiff's low substance use/misuse potential was unreliable and based on inaccurate or incomplete information and was contradicted by information known to or observed by the employer. Therefore, the Defendants' reliance on Dr. Tye's opinions over those of the Plaintiff's own healthcare providers was reasonable and appropriate.

### Expert Opinion #4

**The opinions of the Plaintiff's treating mental healthcare providers that his mental health crisis on September 7, 2017 stemmed from the loss of his job are unsupported by the facts.**

32.   Mr. Gritton testified that the Plaintiff became suicidal after he was fired from his position with the Twin Falls County Sheriff's Office (per transcript of Mr. Gritton's 6/3/2020 deposition, p. 101, lines 8-10; p. 102, lines 9-10; p. 104, lines 4-10).

HILLIARD002355

33. Ms. Wray also testified that she believed the Plaintiff's mental health crisis on 9/7/2017 stemmed from being fired (per transcript of Ms. Wrayi's 6/3/2020 deposition, p. 46, lines 11-14; p. 48, line 4).

34. It is my understanding that the Plaintiff was fired for driving under the influence of alcohol, which occurred after his mental health crisis on 9/7/2017.

35. The Plaintiff had available to him a variety of remedies on 9/7/2017 that would have prevented or delayed his alleged fear of job termination.

    a. County policy 1032.3 (Relief From Duty; Bates 01572) entitles employees to temporary relief from duty for a work- or non-work related medical condition.

    b. County policy 1032.5 (Appeals; Bates 01573)) entitles employees separated from paid employment or who receive a reduction in salary resulting from a fitness-for-duty evaluation to an administrative appeal.

36. Each of the above-listed opinions and statements is based upon the best of my knowledge, information and belief.

_____

David M. Corey, Ph.D., ABPP

June 15, 2020

HILLIARD002356

**Cases In Which I Have Testified As an Expert At Trial or By Deposition During the**

**Previous 4 Years**

I have testified as an expert witness in the following cases in the previous four years:

    a. *In the Matter of Henderson v. Morrow.* May 31, 2018, Case No. 16DR04062, Coos County Circuit Court, Coquille, Oregon.

    b. *In the Matter of Kelly Sigalove, Petitioner vs. Mark Sigalove, Respondent.* July 7, 2017, Case No. 16DR05110, Jackson County Circuit Court, Medford, Oregon.

    c. *In the Matter of Arbitration Between Oregon City Police Employees Association and City of Oregon City, David W. Stiteler, Arbitrator.* Decided January 11, 2017. I was retained in this matter as an expert for the Employer.

**Compensation to Be Paid for My Research and Testimony In This Case**

My fees in this case consist of an hourly rate of $450.00 for research, document review, and other in-office activities, and $300.00 per hour for travel time except when spent conducting activities directly related to services for which I was retained (e.g., review of case materials, report preparation, examination preparation, research). I also charge for the cost of direct expenses, without mark-up. I did not require a retainer fee in this matter.

**Publications Authored in the Previous 10 Years**

I have authored the following publications in the previous 10 years (ordered most recent to least recent):

    1. **Corey, D. M.**, & Ben-Porath, Y. S. (2020). Practical guidance on the use of the MMPI instruments in remote psychological testing. *Professional Psychology: Research & Practice, 51*(3), 199-204. doi: 10.1037/pro0000329

HILLIARD002357

2.  **Corey, D. M.**, & Ben-Porath, Y. S. (2020). *User's Guide for the MMPI-3 Police Candidate Interpretive Report.* Minneapolis: University of Minnesota Press.

3.  **Corey, D. M.**, & Zelig, M. (2020). *Evaluations of police suitability and fitness for duty.* K.Heilbrun, T. Grisso, & A. M. Goldstein (Series Eds.), *Best Practices in ForensicMental Health Assessment.* New York: Oxford University Press.

4.  Sellbom, M., **Corey, D. M.**, & Ben-Porath, Y. S. (2019). Examining the validity of the Multidimensional Personality Questionnaire in the assessment of police candidates. *Assessment*. Advance online publication. doi: 10.1177/1073191119887443

5.  **Corey, D. M.**, Sellbom, M., & Ben-Porath, Y. S. (2018). Risks associated with overcontrolled behavior in police officer recruits. *Psychological Assessment, 30*(12), 1691-1702. doi: http://dx.doi.org/10.1037/pas0000607

6.  Spilberg, S. W., & **Corey, D. M.** (2019). *POST Peace Officer Psychological Screening Manual* (Revised edition)*.* Sacramento, CA: California Commission on Peace Officer Standards and Training.

7.  **Corey, D. M.**, & Ben-Porath, Y. S. (2018). *Assessing police and other public safety personnel using the MMPI-2-RF: A practical guide.* Minneapolis: University of Minnesota Press.

8.  Ben-Porath, Y. S., **Corey, D. M., &** Tarescavage, A. M. (2017). Using the MMPI-2-RF in preemployment evaluations of police officer candidates. In C. L. Mitchell & E. Dorian (Eds.), *Police psychology and its growing impact on modern law enforcement* (pp. 51-78). Hershey, PA: IGI Global.

HILLIARD002358

9.  Mayer, M. J., & **Corey, D. M.** (2017). Current issues in psychological fitness-for-duty evaluations for law enforcement officers: Legal and practice implications. In C. L. Mitchell & E. Dorian (Eds.), *Police psychology and its growing impact on modern law enforcement* (pp. 93-117). Hershey, PA: IGI Global.

10.  **Corey, D. M.** (2016). Police and public safety psychologists. In R. J. Sternberg (Ed.), *Career paths in psychology: Where your degree can take you* (3rd edition), pp. 409-420. Washington, DC: American Psychological Association.

11.  Ben-Porath, Y. S., Tarescavage, A. M., & **Corey, D. M.** (2016). Using the MMPI-2-RF in preemployment evaluations of police officer candidates. In C. L. Mitchell & E. Dorian (Eds.), *Police psychology and its growing impact on modern law enforcement* (pp. 51-78). Hershey, PA: IGI Global.

12.  Brewster, J., Stoloff, M., **Corey, D. M.,** Greene, L., Gupton, H., & Roland, J. (2016). Education and training guidelines for the specialty of police and public safety psychology. *Training and Education in Professional Psychology, 10*(3), 171-178.

13.  Tarescavage, A. M., **Corey, D. M.,** & Ben-Porath, Y. S. (2016). A prorating method for estimating MMPI-2-RF scores from MMPI responses: Examination of score fidelity and illustration of empirical utility in the PERSEREC police integrity study sample. *Assessment, 23*(2), 173-190. doi: 10.1177/1073191115575070

14.  **Corey, D. M.,** & Stewart, C. O. (2015). Under the color of authority: Police officers as violent offenders. In C. A. Pietz & C. Mattson (Eds.), *Violent*

HILLIARD002359

*offenders: Understanding and assessment* (pp. 249-268)*. New York: Oxford Press.

15. Tarescavage, A. M., Brewster, J. A., **Corey, D. M.**, & Ben-Porath, Y. S. (2015). Use of pre-hire MMPI-2-RF police candidate scores to predict supervisor ratings of post-hire performance. *Assessment, 22*(4), 411-428*. doi: 10.1177/1073191114548445

16. Tarescavage, A. M., **Corey, D. M.**, & Ben-Porath, Y. S. (2015). Minnesota Multiphasic Personality Inventory–2–Restructured Form (MMPI-2-RF) predictors of police officer problem behavior. *Assessment, 22*(1), 116-132. doi: 10.1177/1073191114534885

17. Tarescavage, A. M., **Corey, D. M.**, Gupton, H. M., & Ben-Porath Y. S. (2015). Criterion validity and practical utility of the Minnesota Multiphasic Personality Inventory-2-Restructured Form (MMPI-2-RF) in assessments of police officer candidates. *Journal of Personality Assessment, 97*(4), 382-394*. doi: 10.1080/00223891.2014.995800

18. Tarescavage, A. M., Fischler, G., Cappo, B., Hill, D., **Corey, D. M.**, & Ben-Porath, Y. S. (2015). Minnesota Multiphasic Personality Inventory-2-Restructured Form (MMPI-2-RF) predictors of police officer problem behavior and collateral self-report test scores. *Psychological Assessment, 27*(1), 125-137.

19. **Corey, D. M.**, & Ben-Porath, Y. S. (2014). *User's guide for the MMPI-2-RF Police Candidate Interpretive Report.* Minneapolis: University of Minnesota Press.

HILLIARD002360

20. **Corey, D. M.**, & Borum, R. (2013). Forensic assessment for high-risk occupations. In R. K. Otto & I. B. Weiner (Vol. Eds.), *Forensic psychology* (Volume 11, 2nd edition), pp. 246-270. Hoboken, NJ: John Wiley & Sons, Inc.

21. Scrivner, E., **Corey, D. M.**, & Greene, L. W. (2013). Psychology and law enforcement. In I. B. Weiner & R. K. Otto (Eds.), *The handbook of forensic psychology* (fourth edition), pp. 443-468. Hoboken, NJ: Wiley.

22. **Corey, D. M.** (2011). Principles of fitness-for-duty evaluations for police psychologists. In J. Kitaeff (Ed.), *Handbook of police psychology,* pp. 263-293. New York: Routledge Psychology Press.

23. **Corey, D. M.**, Cuttler, M. J., Cox, D. R., & Brower, J. (2011). Board certification in police psychology. *Police Chief*, *78*(8), 100-104.

24. Trompetter, P. S., **Corey, D. M.**, Schmidt, W. W., & Tracy, D. (2011). Psychological factors after officer-involved shootings: Addressing officer needs and agency responsibilities. *The Police Chief, 78*(6), 28-33.

25. **Corey, D. M.** (2010). Police sexual misconduct. In Major Cities Chiefs and Federal Bureau of Investigations, National Executive Institute (Eds.), *Disciplinary trends: Focus on behavior affecting the integrity and effectiveness of the agency* (pp. 31-39). Washington, DC: Editors.

HILLIARD002361

## Exhibit #1

## Documents Reviewed

*Documents Provided by Employment Lawyers of Idaho:*

1.  Complaint and Demand for Jury Trial (18 pages)

2.  Amended Complaint and Demand for Jury Trial (20 pages)

3.  Deposition of Ronald B. Tye, Psy.D., dated 3/6/2020 (53 pages, compressed)

4.  Curriculum Vitae of Ronald B. Tye, Psy.D. (Ex. 19A, 4 pages)

5.  Agencies Served (Present and Past) by Ronald B. Tye, Psy.D. (Ex. 20A, 1 page)

6.  Treasure Valley Psychological Services Patient Registration Form for Brent Hilliard, dated 7/27/2017 (Ex. 21A, 1 page)

7.  Brent Hilliard's Idaho Commercial Driver's License (front and back, Ex. 22, 1 page)

8.  PAI Law Enforcement, Corrections, and Public Safety Selection Report for Brent Hilliard, 7/27/2017 date of testing (Ex. 23, 16 pages)

9.  Inwald Personality Inventory-2 Report for Brent Hilliard, 7/27/2017 date of testing, (Ex. 24, 15 pages)

10. Beck Depression Inventory-II score sheet, dated 7/27/2017; Beck Anxiety Inventory score sheet, dated 7/27/2017 (Ex. 25, 3 pages)

11. Fitness for Duty Evaluation Report of Brent Hilliard, prepared by Ronald B. Tye, Psy.D., undated but pertaining to evaluation of 7/27/2017 (Ex. 26 and Ex. 30, 5 pages)

12. Clinical Records/Patient Contact (Dr. Tye's handwritten notes of his interviews with Brent Hilliard on 7/27/2017 (2 pages) and 8/29/2017 (1 page), and notes from a phone call with Chief Deputy Don Newman on 12/18/2019 (1 page) (Ex. 22, 3 pages total)

13. Letter from Dr. Tye to Chief Deputy Newman re: "Capt. Brent Hilliard/Summary of Concerns" (Ex. 28, 1 page)

HILLIARD002362

14. Fax Transmittal Cover Sheet from Dr. Tye to "Don," dated 8/3/2017, re: "Pt. records" (Ex. 29, 1 page)

15. Letter from Deputy Deputy Newman to Dr. Tye concerning Brent Halliard, dated 7/31/2017 (Ex. 30, 4 pages with fax transmittal cover sheet, same date)

16. Letter to Sheriff Tom Carter from Mark Gritton, LCPC, NCC, Crosspointe Family Services, dated 8/24/2017, re: his treatment and assessment of Brent Hilliard (1 page); letter "to whom it may concern" from Shelley Wray, PMHNP-C, dated 8/21, 2017, re: her treatment and assessment of Brent Hilliard (1 page); and "GAIN-I Recommendation and Referral Summary (GRRS)" of Brent Hilliard, dated 8/23/2017, prepared by Justine Sweet, LCSW, QP (7 pages) (Ex. 31, 9 pages total)

17. Treasure Valley Psychological Services Invoice to Twin Falls County for Dr. Tye's services re: Brent Hilliard (4/12/2017 [sic] and 8/29/2017) (Ex. 32, 2 pages)

18. Internet news article, "Twin Falls County Sheriff's captain suspended for drunken driving charge," dated 9/8/2017 (Ex. 33, 2 pages)

19. 2017 Annual Performance Evaluation of Capt. Brent Hilliard, dated 5/31/2017 (Ex. 35, 5 pages)

20. Plaintiff's Expert Witness Disclosure (10 pages)

21. Expert Witness Report prepared by Susan M. Langley, CPA, CFE, dated 5//18/2020 (Bates 02614-02613, 18 pages)

22. Expert Witness Report prepared by Micah Hoffman, M.D., dated 5/11/2020 (Bates 02610-02613, 4 pages)

23. Dr. Hoffman's retainer fee schedule (Bates 02607-20609, 3 pages)

HILLIARD002363

24. Expert Witness Retention Agreement between Hepworth Law Offices and Victor R. McGraw concerning Hilliard v. TFRCSO, dated 8/28/2019 (3 pages)

25. Expert Witness Report prepared by Victor R. McGraw (undated, 3 pages)

26. Twin Falls County Personnel Manual Conduct and Work Rules

27. Twin Falls County Personnel Manual Policy 730

28. Twin Falls County Sheriff Office Policy Manual - 1012, 1020, 1032

29. Mark Gritton Deposition Transcript 6.3.20

30. Shelley Wray Deposition Transcript 6.3.20

31. Newman Statement for 7.20.17

32. Jon Daubner Statement for 7.10.17

33. 5 Photos of Hilliard's vehicle

34. Daron Brown Statement dated 7.7.17

35. Barnhill Statement dated 8.7.17

36. Unsigned/Undated 2 point statement

37. Sugden Statement dated 10.13.17

38. Don Newman Deposition Transcript 3.12.20

HILLIARD002364

**CURRICULUM VITA**

**DAVID MICHAEL COREY**
**5285 SW Meadows Road, Suite 311**
**Lake Oswego, Oregon 97035**
**USA**
**503-620-8050**
**dmc@corey-stewart.com**

**EDUCATION**

Ph.D.    Clinical Psychology, Fielding Graduate Institute (now Fielding Graduate University), Santa Barbara, California; degree conferred September 1988
Additional doctoral study in Public Affairs Psychology, Claremont Graduate School (now Claremont Graduate University), Claremont, California, September 1977-1979

M.A.     Experimental Psychology, San Diego State University, San Diego, California; degree conferred May 1977

B.A.     Psychology & German, Loma Linda University, Riverside, California; degree conferred June 1975
Additional baccalaureate study in German, Seminar Schloss Bogenhofen, St. Peter am Hart, Austria; Goethe Institute, 1973-1974

**LICENSURE & BOARD CERTIFICATION**

Licensed Psychologist, State of Arizona, 2009-present (#4050)
Licensed Psychologist, State of California, 1989-present (#PSY-11389)
Licensed Psychologist, State of Hawaii, 2004-present (#PSY-847)
Licensed Psychologist, State of Oregon, 1995-present (#1187)
Licensed Psychologist, State of Utah, 2006-present (#6271762-2501)
Licensed Psychologist, State of Washington, 1996-present (#PY-1941)
Chartered Forensic Psychologist of the Psychological Society of Ireland (M9465C)
Board Certified in Forensic Psychology, American Board of Professional Psychology, American Board of Forensic Psychology, 2003-present (#5665)
Board Certified in Police & Public Safety Psychology, American Board of Professional Psychology, American Board of Police & Public Safety Psychology, 2011-present (#6962)

**PROFESSIONAL PRACTICE**

Practice of Psychology, 1980 to present

1995-present:  David M. Corey, Ph.D., P.C.
               dba Corey & Stewart
               Lake Oswego, Oregon

1985-1995:     Wolf-Corey, Inc.
               Napa, California

HILLIARD002365

1980-1985:    R. William Mathis, Ph.D. & Associates
              Napa, California

Description of Practice:

Specializing in Forensic, Consulting, and Police & Public Safety Psychology in Oregon, Washington, California, Hawaii, Utah, and Arizona. Consulting psychologist/expert witness to government and public safety agencies, corporations, and attorneys/courts in the areas of employment assessment (preemployment and fitness for duty), workplace threat management, personal injury/disability, immigration-related hardship evaluations, and standards of practice in civil forensic psychological evaluations and testimony. My research focus is on psychological assessments of public safety personnel. My practice expertise is more broadly focused on civil forensic assessments.

## CLINICAL PRIVILEGES HELD

Federal Occupational Health Service, Bethesda, Maryland, 2018-2020
Portland VA Medical Center, Portland, Oregon, 2019-2021
Walla Walla VA Medical Center, Walla Walla, Washington, 2019-2021
Roseburg VA Medical Center, Roseburg, Oregon, 2019-2021

## AD HOC MANUSCRIPT REVIEW FOR REFEREED SCIENTIFIC JOURNALS

*Assessment* (Sage Publication)
*Behavioral Sciences & the Law* (Wiley)
*Journal of Personality Assessment* (Taylor & Francis)
*Psychological Assessment* (American Psychological Association)

## TEACHING EXPERIENCE

Fielding Graduate University, Santa Barbara, CA:  Faculty Fellow, 2013-present
American Academy of Forensic Psychology:  2008-present
American Academy of Police & Public Safety Psychology:  2011-present
American Board of Professional Psychology, Summer Workshop Series:  2011-2015
Alliant International University, San Francisco, California, Adjunct Faculty:  2011
University of Minnesota Press/Kent State University MMPI-2/MMPI-2-RF/MMPI-A
       Workshops & Symposium; Workshop Faculty:  2009-present

## PROFESSIONAL ASSOCIATIONS, OFFICES & ACTIVITIES

### American Academy of Forensic Psychology

Fellow (since 2003)
Workshop Faculty (since 2008)

### American Board of Police & Public Safety Psychology

Founding President (2011-2013)
Member, Board of Directors (2011-present)
Practice Sample Reviewer & Oral Examiner, 2011-present

HILLIARD002366

**American Board of Professional Psychology**

Trustee, Board of Trustees, 2015-present (now in second 4-year term)

**American Psychological Association**

Fellow since 2010; Member since 1986
Council of Representatives (member, 2017-2019, representing Division 18)
Committee on Psychological Tests & Assessment, Member (2017-2019; 3-year term)
Committee on Professional Practice & Standards, Member (2013-2015; 3-year term)
    Chair, Development Group, *Professional Practice Guidelines for*
    *Occupationally Mandated Psychological Evaluations*
Committee on Legal Issues, Member (2007-2009), Chair (2009)
Division 18, Psychologists in Public Service, Member (Police & Public Safety Section)
Division 41, American Psychology-Law Society, Member

**Council of Organizations in Police Psychology (Police & Public Safety Psychology Specialty Council)**

Founding Chair (2009-2011)
Member-at-Large, Board of Directors (2013-present)
Chair, 2019 to present

**Council of Specialties in Professional Psychology**

Secretary, 2016-2019
Specialty Council Representative, Police & Public Safety Psychology, 2013-2018

**International Association of Chiefs of Police**

Police Psychological Services Section
    Member (since 1989)
    Section Board Member, Police Psychological Services Section (2004-2010);
       General Chair (2008-2009)
    Chair, Joint Committee on APA Petition for Recognition of Police
       Psychology as a Proficiency (2007-2008)
    Chair, Joint Committee on Defining Competencies in Police Psychology
       (2006-2007)
    Committee on Psychological Evaluations for Police Specialty Assignments
       (co-chair, 2002-2003; member, 2006-2008; ex-officio member, 2008-
       2009)
    Committee to Revise Psychological Fitness-for-Duty Evaluation Guidelines
       (co-chair, 2004; oversight chair, 2009; co-chair, 2012-2013; chair, 2018)
    Committee to Revise Preemployment Psychological Evaluation Guidelines
       (member, 1999; oversight chair, 2009; co-chair, 2013-2014)
    Committee to Revise Officer-Involved Shooting Guidelines (ex-officio
       member, 2009)

**Napa Valley Psychological Association (Member, 1980-1995)**

Founding Chair, Disaster Response Committee (1989-1990)
Offices:  President (1991); Secretary/Newsletter Editor (1987-1989)

HILLIARD002367

**Oregon Association of Chiefs of Police, Associate Member**

**Oregon Psychological Association, Member**

Ethics Committee, Member (1999-2006), Vice Chair (2004-2005)

**Psychological Society of Ireland**

Chartered Member (since 2018)
Forensic Division Member (since 2018)
Graduate Member (since 2018)

**Society for Personality Assessment, Member**

**Society for Police & Criminal Psychology, Member**

Diplomate (since 1995)
Board of Directors (1996-1999); President (1997-1998)
Chair, Ad Hoc Committee for Bylaws (1998-1999)
Member, Diplomate Committee (1999-2003; 2008)

PROFESSIONAL RECOGNITIONS & AWARDS

**American Psychological Association,** Fellow (lifetime member)

**Division 18, Psychologists in Public Service**

*Fellow* (elected in 2010 "in recognition of outstanding and unusual contributions to the science and profession of psychology")

Recipient of the 2018 *Harold M. Hildreth Distinguished Public Service Award*, the highest award bestowed by the division, in recognition of "an individual whose work has, over a lifetime career, greatly benefitted public mental health."

Award for *Outstanding Contributions to the Field of Police & Public Safety Psychology* (August 2011)

**Division 18, Psychologists in Public Service, Police & Public Safety Section**

Award for *Outstanding Research in Police & Public Safety Psychology* (August 2015)

Award for *Outstanding Contributions to Practice in Police & Public Safety Psychology* (August 2009)

**International Association of Chiefs of Police, Police Psychological Services Section**

Award for *Outstanding Leadership in Police Psychology* (October 2012)

**Napa Valley Psychological Association**

*Distinguished Service Award* (1992)

**Society for Police & Criminal Psychology**

*Chris Hatcher Award for Vision in Police Psychology* (October 2014 and October 2008)

*Recognition for Outstanding Service to the Society for Police & Criminal Psychology* (September 2013)

*Special Recognition Award for Outstanding Contributions to the Development of Police Psychology* (October 2008)

HILLIARD002368

**PARTIAL LIST OF PUBLICATIONS (LISTED BY DATE)**

Sellbom, M., **Corey, D. M.**, & Ben-Porath, Y. S. (2019). Examining the validity of the Multidimensional Personality Questionnaire in the assessment of police candidates. *Assessment*. Advance online publication. doi: 10.1177/1073191119887443

**Corey, D. M.**, & Zelig, M. (2020). *Evaluations of police suitability and fitness for duty.* K. Heilbrun, T. Grisso, & A. M. Goldstein (Series Eds.), *Best Practices in Forensic Mental Health Assessment.* New York: Oxford University Press.

**Corey, D. M.**, Sellbom, M., & Ben-Porath, Y. S. (2018). Risks associated with overcontrolled behavior in police officer recruits. *Psychological Assessment,* 30(12), 1691-1702. doi: http://dx.doi.org/10.1037/pas0000607

Spilberg, S. W., & **Corey, D. M.** (2019). *POST Peace Officer Psychological Screening Manual* (Revised edition)*.* Sacramento, CA: California Commission on Peace Officer Standards and Training.

**Corey, D. M.**, & Ben-Porath, Y. S. (2018). *Assessing police and other public safety personnel using the MMPI-2-RF: A practical guide.* Minneapolis: University of Minnesota Press.

Ben-Porath, Y. S., **Corey, D. M., &** Tarescavage, A. M. (2017). Using the MMPI-2-RF in preemployment evaluations of police officer candidates. In C. L. Mitchell & E. Dorian (Eds.), *Police psychology and its growing impact on modern law enforcement* (pp. 51-78). Hershey, PA: IGI Global.

Mayer, M. J., & **Corey, D. M.** (2017). Current issues in psychological fitness-for-duty evaluations for law enforcement officers: Legal and practice implications. In C. L. Mitchell & E. Dorian (Eds.), *Police psychology and its growing impact on modern law enforcement* (pp. 93-117). Hershey, PA: IGI Global.

**Corey, D. M.** (2016). Police and public safety psychologists. In R. J. Sternberg (Ed.), *Career paths in psychology: Where your degree can take you* (3rd edition), pp. 409-420. Washington, DC: American Psychological Association.

Brewster, J., Stoloff, M., **Corey, D. M.**, Greene, L., Gupton, H., & Roland, J. (2016). Education and training guidelines for the specialty of police and public safety psychology. *Training and Education in Professional Psychology, 10*(3), 171-178*.*

Tarescavage, A. M., **Corey, D. M.**, & Ben-Porath, Y. S. (2016). A prorating method for estimating MMPI-2-RF scores from MMPI responses: Examination of score fidelity and illustration of empirical utility in the PERSEREC police integrity study sample. *Assessment, 23*(2), 173-190. doi: 10.1177/1073191115575070

**Corey, D. M.**, & Stewart, C. O. (2015). Under the color of authority: Police officers as violent offenders. In C. A. Pietz & C. Mattson (Eds.), *Violent offenders: Understanding and assessment* (pp. 249-268)*.* New York: Oxford Press.

Tarescavage, A. M., Brewster, J. A., **Corey, D. M.**, & Ben-Porath, Y. S. (2015). Use of pre-hire MMPI-2-RF police candidate scores to predict supervisor ratings of post-hire performance. *Assessment, 22*(4), 411-428*.* doi: 10.1177/1073191114548445

Tarescavage, A. M., **Corey, D. M.**, & Ben-Porath, Y. S. (2015). Minnesota Multiphasic Personality Inventory–2–Restructured Form (MMPI-2-RF) predictors of police officer problem behavior. *Assessment, 22*(1), 116-132. doi: 10.1177/1073191114534885

Tarescavage, A. M., **Corey, D. M.**, Gupton, H. M., & Ben-Porath Y. S. (2015). Criterion validity and practical utility of the Minnesota Multiphasic Personality

HILLIARD002369

Inventory-2-Restructured Form (MMPI-2-RF) in assessments of police officer candidates. *Journal of Personality Assessment, 97*(4), 382-394. doi: 10.1080/00223891.2014.995800

Tarescavage, A. M., Fischler, G., Cappo, B., Hill, D., **Corey, D. M.**, & Ben-Porath, Y. S. (2015). Minnesota Multiphasic Personality Inventory-2-Restructured Form (MMPI-2-RF) predictors of police officer problem behavior and collateral self-report test scores. *Psychological Assessment, 27*(1), 125-137.

**Corey, D. M.**, & Ben-Porath, Y. S. (2014). *User's guide for the MMPI-2-RF police candidate interpretive report.* Minneapolis: University of Minnesota Press.

**Corey, D. M.**, Trompetter, P. S., & Ben-Porath, Y. S. (2013). Establishing a peer review group. *The California Psychologist, 46*(5), 25-27.

**Corey, D. M.**, & Borum, R. (2013). Forensic assessment for high-risk occupations. In R. K. Otto & I. B. Weiner (Vol. Eds.), *Forensic psychology* (Volume 11, 2nd edition), pp. 246-270. Hoboken, NJ: John Wiley & Sons, Inc.

Scrivner, E., **Corey, D. M.**, & Greene, L. W. (2013). Psychology and law enforcement. In I. B. Weiner & R. K. Otto (Eds.), *The handbook of forensic psychology* (fourth edition), pp. 443-468. Hoboken, NJ: Wiley.

**Corey, D. M.** (2011). Principles of fitness-for-duty evaluations for police psychologists. In J. Kitaeff (Ed.), *Handbook of police psychology,* pp. 263-293. New York: Routledge Psychology Press.

**Corey, D. M.**, Cuttler, M. J., Cox, D. R., & Brower, J. (2011). Board certification in police psychology. *Police Chief, 78*(8), 100-104.

Trompetter, P. S., **Corey, D. M.**, Schmidt, W. W., & Tracy, D. (2011). Psychological factors after officer-involved shootings: Addressing officer needs and agency responsibilities. *The Police Chief, 78*(6), 28-33.

**Corey, D. M.** (2010). Police sexual misconduct. In Major Cities Chiefs and Federal Bureau of Investigations, National Executive Institute (Eds.), *Disciplinary trends: Focus on behavior affecting the integrity and effectiveness of the agency* (pp. 31-39). Washington, DC: Editors.

**Corey, D. M.**, & Honig, A. L. (2008). Police psychology into the 21st century. *Police Chief, 75*(10), 138.

**Corey, D. M.** (2007). "Analysis of the ADA as it pertains to medical examinations of police officers applying for special assignments." *AELE Monthly Law Journal,* 501(7).

Aumiller, G. S., **Corey, D. M.**, Allen, S., Brewster, J., Cuttler, M., Gupton, H., & Honig, A. (2007). Defining the field of police psychology: Core domains and proficiencies. *Journal of Police & Criminal Psychology, 22,* 65-66. DOI 10.1007/s11896-007-9013-4

**Corey, D. M.**, & Wolf, G. D. (1992). An integrated approach to reducing stress injuries. In L. R. Murphy, J. J. Hurrell, & J. C. Quick (Eds.), *Stress and well-being at work: Assessments and interventions of occupational mental health*, pp. 64-78. Washington, D.C.: American Psychological Association.

HILLIARD002370

Exhibit K

United States District Court
for The District of Idaho                                        Case 1:18-cv-00550-CWD

Requestor: Attorneys for Plaintiff
Jeffrey J. Hepworth, ISB No. 3455
J. Grady Hepworth, ISB No. 10364
HEPWORTH LAW OFFICE
2229 W. State Street P.O. Box 2815
Boise, ID 83701-2815

## BRENT E. HILLIARD v.
## TWIN FALLS COUNTY SHERIFF'S OFFICE, TWIN FALLS COUNTY

**SCOPE OF DOCUMENT REVIEW**
**Victor McCraw – Expert witness**

1.  Deposition of Sheriff Carter
2.  Deposition of Chief Deputy Newman
3.  Twin Falls County Policy 600
4.  Twin Falls County Policy 730
5.  Twin Falls County Sheriff's Office Policy 1012
6.  Twin Falls County Sheriff's Office Policy 1020
7.  Twin Falls County Sheriff's Office Policy 1032
8.  Idaho Code 72-1705
9.  Statement of Chief Deputy Newman (HILLIARD002282)
10. Statement of Lieutenant Daron Brown
11. Statement of Lieutenant Perry Barnhill
12. Statement of Lieutenant Det. Martinez
13. The County of Sonoma California Administrative Policy Manual: *8-2 Drug-Alcohol Guidelines* includes a subsection titled "IV. *Reasonable Suspicion*"

## BRENT E. HILLIARD v.
## TWIN FALLS COUNTY SHERIFF'S OFFICE, TWIN FALLS COUNTY

### OPINIONS

The following opinions are based on my experience, and my review of the documentation provided for review.

**In your professional opinion, was there "reasonable suspicion" that Brent Hilliard was "impaired" while working in June and July 2017? What tests should be conducted to establish "reasonable suspicion of drug or alcohol" impairment?**

**Opinion**

In my professional opinion, reasonable suspicion did exist that Brent Hilliard may have been impaired while on duty during the timeframe of June to July 2017.

1

In my professional opinion, drug tests should be conducted to investigate the allegations of drug impairment in the workplace, and that such test(s) are explicitly required by Twin Falls County Personnel Manual policy 600, *Drug and Alcohol Policy*.

My review of the relevant documents and testimony revealed that the Twin Falls County Sheriff's office acted on allegations of objective symptoms of possible impairment. These symptoms constituted the minimal standard of reasonable suspicion, and needed to be definitively confirmed through physical and medical test(s).

In my law enforcement and paramedic experience, the behaviors reported to be observed regarding Hilliard are non-specific physical indicators which may have any number of medical origins, including fatigue, pain, hearing loss, low blood sugar, head injury, TIA, or stress. Without field sobriety or DRE testing, and blood, urine or breath testing, designed to isolate, eliminate and identify possible causes, no definite conclusion can be drawn about the source of the alleged impairment.

This information should have been investigated by initiating an immediate investigation including tests to determine impairment, and chemical substance tests required by policy. In addition to any immediately available test (field sobriety, DRE, breath), the provisions of policy 600 should have been followed immediately, most specifically on July 10, 2017 when Hilliard was in the workplace on the same date as verbal reports of suspected impairment. It was reasonable to assume that the presence of a prohibited substance might still be detected within 4 hours of visible impairment.

**If one were to assume that there was a "reasonable suspicion" that Mr. Hilliard was impaired while on-duty, how should that concern be investigated in the law enforcement profession?**

**Opinion**

In my professional opinion, concerns regarding reasonable suspicion of on-duty impairment due to drugs or alcohol in the law enforcement profession, should be investigated according to established and approved procedures for internal personnel complaint investigations of violations of law or policy.

These procedures are readily found in the policy manual(s) governing the law enforcement agency's operations and administration. Law enforcement agencies are uniquely equipped to collect and examine evidence in cases of this type. Testing could have involved field sobriety testing by a Drug Recognition Expert or other medical testing allowed under policy.

**Did Twin Falls County and the Twin Falls County Sheriff's Office policy require drug testing at St. Luke's Magic Valley by a Medical Review Officer?**

**Opinion**

It is my professional opinion, after reviewing the applicable policies, that Twin Falls County Sheriff's Office policy regarding drug testing is dictated by Twin Falls County policy, which requires all employees subject to drug testing to report to St. Luke's Magic Valley Regional Medical (MVRMC), who will designate a licensed physician with knowledge of drugs, testing methods and drug abuse disorders as the Medical Review Officer (MRO) to interpret, evaluate and monitor the drug testing program and results as necessary.

The agency policy is clear on this point. The failure to involve appropriately trained medical professionals in this process, in a timely fashion, resulted in the loss of critical evidence regarding the allegations.

2

**What role do employee manuals and agency policies play in establishing the rights and responsibilities of an employee at a law enforcement agency like Twin Falls County Sheriff's Office?**

<u>**Opinion**</u>

In my professional opinion, based on my experience and review of the policies in this case, employee manuals and agency policies serve to provide guidelines for agency administration and operations, including employee roles, responsibilities, employment rights and due process procedures.

**What role do employee manuals and agency policies play in establishing the rights and responsibilities of the employer or agency like Twin Falls County Sherriff's Office?**

<u>**Opinion**</u>

In my professional opinion, based on my experience and review of the policies in this case, employee manuals and agency policies serve to the agency's mission and purpose, and to outline the expectations for agency administration and operations. The agency policies should clearly establish the agency / employee relationship in terms of expectations and workplace procedures.

**Did Twin Falls County and Twin Falls County Sheriff's Office follow fit for duty testing standards?**

<u>**Opinion**</u>

It is my professional opinion that Twin Falls County Sheriff's Office did not follow the Fitness for Duty policy. The agency failed to meet critical policy requirements for determining the level of performance inability, taking prompt and appropriate action to address the situation, and properly serving the  employee with a written order to undergo a physical and/or psychological examination.

**Was an Internal Affairs ("IA") Investigation necessary? If so, who and how is an IA conducted?**

<u>**Opinion**</u>

In my professional opinion, an internal affairs investigation was necessary in this case to comprehensively examine, document and substantiate the allegations in a formal manner supported by policy.

By definition, "personnel complaints" of policy violations, include reports of violations of drug and alcohol policy, supervisors' determinations of reasonable suspicion or belief of impairment due to prohibited drug or alcohol use. Not all personnel complaints are related to drug and alcohol policy violations, but all allegations of drug and alcohol policy violations are personnel complaints and should be investigated as such.

Twin Falls County Sheriff's Office Policy Manual policy 1020 *Personnel Complaints*, is fairly comprehensive, and has provisions for ensuring the assignment of an unbiased investigator of appropriate rank who is not a witness or complainant, not personally involved, who is tasked with identifying witnesses, obtaining and documenting statements and collecting and compiling evidence.

_____
Victor McCraw

3

Exhibit L

Jeffrey J. Hepworth, ISB No. 3455
J. Grady Hepworth, ISB No. 10364
HEPWORTH LAW OFFICE
2229 W. State Street
P.O. Box 2815
Boise, ID 83701-2815
Telephone: (208) 333-0702
Facsimile: (208) 246-8655
courtservice@idalawyer.com
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| BRENT E. HILLIARD, an individual, | |
| Plaintiff, | Case No.  1:18-cv-00550-CWD |
| v. | **PLAINIFF'S RESPONSE TO DEFENDANT'S SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSIONS** |
| TWIN FALLS COUNTY SHERIFF'S OFFICE, a Public Entity, TWIN FALLS COUNTY, a Public Corporation, | |
| Defendants. | |

COMES NOW, the plaintiff Brent Hilliard, by and through his counsel of record, Hepworth Law Offices, and answers *Defendant's Second Set of Requests for Production of Documents and Requests for Admission to Plaintiff* as follows:

**REQUESTS**

**Request for Production No. 22:** Please produce all prescriptions for opioids, synthetic opioids, narcotics, controlled substances, or any other prescription pain medication that you filled between

PLAINIFF'S RESPONSE TO DEFENDANT'S SECOND SET OF DISCOVERY
 - 1

January 1, 2017, and December 31, 2017.

**RESPONSE NO. 22:** Mr. Hilliard does not have in his possession copies of prescriptions for pain medication filled between January 1, 2017 and December 31, 2017. His prescriptions were usually filled at Smiths Drugs in Twin Falls.

## REQUESTS FOR ADMISSIONS

**Request for Admission No. 47:** Please admit that, as reflected on HILLIARD-01895 – HILLIARD-01896, on or about July 15, 2010, you were prescribed Vicodin.

**ANSWER NO. 47:** Admit

**Request for Admission No. 48:** Please admit that you used the Vicodin that was prescribed to you on or about July 15, 2010.

**ANSWER NO. 48:** Deny. Mr. Hilliard has no memory of the amount of Vicodin he used after the right foot and ankle injury he suffered July 15, 2010. It was Captain Hilliard's habit and practice to use prescribed medications as prescribed and as long as needed.

**Request for Admission No. 49:** Please admit that, as reflected on HILLIARD-01818, on or about October 20, 2010, you were prescribed Norco.

**ANSWER NO. 49:** Admit.

**Request for Admission No. 50.:** Please admit that you used the Norco that was prescribed to you on or about October 20, 2010.

**ANSWER NO. 50:** Mr. Hilliard has no memory of the amount of Norco he used after his hospital visit October 20, 2010 for flank pain. It was Captain Hilliard's habit and practice to use prescribed medications as prescribed as long as needed.

**Request for Admission No. 51**: Please admit that, as reflected on HILLIARD-00429, on or about September 30, 2011, you requested a refill of a prescription for Percocet.

PLAINIFF'S RESPONSE TO DEFENDANT'S SECOND SET OF DISCOVERY
 - 2

**ANSWER NO. 51:** Admit.

**Request for Admission No. 52:** Please admit that, as reflected on HILLIARD-00429, on or about September 30, 2011, you were prescribed Percocet.

**ANSWER NO. 52:** Admit

**Request for Admission No. 53:** Please admit that you used the Percocet that was prescribed to you on or about September 30, 2011.

**ANSWER NO. 53**: Deny. Mr. Hilliard has no memory of the amount of Percocet he used before or after the back surgery performed by Dr. Verst in 2011. It was Captain Hilliard's habit and practice to use prescribed medications as prescribed as long as needed.

**Request for Admission No. 54:** Please admit that, as reflected on HILLIARD-00450, on or about October 25, 2011, you were prescribed Percocet.

**ANSWER NO. 54:** Admit.

**Request for Admission No. 55:** Please admit that you used the Percocet that was prescribed to you on or about October 25, 2011.

**ANSWER NO. 55:** Deny. Mr. Hilliard has no memory of the amount of Percocet he used after the nerve ablation procedure Dr. Dille performed on his low back October 25, 2011. It was Captain Hilliard's habit and practice to use prescribed medications as prescribed as long as needed.

**Request for Admission No. 56:** Please admit that, as reflected on HILLIARD-00454, on or about November 22, 2011, you were prescribed Percocet.

**ANSWER NO. 56:** Admit

**Request for Admission No. 57**: Please admit that you used the Percocet that was prescribed to you on or about November 22, 2011.

PLAINIFF'S RESPONSE TO DEFENDANT'S SECOND SET OF DISCOVERY
- 3

**ANSWER NO. 57 :** Deny. Mr. Hilliard has no memory of the amount of Percocet he used after reinjuring his low back November 20, 2011. It was Captain Hilliard's habit and practice to use prescribed medications as prescribed as long as needed. Mr. Hilliard does recall the back surgery performed by Dr. Verst in 2011 was beneficial and decreased his pain and need for pain medications.

**Request for Admission No. 58:**  Please admit that, as reflected on HILLIARD-01769, on or about December 31, 2013, you were prescribed Norco.

**ANSWER NO. 58:** Admit

**Request for Admission No. 59:**  Please admit that you used the Norco that was prescribed to you on or about December 13, 2013.

**ANSWER NO. 59:** Deny. Mr. Hilliard has no memory of being prescribed Norco December 13, 2013. It was Captain Hilliard's habit and practice to use medications as prescribed as long as needed.

**Request for Admission No. 60:** Please admit that, as reflected on HILLIARD-01824 – HILLIARD-01825, on or about March 6, 2014, you were prescribed Norco.

**ANSWER NO. 60:** Admit.

**Request for Admission No. 61:**  Please admit that you used the Norco that was prescribed to you on or about March 6, 2014.

**ANSWER NO. 61:** Deny. Mr. Hilliard has no memory of how often he used Norco after March 6, 2014. It was Captain Hilliard's habit and practice to use medication as prescribed as long as needed.

**Request for Admission No. 62**: Please admit that, as reflected on HILLIARD-00082, on or about March 20, 2014, you were prescribed Norco.

PLAINIFF'S RESPONSE TO DEFENDANT'S SECOND SET OF DISCOVERY
 - 4

**ANSWER NO. 62:** Admit.

**Request for Admission No. 63:** Please admit that you used the Norco that was prescribed to you on or about March 20, 2014.

**ANSWER NO. 63:** Deny. Mr. Hilliard does recall re-injuring his back in the spring of 2014 and being in severe pain. He was prescribed various medications without much relief. It was Captain Hilliard's habit and practice to use medications as prescribed but if they were ineffective, to seek a different medication.

**Request for Admission No. 64:** Please admit that, as reflected on HILLIARD-00098, on or about March 22, 2014, you were prescribed Percocet.

**ANSWER NO. 64:** Admit.

**Request for Admission No. 65:** Please admit that you used the Percocet that was prescribed to you on or about March 22, 2014.

**ANSWER NO. 65:** Deny. As reflected by the medical records Mr. Hilliard suffered a new herniated disk in March 2014 as evidenced by MRI. The Norco prescribed earlier was ineffective and he was switched to Percocet on March 22, 2014. Mr. Hilliard does not specifically recall using the medication. It was his habit and practice to use medications as prescribed.

**Request for Admission No. 66:** Please admit that, as reflected on HILLIARD-00098, on or about March 22, 2014, you were prescribed Oxycodone.

**ANSWER NO. 66:** Admit.

**Request for Admission No. 67:** Please admit that you used the Oxycodone that was prescribed to you on or about March 22, 2014.

**ANSWER NO. 67:** Deny. According to the medical records Mr. Hilliard was prescribed both

PLAINIFF'S RESPONSE TO DEFENDANT'S SECOND SET OF DISCOVERY
- 5

Percocet and Oxycodone at St. Luke's Magic Valley Emergency Room on March 22, 2014. Mr. Hilliard has no memory of which medications he used or for how long. It was Captain Hilliard's habit and practice to use medication as prescribed as long as it was needed and effective.

**Request for Admission No. 68:** Please admit that, as reflected on HILLIARD-00137, as of on or about April 4, 2014, you were using Percocet.

**ANSWER NO. 68:** Deny. Mr. Hilliard was in the hospital for L3-L5 revision back surgery April 4, 2014. Mr. Hilliard has no memory of what medications were prescribed or what medications he was using at that time. It was Mr. Hilliard's habit and practice to use medications as prescribed as long as they were beneficial but to discontinue and request a different medication if not effective.

**Request for Admission No. 69:** Please admit that, as reflected on HILLIARD-00146, as of on or about April 6, 2014, you were using Oxycodone.

**ANSWER NO. 69:** Deny. Mr. Hilliard had surgery April 4, 2014 and it appears from the medical records he was discharged at around 4:00p.m. on April 6, 2014. The discharge records indicate Mr. Hilliard was prescribed Oxycodone for pain at the time of discharge. Mr. Hilliard does not recall what he was given for pain while in the hospital or what he used after discharge.

**Request for Admission No. 70:** Please admit that, as reflected on HILLIARD-01788, as of on or about April 25, 2014, you were using Oxycodone.

**ANSWER NO. 70:** Admit.

**Request for Admission No. 71:** Please admit that, as reflected on HILLIARD-01791, as of on or about May 15, 2014, you were using Norco.

**ANSWER NO. 71:** Admit. At the time Mr. Hilliard reported for his post op visit that he

PLAINIFF'S RESPONSE TO DEFENDANT'S SECOND SET OF DISCOVERY
 - 6

was suffering only "mild right back and hip pain" and that he was taking "some Norco" for pain. Mr. Hilliard has no recall of what he was taking or how often and relies on the medical records to accurately reflect what he reported at the time.

**Request for Admission No. 72:** Please admit that, as reflected on HILLIARD01812 – HILLIARD01813, on or about October 14, 2014, you were prescribed Norco.

**ANSWER NO. 72:** Admit. Mr. Hilliard does recall re-injuring his left knee deer hunting in the fall of 2014. The record reflects he was prescribed Norco 7.5 mg tabs to be used as necessary for "nighttime pain." Mr. Hilliard has no memory of the prescription but does not dispute the medical record.

**Request for Admission No. 73:** Please admit that you used the Norco that was prescribed to you on or about October 14, 2014.

**ANSWER NO. 73:** Deny. Mr. Hilliard has no memory of how much Norco he used. It was Captain Hilliard's habit and practice to use his medications as prescribed but only when needed.

**Request for Admission No. 74:** Please admit that, as reflected on HILLIARD-00394, on or about June 1, 2015, you were prescribed Norco.

**ANSWER NO. 74:** Admit. Mr. Hilliard was prescribed Norco 7.5 mg "to be used when necessary nocturnal pain."

**Request for Admission No. 75:** Please admit that you used the Norco that was prescribed to you on or about June 1, 2015.

**ANSWER NO. 75:** Deny. Mr. Hilliard has no memory of using the Norco. It was his habit and practice to use his medication as prescribed.

**Request for Admission No. 76:** Please admit that, as reflected on HILLIARD-00413, on or about

PLAINIFF'S RESPONSE TO DEFENDANT'S SECOND SET OF DISCOVERY
- 7

July 21, 2015, you were prescribed Norco.

**ANSWER NO. 76:** Admit.

**Request for Admission No. 77:** Please admit that you used the Norco that was prescribed to you on or about July 21, 2015.

**ANSWER NO. 77:** Deny. Mr. Hilliard does not recall using the Norco 7.5 mg for his knee problems. It was his habit and practice to use his medications as prescribed.

**Request for Admission No. 78:** Please admit that, as reflected on HILLIARD-00063 – HILLIARD-00064, on or about February 16, 2016, you were prescribed Norco.

**ANSWER NO. 78:** Admit.

**Request for Admission No. 79:** Please admit that you used the Norco that was prescribed to you on or about February 16, 2016.

**ANSWER NO. 79:** Deny. Mr. Hilliard has no memory of using the Norco 7.5 mg to be used when necessary for night time pain. It was Captain Hilliard's habit and practice to use his medications as prescribed.

**Request for Admission No. 80:** Please admit that, as reflected on HILLIARD-00488, as of on or about December 7, 2016, you were using Norco.

**ANSWER NO. 80:** Admit.

**Request for Admission No. 81**: Please admit that, as reflected on HILLIARD-00540 and HILLIARD-00560, on or about July 8, 2016, you were prescribed Norco.

**ANSWER NO. 81:** Deny. The medical records provided by St. Luke's are very confusing. It appears Mr. Hilliard went to the St. Luke's ER January 8, 2017 after re-injuring his low back after a fall and shoveling snow. He had 4 prior back surgeries, the most recent in April 2014. The record reflects "new medications" were Oxycodone-Acetaminophen (Percocet)

PLAINIFF'S RESPONSE TO DEFENDANT'S SECOND SET OF DISCOVERY
 - 8

and "previous medications" included Hydrocodone-acetaminophen (Norco) 7.5 mg. (HILLIARD-00503). The record at HILLIARD 00540 is for a visit February 14, 2017. The record at HILLIARD 00560 is for a visit March 6, 2017 where the attending provider is Janice Carter Nurse Practitioner and an MRI was ordered for the lumbar spine.

**Request for Admission No. 82:** Please admit that you used the Norco that was prescribed to you on or about July 8, 2016.

**ANSWER NO. 82:** Deny. Captain Hilliard has no memory of what he used. It was his habit and practice to use as prescribed.

**Request for Admission No. 83:** Please admit that, as reflected on HILLIARD-00617, on or about March 6, 2017, you were prescribed Percocet.

**ANSWER NO. 83:** Deny. The medical record at HILLIARD-00617 relates to a visit March 20, 2017 at St. Luke's Orthopedics.

**Request for Admission No. 84:** Please admit that you used the Percocet that was prescribed to you on or about March 6, 2017.

**ANSWER NO. 84:** Deny. Captain Hilliard has no memory of how much he used. His habit and practice was to use as prescribed as beneficial.

**Request for Admission No. 85:** Please admit that you did not disclose to Dr. Tye in your fitness for duty examination that occurred on July 27, 2017, that you used the Percocet that was prescribed to you on or about March 6, 2017.

**ANSWER NO. 85:** Deny. Dr. Tye did not ask me to disclose medication used on March 6, 2017.

**Request for Admission No. 86**: Please admit that, as reflected on HILLIARD-00617 and HILLIARD-00674, on or about March 20, 2017, you were prescribed Percocet.

PLAINIFF'S RESPONSE TO DEFENDANT'S SECOND SET OF DISCOVERY
 - 9

**ANSWER NO. 86:**  Deny. The record at HILLIARD-00617 is ambiguous and inconsistent. The record at HILLIARD-00674 relates to an office visit March 29, 2017 and is ambiguous and inconsistent.

**Request for Admission No. 87**:  Please admit that you used the Percocet that was prescribed to you on or about March 20, 2017.

**ANSWER NO. 87:** Deny. Mr. Hilliard has no memory of what he was prescribed in March 2017. It is his habit and practice to use the medication he is prescribed and to follow the prescription.

**Request for Admission No. 88**: Please admit that you did not disclose to Dr. Tye in your fitness for duty examination that occurred on July 27, 2017, that you used the Percocet that was prescribed to you on or about March 20, 2017.

**ANSWER NO. 88:** Deny. Dr. Tye did not ask me to disclose medications I used on March 29, 2017.

**Request for Admission No. 89**:  Please admit that, as reflected on HILLIARD-00674 and HILLIARD-00727, on or about March 29, 2017, you were prescribed Percocet.

**ANSWER NO. 89:** Deny. See response to 86. The record at HILLIARD-00727 relates to a doctor visit April 19, 2017 and is ambiguous and inconsistent. Mr. Hilliard does not dispute the medical records and relies upon them to accurately record the events.

**Request for Admission No. 90**:  Please admit that you used the Percocet that was prescribed to you on or about March 29, 2017.

**ANSWER NO. 90:** Deny. Mr. Hilliard has no memory of using the medications but it was his habit and practice to follow his doctors' instructions for use.

**Request for Admission No. 91**:  Please admit that you did not disclose to Dr. Tye in your fitness for

PLAINIFF'S RESPONSE TO DEFENDANT'S SECOND SET OF DISCOVERY

duty examination that occurred on July 27, 2017, that you used the Percocet that was prescribed to you on or about March 29, 2017.

**ANSWER NO. 91:** Deny. Dr. Tye did not ask me to disclose medications I used on March 29, 2017.

**Request for Admission No. 92**:  Please admit that, as reflected on HILLIARD-00719, on or about April 18, 2017, you requested a refill of a prescription for Oxycodone.

**ANSWER NO. 92:** Deny. The record states Oxy 10.

**Request for Admission No. 93:** Please admit that, as reflected on HILLIARD-00727, on or about April 19, 2017, you were prescribed Percocet.

**ANSWER NO. 93:** Deny. Mr. Hilliard relies on the records to accurately record his prescriptions and his habit was to use as prescribed.

**Request for Admission No. 94:** Please admit that you used the Percocet that was prescribed to you on or about April 19, 2017.

**ANSWER NO. 94:** Deny. Mr. Hilliard has no memory of when he used his prescriptions but his habit was to use the prescriptions as directed by his doctor.

**Request for Admission No. 95:** Please admit that you did not disclose to Dr. Tye in your fitness for duty examination that occurred on July 27, 2017, that you used the Percocet that was prescribed to you on or about April 19, 2017.

**ANSWER NO. 95:** Deny. Dr. Tye did not ask Mr. Hilliard to disclose medications being used April 19, 2017.

**REQUEST FOR ADMISSION NO. 96:**  Please admit that, as reflected on HILLIARD-00794 and HILLIARD-01417, on or about May 13, 2017, you were prescribed Oxycodone.

**ANSWER NO. 96:** Deny. It is unclear from the records what was prescribed. The record

PLAINIFF'S RESPONSE TO DEFENDANT'S SECOND SET OF DISCOVERY
 - 11

reflects both "Roxicodone" 5mg and "Oxycontin" 20 mg under the name Oxycodone. As an "ED prescription." Dr. May prescribed both to be used between May 13 and May 30, 2017. Mr. Hilliard was discharged from the hospital May 13th following the surgical procedure on his back. It was Captain Hilliard's habit to use the medications as prescribed.

**REQUEST FOR ADMISSION NO. 97:**  Please admit that you used the Oxycodone that was prescribed to you on or about May 13, 2017.

 **ANSWER NO. 97:** Deny. Mr. Hilliard does not recall which medicines he used or when. It was his habit and practice to use medications as prescribed.

**REQUEST FOR ADMISSION NO. 98:**  Please admit that you did not disclose to Dr. Tye in your fitness for duty examination that occurred on July 27, 2017, that you used the Oxycodone that was prescribed to you on or about May 13, 2017.

 **ANSWER NO. 98:** Deny. Dr. Tye did not ask Mr. Hilliard to disclose the medications he was prescribed May 13, 2017.

**REQUEST FOR ADMISSION NO. 99:**  Please admit that, as reflected on HILLIARD-01469 and HILLIARD-01481, on or about May 30, 2017, you were prescribed Oxycodone (Oxycontin).

 **ANSWER NO. 99:** Deny. It appears Dr. Waters prescribed Oxycontin 20 mg. 1 tablet every 12 hours beginning May 30th and ending June 14, 2017. He also prescribed Roxicodone 5mg 1-3 tablets every three hours as needed for pain beginning May 30th and ending June 9, 2017.Mr. Hilliard used his prescribed medications as prescribed.

**REQUEST FOR ADMISSION NO. 100:**  Please admit that you used the Oxycodone (Oxycontin) that was prescribed to you on or about May 30, 2017.

 **ANSWER NO. 100:** Deny. Mr. Hilliard cannot recall how much medication he used. It was

PLAINIFF'S RESPONSE TO DEFENDANT'S SECOND SET OF DISCOVERY
 - 12

his habit and practice to use his medication as prescribed but only if he needed it.

**REQUEST FOR ADMISSION NO. 101:** Please admit that you did not disclose to Dr. Tye in your fitness for duty examination that occurred on July 27, 2017, that you used the Oxycodone (Oxycontin) that was prescribed to you on or about May 30, 2017.

> **ANSWER NO. 101:** Deny. Doctor Tye did not request Mr. Hilliard to disclose the medications he used in May 2017.

**REQUEST FOR ADMISSION NO. 102:** Please admit that, as reflected on HILLIARD-01469 and HILLIARD-01481, on or about May 30, 2017, you were prescribed Oxycodone (Roxicodone).

> **ANSWER NO. 102:** Admit.

**REQUEST FOR ADMISSION NO. 103:** Please admit that you used the Oxycodone (Roxicodone) that was prescribed to you on or about May 30, 2017.

> **ANSWER NO. 103:** Deny. Mr. Hilliard used his prescriptions as prescribed. He does specifically recall that he did not use Oxycodone or OxyContin while at work. He returned to work June 7, 2017.

**REQUEST FOR ADMISSION NO. 104:** Please admit that you did not disclose to Dr. Tye in your fitness for duty examination that occurred on July 27, 2017, that you used the Oxycodone (Roxicodone) that was prescribed to you on or about May 30, 2017.

> **ANSWER NO. 104:** Deny. See Answer No. 101. Dr. Tye did not ask about his historical use of medications on July 27th.

**REQUEST FOR ADMISSION NO. 105:** Please admit that, as reflected on HILLIARD-01499, on or about June 7, 2017, you were prescribed Tramadol.

> **ANSWER NO. 105:** Admit. It appears that on June 7, 2017 Mr. Hilliard had an appointment at St. Luke's Orthopedic and was prescribed Tramadol (Ultram) 50 mg tablet and told to take 1

PLAINIFF'S RESPONSE TO DEFENDANT'S SECOND SET OF DISCOVERY
 - 13

tablet every 6 hours as needed for pain. This is the same time he received the release to work part-time light duty. Mr. Hilliard normally only took 1 Tramadol in the morning for his half day of work.

**REQUEST FOR ADMISSION NO. 106:** Please admit that you used the Tramadol that was prescribed to you on or about June 7, 2017.

**ANSWER NO. 106:** Admit. Mr. Hilliard cannot recall when or how much of the Tramadol he used but it was his habit and practice to take 1 Tramadol in the morning before he went to work to help him while at work.

**REQUEST FOR ADMISSION NO. 107:** Please admit that, as reflected on HILLIARD-01513, on or about June 12, 2017, you were prescribed Oxycodone.

**ANSWER NO. 107:** Admit. The actual record refers to Oxycodone (Roxicodone) 5mg total every 4 hours as needed for severe pain beginning June 12 and ending June 22, 2017.

**REQUEST FOR ADMISSION NO. 108:** Please admit that you used the Oxycodone that was prescribed to you on or about June 12, 2017 or take before going to work in the morning.

**ANSWER NO. 108:** Deny. Mr. Hilliard cannot recall each and every time he used the medication prescribed. It was his habit and practice to only use this medication after work or at night. He did not use this at work.

**REQUEST FOR ADMISSION NO. 109:** Please admit that you did not disclose to Dr. Tye in your fitness for duty examination that occurred on July 27, 2017.

**ANSWER NO. 109:** Deny. Dr. Tye did not ask Mr. Hilliard on July 27th about his use of drugs on June 12, 2017. He was only asked what he was currently taking.

**REQUEST FOR ADMISSION NO. 110:** Please admit that, as reflected on HILLIARD-01557, as of on or around June 20, 2017, you were using Tramadol.

**ANSWER NO. 110:** Admit. See answer to Request No. 105 and 106. Mr. Hilliard did not

PLAINIFF'S RESPONSE TO DEFENDANT'S SECOND SET OF DISCOVERY
 - 14

take medication while he was at work. He took Tramadol shortly before going to work to help him while at work.

**REQUEST FOR ADMISSION NO. 111:**   Please admit that, as reflected on HILLIARD-01571, on or about June 21, 2017, you were prescribed Tramadol.

**ANSWER NO. 111:** Admit. On June 21, 2017 St. Luke's orthopedics Phillip Stevenson PA ordered a refill of the prescription for use from June 21-July 10, 2017 and was to be used "as needed." Mr. Hilliard would take one pill in the morning and could have taken 1 after work on occasion.

**REQUEST FOR ADMISSION NO. 112:**   Please admit that you used the Tramadol that was prescribed to you on or about June 21, 2017.

**ANSWER NO. 112:** Admit. Mr. Hilliard cannot recall each and every time he took Tramadol. It was his habit and practice to use his medication as prescribed but he did not take medication with him to work. He used the Oxycodone after work and at night and occasionally early in the morning if needed. He took the Tramadol in the morning before work.

**REQUEST FOR ADMISSION NO. 113:**   Please admit that, as reflected on HILLIARD-01584, on or about July 5, 2017, you requested a refill of a prescription for Oxycodone.

**ANSWER NO. 113:** Admit. On or about July 5th Mr. Hilliard called to request a refill of both "oxy" and "tramadol." The "oxy" probably refers to the "Roxicodone" 5mg prescribed beginning June 12th and ending June 22nd. The Tramadol was scheduled to run out July 10th.

**REQUEST FOR ADMISSION NO. 114:**   Please admit that, as reflected on HILLIARD-01584, on or about July 5, 2017, you requested a refill of a prescription for Tramadol.

**ANSWER NO. 114:** Admit. See Answer No. 113.

**REQUEST FOR ADMISSION NO. 115:**   Please admit that, as reflected on HILLIARD-

PLAINIFF'S RESPONSE TO DEFENDANT'S SECOND SET OF DISCOVERY
 - 15

01584, on or about July 7, 2017, you called to follow up on your request for refills of prescriptions for Oxycodone and Tramadol.

**ANSWER NO. 115:** Admit. See Answers No. 113 and 114.

**REQUEST FOR ADMISSION NO. 116:**  Please admit that, as reflected on HILLIARD-01595, on or about July 10, 2017, you were prescribed Oxycodone.

**ANSWER NO. 116:** Admit. Mr. Hilliard had a doctor visit July 10, 2017 at St. Luke's Orthopedic and met with PA Phillip Stevenson who determined his medications should be refilled. The refill for Roxicodone was for 60 tablets 5mg every 6 hours as needed for pain between July 10 and August 3, 2017. The records reflect the Tramadol refill was for 60 tablets July 10 to July 13 which is clearly a record entry error.

**REQUEST FOR ADMISSION NO. 117:**  Please admit that you used the Oxycodone that was prescribed to you on or about July 10, 2017.

**ANSWER NO. 117:** Deny. Mr. Hilliard began decreasing his use of Roxicodone after July 10 at the request of Sheriff Carter and Chief Deputy Newman. Mr. Hilliard did continue to use the medication off work but began decreasing to the point he experienced adverse health effects requiring treatment and medication management. Mr. Hilliard used the medications as prescribed but began weaning himself off the Roxicodone.

**REQUEST FOR ADMISSION NO. 118:**  Please admit that you did not disclose to Dr. Tye in your fitness for duty examination that occurred on July 27, 2017, that you used the Oxycodone that was prescribed to you on or about July 10, 2017.

**ANSWER NO. 118:** Deny. Dr. Tye did not ask Mr. Hilliard what he was taking for medication on July 10, 2017. Mr. Hilliard had taken Tramadol on July 10th which he disclosed to Dr. Tye.

PLAINIFF'S RESPONSE TO DEFENDANT'S SECOND SET OF DISCOVERY
 - 16

**REQUEST FOR ADMISSION NO. 119:** Please admit that, as reflected on HILLIARD-01595, on or about July 10, 2017, you were prescribed Tramadol.

**ANSWER NO. 119:** Admit. This is the same medical record referred to in request 116. See answer 116.

**REQUEST FOR ADMISSION NO. 120:** Please admit that you used the Tramadol that was prescribed to you on or about July 10, 2017.

**ANSWER NO. 120:** Admit. Mr. Hilliard's habit and practice was to take Tramadol before going to work each morning after June 7th.

**REQUEST FOR ADMISSION NO. 121:** Please admit that, as reflected on HILLIARD-00029 – HILLIARD-00030, on or about July 12, 2017, you had a session with Dr. Mark Gritton during which you discussed your opioid use and withdrawal symptoms.

**ANSWER NO. 121:** Admit. I started to wean myself off of the pain medications so I could go back to work. That caused adverse effects so I had to stop using more gradually,

**REQUEST FOR ADMISSION NO. 122:** Please admit that, as reflected on HILLIARD-00029 – HILLIARD-00030, as of on or about July 12, 2017, you were experiencing symptoms of withdrawal related to opioid use.

**ANSWER NO. 122:** Admit.

**REQUEST FOR ADMISSION NO. 123:** Please admit that you did not disclose to Dr. Tye in your fitness for duty examination that occurred on July 27, 2017, that as of on or about July 12, 2017, you were experiencing symptoms of withdrawal related to opioid use.

**ANSWER NO. 123:** Deny. Mr. Hilliard does believe that topic came up very briefly in his discussion with Dr. Tye, likely at the August meeting.

**REQUEST FOR ADMISSION NO. 124:** Please admit that, as reflected on HILLIARD-

PLAINIFF'S RESPONSE TO DEFENDANT'S SECOND SET OF DISCOVERY
 - 17

01628, as of on or around July 13, 2017, you were using Oxycodone.

**ANSWER NO. 124:** Admit. Mr. Hilliard began tapering off Oxycodone as directed by Dr. Waters. See HILLIARD-001630.

**REQUEST FOR ADMISSION NO. 125:** Please admit that you did not disclose to Dr. Tye in your fitness for duty examination that occurred on July 27, 2017, that you were using Oxycodone as of on or around July 13, 2017.

**ANSWER NO. 125:** Deny. Dr. Tye did not ask Mr. Hilliard what he was using on July 13, 2017.

**REQUEST FOR ADMISSION NO. 126:** Please admit that, as reflected on HILLIARD-01628, as of on or around July 13, 2017, you had, for several months, been using one tab of Oxycodone four times per day.

**ANSWER NO. 126:** Deny. Mr. Hilliard used his medication as prescribed while off work following his surgery. After returning to work part-time he was careful to not take oxy at work. He was only working part-time and was able to take oxy after work and at night. He began decreasing further after July 10th leading to withdrawal symptoms.

**REQUEST FOR ADMISSION NO. 127:** Please admit that you did not disclose to Dr. Tye in your fitness for duty examination that occurred on July 27, 2017, that, as of on or around July 13, 2017, you had, for several months, been using one tab of Oxycodone four times per day.

**ANSWER NO. 127:** Deny. Dr. Tye did not ask Mr. Hilliard what medications Hilliard took historically. He only asked what medication he was taking "currently" referring to July 27th. At the time Mr. Hilliard had greatly decreased his medication to the point he would not be "on medication" at work. On July 27th Mr. Hilliard did not take any medication.

**REQUEST FOR ADMISSION NO. 128:** Please admit that, as reflected on HILLIARD-

PLAINIFF'S RESPONSE TO DEFENDANT'S SECOND SET OF DISCOVERY
 - 18

01643, as of on or around July 24, 2017, you were using Oxycodone.

**ANSWER NO, 128:** Admit. Mr. Hilliard was "tapering down off oxycodone" as reflected in the records and consistent with medical advice. He was off Oxycodone July 27th.

**REQUEST FOR ADMISSION NO. 129:** Please admit that you did not disclose to Dr. Tye in your fitness for duty examination that occurred on July 27, 2017, that you were using Oxycodone on or around July 24, 2017.

**ANSWER NO. 129:** Deny. Dr. Tye did not ask Captain Hilliard about his drug use on July 24, 2017.

**REQUEST FOR ADMISSION NO. 130:** Please admit that you did not disclose to Dr. Tye in your fitness for duty examination that occurred on July 27, 2017, that you were using Oxycodone.

**ANSWER NO. 130:** Admit. Captain Hilliard did not use oxycodone July 27th.

**REQUEST FOR ADMISSION NO. 131:** Please admit that you did not disclose to Dr. Tye in your fitness for duty examination that occurred on July 27, 2017, that you were addicted to Oxycodone.

**ANSWER NO. 131:** Admit.

**REQUEST FOR ADMISSION NO. 132:** Please admit that you did not disclose to Dr. Tye in your fitness for duty examination that occurred on July 27, 2017, that you were investigated for prescription drug use in or around early 2009.

**ANSWER NO. 132:** Deny. Dr. Tye did not inquire about the investigation that was unfounded.

**REQUEST FOR ADMISSION NO. 133:** Please admit that documents Bates range HILLIARD00001 – HILLIARD00054 are true and authentic copies of genuine original

PLAINIFF'S RESPONSE TO DEFENDANT'S SECOND SET OF DISCOVERY
 - 19

documents.

**ANSWER NO. 133:** Admit. These are the records Crosspointe provided to Plaintiff in response to our written request for all of their "true and correct" "notes and records."

**REQUEST FOR ADMISSION NO. 134:**   Please admit that documents Bates range HILLIARD00001 – HILLIARD00054 were made at or near the time of the regularly conducted activity to which the documents pertain.

**ANSWER NO. 134:** Deny. Mr. Hilliard does not know the specifics of record keeping practiced at Crosspointe.

**REQUEST FOR ADMISSION NO. 135:**   Please admit that documents Bates range HILLIARD00001 – HILLIARD00054 were made by a person with knowledge of the activity to which the documents pertain, or were made from information transmitted by a person with knowledge of the activity to which the documents pertain.

**ANSWER NO. 135:** Admit. Mr. Hilliard is unaware of the Crosspointe business practices.

**REQUEST FOR ADMISSION NO. 136:**   Please admit that documents Bates range HILLIARD-00001 – HILLIARD-00054 were prepared and kept by Crosspointe Family Services in the course of regularly conducted activity of a business, organization, occupation, or calling.

**ANSWER NO. 136:** Admit.

**REQUEST FOR ADMISSION NO. 137:**   Please admit that documents Bates range HILLIARD-00001 – HILLIARD-00054 were made in the regular practice of the activity to which the documents pertain.

**ANSWER NO. 137:** Admit. This request is vague and ambiguous and more

PLAINIFF'S RESPONSE TO DEFENDANT'S SECOND SET OF DISCOVERY
 - 20

appropriately addressed to the record keeper at Crosspointe Family Services.

**REQUEST FOR ADMISSION NO. 138:**  Please admit that neither the source of the information, nor the method or circumstances of preparation of information, in the documents Bates range HILLIARD-00001 – HILLIARD-00054 indicates a lack of trustworthiness.

**ANSWER NO. 138:** Admit. Plaintiff lacks information to admit or deny.

**REQUEST FOR ADMISSION NO. 139:**  Please admit that all foundational requirements for admission of documents Bates range HILLIARD-00001 – HILLIARD-00054 have been satisfied.

**ANSWER NO. 139:** Admit. Plaintiff lacks information to admit or deny.

**REQUEST FOR ADMISSION NO. 140:**  Please admit that the statements in documents Bates range HILLIARD-00001 – HILLIARD-00054 are statements made for and reasonably pertinent to purposes of medical diagnosis or treatment.

**ANSWER NO. 140:** Admit. Plaintiff lacks information to admit or deny.

**REQUEST FOR ADMISSION NO. 141:**  Please admit that the statements in documents Bates range HILLIARD-00001 – HILLIARD-00054 describe medical history, past or present symptoms or sensations, or the inception or general cause of such symptoms.

**ANSWER NO. 141:** Admit. Plaintiff lacks knowledge sufficient to admit or deny.

**REQUEST FOR ADMISSION NO. 142:**  Please admit that documents Bates range HILLIARD-00001 – HILLIARD-00054 are certified as correct by the custodian or other person authorized to make the certification.

**ANSWER NO. 142:** Admit.

**REQUEST FOR ADMISSION NO. 143:**  Please admit that documents Bates range HILLIARD-0001980 – HILIARD-0001982 are true and authentic copies of genuine original

PLAINIFF'S RESPONSE TO DEFENDANT'S SECOND SET OF DISCOVERY
 - 21

documents.

**ANSWER NO. 143:** Admit.

**REQUEST FOR ADMISSION NO. 144:** Please admit that documents Bates range HILLIARD-0001980 – HILIARD-0001982 were made at or near the time of the regularly conducted activity to which the documents pertain.

**ANSWER NO. 144:** Admit.

**REQUEST FOR ADMISSION NO. 145:** Please admit that documents Bates range HILLIARD-0001980 – HILLIARD-0001982 were made by a person with knowledge of the activity to which the documents pertain, or were made from information transmitted by a person with knowledge of the activity to which the documents pertain.

**ANSWER NO. 145:** Admit.

**REQUEST FOR ADMISSION NO. 146:** Please admit that documents Bates range HILLIARD-0001980 – HILLIARD-0001982 were prepared and kept by Crosspointe Family Services in the course of regularly conducted activity of a business, organization, occupation, or calling.

**ANSWER NO. 146:** Admit.

**REQUEST FOR ADMISSION NO. 147:** Please admit that documents Bates range HILLIARD-0001980 – HILIARD-0001982 were made in the regular practice of the activity to which the documents pertain.

**ANSWER NO. 147:** Admit.

**REQUEST FOR ADMISSION NO. 148:** Please admit that neither the source of the information, nor the method or circumstances of preparation of information, in the documents Bates range HILLIARD-0001980 – HILLIARD-0001982 indicates a lack of trustworthiness.

PLAINIFF'S RESPONSE TO DEFENDANT'S SECOND SET OF DISCOVERY
- 22

**ANSWER NO. 148:** Admit.

**REQUEST FOR ADMISSION NO. 149:** Please admit that all foundational requirements for admission of documents Bates range HILLIARD-0001980 – HILIARD-0001982 have been satisfied.

**ANSWER NO. 149:** Admit.

**REQUEST FOR ADMISSION NO. 150:** Please admit that documents Bates range HILLIARD-0001986 – HILLIARD-0002007 are true and authentic copies of genuine original documents.

**ANSWER NO. 150:** Admit

**REQUEST FOR ADMISSION NO. 151:** Please admit that documents Bates range HILLIARD-0001986 – HILLIARD-0002007 were made at or near the time of the regularly conducted activity to which the documents pertain.

**ANSWER NO. 151:** Deny. Plaintiff does not have sufficient knowledge to admit or deny.

**REQUEST FOR ADMISSION NO. 152:** Please admit that documents Bates range HILLIARD-0001986 – HILLIARD-0002007 were made by a person with knowledge of the activity to which the documents pertain, or were made from information transmitted by a person with knowledge of the activity to which the documents pertain.

**ANSWER NO. 152:** Admit.

**REQUEST FOR ADMISSION NO. 153:** Please admit that documents Bates range HILLIARD-0001986 – HILLIARD-0002007 were prepared and kept by Crosspointe Family Services in the course of regularly conducted activity of a business, organization, occupation, or calling.

PLAINIFF'S RESPONSE TO DEFENDANT'S SECOND SET OF DISCOVERY
- 23

**ANSWER NO. 153:** Admit.

**REQUEST FOR ADMISSION NO. 154:** Please admit that documents Bates range HILLIARD-0001986 – HILLIARD-0002007 were made in the regular practice of the activity to which the documents pertain.

**ANSWER NO. 154:** Deny. Ambiguous.

**REQUEST FOR ADMISSION NO. 155:** Please admit that neither the source of the information, nor the method or circumstances of preparation of information, in the documents Bates range HILLIARD-0001986 – HILLIARD-0002007 indicates a lack of trustworthiness.

**ANSWER NO. 155:** Admit.

**REQUEST FOR ADMISSION NO. 156:** Please admit that all foundational requirements for admission of documents Bates range HILLIARD-0001986 – HILLIARD-0002007 have been satisfied.

**ANSWER NO. 156:** Admit.

**REQUEST FOR ADMISSION NO. 157:** Please admit that the statements in documents Bates range HILLIARD-0001986 – HILLIARD-0002007 are statements made for and reasonably pertinent to purposes of medical diagnosis or treatment.

**ANSWER NO. 157:** Admit

**REQUEST FOR ADMISSION NO. 158:** Please admit that the statements in documents Bates range HILLIARD-0001986 – HILLIARD-0002007 describe medical history, past or present symptoms or sensations, or the inception or general cause of such symptoms.

REQUEST FOR ADMISSION NO. 159:   Please admit that documents Bates range HILLIARD-00055 – HILLIARD-01899 are true and authentic copies of genuine original documents.

PLAINIFF'S RESPONSE TO DEFENDANT'S SECOND SET OF DISCOVERY
 - 24

**ANSWER NO. 158:** Admit. The records speak for themselves.

**REQUEST FOR ADMISSION NO. 160:** Please admit that documents Bates range HILLIARD-00055 – HILLIARD-01899 were made at or near the time of the regularly conducted activity to which the documents pertain.

**ANSWER NO. 160:** Admit. The records do not appear to be complete but Hilliard assumes they were regularly updated. Hilliard is without sufficient information to admit or deny accurately.

**REQUEST FOR ADMISSION NO. 161:** Please admit that documents Bates range HILLIARD-00055 – HILLIARD-01899 were made by a person with knowledge of the activity to which the documents pertain, or were made from information transmitted by a person with knowledge of the activity to which the documents pertain.

**ANSWER NO. 161:** Admit.

**REQUEST FOR ADMISSION NO. 162:** Please admit that documents Bates range HILLIARD-00055 – HILLIARD-01899 were prepared and kept by St. Luke's Clinics & Magic Valley Regional Medical Center in the course of regularly conducted activity of a business, organization, occupation, or calling.

**ANSWER NO. 162:** Admit.

**REQUEST FOR ADMISSION NO. 163:** Please admit that documents Bates range HILLIARD-00055 – HILLIARD-01899 were made in the regular practice of the activity to which the documents pertain.

**ANSWER NO. 163:** Admit. Although the request is ambiguous, and the records appear to be incomplete, Hilliard admits the records are admissible evidence.

**REQUEST FOR ADMISSION NO. 164:** Please admit that neither the source of the

PLAINIFF'S RESPONSE TO DEFENDANT'S SECOND SET OF DISCOVERY
 - 25

information, nor the method or circumstances of preparation of information, in the documents Bates range HILLIARD-00055 – HILLIARD-01899 indicates a lack of trustworthiness.

**ANSWER NO. 164:** Admit.

**REQUEST FOR ADMISSION NO. 165:** Please admit that all foundational requirements for admission of documents Bates range HILLIARD-00055 – HILLIARD-01899 have been satisfied.

**ANSWER NO. 165:** Admit.

**REQUEST FOR ADMISSION NO. 166:** Please admit that the statements in documents Bates range HILLIARD-00055 – HILLIARD-01899 are statements made for and reasonably pertinent to purposes of medical diagnosis or treatment.

**ANSWER NO. 166:** Admit.

**REQUEST FOR ADMISSION NO. 167:** Please admit that the statements in documents Bates range HILLIARD-00055 – HILLIARD-01899 describe medical history, past or present symptoms or sensations, or the inception or general cause of such symptoms.

**ANSWER NO. 167:** Admit.

**REQUEST FOR ADMISSION NO. 168:** Please admit that documents Bates range HILLIARD-00055 – HILLIARD-01899 are certified as correct by the custodian or other person authorized to make the certification.

**ANSWER NO. 168:** Admit.

**REQUEST FOR ADMISSION NO. 169:** Please admit that documents Bates range HILLIARD-02025 – HILLIARD-02028 are true and authentic copies of genuine original documents.

**ANSWER NO. 169:** Admit.

PLAINIFF'S RESPONSE TO DEFENDANT'S SECOND SET OF DISCOVERY
 - 26

**REQUEST FOR ADMISSION NO. 170:** Please admit that documents Bates range HILLIARD-02025 – HILLIARD-02028 were made at or near the time of the regularly conducted activity to which the documents pertain.

**ANSWER NO. 170:** Admit.

**REQUEST FOR ADMISSION NO. 171:** Please admit that documents Bates range HILLIARD-02025 – HILLIARD-02028 were made by a person with knowledge of the activity to which the documents pertain, or were made from information transmitted by a person with knowledge of the activity to which the documents pertain.

**ANSWER NO. 171:** Admit.

**REQUEST FOR ADMISSION NO. 172:** Please admit that documents Bates range HILLIARD-02025 – HILLIARD-02028 were prepared and kept by St. Luke's Health System in the course of regularly conducted activity of a business, organization, occupation, or calling.

**ANSWER NO. 172:** Admit.

**REQUEST FOR ADMISSION NO. 173:** Please admit that documents Bates range HILLIARD-02025 – HILLIARD-02028 were made in the regular practice of the activity to which the documents pertain.

**ANSWER NO. 173:** Admit.

**REQUEST FOR ADMISSION NO. 174:** Please admit that neither the source of the information, nor the method or circumstances of preparation of information, in the documents Bates range HILLIARD-02025 – HILLIARD-02028 indicates a lack of trustworthiness.

**ANSWER NO. 174:** Admit.

**REQUEST FOR ADMISSION NO. 175:** Please admit that all foundational requirements for admission of documents Bates range HILLIARD-02025 – HILLIARD-02028 have been

PLAINIFF'S RESPONSE TO DEFENDANT'S SECOND SET OF DISCOVERY
 - 27

satisfied.

**ANSWER NO. 175:** Admit.

**REQUEST FOR ADMISSION NO. 176:**   Please admit that documents Bates range HILLIARD-02100 – HILLIARD-02115 are true and authentic copies of genuine original documents.

**ANSWER NO. 176:** Admit.

**REQUEST FOR ADMISSION NO. 177:**   Please admit that documents Bates range HILLIARD-02100 – HILLIARD-02115 were made at or near the time of the regularly conducted activity to which the documents pertain.

**ANSWER NO. 177:** Admit.

**REQUEST FOR ADMISSION NO. 178:**    Please admit that documents Bates range HILLIARD-02100 – HILLIARD-02115 were made by a person with knowledge of the activity to which the documents pertain, or were made from information transmitted by a person with knowledge of the activity to which the documents pertain.

**ANSWER NO. 178:** Admit.

**REQUEST FOR ADMISSION NO. 179:**   Please admit that documents Bates range HILLIARD-02100 – HILLIARD-02115 were prepared and kept by St. Luke's Health System in the course of regularly conducted activity of a business, organization, occupation, or calling.

**ANSWER NO. 179:** Admit.

**REQUEST FOR ADMISSION NO. 180:**   Please admit that documents Bates range HILLIARD-02100 – HILLIARD-02115 were made in the regular practice of the activity to which the documents pertain.

**ANSWER NO. 180:** Admit.

**REQUEST FOR ADMISSION NO. 181:** Please admit that neither the source of the information, nor the method or circumstances of preparation of information, in the documents Bates range HILLIARD-02100 – HILLIARD-02115 indicates a lack of trustworthiness.

    **ANSWER NO. 181:** Admit.

**REQUEST FOR ADMISSION NO. 182:** Please admit that all foundational requirements for admission of documents Bates range HILLIARD-02100 – HILLIARD-02115 have been satisfied.

    **ANSWER NO. 182:** Admit.

**REQUEST FOR ADMISSION NO. 183:** Please admit that documents Bates range HILLIARD-02120 – HILLIARD-02281 are true and authentic copies of genuine original documents.

    **ANSWER NO. 183:** Admit.

**REQUEST FOR ADMISSION NO. 184:** Please admit that documents Bates range HILLIARD-02120 – HILLIARD-02281 were made at or near the time of the regularly conducted activity to which the documents pertain.

    **ANSWER NO. 184:** Admit.

**REQUEST FOR ADMISSION NO. 185:** Please admit that documents Bates range HILLIARD-02120 – HILLIARD-02281 were made by a person with knowledge of the activity to which the documents pertain, or were made from information transmitted by a person with knowledge of the activity to which the documents pertain.

    **ANSWER NO. 185:** Admit.

**REQUEST FOR ADMISSION NO. 186:** Please admit that documents Bates range HILLIARD-02120 – HILLIARD-02281 were prepared and kept by St. Luke's Health System in

PLAINIFF'S RESPONSE TO DEFENDANT'S SECOND SET OF DISCOVERY
- 29

the course of regularly conducted activity of a business, organization, occupation, or calling.

**ANSWER NO. 186:** Admit.

**REQUEST FOR ADMISSION NO. 187:**   Please admit that documents Bates range HILLIARD-02120 – HILLIARD-02281 were made in the regular practice of the activity to which the documents pertain.

**ANSWER NO. 187:** Admit.

**REQUEST FOR ADMISSION NO. 188:**   Please admit that neither the source of the information, nor the method or circumstances of preparation of information, in the documents Bates range HILLIARD-02120 – HILLIARD-02281 indicates a lack of trustworthiness.

**ANSWER NO. 188:** Admit.

**REQUEST FOR ADMISSION NO. 189:** Please admit that all foundational requirements for admission of documents Bates range HILLIARD-02120 – HILLIARD-02281 have been satisfied.

**ANSWER NO. 189:** Admit.

**REQUEST FOR ADMISSION NO. 190:** Please admit that the statements in documents Bates range HILLIARD-02120 – HILLIARD-02281 are statements made for and reasonably pertinent to purposes of medical diagnosis or treatment.

**ANSWER NO. 190:** Admit.

**REQUEST FOR ADMISSION NO. 191:** Please admit that the statements in documents Bates range HILLIARD-02120 – HILLIARD-02281 describe medical history, past or present symptoms or sensations, or the inception or general cause of such symptoms.

**ANSWER NO. 191:** Admit.

**REQUEST FOR ADMISSION NO. 192:**   Please admit that documents Bates range

HILLIARD-02120 – HILLIARD-02281 are certified as correct by the custodian or other person authorized to make the certification.

**ANSWER NO. 192:** Admit.

**REQUEST FOR ADMISSION NO. 193:**    Please admit that documents Bates range HILLIARD-01962 – HILLIARD-01964 are true and authentic copies of genuine original documents.

**ANSWER NO. 193:** Admit.

**REQUEST FOR ADMISSION NO. 194:**    Please admit that documents Bates range HILLIARD-01962– HILLIARD-01964 were made at or near the time of the regularly conducted activity to which the documents pertain.

**ANSWER NO. 194:** Admit.

**REQUEST FOR ADMISSION NO. 195:**    Please admit that documents Bates range HILLIARD-01962– HILLIARD-01964 were made by a person with knowledge of the activity to which the documents pertain, or were made from information transmitted by a person with knowledge of the activity to which the documents pertain.

**ANSWER NO. 195:** Admit.

**REQUEST FOR ADMISSION NO. 196:**    Please admit that documents Bates range HILLIARD-01962– HILLIARD-01964 were prepared and kept by St. Luke's Family Medicine in the course of regularly conducted activity of a business, organization, occupation, or calling.

**ANSWER NO. 196:** Admit.

**REQUEST FOR ADMISSION NO. 197:**    Please admit that documents Bates range HILLIARD-01962– HILLIARD-01964 were made in the regular practice of the activity to which the documents pertain.

PLAINIFF'S RESPONSE TO DEFENDANT'S SECOND SET OF DISCOVERY
 - 31

**ANSWER NO. 197:** Admit.

**REQUEST FOR ADMISSION NO. 198:** Please admit that neither the source of the information, nor the method or circumstances of preparation of information, in the documents Bates range HILLIARD-01962– HILLIARD-01964 indicates a lack of trustworthiness.

**ADMIT NO. 198:** Admit.

**REQUEST FOR ADMISSION NO. 199:** Please admit that all foundational requirements for admission of documents Bates range HILLIARD-01962– HILLIARD-01964 have been satisfied.

**ANSWER NO. 199:** Admit.

**REQUEST FOR ADMISSION NO. 200:** Please admit that documents Bates range HILLIARD-01962– HILLIARD-01964 are certified as correct by the custodian or other person authorized to make the certification.

**ANSWER NO. 200:** Admit.

**REQUEST FOR ADMISSION NO. 201:** Please admit that documents Bates range HILLIARD-02033 – HILLIARD-02099 are true and authentic copies of genuine original documents.

**ANSWER NO. 201:** Admit.

**REQUEST FOR ADMISSION NO. 202**: Please admit that documents Bates range HILLIARD-02033 – HILLIARD-02099 were made at or near the time of the regularly conducted activity to which the documents pertain.

**ANSWER NO. 202:** Admit.

**REQUEST FOR ADMISSION NO. 203:** Please admit that documents Bates range HILLIARD-02033 – HILLIARD-02099 were made by a person with knowledge of the activity

to which the documents pertain, or were made from information transmitted by a person with knowledge of the activity to which the documents pertain.

**ANSWER NO. 203:** Admit.

**REQUEST FOR ADMISSION NO. 204:** Please admit that documents Bates range HILLIARD-02033 – HILLIARD-02099 were prepared and kept by St. Luke's Family Medicine in the course of regularly conducted activity of a business, organization, occupation, or calling.

**ANSWER NO. 204:** Admit.

**REQUEST FOR ADMISSION NO. 205:** Please admit that documents Bates range HILLIARD-02033 – HILLIARD-02099 were made in the regular practice of the activity to which the documents pertain.

**ANSWER NO. 205:** Admit.

**REQUEST FOR ADMISSION NO. 206:** Please admit that neither the source of the information, nor the method or circumstances of preparation of information, in the documents Bates range HILLIARD-02033 – HILLIARD-02099 indicates a lack of trustworthiness.

**ANSWER NO. 206:** Admit.

**REQUEST FOR ADMISSION NO. 207:** Please admit that all foundational requirements for admission of documents Bates range HILLIARD-02033 – HILLIARD-02099 have been satisfied.

**ANSWER NO. 207:** Admit.

**REQUEST FOR ADMISSION NO. 208:** Please admit that the statements in documents Bates range HILLIARD-02033 – HILLIARD-02099 are statements made for and reasonably pertinent to purposes of medical diagnosis or treatment.

**ANSWER NO. 208:** Admit.

PLAINIFF'S RESPONSE TO DEFENDANT'S SECOND SET OF DISCOVERY
 - 33

**REQUEST FOR ADMISSION NO. 209:** Please admit that the statements in documents Bates range HILLIARD-02033 – HILLIARD-02099 describe medical history, past or present symptoms or sensations, or the inception or general cause of such symptoms.

**ANSWER NO.209:** Admit.

**REQUEST FOR ADMISSION NO. 210:** Please admit that documents Bates range HILLIARD-02033 – HILLIARD-02099 are certified as correct by the custodian or other person authorized to make the certification.

**ANSWER NO. 210:** Admit.

**REQUEST FOR ADMISSION NO. 211:** Please admit that documents Bates range HILLIARD-01900 – HILLIARD-01961 are true and authentic copies of genuine original documents.

**ANSWER NO. 211:** Deny. The records produced by Dr. Tye contain a newspaper article and Plaintiff does not believe all records of Dr. Tye have been produced. The records do not appear to be made contemporaneously with the events and omit events. Dr. Tye is an expert retained by TFCSO and therefore is not available to Plaintiffs to inquire further.

**REQUEST FOR ADMISSION NO. 212:** Please admit that documents Bates range HILLIARD-01900 – HILLIARD-01961 were made at or near the time of the regularly conducted activity to which the documents pertain.

**ANSWER NO. 212:** Deny. The records produced by Dr. Tye contain a newspaper article and Plaintiff does not believe all records of Dr. Tye have been produced. The records do not appear to be made contemporaneously with the events and omit events. Dr. Tye is an expert retained by TFCSO and therefore is not available to Plaintiffs to inquire further.

**REQUEST FOR ADMISSION NO. 213:** Please admit that documents Bates range

PLAINIFF'S RESPONSE TO DEFENDANT'S SECOND SET OF DISCOVERY
 - 34

HILLIARD-01900 – HILLIARD-01961 were made by a person with knowledge of the activity to which the documents pertain, or were made from information transmitted by a person with knowledge of the activity to which the documents pertain.

 **ANSWER NO. 213:** Deny. The records produced by Dr. Tye contain a newspaper article and Plaintiff does not believe all records of Dr. Tye have been produced. The records do not appear to be made contemporaneously with the events and omit events. Dr. Tye is an expert retained by TFCSO and therefore is not available to Plaintiffs to inquire further.

**REQUEST FOR ADMISSION NO. 214:** Please admit that documents Bates range HILLIARD-01900 – HILLIARD-01961 were prepared and kept by Treasure Valley Psychological Services in the course of regularly conducted activity of a business, organization, occupation, or calling.

 **ANSWER NO. 214:** Deny. The records produced by Dr. Tye contain a newspaper article and Plaintiff does not believe all records of Dr. Tye have been produced. The records do not appear to be made contemporaneously with the events and omit events. Dr. Tye is an expert retained by TFCSO and therefore is not available to Plaintiffs to inquire further.

**REQUEST FOR ADMISSION NO. 215:** Please admit that documents Bates range HILLIARD-01900 – HILLIARD-01961 were made in the regular practice of the activity to which the documents pertain.

 **ANSWER NO. 215:** Deny. The records produced by Dr. Tye contain a newspaper article and Plaintiff does not believe all records of Dr. Tye have been produced. The records do not appear to be made contemporaneously with the events and omit events. Dr. Tye is an expert retained by TFCSO and therefore is not available to Plaintiffs to inquire further.

**REQUEST FOR ADMISSION NO. 216:** Please admit that neither the source of the

PLAINIFF'S RESPONSE TO DEFENDANT'S SECOND SET OF DISCOVERY
 - 35

information, nor the method or circumstances of preparation of information, in the documents Bates range HILLIARD-01900 – HILLIARD-01961 indicates a lack of trustworthiness.

**ANSWER NO. 216:** Deny. The records produced by Dr. Tye contain a newspaper article and Plaintiff does not believe all records of Dr. Tye have been produced. The records do not appear to be made contemporaneously with the events and omit events. Dr. Tye is an expert retained by TFCSO and therefore is not available to Plaintiffs to inquire further.

**REQUEST FOR ADMISSION NO. 217:** Please admit that all foundational requirements for admission of documents Bates range HILLIARD-01900 – HILLIARD-01961 have been satisfied.

**ANSWER NO. 217:** Deny. The records produced by Dr. Tye contain a newspaper article and Plaintiff does not believe all records of Dr. Tye have been produced. The records do not appear to be made contemporaneously with the events and omit events. Dr. Tye is an expert retained by TFCSO and therefore is not available to Plaintiffs to inquire further.

**REQUEST FOR ADMISSION NO. 218:** Please admit that the statements in documents Bates range HILLIARD-01900 – HILLIARD-01961 are statements made for and reasonably pertinent to purposes of medical diagnosis or treatment.

**ANSWER NO. 218:** Deny. The records produced by Dr. Tye contain a newspaper article and Plaintiff does not believe all records of Dr. Tye have been produced. The records do not appear to be made contemporaneously with the events and omit events. Dr. Tye is an expert retained by TFCSO and therefore is not available to Plaintiffs to inquire further.

**REQUEST FOR ADMISSION NO. 219:** Please admit that the statements in documents Bates range HILLIARD-01900 – HILLIARD-01961 describe medical history, past or present symptoms or sensations, or the inception or general cause of such symptoms.

PLAINIFF'S RESPONSE TO DEFENDANT'S SECOND SET OF DISCOVERY
- 36

**ANSWER NO. 219:** Deny. The records produced by Dr. Tye contain a newspaper article and Plaintiff does not believe all records of Dr. Tye have been produced. The records do not appear to be made contemporaneously with the events and omit events. Dr. Tye is an expert retained by TFCSO and therefore is not available to Plaintiffs to inquire further.

**REQUEST FOR ADMISSION NO. 220:** Please admit that documents Bates range HILLIARD-01900 – HILLIARD-01961 are certified as correct by the custodian or other person authorized to make the certification.

**ANSWER NO. 220:** Deny. The records produced by Dr. Tye contain a newspaper article and Plaintiff does not believe all records of Dr. Tye have been produced. The records do not appear to be made contemporaneously with the events and omit events. Dr. Tye is an expert retained by TFCSO and therefore is not available to Plaintiffs to inquire further.

DATED this 28th day of May, 2020.

HEPWORTH LAW OFFICES

By  /s/ *J. Grady Hepworth*
　　　Jeffrey J. Hepworth
　　　J. Grady Hepworth
　　　*Attorneys for Plaintiff*

PLAINIFF'S RESPONSE TO DEFENDANT'S SECOND SET OF DISCOVERY
 - 37

## CERTIFICATE OF SERVICE

The undersigned, a resident attorney of the State of Idaho, with offices at 2229 W. State Street, Boise, Idaho, certifies that on the 28th day of May, 2020, he caused a true and correct copy of the PLANIFF'S RESPONSE TO DEFENDANT'S SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSIONS to be forwarded with all required charges prepaid, by the method(s) indicated below, to the following:

| | | |
|---|---|---|
| PAMELA S. HOWLAND | Hand Delivered | _____ |
| Idaho State Bar No. 6177 | U.S. Mail | _____ |
| IDAHO EMPLOYMENT LAWYERS, PLLC | Fax | _____ |
| 1116 S. Vista Ave., #474 | Fed. Express | _____ |
| Boise, ID 83705 | ECF/Email | __X__ |
| Telephone (208) 484-8921 | | |
| Facsimile: (208) 534-7445 | | |
| Email: phowland@idemploymentlawyers.com | | |

*Attorneys for Twin Falls County Sheriff's Office;*
*Twin Falls County, Defendants*


 /s/  *J. Grady Hepworth*
J. Grady Hepworth

PLAINIFF'S RESPONSE TO DEFENDANT'S SECOND SET OF DISCOVERY
 - 38

Exhibit M



**CROSSPOINTE**
1363 Fillmore Street
Twin Falls, ID 83301-3392
Ph (208) 736-7090 Fax (208) 736-7089
**FAMILY SERVICES**

August 24, 2017

Tom Carter
Twin Falls County Sheriff
425 Shoshone St N
Twin Falls, ID 83301

RE: Brent Hilliard

Brent Hilliard has requested I provide a letter outlining his progress in treatment for his depression and anxiety, and to address his ability to return to work as deputy sheriff for the Twin Falls County Sheriff's office.

Brent initiated treatment July 18, 2017. At intake he was diagnosed with Major Depression and Anxiety. Treatment focused on resolving depressive and anxiety symptoms on a weekly basis. Brent has maintained 100% attendance to all sessions. Additionally, Brent was referred to Shelley Wray PNP for psychotropic medication evaluation and on-going medication management.

To date Brent has made excellent progress. He has learned and implemented CBT tools and strategies. His mood has stabilized and he has re-engaged in life activities. It is my professional opinion that Brent has made adequate progress in therapy to resume his employment at this time.

If I can be of further assistance in this matter please let me know.

Mark Gritton LCPC, NCC, Owner, Clinical Director

Rec - 8·29·'17



# CROSSPOINTE
## FAMILY SERVICES

21 August 2017

To Whom it may Concern,

This letter is in regards to Brent Hilliard, DOB: 08.16.1966. I have been his psychiatric medications manager since July 2017. He has stabilized on his current medication regimen and I feel he is stable enough to return to current duties and responsibilities at work. He has responded well to his current medications and he also feels that he is ready to resume his job.

If you have any questions or concerns please feel free to contact me at my office. Phone : 208.736.7090 or by fax : 208.933.2188.

Sincerely,

Shelley Wray, PMHNP-C

RC- 8-29-'17

© 2014 Chestnut Health Systems

## GAIN-I Recommendation and Referral Summary (GRRS)

| | |
|---|---|
| **Name:** Brent Hilliard | **Staff:** Justine Sweet, LCSW, QP |
| **Date of Birth:** 8/16/1966 | **Screening Date:** 8/23/2017 |

### Presenting Concerns and Identifying Information

Brent is a 51-year-old Caucasian/White (Self-described as "Caucasian") male who is married and has no children. He presented as typically groomed. He was referred to Crosspointe Mental Health for a **"fit for duty"**. Brent last attended school or training 4 to 12 months ago and has completed school through grade 12. Brent reported last working 1 to 3 months ago at the police department.

Below is a narrative summary of the evaluation procedures, a DSM-5/ICD-10 Diagnosis and Other Conditions That May Be a Focus of Clinical Attention of Brent's problems, a detailed substance use diagnosis and treatment history, an assessment of placement and service needs, the staff's recommendations for specific services within each area, and an overall level of care or program placement to best address them.

### Evaluation Procedure

As part of Brent's evaluation, the Global Appraisal of Individual Needs (GAIN) was orally administered by staff, done on computer. The staff reported no problems in providing a quiet, private environment and observed that Brent appeared cooperative.

### DSM-5/ICD-10 Diagnosis

| | |
|---|---|
| **Staff Comments** | Brent presented as likable and friendly and was forthright with his responses. |
| **Current Treatment** | Physical health treatment: "St. Luke's"; Mental health treatment: "Crosspointe". |
| **Current Medications** | "Cymbalta, Prevacid, Claritin, Clonipin"; "Cymbalta, Klonipin (temporarily)". |
| **Current Allergies** | |

**Diagnoses**

F32.1 Major Depressive Disorder, Single Episode, Moderate -
. Provisional

### Substance Use Diagnoses and Treatment History
### (ASAM criteria A)

Brent reported first using any alcohol or other drugs at age 16 and liking to use alcohol the most. He did not think substance use disorder treatment was needed.

**Other Substance Use:** Though no criteria were met for any further substance use disorder diagnoses, he reported using the following: alcohol; cannabis; cocaine; amphetamines. All of this was self-reported adolescent use.

Printed: 8/27/2017

1

_DC. 8-29-'17_

BH

HILLIARD02173

Client ID: 1111          GAIN-I Recommendation and Referral Summary (GRRS)   Assessment Date: 8/23/2017 12:00:00 AM

**Brent does not self-report lifetime criteria for substance use disorder. Based on the information provided, staff's recommendation is that there is no need for substance use disorder treatment.**

## Level of Care and Service Needs
## (ASAM criteria B)

### Dimension B1 - Acute Alcohol or Drug Intoxication or Withdrawal Potential

Brent stated last using any substance 3 to 7 days prior to the evaluation, when he and his wife went to dinner.

**RECOMMENDATION: None**

### Dimension B2 - Biomedical Conditions and Complications

**Overall Health and Pain Assessment:**
During the past year, Brent rated his overall health as good. Brent scored in the no/minimal range of the Health Problems Scale, reporting that in the past 90 days he was bothered by health problems on 0 days and kept from meeting his responsibilities. Brent reports no history of smoking or using any kind of tobacco products.

**Nutrition and Exercise:**
Brent reported standing about 69 inches tall and weighing approximately 190 pounds without shoes. According to these statistics, Brent is overweight.

**Treatment History for Health Problems:**
Brent reported a history of 3 emergency room admissions; 6 hospital admissions; and medication ("Cymbalta, Prevacid, Claritin, Clonipin") currently being taken for allergies or health problems. The last time he was seen by a doctor or nurse about a health problem was within the past two days. During the past 90 days, Brent reported the following related to health problems: took medication on 90 day(s). He is currently being treated by "St. Luke's" for the past 4months.

**RECOMMENDATION: None**

### Dimension B3 - Emotional, Behavioral, or Cognitive Conditions and Complications

**Emotional Conditions:**
Brent scored in the moderate range of the Internal Mental Distress Scale. Brent self-reported symptoms consistent with a diagnosis of a mood disorder. He reported last feeling significantly disturbed by any kind of nerve, mental, or psychological problems more than 12 months ago. Brent did not report having homicidal thoughts for someone else or suicidal thoughts toward himself.

**Behavioral Conditions:**
Brent scored in the no/minimal range of the Behavior Complexity Scale. He reported last having problems paying attention, controlling behavior, or broke rules 4 to 12 months ago.

**Arguing and Aggression:**
He reported last swearing, cursing, threatening someone, throwing something, or pushing or hitting someone in any way during an argument more than 12 months ago.

HILLIARD02174

Client ID: 1111          GAIN-I Recommendation and Referral Summary (GRRS)   Assessment Date: 8/23/2017 12:00:00 AM

**Illegal Activity and Legal System Involvement:**
He reported that he was not currently involved with the legal system. He stated he had never engaged in any behavior that might result in getting into trouble or be against the law (besides using alcohol or other drugs).

**Cognitive Conditions:**
Brent scored in the no/minimal range of the Cognitive Impairment Screen at the time of the evaluation. The staff observed no indications of developmental disabilities and no evidence of cognitive impairment.

**Treatment History for Emotional, Behavioral, or Cognitive Problems:**
According to self-report, Brent was diagnosed by a doctor, nurse, or counselor with the  following: depression. Brent reports a history of the following: currently taking medication ("Cymbalta, Klonipin (temporarily)") for mental, emotional, behavioral, or psychological problems. Brent stated that he last received treatment for a mental, emotional, behavioral, or psychological problem within the past two days. During the past 90 days, he reported: visiting a mental health doctor in an office or outpatient clinic 10 time(s) for mental, emotional, behavioral, or psychological problems; taking prescribed medication for mental, emotional, behavioral, or psychological problems on 90 day(s). Brent is currently receiving treatment from Crosspointe where treatment has been received for the past two years.

**RECOMMENDATION:  Continue counseling with Crosspointe Family Services**

**Dimension B4 - Readiness to Change**

**Reasons for Quitting:**
Brent reported that he has quit using substances and is about 100% ready to remain abstinent. During the interview, Brent did not endorse any reasons for quitting.

**RECOMMENDATION:  None**

**Dimension B5 - Relapse, Continued Use, or Continued Problem Potential**

Combined with the problems above and risks from the recovery environment below, the following conditions are possible influences on Brent's risk of relapse or continued use.
- Brent verbalized awareness that since being placed on Cymbalta, he can no longer drink even moderately.

**RECOMMENDATION:  None**

**Dimension B6 - Recovery Environment**

**Family/Home Environment:**
During the past year, Brent reported living with the following: spouse, significant companion or other sexual partner; other children over age 12.
Brent reported that of the people he regularly lived with during the past year: all were employed or in school or training full-time; none were involved in illegal activity; none got drunk weekly; none used drugs during the past 90 days; none shouted, argued, and fought most weeks; none have been in drug or alcohol treatment; and none would describe themselves as being in recovery.

HILLIARD02175

**School Environment:**
Brent reported last attending school or training 4 to 12 months ago and has completed through grade 12. During the last year of school, Brent described earning the following pattern of grades: As.

**Work Environment:**
Brent reported last working at the police department 1 to 3 months ago. Of the 20 days Brent was supposed to be at work during the past 90 days, he reported missing 0 days, being in trouble on 0 days, and being suspended on 0 days.

**Social Network Environment:**
Brent stated that of the people he had regularly worked or gone to school with during the past year: all were employed or in school or training full-time; none were involved in illegal activity; none got drunk weekly, none used drugs during the past 90 days; none shouted, argued, and fought most weeks; none have been in drug or alcohol treatment; and none would describe themselves as being in recovery.

Brent reported that of the people he had regularly socialized with during the past year: all were employed or in school or training full-time; none were involved in illegal activity; none got drunk weekly; none used drugs during the past 90 days; none shouted, argued, and fought most weeks; none have been in drug or alcohol treatment; and none would describe themselves as being in recovery.

**Sources of Social Support:**
Brent reports spending most of his free time with his wife.

**Personal Strengths:**
Brent has a steady work history, he is likable and friendly.

**Victimization:**
Brent reported a lifetime history of being attacked with a weapon; and scored in the high range of the lifetime General Victimization Scale. He stated that the last time the problem occurred was more than 12 months ago. He was not currently worried about being victimized. Brent reported that help has been received related to these issues.

**RECOMMENDATION: None**

### Summary Recommendations

Brent's special considerations, disabilities, and priority population issues include, but may not be limited to:

- Income data is missing; cannot determine percent of poverty level

Given current involvement, treatment should be coordinated with: Physical health treatment; Mental health treatment.

**Based on the American Society of Addiction Medicine (ASAM) Criteria there is no further recommendation for treatment**

**Dimension I: There is no risk for withdrawal from alcohol or other drugs.**

HILLIARD02176

Client ID: 1111          GAIN-I Recommendation and Referral Summary (GRRS)   Assessment Date: 8/23/2017 12:00:00 AM

**Dimension 2: Biomedical conditions are being met through use of primary care and/or other physician specialties'.**

**Dimension 3:  Any issues related to depression are being addressed through Crosspointe Family Services.**

**Dimension 4:  There are no issues related to readiness to change as Brent has followed through with all requirements.**

**Dimension 5:  Relapse potential is low due to Brent has minimal use potential**

**Dimension 6:  Brent is employed, has a marital relationship, and does not engage with high risk individuals**

---

### Signatures

By signing below, the following people acknowledge that they have reviewed and agree with the preceding summary and treatment planning recommendations prepared on 8/27/2017 for Brent (XPID: 1111; Name: Brent; DOB: 8/16/1966; Staff Name: Justine Sweet, LCSW, QP) from the GAIN assessment dated 8/23/2017.

_Justine Sweet Lcsw, QP_          _8/28/17_

Justine Sweet, Lcsw, QP                           Date

HILLIARD02177

Exhibit N

OCT/25/2017/WED 03:40 PM   CrossPointe          FAX No. 2087367089          P. 011

**BRENT**
**HILLIARD**
08/16/1966
ID: 12049


**CR✷SSPOINTE**
**FAMILY SERVICES**

Log / Notes
September 11, 2017
2:30pm
Justine Sweet, LCSW

### Crosspointe Family Services
### Psychotherapy Note

**Session Date:** 09/11/2017
**Treatment Code:**
90834 Ind Psychotherapy 38-52 mins

**Client:** BRENT HILLIARD   **D. O. B.:** 08/16/1966

| Start Time: 230p | End Time: 345p |
|---|---|

| If missed appointment was member contacted? | | Yes: | No: |
|---|---|---|---|

| How? | Phone: | Letter: | Email: |
|---|---|---|---|

**Provider:** Justine Sweet, Lcsw, Qp

**Diagnosis Code:** 296.32

**Mental Status:**

| Affect: Sad, Anxious and Guarded | Mood: Withdrawn |
|---|---|
| Thought Content/Process: Intact/Organized | Speech: Normal Rate and Rhythm |
| Concentration: Preoccupied | Self-Harm/Suicide Risk: None |
| Danger Risk: None | Orientation: Person, Place and Time (Times 3) |

**Who attended session:**

| Client: yes | Family: | Other: |
|---|---|---|

**I have reviewed and reconciled the medication list with the patient:** Yes _x__ No ___
Spoke with patient about taking Klonipin and that I cannot do EMDR if he is on this kind of medication.

**Problem (Current stressors and life events, therapist observations, other information ):**
Patient came to session stating that he got a DUI within the past few days. He was asked about the details and I shared with him that something about it did not sound right. He said he lives near the desert and was just out there driving around when he was pulled over. The patient was asked whether or not he drove with guns in the car and he said he sometimes. I shared my concerns with him about this. He denied that he was suicidal at this time. He said that he just got a case of the "I don't cares" regarding his standing with the police department.

**Evidenced Based Intervention(s) used during session:**
Trauma-informed treatment and developed a calm, safe place with imagery. Also, introduced patient to the self-compassion.org website.

**Patients strengths/limitations (how do these impact treatment?):**

EX  NO. 17
B. Hilliard
DATE 12-2-2019
ASSOCIATED
REPORTING & VIDEO

HILLIARD-00007

OCT/25/2017/WED 03:41 PM   CrossPointe                    FAX No. 2087367089                    P. 012

S: He is very capable and smart; L: He does not seem to realize the impact of trauma on his life and its contribution to MDD.

**Progress towards treatment goals: (Progress or lack of progress towards goals, participant's reaction):**
#1 -Patient is wanting to be free from anxiety and depression. He is currently on medications that he believes has helped him, but yet he drank and ended up with a DUI. We discussed the importance of addressing the anxiety as this will be increasing now that he has done this.

**Was patient referred to other providers or services?** x__No  __Yes  If Yes:

**Any Documents Reviewed?**  _x_No  __Yes

**Coordination of Care:**  __No  x__Yes

I staffed this patient with Mark after session.

**Risk Assessment?** x__No  __Yes; **Safety Plan:**
He was asked and denied any SI/HI at this time; although, this patient has access to firearms as he is a LEO

**Was Patient Education provided (describe):**  __No  _x_Yes  If yes:
EMDR was discussed

**Next appointment:**
Weekly

--Digitally Signed: 09/18/2017 03:08 pm   LCSW Justine Sweet, LCSW

HILLIARD-00008

OCT/25/2017/WED 03:41 PM   CrossPointe                FAX No. 2087367089                P. 013

**BRENT**
**HILLIARD**
08/16/1966
ID: 12049


# CR⊗SSPOINTE
## FAMILY SERVICES

**Log / Notes**
September 6, 2017
10:00am
Mark Gritton, LCPC,
NCC

---

Crosspointe Family Services
Psychotherapy Note

Session Date: 09/06/2017
Treatment Code:
90834 Ind Psychotherapy 38-52 mins and G8427 Current Medications Documented

Client: BRENT HILLIARD   D. O. B.: 08/16/1966

| Start Time: 10:00 AM | End Time: 10:45 AM | | |
|---|---|---|---|
| If missed appointment was member contacted? | | Yes: | No: |
| How? | Phone: | Letter: | Email: |

Provider: Mark Gritton, LCPC, NCC

Diagnosis Code: F33.1 Major Depressive; recurrent, moderate.
            F41.1 Generalized Anxiety Disorder

Mental Status:

| Affect: Appropriate | Mood: Appropriate |
|---|---|
| Thought Content/Process: Appropriate | Speech: Normal Rate and Rhythm |
| Concentration: Focused | Self-Harm/Suicide Risk: None |
| Danger Risk: None | Orientation: Person, Place and Time (Times 3) |

Who attended session:

| Client: XX | Family: | Other: |
|---|---|---|

I have reviewed and reconciled the medication list with the patient: Yes __x__  No ___
Reports medication compliance with no negative side effects.

Problem (Current stressors and life events, therapist observations, other information ):
Brent reports doing well with one exception-he feels the process to return to work is tedious. The Psychiarist the sheriff dpartment uses in Boise is taking his time in getting his report to the sheriff. We discussed processes and things happen at their own speed.

Evidenced Based Intervention(s) used during session:
CBT used in session.

Patients strengths/limitations (how do these impact treatment?):

HILLIARD-00009

OCT/25/2017/WED 03:42 PM   CrossPointe          FAX No. 2087367089          P. 014

S: Smart, willingness to use CBT tools.

Progress towards treatment goals: (Progress or lack of progress towards goals, participant's reaction):

Brent remains abstinent from all drugs except his prescribed ones. He is anxious to start work. We discussed how he needs to be patient and take things as they come. Brent is going to start seeing Justine Sweet for EMDR to address his PTSD issues. We will not meet during that time.

Was patient referred to other providers or services? _X_No _Yes  If Yes:

Any Documents Reviewed? _X_No _Yes

Coordination of Care: X_No _Yes

Risk Assessment? _No _X_Yes; Safety Plan:
No risk issues were identified.

Was Patient Education provided (describe): _X_No _Yes  If yes:

Next appointment:
TBD, Brent has transferred care to Justine Sweet for EMDR.

—Digitally Signed: 09/10/2017 09:14 pm   Admin Mark Gritton, LCPC, NCC

HILLIARD-00010

OCT/25/2017/WED 03:42 PM   CrossPointe                     FAX No. 2087367089                    P. 015

© 2014 Chestnut Health Systems

## GAIN-I Recommendation and Referral Summary (GRRS)

| | |
|---|---|
| Name: Brent Hilliard | Staff: Justine Sweet, LCSW, QP |
| Date of Birth: 8/16/1966 | Screening Date: 8/23/2017 |

### Presenting Concerns and Identifying Information

Brent is a 51-year-old Caucasian/White (Self-described as "Caucasian") male who is married and has no children. He presented as typically groomed. He was referred to Crosspointe Mental Health for a **"fit for duty"**. Brent last attended school or training 4 to 12 months ago and has completed school through grade 12. Brent reported last working 1 to 3 months ago at the police department.

Below is a narrative summary of the evaluation procedures, a DSM-5/ICD-10 Diagnosis and Other Conditions That May Be a Focus of Clinical Attention of Brent's problems, a detailed substance use diagnosis and treatment history, an assessment of placement and service needs, the staff's recommendations for specific services within each area, and an overall level of care or program placement to best address them.

### Evaluation Procedure

As part of Brent's evaluation, the Global Appraisal of Individual Needs (GAIN) was orally administered by staff, done on computer. The staff reported no problems in providing a quiet, private environment and observed that Brent appeared cooperative.

### DSM-5/ICD-10 Diagnosis

| | |
|---|---|
| **Staff Comments** | Brent presented as likable and friendly and was forthright with his responses. |
| **Current Treatment** | Physical health treatment: "St. Luke's"; Mental health treatment: "Crosspointe". |
| **Current Medications** | "Cymbalta, Prevacid, Claritin, Clonipin"; "Cymbalta, Klonipin (temporarily)". |
| **Current Allergies** | |

#### Diagnoses

F32.1 Major Depressive Disorder, Single Episode, Moderate -
. Provisional

### Substance Use Diagnoses and Treatment History
### (ASAM criteria A)

Brent reported first using any alcohol or other drugs at age 16 and liking to use alcohol the most. He did not think substance use disorder treatment was needed.

**Other Substance Use:** Though no criteria were met for any further substance use disorder diagnoses, he reported using the following: alcohol; cannabis; cocaine; amphetamines. All of this was self-reported adolescent use.

Printed: 8/27/2017                                     1

BH

HILLIARD-00011

OCT/25/2017/WED 03:42 PM   CrossPointe                    FAX No. 2087367089                 P. 016

Client ID: 1111              GAIN-I Recommendation and Referral Summary (GRRS)   Assessment Date: 8/23/2017 12:00:00 AM

Brent does not self-report lifetime criteria for substance use disorder. Based on the information provided, staff's recommendation is that there is no need for substance use disorder treatment.

### Level of Care and Service Needs
### (ASAM criteria B)

## Dimension B1 – Acute Alcohol or Drug Intoxication or Withdrawal Potential

Brent stated last using any substance 3 to 7 days prior to the evaluation, when he and his wife went to dinner.

**RECOMMENDATION: None**

## Dimension B2 - Biomedical Conditions and Complications

**Overall Health and Pain Assessment:**
During the past year, Brent rated his overall health as good. Brent scored in the no/minimal range of the Health Problems Scale, reporting that in the past 90 days he was bothered by health problems on 0 days and kept from meeting his responsibilities. Brent reports no history of smoking or using any kind of tobacco products.

**Nutrition and Exercise:**
Brent reported standing about 69 inches tall and weighing approximately 190 pounds without shoes. According to these statistics, Brent is overweight.

**Treatment History for Health Problems:**
Brent reported a history of 3 emergency room admissions; 6 hospital admissions; and medication ("Cymbalta, Prevacid, Claritin, Clonipin") currently being taken for allergies or health problems. The last time he was seen by a doctor or nurse about a health problem was within the past two days. During the past 90 days, Brent reported the following related to health problems: took medication on 90 day(s). He is currently being treated by "St. Luke's" for the past 4 months.

**RECOMMENDATION: None**

## Dimension B3 - Emotional, Behavioral, or Cognitive Conditions and Complications

**Emotional Conditions:**
Brent scored in the moderate range of the Internal Mental Distress Scale. Brent self-reported symptoms consistent with a diagnosis of a mood disorder. He reported last feeling significantly disturbed by any kind of nerve, mental, or psychological problems more than 12 months ago. Brent did not report having homicidal thoughts for someone else or suicidal thoughts toward himself.

**Behavioral Conditions:**
Brent scored in the no/minimal range of the Behavior Complexity Scale. He reported last having problems paying attention, controlling behavior, or broke rules 4 to 12 months ago.

**Arguing and Aggression:**
He reported last swearing, cursing, threatening someone, throwing something, or pushing or hitting someone in any way during an argument more than 12 months ago.

BH

HILLIARD-00012

OCT/25/2017/WED 03:43 PM   CrossPointe          FAX No. 2087367089              P. 017

Client ID: 1111                GAIN-I Recommendation and Referral Summary (GRRS)   Assessment Date: 8/23/2017 12:00:00 AM

**Illegal Activity and Legal System Involvement:**
He reported that he was not currently involved with the legal system. He stated he had never engaged in any behavior that might result in getting into trouble or be against the law (besides using alcohol or other drugs).

**Cognitive Conditions:**
Brent scored in the no/minimal range of the Cognitive Impairment Screen at the time of the evaluation. The staff observed no indications of developmental disabilities and no evidence of cognitive impairment.

**Treatment History for Emotional, Behavioral, or Cognitive Problems:**
According to self-report, Brent was diagnosed by a doctor, nurse, or counselor with the following: depression. Brent reports a history of the following: currently taking medication ("Cymbalta, Klonipin (temporarily)") for mental, emotional, behavioral, or psychological problems. Brent stated that he last received treatment for a mental, emotional, behavioral, or psychological problem within the past two days. During the past 90 days, he reported: visiting a mental health doctor in an office or outpatient clinic 10 time(s) for mental, emotional, behavioral, or psychological problems; taking prescribed medication for mental, emotional, behavioral, or psychological problems on 90 day(s). Brent is currently receiving treatment from Crosspointe where treatment has been received for the past two years.

**RECOMMENDATION: Continue counseling with Crosspointe Family Services**

**Dimension B4 - Readiness to Change**

**Reasons for Quitting:**
Brent reported that he has quit using substances and is about 100% ready to remain abstinent. During the interview, Brent did not endorse any reasons for quitting.

**RECOMMENDATION: None**

**Dimension B5 - Relapse, Continued Use, or Continued Problem Potential**
Combined with the problems above and risks from the recovery environment below, the following conditions are possible influences on Brent's risk of relapse or continued use.
- Brent verbalized awareness that since being placed on Cymbalta, he can no longer drink even moderately.

**RECOMMENDATION: None**

**Dimension B6 - Recovery Environment**

**Family/Home Environment:**
During the past year, Brent reported living with the following: spouse, significant companion or other sexual partner; other children over age 12.
Brent reported that of the people he regularly lived with during the past year: all were employed or in school or training full-time; none were involved in illegal activity; none got drunk weekly; none used drugs during the past 90 days; none shouted, argued, and fought most weeks; none have been in drug or alcohol treatment; and none would describe themselves as being in recovery.

BH

HILLIARD-00013

OCT/25/2017/WED 03:44 PM   CrossPointe                    FAX No. 2087367089                    P. 018

Client ID: 1111                    GAIN-I Recommendation and Referral Summary (GRRS)   Assessment Date: 8/23/2017 12:00:00 AM

## School Environment:

Brent reported last attending school or training 4 to 12 months ago and has completed through grade 12. During the last year of school, Brent described earning the following pattern of grades: As.

## Work Environment:

Brent reported last working at the police department 1 to 3 months ago. Of the 20 days Brent was supposed to be at work during the past 90 days, he reported missing 0 days, being in trouble on 0 days, and being suspended on 0 days.

## Social Network Environment:

Brent stated that of the people he had regularly worked or gone to school with during the past year: all were employed or in school or training full-time; none were involved in illegal activity; none got drunk weekly, none used drugs during the past 90 days; none shouted, argued, and fought most weeks; none have been in drug or alcohol treatment; and none would describe themselves as being in recovery.

Brent reported that of the people he had regularly socialized with during the past year: all were employed or in school or training full-time; none were involved in illegal activity; none got drunk weekly; none used drugs during the past 90 days; none shouted, argued, and fought most weeks; none have been in drug or alcohol treatment; and none would describe themselves as being in recovery.

## Sources of Social Support:

Brent reports spending most of his free time with his wife.

## Personal Strengths:

Brent has a steady work history, he is likable and friendly.

## Victimization:

Brent reported a lifetime history of being attacked with a weapon; and scored in the high range of the lifetime General Victimization Scale. He stated that the last time the problem occurred was more than 12 months ago. He was not currently worried about being victimized. Brent reported that help has been received related to these issues.

## RECOMMENDATION: None


### Summary Recommendations

Brent's special considerations, disabilities, and priority population issues include, but may not be limited to:

- • Income data is missing; cannot determine percent of poverty level

Given current involvement, treatment should be coordinated with: Physical health treatment; Mental health treatment.

**Based on the American Society of Addiction Medicine (ASAM) Criteria there is no further recommendation for treatment**

**Dimension I: There is no risk for withdrawal from alcohol or other drugs.**

BH

HILLIARD-00014

OCT/25/2017/WED 03:44 PM   CrossPointe          FAX No. 2087367089          P. 019

Client ID: 1111                 GAIN-I Recommendation and Referral Summary (GRRS)   Assessment Date: 8/23/2017 12:00:00 AM

**Dimension 2: Biomedical** conditions are being met through use of primary care and/or other physician specialties'.

**Dimension 3:** Any issues related to depression are being addressed through Crosspointe Family Services.

**Dimension 4:** There are no issues related to readiness to change as Brent has followed through with all requirements.

**Dimension 5:** Relapse potential is low due to Brent has minimal use potential

**Dimension 6:** Brent is employed, has a marital relationship, and does not engage with high risk individuals

---

## Signatures

By signing below, the following people acknowledge that they have reviewed and agree with the preceding summary and treatment planning recommendations prepared on 8/27/2017 for Brent (XPID: 1111; Name: Brent; DOB: 8/16/1966; Staff Name: Justine Sweet, LCSW, QP) from the GAIN assessment dated 8/23/2017.

_Justine Sweet Lcsw, QP_          _8/28/17_

Justine Sweet, Lcsw, QP                   Date

---

BH
HILLIARD-00015



**CR✥SSPOINTE**
**FAMILY SERVICES**

1363 Fillmore Street
Twin Falls, ID 83301-3392
Ph (208) 736-7699 Fax (208) 736-7069

August 24, 2017

Tom Carter
Twin Falls County Sheriff
425 Shoshone St N
Twin Falls, ID 83301

RE: Brent Hilliard

Brent Hilliard has requested I provide a letter outlining his progress in treatment for his depression and anxiety, and to address his ability to return to work as deputy sheriff for the Twin Falls County Sheriff's office.

Brent initiated treatment July 18, 2017. At intake he was diagnosed with Major Depression and Anxiety. Treatment focused on resolving depressive and anxiety symptoms on a weekly basis. Brent has maintained 100% attendance to all sessions. Additionally, Brent was referred to Shelley Wray PNP for psychotropic medication evaluation and on-going medication management.

To date Brent has made excellent progress. He has learned and implemented CBT tools and strategies. His mood has stabilized and he has re-engaged in life activities. It is my professional opinion that Brent has made adequate progress in therapy to resume his employment at this time.

If I can be of further assistance in this matter please let me know.

Mark Gritton LCPC, NCC, Owner, Clinical Director

HILLIARD-00016

OCT/25/2017/WED 03:45 PM    CrossPointe                FAX No. 2087367089              P. 021

**BRENT**
**HILLIARD**
08/16/1966
ID: 12049



Log / Notes
August 22, 2017 10:00am
Mark Gritton, LCPC,
NCC

**Crosspointe Family Services**
**Psychotherapy Note**

**Session Date:** 08/22/2017
**Treatment Code:**
90834 Ind Psychotherapy 38-52 mins and G8427 Current Medications Documented

**Client:** BRENT HILLIARD      **D. O. B.:** 08/16/1966

| Start Time: 10:00 AM | | End Time: 10:45 AM | |
|---|---|---|---|
| If missed appointment was member contacted? | | Yes: | No: |
| How? | Phone: | Letter: | Email: |

**Provider:** Mark Gritton, LCPC, NCC

**Diagnosis Code: F33.1 Major Depressive; recurrent, moderate.**
                **F41.1 Generalized Anxiety Disorder**

**Mental Status:**

| Affect: Appropriate | Mood: Appropriate |
|---|---|
| Thought Content/Process: Appropriate | Speech: Normal Rate and Rhythm |
| Concentration: Focused | Self-Harm/Suicide Risk: None |
| Danger Risk: None | Orientation: Person, Place and Time (Times 3) |

**Who attended session:**

| Client: XX | Family: | Other: |
|---|---|---|

**I have reviewed and reconciled the medication list with the patient:** Yes __X__ No ____
Reports medication compliance.

**Problem (Current stressors and life events, therapist observations, other information ):**
Brent is stressed trying to get back to work and jumping through the hoops.

**Evidenced Based Intervention(s) used during session:**
CBT used in session.

**Patients strengths/limitations (how do these impact treatment?):**

S; Intelligent, ability use tools, medication compliant.

HILLIARD-00017

Crosspointe Family Services                    BRENT HILLIARD DOB: 08/16/1966              Page 1 of 2

OCT/25/2017/WED 03:46 PM   CrossPointe          FAX No. 2087367089          P. 022

**Progress towards treatment goals: (Progress or lack of progress towards goals, participant's reaction):**

Brent processed in anxiety and frustration. We identified CBT and DBT tools he can use to help manage the anxiety and frustration. He alos asked therapist for letter indicating he is able to return to work. His progress is good.

**Was patient referred to other providers or services?** _X_No  __Yes  If Yes:

**Any Documents Reviewed?** _x_No  __Yes

**Coordination of Care:** X_No  __Yes

**Risk Assessment?** _X_No  __Yes; Safety Plan:

**Was Patient Education provided (describe):** _X_No  __Yes  If yes:

**Next appointment:**
TBD

--Digitally Signed: 09/01/2017 10:17 am   Admin Mark Gritton, LCPC, NCC

HILLIARD-00018

OCT/25/2017/WED 03:46 PM   CrossPointe                     FAX No. 2087367089                    P. 023

**BRENT
HILLIARD**
08/16/1966
ID: 12049


# CR❂SSPOINTE
### FAMILY SERVICES

Log / Notes
August 16, 2017 10:00am
Mark Gritton, LCPC,
NCC

**Crosspointe Family Services
Psychotherapy Note**

**Session Date:** 08/16/2017
**Treatment Code:**
90834 Ind Psychotherapy 38-52 mins and G8427 Current Medications Documented

**Client:** BRENT HILLIARD    **D. O. B.:** 08/16/1966

| Start Time: 10:00 AM | End Time: 10:45 AM |
|---|---|

| If missed appointment was member contacted? | Yes: | No: |
|---|---|---|

| How? | Phone: | Letter: | Email: |
|---|---|---|---|

**Provider:** Mark Gritton, LCPC, NCC

**Diagnosis Code:** F33.1 Major Depressive; recurrent, moderate.
          F41.1 Generalized Anxiety Disorder

**Mental Status:**
N/A

**Who attended session:**

| Client: XX | Family: | Other: |
|---|---|---|

**I have reviewed and reconciled the medication list with the patient:** Yes _X__  No ___
Reports use of Cymbalta is going well; feels really good.

**Problem (Current stressors and life events, therapist observations, other information ):**
Brent reports he is frustrated with the process of returning to work. He feels others are trying to make it hard for him to return to his job at the TF Sheriff's office.

**Evidenced Based Intervention(s) used during session:**
CBT used in session.

**Patients strengths/limitations (how do these impact treatment?):**

S: Good intellect, insight, willingness to use tools

**Progress towards treatment goals: (Progress or lack of progress towards goals, participant's reaction):**

Excellent progress. Brent is using tools, maintaining medication compliance. He reports improved mood and is active in life

HILLIARD-00019

Crosspointe Family Services
BRENT HILLIARD DOB: 08/16/1966
Page 1 of 2

again. He went to a party with his wife and expressed himself. We discussed his return to work; therapist will compose a return to work letter for him.

Was patient referred to other providers or services? _X_No __Yes If Yes:

**Any Documents Reviewed?** _Z_No __Yes

**Coordination of Care:** _X_No __Yes

**Risk Assessment?** _X_No __Yes; Safety Plan:

**Was Patient Education provided (describe):** _X_No __Yes If yes:

**Next appointment:**
8/22/17

--Digitally Signed: 08/23/2017 02:36 pm Admin Mark Gritton, LCPC, NCC

HILLIARD-00020

OCT/25/2017/WED 03:47 PM   CrossPointe                    FAX No. 2087367089              P. 025

**BRENT**
**HILLIARD**
08/16/1966
ID: 12049



Log / Notes
August 9, 2017 11:00am
Mark Gritton, LCPC,
NCC

### Crosspointe Family Services
### Psychotherapy Note

**Session Date:** 08/09/2017
**Treatment Code:**
90834 Ind Psychotherapy 38-52 mins, G8427 Current Medications Documented, G8734 Elder maltreatment negative and 1036F Tobacco Non-User

**Compsych EAP**

**Client:** BRENT HILLIARD   D. O. B.: 08/16/1966

| Start Time: 11:00 AM | End Time: 11:55 AM |
|---|---|

| If missed appointment was member contacted? | | Yes: | No: |
|---|---|---|---|

| How? | Phone: | Letter: | Email: |
|---|---|---|---|

**Provider:** Mark Gritton, LCPC, NCC

**Diagnosis Code:** F11.94  Substance Induced Depressive Disorder

**Mental Status:**

| Affect: Appropriate | Mood: Appropriate |
|---|---|
| Thought Content/Process: Appropriate | Speech: Normal Rate and Rhythm |
| Concentration: Focused | Self-Harm/Suicide Risk: None |
| Danger Risk: None | Orientation: Person, Place and Time (Times 3) |

**Who attended session:**

| Client: xx | Family: | Other: |
|---|---|---|

**I have reviewed and reconciled the medication list with the patient:** Yes _X_ No ___
Brent reports he started Cymbalta and it is working well for him

**Problem (Current stressors and life events, therapist observations, other information ):**
Brent is anxious today; the sheriff wants to meet with him and his wife has a lump in her neck and is going in for a biopsy later this week. He is fearful. He voiced his apprehension about the sheriff's meeting as well. He feels others are out to get him and he fears demotion.

**Evidenced Based Intervention(s) used during session:**
CBT used in session.

HILLIARD-00021

Crosspointe Family Services                   BRENT HILLIARD DOB: 08/16/1966                Page 1 of 2

OCT/25/2017/WED 03:47 PM   CrossPointe                FAX No. 2087367089                P. 026

Patients strengths/limitations (how do these impact treatment?):

Brent is friendly and very intelligent; he does have some unwarranted fears due to his past experiences in the TF Sheriffs dept.

Progress towards treatment goals: (Progress or lack of progress towards goals, participant's reaction):

Brent is doing well; his progress is good. He processed his anxiety and fear; we reviewed tools he can use to avoid being catastrophic and expecting the worse. Therapist challenged and reframed his cognitive distortions. We again reviewed CBT Tools he can use in the moment to avoid being over reactive. He agreed to try using them during the coming week and report back his successes.

Was patient referred to other providers or services? _X_No  __Yes  If Yes:

**Any Documents Reviewed?** _x_No  __Yes

Coordination of Care: _x_No  __Yes

Risk Assessment? _X_No  __Yes; Safety Plan:

Was Patient Education provided (describe): X__No  __Yes  If yes:

Next appointment:
8/16/17

—Digitally Signed: 08/15/2017 11:50 am   Admin Mark Gritton, LCPC, NCC

HILLIARD-00022

Crosspointe Family Services                BRENT HILLIARD DOB: 08/16/1966                Page 2 of 2

OCT/25/2017/WED 03:47 PM    CrossPointe                FAX No. 2087367089                    P. 027

**BRENT**
**HILLIARD**
08/16/1966
ID: 12049


# CR SSPOINTE
## FAMILY SERVICES

Log / Notes
August 1, 2017 4:00pm
Mark Gritton, LCPC,
NCC

---

### Crosspointe Family Services
### Psychotherapy Note

**Session Date:** 08/01/2017
**Treatment Code:**
90847 Family w/patient Psychotherapy and G8427 Current Medications Documented

**Client:** BRENT HILLIARD    **D. O. B.:** 08/16/1966

| Start Time: | | End Time: | |
|---|---|---|---|
| If missed appointment was member contacted? | | Yes: | No: |
| How? | Phone: | Letter: | Email: |

**Provider:** Mark Gritton, LCPC, NCC

**Diagnosis Code: F11.94  Substance Induced Depressive Disorder**

**Mental Status:**

| Affect: Appropriate | Mood: Appropriate |
|---|---|
| Thought Content/Process: Appropriate | Speech: Normal Rate and Rhythm |
| Concentration: Focused | Self-Harm/Suicide Risk: None |
| Danger Risk: None | Orientation: Person, Place and Time (Times 3) |

**Who attended session:**

| Client: XX | Family: wife Amber | Other: |
|---|---|---|

I have reviewed and reconciled the medication list with the patient: Yes _X_  No ___
Reports medication compliance.

**Problem (Current stressors and life events, therapist observations, other information ):**
Brent had is wife Amber attend session today; he feels she does not understand what he is going through. Brent reports he has stopped all opiate use and is dealing with his pain by exercise and use of other non-medication interventions.

**Evidenced Based Intervention(s) used during session:**
CBT and psycho-education used in session.

**Patients strengths/limitations (how do these impact treatment?):**

HILLIARD-00023

Crosspointe Family Services                    BRENT HILLIARD DOB: 08/16/1966                    Page 1 of 2

S: Supportive spouse, good intellect, desire to manage depression.

**Progress towards treatment goals: (Progress or lack of progress towards goals, participant's reaction):**

Brent processed his fears and explained to Amber what he is dealing with; therapist provided psycho-education to Amber about depression and anxiety and how the use of opiates can effect a person as the end opiate use. Amber and Brent were interactive and asked questions. CBT was used to challenge and reframe cognitive distortions.

**Was patient referred to other providers or services?** _X_No ___Yes  If Yes:

**Any Documents Reviewed?** _X_No ___Yes

**Coordination of Care: X__No ___Yes**

**Risk Assessment? __No _X_Yes; Safety Plan:**
No risks identifed; Brent reports seeing his PCP weekly.

**Was Patient Education provided (describe): __No _X_ Yes** If yes:
Opiates and withdrawal issues related to pain management.

**Next appointment:**
TBD

--Digitally Signed: 08/08/2017 04:50 pm   Admin Mark Gritton, LCPC, NCC

HILLIARD-00024

OCT/25/2017/WED 03:48 PM   CrossPointe                FAX No. 2087367089                 P. 029

**BRENT**
**HILLIARD**
08/16/1966
ID: 12049


# CR SSPOINTE
## FAMILY SERVICES

Log / Notes
July 25, 2017 11:00am
Mark Gritton, LCPC,
NCC

Crosspointe Family Services
Psychotherapy Note

Session Date: 07/25/2017
Treatment Code:
90834 Ind Psychotherapy 38-52 mins

Compsych EAP Session 3 of 8

Client: BRENT HILLIARD   D. O. B.: 08/16/1966

| Start Time: 11:00 AM | End Time: 11:45 AM |
|---|---|

| If missed appointment was member contacted? | | Yes: | No: |
|---|---|---|---|

| How? | Phone: | Letter: | Email: |
|---|---|---|---|

Provider: Mark Gritton, LCPC, NCC

Diagnosis Code: F11.94  Substance Induced Depressive Disorder

Mental Status:

| Affect: Appropriate | Mood: Appropriate |
|---|---|
| Thought Content/Process: Circumstantial | Speech: Normal Rate and Rhythm |
| Concentration: Focused | Self-Harm/Suicide Risk: None |
| Danger Risk: None | Orientation: Person, Place and Time (Times 3) |

Who attended session:

| Client: XX | Family: | Other: |
|---|---|---|

I have reviewed and reconciled the medication list with the patient: Yes __X__  No ___
Reports he stopped some of his medications due to an allergic reaction (prozac); he saw Shelley and she told him to stop
taking Prozac. He stated he has been 100% off of Oycontin for the 3 days with no side effects he has been able to identify.

Problem (Current stressors and life events, therapist observations, other information ):
Brent asked to ramble today. His level of trust is increasing; he discussed his mental health history and his mother and
father's health history. Depression runs in his family. He feels his wife does not understand and just expects him to get
better. He is isolating at home. He tried to return to work unsuccessfully. He is feeling like he needs to do something, but
does not want to go anywhere.

Evidenced Based Intervention(s) used during session:

CBT used in session

**Patients strengths/limitations (how do these impact treatment?):**

S: Smart, willingness to try, desire to be normal again.

**Progress towards treatment goals: (Progress or lack of progress towards goals, participant's reaction):**

Brent processed his feelings, related family history and queried questions he struggles with. Therapist challenged and reframed his cognitive distortions. Brent is engaging is catastrophic thinking and is having some paranoia. He stated he cannot trust anyone; others are to get him. He does not like medication, yet wants to get better, his wife does not understand him, his family pretends nothing is wrong.
Therapist reflected, challenged and helped Brent identify life goals and what specifically he wants to change. He asked to bring his wife to a future session which was agreed to by therapist. His progress is minimal at present.

**Was patient referred to other providers or services?** _X_No  __Yes  If Yes:

**Any Documents Reviewed?** _X_No  __Yes

**Coordination of Care:** x__No  __Yes

**Risk Assessment?** x__No  __Yes; Safety Plan:

**Was Patient Education provided (describe):** _x_No  __Yes  If yes:

**Next appointment:**
TBD

–Digitally Signed: 08/01/2017 01:14 pm   Admin Mark Gritton, LCPC, NCC

OCT/25/2017/WED 03:49 PM   CrossPointe          FAX No. 2087367089          P. 031

**BRENT**
**HILLIARD**
08/16/1966
ID: 12049


CR✦SSPOINTE
FAMILY SERVICES

**Log / Notes**
July 19, 2017 10:00am
Mark Gritton, LCPC,
NCC

---

Crosspointe Family Services
Psychotherapy Note

**Session Date:** 07/19/2017
**Treatment Code:**
90834 Ind Psychotherapy 38-52 mins and G8427 Current Medications Documented

**Compsych EAP: Session 2 of 8**

**Client:** BRENT HILLIARD    **D. O. B.:** 08/16/1966

| Start Time: 10:10 AM | End Time: 11:10 AM |
|---|---|

| If missed appointment was member contacted? | | Yes: | No: |
|---|---|---|---|

| How? | Phone: | Letter: | Email: |
|---|---|---|---|

**Provider:** Mark Gritton, LCPC, NCC

**Diagnosis Code: F11.94  Substance Induced Depressive Disorder**

**Mental Status:**

| Affect: Anxious and Guarded | Mood: Anxious and Suspicious |
|---|---|
| Thought Content/Process: Intact/Organized and Circumstantial | Speech: Normal Rate and Rhythm |
| Concentration: Focused | Self-Harm/Suicide Risk: None |
| Danger Risk: None | Orientation: Person, Place and Time (Times 3) |

**Who attended session:**

| Client: XX | Family: | Other: |
|---|---|---|

**I have reviewed and reconciled the medication list with the patient:** Yes _X_ No ___

Reports seeing Dr. Shell on 7/18 and starting Prozac; was given RX for Xanax to address anxiety, but stated "I don't like taking medication, so I did not fill it". Reports seeing Dr. Watters and is continuing to take 1/2 tablet #10 Oxy today, Thurs and Friday, then stopping Oxy 100%.

**Problem (Current stressors and life events, therapist observations, other information ):**

Brent is still very emotional and weepy. He stated he feels his Oxy is not contributing to his depression. He discussed he did not want to come to session today; would rather avoid all social and interpersonal interactions with others and stay home and do nothing. He wants to bring his wife to session, but is not sure when "she knows about me".

Brent stated during session "I don't trust anyone, except my wife"; "people are out to get me". He asked therapist if he had ever watch the series Dexter. Brent stated he has similar ideas go through his mind, but did not elaborate as to what specific thoughts; he did allude to he is not a serial killer; but the character Dexter engages in judge, jury and executioner in the

HILLIARD-00027

Crosspointe Family Services          BRENT HILLIARD  DOB: 08/16/1966          Page 1 of 2

OCT/25/2017/WED 03:50 PM   CrossPointe        FAX No. 2087367089           P. 032

series. Brent stated he has voices in his head that talk to him; he again did not elaborate as to what the voices tell him.

**Evidenced Based Intervention(s) used during session:**
CBT used in session.

**Patients strengths/limitations (how do these impact treatment?):**

N/A

**Progress towards treatment goals: (Progress or lack of progress towards goals, participant's reaction):**

Brent processed his not trusting others and feels other "will stick in me and break it off, even at work, I trust no one!" Brent stated he does NOT have anxiety, but asked for help with dealing with anxiety symptoms. He is going to Boise with his wife and son. The son is going into the military and they are taking him to the airport; Brent does want to go. Therapist introduced CBT tools to address anxiety

**Was patient referred to other providers or services?** _X_No   __Yes   If Yes:

**Any Documents Reviewed?** _x_No   __Yes

**Coordination of Care:** _x_No   __Yes

**Risk Assessment?** __No   _X_Yes; Safety Plan:
Extreme risk of withdrawal issues; he discussed that if he becomes suicidal he will seek out a ER; he stated his wife is aware of the situation as well and he will talk with her.

**Was Patient Education provided (describe):** __No   _X_Yes   If yes:
Oxy withdrawal and effects of opiates in the brain.

**Next appointment:**
7/26/17

--Digitally Signed: 07/19/2017 03:15 pm   Admin Mark Gritton, LCPC, NCC

HILLIARD-00028

Crosspointe Family Services          BRENT HILLIARD DOB: 08/16/1966          Page 2 of 2

OCT/25/2017/WED 03:50 PM    CrossPointe          FAX No. 2087367089              P. 033

**BRENT
HILLIARD**
08/16/1966
ID: 12049



CR☉SSPOINTE
FAMILY SERVICES

Log / Notes
July 18, 2017 1:51pm
Mark Gritton, LCPC,
NCC

Crosspointe Family Services
Psychotherapy Note

**Session Date:** 07/12/2017
**Treatment Code:**
90834 Ind Psychotherapy 38-52 mins and G8427 Current Medications Documented

**Client:** BRENT HILLIARD     **D. O. B.:** 08/16/1966

| Start Time: 10:00 AM | End Time: 10:45 AM |
|---|---|

| If missed appointment was member contacted? | | Yes: | No: |
|---|---|---|---|

| How? | Phone: | Letter: | Email: |
|---|---|---|---|

**Provider:** Mark Gritton, LCPC, NCC

**Diagnosis Code:** F11.94 Substance Induced Depressive Disorder

**Mental Status:**

| Affect: Sad and Anxious | Mood: Withdrawn and Depressed |
|---|---|
| Thought Content/Process: Circumstantial | Speech: Normal Rate and Rhythm |
| Concentration: Focused | Self-Harm/Suicide Risk: None |
| Danger Risk: None | Orientation: Person, Place and Time (Times 3) |

**Who attended session:**

| Client: XX | Family: | Other: |
|---|---|---|

I have reviewed and reconciled the medication list with the patient: Yes _X__  No ___
Reports med use; unsure of meds and dosages.

**Problem (Current stressors and life events, therapist observations, other information ):**
Brent describes depression, he sits around and cries for no reason he can identify. He has no energy and lacks motivation.
He reports having back surgery several months ago and is trying to titrate off Oxycontin and his symptoms started about 6
weeks ago when he started to end use of Oxycontin.

**Evidenced Based Intervention(s) used during session:**
CBT used in session.

**Patients strengths/limitations (how do these impact treatment?):**

S: Intelligent; awareness of addiction, trying to wean self off pain meds

HILLIARD-00029

Crosspointe Family Services              BRENT HILLIARD DOB: 08/16/1966                    Page 1 of 2

OCT/25/2017/WED 03:51 PM   CrossPointe                FAX No. 2087367089                    P. 034

**Progress towards treatment goals: (Progress or lack of progress towards goals, participant's reaction):**

Discussed options for stopping pain med use. Discussed tools to help with depressive symptoms.

**Was patient referred to other providers or services?** __No   _X_Yes  If Yes:
Referred to his PCP to address pain medication management to stop using Oxycontin.

**Any Documents Reviewed?** _X_No   __Yes

**Coordination of Care:** _x_No   __Yes

**Risk Assessment?** __No   _x_Yes; Safety Plan:
High risk for continued depressive episodes to to opioid use.

**Was Patient Education provided (describe):** __No   _X_Yes  If yes:
Opioid use and withdrawal symptoms.

**Next appointment:**
TBD

--Digitally Signed: 07/18/2017 05:03 pm   Admin Mark Gritton, LCPC, NCC

HILLIARD-00030