Verizon 10:02 AM

+1 (208) 316-9438

Oct 20, 2021, 9:54 PM

1:30 Friday 2229 W. State St. Boise. We're on the corner of State and 23rd

Oct 21, 2021, 12:48 PM

Hey Jeff, this is justine. I had to leave work last night I'll. Is there anyway to do this on the phone? Or, maybe Monday. I even had to leave my car at work. So I really cannot get there today

It actually would be better on Monday

It should say ill

Monday afternoon work? Like 4:00?

Text Message

Cash

Verizon 10:02 AM

+1 (208) 316-9438

Monday afternoon work? Like 4:00?

Sorry you are not feeling well. Nothing serious I hope. Get well!

That works. See you then

Nov 4, 2021, 2:12 PM

Hello Jeff this is justine. I guess it would be best to schedule me for court in the morning after I get off work. I could be there by 830 if that works. There's really no good time for me given the hours I work. I have to share with you that I am nervous. You'll probably think it's silly but this is a bit intimidating. Thanks

Text Message

Verizon 10:02 AM

+1 (208) 316-9438

Nov 4, 2021, 2:12 PM

Hello Jeff this is justine. I guess it would be best to schedule me for court in the morning after I get off work. I could be there by 830 if that works. There's really no good time for me given the hours I work. I have to share with you that I am nervous. You'll probably think it's silly but this is a bit intimidating. Thanks

Nov 4, 2021, 3:13 PM

We can't get to you until about 10:00 Monday. I totally understand being nervous. Totally normal. Could we meet sometime Friday, Saturday and Sunday? If we meet I can make it much easier for you. We can preempt some of the

Text Message

Cash

Verizon 10:02 AM

+1 (208) 316-9438

Nov 4, 2021, 3:13 PM

We can't get to you until about 10:00 Monday. I totally understand being nervous. Totally normal. Could we meet sometime Friday, Saturday and Sunday? If we meet I can make it much easier for you. We can preempt some of the questions Pam badgered you with in your deposition. You just need to tell the jury how the GAINS test is done. I think I understand but I want to be sure. Sounds like there are standard questions mostly about background to see if Brent was psychologically vulnerable and therefore at risk of substance abuse. Unlike a blood or urine test, it measures stressors in life?

Text Message

Cash

Verizon 10:02 AM

+1 (208) 316-9438

I meant either Friday Saturday OR Sunday. Take about 1 hour to practice questions you want me to ask to make it simple to explain how test is administered

Could we do Saturday.

I also p printed some information regarding measurement s as well

It would be easiest for me to come to your office if that would be possible

Nov 4, 2021, 5:36 PM

Yes. Saturday is great. What time?

Text Message

Verizon 10:02 AM

+1 (208) 316-9438

Nov 4, 2021, 5:36 PM

Yes. Saturday is great. What time?

How about 1pm?

Nov 4, 2021, 8:18 PM

Sounds good. Thanks!

Nov 6, 2021, 12:54 PM

Jeff, I just woke up I will be there as soon as I can. So sorry. This is what I am afraid of. My schedule is so crazy. I apologizw

I will be there by 2pm. I apologize again.

Ok

Text Message

Cash

Verizon 10:03 AM

+1 (208) 316-9438

Nov 6, 2021, 12:54 PM

Jeff, I just woke up I will be there as soon as I can. So sorry. This is what I am afraid of. My schedule is so crazy. I apologizw

I will be there by 2pm. I apologize again.

Ok

Nov 8, 2021, 3:56 PM

Justine;
We need you at 8:15 to testify Tuesday morning. (Tomorrow) will you be there? Judge Dale's courtroom on 5th floor of Federal building on Fort street

Yes

Text Message

Cash

Verizon 10:03 AM

+1 (208) 316-9438

Yes

Nov 8, 2021, 5:24 PM

Thanks

Nov 18, 2021, 10:17 PM

Thank you so much Justine! You were awesome on the witness stand! You kick ass! Brent won. Your help was huge! Thanks! Jeff

Nov 22, 2021, 1:36 AM

I'm so happy to here that. I left my phone at work for the past few days so I just got this. Very happy to here this.

This made my day. Truly,

Nov 24, 2021, 5:03 AM

Text Message

Cash

Verizon 10:03 AM

+1 (208) 316-9438

Nov 18, 2021, 10:17 PM

Thank you so much Justine! You were awesome on the witness stand! You kick ass! Brent won. Your help was huge! Thanks! Jeff

Nov 22, 2021, 1:36 AM

I'm so happy to here that. I left my phone at work for the past few days so I just got this. Very happy to here this.

This made my day. Truly,

Nov 24, 2021, 5:03 AM

Good morning Jeff. I hope this doesn't wake you. I just want to thank you for the check you sent. It was both generous and kind and I am very happy with

Text Message

Cash

Verizon 10:03 AM

+1 (208) 316-9438

Nov 22, 2021, 1:36 AM

I'm so happy to here that. I left my phone at work for the past few days so I just got this. Very happy to here this.

This made my day. Truly,

Nov 24, 2021, 5:03 AM

Good morning Jeff. I hope this doesn't wake you. I just want to thank you for the check you sent. It was both generous and kind and I am very happy with the outcome of the trial.. It was good to work with you and Brent was lucky to have you for an attorney. God bless. Enjoy the holidays.

Nov 24, 2021, 8:13 AM

Text Message

Cash

Verizon 10:03 AM

+1 (208) 316-9438 >

the holidays.

Nov 24, 2021, 8:13 AM

You are the best Justine! We couldn't have done it without you! You are a good person and help more people than anyone could count. Hope you get some time to relax and enjoy peace!

I'm Driving

- Sent from My Car

Jan 20, 2022, 2:27 PM

Justine. Could you call me? Needed to find out your memory about our payment arrangements. No big deal. Just wanted your memory

Text Message

Cash

DEPOSITION EXHIBIT 41



UNITED STATES DISTRICT COURT

DISTRICT OF IDAHO

SOUTHERN DIVISION

| | |
|---|---|
| BRENT E. HILLIARD,<br>Plaintiff,<br>vs.<br>TWIN FALLS COUNTY SHERIFF'S OFFICE, et al,<br>Defendants. | Case No. 18-CV-00550-CWD<br><br>Boise, Idaho<br>August 29, 2022<br>1:36 p.m. to 3:12 p.m. |

VOLUME I OF I
MOTION HEARING
BEFORE THE HONORABLE CANDY W. DALE
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:

MR. JEFFREY J. HEPWORTH
MR. J. GRADY HEPWORTH
Hepworth Law Offices
2229 W. State Street
Boise, Idaho 83702

For the Defendants:

MS. PAMELA SIMMONS HOWLAND
MS. JENNIFER M. WALRATH
Idaho Employment Lawyers, PLLC
1116 S. Vista Avenue, No. 474
Boise, Idaho 83703

COURT RECORDER:

AMY TATE
U.S. District Court

TRANSCRIPTION BY:

TAMARA A. WEBER, CSR
P.O. Box 387
Caldwell, Idaho 83606

Proceedings recorded by electronic recording. Transcript produced by transcription service.

UNITED STATES DISTRICT COURT

DISTRICT OF IDAHO

SOUTHERN DIVISION

| | | |
|---|---|---|
| BRENT E. HILLIARD, | ) | Case No. 18-CV-00550-CWD |
| Plaintiff, | ) | |
| vs. | ) | Boise, Idaho<br>August 29, 2022<br>1:36 p.m. to 3:12 p.m. |
| TWIN FALLS COUNTY SHERIFF'S OFFICE, et al, | ) | |
| Defendants. | ) | |
| . . . . . . . . . . . . . . . | ) | |

VOLUME I OF I
MOTION HEARING
BEFORE THE HONORABLE CANDY W. DALE
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:

MR. JEFFREY J. HEPWORTH
MR. J. GRADY HEPWORTH
Hepworth Law Offices
2229 W. State Street
Boise, Idaho 83702

For the Defendants:

MS. PAMELA SIMMONS HOWLAND
MS. JENNIFER M. WALRATH
Idaho Employment Lawyers, PLLC
1116 S. Vista Avenue, No. 474
Boise, Idaho 83703

COURT RECORDER:

AMY TATE
U.S. District Court

TRANSCRIPTION BY:

TAMARA A. WEBER, CSR
P.O. Box 387
Caldwell, Idaho 83606

Proceedings recorded by electronic recording. Transcript produced by transcription service.

I N D E X


| | PAGE | LINE |
|---|---|---|
| PLAINTIFF'S ARGUMENT | 19 | 13 |
| DEFENDANTS' ARGUMENT | 7 | 7 |
| | 56 | 14 |

(Audio begins.)

CLERK: -- the Court is now in session. The Honorable Candy W. Dale presiding.

COURT: Please be seated.

CLERK: The Court will now hear Case CIV18-550-S-CWD, Hilliard versus Twin Falls County Sheriff's Office, et al. Counsel, please state your appearances for the record beginning with counsel for the plaintiff.

MR. J. HEPWORTH: Jeff Hepworth for Brent Hilliard.

MR. G. HEPWORTH: And Grady Hepworth for Brent Hilliard.

MS. HOWLAND: Pam Howland for defendants.

MS. WALRATH: Jennifer Walrath for defendants.

COURT: Well, good afternoon. This is the time we set to hear limited oral argument on two of the motions filed by the defendants post trial. The motions, there are actually six motions pending before the Court: Four of them filed by the defendants and two by the plaintiffs.

The motions of concern to the Court and on which I want to hear limited oral argument are defendants' motion for new trial or amend the judgment under Rule 59 and that's Docket No. 164. And defendants' motion for relief from judgment under Rule 60 which is Docket 166.

In reading the motions that the Court is concerned about, the motion for relief from judgment under Rule 60, again,

which is Docket No. 166, has my concern and I will acknowledge up front that that motion -- the contents of that motion and the supporting information as well as the response was the motion of heightened concern by the Court when I first reviewed it.

The other motions to set aside the judgment, motion for judgment as a matter of law, the renewed Rule 50, those appear to be somewhat replowing old ground that we had covered both before trial and during trial. But I was concerned when I read the situation -- I'll just use that word -- the situation or the circumstances surrounding the payments that were made to Justine Sweet, a primary witness in this case on liability for the plaintiff. And so that is the first issue that I would like to hear from counsel on and that is the payments made to Justine Sweet in relation to her appearance as a witness at trial and her preparation for trial and combined with the comments made by plaintiff's counsel during closing argument regarding the same.

Then also in that appears to be the focus -- the exclusive focus are the circumstances surrounding the payments to Ms. Sweet that form the basis of defendants' motion for relief from judgment under Rule 60.

The other motion, defendants' motion for a new trial or amend the judgment under Rule 59 also relies on those circumstances involving Ms. Sweet and also several other alleged instances of misconduct.

The three of concern to the Court that I'd like to hear

addressed by both sides are the following: The statement -- the statement of facts not in evidence made during closing argument and, specifically, the statements made by plaintiff's counsel asking that the jury, if they -- if the jury noticed that Mr. Hilliard experienced a PTSD event during the testimony of Dr. Tye.

The second is the statements made by plaintiff's counsel during closing argument suggesting that the jury should serve as the voice of the community and attempting to hold -- inform the jury that they would be accountable for the decision that they made to the community.

And then third of concern and as alleged by the defense counsel is the statements or arguments made by plaintiff's counsel during closing which constitute or may have constituted improper vouching for the credibility of the plaintiff. And then most specifically -- and I'm a bit paraphrasing but it was mentioned that plaintiff's counsel as well as Mr. Hilliard himself were Buhl boys, that the plaintiff was a friend -- a friend of plaintiff's counsel and that he knew that he was honest as opposed to what others were suggesting while testify at trial.

So those are the four concerns that the Court has. I should note that the circumstances regarding the payments made to Justine Sweet was not known to opposing counsel or to the jury or to the Court until after the verdict was rendered.

The three other concerns are raised by defendants' motion and their alleged misconduct claims all relate to instances that occurred during closing argument in which there was no contemporaneous objection made. And that's one of the areas, Ms. Howland, that I'd like you to focus on in your argument as to how you -- the basis under which you are asking for relief from the judgment given that you did not contemporaneously object to any of these instances of alleged conduct -- alleged misconduct and that's with the exception of the Justine Sweet situation because that was not known to you.

And then for plaintiff's counsel, I'm specifically interested in your explanation regarding the circumstances of the payments to Justine Sweet. I have some questions about the information in the affidavits of both Jeff Hepworth and Grady Hepworth for you and otherwise but I would also like to hear your explanation of the other alleged instances of misconduct as it relates to what's proper and what's not proper in a closing argument.

So with that, Ms. Howland, they are the defendants' motions so I'll ask you to proceed and, as I indicated, I tend to limit each side to 20 minutes. When I ask a question and you answer the question, that time will not be included in the 20 minutes.

So Ms. Howland, are you presenting the argument for the defendants?

MS. HOWLAND: I am, Your Honor. Thank you.

COURT: And would you like to reserve a certain amount of time for your rebuttal?

MS. HOWLAND: Sure. If I could reserve five for rebuttal.

COURT: Okay. Thank you.

MS. HOWLAND: Thank you.

Thank you, Your Honor. I'd like to start with our -- the defendants' Rule 59 motion and Rule 60 motion relating to newly discovered evidence related to perjurious testimony, fraud on the court, all related to the payments made to Justine Sweet that were discovered after the conclusion of the trial.

So this relates to false testimony by both a witness, Justine Sweet, and then plaintiff's use of that false testimony in closing to leverage an advantage.

COURT: Does the Court need to find that Ms. Sweet provided false testimony or perjured herself in order to grant you the relief that you're requesting?

MS. HOWLAND: No, Your Honor. I don't believe so. I mean I believe we've got separate tracks here. We've got separate issues. We have not just a witness with false testimony but also improper conduct by opposing counsel in knowing that there was false testimony which we know now from the declarations that were submitted in opposition to our motion as well as relying on what he knew was not correct testimony at

the time it was made and how he relied on that in closing in order to bolster Ms. Sweet's credibility.

So as the Court's well aware and as the Court noted several times during the trial, the plaintiff -- the testimony for Justine Sweet was an important part of the case and the plaintiff relied heavily on her as well as the other two local mental health counselors that Mr. Hilliard utilized.

The plaintiff relied on Ms. Sweet who was part of the GAIN assessment and she was relied upon to talk about her administration of that assessment and was a key part of the trial theme that the defendants should have allowed Mr. Hilliard to return to work because he, according to the plaintiff, was okay, was able to return to work and did not have some type of impairment or substance abuse problem.

COURT: In fact, the GAIN was the substance abuse assessment that Dr. Tye specifically requested.

MS. HOWLAND: Correct. And she was somewhat used as a comparator to Dr. Tye which is another reason that made her testimony so important to this.

As the Court's well aware, we had somewhat of a battle of experts going on in the trial. She was held out by the plaintiffs to be a comparator to Dr. Tye who was the fitness for duty psychologist and it was argued throughout the trial that she was more believable than him.

And at some point after the close of plaintiff's

evidence, we've had all these other, you know, motions -- the Rule 50 motions that have already been argued, the Court had indicated that it was Sweet who was an important basis for the Court finding that the plaintiff had shown adequate evidence of being qualified to perform his job.

So the testimony at issue involved the cross-examination where Ms. Sweet was asked if she was being paid for her testimony that day and she testified that she was not compensated beyond the $40 witness fee she received.

COURT: Just so the record's clear, the question that you asked was, "How long did you meet with the attorney for?" This is on -- this is Document 174, page 97 of 268, which I believe is the transcript. "How long did you meet with the attorney for?" You were asking her meeting with the plaintiff's counsel. She answered, "An hour." Question, "Okay." Answer, "Half as long as I met with you." Question, "Are you being paid for your testimony today?" Answer, "$40."

MS. HOWLAND: Correct. Thank you, Your Honor.

COURT: Which, yes, $40 is the statutory fee for a witness that is subpoenaed.

MS. HOWLAND: Correct. But what we know now is there really was no $40 fee. She did not get a check for $40. Instead, the check that evidence has been subsequently produced indicating is that she was given a check for $91.50. She undisputedly was not asked are you being paid on a daily rate or

are you being paid some certain amount per day. Instead, she said that it was $40. So right off the top, there's some question as to the truthfulness of Ms. Sweet's testimony based on that alone.

COURT: But wouldn't it -- isn't it a fair assumption that a person who is not a professional witness or -- yeah, is not a professional witness would understand that it was $40 per day and in fact what was tendered to her was two witness fees because it was potentially anticipated that she would testify two days and then the mileage? Isn't it fair to assume that Ms. -- Ms. Sweet took that question to be what she was being paid at that point?

MS. HOWLAND: I don't know. I don't know that that is fair to assume. I mean I guess another way to look at it would be if you got a check along with your subpoena that was for $91.50, would you really break it out into, oh, that must be a mileage rate calculated at this much per mile. I mean I think we don't know that that's necessarily what she was assuming is that it was $40 per day. We don't know now in hindsight what that related to.

COURT: So we don't know -- I mean I think what you're saying is none of us has a basis to conclude whether she was testifying falsely or intentionally testifying falsely? We know that what her testimony was wasn't that false --

MS. HOWLAND: Right.

COURT: -- because she had received $91.50 with the subpoena.

MS. HOWLAND: Correct. You're right, Your Honor. We don't know her intent. We don't know what she was thinking at the time she gave that. I mean and then there are other facts that clearly muddle it up which is she subsequently submitted an invoice for $250.

COURT: And I've never seen that invoice. Is that invoice in the record anywhere, the invoice from Justine Sweet?

MS. HOWLAND: That's a good question, Your Honor.

COURT: And Mr. Hepworth may be able to answer that for me but I've not seen that. All I saw was what appears to be an invoice from Hepworth Law Offices to you or to the Court for $250 with a check -- a copy of a check attached that's for $500. It appears to me that Ms. Sweet, after trial, received a check for $500. The plaintiffs represent that she sent an invoice which is not in the record but -- so continue. I just want to make sure that this -- the record of this hearing is as precise as we can be.

MS. HOWLAND: I understand. When I'm in my break, I'll look and we'll see if we can find it. What I recall is that the invoice was very scant on details and it appeared to -- I mean there wasn't much to it but I'll double-check.

COURT: Well, the only -- I'll tell you the only thing I have regarding Justine Sweet that's in the record. It's

Document 151-2 which is page 72 of 83 which has witness fee, Justine Sweet, $250, with a copy of a check that shows $500 payment sent to her on November 19 which was the day after the trial.

The other document is Document 151-2, page 58 of 83. So it's the same docket entry and that is the indication that she was paid $80 -- $40 per day and 10 miles at 57.5 cents per mile, 11.50. That must have been before the price of gas went sky high. 91.50. And then in the record I believe are the factual subpoenas themselves.

MS. HOWLAND: Yeah. I'm looking at -- I believe that's all that there is. I'm looking at Document 151-2, page 72 of 83. That's all -- when I referenced her invoice, that's all that's been provided to us.

COURT: Okay.

MS. HOWLAND: So we know that $40 is what she testified to. Subsequent information's been provided which I'll talk about a little bit more. But during closing argument, opposing counsel who what we now know based on the declaration testimony he submitted knew that she had given perjurious testimony when she testified she was only paid $40 but he relied upon her false testimony to bolster her credibility by arguing that she was not compensated beyond the $40 and was only testifying for notable reasons.

And he said, "Justine Sweet testified and I was

incredibly impressed with Justine Sweet. She just finished a 12-hour stint at her place of employment where she deals with drug addicts and very mentally disturbed people. She worked all night, 12 hours, and then showed up to court here for $40. She wasn't a high-paid hired gun. She was a nice lady."

So she didn't show up for $40 and the fact that he used that amount to attempt to bolster her credibility as being someone who was not paid for her time in contrast to some of the defense experts who were paid severely prejudiced the defense.

COURT: The plaintiffs have argued in their briefing that if it was an error, it was a harmless error. Can you respond to that?

MS. HOWLAND: Yes, we disagree that it was a harmless error largely because of the order that the witnesses came in. I mean I -- as I recall it, being the one who was cross-examining her, she was a bit hostile. And when she said, "I was paid $40 for this." To me, that said, okay, they're not paying these folks. That's not going to be a line of questioning that we should be heavily pursuing as to the others. So I would argue it completely changed the way cross-examination went for the mental health professionals who testified on behalf of the plaintiff. So I think that's part of it.

And then the other parts of it are that, you know, again, if you had jurors wondering who do I -- who do I believe? Was Dr. Tye -- you know, was he believable or was it Justine

Sweet? Maybe I should go with the nice lady as categorized by Jeff Hepworth who wasn't a paid hired gun.

So there are a lot of reasons, from the defense perspective it was highly prejudicial. Those are some of them. It changed the way we pursued the case.

COURT: Well, isn't it beyond that? Whether a witness is being paid either before, during or after her testimony goes to the potential bias of the witness.

MS. HOWLAND: Yep, absolutely.

COURT: And the jury's entitled to know that. That's why lawyers always want to bring that out with experts or anyone else who's testifying, correct?

MS. HOWLAND: Correct, yep.

COURT: It's required by the rules under 26 to disclose the payment arrangement for a retained expert. Where is it required for a non-retained expert?

MS. HOWLAND: Well, I think that's something we've grappled with and struggled with as we put together our arguments for this. I don't know that it is really clear. We knew in depositions that Mark Gritton was being paid because I had to write the check for it.

COURT: But isn't -- how is that relevant, what you knew about one witness over the other? To me, it's what was known about this witness and by whom.

MS. HOWLAND: Yeah.

COURT: And it appears to me that plaintiff's counsel knew a lot more than the rest of us.

MS. HOWLAND: Yep. I agree, Your Honor. I agree and, you know, the other piece of my argument is that this -- it goes counter to the purpose behind the rules. Like we have the disclosure requirements and we have, you know, a general set of Federal Rules of Civil Procedure that are fair play and based on info disclosed in advance and if this were really allowed under the rules, then everyone would do that to their witnesses. Just don't pay them. Don't have the discussion but send the check after they've testified and have them carefully prepare to testify if asked that at that moment, they haven't been written -- haven't received a check. So it stands to prejudice parties in civil litigation all across the board really.

So what we know is that plaintiff's counsel at the time that he made the argument in closing or even at the time that Ms. Sweet testified knew that -- at least someone with plaintiff's counsel -- I'm not sure which Hepworth but someone knew that the check was for more than $40 and that triggered an obligation under the Rules of Professional Conduct to correct the false testimony or at least alert the Court in some way that that needed to be corrected so that it was no longer false. And that didn't happen.

The timing is highly suspect. I mean what we know is that literally the day after the verdict was entered that a

record.

MR. G. HEPWORTH: Correct.

COURT: And again, I'm basically -- at this point, I intend to give the benefit of the doubt to Ms. Sweet that she was -- when she answered that question saying, "I was being paid $40 for being here today." I vividly recall Ms. Sweet's testimony and she did show up here and she was one of the most credible witnesses at trial. I don't think she was misrepresenting anything at that time.

My concern is how it was used in closing argument and the facts as they have -- I don't know if we can say they're facts but the circumstances that have been presented starting with November 19, the day after trial, when your firm cut a check for $500 to her.

MR. G. HEPWORTH: Yes, Your Honor. And it didn't start November 19. It started June 9 which was the first time that our firm ever met Ms. Sweet and that was for her deposition that the defendants organized. And the defendants had testified that they didn't comply with the requirements of Rule 45 and they didn't issue her statutory payment fee. And so when we have this deposition, she wasn't prepared. We hadn't talked to her. She hadn't been paid anything at the time of her deposition. In fact, at the beginning, Mr. Jeff Hepworth had to do a redirect of our own witness and ask for her phone number because we hadn't had any conversation with her.

EXHIBIT 45

**BEFORE THE PROFESSIONAL CONDUCT BOARD OF THE IDAHO STATE BAR**

| | |
|---|---|
| IDAHO STATE BAR,<br><br>Plaintiff,<br><br>v.<br><br>JEFFREY J. HEPWORTH,<br><br>Respondent. | ISB Case No. FC 23-02<br><br>**ORDER GRANTING PROTECTIVE ORDER** |

THIS MATTER came before the Chair of the Hearing Committee of the Professional Conduct Board ("Committee") on August 9, 2023, upon the Motion to Quash Subpoena Duces Tecum ("Motion") filed by third-party witness Pam S. Howland ("Howland"). The Chair took the matter under advisement, and the Committee's findings of fact and conclusions of law are set forth below. The Committee grants in part and denies in part the Motion, and issues this protective order that limits the documents and information the Respondent may seek from Howland during her deposition.

## FACTUAL BACKGROUND

On May 31, 2023, the Idaho State Bar ("ISB") filed an Amended Complaint ("Complaint") against the Respondent, Jeffrey J. Hepworth. The Complaint contains general factual allegations against the Respondent in Paragraphs 4 through 59 which involve the Respondent's conduct during a civil case in the U.S. District Court for the District of Idaho ("Court"). The Honorable Judge Candy W. Dale presided over the civil case where the Respondent and his firm represented the plaintiff and Howland and her firm represented the defendants.

At its core, the Complaint essentially alleges (1) the Respondent's firm paid witness Justine Sweet ("Sweet") $91.50 for her testimony prior to the trial, (2) the Respondent failed to correct Sweet's testimony during the trial that she was only paid $40 for her trial testimony, (3) the Respondent argued during closing arguments that the jury should believe Sweet's testimony because she only received $40 for her trial testimony as compared to other witnesses, and (4) the Respondent's firm subsequently paid Sweet $500 for her testimony immediately after the trial which was not previously disclosed to the defendants and the jury. (Complaint pp. 19-22, ¶ 49.) The Complaint also alleges the Respondent made statements to Bar Counsel that contradict his prior statements made to the Court. (*Id.* at pp. 23-24, ¶¶ 53-54.)

Based on these factual allegations, the Complaint alleges the Respondent violated the following rules of the Idaho Rules of Professional Conduct: 3.3(a)(1) (A lawyer shall not knowingly make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer); 3.3(a)(3) (A lawyer shall not knowingly offer evidence that the lawyer knows to be false. If a lawyer or a witness called by the lawyer has offered material evidence and the lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures including, if necessary, disclosure to the tribunal); 4.1(a) (A lawyer shall not knowingly make a false statement of material fact or law to a third person); 8.4(c) (It is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation); 8.4(d) (It is professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice); and 8.1 (A lawyer in connection with a disciplinary matter shall not knowingly make a false statement of material fact). (*Id.* at pp. 26-30.)

The factual allegations in the Complaint are derived almost entirely from the extensive record developed in the civil case. Specifically, Judge Dale granted the defendant's motion for a new trial based on the Respondent's conduct during and after the trial related to Sweet's testimony

regarding her compensation, and the Ninth Circuit Court of Appeals issued an order denying a motion for interlocutory appeal that agreed with Judge Dale's characterization of the Respondent's conduct. (*Id.* at p. 23, ¶ 52, pp. 24-26, ¶¶ 55-58.)

This disciplinary proceeding was initiated after Howland sent a letter to the ISB dated March 8, 2022, that alleges the Respondent's conduct during the civil case violated the Idaho Rules of Professional Conduct. (Aff. of Hepworth, Ex. 3.) Howland's letter was sent after the briefing in the civil case was closed, but before Judge Dale and the Ninth Circuit entered their decisions. Although Howland alleged the Respondent's conduct throughout the civil case violated ethical rules, the Complaint only involves the Respondent's conduct in response to Sweet's testimony regarding the amount of compensation she received for her trial testimony.

On July 26, 2023, the Respondent filed a subpoena for Howland to testify at a video deposition on August 25, 2023, at the Respondent's office in Boise, Idaho. (Subpoena to Testify at Deposition: Pamela Howland.) The subpoena also required Howland to bring the following documents to the deposition:

> 1. All invoices, requests for payment or other documents or communication wherein an expert notified you to pay them for time related to their services in the Hilliard v. Twin Falls County litigation in Federal Court, case no, 1:18-cv-00550. Please produce the records for the following experts: Ronald Tye, Mark Griffon, Shelley Wray, Justine Sweet, Dr. Heiner, Dr. Fabrice Czarnecki, and Dr. David Corey;
>
> 2. Please produce proof of all payments to the expert witnesses listed above in case no. 1:18-cv-00550 showing the payee, date paid and amount paid. Please include all payments whether for preparation, consultation, hearing, deposition, trial, phone conference, subpoena fee, travel fee, or any other type of charge.

(*Id.* at p. 2.) None of the factual allegations in the Complaint involve any of the expert witnesses listed in the subpoena other than Sweet.

Howland asks the Committee to quash the subpoena in its entirety. (Motion, p. 1.). Howland argues the information requested by the Respondent regarding the expert witnesses is irrelevant and overbroad, and subjects Howland to undue burden, because the Respondent should already have that information from the civil case. (Memo. Support. Mot. to Quash, pp. 3-5 9.) Howland believes the Respondent is barred by issue preclusion because a record was "fully developed before Judge Dale" in the civil litigation where the Respondent had an opportunity to "present and argue his side of the story." (*Id.* at pp. 7-8.) Howland also believes the subpoena was brought for an improper purpose to paint Howland as a liar because she filed a grievance against him. (*Id.* at pp. 5-6.) During the hearing Howland requested that, if she is required to attend a deposition, the Committee require the deposition to be held at a neutral location.

In response, the Respondent asks the Committee to deny the Motion. The Respondent argues "[t]he ISB has adopted Howland's assertions about violations of the rules of professional conduct, despite the fact such allegations appear to be directly contrary to both the established facts and the applicable rules." (Memo. Opp. Mot. to Quash, p. 2.) Since Judge Dale's decision was based in part on Howland's affidavits, the Respondent argues he should have an opportunity to depose Howland because her affidavits were not previously subject to cross examination. (*Id.* at p. 3.) The Respondent believes "there are several facts that Howland did not acknowledge to the [Court] pertaining to the 'falsity' and 'materiality' of the Sweet evidence at trial that are fundamental to the disputed charges against [the Respondent]." (*Id.* at p. 9 (alterations added, quotations in original).) The Respondent also believes Sweet testified truthfully at trial in response to Howland's questioning, and he "is entitled to cross examine Howland regarding any evidence she possesses in support of her allegation to the contrary." (*Id.*)

Furthermore, the Respondent argues that "cross examination is also expected to demonstrate that any compensation paid to Ms. Sweet (particularly in comparison to the other experts that were paid) was not material to the issues in dispute at trial." (*Id.*) The Respondent believes that "cross examination is expected to confirm Howland made no attempt to present the 'comparison evidence' she claims was critical and/or material evidence for the jury to consider, and that her own conduct at trial proves her post-trial allegations, which were motivated to try and get the trial reversed, were false." (*Id.* (quotations in original)) As a result, the Respondent believes that cross examining Howland will establish the following facts that are relevant and critical to this proceeding:

1. Justine Sweet was an Fed. R. civ. P. 26(a)(2)(C) witness a/k/a "non -retained witness" a/ka witnesses who do not provide a written report."

2. Hepworth Law was not required and had no legal duty to disclose to opposing counsel compensation to be paid," to a Fed. R. Civ. P. 26(a)(2)(C) expert, unlike Fed. R. Civ. P. 26(a)(2)(B) retained/report writing experts. The Rules imply compensation to 26(a)(2)(C) witnesses is not material.

3. Pamela Howland subpoenaed Justine Sweet to testify at her deposition on June 9, 2020.

4. Pamela Howland was required to tender to Justine Sweet a witness fee of $40 with the subpoena per Fed. R. Civ. P. 45.

5. Pam Howland' s deposition lasted from 2: 07 p.m. to 3: 40 p. m. (1 hour and 33 minutes).

6. Pam Howland did not ask Justine Sweet how much she charged for her deposition time in the deposition.

7. Fed. R. Civ. P. 26(b)(4)(E) provides:
   E. Payment. Unless manifest injustice would result, the Court must require that the party seeking discovery:
      i) pay the expert a reasonable fee for time spent in responding to discovery under rule 26(b)(4)(A) or (D);

8. Pam Howland violated Rule 45 and Rule 26 by not paying Justine Sweet a witness fee of $40 or a 'reasonable fee' pursuant to Fed. R. Civ. P. 26(b)(4)(E).

9. Justine Sweet did not know her rights under F. R.C. P 45 or F. R.C. P 26, and therefore did not seek compensation from either Howland or Hepworth prior or during trial.

10. On October 26, 2021 Hepworth Law subpoenaed Justine Sweet to testify on November 8, 2021 and November 9, 2021 and therefore issued an invoice to Justine Sweet, which advised Sweet she was being paid "$40" reflecting the statutory "per day" witness fee.

11. Sweet ended up testifying November 9th only. Pam Howland asked Sweet how much she was "paid" for her "testimony today," and did not ask any follow up questions.

Q: Are you being paid for your testimony today?
A: $40.00

12. At the time Sweet testified, it is reasonable to assume Ms. Sweet did not expect further compensation given the fact Howland had failed to pay her at all and Hepworth had only paid her $40 per day as required by Rule 45. Neither Howland nor Hepworth knew what Sweet believed was a "reasonable fee" when she testified on November 9, 2021 or during final argument on November 18th.

13. Howland was specifically told how much the other "mental health professionals" charged for their time. Howland chose not to present that evidence at trial even though both Dr. Dazley and Mark Gritton testified before Sweet, and she knew both Gritton and Shelley Wray (and Tye for that matter) were charging substantially greater fees for their time than was ever paid to Ms. Sweet. It also calls into question the credibility of Howland's accusations, given the erroneous allegations made to the District Court:

"Ms. Howland: Yes, we disagree that it was harmless error largely because of the order that the witnesses came in. I mean I — as I recall it, being the one who was cross- examining her, she was a bit hostile. And when she said, "I was paid $40 for this." To me, that said, okay, they' re not paying these folks. That's not going to be a line of question that we should be heavily pursuing as to the others. So I would argue it completely changed the way cross-examination went for mental health professionals who testified on behalf of Plaintiff..."

14. *See* Affidavit of Jeff Hepworth Ex. 2 at 13 1. 13- 22. [Refers to above quote]

15. Howland knew the rules required a F. R.C. P 45 payment to witnesses she subpoenaed and a F.R.C.P 26 payment from Howland to the witness she deposed or testified at trial.

16. I.B.C.R Rules 3.3(a)(1) and (a)(3) and 8.4 only applies to "knowingly... false" and "material" evidence. Sweet's testimony was not false, nor material. Hepworth' s final argument about Sweet' s motivation to show up to testify for a $ 40 Subpoena fee November 9 was true and accurately portrayed Sweet' s testimony at trial, as required by the Rules.

17. Hepworth Law complied with I.R.P. 0 3. 4 by timely disclosing to Howland the payment made to Sweet after trial.

(*Id.* at pp. 9-12 (alteration added).) During the hearing the Respondent also argued that Howland violated Rule 45, I.R.C.P. by not disclosing the compensation she paid to Sweet during her deposition. However, in response to questioning, the Respondent was unable to articulate what questions he would ask Howland during her deposition to assist with his defense.

During the hearing Bar Counsel stated that ISB does not intend to rely upon Howland's testimony during a trial other than for limited purposes such as authenticating exhibits.

ANALYSIS

After formal charges are filed, a respondent may compel the attendance of witnesses and the production of documents at a deposition in accordance with Rule 45, Idaho Rules of Civil Procedure. Rule 524(b), Idaho Bar Commission Rules ("I.B.C.R."). Discovery in formal charge proceedings is otherwise governed by the Idaho Rules of Civil Procedure. Rule 525(k)(1), I.B.C.R. The Chair shall hear and determine any attack on the validity of a subpoena issued under Rule 524(b) and any other disputes regarding the scope and other aspects of discovery. Rule 524(d) and (k)(3), I.B.C.R.

"Control of discovery is within the trial court's discretion." *Wesby v. Schaefer*, 157 Idaho 616, 621, 338 P.3d 1220, 1226 (2014). The scope of discovery is set forth in Rule 26, Idaho Rules of Civil Procedure ("I.R.C.P."):

> General Scope of Discovery. Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense, including the existence, description, nature, custody, condition, and location of any documents or other

> tangible things and the identity and location of persons who know of any discoverable matter. For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

Rule 26(b)(1)(A), I.R.C.P. By signing a discovery request, the attorney making the request certifies the request is:

> (i) consistent with these rules and warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law, or for establishing new law;
>
> (ii) not interposed for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; and
>
> (iii) neither unreasonable nor unduly burdensome or expensive, considering the needs of the case, prior discovery in the case, the amount in controversy, and the importance of the issues at stake in the action.

Rule 26(f)(1)(B), I.R.C.P.

A trial court may enter a protective order to limit or stop discovery. *Wesby*, 157 Idaho at 622, 338 P.3d at 1227 (citing Rule 26(c), I.R.C.P.). Rule 26(c) provides that:

> In General. A party or any person from whom discovery is sought may move for a protective order in the court where the action is pending, or as an alternative on matters relating to a deposition, in the court where the deposition will be taken. . . . The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:
>
> (A) forbidding the disclosure or discovery;
>
> (B) specifying terms, including time and place, for the disclosure or discovery;
>
> (C) prescribing a discovery method other than the one selected by the party seeking discovery;
>
> (D) forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters;
>
> (E) designating the persons who may be present while the discovery is conducted;

> (F) requiring that a deposition be sealed and opened only on court order;
>
> (G) requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way; and
>
> (H) requiring that the parties simultaneously file specified documents or information in sealed envelopes, to be opened as the court directs.

Rule 26(c)(1), I.R.C.P. (alteration added). Similarly, Rule 45(d) provides:

> Relief from Subpoena. The court, upon timely motion, may:
>
> (1) quash or modify the subpoena if it is unreasonable, oppressive, fails to allow time for compliance, requires disclosure of privileged or other protected matter and no exception or waiver applies, or subjects a person to undue burden; or
>
> (2) condition compliance with the subpoena upon the prepayment of the reasonable cost of producing the books, papers, documents, electronically stored information or tangible things.

Rule 45(d), I.R.C.P. The available remedies under Rule 26(c) and 45(d) overlap and are essentially the same when applied to a nonparty. *Gilmore v. Jones*, No. 3:18-cv-00017 (W.D. Va. July 1, 2021) ("Courts also consider the general discovery standards in Rule 26 when determining whether to quash or modify a subpoena directed at a nonparty.")[1].

Relevance of the requested documents and information to the requesting party's claim or defense is a significant factor to consider when deciding whether to quash a subpoena. *Virginia Department of Corrections v. Jordan*, 921 F.3d 180, 188 (4th Cir. 2019). "Relevance is not, on its own, a high bar." *Id.* Nonetheless, when deciding whether to grant a protective order in favor of a nonparty, "courts must give the recipient's nonparty status special weight, leading to an even more demanding and sensitive inquiry than the one governing discovery generally." *Id.* at 189. Besides relevance, courts consider other factors regarding whether to grant protective orders to nonparties

---

1. "[The Idaho Supreme Court] prefer[s] to interpret the Idaho Rules of Civil Procedure in conformance with interpretations of the same language in the federal rules." *Wesby v. Schaefer*, 157 Idaho 616, 621, 338 P.3d 1220, 1226 (2014) (alternations added).

including (1) the requesting party's need for the information, (2) whether the information is available to the requesting party from other sources, (3) the cost of responding to the discovery request, and (4) whether a subpoena seeks information beyond what the requesting party reasonably requires. *Id.* at 189-90. "[T]he requesting party should be able to explain why it cannot obtain the same information, or comparable information that would also satisfy its needs." *Id.* at 189 (alteration added).

The party seeking a protective order has the burden to establish that the discovery request should be limited or not permitted. *Wesby*, 157 Idaho at 622, 338 P.3d at 1227. "A party who requests a protective order to limit discovery must show good cause." *Id.* "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test." *Id.* (citing *Cipollone v. Liggett Crp., Inc.*, 785 F.2d 1108, 1121 (3d Cir. 1986)). Nonetheless, the burden to obtain a protective order is not terribly difficult to meet "if the requesting party cannot articulate its need for the information and address obvious alternative sources." *Jordan*, 921 F.3d at 189 n. 2.

In this case, Howland has shown good cause to limit the scope of discovery the Respondent may obtain through the subpoena. The scope of the Respondent's documents request is overbroad and unduly burdensome on Howland. This is not a case where the Respondent has no idea what Howland's testimony will be during the trial, nor that Howland is the only source from whom the Respondent can obtain the requested documents. To the contrary, as Howald noted, the factual allegations in this case arise from a fully developed record in the civil case where the Respondent had an opportunity to present his side of the story. The fact that the allegations in the Complaint are derived primarily from the trial record is exemplified by the Respondent's repeated responses to the allegations in his Answer to Amended Complaint ("Answer") that the record speaks for itself. (Answer at p. 3, ¶ 10, p. 4, ¶¶ 11-13, p. 6, ¶ 21-25, p. 7, ¶¶ 26-28, 29, p. 8, ¶¶ 31-33, p. 9, ¶¶

35-39, p. 10, ¶¶ 40, 42-43, p. 11, ¶¶ 44-46, p. 21, ¶¶ 47-49, p. 15, ¶¶ 57-58.) As a result, the Respondent already has access to the information Judge Dale relied upon to render her decision regarding the Respondent's conduct which the allegations in the Complaint are based. The Respondent has provided no valid justification for why all of the documents and information he is requesting has more value than what he already has. *See Gilmore*, No. 3:18-cv-00017 ("It is simply irrelevant and not likely to offer some value over and above what he already has.") (quotations omitted).

The Respondent also seeks information from Howland that is not relevant. Specifically, none of the allegations in the Complaint have anything to do with expert witnesses who testified during the civil trial other than Sweet. The conduct alleged in the Complaint only deals with how the Respondent responded to Sweet's testimony regarding her compensation. Thus, the information regarding how much any other witness received to testify at the trial or a deposition is not relevant regarding whether the Respondent responded appropriately during and after the trial regarding Sweet's compensation. The Respondent has not shown how the information requested in the subpoena is reasonably calculated to lead to the discovery of admissible evidence.

The Committee also concludes the Respondent's desire to depose Howland is motivated at least in part by an improper purpose of discrediting her for filing the complaint against him with ISB. This conclusion is supported by some of the facts the Respondent seeks to establish from Howland's deposition. Specifically, the Respondent intends to establish that Howland violated Rules 26 and 45, I.R.C.P. by not paying Sweet for her deposition testimony. (Memo. Opp. Mot. to Quash, p. 10, ¶¶ 3-8.) The Respondent also intends to discredit Howland's opinions regarding whether the amount Sweet testified that she received for her trial testimony was material when compared to the actual amount she received. However, Howland's opinions regarding the materiality of the payment Sweet received are irrelevant to the Respondent's defense because it is

the Committee's role to determine whether the Respondent violated the Idaho Rules of Professional Conduct. Additionally, as stated above, the Respondent already has much of the information he requests from Howland. As a result, the Respondent's subpoena and subsequent explanations suggest he is merely trying to shift the blame to Howland and discredit her judgment without providing any cogent justification for how this will assist his defense or be reasonably calculated to lead to the discovery of admissible evidence.

Nonetheless, the Committee does not find that Howland has established good cause to entirely quash the subpoena. The Respondent makes a valid point that he should be able to cross examine Howland regarding her affidavits submitted in the civil case upon which Judge Dale relied when making her decision. The Respondent should also be able to ask Howland about her knowledge of Sweet's compensation. As a result, the Committee will not prevent the Respondent from deposing Howland within this limited scope of inquiry.

Consequently, it is ordered that Howland shall only be required to produce the documents requested in the subpoena that relate to Sweet, and Howland does not have to provide documentation regarding the other witnesses listed. The scope of questioning during Howland's deposition shall be limited to the statements made in her affidavits filed in the civil proceeding, and Howland's knowledge of Sweet's compensation in the civil case. Howland is not required to answer questions regarding other matters. The deposition shall occur at a neutral location or by Zoom, and it shall not be recorded by video.

## CONCLUSION

For the reasons set forth above, the Committee grants in part and denies in part the Motion, and issues this protective order that limits the documents and information the Respondent may seek from Howland during her deposition.

DATED August 10, 2023.

THOMAS D. SMITH, Chair
Professional Conduct Board

CERTIFICATE OF MAILING

I hereby certify that on the 16th day of August, 2023, I served a true and correct copy of the foregoing *proposed* Order Granting Protective Order to the following recipients by email directed as follows:

Joseph N. Pirtle
Idaho State Bar
jpirtle@isb.idaho.gov

Caralee A. Lambert
Idaho State Bar
clambert@isb.idaho.gov

Jeffrey J. Hepworth
jhepworth@idalawyer.com

Kara Heikkila
kheikkila@workwith.com

Thomas D. Smith, Chair
Professional Conduct Board

Hon. Mark T. Monson
Professional Conduct Board

Sherry Montosa
Professional Conduct Board

Clerk
Professional Conduct Board